UNITED STATES UNITED BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

In re:  
Chapter 13  
Case No. 21-42857-jmm

EVIS NEVERLANE STEPHENS,

          Debtor.

---

EVIS NEVERLANE STEPHENS,       Adv. Pro. No. 22-01037-jmm

          Plaintiff,

     v.

MAXINE BONAPARTE, LEZANTONIO WOODBURN,
12706 HOLDINGS, INC., CHARLES L. MESTER, ESQ.,
PLANET MANAGEMENT GROUP, LLC,
PLANET HOME LENDING LLC dba
PLANET HOME SERVICING,
WILMINGTON SAVINGS FUND SOCIETY, FSB (WSF),
VERUS SECURITIZATION TRUST 2020-NPL1,

          Defendants.

## **STATEMENT OF MATERIAL FACTS PURSUANT TO RULE 7056-1**

PURSUANT to Local Bankruptcy Rule 7056-1, *pro se* defendant CHARLES L. MESTER, ESQ. ("**Mester**") submits this Statement of Material Facts in support of his motion for summary judgment (the "**Summary Judgment Motion**") against Plaintiff Evis Neverlane Stephens ("**Stephens**"). Each fact is supported by admissible evidence as cited below:

    1.    The Revised Second Amended Complaint is the applicable pleading by Stephens against Mester in this Adversary Proceeding. (ECF Doc. No. 93).

    2.    The Revised Second Amended Complaint contains eight (8) causes of action against Mester, as follows:

        First Cause of Action – Cancellation of Deed;

Second Cause of Action – Recission of Equity Purchase Contract, et al.;

Fifth Cause of Action – Violation of NY GBL §349;

Seventh Cause of Action – Fraud;

Eighth Cause of Action – Breach of Fiduciary Duty;

Eleventh Cause of Action – Violation of RICO, 18 U.S.C. §1962(c);

Twelfth Cause of Action – Conspiracy to Violate RICO, 18 U.S.C. §1962(d);

Nineteenth Cause of Action – Legal Malpractice

3. The Answer to Revised Second Amended Complaint is the applicable pleading by Mester against Stephens in this Adversary Proceeding. (ECF Doc. No. 98).

4. Other defendants in the Adversary Proceeding include Maxine Bonaparte ("**Bonaparte**"), Lezantonio Woodburn ("**Woodburn**"), and 12706 Holdings, Inc. ("**Holdings**").

5. Stephens has no evidence regarding her allegation in the Revised Second Amended Complaint that Mester represented Bonaparte. (Tr. at 180-183).

6. Stephens has no evidence regarding her allegation in the Revised Second Amended Complaint that Mester represented Woodburn. (Tr. at 180-183).

7. Stephens has no evidence regarding her allegation in the Revised Second Amended Complaint that Mester represented Holdings. (Tr. at 185, 197).

8. Stephens has no evidence regarding her allegation in the Revised Second Amended Complaint that Mester is an owner of Holdings. (Tr. at 184-185, 197).

9. Holdings is a domestic corporation duly filed with the State of New York on June 20, 2018. (A copy of the corporate filings for Holdings is annexed to the Mester Declaration as Exhibit "____").

10. According to the formation papers, including the Certificate of Incorporation executed by Woodburn on June 20, 2018, all the shares of Holdings are owned by Woodburn, thereby making Woodburn the sole shareholder of Holdings. *Id.*

**BACKGROUND AS TO THE PURCHASE OF STEPHENS' RESIDENCE**

11. On or about 2006, about twelve (12) years before she ever heard of or met Mester for the first time, Stephens became a straw buyer involving multiple residential properties by a group controlled by an individual named Osmond Decoteau ("**Osmond**"), a person who ultimately was arrested and indicted for crimes involving real estate fraud in connection with multiple properties ("**Osmond Fraud**"). (A certified copy of Osmond's Indictment and Arrest is annexed to the Mester Declaration as Exhibit "____").

