UNITED STATES UNITED BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

_____

In re:

EVIS NEVERLANE STEPHENS,

                Debtor

_____

EVIS NEVERLANE STEPHENS,

                Plaintiff,

       v.

MAXINE BONAPARTE, LEZANTONIO WOODBURN,
12706 HOLDINGS, INC., CHARLES L. MESTER, ESQ.,
PLANET MANAGEMENT GROUP, LLC,
PLANET HOME LENDING LLC dba
PLANET HOME SERVICING,
WILMINGTON SAVINGS FUND SOCIETY, FSB (WSF),
VERUS SECURITIZATION TRUST 2020-NPL1

                Defendants

_____

Chapter 13
Case No. 21-42857-jmm

Adv. Pro. No. 22-01037-jmm

## <u>MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT PURSUANT TO FRCP 56 AS AGAINST PLAINTIFF EVIS NEVERLANE STEPHENS</u>

**CHARLES L. MESTER, ESQ.** ("**Mester**")**,** a *pro se* defendant in the above-captioned

adversary proceeding, respectfully submits this memorandum of law for the entry of an Order

pursuant to Rule 56 of the Federal Rules of Civil Procedure, made applicable by Rule 7056 of

the Federal Rules of Bankruptcy Procedure, granting summary judgment in favor of Mester and

against Plaintiff Evis Neverlane Stephens ("**Stephens**") by dismissing the remaining causes of

action against Mester as plead in the Revised Second Amended Complaint, dated February 22,

2024 (ECF No. 93)[1] as a matter of law, and for such other and further relief as may be deemed just, proper, and equitable ("**Summary Judgment Motion**").

<u>**PROCEDURAL HISTORY**</u>

The instant action and original complaint was commenced on May 9, 2022 by Stephens against Charles L. Mester, Esq. ("**Mester**"), Maxine Bonaparte ("**Bonaparte**"), Lezantonio Woodburn ("**Woodburn**"), and 12706 Holdings, Inc ("**Holdings**") ("**Original Complaint**") (ECF No. 1). The Original Complaint had eighteen (18) causes of action, all premised on Stephens being a "tragic victim of a foreclosure rescue scam engineered by the defendants" (ECF No. 1 at First Sentence of Brief Introduction on Page 1) and a pattern of unlawful racketeering activity in which all defendants "conspired with one another to defraud Ms. Stephens and her family members" of the ownership of her home *Id.* at ¶10.

On August 3, 2022, pursuant to FRCP 12(b)(6), Mester moved to dismiss each and every cause of action alleged against him in the Original Complaint ("**Mester 12(b)(6) Motion**") (ECF No. 13).

Prior to a determination of the Mester 12(b)(6) Motion, Stephens received leave of court to amend her Original Complaint and added additional defendants and causes of action, some of which were against Mester **("Amended Complaint**"). (ECF No. 28).

The Court subsequently ruled that Mester could supplement the Mester 12(b)(6) Motion to address the new causes of action against him in the Amended Complaint. (ECF No. 35), which supplemental brief Mester filed on January 26, 2023 (ECF No. 41).

---

[1] Citations to "ECF No. []" are to documents filed on the docket of this adversary proceeding.
Citations to Tr. are to the transcript of the deposition of Stephens held on June 3, 2025 and July 30, 2025. A copy of the transcript and its exhibits has been filed as part of ECF No. 150.

On March 23, 2023, the Court issued its Memorandum Decision granting Mester's 12(b)(6) Motion in part and denying the motion in part ("**Decision**") (ECF. No. 54). In sum, out of the mis-labeled twenty-one (21) causes of action in the Amended Complaint, the Decision dismissed twelve (12) of them as against Mester.

Mester subsequently filed an Answer to the Amended Complaint. (ECF No. 57).

Stephens ultimately filed a Second Amended Complaint ("**Second Amended Complaint**") and rearranged the twenty-one (21) causes of action from the Amended Complaint into twenty-two (22) causes of action (ECF No. 90). In addition, Stephens failed to file with the Second Amended Complaint any of the fourteen (14) exhibits attached to the Amended Complaint even though the pleading continued to reference those same exhibits.

Prior to Mester answering the Second Amended Complaint, Stephens filed her final pleading, that being a Revised Second Amended Complaint ("**Revised Second Amended Complaint**") referencing the exhibits from the Amended Complaint (ECF No. 93).[2]

The Revised Second Amended Complaint contains eight (8) causes of action against Mester, as follows:

> First Cause of Action – Cancellation of Deed;
>
> Second Cause of Action – Recission of Equity Purchase Contract, et al.;
>
> Fifth Cause of Action – Violation of NY GBL §349;
>
> Seventh Cause of Action – Fraud;
>
> Eighth Cause of Action – Breach of Fiduciary Duty;
>
> Eleventh Cause of Action – Violation of RICO, 18 U.S.C. §1962(c);
>
> Twelfth Cause of Action – Conspiracy to Violate RICO, 18 U.S.C. §1962(d);

---

[2] For purposes of this Summary Judgment Motion, Mester will assume the Revised Second Amended Complaint properly incorporated the exhibits filed with the Amended Complaint.

Nineteenth Cause of Action – Legal Malpractice

Mester filed an answer to the Revised Second Amended Complaint (ECF No. 98). The Revised Second Amended Complaint is the final pleading filed by Stephens and is the pleading in which Mester seeks dismissal of the remaining eight (8) causes of action against him in this Summary Judgment Motion.

Thereafter, among other things, the Parties conducted discovery and Stephens sat for an oral deposition on June 3, 2025 and July 30, 2025 ("**Deposition**"). (A copy of the Deposition Transcript and Exhibits to the Deposition are filed under ECF No. 150).

## OVERVIEW OF ADVERSARY PROCEEDING

The Revised Second Amended Complaint seeks to hold Mester responsible for an alleged foreclosure rescue scam organized by him and other defendants who allegedly schemed to defraud her into transferring ownership of her Residence[3] to Holdings. (ECF No. 93 at Page 1 and ¶15). Stephens also claims Mester committed legal malpractice after she retained him as her attorney. *Id.* at ¶¶221-227.

