**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>EVIS NEVERLANE STEPHENS,<br><br>       Debtor. | 21-42857-jmm<br><br>Chapter 13 |
| EVIS NEVERLANE STEPHENS,<br><br>       Plaintiff,<br>   v.<br><br>MAXINE BONAPARTE,<br>LEZANTONIO WOODBURN,<br>12706 HOLDINGS, INC.,<br>CHARLES L. MESTER, ESQ.<br>PLANET MANAGEMENT GROUP, LLC,<br>PLANET HOME LENDING, LLC d/b/a<br>PLANET HOME SERVICING,<br>WILMINGTON SAVINGS FUND<br>SOCIETY, FSB (WSF),<br>VERUS SECURITIZATION TRUST 2020-NPL1<br><br>       Appellees. | Adversary Proceeding No. 22-01037(jmm) |

**LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS**

Defendants Planet Management Group, LLC and Planet Home Lending, LLC d/b/a Planet Home Servicing respectfully submit the following Statement of Undisputed Material Facts Pursuant to Local Bankruptcy Rule 7056-1(c).

A.  Ownership of the Subject Property

1. Plaintiff, Evis Neverlane Stephens ("Plaintiff"), purchased the property at 127-06 177th Street in Jamaica, New York (the "Subject Property"), on August 29, 2006. (Declaration of Ryan P. Mulvaney, Esq. ("Mulvaney Dec.") Ex. D (Tr.D1 60:6-141, Ex. F),[1] Ex. C (Revised Second Amended Adversary Complaint ("Revised SAC") ¶ 20)).

2. Plaintiff financed the purchase of the Subject Property at 127-06 177th Street with a loan from Novastar Mortgage, Inc., in the original principal amount of $630,000.00, and dated August 29, 2006 (the "2006 Mortgage"). (Mulvaney Dec. Ex. D (Tr.D1 88:9-90:8, Ex. G)).

B.  Plaintiff's Default – The 2006 Mortgage

3. Plaintiff fell behind on her mortgage payments a few years later. (Mulvaney Dec. Ex. D (Tr. 106:6-16, 107:25-108:3 ("I could pay the mortgage, 'cause I normally pay the mortgage. But when I got sick I couldn't pay the mortgage.")), Ex. C (Revised SAC ¶ 22)).

4. Ocwen Loan Servicing LLC ("Ocwen") was the servicer of the 2006 Mortgage. (Mulvaney Dec. Ex. D (Tr.D1 105:16-24, Ex. R)).

5. Plaintiff resolved the delinquency on the 2006 Mortgage in 2010 by agreeing to a loan modification with Ocwen that lowered her monthly payments. (Mulvaney Dec. Ex. C (Revised SAC ¶ 22), Ex. D (Tr.D1 112:8-10, 116:17-117:6, 232:4-25; Tr.D1 Ex. N at 7, ¶ 6)).

6. Plaintiff fell behind on her payments on the modified loan in or about 2012. (Mulvaney Dec. Ex. D (Tr.D1 114:9-13 (admitting she was behind on her mortgage payments). 123:5-13 (stating she believes she made only six payments on the modification), 235:23-236:7, Tr.D1 Exs. M, N at 8, ¶ 8)).

---

[1] The complete transcript of the deposition (held over two days on June 3, 2025, and July 30, 2025) is attached as Exhibits "D" and "E" to the Declaration of Ryan P. Mulvaney ("Mulvaney Dec."). The transcript is continuously paginated and for ease of reference cited as "Tr.D1" and "Tr.D2" reflecting day one and day two throughout this Rule 56.1 statement. Exhibits marked at the deposition are cited as either "Tr.D1 Ex. ___" or "Tr.D2 Ex. ___."

