# EXHIBIT C

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X    21-42857-206
In re:

Evis Neverlane Stephens,

                     Debtor.

                                                            Chapter 13
-------------------------------------------------------X

Evis Neverlane Stephens,

                     Plaintiff,                             Adversary Proceeding No. 22-01037

v.

Maxine Bonaparte,
Lezantonio Woodburn,
12706 Holdings Inc.,
Charles L Mester, Esq.,
Planet Management Group, LLC,
Planet Home Lending LLC dba Planet Home Servicing,
Wilmington Savings Fund Society, FSB (WSF),
Verus Securitization Trust 2020-NPL1,

                     Defendants.
-------------------------------------------------------X

## REVISED SECOND AMENDED COMPLAINT[1]

### Brief Introduction

Ms. Evis Neverlane Stephens is a tragic victim of a foreclosure rescue scam, engineered

by the defendants. Often, these homeowners facing foreclosure are desperate enough to try any

---

[1] This Second Amended Complaint has been amended with the names removed of those defendants from particular counts and claims that the Court had dismissed against such defendants. The Second Amended Complaint is not asserting claims which are dismissed by the Hon. Judge in her orders entered in this adversary proceeding. The complaint is amended pursuant to the judicial allowance granted to the plaintiff by the Court in its orders. The amendment is confined to the claims as permitted by the Court. For the sake of clarity and brevity, no new facts have been added other than some amplification in the causes of action, especially Fifteenth Cause of Action split into three independent claims—A, B, and C. Sixteenth and Seventeenth causes have been similarly amplified factually, twentieth cause of action is reproduction of last cause of action in the former complaint, now labelled as "Twentieth Cause of Action." The paragraph numbering is also unchanged to the extent possible. The exhibits mentioned and numbered here are the same as in the former complaints. The former complaint is incorporated herein to the extent it does not conflict with the Second Amended Complaint.

offer that looks like it may save their home, even if it costs thousands of dollars or puts the homeowner's equity at risk. Foreclosure rescue scammers take advantage of homeowners' desperation through a variety of schemes. When homeowners have significant equity in their homes or when property values are appreciating, foreclosure rescue scams often focus on obtaining title to the home and robbing homeowners of their equity. When homeowners have little equity, scams center on squeezing upfront fees—often thousands of dollars—from borrowers. There are many different types of foreclosure rescue scam. Most foreclosure rescue scams fall into one of three categories: phantom help, obtaining title by fraud or deception, and obtaining title through a fake bailout. The homeowners believe they are obtaining refinancing or a new loan and do not realize they are surrendering ownership of the house. The homeowners may truly sign the papers transferring the home, but the transaction is confusing and the homeowners are misled about the nature of the papers they are signing. Or it could be a "bailout" in which the homeowner typically understands that they are signing a deed to transfer ownership of the home, but they are doing so in the belief that they will be able to regain ownership at a later time. Meanwhile, the homeowner becomes a tenant in their own home on terms that are often oppressive and unaffordable, ending with eviction. The rescuer may even renege on promises to pay off the mortgage, leaving the homeowner liable for loans on a house they no longer own. Sometimes the rescuer goes even further—selling the house to a third party or mortgaging it and pocketing the proceeds. Law enforcement authorities are aware of these horrible predatory practices.[2]

---

[2] https://ag.ny.gov/press-release/2020/attorney-general-james-launches-protect-our-homes-initiative-combat-deed-theft; https://www.nysenate.gov/newsroom/press-releases/velmanette-montgomery/governor-cuomo-signs-montgomery-weinstein-deed-theft

The Defendants here used a hybrid approach convinced Ms. Stephens that she has to transfer the title to their company and charged her $10,000 for rescuing her home with the promise that once the loan is modified with the help of their company they would revert the home back to Stephens. Ms. Stephens's expectation was that the transaction will help them retain possession and ownership of the home. During the transaction homeowners surrender title to their home with the expectation that they will be able to remain in the home as a renter until they are able to repurchase the property. However not everyone is lucky[3] to come out unscathed out of this heinous quagmire of scheme predators like the Defendants. Immediately after the transfer of the title the Defendants commenced eviction proceedings[4] against Ms. Stephens and her family members. The whole family has been put to severe torture, criminal threats and as well as eviction proceeding. Now upon further discovery, it has been found that defendants obtained a commercial loan with the active assistance of the complained defendants to pay off the earlier residential mortgage. This commercial loan has an interest rate that exceeds consumer loans usual interest rates, with a default rate of 24%. Now the said loan is also in default rapidly devouring any and all equity in the house.

---

[3] *In re Wells*, 2016 WL 5819798, at *1 n.2 (Bankr. S.D. Fla. Oct. 5, 2016) (after stating that consumer debtor was contacted by foreclosure rescue company, entered into sale-leaseback to save home from foreclosure and successfully exercised option to repurchase, court noted "The Court is very familiar with these foreclosure rescue schemes and is amazed that, at least in this instance, the homeowner was able to successfully recover ownership of the home.").

[4] *See, e.g.*, *In re* Lima, 2012 WL 3070569 (Bankr. D.R.I. July 30, 2012); *In re* Davis, 169 B.R. 285 (E.D.N.Y. 1994).

> In *In re Davis* the lease agreement required monthly rent payments that were clearly unaffordable and required an entire year's rent upon default. Within one month after the sale-leaseback transaction closed and two weeks after the first rental payment was due, the purchaser had perfected a judgment against the former homeowners for a full year's rent and cost and obtained a warrant of eviction for nonpayment of rent.

Defendants acted, colluded as a team to achieve this unlawful deprivation of Debtor's home and defendants unlawful monetary gains.

## SUBJECT REAL PROPERTY

1.     The real property (Home) which is the subject of this action is a single two family house located at 127-06 177th Street, Jamaica NY 11434, more particularly described as:

> LOT 0093; BLOCK 12527 AS PER MAP RECORDED IN BOOK OF/IN THE OFFICE OF THE COUNTY RECORDER OF QUEENS COUNTY,

hereinafter refer to as "subject premises", or "plaintiff's home" or "Real Property" or "Home."

## JURISDICTION

2.     This Court has jurisdiction over the claims for relief under 18 U.S.C. §§ 1964(a) (Equity) and 1964(c) (Right to Sue and Treble Damages); 28 U.S.C. §§ 1334 (bankruptcy); 28 U.S.C. §§ 1331(federal question) and 28 U.S.C. § 1367 (supplemental jurisdiction over state claims).

## PERSONAL JURISDICTION AND VENUE

3.     Personal jurisdiction and venue are predicated upon 18 U.S.C. § 1965(a) and (b) and 28 U.S.C. § 1391(b) and (d) since the Defendants are residents of, have an agent or agents, or transact their affairs in the Eastern district of New York and the acts and occurrences in furtherance of the claims alleged herein arose in the Eastern District of New York, and because the ends of justice require that other parties residing in other districts be brought before the court.

## PARTIES

4.     Plaintiff Evis Neverlane Stephens ("Ms. Stephens"") is a resident of the County of Queens, city and state of New York. She resides in the subject premises, with her family, which she purchased in or around 2006.

5.     Plaintiff is informed and believes and thereupon alleges that defendant and participant Maxine Bonaparte ("Maxine") is a resident of the city and state of New York. Plaintiff is informed

and believes that Maxine uses several aliases and she has some court records. **Ex. A.** She is also an agent and or an officer of the defendant 12706 Holdings Inc. along with the Lezantonio Woodburn.

6.      Plaintiff is informed and believes and thereupon alleges that defendant and participant Lezantonio Woodburn ("Woodburn") is a resident of the city and state of New York. Plaintiff is informed and believes that Woodburn also an agent and or an officer of the 12706 Holdings Inc. along with Maxine.

7.      Plaintiff is informed and believes and thereupon alleges that defendant 12706 Holdings Inc. (Holdings) was and is a corporation organized under the laws of the State of New York. Holdings' principal place of business is in New York

8.      Plaintiff is informed and believes and thereupon alleges that defendant and participant Charles L Mester (Mester) is a resident of the city and state of New York. Mester is an attorney engaged in the legal professional with an office located at 26 Court Street, Suite 1200, Brooklyn, New York.

9.      Defendant Planet Management Group, LLC (Planet Management) is a New York based company operating from 105 Maxes Road, Suite N 205, Melville, New York 11747, which funded and facilitated the transfer of the real property to the Holdings.

10.     Planet Home Lending LLC dba Planet Home Servicing (Planet Servicing) is a servicer of the loan funded by Planet Management.

11.     Wilmington Savings Fund Society, FSB (WSF) is a Delaware company operating from 500 Delaware Avenue, Wilmington, DE 19801, and upon information and belief is the trustee of the trustee Verus Securitization Trust 2020-NPL1 currently holding the loan note.

12.     Verus Securitization Trust 2020-NPL1 (Verus Trust) upon and belief is a Trust presently holding the Note and Mortgage regarding the home of the Debtor 127-06 177th Street, Jamaica NY 11434 (the "Real Property").

13.     Planet Management, WSF, Planet Servicing and Verus trustee have been collectively addressed as "Planet Enterprise" for pleading purposes, a reference to one includes reference to the other member of the "Planet Enterprise."

14.     Plaintiff is informed and believes and thereupon alleges that at all times herein mentioned:

   (a)    Holdings formed and used and continues to be used as a mere instrumentality and conduit through which Maxine and Woodburn for convenience, has conducted and continues to conduct their own business;
   (b)    Maxine and Woodburn governed and influenced and continues to govern and influence Holdings;
   (c)    There is such a unity of interest and ownership between Maxine, Woodburn and Holdings that the individuality and separateness of Holdings and Maxine and Woodburn did not and does not exist, and Holdings was and is the alter ego of Woodburn and Maxine and merely a conduit through which Woodburn and Maxine performed the acts herein alleged; and
   (d)    Adherence to the fiction of the separate existence of Holdings would sanction fraud and promote injustice.

## THE PATTERN OF UNLAWFUL RACKETEERING ACTIVITY

15.     During the relevant times, the Defendants and Participants conspired with one another to defraud Ms. Stephens and her family members. As part of the scheme to defraud, the Defendants used another participant an attorney Mester to foster an impression of an undertaking to save her house, however all these actors had setup the entire mechanism to defraud Ms. Stephens and her family to divert unlawfully the title of her Home to the benefit of themselves and others who had no lawful right to the title of Real Property. The multifarious racketeering activities through which these broad objectives of the Defendants and Participants were carried out consisted of a complex pattern of individual transactions and groups of transactions. It was a part of the scheme to defraud that Participant Defendants would and did agree and conspire together with the others to devise and participate in a plan of deceit and deception, whereby they would and did abuse their positions

of trust and fiduciary relationships with Ms. Stephens; they would and did abuse the discretion granted to them and breach their obligations of loyalty and fidelity and their duty to act honestly and faithfully in the best interests of Ms. Stephens and not for their own self interests; and they would and did use false and fraudulent pretenses, representations and promises calculated to deceive persons of ordinary prudence and due care and make material nondisclosures and concealment of fact and information important to Ms. Stephens in deciding whether to act in the conduct of Ms. Stephens loan modification, all so as to unlawfully, intentionally and willfully, and with intent to defraud, that is, knowingly and with specific intent to deceive in order to cause financial gain to themselves, procure secretly and divert the title of the Home and profits to themselves to the use and benefit of themselves and others and to the detriment of Ms. Stephens and her family members. Once the transfer of the title to the property was accomplished, the Defendants moved from a subversive to an open notorious conduct including criminally threatening the family members of the plaintiff to leave the house.

16.    That scheme to defraud evolved over time as a pattern of racketeering activities that inflicted discrete harms on Ms. Stephens and other family members These discrete transactions and harms are listed herein. Ms. Stepehens and her family, the victims of the unlawful patterns of racketeering activity suffered loss of their only Home.

17.    In carrying out the scheme to defraud Ms. Stephens of the title to her home, Defendants and Participants including Planet Enterprise engaged, *inter alia*, in conduct in violation of Federal laws, to wit: mail fraud in violation of 18 U.S.C. § 1341; wire fraud in violation of 18 U.S.C. § 1343; violations of the Currency and Foreign Transactions Reporting Act, 31 U.S.C. § 5313; interstate transportation of persons and of property obtained by fraud in violation of 18 U.S.C. § 2314; and Hobbs act extortion in violation of 18 U.S.C. §1951.

