# EXHIBIT D

```
 1
 2   UNITED STATES BANKRUPTCY COURT
     EASTERN DISTRICT OF NEW YORK
 3   Case No. 1:23-cv-10103-NRB
     - - - - - - - - - - - - - - -x 21-42857-206
 4   In re:                        :
                                   :
 5   EVIS NEVERLANE STEPHENS,      :
                                   :
 6                      Debtor. :
     - - - - - - - - - - - - - - -x
 7   EVIS NEVERLANE STEPHENS,      :
                                   :
 8                     Plaintiff, :
                                   :
 9   v.                            :
                                   :
10   MAXINE BONAPARTE, LEZANTONIO  :
     WOODBURN, 12706 HOLDINGS INC.,:
11   CHARLES L. MESTER, ESQ., PLANET :
     MANAGEMENT GROUP, LLC, PLANET HOME :
12   LENDING LLC dba PLANET HOME   :
     SERVICING, WILMINGTON SAVINGS FUND :
13   SOCIETY, FSB(WSF), VERUS      :
     SECURITIZATION TRUST 2020-NPLI, :
14                                 :
                      Defendants.:
15   - - - - - - - - - - - - - - -x
16                     June 3, 2025
                       10:10 a.m.
17                     1251 6th Avenue
                       New York, NY
18
19
20           DEPOSITION UPON ORAL EXAMINATION OF
21   EVIS NEVERLANE STEPHENS, held at the
22   above-mentioned time and place, before Randi
23   Friedman, a Registered Professional Reporter,
24   within and for the State of New York.
25
```

```
 1                    E. Stephens
 2   APPEARANCES:
 3              LAW OFFICE OF NARISSA A. JOSEPH
                Attorneys for Plaintiff
 4
                305 Broadway, Suite 1001
 5              New York, New York 10007
 6              BY:  NARISSA A. JOSEPH, ESQ.
 7
 8              LAW OFFICES OF CHARLES L. MESTER
                Attorneys for Defendant, Charles L.
 9              Mester
10              225 West 34th Street, 9th Floor
                New York, New York 10122
11
                BY:  CHARLES L. MESTER, ESQ.
12
13
                STEVENS & LEE
14              Attorneys for Defendants, Planet
                Management Group, LLC and Planet Home
15              Lending LLC dba Planet Home Servicing
16              669 River Drive, Suite 201
                Elmwood Park, New Jersey 07407
17
                BY:  RYAN P. MULVANEY, ESQ.
18
19
20
21
22
23
24
25   (Appearances continued.)
```

1                    E. Stephens
2    (Appearances continued.)
3              AKERMAN, LLP
               Attorneys for Defendant, Wilmington
4              Savings Fund Society, FSB(WSF) and
               Verus Securitization Trust 2020-NPLI
5
               1251 Avenue of the Americas
6              37th Floor
               New York, New York 10020
7
               BY:   JORDAN SMITH, ESQ.
8
                         *  *  *
9
10
11
12
13
14
15
16
17
18
19
20   ALSO PRESENT:
21             Maxine Bonaparte
               Lezantonio Woodburn
22
23
24
25

1                    E. Stephens

2                 STIPULATIONS

3        IT IS HEREBY STIPULATED AND AGREED, by

4   and among counsel for the respective parties

5   hereto, that the filing, sealing and

6   certification of the within deposition shall be

7   and the same are hereby waived;

8        IT IS FURTHER STIPULATED AND AGREED

9   that all objections, except as to form of the

10  question, shall be reserved to the time of the

11  trial;

12       IT IS FURTHER STIPULATED AND AGREED

13  that the within deposition may be signed before

14  any Notary Public with the same force and effect

15  as if signed and sworn to before the Court.

16                    *  *  *

17

18

19

20

21

22

23

24

25

1              E. Stephens

2                  * * *

3              EVIS NEVERLANE STEPHENS, the

4       witness herein, after first having been duly

5       sworn, was examined and testified as

6       follows:

7                  * * *

8              (Defendants' Exhibit A was

9       marked.)

10                 EXAMINATION

11    BY MR. MESTER:

12         Q     Good morning.

13         A     Good morning.

14         Q     My name is Charles Mester, as you

15    know.  I'll be asking you a series of questions

16    today regarding the allegations that your lawyer

17    put together in the bankruptcy complaint that was

18    filed in 2021 and 2022.  I'd like you to answer

19    the questions verbally.  Please don't nod your

20    head or anything like that because we have to

21    take down an answer on the transcript.  If you

22    don't understand something, you know, we could

23    rephrase the question.  But you have to answer

24    every question presented to you unless there's an

25    objection.

1                    E. Stephens

2                    MR. MESTER:  Are we doing the

3        standard stipulated --

4                    MR. SMITH:  Just the Federal Rules

5        for a deposition.

6                    MR. MESTER:  That's true.

7                    MR. SMITH:  We don't have state

8        stips.

9                    MR. MESTER:  Right.  Okay.

10   BY MR. MESTER:

11       Q     So if you need to consult with your

12   attorney, you can do so, but only after a

13   question has already been answered; okay?

14       A     Okay.

15       Q     First of all, are you on any kind of

16   medication that would prevent from you answering

17   the questions clearly today?

18       A     I'm on high blood pressure medication.

19       Q     High blood pressure medication?

20       A     Uh-huh.

21       Q     Does that interfere with your mental

22   capacity or anything of that nature?

23                    THE WITNESS:  Should I answer

24        that?

25                    MS. JOSEPH:  Yeah.

1          E. Stephens

2          THE WITNESS:  I have high blood

3     pressure.  High blood pressure can give you

4     a stroke.  And it's very high right now.

5     BY MR. MESTER:

6     Q     Okay.  Do you have memory issues as a

7     result of taking this medication?

8     A     Sometimes, yeah, I do.  I do, yeah.

9     Q     Did you take the medication already

10    today?

11    A     Yeah, I did.  I did.  I have to.  All

12    I get, the pressure keeps going up.  Depends on

13    my job and the night.

14    Q     How long have you been on the

15    medication for?

16    A     I have been on pressure pills since

17    2007.  I have been, but it was low dose.  Now I

18    get very high doses now.  Now I am on two blood

19    pressure medications.

20    Q     Do you take any other medications that

21    might interfere with your capacity to remember

22    things?

23    A     Uh-uh.  Only that.  If you take that

24    high blood pressure medication.  I have to be

25    calm.  Very calm.

1          E. Stephens

2     Q     Well, you mentioned about having a

3  stroke.  Have you had a stroke in the past?

4     A     Yes, I have.  I had -- I didn't even

5  know.  It's when I end up in Queens General

6  Hospital.  They said, do you know you had a

7  stroke?  I said, I didn't know.

8     Q     When was that?

9     A     That was 2019, I think.  Maybe 2019.

10 It could be before that.  COVID didn't start yet,

11 I don't think.  COVID didn't start yet, so that's

12 what it is.  And it gets worse.  And I work hard.

13    Q     Did the stroke occur before you met me

14 or after you met me?

15    A     That stroke was before, but it was --

16 it wasn't a big, big stroke.  But now things get

17 worse.

18    Q     Okay.

19    A     Yeah.

20    Q     Okay.  Did you indicate to myself --

21 do you remember telling myself or Maxine that you

22 had had a stroke?

23    A     No, I didn't even remember you sitting

24 there right now.  I couldn't even recall if -- or

25 that might be you.  I said I didn't even remember

```
 1                    E. Stephens
 2    he just told me that he's Mester.  I didn't even
 3    remember you.  'Cause it's awhile now; right?
 4        Q     It is awhile.
 5              Okay.  So let's try to do the best we
 6    can today; okay?
 7        A     Yes.
 8        Q     Based on that situation.
 9              What's your -- what is your current
10    address?
11        A     127-06 177th Street, Jamaica, New
12    York, 11434.
13        Q     Is that a house?
14        A     A house, yes.  Two family.
15        Q     Do you occupy the entire house?
16        A     Just the bottom of it.
17        Q     I'm sorry?
18        A     Just the first floor.
19        Q     Who occupies the second floor?
20        A     I think it's a girl, my niece.  And
21    the rest belongs to Maxine's friend or family or
22    whatever.  His name is Dwight.  Friends and
23    family up there.  I don't know.
24        Q     And --
25        A     I'll turn this phone off.
```

1           E. Stephens
2           (Whereupon there was a cellphone
3    interruption.)
4               THE WITNESS:  That's my daughter
5        waiting for me.
6    BY MR. MESTER:
7        Q     Did you -- how long have you had a
8    cellphone for?
9        A     My what?
10       Q     How long have you had a cellphone for?
11       A     My cellphone?
12       Q     Your cellphone?
13       A     On?
14       Q     No.  How long have you had a
15   cellphone?
16       A     Oh.  Long time.  For years.
17       Q     Before you met me?
18       A     Oh, yeah.
19       Q     Do you use the cellphone to
20   communicate to other people?
21       A     I do.
22       Q     Do you text -- do you text messages
23   with people?
24       A     Yeah, but I'm not so good doing those
25   things.

```
 1                    E. Stephens
 2      Q     Do you mostly use it for voice calls?
 3      A     For voice call or my job, and they
 4 call me, yeah.
 5      Q     When you first met Maxine, how did you
 6 communicate with her?
 7      A     The phone.  Phone or when she comes by
 8 the house.  She comes by the house many times.
 9      Q     Did you text her?
10      A     No, I never did text Maxine.  She text
11 me.
12      Q     What about emails; do you use an
13 email?
14      A     No.  That email thing, I'm not good at
15 it.  So I don't email.
16      Q     Do you have an email address?
17      A     I have an email address.
18      Q     And did you use it to communicate with
19 Maxine at all during the period that you met --
20      A     No, I can't recall that.  I cannot
21 recall doing such thing, because I'm not any good
22 at texting.  And if I do, I can't recall.
23      Q     What is the -- just for the record,
24 what is your email address?
25      A     Evis.stephens@yahoo.com.
```

```
 1                    E. Stephens
 2      Q      And what is your cellphone number?
 3      A      (718)570-7318.
 4      Q      Okay.  I'm going to give you a
 5  document that was previously marked Exhibit A;
 6  okay?
 7      A      Uh-huh.
 8      Q      I'm going to leave it here for you;
 9  okay?
10      A      Okay.
11      Q      Do you recognize the document?  Take a
12  look at it.
13              MS. BONAPARTE:  Can I interject --
14      she said that Dwight, she said, was on the
15      second floor.
16              MR. MESTER:  We're not clarifying
17      anything.  If you want to ask her a question
18      regarding that later, feel free to do that.
19              MS. BONAPARTE:  Okay.
20              THE WITNESS:  Do I have to go
21      through the whole thing?
22  BY MR. MESTER:
23      Q      I just want to know if you recognize
24  it.  Have you seen this document before?
25      A      The name here is Maxine.  And there's
```

1           E. Stephens

2   Antonio Woods and Holding Company, Charles

3   Mester.  I do not know what Planet Management

4   Group -- I can't recall all these things.  Only

5   those two names on top of there and the address,

6   the holding company.  I noticed that holding

7   company after.

8        Q    This is a document your attorney put

9   together in this case; okay?  The reason why

10  we're all here today.

11       A    Okay.

12       Q    So I just wanted to put that in front

13  of you; okay?

14       A    Okay.

15       Q    There are statements in this document

16  that the attorney put down that are your -- that

17  are allegations that you have made against all

18  the defendants.

19       A    Right.

20       Q    Do you understand what a legal

21  complaint is?

22       A    Yeah.  Somebody making a complaint.

23       Q    Right.

24       A    Okay.

25       Q    So I'm going to ask questions about

1                    E. Stephens

2    that today; is that okay?

3         A     Okay.  I'll try my best.

4         Q     Paragraph 19 indicates that in and

5    around 2006, you were a home health aide.

6         A     Uh-huh.

7         Q     Could you describe your work as a home

8    health aide?

9         A     Taking care of the elderlies at their

10   home.  Sometimes I do a living in with them.

11   Sometimes, you know, cooking, cleaning, whatever,

12   you know, for them.  Making sure they're okay.

13        Q     Right.  How do you get paid for that

14   type of job?

15        A     Through check.  By check.  They send

16   it to my phone and I send it straight to the

17   bank.

18        Q     Do you work for a company?

19        A     Uh-huh.

20        Q     Since 2006?

21        A     No.  2006, I can't recall 2006.  I

22   start working for this company on -- after the

23   COVID.  After the COVID.  COVID was around that

24   time, I start working for this company.

25        Q     Okay.

1          E. Stephens

2     A     But 2006, I was an independent

3  contractor.

4     Q     Okay.

5     A     Yeah.

6     Q     Independent.  And when did you begin

7  working for a company?

8     A     The one I'm working for now?

9     Q     Not the one you're working for.  The

10 next --

11    A     2006?

12    Q     After -- did there come a time that

13 you were no longer an independent healthcare

14 worker and you worked for a company?

15    A     I have been working for a company for

16 a while.  For all them times.  When I get sick

17 with the COVID, that's how I stopped working

18 independent contractor.

19    Q     Let's talk about around 2018, which is

20 before COVID.  Were you still an independent

21 healthcare worker at that time?

22    A     Yes, I was.  2018, I think so.  I

23 can't remember some of the dates.  All I can

24 remember is the COVID coming in.  And when the

25 COVID came in, around that time, I was an

```
 1                      E. Stephens
 2    independent contractor.
 3              COVID came in what date?  What time?
 4        Q    Okay.
 5        A    Around that time when COVID came in,
 6    my patient died.  So what time was COVID?
 7        Q    I'm moving on to another question;
 8    Ms. Stephens; okay?
 9              Okay.  Around 2006, where were you
10    residing at that time?
11        A    2006, I bought that house 2007, so I
12    was doing, like, a living-in job.  So I put all
13    my things in storage and I was, like, living in
14    there, taking care of two patients.
15        Q    Okay.  Let me ask you directly.  Did
16    you live at an address, 85 West Roosevelt Avenue,
17    Roosevelt, New York?
18        A    Yes.  Oh, yeah, that's my sister's
19    house.  Yeah.
20        Q    When did you -- what time period were
21    you living at that address?
22        A    Oh, boy.  I can't recall, but after I
23    moved from there, I was living in Baisley
24    Boulevard.
25        Q    No, I didn't ask where you lived after
```

1           E. Stephens
2    that.  I'm going to focus on Roosevelt; okay?
3        A    Okay.  I lived there for a while.
4    Some years.
5        Q    Who lived there with you?
6        A    My sister and her husband.
7        Q    What are their names?
8        A    Esla Williams was her name, and her
9    husband was living there, too.
10       Q    Was that Alvin?
11       A    Alvin Williams, yes.
12       Q    Okay.  Do you remember when you moved
13   out of that house?
14       A    I cannot recall because we moved -- as
15   I said, we moved from there.  I was working all
16   that time.  I moved by Ms. Williams, and I can't
17   even recall the address there.  If you want the
18   address, you could tell me what the address is.
19       Q    No, no.  I'm asking you where you
20   moved after you lived at Roosevelt, and when.
21       A    Okay.  That's her address.  I can't
22   recall.
23       Q    You can't remember?
24       A    I can't remember.  But I'll tell you
25   something, it was on Baisley.  I can see the

1                    E. Stephens

2    property right now.  I cannot --

3        Q     What's the name of the street?

4        A     161 -- 130 something.  Something like

5    that.

6        Q     What's the name?

7              MS. JOSEPH:  I think she said

8        Baisley Boulevard.

9    BY MR. MESTER:

10       Q     Baisley Street or Avenue; what is

11   that?

12       A     Baisley boulevard.  One of the

13   streets, yes.

14       Q     And that's in Brooklyn?

15             MS. JOSEPH:  Queens.

16             THE WITNESS:  Queens.

17   BY MR. MESTER:

18       Q     Oh, that's in Queens.

19             Did you own the property on Baisley?

20       A     No, I was renting.

21       Q     Renting.

22       A     Myself and my daughter, we were

23   renting.

