# EXHIBIT D

1                    E. Stephens
2        A       Whatever is there.  And I signed it.
3    Whoever in charge of it will have to take charge
4    of it.
5        Q       Okay.
6        A       But I cannot recall that.
7        Q       Look at the part of the paragraph that
8    says -- the first line, "May communicate with one
9    or both of you."
10               Do you see that?
11       A       Which one?
12       Q       The first line.
13       A       The first line I was reading?
14       Q       Yes.  "May communicate with one or
15   both of you."
16               Do you see that?
17       A       Yeah.  Yeah.
18       Q       What do you -- what is your
19   understanding of that part of this paragraph?
20       A       My understanding is --
21       Q       Just that part.
22       A       Yeah.  My understanding is that
23   Ms. Maxine will communicate with you to help me
24   with my property in Queens.
25       Q       Right.  And I can communicate to

1               E. Stephens
2  Maxine as well?
3       A    Yes.
4       Q    As well as with you; correct?
5       A    You keep communicating with her.  You
6  didn't call me.  You didn't communicate with me.
7  No, you did not call me.
8       Q    This paragraph says that I could call
9  either of you; correct?
10           I'm just showing you this paragraph.
11      A    Well, okay.  That is what went on.
12 You didn't call me.
13      Q    I'm not asking that question.  I'm
14 asking what this paragraph means.
15      A    Okay.  Communication.
16      Q    Communication.
17      A    Right.
18      Q    That I could communicate with one or
19 both of you.  That means either of you separately
20 or both of you together; is that correct?
21      A    Yeah.
22      Q    Is that your understanding of that
23 language?
24      A    Yes, it's correct.  But I called you;
25 right?

1              E. Stephens

2      Q      Let's not -- I'm asking the questions.

3      A      I know.

4      Q      Please, you'll have your chance.

5             Now look at the bottom where your

6      signature is.  It says in big letters, above your

7      signature, "Acknowledged and agreed."

8             Do you see that?

9      A      Yeah, I see it.

10     Q      What is your understanding of what

11     make that means in the context of this document?

12     A      Well, it's just an agreement of

13     whatever is there.

14     Q      An agreement of what's in the

15     document; correct?

16     A      Yeah.

17     Q      Now I'd like to show -- I'd like you

18     to turn to Page 2 of that document; okay?

19     A      Yeah.

20     Q      I'd like you to read the third

21     paragraph.

22     A      "As of the short sale transaction" --

23     Q      Okay.  You can stop right there.

24            What does that paragraph mean to you?

25     What does that language mean to you?  I'm sorry.

1              E. Stephens

2     A     Short sale.

3     Q     Short sale.

4     A     Right.

5     Q     Okay.  Do you know what a short sale

6  is?

7     A     Selling the property.

8     Q     Selling the property; right?

9     A     Yeah.

10    Q     For what?  What's the difference

11  between a short sale, if you know, and a regular

12  sale?

13    A     Before you go further, what house is

14  this you're speaking about?

15    Q     Well, that's my question to you.

16  Which house was I speaking about?

17    A     Yeah.  Which house are you speaking

18  about?

19    Q     Right.  Can you tell from this

20  paragraph what house I was speaking about?

21    A     Maybe the one in Brooklyn, but I don't

22  know which one.  I cannot recall.

23    Q     Those houses you did not own.

24    A     Right.

25    Q     So I can't be selling a house that you

1                    E. Stephens

2    don't own anymore.

3        A       Right.

4        Q       So which house, out of the three

5    houses in the first paragraph that are mentioned,

6    did you still own as of the day that you came to

7    my office?  Which house did you own?

8        A       The one in Queens.

9        Q       The one in Queens?

10       A       Right.

11       Q       So when you see the language in

12   Paragraph 3 on Page 2, as for this short sale

13   transaction, that means a sale of a property that

14   you owned.

15       A       I didn't see that property.

16       Q       You didn't see it?

17       A       No.  I didn't read that part.

18       Q       You didn't read it?  It's in the

19   document, but you didn't read it?

20       A       I didn't understand that.

21       Q       Okay.

22       A       I didn't understand that.

23       Q       Now I want you to turn the page to

24   Page 3, where it says, "Retainer deposit."

25               Do you see that?

1                    E. Stephens

2      A      What paragraph?  Page 3?

3      Q      Page 3.  On the top.  Retainer deposit

4  section.

5      A      "Attorney requires that you pay an

6  initial retainer in the sum of $10,000.00

7  retainer."  That's a good answer.

8      Q      Keep reading.

9      A      "An account of each of the legal

10  service for each litigation of the (inaudible) in

11  connection herewith.  Attorney is authorized to

12  credit you on an hourly basis for a legal fee for

13  litigation service rendered during the course of

14  presenting."

15      Q      Representing?

16      A      "Representing you on notice herein."

17      Q      You can stop there for now.

18             What do you understand that paragraph

19  to mean, in your own words?

20      A      Understanding that the person -- the

21  attorney required $10,000.00, the person will

22  have to go and represent me.  $10,000.00.

23      Q      For each litigation; right?  For the

24  litigation; isn't that what it says?

25      A      For each litigation.

1              E. Stephens

2      Q      Right.

3      A      Yes.

4      Q      Okay.

5              MS. JOSEPH:  It says -- are you

6      reading it verbatim?  Each of the legal

7      services for each of the litigation.

8              MR. MESTER:  "On account of each

9      of the legal services for each litigation."

10   BY MR. MESTER:

11     Q      That's what that says; right?

12     A      Uh-huh.

13     Q      Okay.  Did you pay me $10,000.00?

14     A      I gave Maxine -- everything Maxine did

15   for me, I gave her $10,000.00 to do all of that.

16   Not I give you.  I gave her.

17     Q      I didn't ask you if you gave her any

18   money.  You didn't give me any money; did you?

19     A      No.  No.

20     Q      Okay.  Read the next paragraph,

21   please.

22     A      "There will be no appearance made on

23   the court records until the full retainer has

24   been paid, nor will there be a refund of any part

25   of the retainer once service has been

1                    E. Stephens

2     recommended -- commended."

3          Q     What do you understand that paragraph

4     to mean?

5          A     Retainer has been paid.  There will

6     not be any record.

7          Q     No.  Look at the word there.  The

8     fifth word.

9          A     There will be no refund.

10         Q     No appearance; right?

11         A     No appearance, yeah.

12         Q     What does that mean to you?

13         A     I don't know.  There will be no

14     appearance.

15         Q     No appearance.  Does that mean

16     anything to you?

17         A     Who will be the appearance, you?  I

18     don't know.

19         Q     The person you're giving the

20     $10,000.00 to.

21         A     Right.

22         Q     Who was that supposed to be?

23         A     You.

24         Q     Me?

25         A     Right.

E. Stephens

1
2       Q    Okay.  And this paragraph says there

3  will be no appearance made on the Court's record

4  until the retainer has been paid.

5            Do you know if I was ever paid

6  $10,000.00?

7       A    I don't know why you're asking me

8  those questions.  Because we went to the closing;

9  right?  We went to the closing.

10      Q    No, no.  I'm not talking about the

11  closing.  This is for litigation.

12      A    No, I didn't pay you any litigation

13  money.

14      Q    Okay.  Okay.  The three properties

15  listed in this Engagement Letter, 1487 East 53rd

16  Street, 844 East 34th Street and 127-06 177th

17  Street in Jamaica, those were all owned under

18  your name; correct?

19      A    I guess so.

20      Q    None of them were owned under Maxine's

21  name; correct?

22      A    No.

23      Q    Okay.  After the meeting concluded,

24  when was the next time you and I spoke?

25      A    For the closing of my property.

1                    E. Stephens

2        Q      Okay.  So when was that?

3        A      I can't recall.  You can remember more

4   than me.

5        Q      It was a number of months after we

6   met; right?

7        A      I think so.

8        Q      And during that period of time between

9   our meeting in my office and the closing, did you

10  contact me to ask me any questions about anything

11  that we discussed at the meeting?

12       A      I called you one time when Maxine was

13  charging me money for whatever the -- in the

14  house.  Like, to pay the monthly installment.

15  And she said if you can't pay it, you will have

16  to rent.  So I called you --

17       Q      Let me stop you there.  This is after

18  the closing; correct?

19       A      Yes.

20       Q      Okay.  So before the closing, after we

21  met in my office, we didn't have any conversation

22  --

23       A      No, we did not.

24       Q      -- and we didn't have any meeting;

25  correct?

1                    E. Stephens

2        A      No, we did not.

3        Q      Okay.  And did you send me any

4    additional paperwork after our meeting?

5        A      No.

6        Q      Is the reason you never called me is

7    because you were relying on Maxine to communicate

8    everything?

9        A      Exactly.

10       Q      I want you to go back to Exhibit A,

11   which you should have there.  The Complaint.

12       A      This one?

13       Q      Go to Paragraph 28.  Not Page 28,

14   Paragraph 28.  It starts at, "In and around

15   March 2019..."

16              Do you see that?

17       A      Yes.

18       Q      Your Complaint says, "In and around

19   March 2019, Maxine, along with Lezantonio

20   Woodburn, once again came to Ms. Stephens to pick

21   her up and take her to the closing to save her

22   house."

