**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------X    21-42857-206
In re:

Evis Neverlane Stephens,

                Debtor.    Chapter 13

-------------------------------------------------X

Evis Neverlane Stephens,

                Plaintiff,    Adversary Proceeding No. 22-01037

v.

Maxine Bonaparte,
Lezantonio Woodburn,
12706 Holdings Inc.,
Charles L Mester, Esq.,
Planet Management Group, LLC,
Planet Home Lending LLC dba Planet Home Servicing,
Wilmington Savings Fund Society, FSB (WSF),
Verus Securitization Trust 2020-NPL1,

                Defendants.

-------------------------------------------------X

## REVISED SECOND AMENDED COMPLAINT[1]

### Brief Introduction

    Ms. Evis Neverlane Stephens is a tragic victim of a foreclosure rescue scam, engineered

by the defendants. Often, these homeowners facing foreclosure are desperate enough to try any

---

[1] This Second Amended Complaint has been amended with the names removed of those defendants from particular counts and claims that the Court had dismissed against such defendants. The Second Amended Complaint is not asserting claims which are dismissed by the Hon. Judge in her orders entered in this adversary proceeding. The complaint is amended pursuant to the judicial allowance granted to the plaintiff by the Court in its orders. The amendment is confined to the claims as permitted by the Court. For the sake of clarity and brevity, no new facts have been added other than some amplification in the causes of action, especially Fifteenth Cause of Action split into three independent claims    A, B, and C. Sixteenth and Seventeenth causes have been similarly amplified factually, twentieth cause of action is reproduction of last cause of action in the former complaint, now labelled as "Twentieth Cause of Action." The paragraph numbering is also unchanged to the extent possible. The exhibits mentioned and numbered here are the same as in the former complaints. The former complaint is incorporated herein to the extent it does not conflict with the Second Amended Complaint.

offer that looks like it may save their home, even if it costs thousands of dollars or puts the homeowner's equity at risk. Foreclosure rescue scammers take advantage of homeowners' desperation through a variety of schemes. When homeowners have significant equity in their homes or when property values are appreciating, foreclosure rescue scams often focus on obtaining title to the home and robbing homeowners of their equity. When homeowners have little equity, scams center on squeezing upfront fees—often thousands of dollars—from borrowers. There are many different types of foreclosure rescue scam. Most foreclosure rescue scams fall into one of three categories: phantom help, obtaining title by fraud or deception, and obtaining title through a fake bailout. The homeowners believe they are obtaining refinancing or a new loan and do not realize they are surrendering ownership of the house. The homeowners may truly sign the papers transferring the home, but the transaction is confusing and the homeowners are misled about the nature of the papers they are signing. Or it could be a "bailout" in which the homeowner typically understands that they are signing a deed to transfer ownership of the home, but they are doing so in the belief that they will be able to regain ownership at a later time. Meanwhile, the homeowner becomes a tenant in their own home on terms that are often oppressive and unaffordable, ending with eviction. The rescuer may even renege on promises to pay off the mortgage, leaving the homeowner liable for loans on a house they no longer own. Sometimes the rescuer goes even further—selling the house to a third party or mortgaging it and pocketing the proceeds. Law enforcement authorities are aware of these horrible predatory practices.[2]

---

[2] https://ag.ny.gov/press-release/2020/attorney-general-james-launches-protect-our-homes-initiative-combat-deed-theft; https://www.nysenate.gov/newsroom/press-releases/velmanette-montgomery/governor-cuomo-signs-montgomery-weinstein-deed-theft

The Defendants here used a hybrid approach convinced Ms. Stephens that she has to transfer the title to their company and charged her $10,000 for rescuing her home with the promise that once the loan is modified with the help of their company they would revert the home back to Stephens. Ms. Stephens's expectation was that the transaction will help them retain possession and ownership of the home. During the transaction homeowners surrender title to their home with the expectation that they will be able to remain in the home as a renter until they are able to repurchase the property. However not everyone is lucky[3] to come out unscathed out of this heinous quagmire of scheme predators like the Defendants. Immediately after the transfer of the title the Defendants commenced eviction proceedings[4] against Ms. Stephens and her family members. The whole family has been put to severe torture, criminal threats and as well as eviction proceeding. Now upon further discovery, it has been found that defendants obtained a commercial loan with the active assistance of the complained defendants to pay off the earlier residential mortgage. This commercial loan has an interest rate that exceeds consumer loans usual interest rates, with a default rate of 24%. Now the said loan is also in default rapidly devouring any and all equity in the house.

---

[3] *In re Wells*, 2016 WL 5819798, at *1 n.2 (Bankr. S.D. Fla. Oct. 5, 2016) (after stating that consumer debtor was contacted by foreclosure rescue company, entered into sale-leaseback to save home from foreclosure and successfully exercised option to repurchase, court noted "The Court is very familiar with these foreclosure rescue schemes and is amazed that, at least in this instance, the homeowner was able to successfully recover ownership of the home.").

[4] *See, e.g., In re Lima*, 2012 WL 3070569 (Bankr. D.R.I. July 30, 2012); *In re Davis*, 169 B.R. 285 (E.D.N.Y. 1994).

> In *In re Davis* the lease agreement required monthly rent payments that were clearly unaffordable and required an entire year's rent upon default. Within one month after the sale-leaseback transaction closed and two weeks after the first rental payment was due, the purchaser had perfected a judgment against the former homeowners for a full year's rent and cost and obtained a warrant of eviction for nonpayment of rent.

Defendants acted, colluded as a team to achieve this unlawful deprivation of Debtor's home and defendants unlawful monetary gains.