12. During her deposition, Stephens portrayed herself as a victim of Osmond's Fraud by vehemently denied knowing that she was fraudulently purchasing various real properties, but the facts show her name and signature on multiple recorded documents related to recorded deeds, as well as multiple mortgage documents showing she borrowed hundreds of thousands of dollars. She testified seeing a lot of houses and signing a lot of papers, but not knowing what she was doing. When shown the various documents at her Deposition, Stephens did not dispute that those signatures with her name were genuine. (Tr. at 23, 28-29, 31-32, 42, 45, 52-54 and at Exhibit "B", "C", "D"; ECF Doc. 93 at ¶20).

13. Many of Stephens' signatures were notarized by Marisol Vasquez ("**Vasquez**"), whom she does not remember. (Tr. 34-35, 44).

14. Vasquez was the same notary that notarized the documents when she purchased her Residence. (Tr. at 90).

3

15. When asked about her signature on a transfer document related to 844 East 34th Street, Brooklyn, NY, she testified, as follows:

> Q. Is that your name at the bottom of that document?
>
> A. Of course that's my name.
>
> Q. Is that your signature at the bottom of the document?
>
> A. Could be.
>
> Q. Does it look like it?
>
> A. Yeah, but what I'm trying to say is my signature here, I don't know when I bought the house. I don't know what went on. My first time buying a house, and there's a lot of papers that was signed. And I don't know. This thing went to the district attorney.
>
> (Tr. at 31 and at Exhibit "B")

16. Eventually, Stephens was contacted by the FBI, and the District Attorney came to see Stephens in connection with her relationship with Osmond. Stephens did not get arrested or indicted in connection with the Osmond Fraud. (ECF Doc. 93 at ¶20; Tr. at 31).

17. In 2006, two of the various properties purchased and mortgaged by Stephens as a result of the Osmond Fraud were (i) 1487 East 53rd Street, Brooklyn, New York ("**1487**"); and (ii) 844 East 34th Street, Brooklyn, New York ("**844**") (Tr. at 31, 58.

18. Also in 2006, Stephens identified 12706 177th Street, Jamaica, New York as the only property that she admitted intentionally buying with Osmond's assistance since she eventually moved into this property as her residence ("**Residence**"). (Tr. at 66-67, 82-83

19. Stephens paid $615,000 for her Residence and obtained a $630,000 mortgage from Novastar Mortgage, Inc. ("**Novastar**") ("**Mortgage**"). She testified that she used about $20,000 of her own money to purchase the Residence. (Tr. at 71-72, 80, 89 Exhibits "F" and "G")

20. At the closing for the purchase of her Residence, Stephens sat at a conference table and signed many papers where her lawyer told her to sign. She did not ask any questions since she relied on her attorney at the closing to help her buy her Residence. She also was not prevented from asking questions. (Tr. at 92-94)

## STEPHENS' MORTGAGE DEFAULT

21. Novastar eventually assigned the Mortgage to Deutsche Bank National Trust Company, as Trustee under Novastar Mortgage Funding Trust, Series 2006-5 ("**Deutsche Bank**"), who retained Ocwen Loan Servicing, LLC ("**Ocwen**") to service the Mortgage against the Residence. (ECF Doc. 93 at ¶22; Tr. At 105).

22. The Residence was the only property purchased through Osmond that she initially made mortgage payments. (Tr. 100, 104).

23. Stephens has no records related to any mortgage payments for the Residence and refuses to search for any records. (Tr. 101-102).

24. In 2008, within two years of purchasing her Residence, she began falling behind on the Mortgage payments due to medical reasons and a surgery. (Tr. 106)

25. On or about 2010, while behind on her Mortgage payments, Stephens sought (without counsel) and obtained a loan modification through Ocwen ("**Loan Modification Agreement**"). (Tr. 112, 116-118 and at Exhibit "H").

26. On or about 2010, Stephens met John Clark ("**Clark**"), a purported unlicensed paralegal, who promised to help Stephens remove the mortgages and her ownership connected to the properties involved in the Osmond Fraud. (ECF Doc. 93 at ¶23; Tr. at 49).

27. Stephens signed many papers with Clark and going to court with him in an effort to remove these properties from her name related to the Osmond Fraud. (Tr. at 47).

5

28. On or about 2012, Clark also advised Stephens to stop paying the Mortgage and convinced her she would be able to fight the Mortgage in court to remove the lien against the Residence due to possible "robo signing" by Novastar. (Tr. 113, 118-119).