## FACTUAL BACKGROUND

The Court is referred to Mester's Statement of Undisputed Facts pursuant to Local Rule 7056-1(c) ("**7056-1 Statement**") and to Mester's Declaration in Support of Summary Judgment.

## LEGAL ARGUMENT

### I.  Overview of Argument

Stephens has failed to produce documents proving any of the remaining claims against Mester and has admitted during her deposition testimony that from the first day she met Bonaparte it was the intention to follow Bonaparte's guidance to avoid losing the Residence in a

---

[3] All terms not defined in this Memorandum of Law are defined in the 7056-1 Statement or in Mester's Declaration, both filed in support of this Summary Judgment Motion.

foreclosure auction, retain Mester to assist in the legal work, and ultimately transfer the Residence to Woodburn, and then for her and her family to continue to occupy the Residence, pay Woodburn's mortgage, all with the promise to refinance Woodburn's loan at a later date so the Residence can be returned to her or her family.

Stephens was no novice when it came to acquiring real estate and knew about deeds, mortgages, foreclosure, mortgage modifications, and real estate closings. She also knew all about real estate fraud, being a victim of Osmond who met with the FBI and District Attorney regarding a number of properties in which she was a straw buyer. Before meeting Mester, she had this negative experience with Osmond, then had more negative experiences with Clark and her attorney Rouse. It was only Bonaparte and Mester that helped save her house from being auctioned by Deutsche Bank and gave her a chance to continue occupying her Residence rather than lose it through foreclosure.

The facts show that Mester initially agreed to represent Stephens under the terms of the Engagement Agreement, which included proposed litigation on her behalf as well as the short sale of the Residence being negotiated by Bonaparte. (Tr. at Exhibit "I"). Months later, when Stephens appeared at a short sale closing of the Residence, Mester was by her side to properly conduct the real estate closing. Stephens knew when she got to the closing that she was there to transfer her Residence to Woodburn/Holdings and that she and her family would continue to reside at the Residence and pay Woodburn/Holdings $2,500 in rent. In sum, the deposition testimony shows that Mester performed legal work for Stephens to facilitate the short sale to save her house from being lost in a foreclosure auction so Stephens and her family could temporarily remain as tenants while trying to qualify for a loan to purchase the Residence back in the future.

Stephens, now in hindsight, contends she expected to get the Residence returned to her without the payment of any money and, as such, was not fully aware of the risks involved in the strategy proposed by Bonaparte and in which Mester agreed to assist as her legal representative. Those risks were that Stephens and her family may not qualify for a new mortgage within the two-year time frame agreed upon to refinance the Residence. However, Mester, as Stephens' attorney for the Closing, had no obligation to provide her business advice, only quality legal advice and services. *See In re Greater Se. Cmty. Hosp. Corp*., 333 B.R. 506, 529 (Bankr. D.D.C. 2005) ("[S]cope of [attorney client] relationship does not include business advice given to the Debtors. Rather, the Law Firm Defendants had an obligation to exercise reasonable casre only with respect to their legal advice"). To the extent Stephens seeks to hold Mester responsible for the strategy which she decided upon to save the Residence from foreclosure, then the claims must all be dismissed.

## II.    Summary Judgment Standards

As this Court recently memorialized in its decision granting summary judgment on behalf of the Defendant in *Anjanie Narine v. United States of America, et al.,* 2024 Bankr. LEXIS 1362, 2024 WL 2947604 (Bankr. E.D.N.Y. 2024), summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law". Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). Further, only disputes over facts that might affect the outcome of the lawsuit will preclude summary judgment, so irrelevant or unnecessary factual disputes will not be counted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court's job is not to resolve disputed issues of fact, but to determine whether a genuine issue of fact exists. Once the moving party meets its burden, the opposing party must set out specific facts showing a genuine issue of material fact requiring a trial. *Price v. Cushman & Wakefield, Inc.*, 808 F.Supp.2d 670 (S.D.N.Y. 2011):

> [A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment, because mere conclusory allegations or denials…cannot be themselves create a genuine issue of material fact where none would otherwise exist.
>
> *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010 (citations omitted); *see also Rosenman & Colin LLP v. Jarrell (In re Jarrell)*, 251 B.R.448, 450-51 (Bankr. S.D.N.Y. 2000 (citations omitted)

Unsupported allegations, many of which are pleaded in the Revised Second Amended Complaint, cannot create a material issue of fact. *Weinstock v. Columbia University*, 224 F.3d 33, 41 (2d Cir. 2000). "[S]peculation alone is insufficient to defeat a motion for summary judgment". *See McPherson v. N.Y.City Dep't of Educ.*, 457 F.3d 211, 215 n. 4 (2d Cir. 2006). A movant may meet its burden of proof by showing that little or no evidence supports the opposing party's case. *In re Lollipop, Inc.,* 205 B.R. 682, 687 (Bankr. E.D.N.Y. 1997). As such, based on the uncontested facts through documents and deposition testimony from Stephens as referenced in the 7056-1 Statement, along with Mester's Declaration, the unsupported and speculative allegations created by Stephens' attorney against Mester are insufficient to create triable issues of fact. As such, Mester is entitled to summary judgment as a matter of law on the remaining eight (8) causes of action against him.

### III.     First Cause of Action – Forgery or Fraud in Factum

The allegation against Mester is as follows:

Plaintiff never knowingly signed or intended to sign the subject grant deed. Plaintiff signed documents presented to her by…**Mester**…which they led her to believe were preliminary to an agreement of the parties, and did not intend to

transfer title to her home at the time these documents were signed. (emphasis added) (ECF Doc. 93 at ¶66)

As the Court previously discussed in the Decision, "forgery encompasses both falsified signatures and "signatures obtained by artifice, trick, or device." *In re Grimes*, 147 B.R 307, 313 (Bankr. E.D.N.Y. 1992)(citations omitted) and fraud in the factum or fraud in the execution means "that the [party] was induced to sign something entirely different than what [the party] thought [he or] she was signing". *ABR Wholesalers, Inc. v. King*, 172 A.D.3d 1929, 1930-31, 99 N.Y.S.3d 846, 848 (N.Y. App. Div. 2019).

The evidence shows that once Stephens hired Bonaparte to assist her, the strategy was to transfer ownership of the Residence to Woodburn once Bonaparte negotiated the short sale with Ocwen. When meeting with Mester, both Bonaparte and Stephens communicated this to him and it was memorialized in the Engagement Letter signed by Stephens.