7. Deutsche Bank National Trust Company as Trustee for Novastar Mortgage Funding Trust, Series 2006-5 Novastar Home Equity Loan ("Deutsche Bank") commenced an action to foreclose the 2006 Mortgage in Queens County Supreme Court on May 8, 2015 (the "2006 Foreclosure Case"). (Mulvaney Dec. Ex. D (Tr.D1 Ex. N, Tr. 236:11-20)).

8. The Supreme Court granted Deutsche Bank's motion for summary judgment and an order of reference by order dated August 4, 2017. (Mulvaney Dec. Ex. D (Tr.D1 Ex. Q)).

9. Plaintiff understood that the foreclosure action could result in her losing title to the property. (Mulvaney Dec. Ex. D (Tr.D1 41:9-13, 114:9-13, 247:22-24 ("Q: So your home was now subject to foreclosure sale. A: Right."))).

10. Plaintiff had the assistance of an attorney named Franklin Rouse, Esq. in the foreclosure action. (Mulvaney Dec. Ex. D (Tr.D1 114:16-115:8)).

C. The Short Sale To 12706 Holdings, Inc. and Payoff and Satisfaction of the 2006 Mortgage

11. Plaintiff met with attorney and Defendant, Charles Mester, Esq., in or about September 21, 2018. (Mulvaney Dec. Ex. D (Tr.D1 135:15-23, Tr. Ex. I), Ex. J (Mester Decl., ¶ F)).

12. Plaintiff signed a retention letter with Mr. Mester dated September 21, 2018. (Mulvaney Dec. Ex. D (Tr.D1 Ex. I), Ex. J (Mester Decl., ¶ F)).

13. Plaintiff had already signed a contract to sell the property to Defendant, 12706 Holdings Inc. ("12706 Holdings"), in July 2018. (Mulvaney Dec. Ex. D (Tr.D1 190:2-4, Tr.D1 Ex. J)).

14. Among the items on which Mr. Mester would work with Plaintiff was the "sale and leaseback" of the Subject Property. (Mulvaney Dec. Ex. D (Tr.D1 Ex. I at 1), Ex. J (Mester Decl., ¶¶ F, G)).

15. Plaintiff did not contact Mr. Mester between September 21, 2018, and the closing on March 27, 2019. (Mulvaney Dec. Ex. D (Tr.D1 155:8-23)).

16. Plaintiff and co-defendants Mester, Bonaparte, and Woodburn, among others, attended a closing on March 27, 2019. (Mulvaney Dec. Ex. J (Mester Decl., ¶ G), Ex. D (Tr.D1 177:17-19)). No one from either of the Planet Defendants attended any closing of the short sale between Plaintiff and Ocwen or involving Plaintiff and 12706 Holdings. (Woods PMG Dec. ¶ 56); (O'Connell PHL Dec. ¶ 36); (Mulvaney Dec. Ex. D (Tr.D1 253:2-13)).

27. At the closing, Plaintiff signed many papers, including documents related to the short sale for Ocwen, and a deed conveying title to the property at 127-06 177th Street in Jamaica, New York, to 12706 Holdings. (Mulvaney Dec. Ex. A (Deed), Ex. J (Mester Dec., ¶ G-H), Ex. D (Tr.D1 156:18-157:16; 196:6-20, Tr.D1 Exs. H-J, R), Ex. E (Tr.D2 346:13-347:6, Tr.D2 Ex. T)).

19. The HUD-1 settlement statement from the closing, which Plaintiff and 12706 Holdings signed, indicates on line 504 that $337,500 would be paid to satisfy the 2006 Mortgage lien on the Subject Property. (Mulvaney Dec. Ex. E (Tr.D2 Ex. T)). Disbursement documents similarly reflect the transmission of funds to the law firm that represented 12706 Holdings at in the amount of $496,884.97. (Declaration of Janina Woods ("Woods PMG Dec.") ¶¶ 42-43, Exs. H, I); Declaration of Thomas O'Connell ("O'Connell PHL Dec.") ¶¶ 24-25, Ex. D).