18.     In carrying out the scheme to defraud Ms. Stephens, Defendants and Participant also

engaged, *inter alia*, in conduct in violation of the laws of the State of New York including to wit:

Deed theft in violation of NY RPP § 265-a. Home equity theft prevention.

## Factual Background

19.     In and around 2006, Ms. Stephens was a home health aide doing live-in-jobs but working

part time in different homes from 9am in the morning to 9 pm. She worked very hard, at times she

would work all night and get off 9 am next day to go to another house. Sometimes she worked 24

hours living in cooking, washing, cleaning, doing laundry shopping, taking elderly people to their

doctor's. Her salary was $1,000 a week. She got paid weekly. She saved around $10,000 and

wanted to a buy a house.

### Mortgage broker Osmond Decoteau

20.     While attending a church service, Ms. Stephens asked another parishioner if he knew any

he knew any broker or a real estate agent. Ms. Stephens wanted to buy a home. After looking for

some weeks she finally saw a home she liked. She went with the broker Osmond Decoteau

(Osmond) to check it out.  It was a two-family house priced at $650,000.  The broker told her not

to worry about the monthly payments as that would be affordable and he would help her get the

house with zero percent down payment. Ms. Stephens attended the closing of the house, however

her nightmare started when she started getting mortgage statements from banks regarding other

properties that she never bought. Osmond used her credit and bought other properties in her name

without her knowledge or understanding.  Also, her mortgage payment on her home was not $2500

as she was told rather sum exceeding $5000 a month. Alarmed, Ms Stephens called Osmond

several times, however he kept assuring her that he would call her back. Which he never did. Ms

Stephens was stuck with the properties bought in her name and also with a high mortgage payment

on her house. Ms. Stephens was contacted by the FBI special agents regarding Osmond. Osmond was shortly thereafter indicted, however he used insanity as a plea to his wrong doings and was not convicted. The said three properties are located at 127-06 177 Street Jamaica, NY 11434 (Jamaica House) since 2006; 1487 East 53 Street, Brooklyn, New York (1487 Property); and 844 East 34th Street, Brooklyn, New York (844 Property). The Jamaica House is the prime residence of Ms. Stephens. And she is in possession of the same, but ownership has been stolen from her by the aforesaid Defendants.

21.     The obligation of the mortgages on three properties burdened Ms. Stephens and her health started failing. She lost her good credit owing to damage caused by the broker Osmond

22.     She struggled to pay mortgages on the subject property her home. In order to make mortgage payments, Ms. Stephens rented out the top floor for a sum of $2000 a month. However, the tenants fell behind in their payments. Ms. Stephens got into a loan modification with the bank with the payments now reducing to $2500. Owing to financial strain and failed health, Ms. Stephens once again fell behind in her payments and once again there was the foreclosure proceeding against her house.

**John Clark, Herkimer Realty One and Maxine Bonaparte**

23.     Meanwhile Ms. Stephens other two properties payments were already in default and she sought help. Around in 2010, Ms. Stephens was referred to one John Clark (Clark)running an office under his company Herkimer Realty One (Herkimer). Clark claimed expertise in loan modifications. Clark introduced Ms. Stephens to Maxine Bonaparte (Maxine) in 2017/18. Maxine spoke to Ms. Stephens and told her that she would help her out from the mortgage issues and she offered to get the loan transactions transferred to Ms. Stephens's husband name if he had a good

credit history. She took $1500 from Stephens to check Ms. Stephens husband, Calivin Stephens' credit history.

24.     Maxine came by Ms. Stephens home to talk at length about saving her house. She told Ms. Stephens that she has some bad news that her house is on the "steps," to be sold and that she could save it. She further suggested that the only way she could save it is to follow her in every manner. She suggested that the title of the Jamaica House has to be transferred to her friend's name or a company and that she would have it retransferred back to her once the property is saved from foreclosure. She also suggested that she could also do something for her houses in Brooklyn and get $150,000 out of them and she could use that money to save her home. Ms. Stephens agreed to do anything to save her home, the Jamaica House.  Meanwhile owing to the stress, in 2018 Ms. Stephens suffered a head stroke. Ms. Stephens also developed high blood pressure, as she was breaking down under the pressure of the mortgage payments.

25.     Maxine demanded $10,000 to save the Jamaica House. She was paid that amount by Ms. Stephens. **Ex. B.** Ms. Stephens had to borrow the same amount and same was sent to her from her son in law.  Maxine told her that $10,000 would be given back to her once everything is under control.  However, Maxine instructed Ms. Stephens to leave the beneficiary's name blank and she suggested that she would fill it up. Ms. Stephens wrote two blank checks $5000. Copies of the Checks retrieved from the bank shows that Maxine had made the checks payable to KE2Contract LLC and 160 21 Avenue Corp. Maxine also suggested that she has a special lawyer Mr. Charles Mester, who is an expert in complex deals and that he is going to help Ms. Stephens in saving the house.

**Charles Mester, Attorney at Law**

26.    Around September 21, 2018, Maxine came to Ms. Stephen's house to pick her up and drove to attorney Mester. In his office, Maxine spoke about the legal issues to which Mester said that he is going to help. Mester also offered to help Ms. Stephens regarding her Brooklyn properties. Attorney Mester had a retainer dated September 21, 2018 (the "Retainer") executed between Ms. Stephens and his office. The Retainer in its very first paragraph states the following:

> Thank you for meeting with me in relation to retaining CHARLES L. MESTER, ESQ. ("Attorney") to provide legal services to you in connection with your prosecution of civil litigation involving the real properties located at 1487 East 53rd Street, Brooklyn New York, and 844 East 34th Street, Brooklyn, New York and *sale of leaseback of the real property located at 12706 177th Street, Jamaica, New York.* This letter, when fully executed, confirms that the Attorney will represent you in the above referenced matters. This engagement does not include any appeals work, which would only be handled after a separate agreement and retainer is agreed upon at the appropriate time. . . .

**Ex. C. Retainer** (emphasis added). In this meeting, once Ms. Stephens had talked about circumstances and the mortgages on the properties, Mester told her to step out of the office and leave Maxine and him alone in office. Ms. Stephens went out of the office and waited for Maxine to come out. However, after half an hour wait, Ms. Stephens was called back and made to sign some papers as the Retainer. Mester promised that he is going to be saving Jamaica House and as well as other properties. Ms. Stephens expressed deep concerns about the ongoing foreclosure of Home. Mr. Mester assured her that he will have her Home.

27.    Mester met Ms. Stephens only twice. Once at the signing of the Retainer and second and last time at the time of Deed transfer of Ms. Stephens Jamaica House. Till date there is no litigation undertaken by Meseter regarding properties that he promised to do.

28.    In and around March 2019, Maxine along with Lezantonio Woodburn (Woodburn), once again came to Ms. Stephens to pick her up and take her to the closing to save her house. Ms.

Stephens found herself in an office with a long conference table. Ms. Stephens met Mester and another attorney claiming to be an attorney for Woodburn. There were some other people, whom Ms. Stephens could not recognize. Upon information and belief the Planet Enterprise was present throughs its agents. Mester on the conference table slides the paperwork to Ms. Stephens and pointed out the exact places where she had to sign. She signed those papers. Mester did not explain the contents of the papers, nor was she told the reasons for such signing, other than that this was to save her house. Ms. Stephens spent approximately two hours in the conference room. When the people at the table started leaving, Ms. Stephens asked for copies of paperwork. Neither Mester nor Maxine provided any paperwork. She did pick a paper which purports to be a loan term sheet. The Planet Enterprise did not provide her with any paperwork, nor did they disclose to her that they are facilitating the funding of the transfer of the property. While Maxine was driving Ms. Stephens back to her house, Ms. Stephens asked Maxine about the paperwork. Maxine assured her that she would soon get her copies of what was signed. Woodburn who was also in the car, told Ms. Stephens, "Don't worry, I do not need your property. I will give it back to you." This only confused Ms. Stephens. She could not understand what Woodburn meant because she had not given her property to anyone. Till date, Maxine has not been provided the paperwork signed by Ms. Stephens.

29.    Upon information and belief, Mester is Maxine and Woodburn's attorney for their businesses and other ventures. The Retainer also has Maxine signature as Mester's client. There was no money paid by Ms. Stephens, as she was told that Mester had an understanding with Maxine. Upon information and belief, even though Mester had a retainer agreement signed with Ms. Stephens, he unethically represented both the 12706 Holdings Inc. and Ms. Stephens.

30.     Upon information and belief Mester prepared (or caused to be prepared) both any paperwork related to Purchase and Sale Agreement and Transfer Ownership Agreement. Mester misrepresented the terms of both documents to the Ms. Stephens and urged her to sign them while never advising her to have them reviewed by independent counsel, knowing that she was under duress as she did not want to lose her Home. At no time did Mester, Maxine or Woodburn inform Ms. Stephens that, on information and belief, they had a beneficial interest in 12706 Holdings Inc. Ms. Stephens did not fully read or understand either agreement, a fact of which defendants were aware or should have been aware. In addition, defendant Mester unduly pressured Ms. Stephens by, among other things, have her signature under the threat of loss of her home. However, trusting and believing that defendant, as her attorney, was acting in her best interests, plaintiff signed the documents in reliance on Attorney's statements and assurances.

31.     Within a day or two of the said closing, Maxine instructed that Ms. Stephens to make a payment of $2500 per month as a mortgage payment while the property is in third party's name. No paperwork was given to Ms. Stephens explaining her situation and or the paperwork. After the closing, Ms. Stephens kept her promised started making regular payment of $2500 every month until December 2019. As around this time, Maxine stated coming to the subject property and started screaming at Ms. Stephens: I *want you to start paying rent, you have to start giving me your rent money.  You cannot afford to buy this house you cannot afford this house.*" Ms. Stephens contacted attorney Charles who just advised her," "if you cannot afford to buy the house continue paying your rent." At the time Ms. Stephens called Charles, she heard Maxine in the background. Not a single week passed by,  after the signing of housing saving documents, that Maxine would not come by the House screaming and threatening the family members of the Ms. Stephens's household to leave.

32.    A few days there, Woodburn turned up at Ms. Stephens' home.  He also accused Ms. Stephens of not paying the mortgage on the house. When he was told by Ms Stephens that she is regular with the mortgage, he told her that it was not sufficient to meet the entire mortgage amount. He also instructed them to leave the house as he had to renovate it. Ms. Stephens advised Woodburn that she has been carrying out the regular renovation and that she had spent $1500 fixing the sewer. Meanwhile the boiler at the house broke down. Ms. Stephens had to pay for the same.

33.    Before the Covid-19 closure, one day around 9 PM Woodburn accompanied with a Notary came to meet Ms Stephens  with a copy of an agreement titled as **Contract-Use and Occupancy Agreement for 127 06 177ᵗʰ Street Jamaica New York 11434** (Occupancy Contract). **Ex. D.**  He told her that the monies being paid is not enough and said that if they want to stay in the house, they will haves to sign the Occupancy Contract. Fearing that they would lose the house, Ms. Stephens and her husband under duress signed the Occupancy Contract. The Occupancy Contract makes the following declaration:

> This agreement dated January 1, 2020 is between the **owner 12706 Holdings Inc and the occupants, Calvin Stephens, Evis Stephens, John Doe(s) and Jane Doe(s). The owner 12706 Holdings Inc has agreed to:**
>
> **Sell** the property known as **12706 177th Street .Jamaica NY 11434 Block: 12527 Lot: 0093.** To Calvin Stephens, Evis Stephens, John Doe(s) and Jane Doe(s) in Two Years and Three Months.
> This agreement is for Two Years and Three Months.
>
> **NATURE OF OCCUPANCY:**
> Calvin Stephens, Evis Stephens, John Doe(s) and Jane Doe(s) will occupy the property as licensee only and **not as Tenant.** The seller confirms and the occupants agrees that they do not have the rights as tenants as in Landlord and Tenant law.
>
> **TERMS:**

From 1/1/2020 to 4/1/2022, Calvin Stephens, Evis Stephens, John Doe (s) and Jane Doe(s) will Occupy the property at unit 1 for a fee of $1500.00 each month. The fee is due on the 1st of Every month. Occupants will pay the Gas and Electric bill for Unit 1, $150.00 every three months for Water Bill in Unit 1. Washer and Dryer area must be kept clean and clutter free in the basement.