24       Q     And how long did you live at that

25   property?

1             E. Stephens

2        A      Could be like five years.  Could be

3   along that time, I think.  I think it was five

4   years.  I'm not so sure.  Yeah, about five years.

5   Maybe about five years.  I'm not so sure.  But I

6   lived there for a little while.  I was even

7   working -- I still was doing living in.  Closed

8   up the apartment.  Go do live-in all over Glen

9   Cove and all those places.

10       Q      Right.

11       A      So I was coming and going.

12       Q      Approximately, do you recall how much

13  money you made around that time period as a home

14  healthcare worker?

15       A      I was making a lot of money because I

16  was taking care of -- I can't remember the names.

17  Two patients.  I was making sometimes 2-,

18  $3,000.00, because it's two people I had taken

19  care of.  The whole house.

20       Q      This is while you were independent

21  still?

22       A      Yes, independent contractor.

23  Contractors used to get jobs for me.  I was an

24  independent contractor.

25       Q      I would like you to look at

1             E. Stephens
2   Paragraph 19 of that document.  It indicates that
3   as a healthcare worker, your salary was $1,000.00
4   a week.
5        A     Well, it started like 1,000 and then
6   it raised up.  Because the old man got sick, and
7   then it raised up.
8        Q     So approximately when did it change
9   from 1,000 to --
10       A     Maybe a year after, because her
11  husband got sick.
12       Q     Okay.  So that was around 2006?
13       A     Yes, around that time.  That's what I
14  recall.
15       Q     So at the end of that paragraph it
16  says you saved around $10,000.00.  Was that
17  around 2006, 2007?
18       A     Yeah, because I had no rent to pay.
19  Again, I gave up my property, put it in a storage
20  in Long Island.  And I was just taking care of
21  those two people.  Had my own car and everything.
22  Driving them around.  Yeah, I'm living there,
23  doing everything for them.  Those days, you make
24  a lot of money when you are doing those jobs.
25       Q     This is around the same time you were

1           E. Stephens
2    renting a place at your sister's house?
3        A      My sister's house?  I was staying
4    there.  I was just giving her something.  I was
5    not working in Glen Cove at that time with her
6    when I was there.
7        Q      So you would live in your patients'
8    house with them?
9        A      Oh, yeah.  Yeah, you could do that.
10       Q      Full time?
11       A      Yeah, 24 hours.  Sometimes I get up
12   early in the morning, I do my running, exercise,
13   go back and make breakfast for them and
14   everything.  Yeah.  Yeah.
15       Q      So if you look at the last sentence on
16   Paragraph 19, it says you saved around $10,000.00
17   and wanted to buy a house.
18       A      That's right.  That's right.  I was
19   alone.  I had no family with me, so I didn't have
20   nothing to do.  So I could save my money.
21       Q      Well, what about your daughter?
22       A      She married and gone.
23       Q      So you weren't living with her
24   anymore?
25       A      No.  I lived with nobody.  On my own.

1                    E. Stephens

2        Q      When it says you wanted to buy a

3   house, does that mean you wanted to buy a house

4   and live in the house?

5        A      Of course.  Because I do filing for my

6   husband and everything.  I prepared myself for

7   them to come.

8        Q      Your husband?

9        A      Yeah.

10       Q      Where was he living?

11       A      He's in Trinidad.  He was in Trinidad.

12  I prepared myself, you know, to get things

13  together.

14       Q      So you were living here in 2006, and

15  he was in Trinidad living with you -- residing

16  there?

17       A      Yes.  Yes.

18       Q      Were you planning to buy this house

19  with your husband?

20       A      No, myself, because he's over there.

21  I'm doing everything for myself.  I'm preparing

22  myself.

23       Q      How did you go -- what did you do to

24  investigate how to buy a house?

25       A       I asked friends and neighbors and so

1          E. Stephens
2     on.
3          Q     So you were asking -- any specific
4     professionals?
5          A     I don't understand what you mean.
6          Q     Well, did you speak to a real estate
7     agent?
8          A     I speak to some of them, but not in
9     the --
10         Q     Did you see it?  Did you go and look
11    at any houses that were for sale?
12         A     Did I look at any houses?  Yeah, there
13    was a guy --
14         Q     I'm talking in 2006 still.
15         A     Yeah, I looked at houses.  And after
16    that, I didn't go places much with him, with
17    whoever I asked to help me out with a house or
18    whatever.  I asked people, so --
19         Q     These are people that owned houses?
20         A     Yeah, they owned houses.
21         Q     What kind of questions would you ask
22    them?
23         A     How to go about to get a house,
24    because I need a house sooner or later.  My
25    family is coming.

1                    E. Stephens
2      Q      Okay.  Well, let's talk about the
3  first house you got.  What was that?  What was
4  the first house that you purchased?
5      A      The first house I purchased, only one
6  house I had.
7      Q      Okay.  You only had one house?
8      A      Yeah, the one I'm living in right now.
9  That's the first house.
10     Q      What's the address?
11     A      127-06 177th Street, Jamaica, New
12  York, 11434.
13     Q      You don't recall buying any other
14  houses before --
15     A      No, I did not.
16     Q      -- that property?
17     A      No, I did not.
18     Q      When did you buy the house on 177th
19  Street?
20     A      2007.
21     Q      Okay.  What about the property at
22  844 East 34th Street in Brooklyn?
23     A      I didn't buy that.  That was something
24  different.  Real estate.  I went to real estate,
25  who get that house for me, and did all this

1                    E. Stephens
2    drama.  I buy nothing.  I did not buy anything
3    else.
4         Q     Okay.  Tell me how you got involved in
5    the property at 844 East 34th Street?
6         A     There's this guy.  Well, he die now.
7         Q     What's his name?
8         A     His name?  I can't remember his name.
9    I can't recall his name.  He died about -- many
10   years now.  He's the one that helped me to get
11   the real estate person to get my house.
12        Q     844 East 34th Street?
13        A     No, no.  To get my house, 127-06.
14        Q     You're going to have to use the
15   address.
16        A     127 --
17        Q     Because there's a lot of properties
18   here.
19        A     127-06 is my house.  The guy showed me
20   how to go around it and introduced me to Osmond.
21   When he introduced me to Osmond, I said you get a
22   house for me, and that's how it goes.
23        Q     So before you purchased the house on
24   177th Street, you were speaking with somebody by
25   the name of Osmond?

1                    E. Stephens

2        A      Yeah.  He was a real estate guy.

3        Q      Osmond was a real estate broker?

4        A      Yeah.

5        Q      Did he own houses?

6        A      I don't know.  I didn't ask him any

7    questions.

8        Q      He had connections to houses?

9        A      I don't know.  I don't recall that.  I

10   just wanted to know something for me.

11       Q      So why were you speaking with

12   Mr. Osmond?

13       A      To get a house for me, because he's a

14   real estate guy.

15       Q      What did Mr. Osmond say that he could

16   do for you?

17       A      He said he could get a house for me.

18   A real estate person, yeah.

19       Q      He would get a house for you?

20       A      Yeah.

21       Q      Did you go to see any houses with

22   Mr. Osmond?

23       A      No, I did not.  I didn't go with him.

24   I went with a friend looking at houses.  I went

25   with a friend looking at houses.  And then I

```
1                    E. Stephens
2    recall Osmond, I say, I see a house.  Look at the
3    next house again.  I didn't like it.  And I
4    called him.  I looked at 127, and I said, I like
5    that house, yeah.
6         Q    Do you know anybody by the name of
7    Joyce Halls?
8         A    No, I don't know that person.
9         Q    Have you ever been to the property at
10   844 East 34th Street in Brooklyn?
11        A    I saw the houses.  I never lived in
12   them.  I never occupied them.  I never do
13   anything.  I just saw those properties.  When I
14   get a final -- when the detective from -- called
15   me and said, do you know Osmond, and Osmond, who
16   does houses, and blah, blah, blah.  I took all
17   the documents, because the papers coming to me.
18   And I said, yeah, I just don't know what it is.
19   And they told me, you know you have all these
20   houses in your name?  I said, really?  Really?  I
21   didn't even know.  Because a lot of people got
22   involved in that.
23        Q    I'm going to show you some documents.
24        A    Okay.
25        Q    I guess we will mark all of these.
```

```
 1                    E. Stephens
 2              MR. MESTER:  I'm marking as
 3      Exhibit B a deed on record with the Kings
 4      County register's office for the property at
 5      844 East 34th Street.  And the ancillary
 6      papers that are recorded by the City when a
 7      deed is put on record.
 8              (Exhibit B was marked.)
 9  BY MR. MESTER:
10      Q     I'd like to show you --
11              MR. SMITH:  Do you have copies of
12      that?
13              MR. MESTER:  I don't.  We're going
14      to have to make copies for everybody later.
15      I'm sorry.
16  BY MR. MESTER:
17      Q     I want to show you this.  I want you
18  to turn to Page 6 of that document.
19      A     Yeah.  My name is there.
20      Q     Do you see your name at the bottom of
21  that document?
22      A     Of course my name is there.  My name
23  is on a lot of houses.
24      Q     Go ahead.
25      A     I can talk?  One of the guys, when I
```

1              E. Stephens
2    finished with the table that they have for me to
3    sign, he said, do you know how many documents you
4    signed there?  I said no.  He said, I'm going to
5    give you a card.  I said, give me a card?  I
6    don't know.  Because first time I'm buying a
7    house.  He give me the card.
8         Q    Let me ask you some questions about
9    this event that you were just describing; okay?
10        A    Uh-huh.
11        Q    Explain what happened that day.
12        A    Okay.
13             MS. JOSEPH:  The date of closing?
14             MR. MESTER:  The day that she's
15   describing about signing a lot of papers.
16             THE WITNESS:  Signing the papers
17   for the closing.
18             MR. MESTER:  Yes.
19             MS. JOSEPH:  But she's saying
20   that -- I'm not sure if she's saying at this
21   closing.
22             MR. MESTER:  That closing,
23   844 East 34th Street.
24             MS. JOSEPH:  I think the proper
25   question is whether -- you asked her if her

1              E. Stephens

2    name on the paperwork.  Whether or not

3    that's her signature, did she sign this

4    document.

5              MR. MESTER:  I'm going to get to

6    that question, but she brought up the fact

7    that she was at a table and was signing a

8    the lot of papers.  So I want to know about

9    that day.

10             MS. JOSEPH:  Right.  Not

11   specifically this closing.  That day that

12   she's referencing.

13             THE WITNESS:  That day, that was

14   my house.

15  BY MR. MESTER:

16      Q     The day that you signed the papers for

17  844 East 34th Street --

18             MS. JOSEPH:  No.  That's -- I

19   think that's what the clarification is.

20   Your initial question was whether or not, if

21   she sees her name here.  She said yes.  Then

22   she starts going into about what happened

23   that day, but she never acknowledged that

24   she signed this on this closing.

25

1                    E. Stephens

2     BY MR. MESTER:

3          Q     Is that your name at the bottom of

4     that document?

5          A     Of course that's my name.

6          Q     Is that your signature at the bottom

7     of the document?

8          A     Could be.

9          Q     Does it look like?

10         A     Yeah.  But what I'm trying to say is

11    my signature here, I don't know when I bought the

12    house.  I don't know went on.  My first time

13    buying a house, and there's a lot of papers that

14    was signed.  And I don't know.  This thing went

15    to the district attorney.  This thing went to

16    everybody.

17         Q     So now we're referring to -- we're

18    referring to the property at 844 East 34th Street

19    in Brooklyn.  Is that one of the properties that

20    you're referring to that went to the district

21    attorney?

22         A     I don't know.  Maybe.  All of them --

23    any property that you see in my name, with those

24    names on it, went to the district attorney.

25         Q     This is your name that's on the

1                        E. Stephens

2       document.

3            A       It could be.  I don't know.  Somebody

4       else could be copied it, too.

5            Q       I'm not asking what may be.  I'm

6       asking you to look at that signature and tell us

7       if you recognize that as your signature.

8            A       Yeah, that's --

9            Q       Then turn the page.

10                        MS. JOSEPH:  This is this

11                   signature that you're referencing.  So

12                   you're saying is it her signature or did she

13                   sign the document?

14                        MR. MESTER:  Is that her

15                   signature?  Is that her signature?

16                        THE WITNESS:  It is my signature.

17       BY MR. MESTER:

18            Q       Okay.  Turn the page.  And do you see

19       your name?

20            A       I can't recall it.  I cannot recall

21       that.

22            Q       No, no.  Do you see your name on the

23       paper?

24            A       My name is, yeah, but that doesn't --

25                        MS. JOSEPH:  Her name is not on

1                          E. Stephens

2           the paper.  It's a signature.

3                     THE WITNESS:  Yes, it's a

4           signature.

5                     MS. JOSEPH:  So that's what I'm

6           trying to reference.

7                     THE WITNESS:  I don't know.

8    BY MR. MESTER:

9           Q       The signature is a signature that says

10   Evis Stephens; is that correct?  Can you read?

11          A       It says Evis Stephens.

12          Q       You can read that; right?

13          A       Yeah.

14          Q       It has the name Evis Stephens;

15   correct?

16          A       Yes, it says.

17          Q       Does that appear to be your signature?

18          A       It don't look like that.  Because the

19   other one in the front look different from that.

20          Q       Turn the page again.  Do you see a

21   signature there that appears to be Evis Stephens?

22          A       It looks different.  I cannot recall a

23   lot of stuff right now.

24          Q       Okay.  Do you remember being in a real

25   estate closing in 2000 with Mr. Osmond?

1                    E. Stephens

2       A     Yeah.

3       Q     When was that, approximately, the

4  first time?  Was there more than one --

5       A     Around the time I bought my house.

6       Q     Huh?

7       A     Around the time I bought my house.

8       Q     What about other times?

9       A     No, I did not.  That's the only time I

10  go there with him, when I buy my house.

11      Q     So you were only there one time?

12      A     Yeah, with him.

13      Q     With Mr. Osmond at a closing?

14      A     Yeah.

15      Q     Okay.  No other times that you recall?

16      A     No, I can't recall that.  No.

17      Q     Okay.  I'm going to stand here for a

18  second.

19                  MS. JOSEPH:  Okay.

20  BY MR. MESTER:

21      Q     I want to show you the notary on this

22  document.  I'm showing you the name of the

23  notary, Marisol Vasquez.  Do you know this

24  person?

25      A     No.

1                    E. Stephens
2        Q     Do you remember her from any --
3        A     No.
4        Q     Did you meet her at all?
5        A     No.  No.
6        Q     The document is dated June 29th, 2006.
7   Is that around the time you and Osmond were
8   looking for houses?
9        A     No.  No.  I bought it in 2007, and I
10  never looked for houses with Osmond.  I look,
11  payment, something on Hillside.  They are a
12  company, and he's the guy that take me to
13  different houses.
14       Q     When did you start looking at houses
15  with Mr. Osmond?
16       A     I never looked at houses with
17  Mr. Osmond, no.
18       Q     When did you start working with
19  Mr. Osmond?
20       A     I never worked with Mr. Osmond.  I was
21  introduced by the guy that died, to Osmond to do
22  the closing for me at my house.  I don't -- I
23  never knew Mr. Osmond.
24       Q     So who introduced you to Mr. Osmond?
25       A     The guy that died.  I told you

1          E. Stephens

2    already.  I can't recall his name.  He died.  He

3    had some kind of an infection or something, and

4    then he died.

5          Q    You don't remember his name?

6          A    I can't recall his name now.

7          Q    Do you remember when that introduction

8    took place?

9          A    It was around -- let me tell you

10   something.  Around 2007, a lot of things went

11   down in 2007.  That's why I bought a house.  I

12   know nothing more.  I can't recall that.

13         Q    Okay.

14              MR. MESTER:  I'll have this marked

15         Exhibit C.  This is the mortgage that was

16         recorded against the property, 844 East 34th

17         Street in Brooklyn, at the time that the

18         deed that was marked as Exhibit A was also

19         recorded.