23              Do you see that?

24       A      Yes.

25       Q      So is that the closing that you and I

1                    E. Stephens
2    met at?
3         A     Yes.
4         Q     So between September of 2018 and March
5    of 2019, we had no communication with each other?
6         A     No, we didn't.
7         Q     Why were you going to a closing with
8    Maxine and Mr. Woodburn?
9         A     It wasn't a closing, as she said.  She
10   would put the house in her friend's name.  She
11   advised me, let's put the house in my friend's
12   name, and then after they would return it back to
13   me.  That is why we were going to do the closing.
14   I didn't even know that you were going to be
15   there in the closing.  I didn't know.  I didn't
16   even know what a closing was.
17        Q     You had been to one closing before;
18   right?
19        A     I know I had been to a closing before.
20   But she's taking me now to a closing.  When I
21   went there, there was more than one person there
22   again.  Apparently, I thought it was just a
23   closing with my house.  Unless, remember, I
24   signed something wrong, and Mr. Antonio said,
25   Ms. Stephens, don't fret.  Sign it.  I'll give

1            E. Stephens
2    you back your property.  There's nothing to be
3    scared about.  Because I made a mistake.  He was
4    there, too.  And then he said, sign where I tell
5    you to sign.  You said that to me.  Maxine was
6    sitting in the corner there.  And to me, like,
7    more than one closing it have.  A lot of people
8    were there.
9        Q    There was a lot of people there;
10   right?
11       A    Yes.  More than one person.
12       Q    There were multiple attorneys there;
13   correct?
14       A    Yes.
15       Q    Okay.  And you walked in --
16       A    Yes.
17       Q    -- to the place that they were driving
18   you.
19            Did you have any conversations in the
20   car when you were driving to the --
21       A    The only conversation I will have is
22   that Mr. Lez would always say, Ms. Stephens, I
23   don't want your property now.  I will give you
24   back your property.  That's the only thing me and
25   he keep talking about.

1                    E. Stephens
2        Q      So you knew that Mr. Lezantonio
3   Woodburn was the person that Maxine was referring
4   to as far as putting the property in his name,
5   transferring the property?
6        A      Right.  Yes.  Yes.  He said, you're
7   going to get back your property, Ms. Stephens.
8   That's what he keep telling me all the time.
9        Q      Okay.  So your understanding was that
10  you were being picked up in a car --
11       A      Yes.
12       Q      -- by Maxine and Mr. Woodburn.  You
13  were going to be driven to a place where all the
14  paperwork was going to be signed; yes?
15       A      Yes.
16       Q      Okay.  And at that place where the
17  paperwork was going to be signed, okay, that was
18  going to help you save your house.
19       A      Yes.
20       Q      Is that correct?
21       A      Yes.
22       Q      That's what Paragraph 28 says.
23       A      Yes.
24       Q      That they were taking you to a closing
25  to "save her house"?

1                    E. Stephens

2       A       Right.

3       Q       Okay.  Just remind me, what were they

4  saving your house from?

5       A       The foreclosure.

6       Q       Foreclosure.

7       A       Yeah.

8       Q       Okay.  So they didn't -- if you didn't

9  do what you had agreed to do that day, was the

10  bank going to auction the property?

11      A       The bank?

12      Q       The bank that you had the mortgage

13  with, were they going to auction the property?

14      A       No, they wasn't going to auction the

15  property.

16      Q       No?  It wasn't scheduled to be

17  auctioned?

18      A       No, it was not.

19      Q       Okay.  Ever?

20      A       No.  I didn't get no mail from them

21  saying they were going to auction anything.

22      Q       But Mr. Rouse was representing you on

23  the foreclosure.

24      A       Yeah, he went to them.

25      Q       So isn't it possible that the mail

1               E. Stephens
2  went to his office?
3      A    I don't think so, because he never
4  called me and let me know anything that was
5  happening.  Mr. Rouse never say anything to me.
6  I just take it up with Maxine now concerning the
7  property.  Mr. Antonio, I don't know him.  But I
8  know Maxine through him.  I didn't even know her
9  much.  She come to my house asking for the money
10 to go to the closing.  I didn't have the money.
11     Q    Do you know how much you owed the bank
12 at that time that you were going to close?
13     A    It went back to, like, 600-something
14 thousand.  I think it went back to that.  Damn
15 it.  I said, but I sell the house to a jew and I
16 get the $10,000.00 and walk away.
17     Q    I'm sorry, say that again.
18     A    If I had given the house or sell the
19 house to a jew, I would get $10,000.00.  But I
20 didn't have the money.  My son-in-law gave me
21 $10,000.00.  Maxine fought me to get the
22 $10,000.00.  I said, I don't have the money.  I
23 called Trinidad to get $10,000.00.  My stepson
24 sent $10,000.00 to me, but the bank wouldn't
25 exchange it because that money can't change

1                    E. Stephens
2    hands, the check.  So my son-in-law, in
3    Connecticut, Maxine -- my next son-in-law, our
4    son-in-law, he -- I called him from Connecticut.
5    Maxine can't get the money.  She said, can you
6    get it from anybody?  Can you get it from
7    anybody?  I called my son-in-law from
8    Connecticut.  She spoke to him.  And he asked
9    her, are you sure you're going to get this done
10   in the right way?  She said, yes, we're going to
11   get it done in the right way.  He give my
12   daughter $10,000.00 check to give me, to give
13   Maxine -- to give this lady sitting there.  And
14   we give her the $10,000.00.  She promised to get
15   everything back for me on his name.  After the
16   closing and we reached home, I said Maxine didn't
17   give me no paperwork.  You know what Maxine said
18   to me?  You think I'm stupid.  That lady sitting
19   there, she said that to me.
20       Q    Okay.  I'm going to -- do you need to
21   take a break at all?  You want to take a
22   couple-minute break so you could -- let's take a
23   little break.
24            (Whereupon there was a brief recess
25   from 2:19 p.m. until 2:23 p.m.)

1               E. Stephens
2     BY MR. MESTER:
3          Q     Do you know what the house was worth
4     at the time of the closing?
5          A     I did know, but I got the final, that
6     house was, like, almost a million dollars.  That
7     house.
8          Q     At that time, in the condition it was
9     in?
10          A     That house was not in a bad condition.
11     They take it into a bad condition.  The only
12     thing that happened to the house, just the roof
13     was leaking over the toilet.
14          Q     When you say "they," who are you
15     talking about, "they"?
16          A     Maxine.
17          Q     They didn't live there.  You lived
18     there.
19          A     No, I lived there.
20          Q     You lived there.
21          A     What I said, the only thing that
22     happened to the house was a leak over the toilet.
23     And the sewer was always backing up, but I would
24     get Roto-Rooter to come and clean it out for me
25     all the time.  That is what happened to that

1            E. Stephens
2    house.  That house wasn't in a bad condition.
3    That house wasn't nothing.  That was a new house.
4    It was in a good condition, that house.
5        Q    It was a new house?
6        A    Remember, 2007, I bought a house.  It
7    was a brand-new house that I bought.
8        Q    You didn't say it was a brand-new
9    house.
10       A    It was a brand-new house.  Nobody
11   lived there.
12       Q    It was constructed in 2007?
13       A    Yes.  Nobody lived in that house.
14   Only I.  Only I.
15       Q    You mean 2006; right?
16       A    Yes.  Only I.  I am the only one who
17   lived in that house.
18       Q    But you don't know what the market
19   value was in 2019 at the closing?
20       A    No, I don't know.
21            2019, it was worth more than
22   600-something thousand dollars.  It was worth
23   more than that.
24       Q    But you didn't do any --
25       A    Renovation or anything?

1                    E. Stephens

2       Q     No.  You didn't do any appraisals or

3    any kind of valuation; did you?

4       A     No, I didn't do anything until

5    Ms. Maxine sent somebody to do whatever on the

6    house to get it sold.

7       Q     Right.  Okay.

8       A     I didn't do anything.

9       Q     So Maxine did everything in order for

10   the house to be sold to Mr. Woodburn; right?

11      A     I guess so.  I guess so.

12      Q     Right.  You didn't assist her at all?

13      A     Assist her?

14      Q     Assist her, by giving documentation or

15   anything of that nature?

16      A     No.  I told her Maxine, I said, but

17   the bank didn't send anything to me.  She said

18   she knows how to get it from the bank.  So I

19   guess she gets it from the bank.  I didn't

20   nothing from the bank to say that they know I'm

21   selling the house, blah, blah, blah.  No, she got

22   everything from the bank.  I didn't get anything.

23      Q     Did she ask you to sign any kind of

24   paperwork?

25      A     I can't recall that.

1                    E. Stephens

2        Q      You don't remember?

3        A      No.

4        Q      In a short sale, you have to normally

5   submit what's called a hardship letter.  Do you

6   recall signing a hardship letter?

7        A      No, I can't recall.  Somebody has to

8   show me right now.  I cannot recall.  All that

9   time I was in a mess.  I cannot recall.

10       Q      But you may have signed it in order to

11  move forward with the -- with what you were

12  planning to do; right?