## SUBJECT REAL PROPERTY

1.      The real property (Home) which is the subject of this action is a single two family house located at 127-06 177th Street, Jamaica NY 11434, more particularly described as:

> LOT 0093; BLOCK 12527 AS PER MAP RECORDED IN BOOK OF/IN THE OFFICE OF THE COUNTY RECORDER OF QUEENS COUNTY,

hereinafter refer to as "subject premises", or "plaintiff's home" or "Real Property" or "Home."

## JURISDICTION

2.      This Court has jurisdiction over the claims for relief under 18 U.S.C. §§ 1964(a) (Equity) and 1964(c) (Right to Sue and Treble Damages); 28 U.S.C. §§ 1334 (bankruptcy); 28 U.S.C. §§ 1331(federal question) and 28 U.S.C. § 1367 (supplemental jurisdiction over state claims).

## PERSONAL JURISDICTION AND VENUE

3.      Personal jurisdiction and venue are predicated upon 18 U.S.C. § 1965(a) and (b) and 28 U.S.C. § 1391(b) and (d) since the Defendants are residents of, have an agent or agents, or transact their affairs in the Eastern district of New York and the acts and occurrences in furtherance of the claims alleged herein arose in the Eastern District of New York, and because the ends of justice require that other parties residing in other districts be brought before the court.

## PARTIES

4.      Plaintiff Evis Neverlane Stephens ("Ms. Stephens"") is a resident of the County of Queens, city and state of New York.  She resides in the subject premises, with her family, which she purchased in or around 2006.

5.      Plaintiff is informed and believes and thereupon alleges that defendant and participant Maxine Bonaparte ("Maxine") is a resident of the city and state of New York. Plaintiff is informed

4

and believes that Maxine uses several aliases and she has some court records. **Ex. A.** She is also an agent and or an officer of the defendant 12706 Holdings Inc. along with the Lezantonio Woodburn.

6.   Plaintiff is informed and believes and thereupon alleges that defendant and participant Lezantonio Woodburn ("Woodburn") is a resident of the city and state of New York. Plaintiff is informed and believes that Woodburn also an agent and or an officer of the 12706 Holdings Inc. along with Maxine.

7.   Plaintiff is informed and believes and thereupon alleges that defendant 12706 Holdings Inc. (Holdings) was and is a corporation organized under the laws of the State of New York. Holdings' principal place of business is in New York

8.   Plaintiff is informed and believes and thereupon alleges that defendant and participant Charles L Mester (Mester) is a resident of the city and state of New York. Mester is an attorney engaged in the legal professional with an office located at 26 Court Street, Suite 1200, Brooklyn, New York.

9.   Defendant Planet Management Group, LLC (Planet Management) is a New York based company operating from 105 Maxes Road, Suite N 205, Melville, New York 11747, which funded and facilitated the transfer of the real property to the Holdings.

10.   Planet Home Lending LLC dba Planet Home Servicing (Planet Servicing) is a servicer of the loan funded by Planet Management.

11.   Wilmington Savings Fund Society, FSB (WSF) is a Delaware company operating from 500 Delaware Avenue, Wilmington, DE 19801, and upon information and belief is the trustee of the trustee Verus Securitization Trust 2020-NPL1 currently holding the loan note.

12.    Verus Securitization Trust 2020-NPL1 (Verus Trust) upon and belief is a Trust presently holding the Note and Mortgage regarding the home of the Debtor 127-06 177th Street, Jamaica NY 11434 (the "Real Property").

13.    Planet Management, WSF, Planet Servicing and Verus trustee have been collectively addressed as "Planet Enterprise" for pleading purposes, a reference to one includes reference to the other member of the "Planet Enterprise."

14.    Plaintiff is informed and believes and thereupon alleges that at all times herein mentioned:

   (a)    Holdings formed and used and continues to be used as a mere instrumentality and conduit through which Maxine and Woodburn for convenience, has conducted and continues to conduct their own business;

   (b)    Maxine and Woodburn governed and influenced and continues to govern and influence Holdings;

   (c)    There is such a unity of interest and ownership between Maxine, Woodburn and Holdings that the individuality and separateness of Holdings and Maxine and Woodburn did not and does not exist, and Holdings was and is the alter ego of Woodburn and Maxine and merely a conduit through which Woodburn and Maxine performed the acts herein alleged; and

   (d)    Adherence to the fiction of the separate existence of Holdings would sanction fraud and promote injustice.

### THE PATTERN OF UNLAWFUL RACKETEERING ACTIVITY

15.    During the relevant times, the Defendants and Participants conspired with one another to defraud Ms. Stephens and her family members. As part of the scheme to defraud, the Defendants used another participant an attorney Mester to foster an impression of an undertaking to save her house, however all these actors had setup the entire mechanism to defraud Ms. Stephens and her family to divert unlawfully the title of her Home to the benefit of themselves and others who had no lawful right to the title of Real Property. The multifarious racketeering activities through which these broad objectives of the Defendants and Participants were carried out consisted of a complex pattern of individual transactions and groups of transactions. It was a part of the scheme to defraud that Participant Defendants would and did agree and conspire together with the others to devise and participate in a plan of deceit and deception, whereby they would and did abuse their positions

6

of trust and fiduciary relationships with Ms. Stephens; they would and did abuse the discretion granted to them and breach their obligations of loyalty and fidelity and their duty to act honestly and faithfully in the best interests of Ms. Stephens and not for their own self interests; and they would and did use false and fraudulent pretenses, representations and promises calculated to deceive persons of ordinary prudence and due care and make material nondisclosures and concealment of fact and information important to Ms. Stephens in deciding whether to act in the conduct of Ms. Stephens loan modification, all so as to unlawfully, intentionally and willfully, and with intent to defraud, that is, knowingly and with specific intent to deceive in order to cause financial gain to themselves, procure secretly and divert the title of the Home and profits to themselves to the use and benefit of themselves and others and to the detriment of Ms. Stephens and her family members. Once the transfer of the title to the property was accomplished, the Defendants moved from a subversive to an open notorious conduct including criminally threatening the family members of the plaintiff to leave the house.