29. Stephens believed if she followed Clark's advice, she would be rewarded with ownership of her Residence free of the Mortgage. (Tr. 119-121).

30. On or about June 2012, Stephens listened to Clark and stopped making her Mortgage payments on the Residence. (Tr. 123).

31. Stephens never made any further payments towards her Mortgage after taking Clark's advise to stop payments. (Tr. 123, 126, 128).

**COMMENCEMENT OF FORECLOSURE ACTION AGAINST THE RESIDENCE**

32. On or about May 2015, Deutsche Bank commenced a mortgage foreclosure action ("**Foreclosure Action**") against Stephens for failure to make any Mortgage payments under the Loan Modification Agreement as of June 1, 2012. (Tr. at Exhibit "N").

33. On or before October 17, 2016, Clark referred Stephens to attorney Franklin Rouse, Esq. ("**Rouse**") to represent her in the Foreclosure Action. (Tr. 114-115, 339).

34. On October 17, 2016, Rouse signed a Notice of Appearance for Stephens in the Foreclosure Action and filed a copy with the Queens County Clerk. (A copy of the Notice of Appearance is annexed to the Mester Declaration as Exhibit "_____").

35. Stephens met with Clark many times and signed a lot of papers prepared by Clark, although Stephens did not know what she was signing. For example, Stephens had no idea she signed papers giving Clark ownership of some of the properties involved in the Osmond Fraud. (Tr. 325).

36. Stephens also met with Rouse many times, some of those in the courthouse in relation to the Foreclosure Action. (Tr. 280)

37. Rouse was not effective in opposing the Foreclosure Action and unable to secure a decision in Stephen's favor that would have dismissed the Foreclosure Action and terminated the Mortgage lien against her Residence. (Tr. at Exhibit "Q").

38. Mester never replaced Rouse as the attorney for Stephens in the Foreclosure Action. (Tr. 142, 339).

## **CLARK REFERRED TO STEPHENS TO BONAPARTE**

39. Stephens was introduced to Bonaparte through Clark's nephew. (Tr. 130).

40. At her first meeting with Bonaparte, Bonaparte told Stephens that the best way for her to save her house would be to put the Residence into the name of Maxine's friend Tony to stop the Foreclosure Action and prevent the Residence from being sold at public auction. (Tr. 131-133).

41. "Tony" is the same person as defendant Woodburn. *Id.*

42. Stephens fully understood that a deed would need to be signed by her in order to transfer the Residence into Woodburn's name. *Id.*

43. Bonaparte also explained to Stephens that the sale to Woodburn would only be temporary in that after the sale and transfer of the Residence to Woodburn she and her family could remain as occupants for up to two years and pay about $2,500 towards Woodburn's new mortgage on the Residence while her husband or family member attempted to qualify for a new mortgage to later refinance and buy back the house. (Tr. 131, 198, 201-202)

44. Bonaparte told Stephens that Bonaparte needed to negotiate a lower amount for the Mortgage payoff since the present value of the Residence was less than the amount of arrears accumulated under the Mortgage. (Tr. 164-165, 305).

45. Stephens agreed to rely on Bonaparte to value the Residence and do all the negotiations and paperwork with Ocwen to get the Residence sold so she could pay off the Mortgage and save her house. (Tr. at 165).

46. Stephens understanding of saving her house meant saving it from losing it in a foreclosure auction. (Tr. 159-160).

47. As part of her agreement with Bonaparte, Stephens authorized Bonaparte to begin negotiating with Ocwen as her agent to obtain approval for a short sale of the Residence to Woodburn. ("**Short Sale Transaction**").

48. On or about July 11, 2018, Stephens signed a contract of sale ("**Contract of Sale**") to sell the Residence to Holdings and authorized Bonaparte to begin negotiating with Ocwen as her agent to obtain approval for the Short Sale Transaction. (Tr. at 188-193; Exhibit "J").

49. The Contract of Sale was signed by Stephens, as Seller, and Woodburn on behalf of Holdings, as Purchaser. (Tr. at 188-193).