Further, Stephens acknowledged many times that she knew she was planning to transfer ownership of her Residence at the Closing. She understood that the way to transfer ownership of real property is through a deed. Stephens was under an obligation to read a legal document and ask questions if she did not understand it. Instead, she admits not asking Mester any questions about the various documents she was signing during the Closing. Her decision not to ask questions when given the opportunity to do so goes against the claim that she was misled into signing the deed and other documents.

The allegations in the Second Revised Amended Complaint which claim Stephens was at the Closing to execute documents for a mortgage modification have no basis in fact, are not an extension of any facts, and are clearly frivolous. Stephens knows the difference between a mortgage modification and a deed transfer based on her own prior experiences with both. To allege Mester is somehow responsible for monetary damages for doing his job correctly at the

Closing by guiding Stephens where to sign paperwork must be rejected by this Court. That is precisely the role a real estate attorney does at a closing.

In *Levine v. Trumbull (In re Stallmer)*, 792 Fed. Appx. 856 (2d Cir. 2019), the court upheld summary judgment on behalf of the current property owner to maintain the deed transfer from the debtor even though the debtor, who previously owned the property, claimed he did not know he was signing a deed and thought he was signing a different type of document. The Court held it was not a material dispute that the debtor may have been a victim of false representations related to the document since those alleged misrepresentations did not relieve debtor of his obligation to read the document before signing it:

> Under New York law, it is well settled that a party is under an obligation to read a
> document before he or she signs it, and a party cannot generally avoid the effect
> of a document on the ground that he or she did not read it or know its contents.
> *Id.* at 858.

Stephens testified that she knows how to read English and the times she remembered attending a real estate, she simply signs where she is told to sign. She asks no questions as to what she is signing every time she sits at a closing table. Someone who simply signs legal documents put in front of them cannot later complain she did not know what she was signing and is conclusively bound by its terms. *Ferrarella v. Godt*, 131 A.D.3d 563, 567-568 (2d Dept. 2015).

The proof submitted demonstrates Mester made no misrepresentations regarding the natur and effect of Stephen's execution of the documents at the Closing and that no questions or reservations were made by Stephens regarding the documents she signed. Accordingly, summary judgment should be granted.

## IV. <u>Second Cause of Action – Recission of Equity Purchase and Damages</u>

The only allegation against Mester is as follows:

> Because…**Mester** are and were Holdings representative…**Mester** are liable for all damages resulting from any action or omission of…**Mester** regarding Holdings' acquisition of the [Premises] pursuant to 265-a. (ECF Doc. 93 at ¶71) (emphasis added)

As the Court previously discussed in the Decision, this cause of action is brought under N.Y. Real Property Law §265-a, also known as the Home Equity Theft Prevention Act. For Mester to have any exposure under this statute, Stephens would need to prove he was "an equity purchaser" defined as "[a]ny person who, or entity which, acquires title to any residence in foreclosure or, where applicable, default, **or the representative of such person or entity** as defined in this subdivision." N.Y. RPL §265-a(2)(e) (emphasis provided).

There is no evidence Mester had anything to do with the Contract of Sale involving the Short Sale Transaction since the document was drafted and signed by Stephens and Woodburn in July 2018, two months before Mester was retained by Stephens in September 2018.

Further, there is no evidence Mester is the representative or agent of either Woodburn or Holdings. Woodburn, through Holdings, is the only purchaser of the Residence as a result of the Contract of Sale and subsequent documents executed at the Closing. The corporate documents for Holdings reflects Woodburn as the sole shareholder. Further, the Engagement Letter does not mention that Mester represented the interests of Woodburn or Holdings. Finally, Woodburn and Holdings had attorney Chilliest as their legal representative for all purposes involving the Short Sale Transaction.

The Decision discusses the possibility of Mester having a connection to Holdings based upon the financial terms of the Engagement Letter. Those terms state that Mester would receive additional fees if the Residence was refinanced subsequent to the Short Sale Transaction. There is no evidence that these additional fees, if generated in the future, would have been paid by Holdings. Rather, the fee due Mester if the Residence was refinanced and transferred back to

Stephens or her family would be due at that time from Stephens and no one else. Since Stephens was Mester's client for the Short Sale Transaction and any subsequent refinance involved in reacquiring the Residence, Mester requested additional legal fees at that later date, if applicable, as an additional fee for helping her save her house.

## V.     Fifth Cause of Action – Violation of General Business Law §349

Stephens has no claim against Mester under New York GBL §349, a statute intended to protect the public from deceptive acts and practices in the conduct of any business, trade or commerce or in the furnishing of any services. "The typical violation contemplated by the statute involves an individual consumer who falls victim to misrepresentations made by a seller of consumer goods usually by way of false and misleading advertising." *Genesco Entm't v. Koch*, 593 F. Supp. 743 (S.D.N.Y 1984). The deception, however, must be of a recurring nature and have ramifications for the public at large. *Id*. at 750-52. Private transactions not of a recurring nature or without public ramifications are not actionable under the statute. *Id*.

First, by representing Stephens in a private real estate closing, Mester was not involved in any activity which has a broad impact on consumers at large. If that were true, every real estate attorney conducting a single residential closing would fall under this statute, and that certainly is not what the statute is designed to cover. In *Ramirez v. Donado Law Firm, P.C.*, 169 A.D.3d 940 (2d Dept. 2018), the court denied the dismissal of a GBL §349 claim since "in contrast to a private contract dispute, the practices alleged by the plaintiffs were not unique to these parties and involved an extensive marketing scheme that had a broader impact on consumers at large." There is no evidence of Mester's involvement in any additional legal matter that would provide an indicia of proof that his alleged improper activity involving Stephens is part of a broader

situation involving the general public.  The scope of Mester's representation was spelled out in the Engagement Letter, and Mester performed under those terms.

Second, in the Decision, the Court denied dismissal based on allegations of deceptive practices derived from Mester's "alleged misrepresentations to [Stephens] to persuade her to transfer the Residence to Holdings and Mester's failure to explain [that] the sale-leaseback transaction…was intended to, and would result in, [Stephens] losing her house."  (ECF Doc. 54 at Page 20).   Those allegations are not supported by any evidence.  First, Stephens met Mester at the Mester Consultation, sat with him, and agreed to sign the Engagement Letter.  There were extensive discussions between the time Stephens arrived and left the office, all of which concerned the matters contained in the Engagement Letter.