20. The closing lasted over two hours. (Mulvaney Dec. Ex. J (Mester Decl., ¶ H)).

21. Plaintiff "looked" at the documents at the closing but did not ask any questions about them. (Mulvaney Dec. Ex. D (Tr.D1 172:18-174:2)).

22. Mr. Mester sat next to Plaintiff at the closing on March 27, 2019, and directed her in signing the required documents. (Mulvaney Dec. Ex. D (Tr.D1 170:9-171:19), Ex. J (Mester Dec., ¶ H)).

23. Ocwen accepted the tender of $337,500 as full satisfaction of its mortgage. (Mulvaney Dec. Ex. B (Release of Mortgage), Ex. E (Tr.D2 274:23 – 275:3 ("Q: And by virtue of this release you no longer paid the mortgage to Ocwen; right? A: No. Q: There's no mortgage to pay; correct? A. Right."), 293:16-22 ("Listen to me carefully, when the house was transferred – you guys know what's going on. Ocwen never sent anything to me again."), 294:8-11 ("Q: Was it your understanding at that point that your relationship with Ocwen was over because the loan has been paid off. A: Of course."), Ex. H (affirmation of counsel for the foreclosing mortgagee identifying the reason for foreclosure discontinuance as "short fall pay off.")).

D. "Involvement" of The Planet Defendants

24. PMG and PHL are affiliated entities and platform businesses of Planet Financial Group. (Woods PMG Dec. ¶ 1); (O'Connell PHL Dec. ¶¶ 1, 13).

25. On March 27, 2019, PMG, as lender, entered into a loan agreement with 12706 Holdings, as borrower, pursuant to which PMG agreed to make a commercial loan to 12706 Holdings in the principal amount of $535,000.00 (the "Loan Agreement"). (Woods PMG Dec. ¶¶ 7-9, Ex. A); (O'Connell PHL Dec. ¶¶ 5-6, Ex. A)).

17. The Loan Agreement was executed by Defendant, Lezantonio Woodburn ("Woodburn"), in his official capacity as President of 12706 Holdings. (Woods PMG Dec. ¶ 10); (O'Connell PHL Dec. ¶ 7).

18. Section 2.1 of the Loan Agreement provided an After Repair Value of the Subject Property in the amount of the lesser of $765,000.00 and the Appraised Value determined by an Appraisal made after completion of all Planned Improvements pursuant to Section 2.5(a)-(v) in the Loan Agreement. (Woods PMG Dec. ¶ 11). The After Repair Value was based on an appraisal that was previously prepared by Greater NY Appraisal Services, Inc. ("Greater NY Appraisal")

for a borrower identified in the appraisal as 7842 79th Pl., Inc. (*Id.* ¶¶ 12-13, 17, Ex. B). The appraisal was effective December 17, 2018, before PMG's involvement and before 12706 Holdings applied to PMG for a loan. (*Id.* ¶¶ 12-13, 17, Ex. B). For purposes of the loan-to-value ratio, the principal loan amount of $535,000.00 reflected seventy percent of the $765,000.00 After Repair Value of the Subject Property. (*Id.* ¶ 14).

19. Greater NY Appraisal noted in the appraisal that it considered "[s]everal 'flips'" in its comparables analysis because "they were considered to best represent the condition of the [S]ubject [Property] based on the hypothetical conditions employed in the report." (Woods PMG Dec. ¶ 15, Ex. B). Those hypothetical conditions were, as detailed in the Loan Agreement, the After Repair Value assuming repairs were made to the Subject Property. (*Id.*). Greater NY Appraisal forecasted the appraised value of the Subject Property based on what the planned improvements contemplated in the Loan Agreement might result but before those planned improvements were completed. (*Id.*). Section 2.1 provides that the Loan Agreement contemplated another appraisal after the planned improvements had been completed. (*Id.*). The After Repair Value would ultimately be the lesser of either the After Repair Value set forth in the appraisal effective December 17, 2018, or the value set forth in an appraisal after the planned improvements were completed. (*Id.*). The certification set forth in the appraisal noted that the appraisal expired on December 21, 2019. (Woods PMG Dec. ¶ 16, Ex. B).