Basement will only have a Sofa, TV, pantry and closet. Basement will not be a storage space for boxes, barrels or any other items except items listed above. Any disregards for the rule will result in a fee in the amount of $1000.00. No storage in the boiler room. No allowing children to
write on the walls, doors, closets or the walls, hook basketball hoops to any walls in the house.
Areas must be kept clean in the house.

Empty rooms cannot be storage space. A bed, dresser or TV in rooms only.

Kitchen must be kept extremely clean. No grease on the walls or floors.

Living Room must be clutter free, Sofa, TV and dining furniture.

**NOTICE:**

The occupants will be responsible for all and any damages to the property that occurs during their stay.

The damages include the backyard. The shad will not be overstocked with items not used. No storage of unused items in the shad. No storage on the property, (backyard) The seller will provide back yard furniture for the summer months. Shad must be able to store the lawn
furniture.

The occupants must keep the front area of the property sweep clean, garbage in provided cans.
Garbage put on curbside on destinated days, including recyclable.

If the property 127 06 177th Street Jamaica NY 11434 is damage at any time the occupants will pay to repair or be prepared to move out. The occupants must call the owner for any repairs.

If the occupants cannot purchase the property at the end of the contract agreement, the Occupants agree to move out of property, 12706 177th Street Jamaica NY 11434 without argument in 30 (Thirty days) from the expiration of the agreement.

**The property 127 06177th Street Jamaica NY 11434 has, new roof with new leaders' new kitchen, bathrooms. Hallway walls have been repaired and painted. Bathrooms has new vanities, toilets and painted. Walls have been repaired and painted. Bedrooms has been painted. New back yard fence and landscape cemented back yard. Front of house landscaped and painted. New three security Doors. New Shad 10 x 12.**

**Owner shall expect unit one to remain in the rehab condition during the agreement period including back yard. Property must be appraisable after two years and three months, if not the occupants must cure any damages to pass the appraisal or move out. The Stephens, John Doe(s) and Jane Doe(s) can move out at any time prior to the next month payment.**

**\*\*\*\* The damage sewage line has been repaired; lead water line has been replaced\*\*\*\*.**
**\*\*\*\* Please take note the rules must be followed. If not, the owner can demand you to move out of the property asap.\*\*\*\***

The signatures are acknowledgment of this agreement:


**/s/ Lez Antonio Woodburn**
**/s/ Evis Stephens**
**/s/ Calvin Stephens**

Notary Notary acknowledges the signatures of, Lez Antonio W oodbum, Evis Stephens, and Calvin Stephens on this.

**Ex. D. Occupancy Contract.** However, lot of the alleged improvements are a false statement in the Occupancy Contract, which Ms. Stephens signed out of fear. She and her husband did not want to lose their home. They had no choice; they were expecting that their house would be reverted back to them.

34.     Maxine thereafter immediately moved to take possession of the house. She changed the locks the house. She also told Ms. Stephens' relatives that she and Woodburn were the new owners and that they will have to pay her $1000 a month in rent and also demanded Ms. Stephens to pay at least $3000 in rent. Maxine also brought several people into the house with one pretext or the other. Once she came removed all the curtains of the house and removed towels from the bathroom. Woodburn accompanied her in few of these visits. Maxine and Woodburn also took possession of the one of the rooms of the house and rented it to a third party.  On or about August 20, 2019 and continuing even now, Maxine and Woodburn placed notices at the house of Ms. Stephens claiming that the house driveway does not belong Ms. Stephens and that should she park her car, it would be towed away. On September 25, 2020, Woodburn left a notice at the house: "You were told to not park in the driveway, Today is your Final Warning—You will not get another. The cars will be towed." **Ex. E**. The house utilities were changed. Woodburn and Maxine created new accounts. Con Edison refused to accept payments from Stephens and Defendants did not make payments for the utilities, as a result of which there were final disconnection notices that kept coming to the house.

35.     On or about April 10, 2020 Woodburn through his company 12706 Holdings Inc. issued a "Cancellation of contract—Use and Occupancy Agreement." **Ex. F**.  The Notice stated the following:

> The agreement dated January 1, 2020 between the owner, 1206 Holdings Inc. and occupancy, Calvdin Stephens, Evis Stephens, John Does and Jane Does is terminated as of April 10, 2020.
>
> The owner 12706 Holdings Inc. has decided to cancel the Contract—sue and occupancy agreement to purchase, 12706 177th Street, Jamaica, NY 11434, Block: 12527 Lot: 0093 and reside at the property.
>
> The Short Sale liquidation is an Arm's length transaction. It does not allow the homeowner, and all occupant that resides at the property to continue residing for more than 90 days, however 12706 Holdings has given the

homeowner a and the occupant more than a year. The homeowner signed the Affidavit of Arm's length Transaction at closing.

12706 Holdings Inc. has given the occupants and homeowner more than one year to relocated, which can be common a nd customary in New York, however the homeowner and occupants must vacate the property. Use and Occupancy fees, all utilities services charges continue until the occupants move.

/s/_____

Owner, 12706 Holdings Inc.

Lez Antonio Woodburn.

**Holdings Notice of Cancellation. Ex. F.**

36.    On or about May 5, 2020, Woodburn issued an eviction letter to Ms. Stepehens and her husband, wherein, he made the following statement:

> Please take notice the use and occupancy agreement is cancelled as of April 10, 2020. The agreement can not be validated, due to the Arm's length Transaction.
> The occupant must be out of the above property by June 1, 2020. All owed Use and occupancy fees, Water bill, and utilities will be deducted from the refunded $10,000.

Letter May 5, 2020 (Eviction Letter). Woodburn also on September 1, 2020 and November 2, 2020 signing letter as owner also issued a 10 Day notice to quit. **Ex. G.**

37.    Finally, Maxine commenced an eviction proceeding against Ms Stephens and her family with the Queens Housing Court (LT-058417-20/QU). Also on or about October 2, 2020, Holdings and Woodburn as plaintiffs commenced a breach of contract and negligence action against Ms. Stepehens and her family claiming money damages of $45,000. In the complaint with the Supreme Court, Woodburn and Holdings claimed the following:

> The Complaint of the plaintiff, Lezantonio Woodburn, respectfully shows and alleges as follows:
>
> The defendants Evis Stephens, Calvin Stephens, John Does, Jane Does principal address is 12706, Jamaica NY 11434.
>
> The property was sold on March 27, 2019 to 12706 Holdings Inc. & Lezantonio Woodburn as a short sale for $350,000. The premises had extensive repairs to the sum of $250,000.

Ms. Evis Stephens signed an affidavit of Arm's length transaction which allows the mortgage holder (seller) to remain in the premises as a tenant for a short term, nor more than 90 days after the sale. The defendant tenancy expired June 27, 2019.

Ms. Evis Stephens, Calvin Stpehens, John Does and Jane Does continue to live in the premises 12706 177th Street, Jamaica NY 11434 from July 2019 to current date in 2020(October) without paying use & occupancy, Con Edison, National grid $ Dep Water bill.
The defendants made several promises to move out of the premises. Each time myself or partner tried to get a move out date, Ms. Evis Stephens would use her health as a reason she could not find new location to move. January 1, 2020, an agreement was crated signed by all parties. The defendants made 1 payment which wqs later. The agreement was cancelled three months later.

Ms. Evis Stephens stated she was not going to pay any bills & I would have to take her & her family to court.

As the Plaintiffs I am requesting the court to grant me use & occupancy from August to December 2019 : 1500 x 5: $72, 5000 & January to current (October) 2020     10 x 2500=25,000; national grid: $1500 con Edison & 1600 Dep Water bill $ 1000.

All frees to continue to be paid until defendants move out or evicted Secondly to order the defendants to pay all bills owed.

Evict The defendants based upon breach of Contract with the bank's arm length transaction.

As the Plaintiff, I have lost buyers, income and late mortgage payments. I am forced to spend my personal money to maintain the bills.

The defendants Calvin Stephens works at Marlene Union 301 Nicklane, Malevene NY 11566. He is currently employed.

Ms. Evis Stephens works off the books at a home in Long Island, NY.
Jane Does John Does doesn't work. She is at premise all days. The Stephens had no hardship in he pandemic, neither parties did not stop working in the pandemic.

The defendants do not want to move. The defendants do not want to pay any bills for the premises which they lived for one year and 7 months.
The defendants dont qualify to purchase the property 12706 Jamaica NY 11434.

The defendants are causing plaintiff extreme hardship, credit & income has been affected.

> Currently I have a buyer, which took me 5 months to vacate the buyer. The lack of cooperation from the defendants is making the sale difficult. I cannot maintain the house with my personal funds.
>
> *Verification*
>
> *Lezantonio Woodburn*, being duly sworn, deposes and says: I am the plaintiff in the above entitled action. I have thread the foreign complaint nad know the contents thereof. The same are t4rue to my knowled.ge, exception as to matter there in stated to be alleged information and beliefs and as to those matters I believe them to be true.

Supreme Court, Queens County Complaint. **Ex. H.**

38.    On or about November 2, 2020, Woodburn issued another 10 days' notice to quit upon the

plaintiff and her husband. The Notice stated the following:

> PLEASE TAKE NOTICE, that you are and all other persons occupying the subject premises are required to quit and vacate the premises on or before November 16, 2020.
> You are in possession of the premises after the short sale. Ms. Stephens and her family were permitted to stay on the premises after the short sale for a shorter term to facilitate new location but longer than (90) ninety days. The shorter term to stay on the premises expired on June 30, 2019. Evis Stephens signed the affidavit of arm's length transaction.
> Your rights to occupy the subject premise has been revoked by 12706 Holdings Inc.
> PLEASE TAKE NOTICE, that if you a and all other persons fail to quit, vacate or surrender the subject premises by November 16, 2020, the undersigned will commence summary proceeding against you.
> Daed: November 2, 2020
>
> 12706 Holdings Inc.
> s/_____ Landlord

39.    On November 9, 2020, Ms. Stephens and her daughter filed an order to show cause for a

finding of harassment and for a restraining order with the Housing Court. The Court found conduct

of the defendants as harassing and restrained the defendants Maxine and Woodburn from acting

in an improper manner. **Ex. I.**

40.    On April 7, 2022, around 12:30 PM, the Debtor and her family saw Ms. Bonaparte parked

a dark blue Honda in front of the house. Ms. Bonaparte did not come out of the car. The Debtor's

family called 911 explaining that she had parked her car. Almost an hour later the police came and

talked to the Debtor and Ms. Bonaparte. Ms. Bonaparte told the police that the Debtor and her family should not be parking their car in house driveway. The police officers demanded proofs of the Debtors' residence which was duly provided. At the same a toll truck came by. One of the police officer went to the toll truck to tell them that Debtor's has properly utilized her driveway and that the toll truck absolutely could not remove the Debtors car. And the police left having instructed the Debtor that in case Ms. Bonaparte calls any towing truck on them, they should call the police.

41. On or about April 19, 2022, the family of the Debtor realizing that there was no heat in the house went to the basement to check the boilers, they found out that the two boilers have been turned off. It was found when Debtor's family wasn't there, Ms. Bonaparte came to the House and turned off the boilers to forcibly evict the family from the house.

42. Perforce under the foregoing circumstances, Ms. Stephens not wanting to lose her house had to seek bankruptcy protection in November 2021.

43. Upon learning of the existence of the subject grant deed, plaintiff thereupon executed a notice of rescission pursuant to NY RPL 265-a on November 18, 2021, of the subject grant deed and attempted to have the same recorded with the county. Till date, the defendants have not responded to the said notice.

44. On date of the transfer of the subject property to defendants, the approximate value of the subject property exceeded $850,000. It is a two-family house.

45. Pursuant to Defendants own admission, the Defendants took title to the property by a payment of a sum not exceeding $350,000 to Ocwen bank, thus fraudulently depriving the plaintiff of her Home.

46. All exhibits attached hereto are incorporated by reference.

## Unraveling of the Fraud, Mail and Wire Scheme

47.     Maxine and Woodburn were the foreclosure rescue experts as is unraveled by the paperwork filed in the state court and with this Court regarding lifting stay. Maxine charged a sum of $10,000 for help Ms. Stephens to negotiate her loan. The checks dated December 7, 2018 were taken in blank by Maxine. **Ex. B**.   Maxine along with Woodburn and attorney Mester provided a platform to foster an impression upon Ms. Stephens that a genuine effort is being made to protect her house and negotiate a loan deal. However, it was a scheme to take over Home of Stephens. A House exceeding $850,000 was transferred to wholly owned corporation of defendants Maxine and Woodburn, called Holdings at a purchase price of $350,000.  It was a termed short sale.