20              MS. JOSEPH:  Exhibit B?

21              MR. MESTER:  I'm sorry, Exhibit B.

22              (Exhibit C was marked.)

23   BY MR. MESTER:

24         Q    Ms. Stephens, I'm going to show you a

25   document that's been marked Exhibit C.  Please

1          E. Stephens

2   take a look at the document and then turn to

3   Page 3 and Page 5.

4               MS. JOSEPH:  It's only a few pages

5       of the mortgage.  It's not the entire

6       mortgage.

7               MR. MESTER:  Right, not the entire

8       mortgage.

9               MS. JOSEPH:  Okay.  The property

10      address.  The date.

11              Do you want her to look at Page 3?

12  BY MR. MESTER:

13      Q     Look at the first page -- I'm sorry,

14  the second page, where the document starts.

15              Okay.  What type of document is this?

16  Can you recognize the type of document that this

17  is?

18      A     What is it, a mortgage or something?

19      Q     Mortgage.  What is your understanding

20  of a mortgage?

21      A     It's to pay the mortgage every month.

22      Q     Do you know what a mortgage is?

23      A     Not really.

24      Q     Huh?

25      A     Not really.

                        E. Stephens

1

2       Q       Okay.  Well, why would an individual

3    need to pay a mortgage?  What would be the reason

4    for that?

5       A       To keep it.

6       Q       To keep what?

7       A       The keep your property.

8       Q       Okay.  Okay.  Does that mean that

9    you -- when somebody has to pay a mortgage, does

10   that mean that you're paying -- can you describe

11   what -- who you're paying when you pay a

12   mortgage?

13      A       The bank.

14      Q       Why would you be paying a bank the

15   mortgage?  Did the bank give money to somebody in

16   order to obtain the house?

17              I'm just asking you general questions.

18              MS. JOSEPH:  General questions.

19   BY MR. MESTER:

20      Q       About your understanding of what a

21   mortgage is.

22      A       Yes, a mortgage is just like the house

23   I'm living in, to pay it.  I pay it every month.

24   That's what it is.  I understand you have to pay,

25   just like you do the rent.  You have to pay

1                    E. Stephens
2    whoever you have to pay every month, a payment.
3         Q     And I just want you to describe for us
4    what you believe -- why you're paying a bank
5    every month.
6         A     Because the mortgage belongs to the
7    bank.  The mortgage belongs to the bank, so you
8    pay it all the time.  So you want to keep your
9    house and you pay the bank.  Just like everything
10   else.  I buy a car, and I have to pay for the car
11   and so on.
12        Q     Right.  Because a bank is then giving
13   you money --
14        A     Yes.
15        Q     -- right?
16        A     Yes, to buy it.
17        Q     The bank is giving you money; correct?
18        A     Yeah.
19        Q     In order to purchase --
20        A     Right.
21        Q     -- either the car?
22        A     Yeah.
23        Q     -- or the house; right?
24        A     Right.
25        Q     And now you have to pay that money

1                    E. Stephens

2    back; right?

3         A     Right.

4         Q     Okay.  And when you have to pay that

5    money back, there are documents that require

6    that; right?

7         A     Uh-huh.

8         Q     And a mortgage is one of those

9    documents; right, that requires somebody to pay

10   the money back; right?

11            What would happen if somebody had

12   taken a loan from a bank, in general, take a loan

13   from a bank -- the bank gives you a mortgage;

14   right?

15        A     Uh-huh.

16        Q     Yes?  Yes?

17        A     Right.

18        Q     And you don't pay it back.  What would

19   happen then?

20        A     I guess they just take back the house.

21        Q     Do you know what that's called?

22        A     That they take back the property.

23   That's all.  What was it called?

24        Q     Do you know what the legal term is

25   when a bank takes back property?

1                    E. Stephens

2        A      I just told you.

3        Q      Huh?

4        A      I don't know.  They take back the

5    property.  That's all.

6        Q      Have you ever heard of the term

7    "foreclosure"?

8        A      Yes.

9        Q      What you do you understand the word

10   "foreclosure" to mean?

11       A      Well, when the house in foreclosure,

12   it means the bank is coming to take back the

13   property.

14       Q      And why would a bank come to take back

15   the property?

16       A      Because you're not paying the

17   mortgage.

18       Q      Thank you.  Okay.  So I'd like you to

19   look at Page 1.  That says it's a mortgage;

20   correct?

21       A      Page 1?

22       Q      Page 2.  I'm sorry.  Page 2.

23              It says a mortgage; right?

24       A      Yeah.

25       Q      And does that mean that the bank gave

```
 1                    E. Stephens
 2   somebody money to purchase a house?
 3        A     I guess so.
 4        Q     Okay.  I'd like you to turn the page.
 5   Actually, look at that page again.  Does it say
 6   on that page who the bank gave the money to?
 7        A     I have no idea.
 8        Q     Does it have your name on the first
 9   page?  It's on the second page.  I'm sorry.
10              Is your name there?  It's the second
11   page.  That's the second page.  Is your name on
12   the second page?
13        A     Yeah, the borrower.
14        Q     I'm sorry?
15        A     As the borrower.
16        Q     As the borrower?
17        A     Yeah, Evis Stephens.
18        Q     Evis Stephens, that's you; right?
19        A     Uh-huh.
20        Q     Okay.  Does it have an address for you
21   on that page?
22        A     Uh-huh.  Roosevelt.
23        Q     The Roosevelt address, that's the one
24   that you said that you lived in with your sister
25   and her husband; right?
```

1                    E. Stephens

2        A     Yeah, but I moved from that 2006, long

3    time, and I gone.  I wasn't there no more.

4        Q     When did you -- I don't think you told

5    us when you moved out of there.

6        A     Listen to me, I moved out from there

7    and I end up -- I think I moved before 2006,

8    because I stayed by Ms. Williams' property.  I

9    rent there.  That was 2007, 2008, 2009.  I think

10   I moved out from there 2005, my daughter and

11   myself.

12       Q     You don't have anything that would

13   show when you moved?

14       A     No, I have nothing.  It was

15   20-something years.  I don't have nothing.

16       Q     Okay.  I would like you to turn the

17   page.

18               MS. JOSEPH:  This is Page 14 of 14

19       of the mortgage.

20   BY MR. MESTER:

21       Q     Do you see a signature on that page?

22       A     Yes.

23       Q     What is the name of that signature?

24       A     Evis Stephens.

25       Q     Is that your signature, or does it

1                    E. Stephens

2   appear to be your signature?

3        A       It appears like my signature, but I

4   can't recall doing these things, writing in that.

5   I don't know.

6        Q       Okay.

7        A       I have no idea.

8        Q       And there's a notary at the bottom of

9   the page.

10       A       Yes, I saw it.

11       Q       Do you see the name?

12       A       Yeah, I see it.

13       Q       What's the name?

14       A       Something -- I don't know.  What was

15   that?

16       Q       Can you read it?

17       A       Marisol or some kind of something like

18   that.  I don't know.

19       Q       Do you know who that person is?

20       A       No.

21       Q       I'd like you to turn the page.

22       A       No.

23       Q       And turn to the last page.

24               Do you see your name on the last page?

25       A       I see my name, but I cannot recall

1                           E. Stephens

2    writing that.

3           Q       Does it appear to be your signature,

4    though?

5           A       It looks like my signature, but that

6    doesn't mean I write it.

7           Q       Thank you.  Did you ever meet a John

8    Clark?

9           A       Yeah.

10          Q       When did you meet Mr. Clark?

11          A       I can't recall the time.  Somebody

12   introduced me to Mr. Clark, and I can't recall

13   the time I saw it.

14          Q       Did he help you with real estate

15   matters?

16          A       Yeah, because when I saw all these

17   things coming to the mail, I asked him if he

18   could get it off.  Because I don't understand

19   what it is there on my property -- my name.  So

20   he's a real estate guy.

21          Q       When you say you saw things come in

22   the mail, what kind of things?

23          A       When it comes in the mail -- like, a

24   matter of fact, as I said, I went to the district

25   attorney's and they saw all these things.  They

1                    E. Stephens
2    came to me with all these things already.  These
3    are things that was -- district attorney come --
4    because after they arrest Mr. Osmond and all
5    these different things, of course they came to
6    me.  I took the whole bag of mail or whatever I
7    get.  My sister said there's mail coming here.
8    There's mail coming where I was living.  They
9    called me, I said, I'm coming down to your
10   office.  That was in something plaza.  I said,
11   I'm coming down to that office because I don't
12   want you to come here, because it looks like
13   people following me.  I don't know who it is.
14   And I went down there and they handled it.
15        Q     When did that happen?
16        A     Oh, my goodness.  That happened, I
17   think, 2008.  I think that happened, 2008.  I
18   can't recall the date.
19        Q     Well, did you ever make a --
20        A     And I asked him, I said, what am I to
21   do with these things?  They said, I don't know.
22        Q     Did Mr. Clark ask you to transfer any
23   of the properties to him?
24        A     I hand those things to Mr. Clark.
25        Q     Right.

1              E. Stephens

2      A     He went to court to get these things

3  rectified.  These things were rectified already

4  by the Court.  He maybe wanted the property or

5  whatever.  I said, if you want it, take it.  I

6  don't care what happened because it's not mine's.

7  It's not mine's.  Those properties is not mine's.

8      Q     Okay.  Next question.  Do you remember

9  transferring -- signing papers with Mr. Clark to

10  transfer real estate properties?

11      A     I can't recall that, no.  I just give

12  it to him.  I can't recall.  He called me and we

13  go to court to -- for the judge to rectify these

14  things.  To maybe get it in his name.

15      Q     What court did you go to?

16      A     I think it was in Brooklyn.  Brooklyn

17  house.  Somewhere in Brooklyn, yeah.

18      Q     Did you have an attorney at the time

19  that you went to court?

20      A     No, I had no attorney.  Only

21  Mr. Clark.

22      Q     Only Mr. Clark?

23      A     Yeah.  And I think he had an attorney,

24  Mr. Rouse or something like that.

25      Q     Mr. Who?

1                    E. Stephens

2        A      Mr. Rouse.  I think it was Mr. Rouse.

3        Q      Did he introduce you to Mr. Rouse?

4        A      (The witness nods head up and down.)

5        Q      Yes?

6        A      Yes.

7        Q      You met Mr. Rouse?

8        A      Yes.

9        Q      How many times?

10       A      Many times.

11       Q      Many times.

12       A      Before we went to court to get

13  whatever he wants to do.  If he wants to take it

14  or whatever.  I don't care.

15       Q      So Mr. Rouse was handling a lot of --

16       A      Yes, yes.

17       Q      -- a lot of these things that you were

18  getting in the mail?

19       A      Yeah.

20       Q      Okay.  Do you remember signing papers

21  in Mr. Clark's office?

22       A      Yes.  Some of the papers, he wanted to

23  get me to sign things for him to handle.

24       Q      Right.  How many times do you remember

25  going to his office to sign papers?  More than

1         E. Stephens

2    once?

3         A    Yeah, more than once.  More than once,

4    I think.

5         Q    Was there anybody else in the office?

6         A    He had an office.  Otis was his name.

7    He passed away.  His secretary, I think, was

8    Otis' wife.

9         Q    Do you know anybody by the name of

10   Claudette Winston?

11        A    No idea.  No.

12        Q    Okay.

13        A    I only go to Mr. Clark to get those

14   things done.  I knows nothing about those things.

15   He said he was going to handle it.  I didn't even

16   know he was nothing.  He was just like a

17   paralegal or something like that.

18        Q    Okay.  Please.

19             Have you ever heard of the address --

20   okay.  So you never resided at 844 East 34th

21   Street in Brooklyn?

22        A    No, I did not.  I never resided there.

23        Q    Did you receive any kind of money

24   involving the rental --

25        A    No.

1                    E. Stephens
2        Q       -- of that house?
3        A       No, dear.  No.
4        Q       Nothing?
5        A       Nothing.
6        Q       Okay.  So let me ask you about
7    1487 East 53rd Street.  Have you heard of that
8    address?  That's in Brooklyn.
9        A       Yeah.  In Brooklyn?
10       Q       1487 East 53rd Street in Brooklyn, New
11   York?
12       A       Yeah, I think so.
13       Q       Yeah?
14       A       I recall something -- yeah.
15       Q       How do you know that property?
16       A       Because Con Edison came to me and said
17   there's a house in Brooklyn that the bill is
18   going up to $6,000.00.  I think it was a guy
19   named Everton Pierre.  Mr. Pierre.  And they came
20   to me and said that you're owing this $6,000.00
21   in Brooklyn because the house is in your name.  I
22   said, I'm not going there.  I went to Con Edison.
23   They decide to cut my lights off.  And I said,
24   but I didn't know anything about that.  So I told
25   Mr. Clark --

1                    E. Stephens

2       Q       Let me stop you there.  Do you

3  remember going to a closing in which you

4  purchased 1487 East 53rd Street in Brooklyn?

5       A       No.  Nope.

6       Q       Do you know Nicole Bridges?

7       A       No.  I heard about her, but I don't

8  know her.

9       Q       I'm going to show you what we'll mark

10  as Exhibit D.

11                    (Exhibit D was marked.)

12  BY MR. MESTER:

13       Q       It's two documents.  I'd like you to

14  look at the second page, and then -- second page

15  and the fourth page of that document.

16                    Do you see the second page?

17                    MS. JOSEPH:  This is the mortgage,

18       okay.

19                    MR. MESTER:  Yes.

20  BY MR. MESTER:

21       Q       What kind of document is this?

22       A       Is this a mortgage?

23       Q       What does it say on there?

24       A       Title insurance.

25       Q       What is the title of the document?

1                         E. Stephens

2    What type of document is this?

3         A     I don't know.

4         Q     Does it say mortgage on the top?

5         A     Yeah, it says mortgage on the top.

6         Q     Do you recognize that as the first

7    page of a mortgage document?

8         A     No.

9         Q     Does it have your name on it?  Let's

10   go there.  Is your name printed on that page?

11        A     Yeah, on the bottom.

12        Q     Do you see your name?

13        A     On the bottom part.

14        Q     I don't have a copy, so -- yes.

15              Okay.  Your name is printed there?

16        A     Yes.

17        Q     What is the word next to your name?

18        A     Borrower.

19        Q     Borrower?

20        A     Yes.

21        Q     Is that similar to the last document I

22   showed you, the last mortgage document, where

23   your name appeared with the word borrower next to

24   it?

25        A     I think so.

1                        E. Stephens
2        Q      Okay.  I'd like you to turn the page.
3  Do you see -- turn the page again to the fourth
4  page.  Do you see your name on that page?
5        A      Signed?
6        Q      Yes.  Do you see a signature?
7        A      I see a signature.
8        Q      Do you see your name printed by the
9  signature?
10       A      Oh, yeah, I do, but I cannot recall
11  these things.
12       Q      Right.  Does that appear to be your
13  signature, though, on that document?
14       A      I don't know.  I can't remember.
15       Q      Take another look at it, please.
16              MS. JOSEPH:  I think she answered
17       the question.
18              THE WITNESS:  Yeah, I said I can't
19       remember.  I don't know.
20  BY MR. MESTER:
21       Q      Does it look like your signature?
22       A      It may look, but it doesn't mean to
23  say that I signed it.  I know nothing.
24       Q      Okay.  I'd like you to look at the
25  next document that is part of it.

1              E. Stephens

2        A     Okay.

3        Q     I'd like you to look at Page 2 and

4    Page 3.

5        A     Two?

6        Q     Page 2.  What type of document is in

7    front of you?

8        A     A mortgage.

9        Q     Does it have your name printed on that

10   page?

11       A     Yeah, it's printed here.

12       Q     Does it have the word borrower next to

13   your name?

14       A     Yes.

15       Q     I'd like you to turn the page.  Do you

16   see a signature on that page?

17       A     Oh, yeah.

18       Q     Do you see your name printed on that

19   page?