13       A      Right.  Maybe.  I don't know.

14       Q      Before you met Mr. Woodburn driving to

15  the closing, had you met him before?

16       A      Yeah.  One of the boilers downstairs

17  had broken, and Maxine said she will get him to

18  work on it for me.  I paid him to get it done for

19  me.

20       Q      That was before the closing?

21       A      Yes.  I paid him for that.

22       Q      Was there anybody else in the car on

23  the way to the closing?

24       A      No.

25       Q      Just the three of you?

1                    E. Stephens

2        A        The three of us, yeah.

3        Q        The closing was in Queens; correct?

4        A        I guess so.

5        Q        Do you remember?

6        A        I can't remember where it is.  I can't

7   recall where the spot was.

8        Q        Were you asked to bring anything to

9   the closing?

10       A        No, I didn't have to bring anything.

11  All I know, I already gave her the money for the

12  closing, $10,000.00.  So that's all.  I put

13  myself in the car and go with her.

14       Q        Did you bring your photo ID with you

15  to the closing?

16       A        I bring my ID anywhere I go.

17       Q        What did you expect to do once you

18  arrived at the closing?

19       A        Just sign.

20       Q        Just sign papers?

21       A        Yeah, sign papers.

22       Q        And those were the papers to put the

23  property in Mr. Woodburn's name; right?

24       A        Yeah, I guess so.

25       Q        You had done a mortgage modification

1              E. Stephens
2    earlier with Ocwen; right?  We talked about that?
3         A     If I did a modification?
4         Q     No, with Ocwen.  Remember the one we
5    spoke about earlier?
6         A     Ocwen, yeah.
7         Q     What procedure did you use -- did you
8    do in order to sign those papers?
9         A     I called Ocwen and I said that I am
10   running short.  And they said, if you want to do
11   a modification.  I did it on my own.  Just to
12   write a letter, stating how much money you're
13   owing, what you have, where you're working.  And
14   then my daughter typed it all for me and then we
15   sent it.
16        Q     Did they send you anything in return?
17        A     Yeah, they sent something to me, I
18   think.  And then I started paying back $2,500.00.
19        Q     This was all done at your house;
20   right?  You didn't go to a closing location;
21   right?
22        A     No, no, no.
23        Q     Okay.  So when you were at the
24   closing, going back to Exhibit A, Paragraph 28,
25   you indicate that you were there for about two

```
1                    E. Stephens
2   hours in a conference room; right?
3        A     Yes.  I don't know.
4        Q     Is that right?
5              MS. JOSEPH:  Which one?  Which
6        paragraph?
7              MR. MESTER:  Paragraph 28.  Same
8        paragraph.
9              THE WITNESS:  Maybe.  Could be,
10       yes.  Two hours?  Could be.  I can't recall.
11  BY MR. MESTER:
12       Q     Let me retract that question.
13             So you got to the closing with Maxine
14  and Mr. Woodburn; right?
15       A     Right.
16       Q     What kind of -- do you remember what
17  the place looked like?  Was it an office?  Was it
18  someone's house?
19       A     I think it was an office with a long
20  table.
21       Q     It had a conference table in it?
22       A     Yes, a conference table.
23       Q     Okay.  Were there other people there
24  other than --
25       A     Yeah, there were other people on the
```

1                    E. Stephens

2    other side.  I remember that.

3          Q     Did you sit at the conference table?

4          A     Yeah.

5          Q     Who else was at the conference table

6    with you?

7          A     You.

8          Q     I'm sorry?

9          A     You were there.  Lez was there.

10   Maxine was at another table.  She was in the

11   corner sitting over there.  Like, she was there

12   sitting.

13         Q     Did you sit next to me?

14         A     Yes, next to you.

15         Q     I mean, why did you sit next to me?

16         A     Because you was my attorney.

17         Q     I was your attorney; right?

18         A     Yeah, you were the attorney.

19         Q     Okay.  And as your attorney, what was

20   I there to do for you?

21         A     To direct me.

22         Q     And we were there for the Queens

23   property; right?

24         A     Yes.

25         Q     Your property on 177th Street; right?

1           E. Stephens

2      A      Yes.

3      Q      That was the only property we were

4 there for; correct?

5      A      That's right.

6      Q      And by directing you, what were your

7 expectations, you know, for me to direct you to

8 do?

9      A      You were there to direct me.  I was

10 trying to make a wrong right.  You said to me,

11 you sign when I tell you to sign.  That's what

12 you told me.

13      Q      But, basically, I was there to direct

14 you for the purpose of while you were there;

15 right?

16      A      Exactly.

17      Q      And you were there for what purpose

18 again?

19      A      To put the house in Lez's name.

20      Q      Okay.  So based on your experience

21 when you purchased the house in Queens, in order

22 to do that, various types of paperwork had to be

23 signed between you and Mr. Woodburn; correct?

24      A      Right.

25      Q      And because you were the owner of the

1                    E. Stephens

2    property at the time, you would be selling it to

3    Mr. Woodburn; correct?

4          A      Right, exactly.

5          Q      And did you sign papers during the

6    time that we were there?

7          A      Yeah, I was signing.

8          Q      We were there for, according to this

9    paragraph, about two hours; right?

10         A      I think so.  And Lez was there.

11   Telling me, don't bother yourself.  Don't bother

12   yourself.  You'll get back your property.  I was

13   in the middle.

14         Q      I was next to you; right?

15         A      Yes, you was next to me.  And he was

16   next to me right here.  Lez here.  You here.  And

17   I'm in the middle.

18         Q      Was there a pile of papers on the

19   table in front of us?

20         A      Yeah.

21         Q      And did I put each paper in front of

22   you and show you where to sign, if you needed to

23   sign that paper?

24         A      Yeah, if I needed to sign it, you will

25   tell me where to sign.  That's why I said a

1                          E. Stephens
2    minute ago, you said, you sign right there.  You
3    sign.  That's what you told me.  And Lez would do
4    the same thing.  He said, Ms. Stephens, I don't
5    want your property from you.  I don't want it.
6         Q     All the documents that you signed were
7    written in English; correct?
8         A     Yes.
9         Q     Did you look at any of them?
10        A     I didn't get the papers.
11        Q     Did you look at them when we were
12   sitting at the table?
13        A     Yeah.  I looked at them, but I didn't
14   get to read it, because you tell me sign, and I
15   sign.  Sign, I sign.  I didn't read anything.
16        Q     You didn't read it; okay.  We get you.
17   We understand you didn't read it.
18              Did you have any questions that were
19   not answered at the time?
20        A     No.  I'm not that kind of a person,
21   who asks questions like that.  Because I trust
22   what was going on.
23        Q     And you understood -- like we're
24   talking now, you understood everything I said;
25   correct?

1                    E. Stephens
2       A     Yes.  Yes.
3             Could I say something?
4       Q     No.  I have a question for you.
5       A     Okay.
6       Q     At the closing, were you told that you
7  were taking out a new mortgage under your name?
8       A     No.
9       Q     You were not?
10      A     No.
11      Q     You were not taking out a new mortgage
12  under your name; right?
13      A     No, no, no.
14            Not cutting you off.  Can I say
15  something?
16      Q     There's no question.
17                 MS. JOSEPH:  Just answer the
18         question.
19  BY MR. MESTER:
20      Q     I don't know what you want to say.
21      A     Okay.
22      Q     Was there any time during the closing
23  that you felt that anyone was rushing you to
24  finish?
25      A     Yes, they were rushing me.  That's why

1                    E. Stephens
2    I want to say something.  They were rushing me to
3    do what I have to do.  Maxine was just rushing me
4    in every way.  When everything over, I did not
5    get the documents from nobody.  I didn't get,
6    like, from you giving me documents to go home and
7    read.  Or Maxine giving me documents.  She had
8    everything.  And she said everything will be
9    fine.  Next time I said to her, I didn't get any
10   documents.
11        Q    So let's -- you've said this a couple
12   of times already.
13        A    Yeah, but I have to say it again.
14        Q    Let me ask you a question then.
15   You've been to my office one time before the
16   closing; correct?
17        A    Right.
18        Q    So you knew where I worked; correct?
19        A    Right.
20        Q    Was there a time after the closing
21   that you contacted me to come to my office a
22   second time?
23        A    I called you.
24        Q    No, I didn't ask that question.
25             Did you contact me to make an

1          E. Stephens
2    appointment to come to my office?
3          A    No, I did not contact you to come to
4    your office, but I contacted you.
5          Q    Did you contact me to request that I
6    send you copies of the closing documents?
7          A    I called you.  I contact you when I
8    said to you, Maxine said to me that I have to
9    start to pay rent.  And you said to me,
10   Ms. Stephens, if you cannot pay the mortgage, why
11   not pay the rent.  You said that.
12         Q    That was the only conversation we've
13   had; right?
14         A    Yes.  Yes.
15         Q    Did you notice other people signing
16   papers when we were at the closing?
17         A    Yeah.  Next to Mr. Lez, his attorney
18   was on the other side.
19         Q    Mr. Woodburn had his --
20         A    He had his attorney, too.
21         Q    He had an attorney there?
22         A    A dark guy, yes.
23         Q    Do you remember his name?
24         A    No, I don't remember his name.  I have
25   no documents.