16.     That scheme to defraud evolved over time as a pattern of racketeering activities that inflicted discrete harms on Ms. Stephens and other family members These discrete transactions and harms are listed herein. Ms. Stepehens and her family, the victims of the unlawful patterns of racketeering activity suffered loss of their only Home.

17.     In carrying out the scheme to defraud Ms. Stephens of the title to her home, Defendants and Participants including Planet Enterprise engaged, *inter alia*, in conduct in violation of Federal laws, to wit: mail fraud in violation of 18 U.S.C. § 1341; wire fraud in violation of 18 U.S.C. § 1343; violations of the Currency and Foreign Transactions Reporting Act, 31 U.S.C. § 5313; interstate transportation of persons and of property obtained by fraud in violation of 18 U.S.C. § 2314; and Hobbs act extortion in violation of 18 U.S.C. §1951.

18.    In carrying out the scheme to defraud Ms. Stephens, Defendants and Participant also engaged, *inter alia*, in conduct in violation of the laws of the State of New York including to wit: Deed theft in violation of NY RPP § 265-a. Home equity theft prevention.

### Factual Background

19.    In and around 2006, Ms. Stephens was a home health aide doing live-in-jobs but working part time in different homes from 9am in the morning to 9 pm. She worked very hard, at times she would work all night and get off 9 am next day to go to another house. Sometimes she worked 24 hours living in cooking, washing, cleaning, doing laundry shopping, taking elderly people to their doctor's. Her salary was $1,000 a week. She got paid weekly. She saved around $10,000 and wanted to a buy a house.

**Mortgage broker Osmond Decoteau**

20.    While attending a church service, Ms. Stephens asked another parishioner if he knew any he knew any broker or a real estate agent. Ms. Stephens wanted to buy a home. After looking for some weeks she finally saw a home she liked. She went with the broker Osmond Decoteau (Osmond) to check it out. It was a two-family house priced at $650,000. The broker told her not to worry about the monthly payments as that would be affordable and he would help her get the house with zero percent down payment. Ms. Stephens attended the closing of the house, however her nightmare started when she started getting mortgage statements from banks regarding other properties that she never bought. Osmond used her credit and bought other properties in her name without her knowledge or understanding. Also, her mortgage payment on her home was not $2500 as she was told rather sum exceeding $5000 a month. Alarmed, Ms Stephens called Osmond several times, however he kept assuring her that he would call her back. Which he never did. Ms Stephens was stuck with the properties bought in her name and also with a high mortgage payment

8

on her house. Ms. Stephens was contacted by the FBI special agents regarding Osmond. Osmond was shortly thereafter indicted, however he used insanity as a plea to his wrong doings and was not convicted. The said three properties are located at 127-06 177 Street Jamaica, NY 11434 (Jamaica House) since 2006; 1487 East 53 Street, Brooklyn, New York (1487 Property); and 844 East 34th Street, Brooklyn, New York (844 Property). The Jamaica House is the prime residence of Ms. Stephens. And she is in possession of the same, but ownership has been stolen from her by the aforesaid Defendants.

21. The obligation of the mortgages on three properties burdened Ms. Stephens and her health started failing. She lost her good credit owing to damage caused by the broker Osmond

22. She struggled to pay mortgages on the subject property her home. In order to make mortgage payments, Ms. Stephens rented out the top floor for a sum of $2000 a month. However, the tenants fell behind in their payments. Ms. Stephens got into a loan modification with the bank with the payments now reducing to $2500. Owing to financial strain and failed health, Ms. Stephens once again fell behind in her payments and once again there was the foreclosure proceeding against her house.

**John Clark, Herkimer Realty One and Maxine Bonaparte**

23. Meanwhile Ms. Stephens other two properties payments were already in default and she sought help. Around in 2010, Ms. Stephens was referred to one John Clark (Clark)running an office under his company Herkimer Realty One (Herkimer). Clark claimed expertise in loan modifications. Clark introduced Ms. Stephens to Maxine Bonaparte (Maxine) in 2017/18. Maxine spoke to Ms. Stephens and told her that she would help her out from the mortgage issues and she offered to get the loan transactions transferred to Ms. Stephens's husband name if he had a good

credit history. She took $1500 from Stephens to check Ms. Stephens husband, Calivin Stephens' credit history.

24.    Maxine came by Ms. Stephens home to talk at length about saving her house. She told Ms. Stephens that she has some bad news that her house is on the "steps," to be sold and that she could save it. She further suggested that the only way she could save it is to follow her in every manner. She suggested that the title of the Jamaica House has to be transferred to her friend's name or a company and that she would have it retransferred back to her once the property is saved from foreclosure. She also suggested that she could also do something for her houses in Brooklyn and get $150,000 out of them and she could use that money to save her home. Ms. Stephens agreed to do anything to save her home, the Jamaica House.  Meanwhile owing to the stress, in 2018 Ms. Stephens suffered a head stroke. Ms. Stephens also developed high blood pressure, as she was breaking down under the pressure of the mortgage payments.

25.    Maxine demanded $10,000 to save the Jamaica House. She was paid that amount by Ms. Stephens. **Ex. B.** Ms. Stephens had to borrow the same amount and same was sent to her from her son in law.  Maxine told her that $10,000 would be given back to her once everything is under control.  However, Maxine instructed Ms. Stephens to leave the beneficiary's name blank and she suggested that she would fill it up. Ms. Stephens wrote two blank checks $5000. Copies of the Checks retrieved from the bank shows that Maxine had made the checks payable to KE2Contract LLC and 160 21 Avenue Corp. Maxine also suggested that she has a special lawyer Mr. Charles Mester, who is an expert in complex deals and that he is going to help Ms. Stephens in saving the house.