50. The Contract of Sale does not list an attorney for Stephens or Woodburn. (Tr. at 188-193).

51. At subsequent meeting with Bonaparte, Bonaparte also suggested that Stephens let Bonaparte try to do some legal work involving the 1487 and 844 properties to help raise extra money for Stephens that she could later use when refinancing Holding's mortgage it needed to obtain against the Residence to pay off the Mortgage in the Short Sale Transaction. (Tr. 136)

52. Stephens agreed to allow Bonaparte to handle everything having to do with the transfer of the Residence as well as the 1487 and 844 properties involved in the Osmond Fraud. (Tr. 311)

53. Stephens did not care about the properties involved in the Osmond Fraud – she only cared about not losing the Residence in a foreclosure auction, but had no opposition to Bonaparte trying to extract money from those properties to help her later buy back the Residence from Woodburn. (Tr. 327).

### **STEPHENS FIRST MEETING WITH MESTER**

54. To accomplish the above strategies, Bonaparte knew that Stephens required a real estate attorney.

55. Mester is an attorney duly licensed to practice law in the State of New York.

56. Bonaparte had worked with and referred Mester to other property owners and purchasers in past complicated and creative real estate litigations and transactions. (ECF No. 93 at ¶25).

57. Bonaparte subsequently set up an initial consultation with Mester for her and Stephens to attend.

58. At the time of the Mester Consultation, Stephens was still in arrears on her Mortgage and waiting for Rouse to inform her if the court was going to auction her Residence. (Tr. 141-142).

59. On September 21, 2018, Bonaparte drove Stephens to Mester's law office for an initial consultation ("**Mester Consultation**"). During the Mester Consultation, Bonaparte and Stephens explained the litigation strategy Bonaparte and Stephens previously discussed involving 1487 and 844. (Tr. 140).

60. During the Mester Consultation, Bonaparte and Stephens also explained and discussed with Mester the proposed Short Sale Transaction for the Residence. (Tr. 140).

61. During the Mester Consultation, Stephens informed Mester that Bonaparte would be handling all the Short Sale negotiations and coordinating the details with Woodburn and Woodburn's attorney.

62. During the Mester Consultation, Stephens informed Mester that Bonaparte would be providing Mester with all necessary documentation and information needed to represent Stephens.

63. During the Mester Consultation, it was agreed that any legal fee being paid to Mester to perform litigation involving 1487 and 844 would be provided by Bonaparte since Stephens had no money or desire to obtain clear ownership of those properties involved in the Osmond Fraud.

64. During the consultation, Mester discussed helping Stephens through a litigation strategy in an effort for Stephens to regain ownership and clear title on 1487 and 844 so Stephens could sell them and raise capital to assist her and her husband in repurchasing her Residence at a later date after the Short Sale Transaction (the "**Litigation**"). (A copy of Mester's notes taken during the Mester Consultation regarding the Litigation is annexed to the Mester Declaration as Exhibit "____".

65. Stephens did not care about the Litigation. She only cared about the Residence. (Tr. at 327).

66. The strategy discussed during the Mester Consultation would be for Mester to conduct the Litigation while Bonaparte continued to negotiate the Short Sale Transaction for the

Residence to allow Woodburn to pay off the Mortgage and end the Foreclosure Action, thereby preventing Stephens from losing her home as a result of a foreclosure auction.

67. During the Mester Consultation, Mester prepared a Legal Engagement Agreement for both Stephens and Bonaparte to review and sign ("**Engagement Letter**"). (Tr. at Exhibit "I").

68. The Engagement Letter described legal services Mester agreed to perform on behalf of Stephens involving the Litigation and legal services Mester agreed to perform on behalf of Stephens involving the Short Sale Transaction of her Residence. *Id.* at Page 2 (Tr. 149-150)

69. As is common in most lawyer engagement letters, the Engagement Letter also discussed fees that Mester would charge Stephens to perform the Litigation and Short Sale Transaction. *Id.* at Pages 1-2.

70. As is common in most lawyer engagement letters, the Engagement Letter required a retainer deposit. The Engagement Letter required "an initial retainer in the sum of $10,000 (the "**Retainer**") on account of each of the legal services for each litigation" and that "[t]here will be no appearance made on the court's record until the full Retainer has been paid…." *Id.* at Page 3.