Second, Stephens met with Mester for the second and final time at the Closing.  She sat with Mester for at least two hours.  During that time, Stephens knew she was there to transfer ownership to Woodburn so he could pay off the Mortgage and end the Foreclosure Action.  To accomplish those goals, there were also extensive instructions and discussions on where to sign each paper.  There can be no deception since Stephens knew that the transfer of the Residence to Woodburn was precisely what was discussed during the Mester Consultation as a strategy for Stephens not to lose her house:

> Q. So you knew that Mr. Lezantonio Woodburn was the person that Maxine was referring to as far as putting the property in his name, transferring the property?
> A. Right. Yes.  Yes.  He said, you're going to get back your property, Ms. Stephens.  That's what he keep telling me all the time.
> Q. Okay.  So your understanding was that you were being picked up in a car –
> A. Yes.
> Q. – by Maxine and Mr. Woodburn.  You were going to be driven to a place where all the paperwork was going to be signed; yes?
> A. Yes.

> Q. …And at that place where the paperwork was going to be signed, okay, that was going to help you save your house?
>
> A. Yes.
>
> Q. That they were taking you to a closing to "save her house"?
>
> A. Right
>
> Q. Okay, Just remind me, what were they saving your house from?
>
> A. The foreclosure

Tr. at Pages 159-160.

Third, there is no proof Stephens suffered any form of injury or damages as a result of the transfer of the Residence. Her attorney claims that Stephens lost $550,000 of equity but has not produced any documents showing the market value of the Residence on the day of the Closing. Meanwhile, the evidence shows a very different and much lower valuation then alleged by Stephens. There was an original Contract of Sale with a Purchase Price of $525,000, later negotiated by Bonaparte to $375,000, which was the final price approved by Ocwen in agreeing to a short payoff of the Mortgage. In either case, the Purchase Price was still below the amount of arrears due on the Mortgage at Closing which, by Stephens' testimony, exceeded $600,000. Therefore, the Purchase Price was not enough to pay off the Mortgage arrears. All of the funds for the Closing that went towards the purchase of the Residence from Stephens went towards paying Ocwen and the closing costs approved by Ocwen and are reflected on the HUD-1 Statement. (Tr. at Exhibit "T"). Stephens had no profit or loss in the Short Sale Transaction, thereby making it impossible to suffer any financial damages upon the sale to Woodburn.

**VI.**     <u>**Seventh Cause of Action – Fraud**</u>

Stephens fails to prove as to how Mester committed Fraud against Stephens. Under New York law, to state a claim for fraud Stephens must show that Mester (i) made a misrepresentation or material omission of fact known to be false by Mester; (ii) made for the purpose of inducing Stephens to rely upon it; (iii) justifiable reliance by Stephens on the misrepresentation or material

omission; and (iv) injury. *See Spector v. Wendy*, 63 A.D.3d 820, 821-22 (2nd Dept. 2009); *See also Banque Arabe et Internationale D'Investissement v. Maryland Nat. Bank*, 47 F.3d 146, 153 (2d Cir. 1995); *see also Marini v. Adamo (In re Adamo)*, 560 B.R. 642, 648 (Bankr. E.D.N.Y. 2016).

Throughout her deposition testimony, Stephens related how she tried to get help from Clark and the attorney Rouse without success. When she met Bonaparte, she agreed to go through with the strategy to sell the Residence to her friend Woodburn with the promise of being able to get it back at a later date. When she met Mester through Bonaparte's referral, this strategy was the only strategy discussed during the Mester Consultation and ultimately contained within the Engagement Letter. In sum, the short sale to Woodburn was the only legal work Mester agreed to perform for Stephens in connection to the Residence and that is ultimately the only legal work actually performed by Mester once the short sale was approved. Mester simply did not misrepresent to Stephens that he would do any work for her that was not discussed and contained within the Engagement Letter. There is simply no evidence that what occurred at the Closing was different than what was discussed at the Mester Consultation.

The Decision denied Mester's motion to dismiss based on allegations in the Revised Second Amended Complaint that Mester made misrepresentations or material omissions in September 2018 by telling Stephens Mester would "save the Residence and the Investment Properties". (ECF Doc. 93 at ¶28). In her deposition, Stephens testified her understanding of what it meant to "save the Residence" meant stopping the Foreclosure Action so the Residence would not be auctioned. (Tr. at 159-160). In fact, Mester did assist Stephens in stopping the Foreclosure Action through his representation of her at the Closing in which her loan owned by Deutsche Bank and managed by Ocwen was paid in full in accordance with the short sale

negotiations performed by Bonaparte.  After Closing, the attorneys for Deutsche Bank filed papers with the Queens County Supreme Court discontinuing the Foreclosure Action and their Lis Pendens and Deutsche Bank filed a "Release of Lien" document terminating the lien against the Residence.  In sum, both the court action and the underlying lien against the Residence were officially concluded and Stephens was no longer in jeopardy of losing her Residence due to foreclosure.

As to the Investment Properties purchased through the Osmond Fraud, in the Engagement Letter, Mester promised to assist Stephens in recovering clear ownership to 1433 and 844 in exchange for payment of the Retainer.  The Retainer was never paid, thereby removing any obligation by Mester to perform Litigation on behalf of Stephens.  Further, the Engagement Letter stated that there were no "guaranties" of any particular result connected to Mester's representation of Stephens.  Tr. at Exhibit "I" at Page 3.

The Decision concluded that allegations of Mester preparing closing documents for a real estate closing indicates he knew his statements made at the time of the Mester Consultation were false.  (ECF Doc. 54 at Page 23). Not only has Stephens failed to present any evidence that Mester misrepresented anything to Stephens at any time during their relationship including all the documents signed by Stephens at the Closing, there is also no evidence that any of the statements made by Mester to Stephens was known by Mester to be false.  "Scienter" or "intent" is an element of fraud that Stephens has made conclusory allegations, but no evidence to support it.  Stephens did not testify that Mester mishandled the Closing or lied or misrepresented any facts to her during the Closing, only that he did not explain things to her.  The evidence, though, contrast with this allegation in that both Stephens and Mester were at the Closing for over two hours, so of course the two of them were discussing the paperwork being signed.  Also, Stephens

has a history of voluntarily attending closings and just signing papers put in front of her. She testified that in every one of her real estate closings that she relies on who she is with to show her what to do and where to sign. Mester performed his role as Stephens' closing attorney with skill and competence.