20. PMG did not order the appraisal nor was it involved in the conduct of the appraisal or the preparation of the appraisal report. (Woods PMG Dec. ¶ 17). When 12706 Holdings subsequently applied to PMG in March 2019, the prior appraisal was subsequently certified to PMG by Greater NY Appraisal, which is why PMG is noted as the lender for an appraisal that was

effective on December 17, 2018, before its involvement. (Woods PMG Dec. ¶ 18). As reflected in the appraisal, PMG relied on an as-renovated value of the Subject Property. (*Id.*).

21. PMG validated the After Repair Value set forth in the appraisal by way of a Property Review. (Woods PMG Dec. ¶¶ 19-20, Ex. C).

22. Pursuant to Section 3.2 of the Loan Agreement, the maturity date of the Commercial Mortgage Loan was April 1, 2020. (Woods PMG Dec. ¶ 21, Ex. A); (O'Connell PHL Dec. ¶ 8, Ex. A). Pursuant to Article 3.3(a) of the Loan Agreement, 12706 Holdings was required to make its first payment of interest on May 1, 2019, and continue on the first day of each month thereafter until the maturity date. (Woods PMG Dec. ¶ 21, Ex. A); (O'Connell PHL Dec. ¶ 8, Ex. A). Interest, including default interest, and late fees on the unpaid principal balance are due and owing pursuant to Articles 3.3(b) through (e) of the Loan Agreement. (Woods PMG Dec. ¶ 21, Ex. A); (O'Connell PHL Dec. ¶ 8, Ex. A).

23. Pursuant to Section 4.2 of the Loan Agreement, 12706 Holdings represented and warranted that the execution, delivery and performance by 12706 Holdings, as borrower, and Woodburn, as guarantor, of the Loan Documents to which they are parties will not violate any law or result in the imposition of any lien, charge or encumbrance upon all or any portion of the Subject Property, except for any liens in favor of PMG, as lender, as contemplated by the Loan Documents. (Woods PMG Dec. ¶ 22, Ex. A); (O'Connell PHL Dec. ¶ 9, Ex. A). The Loan Documents as referenced in the Loan Agreement include the Loan Agreement, the Commercial Mortgage, the Note, and the Guaranty Agreement, which are all further identified below. (Woods PMG Dec. ¶ 22, Ex. A); (O'Connell PHL Dec. ¶ 9, Ex. A).

24. Pursuant to Section 4.17 of the Loan Agreement, 12706 Holdings represented and warranted that it was the sole owner of the property located at 127-06 177th Street, Jamaica, New

York 11434 ("Subject Property"); the Subject Property is not subject to any leases; other than 12706 Holdings, no person has any possessory interest in the Subject Property or right to occupy the same; the Subject Property is not occupied and neither 12706 Holdings, as borrower, nor Woodburn, as guarantor, has any intent to occupy the Subject Property, or to permit any other person to occupy the Subject Property during the term of the Commercial Mortgage Loan. (Woods PMG Dec. ¶ 23, Ex. A); (O'Connell PHL Dec. ¶ 10, Ex. A).

25. Pursuant to Section 4.2 of the Loan Agreement, 12706 Holdings represented and warranted that neither 12706 Holdings, as borrower, nor Woodburn, as guarantor, had failed to disclose any fact that could cause any information described in any representation or warranty to be misleading or adversely affect the value of the Subject Property. (Woods PMG Dec. ¶ 24, Ex. A); (O'Connell PHL Dec. ¶ 11, Ex. A). 12706 Holdings, as borrower, and Woodburn, as guarantor, further represented and warranted that no statement of fact made by them in any of the Loan Documents contained any untrue statement of a material fact or omitted to state any material fact necessary to make statements contained in the Loan Documents not misleading. (Woods PMG Dec. ¶ 24, Ex. A); (O'Connell PHL Dec. ¶ 11, Ex. A). 12706 Holdings, as borrower, and Woodburn, as guarantor, further represented and warranted that there was no fact then-known to them that has not been disclosed to PMG, as lender, which adversely affects, nor as they could foresee, might adversely affect the business, operation or condition of 12706 Holdings, Woodburn or the Subject Property. (Woods PMG Dec. ¶ 24, Ex. A); (O'Connell PHL Dec. ¶ 11, Ex. A).