48.     Maxine and Woodburn had already started working on this conspiracy to take over the house, way before June 2018, when they incorporated 12706 Holdings Inc. on June 20, 2018.

49.      Maxine took Stephens signatures on papers which prepared by the defendants are presently in exclusively custody of Defendants, which clearly upon information and belief must have shown the value of property at a depressed level.

50.     Ms. Maxine and Woodburn mailed several documents to Ocwen to facilitate the short sale as a means of taking over the house of Ms. Stephens. The date of mailing and all correspondences is strictly within the custody and control of the defendants.

51.     Maxine to show that she is financing the deal to help the family, took out a loan application to be signed by Mr. Calvin Stephens, husband of Ms. Stephens. In the residential loan application form, she had it filled gave it to Mr. Stephens to sign the same which was signed by him. It is unclear if the same application has been used by the Defendants. **Ex. J**.  However, the Defendants here in the loan application showed the value of the Real Property at least $725,000 and the same Defendants negotiated a settlement of Real Property at $350,000.

52.     At a closing which was supposed to be a loan modification for Ms. Stephens, she was made to sign deed transfer papers. On or about July 19, 2019, one Nathaly Chilliest, Esq. and United American Title Agency on behalf of the defendants, caused to be mailed and registered via electronic means a deed registration with the Queens County records as a part of their taking over of the house of Ms. Stephens. The Planet Enterprise assisted, aided and abetted the alleged loan modification or funding the transfer of the Home from the Debtor to the Holding.

53.     On or about October 2, 2020, Woodburn caused to have summons issued from the Queens County State Supreme Court along with a complaint claiming breach of contract and negligence claiming money damages of $45,000 and mailed them to Ms. Stephen with full knowledge that there was neither a breach of a contract or negligence and that Ms. Stephens was the actual owner of the house.

54.     On or about September 28, 2021, the Defendants Holdings and Woodburn and Maxine caused to be issued by the Civil Court notice of Court date for ejectment proceedings of the Plaintiff from the subject property. The video conferences initially set by the civil court was not attended by the complaining defendants. Once the civil court heard the matter, it was brought to their attention that the Ms. Stephens has filed for bankruptcy, that the court after a couple of hearing decided to stop the proceeding.

55.     Both the Defendants, Maxine and Woodburn used threats of immediate ejectment from their home unless they had signed the agreement to buy back and also, to acknowledge false claims of improvement on the real property. On January 2, 2020, Woodburn made Ms. Stephens and her husband sign Contract-Use and Occupancy Agreement making Ms. Stephens and her husband acknowledge that Woodburn has carried out stated repairs on the property, when in fact no such repairs etc. were carried out. Also, by virtue of the signing of the said agreement, the Defendants

made them a vendee of the real property and that they had to buy the real property in two years and three months from January 1, 2020. **Ex. D.** However, around March 30, 2020 (as disclosed by Holdings Motion in the Court), Woodburn makes an Amendment to Use and Occupancy agreement. **Ex. K**. He authors the following amendment:

> The previous agreement dated January 1, 2020 between the owner , 12706 Holdings Inc and occupancy, Calvin Stephens, Evis Stephens, John Does and Jane Does is hereby amended to:
>
> Unit 1(Floor 1) no basement usage, please remove your washer and dryer. The backyard is not usable. The shad is just for the 12706 Holdings Inc. Items.
>
> The occupants can continue to put the garbage in the can. The recycles go in the recyclable garbage can, as of, April 10, 2020 is the start date, please put recyclable items in the can.
>
> 12706 Holdings Inc. is adjusting the two years and three-month purchase agreement to:
>
> One year (January 01, 2021) due to the Stephens inability to get financing as of 10/10/19, 2019 to purchase 12706 177th Street Jamaica NY 11434 and the Arm's length agreement expired on June 27, 2019.
>
> If the Stephens cannot ger the finance to purchase 12706 177th Street Jamaica NY 11434 by the end of this contract, they agreed to vacate 12706 177th Street Jamaica NY with their family members on floor 2 within 30 days.
>
> The signature are acknowledgment of the amendment of the agreement.
>
> /s/ Lez Antonio Woodburn
> /s/evis stepehens
> /s/ Calvin Stephens

56.     The Defendants enticing the plaintiff to transfer the ownership of the property with the excise to get a loan modification, started tightening the hold over the property, gradually chipping away any right to recover the property, which entailed reducing the buyback time [not disclosing the buyback purchase price], implanting other tenants in the house, removing Ms. Stephens from complete dominion and enjoyment of her house.

57.     Woodburn and Maxine used fear of loss of home for the plaintiff, Ms. Stephens to sign an acknowledgment of the alleged investment in the property and as well as the accepting status as a licensee. Both Woodburn and Maxine used wrongful means to achieve ownership of the house on which they had no lawful claim. The Defendants have no lawful claim over the house of the plaintiff, however under the pretext of loan modification, made Ms. Stephens transfer her ownership and then used fear of eviction from her house to sign Use and Occupancy Agreement. However shortly thereafter within and by April 10, 2020, Woodburn through Holdings terminated the contract as of April 10, 2020. **Ex. L**

58.     In furtherance of the scheme to exact and extract monies for work not done and for work allegedly done to the property when the ownership had already been takeover by the Defendants, the Defendants caused a Proof of Claim filed with the bankruptcy court on April 14, 2022 claiming $55,000.

59.     On or about April 15, 2022, the Defendant Holdings moved this Court for lifting the stay, which revealed a new set of paperwork. With motion is attached a copy of the contract of sale, which was undertaken to save the plaintiff's house from foreclosure. The Contract is very telling. The Contract dated January 4, 2019 is a residential contract of sale from Evis Stephens to 12706 Holdings Inc. for sale of house for $400,000 (as a short sale) when in fact that the value of the house was not less than $850,000. The Contact is signed by both Ms. Stephens and Woodburn on behalf of Holdings.  The Contract clearly an attorney marked contract does not hear the name of the attorney for either parties. The Motion of 12706 also has a copy of the approval of the sale at a discounted price of $337,5000 (payoff amount). The motion also bears a deed transfer from Ms. Stephens to the Holdings and also attached is the HUD- 1 statement.  HUD statement reflects no

payment to the plaintiff. The HUD statement has figures that makes sense only to the Defendants, especially:

> Garrison Construction: $15,000
> Khermit Enterprises: $25,000.
> Addittional settlement charges for Kermit Enterprise: $7,425.00
> Donaldson & Chilliant LLP: $5000
> Madison Construction and Development: $22,5000.

**Ex. M. HUD statement**. Upon information and belief Khermit enterprise is a company owned and operated by Maxine.

60.    Also listed with the motion is an Affidavit of Arm's Length Transactions, which were signed by the parties including Stepehns and Maxine Bonaparte on the date of the closing, the form which was pre-marked "sign here."   Also in this affidavit, Maxine Bonaparte signs both as a the Seller agents and as well as the Buyer's agent. Also the Notary notarized the affidavit on March 28, 2019, when in fact the Affidavit shows March 27, 2019 as the date of closing and signing of affidavit. **Ex. N.**

61.    Immediately after the transfer of the ownership, the demands of the Defendants increased, from regular payments for an alleged "New Mortgage," for new alleged renovation of the property. Maxine came to the house every week and threatened the family members to leave, changed the locks, dislodged the family from couple of rooms and even turning off the boilers.

62.    On or about April 13, 2022, pursuant to the eviction proceedings commenced by the Defendants with the civil court of the City of New York, the Civil Court mailed a letter to Ms. Stephens, scheduling a hearing on May 2, 2022 with a warning: "This is your opportunity to answer the petitioners' motion to proceed with a warrant of eviction against you."

63.    The Defendants in a vicious manner took over the property of the Plaintiff by misleading her that they are going to help her negotiate a loan modification and under those excuses, the Defendants manipulated Ms. Stephens to transfer ownership of the house.

## FIRST CAUSE OF ACTION
### Cancellation of Deed
### Based upon Forgery or Fraud in Factum
### (Against all Defendants)

64.    Plaintiff incorporates the allegations contained in paragraphs 1 through 57, inclusive, as though fully set forth at this place.

65.    Plaintiff did not sign the subject grant deed nor did she authorize anyone to sign same.

66.    Plaintiff never knowingly signed or intended to sign the subject grant deed. Plaintiff signed documents presented to her by Maxine, Woodburn, Mester, Planet Enterprise which they led her to believe were preliminary to an agreement of the parties, and did not intend to transfer title to her home at the time these documents were signed.

67.    Because of the forgery of plaintiff's name to the grant deed or the fraud in the factum in obtaining plaintiff's signature, the subject grant deed is null and void *ab initio*.

68.    Plaintiff intends service of the summons and complaint in this action to serve as a notice of cancellation of the subject grant deed.

69.    Plaintiff is under a reasonable apprehension that the subject grant deed will cause serious injury if left outstanding. Plaintiff now seeks to cancel the subject grant deed.

WHEREFORE, plaintiffs pray for judgment as follows:

a.    That this Court declare that the subject grant deed is null and void *ab initio* and of no effect;
b.    For costs of suit;
c.    For such other and further relief as this court deems just and proper.

## SECOND CAUSE OF ACTION
### Rescission of Equity Purchase Contract and Grant
### Deed, Declaratory Relief and Damages
### (Against all Defendants)

70.    Plaintiff incorporates the allegations contained in paragraphs 1 through 69 inclusive, as though fully set forth at this place.

71. All statutory references in this cause of action are to the NY Real Property Laws unless otherwise indicated.

72. At all times herein mentioned plaintiff was an "equity seller" within the meaning of Section 265-a (2)(f).

73. At all times herein mentioned Holdings was an "equity purchaser" within the meaning of Section 265-a (2)(e).

74. At all times mentioned herein Woodburn, Maxine, Holdings, and Planet Enterprise are an "equity purchaser" within the meaning of Section 265-a, or the "representative" of an equity purchaser, namely Holdings, within the meaning of Section 265-a

75. At all times herein mentioned the subject premises was a "residence in foreclosure" within the meaning of Section 265-a.

76. Because Woodburn, Maxine, Mester are and were Holdings representative and the transaction related to the Real Property facilitated by Planet Enterprise's itself and through their agents, Woodburn, Maxine, Mester, Planet Enterprise are liable for all damages resulting from any action or omission of Woodburn, Maxine, Mester, Planet Enterprise regarding Holdings' acquisition of the subject premises pursuant to section 265-a.

77. In the transaction involving the transfer of plaintiff's the subject premises in foreclosure, all Defendants took unconscionable advantage of plaintiff, in violation of section 265-a.

78. Plaintiff is informed and believes and thereupon alleges that she was never presented with and never signed any equity purchase contract in the transaction involving plaintiff's home in foreclosure.

79.    If in fact plaintiff signed an equity purchase contract in the transaction involving plaintiff's

home in foreclosure, which plaintiff denies, said equity purchase contract violates Section 265-a

in the following ways that are listed by way of example and not limitation:

    a.    Plaintiff is informed and believes and thereupon alleges that said contract is not and was
not fully completed and signed and dated by the equity seller and equity purchaser, in
violation of Section 265-a.

    b.    Plaintiff is informed and believes and thereupon alleges that said contract did not and
does not contain:  the name, business address, and telephone number of the equity
purchaser; the address of the residence in foreclosure; the total consideration to be given
by the equity purchaser; a complete description of the terms of payment or other
consideration; the time at which possession would be transferred; the terms of any rental
agreement, and the required notice that until plaintiff's right to cancel had ended that she
could not have been asked to sign any deed or other document, all in violation of Section
265-a.

    c.    Plaintiff is informed and believes and thereupon alleges that said contract did not and
does not contain a notice of cancellation, in violation of Section 265-a.

    d.    Defendants did not provide plaintiff with a copy of the equity purchase contract nor the
notice of cancellation, in violation of Section 265-a

80.    The transaction involving the transfer of plaintiff's home in foreclosure violated section

265-a in the following ways which are listed by way of example and not limitation:

    a.    Prior to the expiration of the time plaintiff had to cancel the transaction, the Defendants:
accepted from plaintiff and induced her to sign the subject grant deed, in violation of
Section265-a, recorded the subject grant deed, in violation of section 265-a and
encumbered the premises, in violation of Section 265-a.