20       A     Oh, yes.

21       Q     Does that appear to be your signature?

22       A     Could be, but I didn't sign those

23   things.

24       Q     Do you see the address for that -- do

25   you see the address that's printed on that

1                    E. Stephens

2    document?

3        A       1487 East 53rd?

4        Q       Yes.

5        A       Yeah.

6        Q       Okay.  Thank you.

7        A       I wasn't living there, and I did not

8    have no recall of those things.  I was never

9    living in those places.

10       Q       Did Mr. Clark ask you to transfer

11   ownership of this property to him at any time?

12       A       Mr. Clark?

13       Q       Mr. Clark.

14       A       Did he ask me to transfer the

15   property?  He was taking care of the property.

16   He didn't ask me to transfer anything.  He was

17   taking care of the property for the Court to

18   recognize --

19       Q       He was taking care of it; what does

20   that mean exactly?

21       A       Well, I told Mr. Clark that these

22   things are on my name, is he able to get it off

23   my name, because I know nothing about it.  So he

24   went to court.  Went to court many a times, and

25   most of the time I'm not even there.  I was not

1           E. Stephens
2    there most of the time when Mr. Clark did
3    whatever he's doing.
4        Q    Did there come a time that the
5    properties came up with your name?
6        A    I don't even know if they are still in
7    my name, they're in my name.  I don't know.  I'm
8    not interested anymore.  Because it's too much
9    confusion with these things going on in my name.
10   My name here, my name there.  It all in
11   everybody's hand.  And everybody blaming me.
12       Q    But you do remember signing papers?
13       A    I didn't sign most of the papers.  All
14   I do for Mr. Clark is sign for him to take care
15   of this property, get it off my name.
16       Q    And you signed papers in Mr. Clark's
17   office; is that correct?
18       A    Yeah, just to get things off my name.
19       Q    You don't remember exactly when you
20   signed them; do you?
21       A    No.  I think, the whole thing about
22   it, I trust people too much.  That's what it is.
23       Q    Do you remember a notary public being
24   present whenever you signed papers, so they could
25   notarize your signature?

1                    E. Stephens
2        A      One person, I know I met with
3    Mr. Clark in the office.  It was Maxine that came
4    to sign something.
5        Q      Before that?
6        A      Before that, I can't recall notary
7    public come.  But I always can remember
8    Ms. Maxine's face.  Other than that, I had so
9    much people coming and going.  He would just say
10   sign this, sign that.  Trusting him.  Not reading
11   anything.
12       Q      But you do know what a notary -- do
13   you know what a notary public does?
14       A      Yeah, I think when you sign something,
15   they rectify that you signed it or something.  I
16   think he's a witness or something like that.
17       Q      Right.  And they verify that the
18   person signing is the actual person whose name is
19   present on the document; is that your
20   understanding of a notary?
21       A      Yeah, understanding.
22       Q      What kind of information would a
23   notary public ask you for before they could
24   verify your identity?
25       A      My ID.

1                    E. Stephens

2        Q        ID.  So you carry photo ID?

3        A        Yeah.

4        Q        Do you have a copy today?

5        A        Yeah, I have my ID.

6        Q        Okay.  We might want a copy of that

7    later.

8        A        Okay.

9        Q        And you have had a photo ID since

10   2006?

11       A        Yeah.

12       Q        Okay.  Did anybody ever ask you to see

13   your photo ID?

14       A        After Mr. Clark, nobody else, I think.

15   I don't know.

16       Q        How about Mr. Osmond?

17       A        No.  Mr. Osmond was there, as I said,

18   with just the papers on the table there.  And

19   they were just having my ID and they're just

20   letting me sign this, sign this, sign this.

21       Q        So you did provide your ID and then

22   you did sign things?

23       A        Uh-huh.

24       Q        Okay.  Are you aware that Mr. Clark --

25   let me rephrase that.

1       E. Stephens

2       Are you aware that you signed papers

3  giving ownership of properties to John Clark?

4       A    No, I am not aware of that.  I am not

5  aware of that, giving him anything to sign to

6  take over.  I never did.  But -- I never did.

7  And I don't even know what's going on.

8       Q    Are you aware Mr. Clark had filed a

9  bankruptcy in which he listed those properties as

10 the owner -- himself as the owner?

11      A    No, I don't know.

12      Q    Okay.  Did you ever reside at

13 1487 East 53rd Street?

14      A    No.

15      Q    Did you receive any income from

16 tenants that resided at 1487 East 53rd Street?

17      A    No.  No.

18      Q    Okay.  Was it around the same time,

19 2006, that you purchased your house at 177th

20 Street?

21      A    That what?

22      Q    Huh?

23      A    Repeat that again.

24            MR. MESTER:  Repeat the question.

25            (Whereupon the reporter read back

1              E. Stephens

2         the requested portion of the record.)

3                   THE WITNESS:  Was it the same time

4         of what?

5    BY MR. MESTER:

6         Q     2006, does that sound about when you

7    purchased the property at 177th Street?

8         A     Yeah, around 2006, when -- if the

9    property was in 2006, I purchased that; what do

10   you mean by that?

11        Q     I'm just asking the date that you

12   purchased the property.

13        A     I think around that time, 2006, 2007.

14   Around that time.

15        Q     Okay.  Before we get into that, I just

16   want to quickly -- did you purchase any

17   properties after the property on 177th Street?

18        A     No.

19        Q     Have you heard of the property

20   address, 885 Sterling Place in Brooklyn?

21        A     I heard about all those things.  I

22   think so.  I'm not sure.

23        Q     Does that property address sound

24   familiar to you?

25        A     Yes.  Yeah, I think so.

1                    E. Stephens

2        Q      Why does that sound familiar to you?

3        A      I don't know why it sounds familiar.

4   Because I -- it might sound familiar because the

5   amount of things in my name, I don't even know.

6   It sounds like something like that, but I don't

7   know.

8        Q      Well, did you purchase that property?

9        A      No, I did not.

10       Q      Did you reside at that property?

11       A      No, I did not.

12       Q      Do you know anybody by the name of

13  Donna Daniels?

14       A      No, I don't.

15       Q      Do you remember meeting anyone by the

16  name of Marisol Vasquez?

17       A      No, I don't.

18       Q      Does the name Ted Jackson sound

19  familiar to you?

20       A      No.

21       Q      How about the company Narcarta Holding

22  Corp.?  Narcarta Holding Corp., does that sound

23  familiar to you?

24       A      I think it's Maxine's name, holding

25  something.

```
1                    E. Stephens
2               MS. BONAPARTE:  That's not my
3       company.
4  BY MR. MESTER:
5       Q     No.  I'm just asking if you know --
6       A     No, I don't know that.
7       Q     -- Narcarta Holding Corp.
8       A     No, I don't know.  I don't recall
9  that.
10      Q     Okay.  You don't recall.
11      A     Sorry.
12               MR. MESTER:  I'm going to mark all
13      of these documents together.
14               MR. SMITH:  Maybe mark them
15      individually.
16               MR. MESTER:  Yeah, maybe.  I
17      guess.
18               All right.  Let's mark this one
19      Exhibit E.
20               (Exhibit E was marked.)
21  BY MR. MESTER:
22      Q    I'd like you to look at what's been
23  marked as Exhibit E.  I'd like you to look at the
24  second page and the third page.
25      A     This one?
```

1                         E. Stephens

2        Q      Yes, the second page.  Can you

3    identify what kind of document that is?

4              MS. JOSEPH:  That's just the cover

5        page.  You said the second page?

6    BY MR. MESTER:

7        Q      The second page.  I'm sorry.

8        A      This is a mortgage.

9        Q      Does it have your name on that page?

10       A      At the top, yeah.

11       Q      Does it have the word borrower next to

12   your name?

13       A      Yes, it does.

14       Q      And you do remember what a mortgage

15   is; correct?

16       A      Yes.

17       Q      It means that the bank is giving

18   somebody money; right?

19       A      Yes.

20       Q      In order to buy a house; right?

21       A      Yes.

22       Q      I'd like you to turn to the next page.

23              Do you see your name and a signature?

24       A      Uh-huh, but I know nothing about these

25   things.

1                    E. Stephens

2       Q      All right.  Does that appear to be
3  your signature on that page, though?

4       A      It looks like my signature, again, as
5  I said, but it's not mine.  I didn't write these
6  things.

7       Q      That's fine.

8       A      I know nothing about these things.

9       Q      Look at that document again.  Does it
10  have the address on it, what property it's for?

11      A      885 Sterling Place.

12      Q      That's in Brooklyn; right?

13      A      Yeah, it's Brooklyn.  But I know
14  nothing about those things.

15      Q      Do you recall selling that property to
16  anybody?

17      A      No.  I can't recall that.

18      Q      Did you ever reside at 885 Sterling
19  Place?

20      A      No.

21      Q      Did you ever receive income from any
22  tenants at that property?

23      A      No.

24      Q      Do you recall speaking to the district
25  attorney about this property?

1          E. Stephens

2     A     I talked about a lot of stuff to the

3 district attorney.  And they took out all those

4 things.

5     Q     Do you recall specifically which

6 properties you spoke to the district attorney

7 about?

8     A     No.  They had all those things.  They

9 took all those things and they -- because they

10 were looking for the person that did all these

11 things.  I don't know.

12    Q     Do you have any paperwork from the

13 time that you went to visit the district

14 attorney?

15    A     No.  No.  I have nothing.

16    Q     Did you ever reside at 68 Herkimer

17 Street in Brooklyn?

18    A     No, I did not.

19    Q     Do you know who owns that property?

20    A     No.

21    Q     How did you go about finding the

22 property at 177th Street?

23    A     As I said, I had this guy who went

24 with me to look for property.  A friend of mine's

25 introduced me to the real estate person, which

1              E. Stephens

2    was Osmond.  That was the biggest mistake that I

3    made, was meeting these people.

4         Q     Did you purchase 177th Street through

5    your relationship with Osmond and these people?

6         A     Yeah.  I told Mr. Pierre, was his

7    name, the real estate guy.  I said I was looking

8    for a property.  The friend of ours introduced us

9    to Osmond to buy the property.  I'm living in

10   there.  Yeah.  That's how I get to know him.

11   After the closing, one of the guys get up and

12   said, do you know how many things that you signed

13   here?  I said no.  He said give me -- he gave me

14   his card.  When I do try to get him, I never find

15   him again.

16        Q     Do you remember going to a closing in

17   which you purchased 177th Street?

18        A     Yeah.

19        Q     Do you remember the closing?

20        A     No.  I can't recall the place.  I

21   can't recall those places in Brooklyn.

22        Q     Well, do you remember, was anyone with

23   you that day?

24        A     It was Osmond and a whole set of

25   attorneys was there around the table.  A whole

1                    E. Stephens

2    bunch of people was there.

3         Q     What about a notary public?

4         A     No.

5         Q     Do you remember seeing a notary

6    public?

7         A     No.  No.  A whole bunch of them and a

8    whole bunch of people.  Sign this, sign that,

9    sign that.  By not having an attorney, that's the

10   biggest mistake I made.

11        Q     Let me ask you a question.  Did you

12   want to purchase 177th Street or you were forced

13   to purchase it?

14        A     No, I wanted to.  That's what I said

15   to you, again, I saved money to do that.

16   Preparing for my family.  Yes, I saved money.

17        Q     So did you meet with a mortgage broker

18   before you purchased 177th Street?

19        A     His name was -- Piermont was his name.

20   They had a broker on Hillside, yeah.

21        Q     Who had a broker?

22        A     Mr. Piermont.  I can't remember his

23   name, but he was there.

24        Q     Who introduced you to this individual?

25        A     The guy that died.  I can't recall his

1              E. Stephens

2   name again.  He died.  After I saw him, I said

3   what it is that you're introducing me to these

4   people?  And then after, he died, because he had

5   cancer and whatever.

6        Q     So the person who died, he knew

7   Mr. Osmond; correct?

8        A     Yes.  Apparently he know Mr. Osmond,

9   yeah.

10       Q     And the person that died, did he also

11  know Mr. Clark?

12       A     No, he didn't know Mr. Clark.

13  Somebody else -- when I see all these things in

14  my name, somebody introduced me to Mr. Clark.

15  They said he is a party or something like that.

16  And we will fix those things.

17       Q     We'll get to that.

18             So the person that introduced you to

19  Mr. Osmond also introduced you to the mortgage

20  broker?

21       A     Yeah.

22       Q     And what did the mortgage broker --

23  what kind of information did you provide the

24  mortgage broker?

25       A     To buy the house?

1              E. Stephens

2         Q     Yes.

3         A     Yeah.  I have money to buy a house and

4    I want to get a house.  Those there houses were

5    very reasonable.  So that's why I wanted to buy

6    one.

7         Q     Okay.  Do you remember what

8    documentation you gave to the mortgage person in

9    order to qualify to buy the 177th Street?

10        A     My house.  Money from my bank that I

11   saved.

12        Q     Do you remember when you --

13   approximately how -- did you provide the

14   financial documents to this individual?

15        A     If I provide it?

16        Q     Yeah.  Did you provide any financial

17   documents to this individual.

18        A     To what individual?

19        Q     To the person that was -- that you met

20   to do the mortgage for you.

21        A     Like, the broker that gets --

22        Q     Yes.  Did you provide any financial

23   documents to of any these people?

24        A     I just tell him I have the money and I

25   want to buy a property.  But Osmond said, how

1                    E. Stephens
2  much money you have?  And I said how much money I
3  had.
4       Q     How much money did you have?
5       A     I had like $20,000.00 at the time.
6  That's it.  Nothing more.  And he said, okay,
7  come along.  And I do that.
8       Q     Did, at any time, anybody ask you for
9  copies of your tax returns?
10      A     I have tax returns, yes.
11      Q     Did you provide them to these people?
12      A     Not really.
13      Q     Do you remember?
14      A     I can't remember.  I can't recall.
15  'Cause I do taxes.
16      Q     Do you file tax returns?
17      A     I did.
18      Q     Okay.  And at the time that you
19  purchased this, you were still an independent
20  healthcare worker; is that correct?
21      A     That's right.
22      Q     Which means you were paid directly
23  from your patients?
24      A     Yeah, my patients, yes.
25      Q     You weren't paid through an

```
1                    E. Stephens
2    organization; right?
3         A     No, no, no, no.  From the patient.
4         Q     Okay.  So did the person that
5    introduced you to the property on 177th Street,
6    did you go to see the property?
7         A     Yeah, I went and see the property.
8         Q     Was the property occupied at the time?
9         A     Nobody was living there.
10        Q     And do you know how much the
11   property -- do you know what the price is that
12   they wanted for this property?
13        A     It was -- I think it was something
14   like 5- or $600,000.00.  Something like that.
15        Q     And you didn't have the $600,000.00;
16   right?  You only had $20,000.00; right?
17        A     Reason for that, if you recalled, that
18   President Bush had a lot of people who were
19   buying houses at reasonable price, down payment.
20   That's why I run and take that.
21        Q     So you put a down payment onto the
22   house?
23        A     Yes.
24        Q     How much?
25        A     I think it was like $20,000.00.
```

```
1                    E. Stephens
2      Q      20,000?
3      A      Yeah.
4      Q      Okay.  And --
5      A      And the mortgage --
6      Q      And what did you do to obtain the rest
7  of the money for the house?
8      A      Like what?
9      Q      How did you obtain the rest of money
10 for the house that cost over $600,000.00?
11     A      I borrowed from my daughter and all of
12 them, and we put our money together.
13     Q      Did you take out a mortgage with a
14 bank?
15     A      Well, I get a bank.  There had to be a
16 mortgage, yeah.
17     Q      Is that a yes?
18     A      Yes, it's a mortgage.  It's a
19 mortgage, yes.
20     Q      Do you remember how much of a mortgage
21 you took out?
22     A      I can't recall now.  I cannot recall
23 how much it was.
24     Q      Well, let's see if we could --
25     A      I cannot recall.
```

1                    E. Stephens

2        Q     Let's see if we can take care of that

3    for you.