1                    E. Stephens

2        Q     Did anyone other than me ask you to

3   sign papers that day?

4        A     No.  Just you.

5        Q     Did you notice a notary public was in

6   the office during the closing?

7        A     I think so.  I'm not sure because I

8   was a bit nervous.  I was nervous, so I wasn't

9   sure.

10       Q     Do you remember having to give your

11  photo ID for copying?

12       A     No, I can't recall that either.  Can't

13  recall these things.

14       Q     Is it possible you did that, though?

15       A     Maybe.  I'm not sure.  I don't recall

16  that.

17       Q     Was I with you the entire time that

18  you were present at the closing?

19       A     Yeah, you was sitting there with me.

20       Q     I didn't leave before you left; did I?

21       A     No.

22       Q     Was I -- if you remember, was I

23  instructing anybody else at the table to do

24  anything?

25       A     Not to my recall.

1              E. Stephens
2       Q      Did you pay any fee to me for being
3  there that day?
4       A      No, I didn't.
5       Q      Did you know how I was getting paid?
6       A      Maxine has the money in her pocket.
7       Q      At any time during the closing, did
8  you get up and leave before we were all
9  completed?
10      A      No, I did not.
11      Q      Nobody threatened you to stay there
12 against your will?
13      A      No.
14      Q      No?  Nobody threatened you to sign any
15 papers there against your will?
16      A      Not at that point, yeah.
17      Q      Who did you leave the closing with?
18      A      Maxine.
19      Q      Did she drive you back home that day?
20      A      Yes, she did.
21      Q      Anybody else in the car?
22      A      Lez.
23      Q      Did you speak to her about what had
24 just happened at the closing?
25      A      I told her and she said she would give

1                    E. Stephens
2   me the documents.  And she never did.
3        Q     Did you speak about what your -- what
4   was going to happen with the property now after
5   the closing?
6        A     Yeah.  They said to me, you'll get
7   back your property.  That's all they would say,
8   you'll get back your property.  Don't worry,
9   Ms. Stephens.  You have nothing to worry about.
10       Q     What about renovating the property,
11  did you talk about that?
12       A     No, she didn't talk about that yet.
13  None of that happened.
14       Q     About work being done on the property?
15       A     No, she didn't tell me nothing about
16  that.
17       Q     All right.  I'd like you to look at
18  Paragraph 29 of Exhibit A.
19             You see what that says?
20       A     Yeah.  Upon information and belief,
21  that Mester, Maxine and Woodburn, attorney for
22  their business and other ventures.
23       Q     Do you know what that sentence means?
24       A     No.
25       Q     No?  Okay.

1               E. Stephens
2               MS. JOSEPH:  I think she missed a
3       letter.  She missed a word.
4  BY MR. MESTER:
5       Q     You can read it again.
6               MS. JOSEPH:  Take your time and
7       read it.
8               THE WITNESS:  Upon information and
9       belief, Mester is Maxine and -- sorry, and
10      Woodburn's attorney.
11 BY MR. MESTER:
12      Q     Keep reading.
13      A     Attorney for their business and other
14 ventures.
15      Q     Correct.  Okay.  Can you -- what
16 businesses are you referring to in that sentence?
17      A     I don't know what business they had.
18 I don't know.
19      Q     Do you know any particular businesses?
20      A     I didn't know they had business.
21      Q     What about the ventures?  You
22 mentioned the word "other ventures."  Do you have
23 any information about what ventures you're
24 referring to?
25      A     I have no idea.

1              E. Stephens

2      Q      Okay.  And do you have any proof that

3  I represented Maxine or Mr. Woodburn in anything

4  at any time?

5      A      No.  I didn't think about that.  I

6  never thought about that.

7      Q      I'm just reading what your lawyer

8  wrote here on the page.

9              What I'm asking you is what businesses

10  are you referring to, what ventures are you

11  referring to, and what representation are you

12  referring to that I did -- that I had with Maxine

13  or Mr. Woodburn?

14      A      You are their attorney.  You were

15  representing them at all times.

16      Q      What do you mean?

17      A      Because I heard him speak about

18  Mester, and that's one of the reasons why I

19  called you and said that they want me to rent.

20  And you said to me, if you cannot buy, why not

21  rent?  So in my belief, you're just for both of

22  them.  That's what my belief is.

23      Q      You believe that I represent --

24      A      Both of them.

25      Q      -- both of them?

1           E. Stephens

2      A      Yes.

3      Q      Based on?

4      A      Based on what they said to me and

5  based on how they act to me.  When I call you,

6  you said to me -- you said to me, why not rent if

7  you cannot buy the house.  I don't know why you

8  said that.  So my recall is that, okay, so you

9  are their attorney.

10     Q      But nobody actually said that I'm

11 their attorney; did they?

12     A      I heard him speak about Mr. Mester

13 already.

14     Q      Yes, I do exist.

15     A      Yes.

16     Q      But did they say that I actually was

17 their attorney?  Did they tell you that?

18     A      Well, Maxine told me that's why she

19 drive me to your office.

20     Q      Right.  Maxine knows who I am; right?

21 That's correct.

22     A      Yeah, you are an attorney.

23     Q      I am an attorney.

24     A      For them.

25     Q      On what projects?

1          E. Stephens

2     A    I don't know.  I cannot recall.

3     Q    Well, I need you to recall that.

4          Do you have any recollection at all?

5     A    No.

6     Q    Nothing?

7     A    No.

8     Q    Okay.  As a matter of fact, wasn't

9  Maxine assisting you before she introduced you to

10 me?

11    A    What do you mean assisting?

12    Q    Assisting you.

13    A    She came to my house.

14    Q    Giving you advice?

15    A    Yeah, on everything.

16    Q    Informing you what her ideas and

17 suggestions were so you could get out of the

18 problems that you were in.

19    A    I don't think she wanted any ideas,

20 no.  Afterwards, I think Maxine just wanted to

21 take over my life.  That's what she come for, to

22 take me over.

23    Q    But you met her way before you met me;

24 correct?

25    A    Yes.

1              E. Stephens

2     Q     That's my question.

3     A     Yes.

4     Q     Okay.  The last sentence of that same
5  paragraph, 29, indicates that, "Mester
6  unethically represented both the 127-06 Holdings,
7  Inc. and Ms. Stephens."

8              Do you see that?

9     A     Yeah.

10    Q     Do you know who owns 127-06 Holdings,
11  Inc.?

12    A     Maxine and Lez.

13    Q     Is that your answer?

14    A     This is 127 Holdings.

15    Q     127-06 Holdings, Inc., do you know who
16  owns that -- that's a company; correct?

17    A     Yeah, it's a company.

18    Q     Do you know who owns that company?
19  Are you guessing or are you sure?

20    A     I know I'm sure.  It's both of them.

21    Q     Both of them?

22    A     Yes.

23    Q     Okay.  And how do you know that?

24    A     'Cause I see mail come to my property,
25  too, for them.  Mail come to property concerning

1          E. Stephens

2   these two people.

3       Q     And it has their individual names on

4   the mail or does it have the company name?

5       A     It has the company and it have their

6   name inside.  The company and the name.  That's

7   how I know what's going on.

8       Q     Does any of this mail have my name on

9   it?

10      A     No.

11      Q     Okay.  The Engagement Letter, which is

12  right there --

13                MR. MESTER:  What exhibit was

14      that?

15                MS. JOSEPH:  I.

16                MR. MESTER:  I?

17                MS. JOSEPH:  Uh-huh.

18  BY MR. MESTER:

19      Q     Okay.  Does that letter indicate that

20  I was representing 127-06 Holdings, Inc.,

21  anywhere in that letter?

22      A     No.

23      Q     Okay.  Do you have any proof that I

24  represent or represented 127-06 Holdings, Inc.?

25      A     No.

1                           E. Stephens

2        Q      I'd like you to look at Paragraph 30

3   of Exhibit A, please.  Paragraphs 30 starts,

4   "Upon information and belief, Mester prepared or

5   caused to be prepared both any paperwork related

6   to Purchase and Sale Agreement and Transfer

7   Ownership Agreement."

8               Do you see that?

9        A      Yeah.

10       Q      Okay.  What does that sentence mean to

11  you?  What do you understand that sentence to

12  mean?

13       A      That you are representing them in some

14  way or the other.  Doing paperwork for them.

15       Q      Does it say the name of any person or

16  company in that sentence?

17       A      No.

18       Q      Okay.  Let's read it again so maybe --

19  I want to make sure you understand.

20       A      "Upon information and belief, Mester

21  prepared or caused to be prepared both paperwork

22  related to Purchase and Sale Agreement and

23  Transfer Ownership Agreement."

24       Q      Let's stop at that first sentence.

25  The sentence indicates that I prepared or caused

1              E. Stephens
2  to be prepared paperwork; correct?
3       A     Right.
4       Q     And the paperwork described there is a
5  Purchase and Sale Agreement; right?
6       A     Uh-huh.
7       Q     And a Transfer Ownership Agreement;
8  right?
9       A     Right.
10      Q     So Purchase and Sale Agreement, what
11  property are we referring to there; do you know?
12      A     No, I don't know.
13      Q     Well, which property were you selling
14  to Mr. Woodburn?
15      A     Only 127-06 177th Street.
16      Q     Right.  So the Purchase and Sale
17  Agreement would refer to that property; correct?
18      A     Right.
19      Q     And the Transfer Ownership Agreement
20  is the -- I guess, some kind of paperwork where
21  the ownership is transferred from you to
22  Mr. Woodburn; correct?
23      A     Right.
24      Q     Do you understand that -- is that your
25  understanding of this sentence?