**Charles Mester, Attorney at Law**

10

26.     Around September 21, 2018, Maxine came to Ms. Stephen's house to pick her up and drove to attorney Mester. In his office, Maxine spoke about the legal issues to which Mester said that he is going to help. Mester also offered to help Ms. Stephens regarding her Brooklyn properties. Attorney Mester had a retainer dated September 21, 2018 (the "Retainer") executed between Ms. Stephens and his office. The Retainer in its very first paragraph states the following:

> Thank you for meeting with me in relation to retaining CHARLES L. MESTER, ESQ. ("Attorney") to provide legal services to you in connection with your prosecution of civil litigation involving the real properties located at 1487 East 53rd Street, Brooklyn New York, and 844 East 34th Street, Brooklyn, New York and *sale of leaseback of the real property located at 12706 177th Street, Jamaica, New York.* This letter, when fully executed, confirms that the Attorney will represent you in the above referenced matters. This engagement does not include any appeals work, which would only be handled after a separate agreement and retainer is agreed upon at the appropriate time. . . .

**Ex. C. Retainer** (emphasis added). In this meeting, once Ms. Stephens had talked about circumstances and the mortgages on the properties, Mester told her to step out of the office and leave Maxine and him alone in office. Ms. Stephens went out of the office and waited for Maxine to come out. However, after half an hour wait, Ms. Stephens was called back and made to sign some papers as the Retainer. Mester promised that he is going to be saving Jamaica House and as well as other properties. Ms. Stephens expressed deep concerns about the ongoing foreclosure of Home. Mr. Mester assured her that he will have her Home.

27.     Mester met Ms. Stephens only twice. Once at the signing of the Retainer and second and last time at the time of Deed transfer of Ms. Stephens Jamaica House. Till date there is no litigation undertaken by Meseter regarding properties that he promised to do.

28.     In and around March 2019, Maxine along with Lezantonio Woodburn (Woodburn), once again came to Ms. Stephens to pick her up and take her to the closing to save her house. Ms.

Stephens found herself in an office with a long conference table. Ms. Stephens met Mester and another attorney claiming to be an attorney for Woodburn. There were some other people, whom Ms. Stephens could not recognize. Upon information and belief the Planet Enterprise was present throughs its agents. Mester on the conference table slides the paperwork to Ms. Stephens and pointed out the exact places where she had to sign. She signed those papers. Mester did not explain the contents of the papers, nor was she told the reasons for such signing, other than that this was to save her house. Ms. Stephens spent approximately two hours in the conference room. When the people at the table started leaving, Ms. Stephens asked for copies of paperwork. Neither Mester nor Maxine provided any paperwork. She did pick a paper which purports to be a loan term sheet. The Planet Enterprise did not provide her with any paperwork, nor did they disclose to her that they are facilitating the funding of the transfer of the property. While Maxine was driving Ms. Stephens back to her house, Ms. Stephens asked Maxine about the paperwork. Maxine assured her that she would soon get her copies of what was signed. Woodburn who was also in the car, told Ms. Stephens, "Don't worry, I do not need your property. I will give it back to you." This only confused Ms. Stephens. She could not understand what Woodburn meant because she had not given her property to anyone. Till date, Maxine has not been provided the paperwork signed by Ms. Stephens.

29.    Upon information and belief, Mester is Maxine and Woodburn's attorney for their businesses and other ventures. The Retainer also has Maxine signature as Mester's client. There was no money paid by Ms. Stephens, as she was told that Mester had an understanding with Maxine. Upon information and belief, even though Mester had a retainer agreement signed with Ms. Stephens, he unethically represented both the 12706 Holdings Inc. and Ms. Stephens.

30.    Upon information and belief Mester prepared (or caused to be prepared) both any paperwork related to Purchase and Sale Agreement and Transfer Ownership Agreement. Mester misrepresented the terms of both documents to the Ms. Stephens and urged her to sign them while never advising her to have them reviewed by independent counsel, knowing that she was under duress as she did not want to lose her Home. At no time did Mester, Maxine or Woodburn inform Ms. Stephens that, on information and belief, they had a beneficial interest in 12706 Holdings Inc. Ms. Stephens did not fully read or understand either agreement, a fact of which defendants were aware or should have been aware. In addition, defendant Mester unduly pressured Ms. Stephens by, among other things, have her signature under the threat of loss of her home. However, trusting and believing that defendant, as her attorney, was acting in her best interests, plaintiff signed the documents in reliance on Attorney's statements and assurances.

31.    Within a day or two of the said closing, Maxine instructed that Ms. Stephens to make a payment of $2500 per month as a mortgage payment while the property is in third party's name. No paperwork was given to Ms. Stephens explaining her situation and or the paperwork. After the closing, Ms. Stephens kept her promised started making regular payment of $2500 every month until December 2019. As around this time, Maxine stated coming to the subject property and started screaming at Ms. Stephens: I *want you to start paying rent, you have to start giving me your rent money.  You cannot afford to buy this house you cannot afford this house.*" Ms. Stephens contacted attorney Charles who just advised her," "if you cannot afford to buy the house continue paying your rent." At the time Ms. Stephens called Charles, she heard Maxine in the background. Not a single week passed by,  after the signing of housing saving documents, that Maxine would not come by the House screaming and threatening the family members of the Ms. Stephens's household to leave.