71. The Engagement Letter informed Stephens that any statements made to Stephens "are expressions of opinion only and should not be construed as promises or guarantees". *Id.* at Page 3.

72. Since Stephens was relying on Bonaparte to do everything including, but not limited to, paying Mester for the Litigation and negotiating the Short Sale Transaction, an additional paragraph was added to the Engagement Letter informing both Stephens and Bonaparte that Mester may communicate with Bonaparte on all matters of engagement without violating an attorney-client privilege afforded to Stephens (Tr. 156-157):

YOU AGREE THAT ATTORNEY MAY COMMUNICATE WITH ONE OR BOTH OF YOU ON ALL MATTERS RELATED TO YOUR REPRESENTATION AND SUCH COMMUNICATIONS SHALL NOT BE A VIOLATION OF PRIVILEGE AND BE ACCORDED FULL ATTORNEY-CLIENT PRIVILEGE AND REMAIN CONFIDENTIAL AS FULLY AS THE LAW ALLOWS.

*Id.* at Page 4.

73. Stephens understood the above paragraph to mean that Mester could speak with Bonaparte alone or with both Stephens and Bonaparte. (Tr. 146-147).

74. Stephens did not read the Engagement Letter and was not prevented from reading the Engagement Letter or asking questions. (Tr. 144).

75. Both Bonaparte and Stephens signed the Engagement Letter during the Mester Consultation in which they both acknowledged and agreed with the terms contained therein.

## EVENTS AFTER THE MESTER CONSULTATION

76. Mester was never paid the Retainer and, therefore, did not perform any of the Litigation as specified in the Engagement Letter.

77. Bonaparte and Mester continued to communicate after the Mester Consultation regarding the Short Sale Transaction.

78. Stephens relied on Bonaparte to keep in touch with both her and with Mester. (Tr. at 156-157).

79. On or about March 8, 2019, Bonaparte obtained approval from Ocwen to sell the Residence to Holdings in which Ocwen would receive $337,500. (Tr. at Exhibits "T and "Y")

80. On or about March 12, 2019, Bonaparte informed Mester of the identity of Woodburn's attorney, that being Anthony S. Chilliest, Esq. ("**Chilliest**").

81. Chilliest eventually informed Mester of the title insurance company who would be involved in insuring and closing the Short Sale Transaction, that being United American Title Agency ("**Title Company**"), and forwarded Mester a copy of the title report for review.

82. Mester, Chilliest and the clearance officer from the Title Company worked on clearing all title issues so the closing for the Short Sale Transaction could be scheduled.

83. Mester cleared all title issues so Stephens could sell the Residence in the Short Sale Transaction.

84. There was no further communication between Mester and Stephens until March 27, 2019, which is when they saw and spoke with each other at the scheduled short sale closing of the Residence to Woodburn (the "**Closing**").

## THE CLOSING

85. The Closing was scheduled by Chilliest to occur at the office of Anokye Blissett, Esq. ("**Blissett**"), 101-05 Lefferts Boulevard, Suite 207, S. Richmond Hill, New York.

86. Blissett was the notary public and agent for the Title Company.

87. On March 27, 2019, Stephens was picked up and driven to the Closing by Maxine and Woodburn where she met up with Mester.

88. At the Closing, Woodburn met up with his attorney Chilliest.

89. Stephens acknowledged she was heavily in arrears with Mortgage debt on the day of Closing of over $600,000. (Tr. at 161).

90. On the day of the Closing, Stephens knew she would be transferring ownership of her Residence to Woodburn. (Tr. at 157).

91. On the day of the Closing, Stephens knew the money being used to pay her Mortgage was coming from a new loan being provided to Woodburn. (Tr. at 321).

92. For approximately 2+ hours, Mester explained and assisted Stephens in showing her where to sign the paperwork required to complete the Short Sale Transaction of the Residence to Woodburn/Holdings. (Tr. 171).

93. During the Closing, Chilliest assisted Woodburn in showing him where to sign the paperwork required to complete the Short Sale Transaction of the Residence from Stephens to Holdings.