On the day of the Closing, Stephens voluntarily was driven to the closing by Bonaparte and Woodburn where she met Mester, who was ready, willing, and able to guide her in transferring the Residence to Woodburn. The Closing was not a situation where she showed up to transfer the Residence to Woodburn and wound up with an entire different result that was never explained to her. In fact, the Closing resulted in precisely what Bonaparte discussed with Stephens, and which was later discussed with Mester during the Mester Consultation and memorialized in the Engagement Letter. As for the Litigation also memorialized in the Engagement Letter, Mester did not agree to litigate any matter for Stephens unless he was paid to do so, which he was not.

In fact, Mester expertly performed the legal work to clear all title issues in connection with the short sale and then assisted Stephens at the Closing in transferring ownership of the Residence to Woodburn in exchange for the payment of her Mortgage, which is precisely what Stephens claimed she was present to do at the Closing.

Stephens made the decision to transfer the Residence to Woodburn before she ever met Mester. It was a strategy devised by Bonaparte to help Stephens save the Residence from being sold through the Foreclosure Action. During the Mester Consultation, Mester agreed with the strategy and indicated he would help Stephens prepare the paperwork and, at Closing, show her where to sign. The additional fees referenced in the Engagement Letter was speculative in nature

in that it would only have been relevant if Stephens or her family was able to refinance and obtain ownership of the Residence at a later date which did not happen due to no fault of Mester.

Mester made $5,000 to represent Stephens at the Closing, which is not an unreasonable legal fee for a real estate closing. Although the Engagement Letter discusses additional fees at a later date, those fees were not earned at the Closing and would only be collected from Stephens if many future events fell into place involving the ability to later qualify to refinance and purchase back the Residence from Woodburn, none of which ultimately occurred. There is simply no evidence that Mester pushed Stephens into agreeing to transfer the Residence to maybe receive future and contingent additional fees.

Finally, there is no question that Stephens signed the closing documents because she "felt threatened that she would lose her home." (ECF Doc. 54 at 24). The threat was in the form of a Foreclosure Action by Deutsche Bank in which Stephens admittedly owed over $600,000. Originally, before the agreement to transfer the Residence, Stephens had consulted and worked with Clark and his recommended attorney Rouse, who were unable to effectively assist her in fighting the Foreclosure Action. In fact, Stephens knew she had no plan to stop Deutsche Bank from obtaining a judgment of foreclosure and ultimately auctioning the Residence where she would then need to move out or be evicted. Instead of allowing that to happen, Stephens met Bonaparte, who came up with a solution to stop the foreclosure by coordinating a sale to Woodburn and allow Stephens and her family to continue to reside at the Residence as long as she made certain payments to Woodburn with a chance to eventually get ownership of the Residence returned to her family. Stephens agreed to Bonaparte's plan and fully cooperated with her to make it happen.

Stephens made that decision long before she met Mester. Mester's role was simply to perform the necessary legal work to accomplish the strategy already agreed upon by Stephens and that is precisely what was accomplished at the Closing. Mester had no obligation to continue working for Stephens once the Closing had concluded unless Stephens was able to later refinance and take back the ownership of the Residence. Mester was simply doing the legal work for Stephens to accomplish what everyone believed was the best way to prevent Stephens from losing her Residence as a result of the Foreclosure Action.

There is simply no evidence that Mester was "working to benefit Bonaparte, Woodburn, Holdings or himself" more than Stephens. (ECF Doc. 54 at Page 25). The Engagement Letter does not reflect that Mester represented Bonaparte, only that he be permitted to communicate with Bonaparte on behalf of Stephens due to all the work Bonaparte was doing on her behalf. Stephens was relying on Bonaparte to do everything to save her home. Stephens agreed to this communication arrangement and that is why the language in the Engagement Letter, in ALL CAPITAL LETTERS, was placed into the document on Page 4 – so it was crystal clear that Mester had the authority from Stephens to discuss the agreed upon strategy with Bonaparte. Any actual or perceived conflict of interest was waived when Stephens signed the Engagement Letter containing the above language.

Any allegation that there was a conflict of interest and it benefited Mester is not supported by any evidence. Stephens claims the additional fees in the Engagement Letter that Mester would receive once Stephens was able to refinance the property subsequent to the short sale would benefit Mester. Of course, Mester obtains a financial benefit for any legal fee agreed to be paid to him by a client. Those additional fees, though, referenced in the Engagement Letter, would be due from Stephens, not Bonaparte, and was contingent in that it would only be

owed to Mester if Stephens was successfully able to refinance and recover ownership of the Residence after the Closing. Basically, those extra fees were disclosed to Stephens in advance of any future refinance Mester would handle on behalf of Stephens.

There is no evidence Stephens suffered any injury at the time she transferred the Residence to Woodburn/Holdings. Her attorney claims the present market value of the Residence was $850,000, thereby depriving Stephens of receiving any profit upon selling the Residence to Woodburn. Yet, there is no evidence whatsoever that the Residence was worth $850,000 on the day of Closing. Rather, the evidence shows that Deutsche Bank agreed to accept $375,000 as the current market valuation when Ocwen, as its agent, issued and approved the short sale letter agreeing to accept $337,500 to release its Mortgage lien. (Tr. at Exhibit "T"). In an approved short sale, the Seller of the real property cannot receive any profit since the lender has agreed to accept less than the amount of arrears on the current mortgage. As such, Stephens suffered no monetary damage.