26. The Loan Agreement contained an indemnification provision set forth in Section 5.13. (Woods PMG Dec. ¶ 25, Ex. A); (O'Connell PHL Dec. ¶ 12, Ex. A).

27. Events of default under the Loan Agreement include, among other things as set forth in Section 6, 12706 Holdings' failure to pay any principal, interest or other amount due under

the Loan Documents when due, 12706 Holdings' violations of its obligations under Sections 3.3(a) and/or 6.3 of the Loan Agreement, and the untruth in any material respect when made or deemed made any representation or warranty made in any Loan Document. (Woods PMG Dec. ¶ 26, Ex. A); (O'Connell PHL Dec. ¶ 14, Ex. A).

18. On March 27, 2019, 12706 Holdings executed a Promissory Note in connection with the Commercial Mortgage Loan (the "Note"). (Woods PMG Dec. ¶¶ 27, 28, Ex. D); (O'Connell PHL Dec. ¶¶ 15-16, Ex. B). Pursuant to the Note, 12706 Holdings, as borrower, promised to repay $535,000.00 plus interest to PMG. (Woods PMG Dec. ¶ 29, Ex. D); (O'Connell PHL Dec. ¶ 17, Ex. B). The Note was executed by Woodburn in his official capacity as President of 12706 Holdings. (Woods PMG Dec. ¶ 30, Ex. D); (O'Connell PHL Dec. ¶ 18, Ex. B).

21. To secure repayment of the Note, 12706 Holdings executed a Mortgage, Security Agreement, And Fixture Filing on March 27, 2019 (the "Commercial Mortgage") in favor of PMG, encumbering and granting to PMG a security interest in the Subject Property. (Woods PMG Dec. ¶¶ 31, 32, Ex. E); (O'Connell PHL Dec. ¶¶ 19, 20, Ex. C). The Commercial Mortgage was recorded on July 19, 2019, in the Office of the City of Register of the City of New York under CRFN: 2019000227660 and bears Document ID 2019041000506001. (Woods PMG Dec. ¶ 33, Ex. E); (O'Connell PHL Dec. ¶ 21, Ex. C).

23. Certain of the funds from the Commercial Mortgage Loan satisfied obligations under the 2006 Mortgage. (Woods PMG Dec. ¶¶ 35, 40-41); (O'Connell Dec. ¶ 24). The 2006 Mortgage encumbered the Subject Property as set forth in the 2006 Mortgage and was security for the corresponding note. (Woods PMG Dec. ¶ 37); (O'Connell Dec. ¶ 24).

24. PMG funded the Commercial Mortgage Loan on March 27, 2019, by transmitting funds in the amount of $535,000.00, to eight recipients, including $496,884.97 to the law firm of

Donaldson & Chilliest, LLP, which was the law firm that represented 12706 Holdings. (Woods PMG Dec. ¶¶ 42-43, Exs. H, I); (O'Connell PHL Dec. ¶¶ 25-26, Ex. D).

26. As is standard in the mortgage industry, a title report ("Title Report") was obtained and a policy of title insurance was issued to PMG by issued by WFG National Title Insurance Company ("WFG National") assuring PMG that the Commercial Mortgage Loan to 12706 Holdings would be in first lien position ("Title Policy"). (Woods PMG Dec. ¶¶ 38-41, Exs. F, G); (O'Connell PHL Dec. ¶¶ 27-29, Exs. E, F).