81.    Defendants, violated Section 265-a in the following ways which are listed by way of

example and not limitation by not taking the steps including that :

    a.    "The equity purchaser verifies by appropriate documentation that the equity seller has or
is likely to have a reasonable ability to pay for the subsequent conveyance of an interest
back to the equity seller. In the case of a lease with an option to purchase, payment ability
also includes the reasonable ability to purchase the property within the term of the option
to purchase."

    b.    by entering into an agreement which violates 265-a:  "An equity purchaser shall not enter
into repurchase or lease terms as part of the reconveyance arrangement that are unfair or
commercially unreasonable, and is prohibited from engaging in any other unfair or
unconscionable conduct."

82.    Because of Defendants failure to comply with Section 265-a as described above, plaintiff

elects to have the purported equity purchase contract, if one exists, declared void *ab initio*.

83.     As the result of the actions or inaction of Defendants described above, plaintiff was damaged in that a $550,000 in that she is lost that equity of the House.

84.     The conduct of Defendants as described herein was and continues to be willful, malicious, oppressive and constitutes an intentional scheme to defraud plaintiff with the intention of depriving her of her home and legal rights. Defendants' actions constitute despicable conduct in conscious disregard of plaintiff's rights so as to justify an award of punitive damages from Defendants an amount to be determined at trial.

WHEREFORE, plaintiff prays for judgment as follows:
(a)     That this court declare that the equity purchase contract if any is null and void *ab initio*;
(b)     That this court declare that the subject grant deed is null and void and that defendants required to deliver same to the clerk of the court for cancellation;
(c)     For actual damages in the amount of $550,000 of loss equity and $25,000 penalty for each violation of section 265-a.
(d)     For exemplary damages against Defendants in an amount to be determined,
(e)     For reasonable attorneys fees and costs of suit;
(f)     For such other and further relief as this court deems just and proper.

### THIRD CAUSE OF ACTION
#### Quiet Title
**(Against Defendants, Maxine Bonaparte, Lezantonio Woodburn, 12706 Holdings Inc., Wilmington Savings Fund Society, FSB (WSF), Verus Securitization Trust 2020-NPL1, and Does 1 through 200, inclusive)**

85.     Plaintiff incorporates the allegations contained in paragraphs 1 through 84, inclusive, as though fully set forth at this place.

86.     Defendant Holdings and Woodburn claims that they owns the subject premises in fee simple absolute pursuant to the subject grant deed.

87.     The Defendants claims that they have invested monies on the property in terms of repairs etc.

88.     Plaintiff owns the premises in fee simple absolute, and free and clear of any purported encumbrance created by the Defendants.

89.     The claims of Defendants are without any right whatsoever and such defendants have no right, title, estate, lien or interest whatsoever in the subject premises, and never had any right, title, estate, lien or interest whatsoever in the subject premises, due to the fact that the subject grant deed is a forgery and is void *ab initio* or is voidable under Sections 265-a, and the Defendants were not and are not bona fide encumbrancers.

90.     Plaintiff seeks to quiet title as of March 27, 2019, the date the subject grant deed was purportedly signed by plaintiff.

        WHEREFORE, plaintiff prays for judgment as follows:

(a)     That this Court declare that Defendants have no right, title, interest, estate, title or lien in the subject premises, and never had any right, title, interest, estate, lien or title in the subject premises, and that the subject grant deed conveyed no interest, estate, lien or title to the subject premises to Holdings and that the subject deed created no lien or encumbrance on the subject premises, and that as of March 27, 2019, and from that day forward, plaintiff was and is the owner in fee simple absolute of the subject premises which was and is not encumbered by the subject deed of trust;

(b)     For such other and further relief as this Court deems just and proper.

## FOURTH CAUSE OF ACTION
### Negligent and Intentional Infliction
### of Emotional Distress
### (Against Maxine Bonaparte, Lezantonio Woodburn, 12706 Holdings Inc.,)

91.     Plaintiff incorporates the allegations contained in paragraphs 1 through 90 inclusive, as though fully set forth at this place.

92.     The conduct of Defendants described above was intentional and malicious and done for the purpose of causing plaintiffs to suffer humiliation, mental anguish, and emotional distress.

93.     Defendants knew or should have known that their conduct, as described above, would cause plaintiffs to suffer severe emotional distress.

94.    As a direct and proximate result of defendants' conduct as herein alleged, plaintiff has suffered extreme emotional distress.

95.    The conduct of defendants as described herein was willful, malicious, oppressive and constitutes an intentional scheme to defraud plaintiff with the intention of depriving her of her home and legal rights. Defendants' actions constitute despicable conduct in conscious disregard of plaintiff's rights so as to justify an award of punitive damages from each defendant in an amount to be determined at trial.

WHEREFORE, plaintiff prays for judgment as follows:

a.    For general damages in the sum of Five Hundred Thousand Dollars ($500,000);
b.    For punitive damages according to proof;
c.    For costs of suit;
d.    For such other and further relief as this court deems just and proper.

### FIFTH CAUSE OF ACTION
### For Violation of New York GBL § 349
### (Against Defendants Maxine Bonaparte, Lezantonio Woodburn,
### 12706 Holdings Inc., Charles L Mester, Esq.,)

96.    Plaintiff incorporates the allegations contained in paragraphs 1 through 60, inclusive, as though fully set forth at this place.

97.    Plaintiff is suing both in her individual capacity and on behalf of the general public.

98.    Plaintiff is informed and believes and thereupon alleges that beginning at an exact date which is unknown to plaintiff, but from 2000, defendants have committed unfair and fraudulent business practices as defined by New York GBL § 349, by engaging in the following unlawful business practices:

a.    In the transaction involving the subject premises in foreclosure defendants violated section 265-a of NY RPL, and engaged in practices which operated as a fraud and deceit upon plaintiff, as set forth above;
b.    Defendants have tricked elderly, disabled and unsophisticated homeowners in foreclosure into unconscionable and fraudulent

transactions involving their homes in foreclosure, and has thereby gained substantial monies, fees and profits for himself and/or their companies;

c. On information and belief, Maxine and Woodburn have routinely worked together to mislead the homeowners the banks to take over their properties.

d. Planet Enterprise unconscionably taking a lien over a residential home, converting a residential home related loan to a commercial setting up with a default interest of 24%.

e. Upon information and belief, Planet Enterprise routinely have advanced loans and obtained lien interests in the properties with full knowledge that the debtors would not able to service the debt.

f. Upon information and belief, Plane Enterprise routinely have advanced loans to the consumers in violation of state and federal consumer protections, by packaging the loans as commercial ones, despite knowledge that the loans are not for commercial purposes.

99. The acts and practices described above were and are likely to mislead the public and therefore constitute unfair or fraudulent business practices within the meaning of New York GBL § 349.

100. Plaintiff is informed and believes that defendants unlawful, unfair and fraudulent business practices described above present a continuing threat to members of the public and that defendants continue to engage in the unfair and unlawful acts described above.

101. Plaintiff seeks injunctive relief enjoining defendants from engaging in the unfair business practices described above.. Defendants have engaged in deceptive acts and practices by conduct including but not limited to: i) misrepresenting regarding their services; ii) misrepresenting that they resolve the foreclosures issues of the homeowner; iii) failing to disclose takeover of the houses; iv) misrepresenting that the agreements are enforceable when in fact they are void under New York law; v) misrepresenting their ability to help homeowners; vi) advancing loans and obtaining lien on the houses of people who do not have the capacity to pay such debts.

102. Injunctive relief is proper as plaintiff has no adequate remedy at law. Monetary damages will not compel defendants to cease to engage in the unfair business practices described in this

action. Plaintiff alleges that the benefit to the public good, as well as to the plaintiff, far outweighs the inconvenience to the defendants of ceasing to engage in the unfair business practices.

WHEREFORE, plaintiff prays for judgment as follows:

a. That this Court enter a preliminary and permanent injunction restraining and enjoining all defendants, and their agents, servants, employees, representatives, and anyone acting on their behalf or at their direction from engaging in, committing, permitting, or performing, directly or indirectly, any of the unfair business practices described above;

b. For restitutionary damages in an amount equal $550,000, which is the amount of loss of equity;

b. For reasonable attorneys' fees;

c. For costs of suit;

d. For such other relief as this Court deems proper and just.

### SIXTH CAUSE OF ACTION[5]
**(Violations of New York Judiciary Law§ 487 against defendant Charles Mester has been dismissed pursuant to the Court's order)**

103. The Debtor realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

104. New York Judiciary Law§ 487 provides, in pertinent part, as follows: "An attorney or counselor who ... [i]s guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party ... [i]s guilty of a misdemeanor, and in addition to the punishment prescribed therefore by the penal law, he forfeits to the party injured treble damages, to be recovered in a civil action."

105. As set forth above, Mester engaged in an intentional pattern of collusion, wrongdoing, and deceit with the intent to deceive Ms. Stephens. Ms. Stephens thought that she is a meeting a lawyer and he would be assisting her in saving her property. However, he was the cementing factor of the fraud, he gave the impression that he was helping Ms. Stephens save her property, rather he was

---

[5] This Sixth Cause of Action was dismissed against Charles Mester, however the same has been retained here for formatting and as well as for appellate review.

helping the other defendants in unlawful takeover of her property. Mester assured Ms. Stephens that he will save her home from pending foreclosure. Ms. Stephens shared with him foreclosure actions papers which was pending in the Supreme Court, Queens County.

106. As a result of the deceitful and fraudulent conduct of these Defendants as described in the foregoing paragraphs, Ms. Stephens have been looted of her home and thus has been injured in an amount to be established at trial.

107. Because of the foregoing, Ms. Stephens is entitled to monetary damages against the attorney defendants and the law firm, treble damages, and reasonable attorneys' fees pursuant to judiciary Law § 487.

### SEVENTH CAUSE OF ACTION

**(Fraud against Maxine Bonaparte, Lezantonio Woodburn, 12706 Holdings Inc., Charles L Mester, Esq.,)**

108. The allegations of paragraphs 1 – 107 are incorporated herein as if fully set forth.

109. Defendants procured title to plaintiff's home by fraud. The fraudulent conduct included: having the plaintiff sign paperwork transferring ownership with the pretext of saving it from foreclosure; misrepresenting the terms of the Purchase and Sale Agreement and that signing same was in plaintiff's best interests and was the only means of saving her home; misrepresenting the terms of the Transfer Ownership Agreement and that signing same was in plaintiff's best interests and the only means of saving her home; demanding that plaintiff pay $10,000 for their services for professional help; failing to inform plaintiff of the content and significance of the documents they had her sign; failing to advise plaintiff that she should have real estate documents reviewed by independent counsel; and upon ownership change, immediately suing her and her family to claim possession of the real property.

110.    Plaintiff relied on defendant's above-described fraudulent misrepresentations, and said reliance was reasonable under the circumstances.

111.    As direct and proximate results of defendant's fraud, plaintiff suffered monetary loss and severe emotional distress and mental anguish.

WHEREFORE, plaintiff prays that judgment be entered awarding her compensatory damages, interest, and costs of suit.

## EIGTH CAUSE OF ACTION
### (Breach of Fiduciary Duty by Mester and Maxine)

112.    The allegations of paragraphs 1 – 111 are incorporated herein as if fully set forth.,

113.    As plaintiff's attorney Mester and foreclosure expert Maxine owed plaintiff the highest standard of care commensurate with their position as a fiduciary. Ms. Stephens trusted them and also gave $10,000 to Maxine for her professional expertise.

114.    Defendants breached said duty negligently and/or willfully by engaging in the conduct set forth herein and placing their own interests before those of plaintiff, then their client.

115.    As direct and proximate results of defendant's breach, plaintiff suffered financial loss and severe emotional distress and mental anguish.

WHEREFORE, plaintiff prays that judgment be entered awarding her compensatory damages, interest, and costs of suit.

## NINTH CAUSE OF ACTION
### Unconscionability
### (Against Maxine Bonaparte, Lezantonio Woodburn, 12706 Holdings Inc.)

116.    Plaintiffs repeat and reallege paragraphs 1 through 115 as though fully set forth herein.

117.    Throughout the course of the March 2019 mortgage/deed transaction, an enormous disparity in bargaining power existed between plaintiff and defendants.  Plaintiff is an ailing

minority woman, whereas defendants are seasoned players of the market. The defendants are experienced entities and individuals that sought to profit from the disparity in bargaining power and did so by deliberately targeting plaintiff with misinformation.