4                    MR. MESTER:  Let's mark this as

5        the next exhibit.  This is the deed first.

6                    (Exhibit F was marked.)

7    BY MR. MESTER:

8        Q     I'm going to show you what's been

9    marked Exhibit F.  Please take a look at Page 2.

10                   Do you see your name on that page?

11       A     Yes.

12       Q     Do you know what type of document this

13   is?  Can you identify what type of document this

14   is?

15                   Look at the top of the document, in

16   small print.

17       A     Yeah, that's where I look.  It's too

18   small.

19       Q     Can you read that?

20       A     It's too small.  August.  Independent

21   contractor between management.

22       Q     All the way at the top.  All the way

23   at the top.

24       A     Top, top, top?

25       Q     Top, top.

1                    E. Stephens

2        A       This is so fine.

3        Q       You can't read it?

4        A       Uh-uh.  It's too fine.

5        Q       Let's look at something that's easier

6    to read.  Look at the last sentence before the

7    signature on Page 2 here.

8        A       This here?

9        Q       This last sentence here, "And witness

10   whereof," can you read at that?

11       A       "The party of the first part has duly

12   executed the deed, the day and year, first above

13   written."

14               What's "above written"?

15       Q       So you're able to read that; right?

16       A       Yeah.

17       Q       It has the word deed in it; correct?

18       A       Yeah.

19       Q       Do you know what a deed is?

20       A       Yes.  Ownership.

21       Q       The deed is an ownership; right?

22       A       Right.

23       Q       Ownership of what?

24       A       Of whatever.  A property.

25       Q       Ownership of the property?

1                          E. Stephens

2        A       Right.

3        Q       Does it have the -- this is -- do you

4    recognize this document as the deed that shows

5    ownership being transferred to you, Ms. Stephens,

6    of 177th Street?

7        A       I don't know.

8        Q       Let me ask you another question.  Does

9    this look like all the other papers that might

10   have been put in front of you that we had

11   previously looked at this morning?

12       A       No.  This one looks different.  Looks

13   kind of different.

14       Q       What's different about it?

15       A       There's a stamp.

16       Q       I'm sorry?

17       A       There's a stamp here.

18       Q       Where is the stamp?  You have to

19   identify what you're talking about.

20       A       There's this here.

21       Q       Okay.  Here, take a look at some of

22   the other exhibits that we looked at.

23               Are there stamps on all of them?

24       A       Yes.

25       Q       So tell me what's different about this

1                    E. Stephens
2  document than the other documents that you've
3  already looked at.  If you can point one thing
4  out.
5       A     (No response.)
6       Q     Let me ask you a question.  Do they
7  all look like real estate documents?
8       A     Yeah.
9       Q     Okay.  Yes?
10      A     Yes.
11      Q     I'd like you to look at the
12 signature -- the person that signed the bottom of
13 that -- of the deed that you just identified.
14      A     At the bottom here?
15      Q     Yes.  It says CMI Management, Inc.
16            Do you see that?
17      A     CMI Management, Inc., yeah.
18      Q     Right.  Do you know anybody that works
19 at CMI Management, Inc.?  At the bottom.  Do you
20 see the bottom?
21      A     Yeah.  CMI Management, Inc.?
22      Q     Right.  Do you know anybody that owns
23 that company or works for that company?
24      A     No.
25      Q     Yes or --

1                    E. Stephens

2      A      I can't recall.

3      Q      Okay.  So you don't remember --

4      A      No.

5      Q      -- if you know anybody?

6      A      No.

7      Q      Okay.  Do you know who sold you the
8  property at 177th Street?

9      A      Who sold me the property?

10     Q      Who was the seller?  Who was the owner
11 of the property at the time?

12     A      I cannot recall.  I cannot recall
13 these things.

14     Q      Okay.  But you do understand that
15 somebody -- for you to own 177th Street, somebody
16 would have to sell it to you; correct?

17     A      Yeah, but I can't recall nothing of
18 those things.

19     Q      Right.  On a property transaction,
20 there's a seller and there's a buyer; right?

21     A      Uh-huh.

22     Q      The seller owns it?

23     A      Right.

24     Q      Transfers it to a buyer; is that
25 correct?

1                    E. Stephens

2       A       Right.

3       Q       And the buyer has to pay for the

4  house; correct?

5       A       I guess so.

6       Q       Okay.  And the buyer pays for it

7  through -- most of the money comes from where,

8  when a buyer buys the house?

9       A       From me.  From the bank or somewhere.

10      Q       Most of the money comes from a bank;

11  right?

12      A       Yes.  Yes, correct.

13      Q       And when you purchased 177th Street,

14  you got most of the money from a bank; is that

15  correct?

16      A       In my hand?

17      Q       You got most of the money from a bank

18  when you purchased 177th Street; right?

19      A       I don't know.  Maybe.  I don't know.

20      Q       Do you remember how much you purchased

21  it for?

22               Why don't you turn the page, it will

23  tell you.

24      A       I purchased the house, I think, for

25  700.

1                    E. Stephens

2       Q      I want you to turn the page to page --

3  okay.  Well, first, I want to ask, again, the

4  name Marisol Vasquez, do you recognize that

5  person's name?

6       A      No.

7       Q      Okay.  She was a notary that notarized

8  this document.

9       A      I don't know.  No, I can't recall

10  that.

11      Q      Do you remember meeting her at all?

12      A      No.  I can't recall those things.  A

13  lot of people was there.  I don't recall nothing.

14      Q      Okay.  I'd like you to turn to Page 6,

15  Page 7 and Page 8.  I put it on Page 6 for you.

16              MS. JOSEPH:  The ACRIS document?

17              MR. MESTER:  Yes, of Exhibit F,

18      which is the deed.

19  BY MR. MESTER:

20      Q      Do you see your name on that page?

21      A      Yeah, my name is there.

22      Q      Is it a signature?

23      A      Yes.

24      Q      Does it look like your signature?

25      A      Yes.

1          E. Stephens

2      Q      Okay.  Do you see in the middle of the

3  page, a sales price for the property?  Do you see

4  a dollar amount?

5      A      $600,565.00.

6      Q      Can you read the dollar amount?

7      A      600,500,000.

8      Q      I don't think that's what it says.

9              MS. JOSEPH:  615.

10  BY MR. MESTER:

11      Q      Is it $615,000.00?

12      A      Yes.

13      Q      It says Purchase Price next to that

14  number; right?

15      A      Yeah.

16      Q      Is that what you paid for the house on

17  177th Street?

18      A      I think so.  I can't recall all these

19  things right now.  I think so.  It's 20-something

20  years.

21      Q      And out of the 615,000, how much money

22  did you personally use to purchase the property?

23      A      20,000.  That's what they asked me for

24  and that's what I gave them.

25      Q      So the rest of the money came from the

```
 1                    E. Stephens
 2   bank; correct?
 3        A     So, yeah.
 4        Q     Did anybody give you any -- did
 5   anybody give you the rest of the 600 -- I guess
 6   it would be, if you put $20,000.00 on a
 7   $615,000.00 property, that means you have
 8   $595,000.00; correct?
 9        A     So?
10        Q     That needed to be paid to the seller
11   in order to buy the house.
12              Does that make sense to you?
13        A     Whatever they asked me for, that's
14   what I gave them.  Okay.  That's it.
15        Q     So you took out a mortgage then for
16   $595,000.00; correct?
17        A     I guess like everybody else.
18        Q     What do you mean like everybody else?
19        A     Who takes out a mortgage, you have to
20   pay something to get it.
21        Q     Okay.  Which means that you were
22   qualified to take out a mortgage for $595,000.00
23   based on your income; is that right?
24        A     And my credit score.
25        Q     And your credit score?
```

1                    E. Stephens

2       A       Yeah.

3       Q       Did somebody check your credit score

4   for you?

5       A       Yeah, they do all of that.  They had

6   to check it at the table.

7       Q       Who did that for 177th Street?

8       A       Who was on the table there.  Some

9   attorney that they gave me.  They give me an

10  attorney.

11      Q       So you had an attorney?

12      A       Just listen to me.  I went there and

13  they give me attorney.  Mr. Osmond was there.

14  And that is what I went this.  That's it.

15      Q       But you agreed to do what they asked

16  you to do; correct?

17      A       Exactly.  That's what they want.  But

18  they are the professionals.  Not me.

19      Q       Right.  You didn't -- you had the

20  opportunity to ask whatever questions you wanted

21  to ask; right?

22      A       As was theirs.  Now I know what to do.

23  At that time, I didn't know what to do.

24      Q       But nobody was forcing you to do

25  anything; right?

1                    E. Stephens

2      A      Nobody forced me.

3      Q      Nobody forced you to do any of this;

4   right?

5      A      No.

6      Q      Okay.  Did you look at the -- you

7   identified the purchase price and this is your

8   signature.  I want you to look at the next page.

9             Do you see your name or signature of

10  your name?  Does that look like your signature?

11     A      Evis Stephens.

12     Q      And then if you can turn the page

13  again.  Do you see your name printed on that

14  page?

15     A      Yeah.

16     Q      Do you see a signature under your

17  name?

18     A      Evis Stephens, yeah.

19     Q      Yes?

20     A      Uh-huh.

21     Q      Does that look like your signature?

22     A      Yeah, it looks so.  It looks so.

23     Q      So this document is similar to the

24  other documents that I previously showed you;

25  correct?

1                    E. Stephens
2      A      As I said, it looks so.  I don't know
3  what happened to the others.  As I said, I just
4  was signing papers.  I don't know what it was.  I
5  was just signing papers.
6                  MR. MESTER:  Next document to
7       mark.  This is the mortgage, by the way.
8                  (Exhibit G was marked.)
9  BY MR. MESTER:
10      Q      I'd like you to look at what's been
11  marked as Exhibit G.  This is a double-sided
12  document.  We're saving trees.
13                  MR. SMITH:  Yeah.
14  BY MR. MESTER:
15      Q      So you have to look at the back and
16  the front in order to see certain pages here;
17  okay?  There's a back and there's a front.
18                  So when I say Page 2, it will be the
19  back of Page 1.
20      A      This is the back of Page 1.
21      Q      Let's look at Page 1 first.
22                  Does this have the seal on it like all
23  the other documents I showed you?
24      A      Does it have a seal?
25      Q      Right.  Does it look similar to the

1                    E. Stephens
2    other exhibits that you looked at previously?
3        A    Yeah.
4        Q    Yes?
5        A    Yeah.  One second.
6                (Whereupon there was a cellphone
7            interruption and brief recess from
8            11:44 a.m. until 12:03 p.m.)
9    BY MR. MESTER:
10       Q    I'd like you to look at the second
11   page, which is on the back of the first page,
12   Ms. Stephens.
13       A    This page; right?
14       Q    Second page.  The first page is the
15   cover page.  Turn it over.  And the back of the
16   first page is the second page.
17       A    Okay.
18       Q    So I'd like you to look at that.
19            Can you identify what type of document
20   this is?
21       A    A mortgage.
22       Q    Does it look like the other mortgages
23   you saw in the other exhibits?
24       A    Yeah.  They all look like a mortgage.
25       Q    Does it have your name on that page?

1                    E. Stephens

2        A       Yeah, Evis Stephens.

3        Q       Does it say the word borrower next to

4    your name?

5        A       Yes.

6        Q       Does it say the property that the

7    mortgage is for?

8        A       It's for 1487 East 34th Street.  This

9    one?

10                   MS. JOSEPH:  That's the wrong,

11            separate from what we have.  Hold on.

12                   Were you looking for the one for

13            177?

14                   MR. MESTER:  That's what this one

15            is.

16   BY MR. MESTER:

17       Q       It lists an address here,

18   1487 East 53rd Street, Brooklyn, New York.

19               That's one of the properties we

20   discussed earlier; correct?

21       A       Right.  Right.

22       Q       Which you don't remember anything

23   about that property; do you?

24       A       No.

25       Q       But it's listed here as your address;

```
1                    E. Stephens
2    isn't it?
3         A    Let me see the address.  This address?
4         Q    Let's read what this page says.  Read
5    starting with the letter B.
6         A    Borrower, Evis Stephens.
7         Q    And then?
8         A    And then whose address is this?
9         Q    Whose --
10        A    Whose address?
11        Q    -- address is.  And then it lists this
12   1487 East 53rd Street address in Brooklyn; right?
13        A    Right.
14        Q    Listing that as your address?
15        A    No, that's not my address.
16        Q    No.  But that's one of the properties
17   we spoke about; correct?
18        A    Yeah.
19        Q    I'd like you to continue on this page
20   here.  Does it say the name of the lender?  Can
21   you read where it says that?
22        A    For the purposes of the recording
23   mortgage; right?  The lender is NovaStar
24   Mortgage.
25        Q    Does that sound like a company that
```

1                        E. Stephens
2       you took -- that you got a mortgage from?
3           A     No, I never take a mortgage from this.
4       The property that I had, this was the first
5       mortgage I have, my property.
6           Q     Yeah, your property.
7           A     Yes, my property.  This is not my
8       property.
9           Q     Do you remember taking a mortgage from
10      NovaStar?
11          A     Yeah, for 127-06 177th Street, yes.
12          Q     Do you remember taking a mortgage from
13      any other company?
14          A     No.  No.
15          Q     I'd like you to look at Page 4 of
16      Exhibit G.  I'm going to turn to the page for
17      you.  It says, description of the property; do
18      you see that?
19          A     Yeah.
20          Q     Could you read what property is listed
21      there?
22          A     That's Springfield Gardens property in
23      Queens.
24          Q     Okay.  Is that the property that you
25      purchased?

1                    E. Stephens

2        A      127-06, yeah, 177th Street.

3        Q      Is that the one?

4        A      Yeah, this is the property I

5   purchased, 127-06.

6        Q      Going back to Page 2, does it say how

7   much the mortgage is?

8        A      630,000.

9        Q      You have to speak up, please.

10       A      630,000.

11       Q      630,000?

12       A      Yeah.

13       Q      So is it your understanding that this

14  is a mortgage for the property on 177th Street

15  for 630,000?

16       A      Yeah.

17       Q      Okay.  And you remember going to the

18  closing and signing this document?

19       A      Yeah, on 127.

20       Q      On 127th Street?

21       A      Yeah.

22       Q      So if we turn to page -- towards the

23  end of the document, I don't know which page

24  number this is going to be, but I'm turning to

25  the signature page of Exhibit G.  I'd like you to

```
1                    E. Stephens
2    look at the name that's listed on that page.
3         A     Evis Stephens.
4         Q     Is that your name?
5         A     Yes.
6         Q     Is that your signature above your
7    name?
8         A     Yeah, looks so.  Looks like that.
9         Q     And do you remember providing
10   identification to the person that was going to
11   notarize this document?
12        A     Yeah, my ID.
13        Q     Yes.  Your ID; right?  You gave your
14   ID; right?
15        A     Yeah.
16        Q     And can you see the name of the person
17   on the next page who was the notary?
18        A     Marisol.  I see the name, but I cannot
19   recall this person.
20        Q     Right.  But that is the name that's on
21   this document; correct?
22        A     Yeah, on this document, yes.
23        Q     This is a name that you've seen in
24   some of the other documents, too; correct?
25        A     Right.  I'm now noticing that.
```

1                    E. Stephens

2        Q      Okay.

3        A      Yeah.  I didn't know that.  'Cause

4   this is the house I buy.  I now notice those

5   things.

6        Q      Okay.  So I'd like to show you another

7   page that has your name and what looks like your

8   signature on it.

9        A      Right.

10       Q      Does that look like your signature?

11       A      Yeah, it looks so.

12       Q      Do you remember signing this mortgage

13  document for this?

14       A      If I recall, yeah.

15       Q      Yes?

16       A      Yes, because it's my property.

17       Q      Okay.  I'm going to the second to the

18  last page of this exhibit.

19              Again, do you see your name?

20       A      Uh-huh.

21       Q      Do you see a signature above your

22  name?