1                    E. Stephens

2        A      Yeah.

3        Q      Okay.  So the Purchase and Sale

4    Agreement, do you remember signing one?

5        A      No, I can't recall.

6                    (Exhibit J was marked.)

7    BY MR. MESTER:

8        Q      This is Exhibit J.  Take a look at it.

9    Look at every page and let me know if you

10   recognize or have ever seen that document before.

11       A      I can't recall seeing this before.

12       Q      You do?

13       A      No.

14       Q      You don't recall seeing that?

15       A      No.

16       Q      Is your name on the first page of the

17   document?

18       A      Yeah, Evis Stephens.

19       Q      Okay.

20       A      I don't recall seeing this.

21       Q      Right.  And what does it say after

22   your name?

23       A      Address.

24       Q      What address is it?

25       A      127-06 177th Street, Social Security

1                    E. Stephens

2      number.

3          Q      And then what does it say -- read it

4      going this way.  So what does that say?

5          A      "Hereinafter called seller."

6          Q      And then what's the next name after

7      the "and"?

8          A      127 Holdings -- -06 Holdings Inc.,

9      address 55 West 116th Street, No. 255, New York,

10     New York, 10026.  Social Security Number/Fed.

11     I.D. No."

12         Q      Keep reading to that part.

13         A      "herinafter called purchaser."

14         Q      Purchaser.

15         A      Yeah, purchaser.

16         Q      And what is the title of this

17     document?

18         A      Residential Contract of Sale.

19         Q      And does it have a date on it?

20         A      Where's the date?  Oh, July 11th,

21     2018.

22         Q      And I'd like you to now turn to the

23     last page.  Do you see names and signatures on

24     that last page?

25         A      Yes.

1              E. Stephens

2      Q     Does it have your name there with a

3  signature above it?

4      A     Yes.

5      Q     And does it have a signature and a

6  name on the other side of the document?

7      A     Yes.

8      Q     And whose signature and name is that?

9      A     It's Lez A. Woodburn.

10      Q     Woodburn?

11      A     Yeah.

12      Q     And does that appear to be your

13  signature?

14      A     Yes, over there.

15      Q     And, again, turn to the first page.

16            Oand what was the date on that

17  document?

18      A     2018, July.

19      Q     July of 2018?

20      A     Uh-huh.

21      Q     And when did you and I first meet; do

22  you remember?

23      A     I can't recall.

24      Q     Do you need to refer to the

25  retainer -- the agreement?

                         E. Stephens

1

2      A      It has to be this, 2018.

3      Q      You and I first met at my office;

4  right?

5      A      Yeah.

6      Q      We never spoke before that; correct?

7      A      No.

8      Q      Okay.  So you can refer to Exhibit G.

9             MS. JOSEPH:   F.  I.

10             MR. MESTER:  I?  I'll get it

11      later.

12  BY MR. MESTER:

13      Q      Right?  That was the document you

14  signed in my office; correct?

15      A      This one here, I?

16      Q      Yeah.  Take a look at.  It's on my

17  letterhead; correct?

18      A      "Thank you for meeting with me in

19  relation to retaining, Charles Mester."

20      Q      This is when you hired me; right,

21  originally?

22      A      For what?

23      Q      For the litigation against the

24  three -- with the two properties and for the

25  short sale.

E. Stephens

1

2    A    Right.

3    Q    What's the date on that document?

4    A    September 21, 2018.

5    Q    So September of 2018 is a few months

6    after July; correct?

7    A    Yes.

8    Q    So did I actually give you that -- the

9    Contract of Sale; do you remember?

10   A    No, I can't remember that.

11   Q    But you hadn't met me yet; right?

12   A    I don't think so.

13   Q    Thank you.

14        I want you to look at the last page of

15   the Contract of Sale.  And there's a section

16   there.  This page; correct.  There's a section in

17   the Contract of Sale that lists attorneys for

18   both the seller and the attorneys for both the

19   purchaser; correct?  Do you see that?  Do you see

20   that part of the form -- of the contract?

21   A    Uh-huh.

22   Q    Is there any information printed there

23   that indicates that I'm the attorney for you on

24   that document?

25   A    Repeat what you just said.

1          E. Stephens

2      Q     That I am, Charles Mester is the

3  attorney for you.

4          Does my name appear there?

5      A     No.

6      Q     Okay.  Is there any attorney's name

7  there?

8      A     No.

9      Q     All right.  Paragraph 30 also mentions

10  that I prepared what's called a Transfer

11  Ownership Agreement.

12               MS. JOSEPH:  Exhibit A?

13               MR. MESTER:  Exhibit A.  I'm

14      sorry.

15  BY MR. MESTER:

16      Q     Paragraph 30 of Exhibit A.

17          In addition to the Purchase and Sale

18  Agreement, it alleges that I prepared a Transfer

19  Ownership Agreement.

20          Do you see that?

21      A     Yes.

22      Q     Do you know what that is?

23               MS. JOSEPH:  You said 30; right?

24               MR. MESTER:  30.

25               MS. JOSEPH:  The first sentence;

1                    E. Stephens

2      right?

3                    MR. MESTER:  First sentence.

4  BY MR. MESTER:

5      Q      Do you know what a Transfer Ownership

6  Agreement is?

7      A      It's just transferring something to

8  another person.

9      Q      Okay.  Are you talking about -- I

10 think we talked about this earlier.  What's that

11 document called that transfers ownership of real

12 estate from one person to another?  What's the

13 name of that document?

14     A      It's selling it to another person.

15     Q      Yeah.  What's the name of that

16 document that transfers?

17     A      I can't recall.

18     Q      Are you possibly referring to the

19 deed -- to a deed?

20     A      Transferring?

21     Q      Transferring property from one person

22 to another on, what's called a deed?

23     A      Right.

24     Q      Okay.  I'd like you to read the second

25 sentence --

1                    E. Stephens

2       A      One second.

3       Q      Please read the sentence that comes

4  after that on Paragraph 30.

5       A      Sentence after that?

6       Q      Yes.  Starts with the word "Mester."

7  Second sentence of Paragraph 30.

8       A      Okay.  "At no time" --

9       Q      No, no.  The second sentence of

10  Paragraph 30.

11                 MS. JOSEPH:  That's the "at no

12        time"?  The second line or the second

13        sentence?

14                 MR. MESTER:  The second sentence.

15                 MS. JOSEPH:  Paragraph 30, it

16        says, "At no time..."

17  BY MR. MESTER:

18       Q      Let me see that.  I'm sorry.  My copy

19  is a little different.

20       A      "Mester misrepresented the term of

21  both documents of Ms. Stephens and urged her to

22  sign them, while never advising her to have them

23  review by independent counsel, knowing that she

24  was under stress as she did not want to lose her

25  house."

1                    E. Stephens

2        Q      What does that --

3        A      At no time -- you didn't advise me to

4    do nothing.  At no time.

5        Q      Is that what that sentence means to

6    you?  Is that how you understand that sentence,

7    that I misrepresented the term of the Contract of

8    Sale, which we haven't established that I even

9    prepared, or the deed to Mr. Woodburn?

10       A      Right.

11       Q      Do you remember me pointing to the

12   deed and telling you -- explaining that it was

13   something other than a transfer of the property

14   to Mr. Woodburn?

15       A      No, you didn't tell me anything.

16       Q      Okay.  But I did put the paper in

17   front of you for signature; correct?

18       A      Yeah.

19       Q      And I showed you where to sign; right?

20       A      Yes, that's right.

21       Q      Okay.  The next sentence, I'll read

22   it; okay?  Paragraph 30 of Exhibit A, "At no time

23   did Mester, Maxine or Woodburn inform

24   Ms. Stephens that, on information and belief,

25   they had a beneficial interest in

1           E. Stephens

2  127-06 Holdings, Inc."

3           Do you see where it says that?

4           Paragraph 30.  Do you see it?

5     A     "At no time did Mester, Maxine or

6  Woodburn inform Ms. Stephens that, on information

7  and belief, they had a beneficial interest in

8  127-06 Holdings, Inc."

9     Q     Do you see that?

10    A     Yeah, but it wasn't Holdings, Inc. all

11 the time.

12    Q     My question to you is, do you have

13 any -- what proof do you have that Mester,

14 meaning me, had a beneficial interest in

15 127-06 Holdings Inc.?

16    A     I never had any proof about that.  I

17 never talked about it.

18    Q     Okay.

19    A     I had nothing to talk about about

20 Mester.  You were just his attorney.  I didn't

21 have no proof of nothing.