32.    A few days there, Woodburn turned up at Ms. Stephens' home.  He also accused Ms. Stephens of not paying the mortgage on the house. When he was told by Ms Stephens that she is regular with the mortgage, he told her that it was not sufficient to meet the entire mortgage amount. He also instructed them to leave the house as he had to renovate it. Ms. Stephens advised Woodburn that she has been carrying out the regular renovation and that she had spent $1500 fixing the sewer.  Meanwhile the boiler at the house broke down.  Ms. Stephens had to pay for the same.

33.    Before the Covid-19 closure, one day around 9 PM Woodburn accompanied with a Notary came to meet Ms Stephens  with a copy of an agreement titled as **Contract-Use and Occupancy Agreement for 127 06 177th Street Jamaica New York 11434** (Occupancy Contract). **Ex. D.**  He told her that the monies being paid is not enough and said that if they want to stay in the house, they will haves to sign the Occupancy Contract. Fearing that they would lose the house, Ms. Stephens and her husband under duress signed the Occupancy Contract. The Occupancy Contract makes the following declaration:

> This agreement dated January 1, 2020 is between the **owner 12706 Holdings Inc and the occupants, Calvin Stephens, Evis Stephens, John Doe(s) and Jane Doe(s). The owner 12706 Holdings Inc has agreed to:**
>
> **Sell the property known as 12706 177th Street .Jamaica NY 11434 Block: 12527 Lot: 0093.** To Calvin Stephens, Evis Stephens, John Doe(s) and Jane Doe(s) in Two Years and Three Months.
> This agreement is for Two Years and Three Months.
>
> **NATURE OF OCCUPANCY:**
> Calvin Stephens, Evis Stephens, John Doe(s) and Jane Doe(s) will occupy the property as licensee only and **not as Tenant.** The seller confirms and the occupants agrees that they do not have the rights as tenants as in Landlord and Tenant law.
>
> **TERMS:**

14

From 1/1/2020 to 4/1/2022, Calvin Stephens, Evis Stephens, John Doe (s) and Jane Doe(s) will Occupy the property at unit 1 for a fee of $1500.00 each month. The fee is due on the 1st of Every month. Occupants will pay the Gas and Electric bill for Unit 1, $150.00 every three months for Water Bill in Unit 1. Washer and Dryer area must be kept clean and clutter free in the basement.

Basement will only have a Sofa, TV, pantry and closet. Basement will not be a storage space for boxes, barrels or any other items except items listed above. Any disregards for the rule will result in a fee in the amount of $1000.00. No storage in the boiler room. No allowing children to
write on the walls, doors, closets or the walls, hook basketball hoops to any walls in the house.
Areas must be kept clean in the house.

Empty rooms cannot be storage space. A bed, dresser or TV in rooms only.

Kitchen must be kept extremely clean. No grease on the walls or floors.

Living Room must be clutter free, Sofa, TV and dining furniture.

**NOTICE:**

The occupants will be responsible for all and any damages to the property that occurs during their stay.

The damages include the backyard. The shad will not be overstocked with items not used. No storage of unused items in the shad. No storage on the property, (backyard) The seller will provide back yard furniture for the summer months. Shad must be able to store the lawn
furniture.

The occupants must keep the front area of the property sweep clean, garbage in provided cans.
Garbage put on curbside on destinated days, including recyclable.

If the property 127 06 177th Street Jamaica NY 11434 is damage at any time the occupants will pay to repair or be prepared to move out. The occupants must call the owner for any repairs.

15

If the occupants cannot purchase the property at the end of the contract agreement, the Occupants agree to move out of property, 12706 177th Street Jamaica NY 11434 without argument in 30 (Thirty days) from the expiration of the agreement.

**The property 127 06177th Street Jamaica NY 11434 has, new roof with new leaders' new
kitchen, bathrooms. Hallway walls have been repaired and painted. Bathrooms has new vanities, toilets and painted. Walls have been repaired and painted. Bedrooms has been painted. New back yard fence and landscape cemented back yard.
Front of house
landscaped and painted. New three security Doors. New Shad 10 x 12.**

**Owner shall expect unit one to remain in the rehab condition during the agreement period including back yard. Property must be appraisable after two years and three months, if not the occupants must cure any damages to pass the appraisal or move out. The Stephens, John Doe(s) and Jane Doe(s) can move out at any time prior to the next month payment.**

**\*\*\*\* The damage sewage line has been repaired; lead water line has been replaced\*\*\*\*.
\*\*\*\* Please take note the rules must be followed. If not, the owner can demand you to move out of the property asap.\*\*\*\***

The signatures are acknowledgment of this agreement:


**/s/ Lez Antonio Woodburn**
**/s/ Evis Stephens**
**/s/ Calvin Stephens**

Notary Notary acknowledges the signatures of, Lez Antonio W
oodbum, Evis Stephens, and Calvin Stephens on this.

**Ex. D. Occupancy Contract.** However, lot of the alleged improvements are a false statement in

the Occupancy Contract, which Ms. Stephens signed out of fear. She and her husband did not

want to lose their home. They had no choice; they were expecting that their house would be

reverted back to them.

16

34.    Maxine thereafter immediately moved to take possession of the house. She changed the locks the house. She also told Ms. Stephens' relatives that she and Woodburn were the new owners and that they will have to pay her $1000 a month in rent and also demanded Ms. Stephens to pay at least $3000 in rent. Maxine also brought several people into the house with one pretext or the other. Once she came removed all the curtains of the house and removed towels from the bathroom. Woodburn accompanied her in few of these visits. Maxine and Woodburn also took possession of the one of the rooms of the house and rented it to a third party. On or about August 20, 2019 and continuing even now, Maxine and Woodburn placed notices at the house of Ms. Stephens claiming that the house driveway does not belong Ms. Stephens and that should she park her car, it would be towed away. On September 25, 2020, Woodburn left a notice at the house: "You were told to not park in the driveway, Today is your Final Warning—You will not get another. The cars will be towed." Ex. E. The house utilities were changed. Woodburn and Maxine created new accounts. Con Edison refused to accept payments from Stephens and Defendants did not make payments for the utilities, as a result of which there were final disconnection notices that kept coming to the house.