94. During the Closing, Blissett notarized the documents signed by Stephens and Woodburn on behalf of the Title Company.

95. Various checks and wires were generated in accordance with the HUD-1 Settlement Statement ("**HUD-1**") including, but not limited to, funds required to pay the Mortgage and pay Mester. (Tr. at Exhibits "T" and "U")

96. Mester was paid $5,000 for his work towards representing Stephens in the Short Sale Transaction, such amount being fully disclosed on the HUD-1. (A copy of the closing fee to Mester is annexed to the Mester Declaration as Exhibit "____").

97. At the Closing, Stephens signed various documents including, but not limited to, the HUD-1 and the deed and ancillary documents transferring the Residence to Holdings.

98. At the Closing, Stephens confirmed to Mester that she will continue occupying the Residence and pay Woodburn/Holdings $2,500 while her husband Calvin Stephens ("**Calvin**") or another family member would try to qualify to later purchase the Residence back from Woodburn/Holdings through a mortgage refinance.

99. At no time did Stephens ask any questions or make any effort to cancel the Closing or leave the conference room at any time during the Closing. When the Closing concluded, Stephens left with Maxine and Woodburn.

## POST-CLOSING EVENTS

100. Chilliest wired the funds to Ocwen to pay off the Mortgage in accordance with the approval negotiated by Bonaparte for the Short Sale Transaction. (Tr. at Exhibit "U")

101. Deutsch Bank arranged for its attorneys to discontinue the Foreclosure Action after the Closing after Ocwen received the funds from Chilliest to pay the Mortgage. (Tr. at Exhibit "V" and "W".

102. Deutsch Bank arranged for the Mortgage lien to be removed by recording a Release with the Office of the Queens County Register. (Tr. at Exhibit "S").

103. Stephens understands that her Mortgage was paid off at Closing through a new mortgage loan taken out by Woodburn. (Tr. 321, 343).

104. After the Closing, Stephens was driven home to her Residence by Bonaparte and Woodburn where she continued to reside with her husband Calvin Stephens ("**Calvin**") and other family members.

105. Stephens never met with Mester after the Closing.

106. Stephens never called to schedule an appointment with Mester after the Closing. (Tr. at 176).

107. Stephens never spoke with Mester again after one phone call that allegedly Mester recommended that she continue to pay her rent to Woodburn. (ECF Doc. 93 at ¶31).

108. Stephens acknowledged that Mester was not assisting Woodburn or Bonaparte in managing the Residence after Closing. (Tr. at 205).

109. Stephens acknowledges payment to Bonaparte and Woodburn of $2,500 towards Woodburn's mortgage for an unspecified number of months post-closing. (Tr. at 202, 329).

110. Stephens acknowledges that she and Calvin signed an Occupancy Agreement provided to her by Bonaparte and Woodburn, dated January 1, 2020, requiring Stephens, Calvin, and any other occupant residing in the Residence ("**Occupants**") pay Holdings the sum of $1,500 each month until April 1, 2022 and that if the Occupants are unable to purchase the Residence within two (2) years, the Occupants would move from the Residence. (ECF Doc. 93 at ¶33; Tr. at 297, 330, and at Exhibit "X").

111. On or about November 25, 2020, the Occupants sued Woodburn and Bonaparte in the Housing Part of the Queens County Civil Court for harassment ("**HP Action**"). (Tr. at Exhibit "K").

112. Occupants admit in the HP Action that Woodburn is her landlord and Bonaparte is his manager. (Tr. at Exhibit "K")

113. Stephens admits that she did not allege or complain within the HP Action that anyone stole her Residence or that she was entitled to ownership of the Residence. (Tr. at 209-212).

## MISCELLANEOUS FACTS

114. Stephens wants Woodburn/Holdings to return the Residence to her simply because he promised to do so. (Tr. at 213).

115. Stephens admits that "saving her house" meant saving it from losing it in foreclosure. (Tr. 159-161).

Dated: October 24, 2025

                CHARLES L. MESTER, ESQ.
                Defendant *Pro Se*
                225 West 34th Street – 9th Floor
                New York, New York 10122
                917-608-6462

                /s/ *Charles L. Mester*
                _____
                By: Charles L. Mester, Esq.
                E-Mail: CMester@CharlesMester.com