Also, Stephens does not have a claim for fraud against Mester simply because Woodburn later attempted to cancel the verbal arrangement, and later the Occupancy Agreement, in which Stephens and her family were entitled to continue residing at the Residence. First, there is no evidence that Mester was representing either Stephens at that time, nor is there any evidence that Mester every represented Bonaparte or Woodburn at any past, present, or future time. Stephens left the Closing knowing she was obligated to pay Woodburn $2,500 each month towards his new mortgage. When Stephens alleged she transitioned from this verbal agreement to a written Use and Occupancy Agreement that she signed without the presence of counsel, that would be a superseding intervening event which would serve to sever as a matter of law any causal

connection between alleged fraud or malpractice claims against Mester and Stephens' alleged

damages:

> If the intervening act is extraordinary under the circumstances, no
> foreseeable I the normal course of events, or independent of or far
> removed from defendant's conduct, it may well be a superseding action
> which breaks the causal nexus.
>
> *Stagl v. Delta Airlines, Inc.*, 52 F.3d 463 (2d Cir. 1995) (quoting *Derdiarian v.*
> *Felix Contracting Corp.,* 51 N.Y.2d 308, 434 N.Y.S.2d 166, 414 N.E.2d 666
> (1980)

The facts show that Stephens claimed losses are based on the intervening event of the

failure to later refinance after the Closing and not based on any statements made by Mester

regarding her and her family's ability to continue to afford the payments to Woodburn after

Closing or the ability to refinance and take back ownership of the Residence.  *See Lentell v.*

*Merrill Lynch & Co., Inc.,* 396 F.3d 161, 174 (2d Cir. 2005).  Simply put, the failure to return the

Residence to Stephens after the Closing cannot be attributed to Mester.

## VII.    Eighth Cause of Action – Breach of Fiduciary Duty

Stephens has the burden to show that there was misconduct or breach by Mester while

acting as her counsel.  Stephens has not and cannot show evidence of any misconduct by Mester

while acting as her attorney.  As reflected in the Engagement Letter, Mester agreed to commence

Litigation once he was paid his Retainer and also act as the transactional attorney for Stephens

during any upcoming short sale transaction involving her Residence.  The efforts of Bonaparte

was the key element driving both situations.

First, it was going to be up to Bonaparte to pay Mester the Retainer to commence and

attempt a very difficult litigation to recover ownership of two properties, 1487 and 844, that

Stephens admittedly originally purchased as part of the Osmond Fraud.  When that failed to

occur, Mester no longer had an obligation to Stephens to handle the Litigation which, if

successful, would have turned a negative experience involving Osmond using Stephens as as a straw buyer where she was approached by the FBI and District Attorney into a positive experience of obtaining those properties since those efforts were already unsuccessful by Clark.

As discussed during the Mester Consultation, the purpose of the Litigation would have been to allow Stephens to sell the 1487 and 844 properties to Bonaparte to help Stephens obtain additional financial resources so Stephens would later be able to afford to buy back her Residence once it was sold to Woodburn in a short sale being negotiated by Bonaparte. Simply because Bonaparte intended to financially benefit under both prongs of the Engagement Letter with Stephens does not violate any loyalty Mester was obligated to provide to Stephens since Stephens would be the primary beneficiary of Mester's legal work. Bonaparte would not benefit at all from Mester's legal work for Stephens unless he was first able to successfully represent Stephens in the strategy agreed upon by Bonaparte and Stephens and as discussed during the Mester Consultation.

In the Decision, the Court permitted Stephens to ultimately offer evidence of facts that would be different from the facts underlying the legal malpractice claim. (ECF Doc. 54 at Page 26). Stephens is unable to produce any facts, much less different facts. Therefore, this claim must now be dismissed. *See Kvetnaya v. Tylo*, 49 A.D.3d 608, N.Y.S.2d 425 (2d Dept. 2008) (affirming dismissal on summary judgment of breach of fiduciary duty claim where the claim arose "from the same facts as the legal malpractice cause of action").

**VIII.  Eleventh Cause of Action – Violation of RICO, 18 U.S.C. §1962(c)**

Stephens alleges a RICO violation against Mester for a simple real estate closing in an effort to construct a treble damage suit from what, at best, is a civil wrong, something that was never the intention of those who drafted the statute in the Justice Department or of Congress

when it became law. *See Organized Crime Control Act of 1970*, Pub.L. No. 91-451, § 1, 84 Stat. 922, 1073 (1970) (Statement of Findings and Purpose) ("It is the purpose of this Act to seek the eradication of organized crime in the United States by strengthening the legal tools in the evidence-gathering process, by establishing new penal prohibitions, and by providing enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime."); *Russello v. United States*, 464 U.S. 16, 25 (1983) ("The legislative history clearly demonstrates that the RICO statute was intended to provide new weapons of unprecedented scope for an assault upon organized crime and its economic roots.").  Stephens fails to establish a viable civil RICO claim against Mester under 18 U.S.C. §1962.  Since the claim survived Mester's 12(b)(6) Motion, it is now incumbent upon Stephens to prove (i) conduct; (ii) of an enterprise; (iii) through a pattern; (iv) of racketeering activity.  *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985).

In the Decision, the Court came to the conclusion that the Second Revised Amended Complaint pleaded one count of mail fraud against Mester.  (ECF Doc. 54 at 29-30).  Yet, as previously explained by Mester in seeking summary judgment on the cause of action for fraud, Stephens has no evidence that Mester was part of any scheme to defraud her since the goal had always been to save the Residence from being auctioned at the conclusion of the Foreclosure Action.  Mester accomplished exactly what Stephens asked him to do during the Mester Consultation, which was to make sure the Residence was able to be transferred to Woodburn so her Mortgage could be paid and the Foreclosure Action terminated.  Without evidence that Mester made a material misrepresentation to Stephens, there simply is no fraud.  Without fraud, the alleged misconduct in the context of a single residential real estate closing transaction does not rise to the level of racketeering. *See Anatian v. Coutts Bank (Switzerland) Ltd.*, 193 F.3d 85,

88 (2d Cir. 1999). Finally, the misconduct alleged against Mester in paragraphs 26 and 28 of the Second Revised Amended Complaint simply cannot be defined as misconduct as a matter of law (Mester's offer to help Stephens save her Residence and Mester's instructions to Stephens where to sign real estate closing documents while at the Closing). (ECF Doc. 93).