26. The amount of $337,500.00 was wired to Ocwen from the IOLA account of Donaldson & Chilliest, LLP, counsel for 12706 Holdings, on March 29, 2019. (Mulvaney Dec. Ex. D (Tr.D2 277:17 – 279:7, Tr.D2 Ex. U)).

27. At the time Deutsche Bank commenced foreclosure on the 2006 Mortgage against Plaintiff on May 8, 2015, Deutsche Bank alleged that there was $411,651.39 then-due-and owing from Plaintiff. (Mulvaney Dec. Ex. F (Foreclosure Compl. ¶ 11), Ex. D (Tr.D1 114:6-17, 236:3-7, 236:13 – 238:18, Tr.D1 Ex. N)). Deutsche Bank also alleged that the note that Plaintiff executed and delivered relative to the 2006 Mortgage provided that "in the event any installment shall become overdue for a period in excess of fifteen (15) days a late change of 2.00% on the overdue sum may be charged for the purpose of defraying the expense in handling such delinquent payment." (Mulvaney Dec. Ex. F (Foreclosure Compl. ¶¶ 2, 3, 12)). Deutsche Bank also alleged that the 2006 Mortgage provided that "in the event of default by [Plaintiff], [Deutsche Bank] may recover all costs, including reasonable attorneys' fees, disbursements, and allowances by law in bringing any action to protect its interest in the premises." (Mulvaney Dec. Ex. F (Foreclosure Compl. ¶ 13)).

28. Summary judgment was awarded in the foreclosure case involving the 2006 Mortgage, and the matter was referred to a referee for calculation of damages and the Subject Property was subject to foreclosure sale. (Mulvaney Dec. ¶¶ 10-11, Ex. G (Order Granting Summary Judgment and Order of Reference), Ex. D (Tr.D1 245:-19 – 247:21, Tr.D1 Ex. Q)).

29. Rather than proceed to a sheriff's sale and have the Subject Property sold at foreclosure, Plaintiff entered into the transaction with 12706 Holdings on January 4, 2019. (Mulvaney Dec. Ex. D (Tr.D1 250:14-18, 253:14 – 255:12. Tr.D1 Ex. R)). The transaction between Plaintiff and 12706 Holdings provided Plaintiff with the benefit of paying off Plaintiff's 2006 Mortgage with Ocwen that was the subject of the foreclosure case. (*Id.* (Tr.D1 250:19 – 251:9), Ex. E (Tr.D2 282:18-24)).

28. After receiving the $337,500.00 that was wired to Ocwen, Deutsche Bank executed a release of Plaintiff's 2006 Mortgage on May 29, 2019, which was recorded on June 10, 2019. (Mulvaney Dec. ¶ 5, Ex. B (Release of Mortgage), Ex. D (Tr.D2 271:21-24, Tr.D2 Ex. S)).

28. Deutsche Bank, through its counsel, moved to discontinue its action to foreclose Plaintiff's 2006 Mortgage on April 9, 2019, due to a short sale payoff. (Mulvaney Dec. ¶¶ 12-13, Ex. H, Ex. D (Tr.D1 17-19, 217:2-7), Ex. E (Tr.D2 281:3 – 282:9, Tr.D2 Ex. W)).

29. The Supreme Court, Queens County, granted Deutsche Bank's motion and discontinued the foreclosure proceedings by order dated May 17, 2019. (Mulvaney Dec. ¶¶ 14-15, Ex. I (Order), Ex. E (Tr.D2 280:3-12, Tr.D1 Ex. R, Tr.D2 Exs. S, T)).

24. Consistent with a Master Mortgage Loan Sale and Servicing Agreement ("Master Servicing Agreement") between PMG and IRP Fund II Trust 1A, an affiliate of Verus Residential Loanco, LLC ("Verus"), IRP Fund II Trust 1A purchased the Commercial Mortgage Loan from

PMG on April 30, 2019. (Woods PMG Dec. ¶¶ 44-45, Ex. J); (O'Connell PHL Dec. ¶¶ 30-31, Ex. G).