118.    The terms of the March 2019 mortgage/deed transaction are so one-sided as to be abusive and unconscionable. Defendants exploited the disparity in bargaining power to induce plaintiffs to transfer title to her home and enter a highly disadvantageous equitable loan when plaintiff believed that they were applying for a new mortgage and helping her settle her bank debt and making mortgage more manageable. The defendants Planet Enterprise saddled the Real Property with an exorbitant interest loan with a default interest of 24%. The Defendant Planet Enterprise in collusion with the other defendants obtained inequitable lien on the Debtor's Home. Said procedural and substantive unconscionability renders void and unenforceable the March 2019 equitable mortgage/deed transfer.

**TENTH CAUSE OF ACTION**
**New York Real Property Actions and Proceedings Law, Article 15**
**(Against Maxine Bonaparte, Lezantonio Woodburn, 12706 Holdings Inc.,**
**Wilmington Savings Fund Society, FSB (WSF),  Verus Securitization Trust 2020-NPL1)**

119.   Plaintiffs repeat and reallege paragraphs 1 through 118 as though fully set forth herein.

120.   Plaintiffs bring this claim pursuant to Article 15 of the New York State Real Property Actions and Proceeding Law to compel the determination of any claims adverse to those of plaintiffs in the subject premise, the Home. Through this action, plaintiffs seek to quiet title to the subject property by having declared as void the fraudulent deed transfer from plaintiffs to Holding.

121.   Plaintiffs was the sole owner of the Real Property. She had bought the subject property in 2006. Public records now suggest that defendant Holdings and Planet Enterprise claim an interest in the property. Their purported interest, and the documents upon which it rests, are void because they were obtained through a conspiratorial and fraudulent scheme that tricked plaintiff into conveying ownership of their home without her knowledge. Alternatively, the deed transfer constituted an equitable mortgage and not a deed transfer.

122.   Upon information and belief, no party who is or should be a defendant is or might be an infant, mentally retarded, mentally ill or an alcohol abuser.

123.   Upon information and belief, the judgment to be entered in this action will not affect a person or persons not in being or ascertained at the commencement of this action, who by any contingency contained in a devise or grant or otherwise, could afterward become entitled to a beneficial estate or interest in the property; moreover, every person in being who would have been entitled to such interest in the property if such contingency happened immediately prior to the commencement of this action are parties hereto.

124.   Accordingly, plaintiffs request that this Court issue:

a. a declaration that plaintiff is the lawful sole owner of the subject property and are entitled to lawful, peaceable, and uninterrupted possession thereof as against all defendants herein, and as against anyone claiming under them;

b. an injunction prohibiting all defendants, and every person claiming under them, from claiming an estate or interest in, or lien or encumbrance on, the property;

c. a judgment declaring as void the fraudulent deed dated March 27, 2019 purporting to transfer plaintiffs' interest in the property to 12706 Holdings;

d. a judgment declaring as void any interest or lien of the Defendants against the property;

e. damages stemming from plaintiffs' lost rents and other damage in connection with the loss of their exclusive right to use the property in the manner of her choosing; and

f. any other relief that this Court deems just and proper.

### ELEVENTH CAUSE OF ACTION
### (Violation of RICO, 18 U.S.C. 1962(c))

**(Predicate of Mail Wire fraud and Hobbs Act against Maxine Bonaparte, Lezantonio Woodburn, 12706 Holdings Inc., Charles L Mester, Esq.,)**

125. Plaintiffs repeat and reallege paragraphs 1 through 124 as though fully set forth herein.

126. To carry out its unlawful scheme, the Defendants have conducted a criminal enterprise through a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and (d). Specifically, between 2018 and the present, the Defendants have knowingly and intentionally submitted false and materially misleading declarations under oath with Ocwen Bank, New York State Supreme Court, Queens County and civil court of the same county and as well as this bankruptcy proceeding. While professing to be safeguarding interest of the plaintiff, the Defendants preyed upon the vulnerabilities of the plaintiff and her family and by fraud had her transfer her deed to their own company 12706 Holdings Inc. and then had her signed paperwork under threat. Holdings and the other Defendants also offered her to sell back the house but without the benefit of the sum particular and also taking away the same option when they had fully entrenched with the property ownership. The defendants also violated Hobbs act by physically threatening the family members

to leave the house and forcibly turning off heat and changing locks and also making Ms. Stephens sign paperwork reducing them to licensee. In sum in executing its criminal enterprise, the Defendants crime have included: Mail fraud in violation of 18 U.S.C. § 1341; Wire fraud in violation of 18 U.S.C. § 1343; Hobbs Act in violation of 18 USC. 1951; Unlawful monetary transactions in violation of 18 U.S.C. §§ 1956 and 1957(a); and Bankruptcy fraud in violation of 18 U.S.C. §§ 152(2) and 152(3). The Planet Enterprises aided and abetted the rest of the Defendants in achieving their unlawful results as complained herein.

127.    Ms. Stephens is direct victim and target of Defendants unlawful scheme. Defendants' criminal enterprise has caused Ms. Stephens to lose her house with a profit/equity of a sum exceeding $500,000.

128.    Ms. Stephens hired to two professionals, Maxine and Mester for dire situation with the home loan. However they saw this as an opportunity to make money and they used unlawful means to achive the same result. Instead of conforming to these requirements fiduciary, Defendants affirmatively misrepresented its disinterestedness and unlawfully concealed its disqualifying connections to parties with clear financial interests in the outcome of the work they had undertaken on behalf of the plaintiff. Mester appeared for both Ms. Stepehns and Maxine Bonaparte. Maxine appeared as the agent for both  Ms. Stepehes and her company 12606 Holdings along with Woodburn.  Also, Maxine and Woodburn regularly visited the house of Ms. Stephens and threatened her and her family members to leave on every visit to the House.

129.    The Defendants engaged in a scheme to defraud Ms. Stephens and other family members through falsity, concealment, and obfuscation of disqualifying conflicts of interest, which thereby deprived Ms. Stephens of a reduced mortgage and her ownership of the house. To achieve complete ownership of the house, with no possibility of reversion of the house back to Ms.

Stephens, the defendants made buy agreement without the benefit of the sale price and as well as reducing the buy back period utilitarianly. The Defendants also forcibly managed to took over physical ownership of the part of the house by putting in their own friend in one of the rooms of the house. The Defendants also threatened Ms. Stephens with eviction if she did not sign the agreements which kept changing and were one sided. Ms. Stephens through deception engineered by the defendants lost her house to the Defendants.

130. In furtherance of the scheme, besides threats of violence and eviction, and as described herein, the Defendants prior to the ownership of the house, transmitted, or caused to be transmitted, by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures, and sounds, in violation of 18 U.S.C. § 1343, and also caused matters and things to be placed in a post office or authorized depository or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier, in violation of 18 U.S.C. § 1341. The Defendants' specific mailings and interstate wirings in furtherance of the scheme to defraud included, but are not limited to, the aforementioned, rather there are other numerous mailing undertaken by Maxine and Mester which are solely within the custody and control of the defendants. The mailing was initially undertaken for the purposes of loan modification [or rather short sale] in the name of the plaintiff, but solely for their own ulterior design to takeover the house. The Planet Enterprise assisted rest of the Defendant to achieve their unlawful results including its own lien on the Home of the Debtor.

131. Upon information and belief, the Defendants also used the interstate wires, United States mail, or private interstate commercial carrier to effectuate ownership change of the house of Stephens Evidence of such transactions is peculiarly within the Defendants' knowledge and control and will be proven at trial following discovery.

132.    The Defendants also used the interstate wires, United States mail, or private interstate commercial carrier to transfer illegally obtained funds within the United States for the purpose of furthering the objectives of the Defendants. These transfers include the movement of funds in connection with fees of the loan modification, taking money with the sham excuse of making mortgage payments.

133.    Each of the Defendants, through their direct or indirect control of the various functionaries, participated in, numerous acts of mail and wire fraud. In particular, each of the Defendants, through their control of and/or participation. Each of the said defendants sent or caused to be sent numerous mail or wire communications, or acted with knowledge that mail or wire communications would follow in the ordinary operation of loan modifications with Ocwen or could reasonably have foreseen that the mails or wires would be used in the ordinary course of business as a result of the Defendants' acts in furtherance of the transactions discussed above, including the uses of the mails and interstate wires Also, Maxine and Woodburn threatened evictions to elicit agreements signatures on the Agreements regarding Use and Occupancy and also acknowledgement of expenses which were never undertaken, solely done to make it impossible for Ms. Stephens to buy back her home. And said fraud was completely sealed by the Planet Enterprise obtaining lien on the house of the Debtor with default interest rate of 24% and or exceeding the usurious cap.

### The RICO Enterprise

134.    From October 2018 (said date being approximate and inclusive) and continuing to the present, all Defendants collectively have constituted an enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) or, alternatively, an *association-in fact enterprise* within the meaning of those provisions (the "**Enterprise**").

135.    At all relevant times, each of the Defendants was, and is, a person that exists separate and distinct from the Enterprise.

136.    From the time of the inception of the Enterprise, enterprise participated in the proceedings and activities as complaint of above. Accordingly, at all relevant times, the    Enterprise was engaged in, and its activities affected, interstate and foreign commerce.

137.    Between 2018 and the present, each of the Defendants engaged in a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1961(5), consisting of the predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1)(B) and 18 U.S.C. § 1961(1)(D) described in the aforesaid paragraphs and other predicate acts to be identified after further investigation and discovery herein.

138.    Each of the Defendants engaged in two or more predicate acts of racketeering, and each committed at least one such act of racketeering after the effective date of RICO.

139.    The predicate acts of racketeering activity were related in that they were committed for the purpose of (1) concealing or obfuscating real nature of the takeover/transfer of the house from Ms. Stephens to their entities; (II) taking over unlawfully the ownership of the house of the plaintiff; (III) taking away the inbuilt equity of the house from Ms. Stephens to themselves with fraudulent means; (IV) eliminating any chances for the recovery of the house from the Defendants; (V) saddling the property with a commercial lien and commercial mortgage with a high interest rate, despite the fact that it is a residence.    These acts, and others to be identified after further investigation and discovery herein, shared a common or related purpose, goal, result, participants, victim, and method of commission.

140. Through such patterns of racketeering activity, each of the Defendants conducted or participated, directly or indirectly, in the conduct of the affairs of the Enterprise in violation of 18 U.S.C. § 1962(c).

141. As a direct and proximate result of RICO violations of 18 U.S.C. § 1962(c) by the Defendants, Ms. Stephens has been injured in her property interest suffering damages in an amount to be determined at trial. The damages to Ms. Stephens include, but are not limited to, loss of homeownership, fees from the sham closing of the house, the equity Ms. Stephens would have earned in the absence of the Defendants' unlawful conduct; other lost opportunities; and attorneys' fees and costs, including attorneys' fees and costs associated with exposing and pursuing redress for Defendants' criminal activities.

142. Pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), Ms. Stephens is thereby entitled to recover treble damages, together with the costs of this suit and reasonable attorneys' fees.

## TWELTH CAUSE OF ACTION
### (CONSPIRACY TO VIOLATE RICO, 18 U.S.C. § 1962(d))
### Against Defendants Maxine Bonaparte, Lezantonio Woodburn, 12706 Holdings Inc., Charles L Mester, Esq.)

143. The Plaintiff repeats and realleges paragraphs 1 through 142 as if fully set forth herein.

144. Defendants have unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

145. By and through each of the Defendants' close business and employment relationships with one another, and their close coordination with one another in the affairs of Enterprise described above, each Defendant knew the nature of these enterprises and each Defendant knew that these enterprises extended beyond each Defendant's individual role. Moreover, through the same

connections and coordination, each Defendant knew that the other Defendants were engaged in a conspiracy to commit predicate acts, including those set forth above, and that the predicate acts were part of a pattern of racketeering activity, and each agreed to pursue the same criminal objective.

146.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the affairs of the Association in fact Enterprise, and/or the Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d).

147.    In particular, each Defendant was a knowing, willing, and active participant in one or more such Enterprises and their affairs, and each of the Defendants shared a common purpose, namely, the orchestration, planning, perpetuation, and execution of the scheme to victimize Ms. Stephens and take over her Home as a title holder or a lien holder.