23       A      Yeah.

24       Q      Is that your signature?

25       A      Yeah.  Looks like that, yes.

1                    E. Stephens

2       Q      Okay.  I'm going to the last page now,

3   and do you see your name on this page?

4       A      Yeah, looks so.

5       Q      Yes?

6       A      Yes.

7       Q      Do you see a signature above that?

8       A      Yes.

9       Q      Okay.  When you were purchasing this

10  property, did you -- you said that you had a

11  lawyer there that they gave you; is that correct?

12      A      I can't even recall his name.

13  Whatever attorney they have, whatever they're

14  doing, I can't recall.

15      Q      There was an attorney present, though,

16  that you remember?

17      A      Yeah, but I can't recall, yeah.

18      Q      Did the attorney sit next to you at

19  the closing?

20      A      Yeah, he sit next to me.

21      Q      What did the attorney do at this

22  closing?

23      A      Sign this.  Sign this.  Sign that.

24  You know.  I didn't ask questions.

25      Q      You didn't ask questions.

1                    E. Stephens

2       A     I just sign.

3       Q     Did you have an opportunity to ask

4    questions if you wanted to?

5       A     Maybe.  My first time, I didn't think

6    about it and I -- as I'm here now, I was planning

7    to get back to my job.  Because I left two

8    patients home.  I didn't know what was going on.

9    I just signed it, thinking that I'm signing

10   something good.  That's why I said that the guy

11   get up and he said, do you know what you signed

12   here?  My God, call me.

13      Q     Right.  You were relying on the

14   attorney --

15      A     Exactly.

16      Q     -- to tell you where to sign; right?

17      A     Exactly.  To do everything.

18      Q     And you were relying on the attorney

19   to assist you --

20      A     Exactly.

21      Q     -- correct?

22      A     Yes.

23      Q     Because -- and the attorney was -- did

24   the attorney tell you that he was there to help

25   you buy your house?

1                     E. Stephens

2        A     He just said, I'm the attorney to help

3   you buy the house.  And that's it.  I didn't ask

4   no questions.

5        Q     And that's what you were there to do,

6   to buy the house; right?

7        A     Yeah.

8        Q     Okay.  The attorney helped you; right?

9        A     Yeah.

10       Q     Did you live at the property at 177th

11  Street?

12       A     Yes, I did.

13       Q     Where did you move from before you

14  moved into this property?  Where were you

15  residing?

16       A     Where was I living?

17       Q     Yeah.

18       A     I was renting.  And while renting, I

19  moved and I put my things in storage.  I was

20  living with Mr. Ben and Mrs. Jen in Glen Cove.

21  Working there with them.  Living in with them.  I

22  was living with those people.

23       Q     You were living with Mr. Who?

24       A     Ben and Jen.  They died now.  This is

25  a long time now.  They were old people.  That's

1          E. Stephens

2     my job.

3          Q     Those were patients of yours?

4          A     Yeah.  Independent contractor.

5          Q     Right.  So -- but your property that

6     you used as your actual residence was where?

7     Located where?  Before you started -- before you

8     moved into this house?

9          A     Before I moved into the house, I was

10    renting.  I should have asked for the address of

11    that property.

12         Q     Was that the Baisley Boulevard

13    property that you were living at?

14         A     Yes, I was living there, renting.

15         Q     And then from Baisley Boulevard, you

16    moved into the house on 177th Street?

17         A     Not yet.  Not yet.  As I said, I put

18    my things in storage and I start working --

19    living in.  While I was doing this living in,

20    that's how I ended up purchasing that property.

21         Q     So after you approached the property

22    at 177th Street, you took your things out of

23    storage and you put it in this house?

24         A     Yes, that's right.

25         Q     Okay.  I don't think we established

1        E. Stephens

2   the date here.

3        I want you look at the date on the

4   Exhibit G, on the top of Page 2.  August 29th,

5   2006.  Is that the date you remember buying your

6   house on 177th Street?

7        A    Yeah.  It's 2006, yes.  As I now

8   recall, 2006.

9        Q    And did there come a time that you

10  sold the property on 177th Street?

11       A    177th?  I didn't sold the property,

12  no.  I did not sold the property.

13       Q    I want you to look at Exhibit A again.

14  Where is that?  Right here.  If you could turn

15  that to Paragraph 20 of Exhibit A.

16            MS. JOSEPH:  Not Page 20.

17  Paragraph 20.

18  BY MR. MESTER:

19       Q    Paragraph 20.  Let's make sure it's

20  the same paragraph.  Right here.

21            Okay.  Do you see that?  Do you see

22  Paragraph 20?

23       A    Uh-huh.

24       Q    Paragraph 20 says that you went with

25  Osmond to check out a two-family house priced at

```
1                    E. Stephens
2    650,000.
3              Do you see that?
4         A    Yeah.
5         Q    Which property are you referring to in
6    that paragraph?
7         A    I don't know nothing about that.  I
8    don't recall doing that with Mr. Osmond.
9         Q    So you don't remember doing what it
10   says in Paragraph 20?
11        A    No.
12        Q    Okay.
13        A    That is not true.  That's not true.
14        Q    When did you find out that your name
15   was on all of these other properties as the
16   owner?
17        A    Well, the bank started calling my
18   phone number.
19        Q    Did you report this to the police?
20        A    Yeah, that's what I said, the district
21   attorney.
22        Q    The district attorney or the police?
23        A    The district attorney.  I never went
24   to the police.  I went to the district attorney.
25   The one at federal plaza.  Yeah, federal plaza
```

1                        E. Stephens

2      came.

3          Q      The district attorney talked to you

4      about Osmond; right?

5          A      Yeah, because it was all over the

6      news.

7          Q      Did you ever bring a lawsuit against

8      Osmond, yourself?

9          A      No, because they had him already.  All

10     over the news, taking care of him.

11         Q      The answer is no, you did not bring

12     your own lawsuit; did you?

13         A      No.

14         Q      Did you think about bringing a lawsuit

15     against him?

16         A      No.  As I said again, everybody -- the

17     federal plaza, they done had him already.  I

18     asked them, what are they going to do with him?

19     Because he went to Trinidad.  And they said,

20     we're going to fish him out.

21         Q      Didn't you accuse him of ruining your

22     credit?

23         A      Of course I accused him, but I

24     couldn't find him again because they locked him

25     up.  They fished him out of Trinidad, bring him

1          E. Stephens
2    up here, and he was in jail.  I asked them all
3    those questions, what are they going to do with
4    him?  Because he destroyed my life.
5          Q     Right.  Did you believe you had some
6    kind of a claim against him personally?
7          A     If I had money, I do, you know.  I'd
8    sue him or whatever.  But then they had him.
9    They had him and they did whatever they want with
10   him.  It was good enough for me.
11         Q     Other than your decision -- you
12   decided not to sue Osmond.
13              Did you sue anybody else in relation
14   to the properties that were purchased in your
15   name?
16         A     No, I didn't sue nobody else.  I'm not
17   that kind of a person.  Something will happen.
18   As I always think about one day they will get
19   what they reap -- what they sew, they reap.
20         Q     So the lawsuit that we're here for
21   today, is this the first lawsuit you've ever
22   commenced against individuals regarding your real
23   estate?
24         A     Yeah.  Yeah.  This is the first
25   lawsuit that I'm having, which is whatever is

1              E. Stephens
2  here.
3       Q    Okay.
4       A    First lawsuit.  Other than that, the
5  government took care of --
6       Q    Did you make any payments on any of
7  the mortgages, the 844 East 34th Street?
8       A    No, I did not.
9       Q    Did you may any payments on the
10 mortgage for 1487 East 53rd Street?
11      A    No, I did not.
12      Q    How about for 885 Sterling Place?
13      A    No, I did not.
14      Q    Okay.  How what about for 127-06 177th
15 Street?
16      A    Yes, I was paying my mortgage.
17      Q    You were paying your mortgage?
18      A    Yes.
19      Q    Do you have records of those payments?
20      A    I don't have that, no.  I recall, you
21 have to go to the bank, NovaStar, who I was
22 paying.
23      Q    How were you paying the mortgage?
24      A    Through, like, money order or send
25 them a check.  Money order.

1                    E. Stephens

2      Q      You would mail it?

3      A      Money order.

4      Q      Would you mail the money order?

5      A      Yeah.  Yes, money order.

6      Q      How did you know how much money to

7 send them?

8      A      For my house?

9      Q      How did you know how much money to

10 send to NovaStar Mortgage?

11     A      Because they send a letter to me.

12 It's my property.  It's my house.

13     Q      Okay.  And you don't have copies of

14 those letters?

15     A      No, I don't have copies of nothing.

16 Too much things happen in my house.  Too many

17 things.  I don't have anything.

18     Q      Did you have --

19     A      If I do have them, I'd have to do a

20 search.

21     Q      Did you make any searches for any

22 records regarding payments of your mortgage?

23     A      No.  I have it in my head.  I have

24 everything in my head, when I used to pay for the

25 mortgage.

1                    E. Stephens

2        Q     Would you make copies of your money

3   orders before you mailed them to the bank?

4        A     No, I didn't make any copies.  I

5   didn't make any copies.

6        Q     Would NovaStar send you statements

7   each month --

8        A     Yeah.  They send me --

9        Q     -- showing what your past payments

10  were and what your future payments would have to

11  be?

12       A     Yeah, they used to.

13       Q     Did you make a search for any of those

14  documents?

15       A     No.

16       Q     I'm asking if you can make a search

17  for any of those documents --

18       A     No, I'm going to do that because it's

19  too much things -- too much.

20       Q     I'm not asking you if it's too much.

21  I'm just asking you to make the search, to the

22  best your ability.

23       A     No, I can't.  I can't.  I don't know

24  where those things are.  I will not know to put

25  my hands on anything right now.

1                    E. Stephens

2        Q     So you're saying you don't have them

3   anywhere?

4        A     I'm not the kind of person to keep

5   records like that.  No, I don't.

6                    MS. BONAPARTE:  Mr. Mester, do you

7        want --

8                    MR. MESTER:  No.  I'm okay right

9        now.

10  BY MR. MESTER:

11       Q     I think you just said that you never

12  paid any of the mortgages on those other

13  properties; is that right?

14       A     Yes.

15       Q     I'd like you to read Paragraph 21 of

16  Exhibit A.

17                    Could you read the first sentence out

18  loud, please?

19       A     "Obligation of the mortgage on three

20  properties burdened Ms. Stephens and her health

21  started failing."

22       Q     You can stop there.

23                    What kind of burden did the mortgages

24  on those properties --

25       A     On the properties?

1                    E. Stephens

2        Q     Yes.  What kind of burden was it?  You

3    never paid any --

4        A     No, I never made any payment on those

5    properties because it's not my own and I wasn't

6    interested in those things.

7        Q     Right.  So what was the burden that

8    you're referring to in that paragraph that you

9    were suffering from?

10       A     I don't know who wrote that.

11       Q     You don't know who wrote that?

12       A     No.  I can't remember writing that.

13       Q     So that's not accurate?  That's not

14   accurate, that sentence?

15       A     Once these things are in my name, it's

16   a burden.  It is a stress.  Sorry.  It's a

17   stress.

18       Q     What was stressful?  What was

19   stressful about the three mortgages?

20              MS. JOSEPH:  I think she answered.

21        She said the stuff in her name.

22              THE WITNESS:  Yeah.  Once it's in

23        my name, it is a stress.  Things in your

24        name, your credit gone, it's a stress.  I

25        cannot do what I want to do with my credit.

1          E. Stephens

2      This thing ruined my credit.

3  BY MR. MESTER:

4      Q     Next paragraph, read the first

5  sentence, please.

6      A     Twenty-two?

7      Q     Twenty-two.

8      A     "She struggled to pay mortgage on the

9  subject property on her house."

10      Q     Would you explain what that means?

11      A     Well, I'm supposed to pay $2,500.00;

12  right?

13      Q     I don't know.  Who told you that?

14      A     I was supposed to pay $2,500.00 on my

15  property.

16      Q     Did NovaStar tell you that?

17      A     NovaStar did not stay with us.

18  Another bank took over.

19      Q     Okay.

20      A     Ocwen.

21      Q     Ocwen, O-C-W-E-N?

22      A     Yeah.  They took over the property.  I

23  had stopped paying and then they do a

24  modification.  And I start paying.

25      Q     Let's backtrack.  We'll get to that

1                              E. Stephens

2    later.

3              So when did the obligation of paying

4    the mortgage on the 177th Street property become

5    a struggle to you?

6         A    I did a surgery.

7         Q    I'm sorry?

8         A    I did a surgery.

9         Q    When was this?

10        A    I think it was 2008 or something like

11   that.  Or '9.  I did a surgery.  And because of

12   that surgery, that's how my pressure started

13   going up high.  I did a surgery.  And then I

14   start falling back on everything.  I started

15   falling back because I couldn't work as I wanted

16   to.

17        Q    So your work was reduced?

18        A    Yeah, I couldn't work as I wanted to.

19   I did a surgery.  And that's it.  My pressure

20   started going downhill.

21        Q    So did your income go down at that

22   time?

23        A    Yeah, it started going down.  My

24   income started going down.

25        Q    Okay.  Paragraph 22 indicates that you

1                    E. Stephens

2    rented part of the property.

3        A      Yes.

4        Q      So you collected rental income?

5        A      Well, basically, I paid the utilities

6    for upstairs.  Water, lights, all those things, I

7    paid.  With whatever they give, I just pay it.

8    Paid the utilities.

9        Q      Did you have a lease?

10       A      They had a lease?  No, they didn't

11   have no lease.  It was just family.  It was just

12   my family.

13       Q      Oh, your family was living upstairs?

14       A      Yeah, my niece.

15       Q      You were not renting it to --

16       A      Strangers, no.

17       Q      -- to a stranger, to a different

18   person?

19       A      No.  It was my niece.  And then one of

20   my nieces passed away.  And I have my next niece

21   there and my brother.  Family was renting there.

22   So whatever they paid, I just do the utilities.

23       Q      Was that enough to help you pay the

24   mortgage?

25       A      I couldn't pay the mortgage, 'cause I

1              E. Stephens

2    normally pay the mortgage.  But when I get sick,

3    I couldn't pay the mortgage.

4         Q    So it says that you were renting the

5    top floor for $2,000.00 a month.

6              Was that to your family?

7         A    Yeah.  Basically, we had to pay

8    utilities up there.  It's water, lights.

9    Sometimes the boiler go bad, you had to fix it.

10   This go bad, you had to fix it.

11        Q    What was the water bill just for the

12   second floor?

13        A    My goodness.

14        Q    Approximately.

15        A    Approximately, every month, water was

16   like $400.00 because people use water like crazy.

17        Q    Is that for the whole house?

18        A    No.  No.  Mine was separately.  That

19   was just upstairs, as you said, renting upstairs.

20   And the lights, let me see, sometimes an extra

21   $300.00 again.  $400.00.  All these different

22   things.  And gas.  That's how it goes.

23        Q    Was there a separate gas bill for the

24   upstairs?

25        A    Yeah, everything was separated.  Two

```
1                    E. Stephens
2   families.  Mine separate.  Theirs separate.
3        Q     Do you have copies of any of those
4   bills?
5        A     I will get them, but I don't know all
6   the bills I have there.  Con Edison knows me.
7   Until somebody came and cut me off.  Con Edison
8   never get cut off from me.  Lights, water,
9   everything was in order.
10       Q     So if you had to estimate how much the
11  bills were for the second floor, when you first
12  purchased the property?
13       A     It was something like --
14       Q     Total?
15       A     Sometimes it's like 2,000.  Sometimes
16  it's less than 2,000.
17       Q     So that would be the gas, the electric
18  and the water?
19       A     Yeah, and maintenance.  Sometimes the
20  boiler bursts.  I have to go get people to get
21  the boiler in.
22       Q     Was there a separate boiler for the
23  second floor?
24       A     Definitely.  Everything was separate.
25  Everything was separate.  The sewer was always
```

1                    E. Stephens
2    backing in 'cause there's a tree there.  So I had
3    to always call somebody to get the sewer because
4    it backed into basement.
5         Q    There's one sewer for the whole house,
6    though; right?
7         A    Yes.  Sometimes they use the wrong
8    toilet paper.  So it's -- everything was a
9    stress.
10        Q    But you didn't have a written lease
11   with your family; right?
12        A    No.  No.  Never had a written lease
13   with them.
14        Q    Did they ever stop paying you?
15        A    They stopped.
16        Q    Okay.
17        A    Because the girl was sick with cancer.
18   My niece was sick.  She couldn't pay no more.  I
19   said forget it.
20        Q    So you took on that burden?
21        A    Yes.  I even --
22        Q    You didn't ask them to leave; correct?
23        A    No.  I had to take her to Trinidad,
24   because she left with cancer.  I paid for her to
25   go to Trinidad in order to go home.