22    Q     Okay.

23    A     You was just the attorney.

24    Q     Okay.  That's fine.

25           Next paragraph.  Do you see

1                    E. Stephens

2  Paragraph 31 of Exhibit A?

3       A      Thirty-one?

4       Q      Thirty-one, correct.

5       A      This one here?

6              MS. JOSEPH:  "Within a day"?

7  BY MR. MESTER:

8       Q      Yes, "Within a day."

9       A      "Within a day or two of the said

10 closing, Maxine introduced that Ms. Stephens to

11 make a payment of 2,500 per month as a mortgage

12 payment while the property is in the third-party

13 name."

14      Q      Just read that.

15      A      Okay.

16      Q      What does that sentence mean to you?

17      A      That they want me to pay them 2,500

18 every single month.

19      Q      While the property is in a

20 third-party's name.

21      A      Right.

22      Q      Whose name is that?  Who is the third

23 party?

24      A      That is Maxine and Antonio.

25      Q      The name of Mr. Woodburn; right?

1                    E. Stephens

2        A     Yes.

3        Q     Or his company; right?

4        A     At that time, they had no company

5   name, holding company.  They had no holding

6   company.  They just was Lez Woodburn.  They make

7   their own company afterwards.

8        Q     Really?

9        A     There was not a company.

10       Q     Who told you -- how do you know that?

11       A     I know that because that's what it

12  was.  Afterwards, they went and they registered

13  and make a company.  They know that.  They know

14  that.

15       Q     Well --

16       A     But they didn't tell me anything about

17  it.

18       Q     Take a look at what we previously

19  marked as Exhibit J.

20             Remember the Contract of Sale?

21       A     Yeah.

22       Q     What was the date on that?

23       A     2018.  July 2018.

24       Q     July of 2018?

25       A     Yes.

1          E. Stephens

2     Q     That was before the closing?

3     A     After the closing; right?  That's

4  before the closing?

5     Q     Well, do you remember when the closing

6  was?

7     A     Yeah, but I didn't see that there.

8  That wasn't there.  I did not see anything there

9  with holdings there.  I didn't even know it had a

10  holdings.  I thought it was only Lez that was

11  signing, too.

12     Q     Take a look at the purchaser.  You

13  read it earlier.

14          Do you see that?

15     A     I see it.

16     Q     Does that company -- according to

17  these documents, did that company exist in July

18  of 2018?

19     A     No, it wasn't.  I might sign it,

20  because you tell me to sign, as everybody else.

21  My attorneys and then tell me to sign, I sign.

22  But I didn't think about this holding company.

23  It's after this thing came in.

24     Q     Okay.

25     A     There was no holding, no company, no

1                    E. Stephens

2    name.  I was signing to Lez Woodburn.

3        Q      Other than the name of the company --

4    let's move on from that.

5              You just read Paragraph 31, the first

6    sentence; correct?

7        A      Yes.

8        Q      And you understood that to mean that

9    you're supposed to make a payment of $2,500.00

10   per month?

11       A      Yes.  Yes.

12       Q      Did you make any of those payments?

13       A      I did.

14       Q      For how long?

15       A      For a long while until -- can I say?

16   I was making the payment religiously.

17       Q      Who were you paying?

18       A      Maxine.  I have all the receipts at

19   home.

20                   MS. BONAPARTE:  So do I.

21                   THE WITNESS:  I have all the

22         receipts at home.  I made 2,500 to Maxine.

23         And then they wanted more money.  I said I

24         can't pay more.

25

1                         E. Stephens
2    BY MR. MESTER:
3         Q      Let's just -- okay.  We understand.
4                So you were paying Maxine?
5         A      Yes.
6         Q      You were not paying a mortgage company
7    or a bank; correct?
8         A      No, because she wanted the money to
9    pay -- I couldn't go on and pay because it's all
10   in his name.
11        Q      What was in his name?
12        A      The house was in his name.
13        Q      The house was in his name?
14        A      Yes.
15        Q      So does that mean the mortgage was now
16   in his name?
17        A      Yes.  So I had to pay them for them to
18   pay the mortgage.  Until they're ready to sign it
19   over to me.
20        Q      Right.  Because there was no more
21   mortgage in your name; correct?
22        A      For my name, right.
23        Q      Okay.  Are you aware that the mortgage
24   that was in your name was paid off at the
25   closing?

1               E. Stephens
2       A       No, I wasn't.  I know nothing.  How
3   would I know?
4       Q       I'm just asking, yes or no.
5       A       No, I wasn't aware.  I don't know what
6   went on.
7       Q       But you never received any more
8   statements after the closing from your mortgage
9   company; did you?
10      A       No, I did not.
11      Q       After the closing, there was a lot of
12  interaction between you and Maxine and
13  Mr. Woodburn; correct?
14      A       Yes.
15      Q       You were living in the property;
16  right?
17      A       Yes.
18      Q       Eventually, they started doing
19  renovations to the property?
20      A       Yes.  She went and do some
21  renovations.
22      Q       Eventually -- and they were asking you
23  for money to help pay for Mr. Woodburn's
24  mortgage; correct?
25      A       It don't go like that.  Ms. Maxine,

1                  E. Stephens

2 wherever she was with the bank, she asked me how

3 much I can pay. She called me from wherever she

4 was. I said, Ms. Maxine, I can only pay for the

5 mortgage, 2,500. I can't pay any more. So she

6 did that. And I said -- Mr. Woodburn and Maxine,

7 I don't know what they did, and we're paying the

8 money all the time. She's like, oh, you can't

9 pay no money anymore --

10       Q      Okay. At any -- during this period

11 that this was happening, did you receive any

12 communication from me?

13       A      One communication I had when I called

14 you.

15       Q      You called me. Did I ever call you?

16       A      No, you never called me.

17       Q      After the closing?

18       A      No.

19       Q      You called me. You told me --

20       A      I'm complaining about them, yes.

21       Q      You already told me that you called me

22 that one time.

23       A      Yeah.

24       Q      Okay. Did you receive paperwork from

25 Mr. Woodburn or Maxine relating to an Occupancy

1                    E. Stephens
2    Agreement eventually?  Eventually, did you
3    receive it?
4         A      Eventually, but --
5         Q      Was my name on that paperwork at all?
6         A      No.
7         Q      As far as you know, was I involved at
8    all with helping Maxine or Mr. Woodburn manage
9    the property after the closing?
10        A      Not that I recall.
11        Q      After the closing, did you file any
12   papers at all with the district attorney or the
13   police or any Court, okay, between -- after the
14   closing and this lawsuit, that is in the
15   Bankruptcy Court now, okay, stating that you were
16   fraudulently misled into selling your property?
17        A      Yes, I did.
18        Q      You did?
19        A      Yeah.
20        Q      What case was that?
21        A      The case with Mr. Karam.  I went and
22   complained to him.
23        Q      Is that the bankruptcy case?
24               MR. SMITH:  That's Mr. Dahiya.
25

1                    E. Stephens
2   BY MR. MESTER:
3        Q    Is there any other case that you
4   started or put in any kind of a complaint
5   regarding a misrepresentation into selling your
6   property?
7        A    No, I did not.
8        Q    No?  Okay.
9        A    Mr. Karam had everything.  I handed
10  him everything.
11       Q    Okay.  Did you in fact -- didn't you
12  in fact file a case in the Housing Part Court
13  against Maxine and Mr. Woodburn, November of
14  2020?
15       A    I can't recall.
16       Q    In the Landlord-Tenant Court?  Didn't
17  you start a case against them?
18       A    Anything I did was with Mr. Karam.  He
19  was my only I have.  So he did everything, what
20  he have to do.  Yeah, we was in court.  Could be,
21  but I don't know.  He was handling everything.
22       Q    I'm going to show you what was marked
23  Exhibit I to the Complaint.  That's already been
24  marked as Exhibit A in this deposition.  But this
25  is Exhibit I to that document.

1         E. Stephens

2     A      Okay.

3           (Exhibit K was marked.)

4 BY MR. MESTER:

5     Q      I'd like you to look at what's been

6 marked Exhibit K.  Some of it's hard to read, but

7 I want to see if you recognize that document.

8 This was produced by your attorney as part of

9 this lawsuit.

10    A      I think this is harassment and

11 everything, yes.

12    Q      Do you remember these papers?

13    A      Yes.

14    Q      Do you remember going signing these

15 papers for the Landlord-Tenant Court?  It has

16 your name as the tenant, petitioner, and it's

17 against Lezantonio Woodburn and Maxine Bonaparte.

18    A      Maxine keeps sending all these

19 documents from the Court to us, to move.  To move

20 from the house.

21    Q      Right.  Did you then go to

22 Landlord-Tenant Court to prevent her from doing

23 that?

24    A      Yeah, but I give it to my attorney, so

25 he handled it.  He handled it from wherever he

1          E. Stephens

2  was.  He handled all these things.

3          Q     It's very hard to read.

4          A     I have not been to court.  He handled

5  everything for me when COVID was in.  So we did

6  it in his office.

7          Q     Who is Calvin Stephens?

8          A     That's my husband.

9          Q     That's your husband?

10          A     Yeah.  We didn't go to no court.  When

11  we had to do anything, we do it, like, online in

12  the house.  We didn't go into the court.