35.    On or about April 10, 2020 Woodburn through his company 12706 Holdings Inc. issued a "Cancellation of contract—Use and Occupancy Agreement." Ex. F. The Notice stated the following:

>  The agreement dated January 1, 2020 between the owner, 1206 Holdings Inc. and occupancy, Calvdin Stephens, Evis Stephens, John Does and Jane Does is terminated as of April 10, 2020.
>
>  The owner 12706 Holdings Inc. has decided to cancel the Contract—sue and occupancy agreement to purchase, 12706 177th Street, Jamaica, NY 11434, Block: 12527 Lot: 0093 and reside at the property.
>
>  The Short Sale liquidation is an Arm's length transaction. It does not allow the homeowner, and all occupant that resides at the property to continue residing for more than 90 days, however 12706 Holdings has given the

17

homeowner a and the occupant more than a year. The homeowner signed
the Affidavit of Arm's length Transaction at closing.

12706 Holdings Inc. has given the occupants and homeowner more than
one year to relocated, which can be common a nd customary in New York,
however the homeowner and occupants must vacate the property. Use and
Occupancy fees, all utilities services charges continue until the occupants
move.
/s/_____
Owner, 12706 Holdings Inc.
Lez Antonio Woodburn.

**Holdings Notice of Cancellation. Ex. F.**

36.    On or about May 5, 2020, Woodburn issued an eviction letter to Ms. Stepehens and her

husband, wherein, he made the following statement:

Please take notice the use and occupancy agreement is cancelled as of
April 10, 2020. The agreement can not be validated, due to the Arm's
length Transaction.
The occupant must be out of the above property by June 1, 2020. All
owed Use and occupancy fees, Water bill, and utilities will be deducted
from the refunded $10,000.

Letter May 5, 2020 (Eviction Letter). Woodburn also on September 1, 2020 and November 2, 2020

signing letter as owner also issued a 10 Day notice to quit. **Ex. G.**

37.    Finally, Maxine commenced an eviction proceeding against Ms Stephens and her family

with the Queens Housing Court (LT-058417-20/QU). Also on or about October 2, 2020, Holdings

and Woodburn as plaintiffs commenced a breach of contract and negligence action against Ms.

Stepehens and her family claiming money damages of $45,000. In the complaint with the Supreme

Court, Woodburn and Holdings claimed the following:

The Complaint of the plaintiff, Lezantonio Woodburn, respectfully shows and
alleges as follows:

The defendants Evis Stephens, Calvin Stephens, John Does, Jane Does
principal address is 12706, Jamaica NY 11434.

The property was sold on March 27, 2019 to 12706 Holdings Inc. &
Lezantonio Woodburn as a short sale for $350,000. The premises had
extensive repairs to the sum of $250,000.

18

Ms. Evis Stephens signed an affidavit of Arm's length transaction which allows the mortgage holder (seller) to remain in the premises as a tenant for a short term, nor more than 90 days after the sale. The defendant tenancy expired June 27, 2019.

Ms. Evis Stephens, Calvin Stpehens, John Does and Jane Does continue to live in the premises 12706 177th Street, Jamaica NY 11434 from July 2019 to current date in 2020(October) without paying use & occupancy, Con Edison, National grid $ Dep Water bill.
The defendants made several promises to move out of the premises. Each time myself or partner tried to get a move out date, Ms. Evis Stephens would use her health as a reason she could not find new location to move. January 1, 2020, an agreement was crated signed by all parties. The defendants made 1 payment which wqs later. The agreement was cancelled three months later.

Ms. Evis Stephens stated she was not going to pay any bills & I would have to take her & her family to court.

As the Plaintiffs I am requesting the court to grant me use & occupancy from August to December 2019 : 1500 x 5: $72, 5000 & January to current (October) 2020   10 x 2500=25,000; national grid: $1500 con Edison & 1600 Dep Water bill S 1000.

All frees to continue to be paid until defendants move out or evicted Secondly to order the defendants to pay all bills owed.

Evict The defendants based upon breach of Contract with the bank's arm length transaction.

As the Plaintiff, I have lost buyers, income and late mortgage payments. I am forced to spend my personal money to maintain the bills.

The defendants Calvin Stephens works at Marlene Union 301 Nicklane, Malevene NY 11566. He is currently employed.

Ms. Evis Stephens works off the books at a home in Long Island, NY. Jane Does John Does doesn't work. She is at premise all days. The Stephens had no hardship in he pandemic, neither parties did not stop working in the pandemic.

The defendants do not want to move. The defendants do not want to pay any bills for the premises which they lived for one year and 7 months. The defendants dont qualify to purchase the property 12706 Jamaica NY 11434.

The defendants are causing plaintiff extreme hardship, credit & income has been affected.

19

Currently I have a buyer, which took me 5 months to vacate the buyer. The lack of cooperation from the defendants is making the sale difficult. I cannot maintain the house with my personal funds.

*Verification*

*Lezantonio Woodburn*, being duly sworn, deposes and says: I am the plaintiff in the above entitled action. I have thread the foreign complaint nad know the contents thereof. The same are t4rue to my knowled.ge, exception as to matter there in stated to be alleged information and beliefs and as to those matters I believe them to be true.