Generally speaking, attorneys get referred to individuals all the time where the source of the referral would also derive some benefit. Here, even though Bonaparte referred Mester to assist Stephens and would also financially benefit if Mester was successful, it was clear that Bonaparte would not have benefited from the legal work for Stephens that was contemplated and memorialized in the Engagement Letter unless Stephens was the primary beneficiary of the proposed Litigation as well as the strategy to transfer the Residence to avoid a subsequent auction and the loss of her Residence.

### A. No RICO "Enterprise" Exists

Stephens must demonstrate the existence of an enterprise distinct from the person alleged to have conducted its affairs. *Boyle v. United States*, 556 U.S. 938, 944 (2009). Allegations of routine conduct by Mester at the Closing, who is an accomplished real estate attorney, do not suffice. It would be improper to group Mester with every other individual or company involved in the Closing. If that were true, every real estate transaction in New York would qualify as an enterprise for purposes of RICO. That cannot be the case.

### B. No Pattern of Racketeering Activity

A "pattern" requires at least two predicate acts within ten years that extend over a substantial period of time of two years or more in order to typically satisfy the continuity time requirement. *See DeFalco v. Bernas*, 244 F.3d 286, 321 (2d Cir. 2001) ("Since the Supreme Court decided *H.J., Inc.* [in 1989], this Court has never held a period of less than two years to

constitute a 'substantial period of time'.").  The two acts must amount to or pose a threat of continued criminal activity over that time period. *H.J. Inc. v. Northwestern Bell Tel. Co*., 492 U.S. 229, 239 (1989).

Stephens met Mester on September 21, 2018 and concluded her relationship with Mester at the Closing on March 27, 2019, a time period substantially less than two years.  Therefore, Stephens' allegations lack continuity.

       C.      No effect on Interstate Commerce

The Revised Second Amended Complaint alleges that the alleged RICO Enterprise engaged in interstate and foreign commerce.  (ECF Doc. 93 at ¶136).  The Court's Decision states that Stephens failed to explain how the alleged Enterprise (which allegedly includes Mester) has any impact on foreign or interstate commerce.  (ECF Doc. 54 at Page 37).  To date, like so many other unsupported statements made in the Revised Second Amended Complaint, Stephens has not put forth any evidence to back up this conclusory allegation.

       D. No Proximate Causation or Injury

Stephens must show that the alleged RICO violation proximately caused its injury. *Holmes v. Sec. Investor Prot. Corp.,* 503 U.S. 258, 268 (1992). Her damages claimed under RICO stem from alleged contractual or fiduciary breaches by Mester, not racketeering activity. It is obvious that the RICO claim is a disguised malpractice or fiduciary dispute.  Courts routinely reject attempts to recast ordinary disputes as RICO claims. *E.g., see Kimm v. Chang Hoon Lee*, 196 F. Appx. 14, 16 (2d Cir. 2006).

In *Kimm*, the Court dismissed RICO claims against an individual's former attorney involved in an alleged fraudulent scheme.  The Second Circuit affirmed dismissal, emphasizing

that isolated acts of fraud—even if serious—do not constitute a "pattern of racketeering activity."
*Id.*

Courts require continuity and relatedness of predicate acts, not just a single episode of alleged misconduct. Stephens' allegations, even if accepted as true, sound in breach of contract or fiduciary duty and do not implicate the RICO statute. It would be essential for Stephens to build a record of evidence showing systemic misconduct, multiple predicate acts, and a true enterprise. She has not done so, thereby requiring dismissal of the RICO claim against Mester.

## IX.  Twelfth Cause of Action – Conspiracy to Violate RICO, 18 U.S.C. §1962(d)

As Stephens has not provided evidence against Mester to support a legally sufficient substantive RICO claim, her RICO conspiracy claim also cannot survive. *Citadel Mgmt., Inc. v. Telesis Trust, Inc.,* 123 F. Supp. 2d 133, 156 (S.D.N.Y. 2000) ("[A] RICO conspiracy claim cannot stand where, as here, the elements of the substantive RICO provisions are not met.").

All evidence points to the fact that the objective of transferring the Residence to Woodburn was not criminal, but a strategy agreed upon by Stephens with Bonaparte before she even met with Mester to discuss it during the Mester Consultation. In fact, when Stephens and Bonaparte first met with Mester, the Contract of Sale had already been executed by and between Stephens and Woodburn/Holdings and Mester's role was simply to wait for Bonaparte to conclude the negotiations with Ocwen before preparing the closing documents and clearing title issues so there would be no issues at closing when Stephens was transferring the Residence to Woodburn/Holdings.

The intent of the short sale was to pay off the Mortgage and eliminate the threat of a foreclosure auction in which Stephens would lose the Residence. The intent was to have Stephens and her family continue to temporarily reside at the Residence until a family member

could refinance Woodburn's new mortgage and take back ownership.  The intent was for Stephens and her family to pay $2,500 of Woodburn's mortgage every month for at least two years while Stephens worked on qualifying someone from her family to refinance Woodburn's mortgage.  The fact that after the Closing the refinance never took place was not due to anything in Mester's control nor is there any evidence Mester was responsible to Stephens for the failure of her and her family to later fail to refinance Woodburn's mortgage.  The evidence shows that Mester's role in representing Stephens concluded at the time of the Closing unless there was a subsequent refinance of the Residence in which ownership would be returned to Stephens and her family.

### X.     Nineteenth Cause of Action – Legal Malpractice

As the Court provided in the Decision, "the elements of a claim of legal malpractice under New York law are: (1) an attorney-client relationship at the time of the alleged malpractice; (2) attorney negligence; (3) proximate causation; and (4) actual damage to the client." *Bryant v. Silverman*, 284 F.Supp.3d 458, 470 (S.D.N.Y. 2018).  It is not in dispute that Mester was Stephens' attorney for the matters listed in the Engagement Letter and in accordance with the terms thereof.  Mester had no obligation to perform the Litigation since he was not paid for it.  There is no dispute that Mester represented Stephens in connection with the short sale transaction being negotiated by Bonaparte for the Residence.  There is also no dispute that Stephens in fact transferred the Residence to Woodburn at the Closing and remained in possession thereafter, first with a verbal agreement to pay $2,500 per month, and later with a written occupancy agreement to pay $1,500 per month.  (Tr. at 202, 329, 330 and Exhibit X).