31. As a result of that transaction, PMG is no longer the holder of the Commercial Mortgage. (Woods PMG Dec. ¶¶ 44, 46-47, Ex. K); (O'Connell PHL Dec. ¶¶ 32-33, Ex. H).

32. Pursuant to an Assignment of Mortgage ("Assignment") that was recorded on May 12, 2022, the Commercial Mortgage was assigned to PHL, as servicer for Wilmington Savings Fund Society, FSB, not in its individual capacity but solely as owner trustee for Verus Securitization Trust 2020-NPL1, which is the owner trustee of Verus Securitization Trust 2020-NPL1, the trust that now owns the Commercial Mortgage Loan and holds the Commercial Mortgage. (Woods PMG Dec. ¶¶ 46-47, Exs. J, S, K); (O'Connell PHL Dec. ¶¶ 32-33, Exs. G, H).

33. In connection with the Commercial Mortgage Loan, PMG received many documents from 12706 Holdings as part of the loan application and due diligence process. (Woods PMG Dec. ¶ 54-55, Ex. M).

34. None of the documents that PMG received during the financial due diligence process before it agreed to originate and enter into the Commercial Mortgage Loan provided any indication or information about the negotiations that led to 12706 Holdings' acquisition of the Subject Property that Plaintiff formerly owned. (Woods PMG Dec. ¶¶ 54-57, Ex. M). PMG's loan application review of the documentation provided by 12706 Holdings revealed no unusual characteristics that suggested Plaintiff might have been a victim of fraud. (Woods PMG Dec. ¶¶ 56-57).

35. Other than providing ordinary lending services, namely providing the proceeds of the Commercial Mortgage Loan to 12706 Holdings, PMG did not participate in, was not a party

12

to, was not involved in, and had no knowledge of any negotiations that led to 12706 Holdings' acquisition of the Subject Property from Plaintiff or Plaintiff's short sale with Ocwen, and did not attend any closing of the short sale between Plaintiff and Ocwen or the closing of the Commercial Mortgage Loan. (Woods PMG Dec. ¶ 53); (Mulvaney Dec. Ex. D (Tr. 256:6 – 257:7, 261:16-22, Tr. Exs. R, S)).

36.     PHL did not originate and was not involved with originating the Commercial Mortgage Loan. (O'Connell PHL Dec. ¶ 34). PHL is not a lender; it functions only as a mortgage servicer. (O'Connell PHL Dec. ¶¶ 34-35). PHL's only role with the Commercial Mortgage Loan was to provide ordinary mortgage servicing services for PMG when it held the Commercial Mortgage and, subsequently, Wilmington Savings Fund Society, FSB, not in its individual capacity but solely as owner trustee for Verus Securitization Trust 2020-NPL1. (O'Connell PHL Dec. ¶¶ 35-36).

37.     PHL did not participate in, was not a party to, was not involved in, and had no knowledge of any negotiations that led to 12706 Holdings' acquisition of the Subject Property from Plaintiff or Plaintiff's short sale with Ocwen, and did not attend any closing of the short sale between Plaintiff and Ocwen or the closing of the Commercial Mortgage Loan. (O'Connell PHL Dec. ¶ 36); (Mulvaney Dec. Ex. D (Tr.D1 256:6 – 257:11, 261:16-22, Tr.D1 Ex. R, Tr.D2 Ex. S)).

38.     PHL's capacity as mortgage servicer did not commence until after the closing of the Commercial Mortgage Loan. (O'Connell PHL Dec. ¶ 36).

39.     Aside from providing ordinary mortgage servicing services as set forth above with respect to the Commercial Mortgage Loan, PHL provided no other services related to the Commercial Mortgage Loan. (O'Connell PHL Dec. ¶ 36).