148.    The Defendants played the following roles besides other as mentioned in racketeering conspiracy:

    a.    Maxine Bonaparte professed to be an expert in loan resolutions, and she made Ms. Stephens to hire her;

    b.    Maxine Bonaparte took Ms. Stephens to Charles Mester to represent Ms. Stephens and provide a veneer of professionalism.

    c.    Maxine Bonaparte acted as the agent for Ms. Stephens and 12706 Holdings, the buyer of the short-sale home.

    d.    Mester actually represented the 12706 Holdings in the sale, though retainer with Stephens was that he will represent her.

    e.    Lez Antonio Woodburn made himself as the front face of 12706 Holdings.

f.      Both Maxine and Woodburn threatened Ms. Stephens to leave her house and they made Ms. Stephens and her husband sign Use and Occupancy agreement.

g.      Maxine Bonaparte, Lez Woodburn, Charles Mester collectively led the enterprise to take over Ms. Stephens house to have loot monies distributed among each other.

h.      The Planet Enterprise assisted the other defendants in achieving the stated unlawful results as well entrenching itself as the lien holder over the property of the Debtor.

149.    Further evidence of an agreement among the Defendants is particularly within the knowledge and control of the Defendants.

150.    The participation and agreement of each of the Defendants was necessary to allow the commission of this pattern of racketeering activity.

151.    Ms. Stephens has been and will continue to be injured in her property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at trial. The injuries to Ms. Stephens directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to loss of equity in her house; other lost business opportunities; and attorneys' fees and costs, including attorneys' fees and costs associated with exposing and pursuing redress for Defendants' criminal activities.

152.    Pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), Ms. Stephens is thereby entitled to recover treble damages, together with the costs of this suit and reasonable attorneys' fees.

## THIRTEENTH CAUSE OF ACTION
### (Unjust Enrichment)
### (Against Maxine Bonaparte, Lezantonio Woodburn, 12706 Holdings Inc.,)

153.    Plaintiffs repeat and reallege paragraphs 1 through 152 as though fully set forth herein.

154.    As a result of the events described above, each of the Defendants has unjustly retained a benefit to Ms. Stephens detriment.

155.    Specifically, each of the Defendants were on notice of Ms. Stephen's continuing ownership interest at a time when they took title to the Property, or took a lien hold interest in the Property, or cashed out a portion of Ms. Stephens equity.

WHEREFORE, Ms. Stephens ask this court to void the transfer of title to 12706 Holdings to require that each Defendant pay Plaintiffs the value of the equity in the Property unjustly received by that Defendants.

### FOURTEENTH CAUSE OF ACTION
### (Constructive Trust)
### (Against Maxine Bonaparte, Lezantonio Woodburn, 12706 Holdings Inc.,)

156.    Plaintiffs repeat and reallege all preceding paragraphs as if fully set forth herein.

157.    Undoubtedly Defendants took custody of Plaintiffs' property under a circumstance that would render it equitable for it to return such property to its rightful owner upon due demand.

158.    Ms. Stephens approached Maxine and through Maxine, attorney Mester to help her save her house. Such relationship created a fiduciary relationship.

159.    Ms. Stephens trusted Maxine and Mester with her property and thinking that it was a part of loan modification and that the property is being kept in trust for her, she signed all the papers whatever was given to her to sign by Maxine and Mester

160. Ms. Stephens had a confidential fiduciary relationship with the Defendants.

161.  It is just and equitable that the court impress a constructive trust to attach to the res of Plaintiffs' property from the time it entered Defendants' possession.

162.    Each transferee took possession under circumstances in which such transferee knew Plaintiffs had been despoiled, making it just and fair for the court to apply an equitable lien under the principles of equity.

163.    Applying the doctrine of equitable servitudes to ownership of the house wrongfully obtained by transferees is fair and just under the circumstances.

164.    Defendants would be unjustly enriched if permitted to retain the house or any of the benefits including any lien or equity accruing therefrom.

165.    Plaintiffs have no adequate remedy at law.

166.    Permitting the Defendants to retain property belonging to the Plaintiff is unfair and unjust and in light of the totality of the circumstance's warrants imposing a constructive trust under equitable principles of New York law.

167.    Plaintiff pray for an order impressing a constructive trust upon all holders and purchasers of Plaintiffs' property and their agents, past and present and ordering that all ownership be returned to Plaintiff and that any income, commissions or other benefits be disgorged and paid to Plaintiff.

### FIFTEENTH CAUSE OF ACTION--A
**(Fraudulent conveyance, Section 273 of NYCD law, 11 U.S.C. §544)**
**(Against Maxine Bonaparte, Lezantonio Woodburn, 12706 Holdings Inc.,  Planet Management Group, LLC, Planet Home Lending LLC dba Planet Home Servicing, Wilmington Savings Fund Society, FSB (WSF), Verus Securitization Trust 2020-NPL1)**

168.    Plaintiff incorporates the allegations contained in paragraphs 1 through 167, inclusive, as though fully set forth at this place.

169.    The debtor-plaintiff sought bankruptcy protection on November 11, 2021.

170.    Section 544 of Title 11 states that "the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title." New York Debtor and Creditor Law section

273 states: Every conveyance made, and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

171.    The debtor has unsecured claims at the time of the filing of the case and at the time of transfer of the deed to the Defendants, especially

    i.      Debtor had unsecured debts related to creditors so-called 'golden' or 'triggering' creditors such creditors included LVNV Funding, LLC, Jefferson Capital Systems LLC, Ashley Funding Services, LLC, National Grid (Triggering Creditors) at time of filing of petition and as well as on the date of the transfer of the Debtor's house to Holdings. The Triggering Creditors had a right to be paid from Debtor.

    ii.     Triggering Creditors holds an allowable unsecured claim under section 502, and had different amount of claim as of the date of the transfer of the deed from the Debtor.

    iii.    Triggering Creditors could avoid the transfers at issue under applicable New York State law.

172.    Debtor owned Home and it exceeded $850,0000 in value in 2019.

173.    On March 27, 2019, the Debtor was fraudulently induced to part with her house with the excuse that the same was necessary for loan modification.

174.    The fraudulent parting of the house was designed by the defendant as a short sale for a sum of $350,000, but the value of the house exceeded $850,000.

175.    Thus, the debtor was deprived of equity worth more than $500,000. This conveyance was made without fair consideration, rather there was no consideration and Debtor was made to pay monies for this transfer of her own property what she was thought was a loan modification.   This transfer diminished the size of the debtor's estate and occurred at a time when the debtor was in a financial condition that made it impossible or unlikely that the debtor could satisfy the claims of all its creditors in full. For the said complained transaction, the transferees of the Real Property

did not provide fair equivalent value and did not act in good faith towards the Debtor. And the Debtor was generally not paying its debts as they came due.

176. As a result of this transfer, the Debtor was rendered insolvent and could not pay her bills.

177. The impugned transfer of the deed violated section 273 of New York Debtor & Creditor Law entitling the plaintiff as a debtor relief pursuant to 11 U.S.C. 544 and further (a) disregarding the conveyance of the Real Property and allowing and (b) awarding the value of the property, including interest or appreciation, to the maximum extent allowed by law and (c) awarding reasonable attorney's fees incurred in this action.

Wherefore, the Debtor now in bankruptcy, the March 27, 2019, transfer should be set aside.

## FIFTEENTH CAUSE OF ACTION--B
### (Fraudulent conveyance, Section 275 of NYCD law, 11 U.S.C. §544)
### (Against Maxine Bonaparte, Lezantonio Woodburn, 12706 Holdings Inc., Planet Management Group, LLC, Planet Home Lending LLC dba Planet Home Servicing, Wilmington Savings Fund Society, FSB (WSF), Verus Securitization Trust 2020-NPL1)

178. Plaintiff incorporates the allegations contained in paragraphs 1 through 177, inclusive, as though fully set forth at this place.

179. The debtor-plaintiff sought bankruptcy protection on November 11, 2021.

180. Section 544 of Title 11 states that "the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title."

181. New York Debtor and Creditor Law section 275 states: Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors. This transfer diminished the size of

the debtor's estate and occurred at a time when the debtor was in a financial condition that made it impossible or unlikely that the debtor could satisfy the claims of all its creditors in full. For the said complained transaction, the transferees of the Real Property did not provide fair equivalent value and did not act in good faith towards the Debtor. And the Debtor was generally not paying its debts as they came due.

182. The debtor has unsecured claims at the time of the filing of the case and at the time of transfer of the deed to the Defendants.

      i. Debtor had unsecured debts related to creditors so-called 'golden' or 'triggering' creditors such creditors included LVNV Funding, LLC, Jefferson Capital Systems LLC, Ashley Funding Services, LLC , National Grid (Triggering Creditors) at time of filing of petition and as well as on the date of the transfer of the Debtor's house to Holdings.

      ii. Triggering Creditors holds an allowable unsecured claim under section 502, and had different amount of claim as of the date of the transfer of the deed from the Debtor and

      iii. Triggering Creditors could avoid the transfers at issue under applicable New York State law.

183. Debtor owned Home and it exceeded $850,0000 in value in 2019.

184. On March 27, 2019, the Debtor was fraudulently induced to part with her house with the excuse that the same was necessary for loan modification.

185. The fraudulent parting of the house was designed by the defendant as a short sale for a sum of $350,000, but the value of the house exceeded $850,000.

186. Thus, the debtor was deprived of equity worth more than $500,000. This conveyance was made without fair consideration.

187. As a result of this transfer, the Debtor was rendered insolvent and now she could not pay her debts in a regular course. When the transfer took place, the Debtor intended to incur, or believed or reasonably should have believed that that she has only one house and that is the house she lived in and that she would incur debts beyond her ability to pay as they mature.

188.    The impugned transfer of the deed violated section 275 of New York Debtor & Creditor Law, entitling the plaintiff as a debtor (a) disregarding the conveyance and allowing and (b) awarding the value of the property, including interest or appreciation, to the maximum extent allowed by law, and (c) awarding reasonable attorney's fees incurred in this action.

Wherefore March 27, 2019, transfer should be set aside.

## FIFTEENTH CAUSE OF ACTION--C
**(Homestead Exemption in the Fraudulently conveyed Section 273 and 275 of NYCD law, 11 U.S.C. §544)**
**(Against Maxine Bonaparte, Lezantonio Woodburn, 12706 Holdings Inc., Planet Management Group, LLC, Planet Home Lending LLC dba Planet Home Servicing, Wilmington Savings Fund Society, FSB (WSF), Verus Securitization Trust 2020-NPL1)**

189.    The Plaintiff repeats and re-alleges the allegations set forth in paragraphs "1" through "188" as if set forth fully herein.

190.    The debtor-plaintiff sought bankruptcy protection on November 11, 2021.

191.    Section 544 of Title 11 states that "the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title." New York Debtor and Creditor Law section 273 states: Every conveyance made, and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

192.    In addition and as an alternative to section 544 of the Bankruptcy Code, section 522(h) state that the, "debtor may avoid a transfer of property of the debtor ... to the extent that the debtor could have exempted such property under subsection (g)(1) of this section if the trustee had avoided such transfer . . .    if-(1) such transfer is avoidable by the trustee under

section 544, 545, 547, 548, 549, or 724(a) of this title or recoverable by the trustee under section 553 of this title; and(2) the trustee does not attempt to avoid such transfer."

193.    Ms. Christa Preuss is the Chapter 13 Trustee appointed in this case, 11 U.S.C. § 1302. The Trustee could but has not attempted to avoid the transfer as alleged here.

194.    The Debtor's transfer of Real Property was involuntary, as she never wanted to sell the Real Property.

195.    The Debtor was made to sign the papers by misleading her that she was signing papers for her loan modification.

196.    The Debtor continued to reflect her interest in the Real Property as her home in her bankruptcy filing.

197.    The Debtor continues to in possession of the Real Property as her home.

198.    If the title of the Real Property was in her name, as it was before the alleged fraudulent transfer to the defendants, the Debtor would be entitled to homestead exemption as guaranteed by New York state, NY CPLR 5206.

199.    Now the Debtor seeks to exercise an avoidance power among others under 11 U.S.C. § § 522(h), 544.

200.    The Real Property which was transferred to the defendants, could have been exempted if the trustee had avoided the transfer under the provisions of 11 U.S.C. §522(g). But the Trustee did not avoid the transfer.