1          E. Stephens

2     Q     Did you have multiple -- when your

3 family left -- did your family, ultimately, all

4 leave the second floor?

5     A     No, because my other niece from

6 Brooklyn, she moved in with her two boys.  Her

7 two children, a girl and a boy.  She asked me if

8 she could get in.  Pay a cheap rent.  So I didn't

9 ignore them.  They're family.

10    Q     So you never had a tenant up on the

11 second floor, it was always family?

12    A     Yeah.  A friend of mine's that was

13 there, and she was there, and her husband was

14 paying for her.

15    Q     So you had a lease with her?

16    A     I gave nobody no lease.

17    Q     No leases?

18    A     No leases.  No lease.

19    Q     Did you declare any of the moneys that

20 you received from the upstairs on your tax

21 returns?

22    A     No, I did not.

23    Q     What about expenses?

24    A     No, I didn't declare those things at

25 all.

1                    E. Stephens

2        Q      Did you declare anything on your tax

3    return regarding the rental of the property?

4        A      No, I did not.  I did not.

5        Q      You mentioned earlier that you applied

6    for a loan modification.

7        A      Yes, I did.

8        Q      Was the loan modification with

9    NovaStar or with Ocwen?

10       A      Ocwen.

11       Q      How far behind were you on your

12   mortgage when you started the loan modification?

13       A      I think maybe a year or something, or

14   something like that.  Could be more.  I can't

15   recall.  It wasn't too far when I started doing

16   the loan modification.  When I went to Mr. Clark

17   to help me out with that loan modification, I was

18   paying very well.

19       Q      So you were working with Mr. Clark at

20   the time?

21       A      No, I wasn't working with him.  I was

22   just giving him those documents and see if he can

23   get those things off my name.

24       Q      Right.  You talked earlier how

25   Mr. Clark -- how you gave Mr. Clark authority to

<pre>
 1                    E. Stephens
 2   get these properties off your name.
 3        A      Yes.
 4        Q      Was he also working with you on the
 5   177th Street property?
 6        A      No, he wasn't working with me on that.
 7   When I started paying the mortgage, he said to
 8   me, do not pay that mortgage again because of --
 9   it was, like, something -- the company -- yeah,
10   like NovaStar, Ocwen.  Those days, like, they did
11   some -- I said he said that, do not pay any
12   mortgage anymore.  And I was paying it.  I don't
13   know why I stopped.  Because of some robot's
14   signature.
15        Q      So you took advice from Mr. Clark and
16   followed his instructions?
17        A      Yes.  And he went to court with me on
18   Suffern Boulevard to get things done.
19        Q      So did you start a lawsuit?  Is that
20   why you went to court?
21        A      For what, NovaStar?
22        Q      You mentioned that you hadn't started
23   any lawsuits until this one.  But now it sounds
24   like you started another lawsuit.
25        A      With Ocwen.
</pre>

1                    E. Stephens
2       Q     Can you explain which lawsuit you're
3  referring to?
4       A     Ocwen.  Ocwen was in the court for my
5  property.
6       Q     So let's backtrack.  Ocwen was in
7  court for your property?
8       A     Yes.
9       Q     Was Ocwen suing you in a foreclosure?
10      A     Well, yes.
11      Q     I'm sorry.  I didn't hear your answer.
12      A     Yeah, because I was behind in
13 mortgage.
14      Q     Was that a yes?
15      A     Yes.
16      Q     So Ocwen started a foreclosure action?
17      A     Yes.
18      Q     Is that the court case that you went
19 to --
20      A     On Suffern Boulevard.
21      Q     -- with Mr. Clark to the courthouse?
22      A     Yeah, Mr. Rouse.  Mr. Rouse took me to
23 the court to get me not to pay the mortgage.
24      Q     Mr. Rouse is an attorney; correct?
25      A     Yes, yes.  He's the attorney.

1                    E. Stephens

2      Q      So he was taking you, he was -- he was

3  assisting you?

4      A      Yes.

5      Q      As your attorney?

6      A      Yes.

7      Q      Okay.  What did Mr. Rouse do for you?

8      A      Well, he went inside to talk to the

9  judge.  The judge told me to stay outside.  They

10 said that they will get back to me, the Court.

11     Q      How did you meet Mr. Rouse?

12     A      Through Mr. Clark.

13     Q      Mr. Clark referred you to Mr. Rouse?

14     A      Yes.  Yes.  Yes.

15     Q      Did you pay Mr. Rouse any legal fees?

16     A      I paid him something, but not much.  I

17 promised that whenever things finish, I would

18 give him something.

19     Q      Okay.  But you did pay him?

20     A      Yeah, whenever I --

21     Q      He gave you invoices?

22     A      No, I didn't take an invoice.  If he

23 did, I can't recall.

24     Q      Did you sign an Engagement Letter with

25 him or some kind of a letter saying that he was

1                    E. Stephens
2  going to help you with the foreclosure?
3       A     I can't recall.
4       Q     You don't remember?
5       A     No, I can't recall.
6       Q     So was it during the time you were
7  going to court that you said that you -- let me
8  rephrase that.
9            At the time that you were going to
10 court for the foreclosure action, is that when
11 you started the loan modification?
12      A     Yeah, the loan modification.
13      Q     Yes?
14      A     Yes.  I can't recall that.
15      Q     What was involved in doing the loan
16 modification; do you remember?
17      A     When I wasn't paying and I called
18 Ocwen, they said they will give me a loan
19 modification.  Write a letter to them and
20 everything.  And I did a loan modification.  They
21 did it for me.
22      Q     Did you do it yourself or did someone
23 assist you?
24      A     I write a paragraph or two and I guess
25 somebody typed it out and sent it to them.

1                    E. Stephens

2        Q      Were you communicating directly with

3   Ocwen?

4        A      Yes.

5        Q      Was anybody else communicating?

6        A      No.  I do that on my own with Ocwen.

7        Q      You did that on your own?

8        A      Yeah.

9        Q      Okay.  Did Ocwen send you paperwork to

10  sign?

11       A      I think so.  I'm not sure.  I think

12  so.

13       Q      Do you have any of that paperwork?

14       A      No.  I think so, but I was paying for

15  the modification.  The modification came through

16  and I was paying it every month.

17       Q      But there was paperwork at one point;

18  right?

19       A      I guess so.

20       Q      The paperwork showed how much you had

21  to pay; right?

22       A      Yeah.

23       Q      In order for the modification to

24  continue; right?

25       A      Yes, exactly.

1                    E. Stephens

2       Q    And what was the -- did Ocwen stop the

3 foreclosure?

4       A    No, they didn't stop it.  I stopped

5 it.

6       Q    How did you stop it?

7       A    'Cause of stupid advice I got from

8 Mr. Clark.

9       Q    Okay.  Wait.  You stopped the

10 foreclosure?

11      A    No, no, sorry.  I didn't stop the

12 foreclosure.  Ocwen -- I stopped paying.  So

13 that's what happened.  The foreclosure came in.

14      Q    Was this before or after the

15 modification?

16      A    After the modification happened.

17      Q    This is important, so I need you to

18 really think about your answer here.

19      A    When I did the modification with

20 Ocwen, for six months or so, and I was doing it;

21 right, I talked to somebody and they said, listen

22 to me, don't do any more modification because

23 those -- that house that I bought, it was like a

24 robo-signing.

25      Q    Do you know what that means?

Veritext Legal Solutions
www.veritext.com
212-267-6868         516-608-2400

1      E. Stephens

2      A      I don't know.

3      Q      Did you ask any questions, what that

4  means?

5      A      No, but I went to court for the

6  modification.  I went to court for the

7  foreclosure that they put on me.

8      Q      Did you ask Mr. Rouse what

9  robo-signing means?

10      A      No, I didn't ask him.

11      Q      Okay.  Did you ask Mr. Clark what he -

12  is it Mr. Clark that told you not to pay; right?

13      A      Yes.

14      Q      And he told you not to pay because of

15  something to do with robo-signing; right?

16      A      Yeah.

17      Q      Did he explain what that was?

18      A      Robo-signing is robot.  That's what I

19  thought.

20      Q      But does that mean to you?

21      A      Whatever they sign is not accurate

22  then.  Everything was just not accurate.  And

23  everything would come through if I listened to

24  them.  The house will be forgiven.

25      Q      This was information that Mr. Clark

```
1                    E. Stephens
2    told you?
3         A    Yes.  It would also be forgiven.
4         Q    What does that mean to you,
5    "forgiven"?
6         A    Well, you'll get your house -- plenty
7    of people did it.  And they get back the house.
8         Q    So your strategy, if I'm getting this,
9    correct me if I'm wrong, was to enter into
10   mortgage modification in order to resolve the
11   nonpayment that you had already gone into; right?
12        A    Right.
13        Q    You had already failed to pay your
14   mortgage for a number of months; correct?
15        A    Right.
16        Q    You needed to do your -- you applied
17   to do a mortgage modification?
18        A    Right.
19        Q    Okay.  And then while you were making
20   your payments under the mortgage modification,
21   Mr. Clark said, stop paying --
22        A    Yes.
23        Q    -- the bank, because you could get the
24   house for free and not pay the mortgage anymore?
25        A    Exactly.
```

                         E. Stephens

1

2       Q      And you listened to him?

3       A      Yeah.

4       Q      Okay.

5                    (Whereupon there was a lunch

6       recess from 12:43 p.m. until 1:31 p.m.)

7    BY MR. MULVANEY:

8       Q      So you made payments under the

9    mortgage modification?

10      A      Mortgage modification?

11      Q      The mortgage modification.

12      A      Yes, I was making payments.

13      Q      Let me show you what was produced by

14   your attorney.

15                   (Exhibit H was marked.)

16   BY MR. MESTER:

17      Q      It's hard to read, but maybe you

18   can -- it's a three-page document that was

19   produced.  Take a look at the front page -- take

20   a look at the pages and then look at the last

21   page.

22                   MS. JOSEPH:  Do you have a copy

23      for me, or no?

24                   MR. SMITH:  I have a copy.

25                   MS. JOSEPH:  Please.  Thanks.

1          E. Stephens

2          THE WITNESS:  Have you seen this?

3     BY MR. MESTER:

4          Q     Let me know when you're finished

5     looking at the document.

6               You can't have a conversation.

7               MS. JOSEPH:  No.  She's reading

8          it.

9               MR. MESTER:  Oh, you're reading

10         it.

11              THE WITNESS:  I can't understand

12         whatever.  Go ahead.

13    BY MR. MESTER:

14         Q     Please look at the last page.

15               Do you see your name and signature?

16         A     Yes.

17         Q     Does that appear to be your signature?

18         A     Yeah, this is my signature here.  What

19    is it about?

20               MS. JOSEPH:  Can you read the

21         document?

22               THE WITNESS:  No, I can't read

23         this thing.

24    BY MR. MESTER:

25         Q     Okay.  But you remember doing a

1                    E. Stephens
2    mortgage modification.  You already said that you
3    did one; right?
4        A      Yeah, I did a mortgage modification.
5        Q      And you said that you were making
6    payments under the mortgage modification; right?
7        A      Yes.
8        Q      Right?
9        A      Yes.
10       Q      How many payments did you make; do you
11   remember?
12       A      I think it was like six.  I'm not
13   sure.
14       Q      And you have no records of that?
15       A      No, because whoever comes in my house,
16   everything disappeared from my house.
17       Q      Did there come a time that you
18   stopped -- that you stopped making payments under
19   the modification?
20       A      Yes.
21       Q      Is that when the house went back into
22   foreclosure?
23       A      Yes.
24       Q      Okay.  And is that when you had
25   Mr. Rouse assist you with the foreclosure?

1                    E. Stephens

2       A      Yes.

3       Q      Do you know -- are you familiar with

4  any of the other properties that we spoke about

5  earlier, if those all went into foreclosure; do

6  you know?

7       A      I don't know.  And I didn't care to

8  know.

9       Q      Okay.  Didn't you ask Mr. John Clark

10 to help you with those properties?

11      A      I just hand people over to Mr. John.

12 And I left it in his hands.

13      Q      Did Mr. John Clark live in any of

14 those properties that we talked about earlier?

15      A      I don't know.

16      Q      Did he live at 1487 East 53rd Street?

17      A      I don't know.  Maybe.  I don't know

18 Brooklyn.  I want to know nothing about this

19 house again.  I don't go to this property.

20      Q      So you don't remember starting an

21 eviction case against Mr. Clark --

22      A      No.

23      Q      -- as the owner of that property?

24      A      No, I did not.

25      Q      You did not?

1                    E. Stephens

2        A     No.

3        Q     You don't remember hiring Mr. Rouse to

4   do that for you?

5        A     What, the houses in Brooklyn?

6        Q     The house in Brooklyn, yes.

7        A     The house in Brooklyn, when Ms. Maxine

8   came to me, she told me to go to Mr. Rouse and

9   evict John, or something like that, from the

10  house.  Evict John from living in the house.

11  Mr. John went to court --

12       Q     Wait.  Wait.  Let's stop right there.

13             So when you first -- when you met

14  Maxine, and you were discussing all these other

15  properties with her?

16       A     She already know everything.

17       Q     Okay.  She advised you to go evict

18  Mr. John Clark?

19       A     Yeah.

20       Q     And did you start a case against

21  Mr. Clark?

22       A     To get him out of the property?

23       Q     Right.

24       A     Yes, to get him out of one of the

25  properties.

1                 E. Stephens

2     Q    Right.  So this was one of the

3 properties that you previously said that you

4 didn't buy; right?

5     A    Yes.

6     Q    But when you went to court to evict

7 him, you had to claim in those papers that you

8 were the owner of that property.

9          Do you know that?

10    A    I didn't have no papers.  And we went

11 down there and we had to cancel the case.  I

12 never go back to the court again.

13    Q    But you started the case?

14    A    Yeah.  We started, yes.

15    Q    Okay.  After you stopped making the

16 payments on the mortgage for the 177th Street

17 property, did you ever restart making those

18 payments?

19    A    No.  I went to court.  I went to court

20 and -- Mr. Rouse and myself went to court.  I

21 couldn't go in the room with the judge.  And the

22 judge spoke to him.  He came out and he said,

23 what happened to the modification?  Why don't you

24 do a new modification?  I said, I'm willing to do

25 it if the judge wants me to do it.  And the judge

1                    E. Stephens
2    said he would get back to us.  That's what
3    Mr. Rouse told me, that he would get back to us.
4         Q     The judge said he will get back to
5    you?
6         A     He would get back to Mr. Rouse.
7         Q     I see.  I see.  So you were there when
8    the judge said that?
9         A     I was in -- outside, because I
10   couldn't go in.  Only the attorneys allowed in
11   the room.  When he came back out, that's what he
12   said to me.
13        Q     So did you apply for another
14   modification?
15        A     This is the thing when Ms. Maxine came
16   across when this case start.  Interrupt my home.
17   A package came marked Mr. Rouse and the attorney.
18   I said, where this package came from?  I don't
19   know if it came from the court or whatever it
20   was.  I don't know where it is.  Trying to get
21   things done.  The Court wanted -- what I read is
22   that we have to come back to the court.
23        Q     Going back to two questions ago, have
24   you made any -- did you make any further
25   payments --

1                    E. Stephens

2        A     No, I did not.

3        Q     -- on the mortgage?

4        A     No.

5        Q     -- to Ocwen?

6        A     No, I did not.

7        Q     So did Ocwen continue their

8    foreclosure case against you?