13          Q     I'm going to show you the last page of

14  this document, where it says -- this is

15  Exhibit K.  It's Page 4.

16          A     Right.

17          Q     And it has signature of

18  tenant/petitioner.

19          A     Right.

20          Q     Do you recognize the signature?

21          A     Yes.

22          Q     Whose signature is that?

23          A     That's my daughter.

24          Q     That's your daughter's signature?

25          A     Yeah, Jelann(sic.).  All of us was

1                      E. Stephens

2    there in the house.

3          Q      She was living in the house?

4          A      Yeah.

5          Q      Did you authorize her to file this

6    case?

7          A      Who?

8          Q      Did you authorize her or ask her to go

9    file this case against Maxine and Mr. Woodburn?

10         A      We're in the house.  Harassing

11   everybody.  And we were living there.  So

12   everybody upstairs, downstairs, first and second

13   floor.

14         Q      So you went to court to try to stop

15   that; right?

16         A      Virtual court with my attorney.

17   Because, as I said, COVID was in.  So we did it

18   online with the judge talking.

19         Q      So you do remember doing this?

20         A      Yeah.

21         Q      Okay.

22         A      I can't recall, but I think so, yeah.

23         Q      Okay.  Did you write the information

24   that's on page -- whose handwriting is on Page 4

25   at the top here, if you know?

1                    E. Stephens

2        A      I cannot recall this handwriting.

3        Q      Do you remember who wrote this out?

4        A      No.  I don't understand anything that

5   is here.

6        Q      I know it's hard to read.  But that's

7   the copy we were given.

8        A      That's why this paper is messed up.

9   But there was harassment on the whole property

10  with these people.

11       Q      Let's establish the purpose for these

12  papers.  You were getting harassed; right?  And

13  you went to court to stop that; right?  Yes?

14       A      Yes.  Online.

15       Q      Right.  It was during COVID.  I get

16  it.

17              But there are papers that were filed

18  with the Court in order for you to get to see a

19  judge; right?

20       A      Yes.

21       Q      Okay.  Mr. Dahiya sent these papers.

22  These are the papers that were done; okay?

23       A      All right.

24       Q      Okay.  Can you read the statement that

25  is written -- the handwritten statement on the

1          E. Stephens
2    same page as your signature?  I know it's hard,
3    but can you read that?
4          A     No.  I don't know what it says here.
5    It was said that our cars would be towed away by
6    her.  Yes, it's harassment.  I think this is what
7    this is all about.  I see the car here, will be
8    towed off the property, yes.
9          Q     So this has to do with some of the
10   harassment; right?
11         A     Yes.  A lot of that.
12         Q     Other than this case about the cars
13   and the harassment, do you recall filing any
14   other cases in court regarding your -- regarding
15   this property after the closing?
16         A     Yeah.
17         Q     What other cases did you file?
18         A     Well, harassment in the house.  And
19   sometimes she will open the door in my house.
20   That's somebody's harassment.
21         Q     So my question to you is, in addition
22   to the harassment complaints that you filed, did
23   you file any complaints indicating that you were
24   a victim of people that came in to steal your
25   house?

1          E. Stephens

2     A     If I file it?

3     Q     Did you file any cases about that?

4     A     I couldn't go and file something like

5  that, harassment, people come to steal the house.

6  Because I bought the house from them and I paid

7  them the mortgage, as they said.  They asked for

8  it.  We keep paying them.  Then she keeps coming

9  into the house with a key, opening it up and

10 down.  Harassing everybody in the house.

11    Q     That's the harassment part?

12    A     Yes.

13    Q     Is there anything in that document

14 that says that you were -- that you own the

15 property?

16    A     No, I never put that.

17    Q     You didn't put that there; right?

18    A     No, I didn't put that there.

19    Q     Mr. Woodburn owned the property at the

20 time; right?

21    A     Yeah.  He comes, too.  He comes in the

22 house.  They come in and out.  They're in and out

23 of the house while we're living in there.  In and

24 out.  Both of them, in and out.

25    Q     Right.

1                    E. Stephens

2        A        He did some renovations, yes, that's

3   true.  The keys was there.  My husband was sick.

4   She reached in the bedroom.  She brings somebody

5   to buy the house while my -- my husband was in

6   the bed.  The lady said, why are you bringing me

7   to buy this house and this person is sleeping

8   here?  Until eventually my husband said, what is

9   this?  And we changed the door.  Mr. Karam get a

10  stay for nobody to come back in that house.  The

11  police have to come and all.  But she wanted to

12  move the car and the police said, show me your

13  address that you're living.  She didn't have no

14  address to show, so he told her to move from

15  here.

16       Q        Ms. Stephens, you're claiming you're

17  being harassed.  But you didn't claim in there

18  that you own the property; did you?

19       A        I am on the property.  I'm living on

20  the property.

21       Q        Not that you're living there.  That

22  you owned it.

23       A        Yes, because they promised to give me

24  back.  So I want it.

25       Q        But you didn't own it at that time;

1                    E. Stephens
2    did you?
3         A    Well, not yet.  It didn't turn back
4    over to me yet.
5         Q    Not at that time, that's what I'm
6    asking.
7         A    Yes.  Yes.
8         Q    That's what I'm asking.
9         A    Yeah, because it was promised.
10   Otherwise, I wasn't -- she didn't promise me, I
11   would have continued with the bank and going
12   through whatever I had to go through.
13                    MR. MESTER:  Okay.  I have nothing
14        further.
15                    THE WITNESS:  Thank you.  Thank
16        you very much.
17                    (Whereupon there was a brief
18        recess from 3:33 p.m. until 3:47 p.m.)
19                    EXAMINATION
20   BY MR. MULVANEY:
21        Q    Good afternoon, Ms. Stephens.
22        A    Good afternoon.
23        Q    I am Ryan Mulvaney, and I represent
24   two parties that you have sued in this case.  The
25   first is Planet Management Group, and the second

```
 1                    E. Stephens
 2   is Planet Home Lending, doing business as Planet
 3   Servicing.
 4        A    Okay.
 5        Q    Typically, in this case, when I refer
 6   to both of them, I refer to them as the Planet
 7   defendants.  And obviously when I speak about one
 8   or the other individually, I'll say Planet
 9   Management or Planet Servicing.
10             Do you understand that?
11        A    Planet Management or Planet Servicing.
12        Q    Yes.
13        A    It's like one --
14        Q    Two different companies?
15        A    Two different companies.
16        Q    When I refer to them in the plural
17   together, I refer to them as the Planet
18   defendants.  So if I ask you a question about the
19   Planet defendants, I mean both of them.
20             Can we agree on that designation,
21   Planet defendants means both of them?
22        A    Both of them.
23        Q    Have you ever heard of either one of
24   those entities before?
25        A    Planet defendant?
```

1              E. Stephens

2      Q     Yes.

3      A     No, I never recall.  I can't recall

4  Planet defendant.  I think I see a letter come to

5  my house.  I think so.  Planet defendant.  I

6  think so.

7      Q     You think you saw a letter come to

8  your house?

9      A     Planet, yeah.

10     Q     Was it on Planet letterhead?

11     A     Yeah, I think so.

12     Q     Was it addressed to you?

13     A     No.  It was addressed to them, Planet,

14  yes.

15     Q     But other than that, you don't have

16  any idea who the Planet defendants are?

17     A     No, I don't know.

18     Q     Okay.  You currently reside at

19  127-06 177th Street; correct?

20     A     Yes.

21     Q     And you have lived there since you

22  purchased the home back in 2006; is that correct?

23     A     Yes.

24     Q     Never moved out; correct?

25     A     Never moved.

1                   E. Stephens

2       Q      We spoke a little bit about a

3    foreclosure case earlier.

4              You were never removed at any point in

5    time from that home as a result of the

6    foreclosure; correct?

7       A      That's right.

8       Q      What did you do to prepare for today's

9    deposition?

10      A      Well, I didn't know it was going to

11   happen today.

12      Q      So no one told you that today was a

13   deposition day that was agreed upon by the

14   parties?

15      A      No.  She had told me that we will have

16   one, but I didn't know it was today.

17      Q      How did you know to show up today

18   here, then?