Supreme Court, Queens County Complaint. **Ex. H.**

38.    On or about November 2, 2020, Woodburn issued another 10 days' notice to quit upon the

plaintiff and her husband. The Notice stated the following:

> PLEASE TAKE NOTICE, that you are and all other persons occupying the subject premises are required to quit and vacate the premises on or before November 16, 2020.
> You are in possession of the premises after the short sale. Ms. Stephens and her family were permitted to stay on the premises after the short sale for a shorter term to facilitate new location but longer than (90) ninety days. The shorter term to stay on the premises expired on June 30, 2019. Evis Stephens signed the affidavit of arm's length transaction.
> Your rights to occupy the subject premise has been revoked by 12706 Holdings Inc.
> PLEASE TAKE NOTICE, that if you a and all other persons fail to quit, vacate or surrender the subject premises by November 16, 2020, the undersigned will commence summary proceeding against you.
> Daed: November 2, 2020
>
> 12706 Holdings Inc.
> s/_____ Landlord

39.    On November 9, 2020, Ms. Stephens and her daughter filed an order to show cause for a

finding of harassment and for a restraining order with the Housing Court. The Court found conduct

of the defendants as harassing and restrained the defendants Maxine and Woodburn from acting

in an improper manner. **Ex. I.**

40.    On April 7, 2022, around 12:30 PM, the Debtor and her family saw Ms. Bonaparte parked

a dark blue Honda in front of the house. Ms. Bonaparte did not come out of the car. The Debtor's

family called 911 explaining that she had parked her car. Almost an hour later the police came and

talked to the Debtor and Ms. Bonaparte. Ms. Bonaparte told the police that the Debtor and her family should not be parking their car in house driveway. The police officers demanded proofs of the Debtors' residence which was duly provided. At the same a toll truck came by. One of the police officer went to the toll truck to tell them that Debtor's has properly utilized her driveway and that the toll truck absolutely could not remove the Debtors car. And the police left having instructed the Debtor that in case Ms. Bonaparte calls any towing truck on them, they should call the police.

41.    On or about April 19, 2022, the family of the Debtor realizing that there was no heat in the house went to the basement to check the boilers, they found out that the two boilers have been turned off. It was found when Debtor's family wasn't there, Ms. Bonaparte came to the House and turned off the boilers to forcibly evict the family from the house.

42.    Perforce under the foregoing circumstances, Ms. Stephens not wanting to lose her house had to seek bankruptcy protection in November 2021.

43.    Upon learning of the existence of the subject grant deed, plaintiff thereupon executed a notice of rescission pursuant to NY RPL 265-a on November 18, 2021, of the subject grant deed and attempted to have the same recorded with the county. Till date, the defendants have not responded to the said notice.

44.    On date of the transfer of the subject property to defendants, the approximate value of the subject property exceeded $850,000. It is a two-family house.

45.    Pursuant to Defendants own admission, the Defendants took title to the property by a payment of a sum not exceeding $350,000 to Ocwen bank, thus fraudulently depriving the plaintiff of her Home.

46.    All exhibits attached hereto are incorporated by reference.

## Unraveling of the Fraud, Mail and Wire Scheme

47.    Maxine and Woodburn were the foreclosure rescue experts as is unraveled by the paperwork filed in the state court and with this Court regarding lifting stay. Maxine charged a sum of $10,000 for help Ms. Stephens to negotiate her loan. The checks dated December 7, 2018 were taken in blank by Maxine. **Ex. B.**   Maxine along with Woodburn and attorney Mester provided a platform to foster an impression upon Ms. Stephens that a genuine effort is being made to protect her house and negotiate a loan deal. However, it was a scheme to take over Home of Stephens. A House exceeding $850,000 was transferred to wholly owned corporation of defendants Maxine and Woodburn, called Holdings at a purchase price of $350,000.  It was a termed short sale.

48.    Maxine and Woodburn had already started working on this conspiracy to take over the house, way before June 2018, when they incorporated 12706 Holdings Inc. on June 20, 2018.

49.    Maxine took Stephens signatures on papers which prepared by the defendants are presently in exclusively custody of Defendants, which clearly upon information and belief must have shown the value of property at a depressed level.

50.    Ms. Maxine and Woodburn mailed several documents to Ocwen to facilitate the short sale as a means of taking over the house of Ms. Stephens. The date of mailing and all correspondences is strictly within the custody and control of the defendants.

51.    Maxine to show that she is financing the deal to help the family, took out a loan application to be signed by Mr. Calvin Stephens, husband of Ms. Stephens. In the residential loan application form, she had it filled gave it to Mr. Stephens to sign the same which was signed by him. It is unclear if the same application has been used by the Defendants. **Ex. J.**  However, the Defendants here in the loan application showed the value of the Real Property at least $725,000 and the same Defendants negotiated a settlement of Real Property at $350,000.

22

52.    At a closing which was supposed to be a loan modification for Ms. Stephens, she was made

to sign deed transfer papers. On or about July 19, 2019, one Nathaly Chilliest, Esq. and United

American Title Agency on behalf of the defendants, caused to be mailed and registered via

electronic means a deed registration with the Queens County records as a part of their taking over

of the house of Ms. Stephens. The Planet Enterprise assisted, aided and abetted the alleged loan

modification or funding the transfer of the Home from the Debtor to the Holding.

53.    On or about October 2, 2020, Woodburn caused to have summons issued from the Queens

County State Supreme Court along with a complaint claiming breach of contract and negligence

claiming money damages of $45,000 and mailed them to Ms. Stephen with full knowledge that

there was neither a breach of a contract or negligence and that Ms. Stephens was the actual owner

of the house.

54.    On or about September 28, 2021, the Defendants Holdings and Woodburn and Maxine

caused to be issued by the Civil Court notice of Court date for ejectment proceedings of the

Plaintiff from the subject property. The video conferences initially set by the civil court was not

attended by the complaining defendants. Once the civil court heard the matter, it was brought to

their attention that the Ms. Stephens has filed for bankruptcy, that the court after a couple of

hearing decided to stop the proceeding.