Mester's representation under the Engagement Letter primarily concluded at the Closing when Stephens successfully transferred the Residence to Woodburn/Holdings and where her

Mortgage was satisfied. Any subsequent representation of Stephens after Closing was entirely contingent on Stephens or her family qualifying to refinance the Residence from Woodburn within a two year period. (Tr. at 299-301).

First, Stephens must show that Mester was negligent in his legal representation of Stephens. There is no proof of any negligence. The Litigation discussed during the Mester Consultation required the payment of a Retainer and such was clearly set forth in the Engagement Letter. (Tr. at Exhibit "I" at Page 3). Stephens, though, never paid any money to Mester at any time. (Tr. at 152-154) and Bonaparte never paid any money to Mester at any time. As such, Stephens cannot claim negligence against Mester for litigation that was never commenced, nor was Mester obligated to commence it without being paid as reflected in the Engagement Letter.

Mester was also not negligent in his representation of Stephens involving the short sale of her Residence being negotiated by Bonaparte. At the Closing, the transfer of the Residence took place, the deed and transfer paperwork signed by Stephens with guidance from Mester, and the Mortgage, which was the subject of the Foreclosure Action due to it being unpaid for years, was paid by Woodburn/Holdings. (Tr. at Exhibit "U" at Page 321). The attorneys for Deutsche Bank and Ocwen subsequently filed court papers discontinuing the Foreclosure Action with prejudice and removing the Mortgage lien against the Residence. (Tr. at Exhibits "S", "V" and "W"). In short, the Residence was saved from being sold in a future foreclosure auction, all as intended through Bonaparte's strategy of selling to Woodburn and what Stephens agreed to do rather than continuing to fight the Foreclosure Action with her attorney Rouse. (Tr. at 341). Stephens knew Woodburn would be taking over as the owner of the Residence at the Closing. (Tr. at 321).

Finally, Mester was also not negligent as to the "leaseback" portion of the representation. What was arranged immediately after closing was that Calvin, Stephens' husband and other family members, would pay Woodburn $2,500 each month towards his new mortgage in order to continue to occupy the Residence. (Tr. at 202, 329). Stephens agreed that she would have two years to refinance the Residence in order to stop the monthly payments and have Woodburn transfer the Residence back to her. (Tr. at 336-338). For a period of time, Calvin and Stephens paid Woodburn pursuant to this arrangement before the situation changed. When that happened, all discussions were between Stephens, Bonaparte, and Woodburn – no one else. (Tr. 300-301).

There is no evidence from Stephens that could or would show that the short sale was not in the best interest of Stephens and her family. Without this strategy, there is no clear end to the Foreclosure Action. Stephens had tried to previously do the Mortgage Modification, but then decided to stop paying the Mortgage on advice provided by Clark. She wanted to try and litigate against Deutsche Bank to get the Residence for free. (Tr. at 118-121).

As this Court similarly ruled in *Modikhan v. Aronow (In re Modikhan)*, 2024 Bankr. LEXIS 2883 (Bankr. E.D.N.Y. 2024) when granting summary judgment dismissing legal malpractice claims in favor of the attorney also involved in an alleged real estate rescue scheme, Stephens cannot show that "but for" Mester's alleged negligence, she would have achieved a favorable outcome. In other words, Stephens must show she would have prevailed in the Foreclosure Action and avoided a judgment of foreclosure and sale but for the alleged negligent actions of Mester.

There is no evidence suggesting Stephens would have gotten that result to prevent the Residence from being the subject of a foreclosure sale and auction. Before she met Mester, Stephens had already stopped paying Ocwen and given up fighting against the Foreclosure

Action. (Tr. at 341). She was well aware that when you stop making mortgage payments that the bank can foreclose and auction the property. (Tr. at 319-320). Deutsche Bank had already obtained summary judgment against Stephens. (Tr. at Exhibit "Q"). When she met Maxine, Stephens agreed to have her negotiate a short sale so the Residence can be sold to Woodburn with the promise to get it paid back within two years. (Tr. at 336). There is no evidence that any other options were available to Stephens to save the Residence from foreclosure. Even if there were other possible options, Mester cannot be held accountable for his judgment in agreeing to represent her in the one promising option that Stephens herself chose to pursue before retaining him. An attorney's selection of one among several reasonable courses of action does not constitute malpractice. *See Brookwood Companies, Inc. v. Alston & Bird LLP*, 146 A.D.3d 662, 667, 49 N.Y.S.3d 10, 15 (1st Dept. 2017).

In *Modikhan*, plaintiff's injuries as to the loss of her real properties, were caused, in part, by "intervening events that cut off any causal relationship between the alleged negligent acts and plaintiff's injuries." *Id.* at 41. As previously discussed, the existence of intervening acts subsequent to the Closing negates the possibility that Mester committed legal malpractice. For example, both Stephens and her husband Calvin signed an Occupancy Agreement, dated as of January 1, 2020, for a term of two years that expressly states:

> If the occupants cannot purchase the property at the end of the contract agreement, the Occupants agree to move out of property, 12706 177th Street, Jamaica NY 11434 without argument in 30 (Thirty Days) from the expiration of the agreement.

> Tr. at Exhibit X at Page 2.

Also, on November 9, 2020, Stephens filed a the HP Complaint against Bonaparte and Woodburn in the Housing Part in Queens County without the mention of any statement that she was a victim of a real estate scam and she should be given back ownership of the Residence.

(Tr. at Exhibit "K").  Both the Occupancy Agreement and the HP Complaint either confirm the agreement made at the Closing that Stephens or her family has at least two years to purchase back the Residence, or that Stephens was a victim of a deed scam.  Both are intervening documents that cut off any causal relationship between any alleged negligence and Stephens' financial injuries.

## **<u>CONCLUSION</u>**

For the foregoing reasons, it is respectfully requested that summary judgment dismissing the remaining causes of actions against Mester set forth in the Revised Second Amended Complaint be granted, and for such other and further relief as the court deems just, proper, and equitable.

Dated: October 24, 2025

CHARLES L. MESTER, ESQ.
Defendant *Pro Se*
225 West 34th Street – 9th Floor
New York, New York 10122
917-608-6462

/s/ *Charles L. Mester*

_____
By: Charles L. Mester, Esq.
E-Mail: CMester@CharlesMester.com