201.    The Real Property is the home of the Debtor entitling her state guaranteed homestead exemption.

202.    The debtor has unsecured claims at the time of the filing of the case and at the time of transfer of the deed to the Defendants.

i. Debtor had unsecured debts related to creditors so-called 'golden' or 'triggering' creditors such creditors included LVNV Funding, LLC, Jefferson Capital Systems LLC, Ashley Funding Services, LLC , National Grid (Triggering Creditors) at time of filing of petition and as well as on the date of the transfer of the Debtor's house to Holdings. The Triggering Creditors had a right to be paid from Debtor.

ii. Triggering Creditors holds an allowable unsecured claim under section 502, and had different amount of claim as of the date of the transfer of the deed from the Debtor and

iii. Triggering Creditors could avoid the transfers at issue under applicable New York State law and could have avoided the instant transfer of the Real Property.

203. Debtor owned Home and it exceeded $850,0000 in value in 2019.

204. On March 27, 2019, the Debtor was fraudulently induced to part with her house with the excuse that the same was necessary for loan modification.

205. The fraudulent parting of the house was designed by the defendant as a short sale for a sum of $350,000, but the value of the house exceeded $850,000.

206. Thus, the debtor was deprived of equity worth more than $500,000. This conveyance was made without fair consideration, rather there was no consideration and Debtor was made to pay monies for this transfer of her own property what she was thought was a loan modification. This transfer diminished the size of the debtor's estate and occurred at a time when the debtor was in a financial condition that made it impossible or unlikely that the debtor could satisfy the claims of all its creditors in full. For the said complained transaction, the transferees of the Real Property did not provide fair equivalent value and did not act in good faith towards the Debtor. And the Debtor was generally not paying its debts as they came due. This involuntary transfer of the Real property also was fraudulent to the present and future creditors.

207. As a result of this transfer, the Debtor was rendered insolvent and could not pay her bills.

208. The impugned transfer of the deed violated section 273 and 275 of New York Debtor & Creditor Law entitling the plaintiff as a debtor relief pursuant to 11 U.S.C. §522(h), 544 and further

(a) disregarding the conveyance of the Real Property and its return to the Debtor and or (b) awarding the value of her property, including interest or appreciation, to the maximum extent allowed by law and (c) awarding reasonable attorney's fees incurred in this action.

Wherefore, the Debtor now in bankruptcy, the March 27, 2019, transfer should be set aside.

## SIXTEENTH CAUSE OF ACTION
**(Avoidance Recovery of Fraudulent Transfer under 11 U.S.C. § 550 from 12706 Holdings)**
**(Against Maxine Bonaparte, Lezantonio Woodburn, 12706 Holdings Inc, Planet Management Group, LLC, Planet Home Lending LLC dba Planet Home Servicing, Wilmington Savings Fund Society, FSB (WSF), Verus Securitization Trust 2020-NPL1)**

209.    The Plaintiff repeats and re-alleges the allegations set forth in paragraphs "1" through "207" as if set forth fully herein.

210.    Section 550(a) of the Bankruptcy Code provides in relevant part: [T]o the extent that a transfer is avoided under section 544, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from ... the initial transferee of such transfer or the entity for whose benefit such transfer was made; or ... any immediate or mediate transferee of such initial transferee. 11 U.S.C. § 550(a).

211.    Under section 550(a) of the Bankruptcy Code, the Plaintiff may recover the Transfer or the value thereof from the initial transferee 12706 Holdings Inc., which had by virtue of title ownership to the Real Property full dominion and control over the Real Property.

212.    By reason of the foregoing, the Plaintiff is entitled to an order recovering the Transfer, or the value thereof, pursuant to section 550 of the Bankruptcy Code and a judgment against the Defendant, the initial transferee, 12706 Holdings Inc., in an amount as yet undetermined, but in no event believed to be less than $1million, plus interest thereon, attorneys' costs, or such other amount as may be determined by the Court.

## SEVENTEENTH CAUSE OF ACTION
### Avoidance and Recovery of Fraudulent Transfers from the Planet Management Group, LLC, Planet Home Lending LLC and Wilmington Savings Fund Society, FSB, Verus Securitization Trust 2020-NPL1
### (11 U.S.C. §§ 544 and 550)

213.    The Plaintiff re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

214.    The defendants, Ms. Bonaparte and Mr. Woodburn unlawfully misleading the Debtor with the complained of transaction, transferred the Deed and incurred obligations thereby granting the immediate transferees, the Planet Management Group, LLC, Planet Home Lending LLC, and then the mediate transferees Wilmington Savings Fund Society, FSB, Verus Securitization Trust 2020-NPL1, security interest and made the same for no consideration to the Debtor. The initial transferee, immediate transferee and mediate transferee acted in combination or coordination and or in mutual interest to cement their dominion and control over the Real Property of the Debtor.

215.    The Debtor received no value in exchange for incurring, granting and/or making the engineered transfer [by Ms. Bonaparte and Mr. Woodburn] of her Home and or having a lien of Planet Enterprise and or the Wilmington Savings Fund Society, Verus Securitization Trust 2020-NPL1 with a default interest rate exceeding 24%.

216.    The Debtor was insolvent, became insolvent, or intended or believed she would incur debts beyond its ability to pay as such debts matured at the time the Planet Enterprise or Wilmington Savings Fund Society, FSB, Verus Securitization Trust 2020-NPL1, the lien or interest in the Real Property were incurred, granted and/or made.

216.    The Planet Enterprise Defendants are the initial transferees of the impugned transfer for the encumbrance put on the Real Property, followed by Wilmington Savings Fund Society, FSB,

Verus Securitization Trust 2020-NPL1, the entity or person for whose benefit the said transfer were made, or the immediate or mediate transferees of the initial transferee receiving the transfers. The said encumbrances on the Real Property were not borne of good faith, as Planet Defendants. had full knowledge of the underlying transactions and details—i.e. continued occupation of the house by the Debtor, and value of the Real Property itself [property value exceeding $850,000 being transferred for a sum of $350,000 (as sum reduced as a projected short sale)] was notice enough to put any lender to an inquiry. The Planet defendants knew and thus had reasonable basis to know of the debtor's insolvency or of the fraudulent intent of the other defendants underlying the transfer.

217.    Wilmington Savings Fund Society, FSB, Verus Securitization Trust 2020-NPL1 at the time of transfer of the Note or the Mortgage etc. to the trust knew about the nature of the transaction, had knowledge of the voidability of the transfer, as the Debtor continued to occupy the Real Property as her residence and her pending bankruptcy [a public document listing claims against the defendants]. The Debtor had filed in her petition a notice of rescission of the deed to defendants, which Wilmington Savings Fund Society and Verus Securitation Trust 2020-NPLI knew.

218.    Based on the foregoing, the Plaintiff is entitled to recover the value of the transfers and or return of her Home pursuant to sections 522, 544 and 550 of the Bankruptcy Code.

WHEREFORE, the Plaintiff respectfully requests the entry of a judgment against Planet Management Group, LLC, Planet Home Lending LLC and Wilmington Savings Fund Society, FSB, Verus Securitization Trust 2020-NPL1 avoiding their lien interest in the property and awarding the Plaintiff costs, pre- and post-judgment interest and such other relief the Court deems equitable and just.

## EIGHTEENTH CAUSE OF ACTION
### (Disallowance of Claims)
### (Against Maxine Bonaparte, Lezantonio Woodburn, 12706 Holdings Inc., )

219.    The Plaintiff repeats and re-alleges the allegations set forth in paragraphs "1" through "218" as if set forth fully herein.

220.    To the extent the Defendants are found liable for any of the transfers subject to avoidance and recovery as alleged herein, any claims the Defendants may assert against the estate pursuant to section 502(h) of the Bankruptcy Code or otherwise must be disallowed unless and until the Defendants pay the estate or the Debtor the amount of such liability and make the Debtor whole.

## NINETEENTH CASUE OF ACTION
### (Legal Malpractice Against Mester)

221.    The Plaintiff repeats and re-alleges the allegations set forth in paragraphs "1" through "220" as if set forth fully herein.

222.    Ms. Stephens had her Home in foreclosure proceeding. She wanted to save her home. She was referred to Mr. Mester. Ms. Stephens approached him for saving her home. By signing a retainer agreement and reposing her trust, Ms. Stephens established a client attorney relationship with Mester.

223.    Mr. Mester owed a duty of care to Ms. Stephens. He had assured her that he will save her house.

224.    Mr. Mester failed to exercise required care, rather he abused Ms. Stephens trust by colluding with others depriving Ms. Stephens of her home with a substantial equity as said in the foregoing part of the Amended Complaint.

225.    Mr. Mester was expected to proceed in a manner reasonably calculated to advance a client's lawful objectives, as defined by the client after consultation. He was expected to act with reasonable competence and diligence. He was expected to comply with obligations concerning the

client's confidences and property, avoid impermissible conflicting interests, deal honestly with the client, and not employ advantages arising from the client-lawyer relationship in a manner adverse to the client; and fulfill valid contractual obligations to the client. Mr. Mester breached said duties and obligation. This failure to exercise due care and abuse of trust caused the complained of injury to Ms. Stephens.

226.    Ms. Stephens lost her home because of active collusion and deception of Mr. Mester.

227.    Ms. Stephens damages and deprivation of her home and humiliation has been caused by Mr. Mester breach of obligation with active collusion with other defendants.

Wherefore Ms. Stephens is entitled to be compensated for the damages owing to Mr. Mester's conduct.

**TWENTIETH CAUSE OF ACTION**
**Preliminary and Permanent Injunction**
**(Against the Defendants Maxine Bonaparte, Lezantonio Woodburn, 12706 Holdings Inc.,)**

228.    Plaintiff incorporates the allegations contained in paragraphs 1 through 204 inclusive, as though fully set forth at this place.

229.    The Defendants are now seeking to sell the subject premise. Said conduct is wrongful because the subject grant deed to them is void.

230.    The Defendants having record title, may seek at any time to evict plaintiff, or to transfer or encumber the premise and they are already doing the same.

231.    The Defendants' wrongful conduct unless and until enjoined and restrained by order of this Court will cause great irreparable injury to plaintiff in that plaintiff will suffer loss of her home which will cause personal suffering, including potential homelessness for plaintiff and her grandchildren, which cannot be compensated for by monetary damages.

232.    Plaintiff has no adequate remedy at law for the threatened conduct by defendants.

WHEREFORE, plaintiff prays for judgment against defendant, as follows:

a. For a preliminary and permanent injunction restraining and enjoining the Defendants and their agents, servants, employees, representatives, and anyone acting on their behalf or at their direction from committing, permitting, or performing, directly or indirectly, any of the following acts regarding the premises:

   (1) Contracting for, purchasing, leasing, exchanging, granting, conveying, mortgaging, transferring in trust, encumbering or hypothecating the subject premises;

   (2) Attempting to contract for, purchase, lease, exchange, grant, convey, mortgage, transfer in trust, encumber or hypothecate the subject premises;

   (3) Serving any notices terminating tenancy or filing any unlawful detainer actions or prosecuting any unlawful detainer actions against plaintiff;

   (4) Seeking in any fashion to dispossess plaintiff from the premises.

## PRAYER FOR RELIEF
### (Debtor demands trial by jury on all causes of action)

**WHEREFORE**, Plaintiff prays for relief and judgment as follows:

(a) Judgment in favor of plaintiff on all counts;

(b) General and compensatory damages according to proof at trial;

(c) Treble damages pursuant to 18 U.S.C. § 1964(c); NY RPL 265-a; NY Judiciary law § 487;

(d) Disgorgement of all moneys received by Defendants as a result of their unlawful activities;

(e) An award of Plaintiffs reasonable attorneys' fees and costs and expenses, pursuant to 18 U.S.C. § 1964(c);

(f) Punitive damages;

(g) Prejudgment interest;

(h) Voidance of Lien or any interest obtained by the Defendants on the Debtor's home;

(i.) Reconveyance of the Real Property title to the Debtor plaintiff and

(h) Such other and further relief as the Court deems just and proper.

Dated: February 22, 2024
New York New York

*/s/Karamvirdahiya*
Karamvir Dahiya
Dahiya Law Offices, LLC
75 Maiden Lane Suite 606
New York New York 10038
Tel: 212 766 8000