9        A     Yes.

10       Q     And did there come a time that the

11   foreclosure was resolved?

12       A     No, it wasn't resolved yet.

13       Q     No, it's not resolved as of today?

14       A     It's not resolved with us, no.

15       Q     Huh?

16       A     No.  I don't think so.

17       Q     Have you been receiving any

18   correspondence from Ocwen?

19       A     No.

20       Q     When was the last time you received

21   correspondence from Ocwen?

22       A     No.

23       Q     Do you remember?

24       A     No.  I can't recall.

25       Q     Was it after the closing that I

1              E. Stephens

2    attended with you?

3         A    No.  I didn't get anything from them.

4         Q    You haven't gotten anything from Ocwen

5    since that time; correct?

6         A    No, nothing.

7         Q    Okay.  You haven't received any demand

8    to pay any mortgage; right?

9         A    No.

10        Q    Do you know why?

11        A    Why?

12        Q    Do you know why?

13        A    I don't know why.

14        Q    You don't know why Ocwen is not asking

15   you to pay the mortgage?

16        A    No, because Ms. Maxine step in.

17        Q    It's your mortgage, though.  I'm

18   asking you if you know why you are not receiving

19   a demand to pay mortgage, if you're saying that

20   the foreclosure is still going on?  Isn't that

21   what you said?

22        A    It's not still going on.

23        Q    It's not?

24        A    Ms. Maxine came in to my property that

25   time.  And she came in because of Mr. Clark's

1                          E. Stephens

2    nephew.

3         Q      So Mr. Clark recommended Maxine?

4         A      No.  His nephew.

5         Q      Mr. Clark's nephew?

6         A      Yes.

7         Q      So you met Maxine through Mr. Clark's

8    nephew?

9         A      At first, when I went to Brooklyn to

10   Mr. Clark, Mr. Clark said, I want somebody to do

11   a signing for you, which was Ms. Maxine, to do, I

12   think it's a modification.  Some kind of

13   something with me.  And Maxine was there.  That's

14   how I know Maxine.  One time.  I didn't see her

15   again.  If I'd see her, I wouldn't know her

16   again.  The next time I saw Maxine is when Otis'

17   nephew called me and said, Evis, I want -- he

18   used to go to court with me, too, Otis,

19   Mr. Clark's nephew.  I want you to meet

20   Ms. Maxine.  She said she's said going to help

21   you with your property.

22         Q      Which property?

23         A      127-06 177th Street.

24         Q      Okay.  What about the other

25   properties?

1                    E. Stephens

2       A      I know nothing about that.  She didn't

3   tell me anything about that yet.  Nothing.

4       Q      She didn't go over the other

5   properties with you?

6       A      Not yet.

7       Q      Not yet.  It happened eventually?

8       A      Eventually it will happen.  So then we

9   talk about the house I am in.  She said, I can

10  help you with the house.  I can help you with the

11  house in our name and put it back in your name.

12  That's what she said to me.

13      Q      How do you go about putting a house in

14  somebody else's name?

15      A      That's the next trial.

16      Q      Huh?

17      A      That's the next thing by itself.

18  She's going to put it in her friend's name, which

19  is Tony.  She's going to put it on his name and

20  eventually they will get it back in my name.  But

21  first I have to pay them the money.  I started

22  paying them money.  I give Maxine $10,000.00,

23  2,500 every month.  I started giving them money.

24  That's what I do with Maxine and Tony.

25      Q      Okay.  Let me stop you there.  'Cause

1          E. Stephens
2     we're going into a lot of areas that I don't need
3     to go into.
4          One thing you said is that Maxine said
5     that you should put the property into somebody
6     else's name.
7     A     She told me, I know a friend.  If I
8     put the property in their name, I will get back
9     my house.  I just giving her money, $10,000.00,
10    and paying the mortgage every month.  That's how
11    it went.
12    Q     So did you agree to do what she said
13    to do?
14    A     Yeah, she make a promise to me.  She
15    said I'll get back my property when I do that.
16    And turn it back over to me.
17    Q     So first you had to put it in someone
18    else's name; correct?
19    A     Right.  Right.
20    Q     And I think you testified earlier that
21    you understood that a deed is a document in real
22    estate that transfers property from one name to
23    another; right?
24    A     Right.
25    Q     So did you understand at that point

1           E. Stephens
2  when she said putting your property into somebody
3  else's name, the only way to do that is with a
4  deed; correct?
5      A     Right.
6      Q     Is that correct?
7      A     Yeah.
8      Q     Okay.  So before -- around the time
9  that you were speaking to Maxine, had you met me
10 yet or spoken to me yet?
11     A     Let me see.  I can't recall.  I think
12 so.  Yes, when I was talking to Maxine and she
13 was talking about my house, then after talking
14 about my house, we met you.  Before that, no.
15     Q     Before that, you had never heard of
16 me; correct?
17     A     No.  I never heard about you, yes.
18     Q     Mr. Osmond never talked to you about
19 me, Mr. John Clark never talked to you about me,
20 you didn't know me independently; is that
21 correct?
22     A     No, I did not.
23     Q     So how did you meet me?
24     A     Through Maxine.
25     Q     So Maxine is the one that introduced

1                        E. Stephens

2     us; correct?

3          A      Yeah.

4          Q      And how did we first -- do you

5     remember when we first met?

6          A      Okay.  It goes like this.  Can I talk?

7          Q      You have to answer my question.

8          A      What is that?

9          Q      You can answer my question.

10         A      Okay.  Go ahead.

11                MS. JOSEPH:  Do you need him to

12         repeat the question?

13                THE WITNESS:  Repeat the question.

14                MR. MESTER:  Okay.

15    BY MR. MESTER:

16         Q      When did we first meet; do you

17    remember?

18         A      No, I don't recall.  I don't recall.

19    But I know we met with Maxine.

20         Q      Huh?

21         A      I know I met with you through Maxine.

22         Q      Correct.

23                MR. MESTER:  Let's mark this,

24         please.

25                (Exhibit I was marked.)

1                    E. Stephens

2  BY MR. MESTER:

3        Q      Ms. Stephens, before we actually met

4  in person, had we talked on the phone before

5  that?

6        A      No, we did not.

7        Q      I'd like to show you Exhibit I.

8  Please take a look at that document.  It's also

9  Exhibit C to the Complaint.

10       A      Go ahead.

11       Q      Does this document look familiar to

12 you?

13       A      I think so.  I can't recall.  But it

14 looks something like that.

15       Q      Well, do you remember coming to my

16 office at 26 Court Street in Brooklyn, with

17 Maxine?

18       A      Yes, I do.

19       Q      Was it on September 21st, 2018?

20       A      I can't recall.  Could be.

21       Q      Does that sound like the proper --

22 around the right date?

23       A      I think so.  I'm not sure.

24       Q      What do you remember about that

25 meeting?

1              E. Stephens

2    A      Because I have to go back.

3    Q      I'm sorry?

4    A      I have to go back, how I meet you.

5  Through Maxine, how I meet you; right?

6    Q      Let me just refresh what you just

7  said.  You said you had never spoken to me on the

8  phone and you had never met me until you and

9  Maxine came into my office.

10   A      Right.

11   Q      So let's just start there.

12   A      Maxine had told me that she will take

13  me to Mester to solve these houses in Brooklyn.

14  The houses in Brooklyn.  She came to me first and

15  tell me that the houses in Brooklyn, I can get it

16  solved from Mester.  Because Osmond, he already

17  served his time, and Mester will be able to help

18  you out with those houses that Mr. John took from

19  you in Brooklyn.  So she took me to your office.

20  She went inside.  Discussed whatever she had to

21  discuss with you.  And then you guys told me to

22  come inside your office.

23   Q      I'm a little confused.  The houses

24  that Mr. John took from you in Brooklyn?

25   A      Yes.

1                    E. Stephens

2       Q      Okay.  So you did have the houses in

3   Brooklyn?

4       A      That's what she said.  Houses in

5   Brooklyn that Mr. John took from me, I'm going to

6   get it back.  Went to Mester.

7       Q      And you wanted those houses back?

8       A      I don't want those houses at all.

9       Q      Why did you ask me to help you with

10  something you didn't want to do?

11      A      I didn't ask you to help me.  She

12  said -- I just want those houses off my name.

13  She was the one who wanted the houses.  I don't

14  want them.  What am I going to do with those

15  houses?

16      Q      Did you know that the houses had

17  already been foreclosed and they weren't in your

18  name anymore?

19      A      Yes, I know that they were foreclosed.

20      Q      So those houses were not in your name

21  anymore when you came to see me.  Those houses

22  were not in your name.

23      A      So why Maxine took me there?  'Cause I

24  don't know you.  I don't know where your office

25  is.  I know nothing about you.  Maxine took me to

```
 1                    E. Stephens
 2   you.  Why she took me there?
 3        Q     But did you care to put those
 4   properties back into your name?
 5        A     Those properties cannot go back in my
 6   name.  Maxine made those dates.
 7        Q     Mr. John Clark took the properties
 8   from you?
 9        A     Yes.
10        Q     And that was upsetting; correct?
11        A     No, it did not upset me.
12        Q     That wasn't upsetting?
13        A     It did not upset me.  What upset me is
14   where I'm living.  So she came there to help me
15   and then she bring up all these names of these
16   houses.  She said Osmond already served his time
17   and John have the homes.  So she's going to get
18   it back from him then.  She's going to get it
19   back from him.  I don't want it.  Let her do
20   whatever they wants to do with it.  So I don't
21   want the houses.
22        Q     Did you tell me that during our
23   meeting?
24        A     I told you that I don't want it.  I
25   did told you that, I don't want the houses.
```

```
 1                    E. Stephens
 2        Q      Did you read this Engagement Letter?
 3        A      No, I didn't have time to read it.  I
 4   didn't read nothing.
 5        Q      You didn't have time to read it?
 6        A      I'm a person, no, I don't want to read
 7   it.  You know why?  I'm a person.  With all these
 8   kind of readings with me, you see how I occupy?
 9   It don't bother to me.
10        Q      So look at the last page of that
11   exhibit.
12        A      Maxine promised me everything.
13        Q      Is that your signature on the last
14   page?
15                MS. JOSEPH:  Are you talking about
16        the second to the last page?
17                MR. MESTER:  I'm sorry.  Second to
18        the last page.
19                THE WITNESS:  Yeah, that's me.
20        And Maxine on the bottom.
21   BY MR. MESTER:
22        Q      Right.  Do you remember how this
23   document was created?
24        A      I don't remember.  I don't remember.
25        Q      You don't remember?
```

1                          E. Stephens

2          A      No.  I think I went to the office with

3    her.  I know we discussed all the things.  As a

4    matter of fact, I was outside with her and then

5    she said --

6          Q      Did you not come into the office?

7          A      Yeah, I was in the office with Otis.

8    Otis was there, too.

9          Q      Otis, who's that?

10         A      Mr. Clark's nephew was there with us.

11   Three of us was there.  Maxine, Otis and myself.

12         Q      Okay.

13         A      I don't even know your office.  If you

14   told me to come in your office right now, I don't

15   even know where it is.  I don't know nothing.  So

16   we went in the office.  She went and she talked

17   to you about the houses in Brooklyn, and then she

18   come to me and say that Mr. Mester will talk to

19   me about the houses.

20         Q      Did you come into the office at that

21   point?

22         A      Yes, I did.

23         Q      Did we sit down in the conference

24   room?

25         A      We sit down and we discuss it.

1              E. Stephens

2     Q     And we discussed --

3     A     Yeah.

4     Q     What did we discuss?  What do you

5   remember discussing?

6     A     About the house.  How we're going to

7   get back the houses.  And whatever.

8     Q     Are you talking about the houses in

9   Brooklyn?

10    A     Yeah.

11    Q     So at that point, did we also talk

12  about the house in Queens?

13    A     We never did talk about the house in

14  Queens.

15    Q     No?  You specifically remember that we

16  didn't talk about?

17    A     I don't recall that.  I don't recall

18  talking about the house in Queens.

19    Q     Is it possible that we talked about

20  the house in Queens?

21    A     Maybe.  Maybe.  But I can't recall

22  that.

23    Q     At that point, that house, you were in

24  foreclosure already; correct?

25    A     Yes.

1                    E. Stephens

2      Q      At that point, you were not in a

3  mortgage modification anymore; were you?

4      A      No, but I didn't get put out from the

5  bank or from the Court.  I was waiting for the

6  answer.

7      Q      Do you know why?

8      A      Why?

9      Q      No.  Do you know why?

10     A      No, I didn't ask questions.

11     Q      When you say "put out," do you mean

12  the bank didn't auction your property?  Is that

13  what you mean when you say "put out"?

14     A      Yeah.  They did not.

15     Q      Do you know what an auction is?

16     A      No.  I think it's just to sell it off

17  to somebody else.

18     Q      Sell it off.  Okay.  Right.  Part of

19  the foreclosure process; right?

20            So did you come to see me to help

21  fight the foreclosure?

22     A      For the house in Queens?

23     Q      Right.

24     A      No, I didn't go to you for that.

25     Q      Did you ask me to fight the

1                          E. Stephens

2    foreclosure?

3        A     I go to you for these other properties

4    in Brooklyn.

5        Q     For the properties in Brooklyn?

6        A     Yes.

7        Q     And what about for the property in

8    Queens?  You're saying you never came to me to

9    talk to me about that?

10       A     No, no, no.

11       Q     Is there a reason why I have that

12   property right in the first paragraph, if you can

13   look at that?  The first paragraph of the

14   document that you signed, it lists two Brooklyn

15   properties and the property on 177th Street in

16   Jamaica, in all capital letters.

17             Do you see that?

18       A     Yeah.  That is there.

19       Q     That was there?

20       A     Yeah.

21       Q     That was there when I gave you this

22   document to sign.

23       A     I can't recall that.

24       Q     Okay.  You don't remember reading this

25   document at all before you signed it?

1                    E. Stephens

2        A      No.

3        Q      I didn't prevent you from reading it;

4    did I?

5        A      No.  It was plenty reading.

6        Q      Okay.

7        A      I didn't do that.  I didn't read

8    anything.

9        Q      It was your decision --

10       A      I've now seen this.

11       Q      You mean you're seeing it now for the

12   first time since you were in my office?

13       A      Yes.

14       Q      Are you sure about that?

15       A      Maybe.

16       Q      Are you sure you didn't take a copy of

17   this document and give it to Mr. Dahiya?

18       A      Give it to who?

19       Q      Mr. Dahiya.

20       A      Maybe.  I can't recall what I give

21   him.  I give him a lot of stuff.  I give

22   everybody a lot of stuff, but I can't recall.

23       Q      I want you to look at the page with

24   your signature again.  So the second to the last

25   page of the retainer -- of the Engagement

1                    E. Stephens

2    Agreement.

3                    MS. JOSEPH:   The signature page?

4                    MR. MESTER:   Yes, the signature

5         page.

6    BY MR. MESTER:

7         Q      Do you see the signature page?

8         A      Yes, I see it.

9         Q      Okay.  On the top of that page, do you

10   see the paragraph in all capital letters?

11        A      Yeah.

12        Q      Can you read it, please?

13        A      You agree that attorney may

14   communicate with one or both of your -- on all

15   matters related.  Your representation, such

16   communication shall not be a validation or

17   privilege, and being accorded for attorneys -- to

18   attorney clients.  Privilege remain confidential

19   and fully as the law allow."

20        Q      Do you understand what that paragraph

21   means?

22        A      Yeah, I understand, but I didn't read

23   these things.

24        Q      What do you understand that paragraph

25   to mean?