19      A      Five o'clock this morning, I get up.

20   I normally don't go through my emails.  I'm going

21   through my emails and I see M's. Joseph text

22   around 12 o'clock at night.  I'm like, I was

23   sleeping at 12 o'clock.  So 5 o'clock, I check my

24   emails and I see that you have to come to court

25   today.  So I'm like, I have to come to court

1                    E. Stephens
2  today.  I didn't plan to bring nothing.  I called
3  her.  I said, I can't come today.
4        Q      Well, I don't want you to disclose to
5  me what you said to your attorney.
6        A      Right.
7        Q      But just so I understand, the first
8  that you became aware of the deposition today --
9        A      Yes, 5 o'clock this morning.
10       Q      -- was approximately 5 o'clock this
11 morning?
12       A      Yeah, this morning.
13       Q      You realize that you have sued my
14 clients, the Planet defendants, in this case;
15 right?
16       A      Uh-huh.
17       Q      Okay.  Can you tell me why?
18       A      Because they fraudulently
19 misrepresented me by coming and telling me what
20 they will do for me.  And they did not fulfill
21 what they were going to do for me.  That is what
22 happened.  And the harassment around the
23 neighborhood.  Threatening to -- and opening the
24 house, and all these different things.
25       Q      Just so I understand, you said that

1                      E. Stephens
2    the Planet defendants fraudulently misrepresented
3    what they were going to do for you?
4         A      Yes.
5         Q      Okay.  And they harassed you?
6         A      Yes.
7         Q      What claims have you asserted against
8    my clients in this case?
9         A      What claim I claim from them?
10        Q      No, what claims -- what causes of
11   action have you asserted against my clients in
12   this case?
13               You filed a revised Second Amended
14   Complaint that we identified as Exhibit A.  And
15   it spans 60 pages and 232 paragraphs.
16               What causes of action have you
17   asserted against my clients?
18        A      I don't know why she comes to my house
19   and tells me all these things.  Harassment.  And
20   apparently, like, she must have went -- the bank
21   is writing.  I saw a letter from the bank stating
22   how much money they took out from the house.
23   Equity they took from the house.  And I know
24   nothing about these things.  I didn't know
25   anything about it.  I know nothing about -- she

1                    E. Stephens
2    didn't fulfill, you know, things that she will do
3    for us.  For us in the home, myself and my
4    husband.  That is what it is.  So we have to sue
5    her now because we didn't -- like I said to her,
6    I said to everybody, if I wanted to sell the
7    house, I could sell it to anybody.  Maybe I'll
8    get something in my hand.  But handing somebody
9    money -- you don't hand somebody money to do a
10   short sale for you.  So that's been harassment.
11   I owe my son-in-law right now.
12        Q    I asked what you asserted against my
13   clients.  Not what you asserted against someone
14   else.
15        A    Who's your client?
16        Q    Can you please tell me what you have
17   asserted --
18        A    Who's your client?
19        Q    -- against my clients, the Planet
20   defendants?  What causes of action?
21        A    I don't know anything about them.  I
22   don't have anything.
23        Q    Okay.
24        A    I don't have anything about nobody.
25        Q    Are you aware that many of your causes

1           E. Stephens

2    of action that you asserted originally in this

3    complaint have been dismissed against my clients?

4         A      No, I'm not aware.

5         Q      I'm going to show you a document that

6    I guess we can mark as L.

7                (Exhibit L was marked.)

8    BY MR. MULVANEY:

9         Q      I want you to take a look at that

10   document.  Let me know when you're done reviewing

11   it, and then I'm going to ask you a few questions

12   about it; okay?

13        A      This is an adjustable rate note.

14        Q      Have you had an opportunity to review

15   that?

16        A      Uh-huh.  Never did.

17        Q      No.  I mean right now.

18        A      Yeah.

19        Q      Okay.

20        A      I saw it, but I still can't

21   understand.

22        Q      Well, wait 'til I ask you a few

23   questions.

24                Just so I can recall earlier today, on

25   or about August 29, 2006, you purchased the

```
1                    E. Stephens
2  property located at 127-06 177th Street; is that
3  correct?
4       A     Yeah.
5       Q     And to do that, you took out a
6  mortgage with NovaStar Mortgage; correct?
7       A     Yes.
8       Q     I'll also state for the record that
9  this document was produced on your behalf by
10 Mr. Dahiya in this case.
11      A     Okay.
12      Q     It's Bates stamped Stephens 13 through
13 20.
14            Can you please turn to the bottom of
15 the page where it's Bates stamped Stephens 17.
16            Are you there?
17      A     Yes.
18      Q     Okay.  You see the handwriting on the
19 left side of the page?
20      A     Right.
21      Q     And under the handwriting, it appears,
22 in typewritten form, Evis Stephens.
23            Do you see that?
24      A     Yes.
25      Q     And that's your name; correct?
```

1                    E. Stephens

2       A      That's my name.

3       Q      And is that also your signature?

4       A      Yes, it is.

5       Q      Do you recall signing this document?

6       A      Yes.

7       Q      That was a yes?

8       A      Yes.  Yes.

9       Q      If you turn back to Page 1 -- and I

10   know this is a little bit difficult to see,

11   because, admittedly, I had some problems seeing

12   it, I had to take off my glasses and bring it a

13   little closer.

14      A      I need a new one.

15      Q      But on the top right, it says, "Loan

16   number."

17             Do you see that?

18      A      Yes, loan number.

19      Q      Can you make out what the loan number

20   is?

21             MS. JOSEPH:  You mean the

22         handwritten number or the crossed-out

23         number?

24             MR. MULVANEY:  No.  The

25         crossed-out number at the bottom.

1           E. Stephens

2               MS. JOSEPH:  Okay.

3               THE WITNESS:  The handwriting?

4               MS. JOSEPH:  No.  He's saying the

5       crossed-out number.

6   BY MR. MULVANEY:

7       Q     Can you make that out?

8       A     No.

9       Q     If you can't, I'll help you.  Because

10  I was able to decipher it.

11      A     No, I cannot.

12      Q     Okay.  I'll state for the record that

13  the loan number that's identified on the top

14  right of the adjustable rate note is 06-B54042.

15           This is a note, Ms. Stephens, that was

16  issued on August 29, 2006, with respect to the

17  purchase of the home located at 127-06 177th

18  Street; correct?

19      A     Yes.

20      Q     And in Paragraph 1 -- you see

21  Paragraph 1, where it says, "Borrower promised to

22  pay"?

23      A     Right.

24      Q     It says that in exchange for the loan

25  that you received from NovaStar Mortgage, you

1                    E. Stephens

2  promise to pay 630,000 plus interest to NovaStar

3  Mortgage.

4            Have I read that correctly?

5       A    Yes.

6       Q    Paragraph 3, under the paragraph that

7  is designated payments; do you see that?

8       A    Yes.

9       Q    Also here on Page 1, it states that

10 the payments were to begin on August 1st, 2006.

11           Do you see that?

12      A    Yes.

13      Q    And your monthly mortgage payment was

14 $5,645.44; is that correct?

15      A    Yes.

16      Q    Turning back to Exhibit G, that we

17 went over earlier, Ms. Stephens -- you can put

18 that one down.  I'm done with that.

19           MR. MULVANEY:  And if we can, pull

20      up Exhibit G, which was --

21           MS. JOSEPH:  I think those are

22      back over there.

23 BY MR. MULVANEY:

24      Q    That's Exhibit G.  You were asked

25 about this document earlier today, Ms. Stephens,

1          E. Stephens

2    so I'll be fairly brief on this particular

3    document.

4          A     Okay.

5          Q     I will also note that the version of

6    the document that I am looking at was produced by

7    Mr. Dahiya in this case, and it is identified as

8    Stephens 21, and it goes through Stephens 38.

9    And again, this was produced by Mr. Dahiya on

10   your behalf in this case.

11              Now, you already testified this

12   morning that you recognize your signature on this

13   document, so I won't have to go into that, but

14   what I'd like to do is ask you one quick question

15   about this document.  Well, two.  First is, if

16   you turn to the second page, do you see the loan

17   number?

18        A     Yes.

19        Q     And is that the loan number that I

20   just represented to you was the loan number

21   identified by the note?

22        A     I think so.  I think so.

23        Q     Is that a yes?

24        A     Yes.

25        Q     And you read that document before you

1                     E. Stephens
2    signed it?
3         A      From Mr. Dahiya?
4         Q      Yeah.
5         A      Yeah.
6                MS. JOSEPH:  No.  That's -- if you
7         could just reask the question, because I
8         don't think she understood what you meant.
9         He asked if it's from Mr. Dahiya, if she
10        read that.
11               THE WITNESS:  Is it from him?
12   BY MR. MULVANEY:
13        Q      That's the mortgage that you testified
14   about this morning.  You read that before you
15   signed it; correct?
16        A      Right.
17        Q      You read that -- you testified this
18   morning that you recognized your signature on it.
19               Did you read that document before you
20   signed it?
21        A      Did I read it before I signed it?  I
22   can't recall.
23        Q      Okay.  We talked a little bit this
24   morning -- and I'm trying to be quick because I'm
25   appreciative of your time.

1          E. Stephens

2          We talked a little bit this morning

3     about a loan modification; do you remember that?

4     A     Yeah.

5     Q     Okay.  You were asked a few questions

6     about this document earlier, Ms. Stephens.  I

7     will also represent to you that the copy that I

8     have here was produced on your behalf by

9     Mr. Dahiya in this case, and the Bates numbers

10    are Stephens 59 through Stephens 62.

11          This is a -- well, it's titled, midway

12    down the page, Proposed Modification Agreement;

13    do you see that, in bold capital letters?

14    A     Yes.  Yes.

15    Q     And top left, it's dated September 29,

16    2010; that's correct?

17    A     Yes.

18    Q     And this is addressed to you at

19    127-06 177th Street; right?

20    A     Yes.

21    Q     And while we can't see the loan number

22    because this one is a little bit too redacted,

23    you can see that under your name and address, it

24    identifies the property address of 127-06 177th

25    Street; correct?