55.    Both the Defendants, Maxine and Woodburn used threats of immediate ejectment from

their home unless they had signed the agreement to buy back and also, to acknowledge false claims

of improvement on the real property. On January 2, 2020, Woodburn made Ms. Stephens and her

husband sign Contract-Use and Occupancy Agreement making Ms. Stephens and her husband

acknowledge that Woodburn has carried out stated repairs on the property, when in fact no such

repairs etc. were carried out. Also, by virtue of the signing of the said agreement, the Defendants

made them a vendee of the real property and that they had to buy the real property in two years and three months from January 1, 2020. **Ex. D.**    However, around March 30, 2020 (as disclosed by Holdings Motion in the Court), Woodburn makes an Amendment to Use and Occupancy agreement. **Ex. K.** He authors the following amendment:

> The previous agreement dated January 1, 2020 between the owner , 12706 Holdings Inc and occupancy, Calvin Stephens, Evis Stephens, John Does and Jane Does is hereby amended to:
>
> Unit 1(Floor 1) no basement usage, please remove your washer and dryer. The backyard is not usable. The shad is just for the 12706 Holdings Inc. Items.
>
> The occupants can continue to put the garbage in the can. The recycles go in the recyclable garbage can, as of, April 10, 2020 is the start date, please put recyclable items in the can.
>
> 12706 Holdings Inc. is adjusting the two years and three-month purchase agreement to:
>
> One year (January 01, 2021) due to the Stephens inability to get financing as of 10/10/19, 2019 to purchase  12706 177th Street Jamaica NY 11434 and the Arm's length agreement expired on June 27, 2019.
>
> If the Stephens cannot get the finance to purchase 12706 177th Street Jamaica NY 11434 by the end of this contract, they agreed to vacate 12706 177th Street Jamaica NY with their family members on floor 2 within 30 days.
>
> The signature are acknowledgment of the amendment of the agreement.
>
> /s/ Lez Antonio Woodburn
> /s/evis stepehens
> /s/ Calvin Stephens

56.    The Defendants enticing the plaintiff to transfer the ownership of the property with the excise to get a loan modification, started tightening the hold over the property, gradually chipping away any right to recover the property, which entailed reducing the buyback time [not disclosing the buyback purchase price], implanting other tenants in the house, removing Ms. Stephens from complete dominion and enjoyment of her house.

57.    Woodburn and Maxine used fear of loss of home for the plaintiff, Ms. Stephens to sign an acknowledgment of the alleged investment in the property and as well as the accepting status as a licensee. Both Woodburn and Maxine used wrongful means to achieve ownership of the house on which they had no lawful claim. The Defendants have no lawful claim over the house of the plaintiff, however under the pretext of loan modification, made Ms. Stephens transfer her ownership and then used fear of eviction from her house to sign Use and Occupancy Agreement. However shortly thereafter within and by April 10, 2020, Woodburn through Holdings terminated the contract as of April 10, 2020. **Ex. L**

58.    In furtherance of the scheme to exact and extract monies for work not done and for work allegedly done to the property when the ownership had already been takeover by the Defendants, the Defendants caused a Proof of Claim filed with the bankruptcy court on April 14, 2022 claiming $55,000.

59.    On or about April 15, 2022, the Defendant Holdings moved this Court for lifting the stay, which revealed a new set of paperwork. With motion is attached a copy of the contract of sale, which was undertaken to save the plaintiff's house from foreclosure. The Contract is very telling. The Contract dated January 4, 2019 is a residential contract of sale from Evis Stephens to 12706 Holdings Inc. for sale of house for $400,000 (as a short sale) when in fact that the value of the house was not less than $850,000. The Contact is signed by both Ms. Stephens and Woodburn on behalf of Holdings. The Contract clearly an attorney marked contract does not hear the name of the attorney for either parties. The Motion of 12706 also has a copy of the approval of the sale at a discounted price of $337,5000 (payoff amount). The motion also bears a deed transfer from Ms. Stephens to the Holdings and also attached is the HUD- 1 statement. HUD statement reflects no

payment to the plaintiff. The HUD statement has figures that makes sense only to the Defendants, especially:

> Garrison Construction: $15,000
> Khermit Enterprises: $25,000.
> Addititional settlement charges for Kermit Enterprise: $7,425.00
> Donaldson & Chilliant LLP: $5000
> Madison Construction and Development: $22,5000.

**Ex. M. HUD statement.** Upon information and belief Khermit enterprise is a company owned and operated by Maxine.

60.     Also listed with the motion is an Affidavit of Arm's Length Transactions, which were signed by the parties including Stepehns and Maxine Bonaparte on the date of the closing, the form which was pre-marked "sign here." Also in this affidavit, Maxine Bonaparte signs both as a the Seller agents and as well as the Buyer's agent. Also the Notary notarized the affidavit on March 28, 2019, when in fact the Affidavit shows March 27, 2019 as the date of closing and signing of affidavit. **Ex. N.**

61.     Immediately after the transfer of the ownership, the demands of the Defendants increased, from regular payments for an alleged "New Mortgage," for new alleged renovation of the property. Maxine came to the house every week and threatened the family members to leave, changed the locks, dislodged the family from couple of rooms and even turning off the boilers.

62.     On or about April 13, 2022, pursuant to the eviction proceedings commenced by the Defendants with the civil court of the City of New York, the Civil Court mailed a letter to Ms. Stephens, scheduling a hearing on May 2, 2022 with a warning: "This is your opportunity to answer the petitioners' motion to proceed with a warrant of eviction against you."

63.     The Defendants in a vicious manner took over the property of the Plaintiff by misleading her that they are going to help her negotiate a loan modification and under those excuses, the Defendants manipulated Ms. Stephens to transfer ownership of the house.