# EXHIBIT E

```
 1
 2              UNITED STATES BANKRUPTCY COURT
 3          FOR THE EASTERN DISTRICT OF NEW YORK
 4    ------------------------------------x
 5    In re:
 6    EVIS NEVERLANE STEPHENS,            21-42857-jmm
 7                                        Chapter 13
 8              Debtor,
 9    ------------------------------------x
10    EVIS  NEVERLANE STEPHENS,
11
12                    Plaintiff,
13
      MAXINE BONAPARTE, LEZANTONIO
14    WOODBURN, 12706 HOLDINGS, INC.,
      CHARLES L. MESTER, ESQ, PLANET
15    MANAGEMENT GROUP, LLC, PLANET HOME      Adversary
      SERVICING, WILMINGTON SAVINGS FUND
16    SOCIETY, FSB (WSF), VERUS              Proceeding No.
      SECURITIZATION TRUST 2020-NPLI,
17                                          22-01037(jmm)
18                    Defendants.
      ------------------------------------x
19    1251 Avenue of the Americas
      New York, New York 10020
20    July 30, 2025
      10:00 a.m.
21
22        CONTINUED DEPOSITION OF EVIS NEVERLANE
23    STEPHENS, appearing at the above-mentioned time and
24    place before ANNMARIE OAKLEY, a Notary Public of the
25    State of New York.
```

```
 1              E. STEPHENS
 2             A P P E A R A N C E S
 3
    LAW OFFICE OF NARISSA A. JOSEPH
 4  Attorneys for Plaintiff
         305 Broadway, Suite 1001
 5       New York, NY 10007
    BY: NARISSA JOSEPH, ESQ., ESQ.
 6
 7  LAW OFFICE OF CHARLES L. MESTER
 8  Attorneys for Defendant, CHARLES L. MESTER
         225 West 34th Street, 9th Floor
 9       New York, NY 10122
    BY: CHARLES L. MESTER, ESQ.
10
11  STEVEN & LEE
    Attorneys for Defendants, PLANET MANAGEMENT GROUP,
12  LLC and PLANET HOME LENDING LLC dba PLANET HOME
    SERVICING
13       669 River Drive, Suite 201
         Elmwood Park, NJ 07407
14  BY:  RYAN P. MULVANEY, ESQ.
15
16  AKERMAN, LLP
    Attorneys for Defendant, WILMINGTON SAVINGS FUND
17  SOCIETY, FSB(WSF) and VERUS SECURITIZATION TRUST
    2020-NPLI
18       1251 Avenue of the Americas, 37th Floor
         New York, NY 10020
19  BY:  JORDAN SMITH, ESQ.
20
21  LAW OFFICE OF CHARLES WERTMAN
    Attorneys for MAXINE BONAPARTE and LEZANTONIO
22  WOODBURN
         100 Merrick Road, Suite 304W
23       Rockville Centre, NY 11570
    BY:  CHARLES WERTMAN, ESQ.
24
25  Also present:  M. Bonaparte and L. Woodburn
```

1

2    E V I S   S T E P H E N S, having first been duly

3    sworn or affirmed by a Notary Public of the State of

4    New York, was examined and testified as follows:

5        Q    Would you state your name for the record,

6    please.

7        A    Evis Stephens.

8        Q    Would you state your address for the

9    record, please.

10       A.    127-06 177th Street, Jamaica, New York

11   11434.              .

12   EXAMINATION BY MR. RYAN:

13       ·Q.   Good morning, Ms. Stephens.  How are you

14   today?

15       A.    Okay.  Under the weather.

16       Q.    Good.  Good to hear you're doing all

17   right.  As you may remember I represent defendants

18   in this case, which is Planet Home Servicing and

19   Planet Management Group.

20       A.    Okay.

21       Q.    And at the last deposition we agreed that

22   when I say the phrase Planet defendants I mean both

23   of the Planet entities.  Can we proceed in that same

24   manner today?

25       A.    I guess.  Planet is a company; right?

Page 271

1                     E. STEPHENS

2      A.    It is a company; yes.

3      Q.    When we were last here we concluded your

4    deposition by talking about the short sale that you

5    underwent with Ocwen; do you remember that?

6      A.    With Ocwen I think so.   The short sale of

7    Ocwen concerning --

8                MS. JOSEPH:   Just answer the

9    question.

10      A.    Yes.

11      Q.    Concerning your property at 127-06 177th

12    Street.

13      A.    Yes.

14      Q.    And we showed you a few documents that you

15    signed related to your efforts to obtain a short

16    sale --

17      A.    Right.

18      Q.    -- so that you no longer had to pay the

19    mortgage to Ocwen; do you remember that?

20      A.    Yes.

21      Q.    As a result of the payoff of your mortgage

22    with Ocwen a release of the mortgage was recorded;

23    do you understand that?

24      A.    Mm-hmm.   Yes.

25      Q.    What do you understand that release of the

1                         E. STEPHENS
2    mortgage to mean for you?
3         A.    Well, somebody came and buy the property
4    over.
5         Q.    Ms. Stephens, I'm going to show you a
6    document that we just marked as Exhibit S and I will
7    ask you to take a look at it and let me know when
8    you're done.
9              (Release of Mortgage was introduced as
10             Exhibit S.)
11        A.    Okay.
12        Q.    You had a chance to review the document?
13        A.    I sort of understand certain things.
14        Q.    And this document spans approximately six
15   pages.  I will represent to you that it was pulled
16   from the public records from the New York City
17   Department of Finance, specifically the Office of
18   the City Register and I want you to turn to page
19   three of this document.  Let me know when you're
20   there.
21        A.    Found it.
22        Q.    Okay.  Mr. Stephens, if you can look under
23   the title of the document it says "Release of
24   Mortgage."  Correct?
25        A.    Yeah.

1              E. STEPHENS

2        Q.    And under that it states Ocwen Loan

3    Servicing, LLC, and it provides a number that ends

4    in 5702; do you see that?

5        A.    Okay.

6        Q.    Do you see that, Ms. Stephens?

7        A.    Yes.

8        Q.    And that is the loan number for the

9    mortgage that you had at 127-06 177th Street with

10   Ocwen; correct.

11       A.    I think so.  I can't recall but if that's

12   what they say.

13       Q.    Do you have any reason to believe that

14   does not represent the mortgage?

15       A.    The bank that did it I believe it's that.

16   I never really put these things in my mind.

17       Q.    If you scroll further down the page it has

18   a property address and identifies 127-06 177th

19   Street, Springfield Gardens, New York, and that's

20   the address that was the subject of the foreclosure

21   and the address at which you currently reside; is

22   that correct?

23       A.    The property address, yes, 127-06 177th

24   Street.

25       Q.    And that was the property address that was

1                    E. STEPHENS

2    the subject of the foreclosure case filed against

3    you and the property at which you currently reside;

4    is that right?

5         A.   I can't understand why they put

6    Springfield Gardens.  It's supposed to be Jamaica,

7    New York.

8         Q.   Can you, please, answer my question.

9         A.   Yes.  It say here Springfield Gardens but

10   what I normally used was 127-06 Jamaica, New York

11   11434.  That's the address that we always used ever

12   since I'm living there.

13        Q.   That's the mailing address?

14        A.   Right.

15        Q.   But this is the same address and same

16   residence in which you presently reside; correct?

17        A.   Oh, yes.

18        Q.   Am I correct?

19        A.   Yes.  Yes.

20        Q.   And this was the same property that was

21   the subject of the foreclosure case; correct?

22        A.   Yes, county of Queens.  Yes.

23        Q.   And by virtue of this release you no

24   longer paid the mortgage to Ocwen; right?

25        A.   No.

1              E. STEPHENS

2      Q.   There's no mortgage to pay; correct?

3      A.   Right.

4      Q.   Ms. Stephens, showing you a document we

5  just marked as Exhibit T and I will ask that you

6  take a second to review that and let me know when

7  you're done.

8           (Stephens125-Stephens127 was introduced as

9           Exhibit T.)

10     A.   You're going to have to explain this to me

11 because everything is in black.

12     Q.   Yes, it's not a color copy.  I will

13 represent to you and for the record that this

14 document is produced by you in in this case and it

15 is identified as Stephens 125 through 127.  If you

16 can turn to the last page, identified as Stephens

17 127, do you see a signature on the bottom left?

18     A.   Yes.

19     Q.   Do you recognize that as your signature?

20     A.   Yes.

21     Q.   Now, if we go to the first page, marked

22 Stephens 125, in the middle of the page it says name

23 and address of seller; do you see that?

24     A.   Okay.  Yes.

25     Q.   Do you see that, Ms. Stephens?

1              E. STEPHENS

2       A.   Yes.

3       Q.   Okay.  And its shows that you are the

4  seller; correct?

5       A.   Yes.

6       Q.   And the property location under Section G

7  is 127-06 177th Street in Jamaica, New York.

8       A.   Yes.

9       Q.   And that's the property that was the

10  subject of the foreclosure; correct?

11      A.   Correct.

12      Q.   And that's the property that you currently

13  reside; correct?

14      A.   Yes.

15      Q.   And right above the property location it

16  identifies the name and address of borrower; do you

17  see that?

18      A.   Yes.

19      Q.   And the borrower is identified as 127-06

20  Lease Holdings, Inc; do you see that?

21      A.   Yes.

22      Q.   Still on the top quarter of the page where

23  it identifies the loan number there's a loan number

24  ending in 5702; do you see that?

25      A.   Yes.

Page 277

1                   E. STEPHENS

2          Q.    And that's the same loan number that was

3     identified in Exhibit S, the Release of Mortgage;

4     correct?

5          A.    Mm-hmm.   Yes.

6          Q.    So that's the same loan number as in the

7     release of mortgage; right?

8          A.    Yes.

9          Q.    And if you look on the right-hand side of

10    the page in the right column, about midway down it

11    says, "Payoff of first mortgage loan."   Do you see

12    that line item?

13         A.    Yeah, I see that.

14         Q.    And the pay off amount is $337,500;

15    correct?

16         A.    Yes.

17         Q.    Ms. Stephens, showing you what we just

18    marked as Exhibit U and ask that you take a look at

19    it and, please, let me know when you're done.

20               (Stephens128-Stephens131 was introduced as

21               Exhibit U.)

22         A.    Yes.   Look at the whole thing?

23         Q.    Yes, take a second and review it and let

24    me know when you completed your review.

25         A.    The whole thing, yeah.   I can't really

Page 278

1                    E. STEPHENS
2     understand.  Can you explain this to me, this wire
3     transfer.
4          Q.   So the first thing I will say is that you
5     produced this document in Discovery and that's
6     identified by the Bates number at the bottom,
7     Stephens 128 through Stephens 131.  So this document
8     was produced by you to us in this case and midway
9     down the page it states the amount to collect and
10    it's $337,500; do you see that?
11         A.   Yeah, I see it.
12         Q.   And under that the recipient of that
13    payment is Ocwen loan servicing; right?
14         A.   Yes.
15         Q.   And further down it identifies the loan
16    number, which is again ending in 5702, identifies
17    your name and identifies the property address that
18    was the subject of the foreclosure; correct?
19         A.   Right.  I see that there.
20         Q.   And that's the same loan number that was
21    referenced on exhibit S, which is the Release of
22    Mortgage that we saw earlier; right?
23         A.   Right.
24         Q.   As well as exhibit T that we saw earlier
25    as well; correct?

1              E. STEPHENS

2        A.    So this was a wire transfer for Ocwen;

3   right?

4        Q.    It concerns this, yes.  But I want you to

5   confirm to me this is the same loan number as

6   Exhibit T ending in 5702; correct?

7        A.    Right.

8        Q.    Now, after the short sale of the property

9   identified as 127-06 177th Street --

10       A.    Yes.

11       Q.    -- documents were filed in the foreclosure

12  case; are you aware of that?

13       A.    Documents were filed in the foreclosure.

14  I was not aware.  I wasn't aware of that.

15       Q.    Ms. Stephens, this is a document we just

16  marked as Exhibit V and I will represent to you that

17  it is a document that I pulled from the public

18  foreclosure docket in your foreclosure case.

19  Please, take a second and review that and let me

20  know when you're done.

21              (Notice to Discontinue was introduced as

22              Exhibit V.)

23       Q.    Are you done, Ms. Stephens?

24       A.    Yeah.

25       Q.    Have you ever seen this document before?

1          E. STEPHENS

2     A.    I don't recall seeing this document.

3     Q.    Okay.  Ms. Stephens, just so I understand

4  the chronology here, you entered into a short sale

5  with respect to 127-06 177th Street, which we saw in

6  Exhibit R, you went to a closing for that short

7  sale, which we saw in Exhibit T, there was a Release

8  of Mortgage recorded, which we saw in Exhibit S a

9  few moments ago, and now we have the plaintiff in

10  this foreclosure case dismissing the foreclosure

11  against you; do you understand that?

12     A.    Mm-hmm.

13          MR. SMITH:  I just ask the witness to

14  answer in words.

15     A.    Yes.

16     Q.    And you were represented in this

17  foreclosure case, correct, you had an attorney?

18     A.    Mr. Mester?

19     Q.    In the foreclosure case you had an

20  attorney.

21     A.    In the foreclosure case if I had an

22  attorney?

23     Q.    You were represented by Mr. Franklin Rouse

24  (phonetic)?

25     A.    That's what Mr. Rouse was with me, yes,

1           E. STEPHENS

2    for that one.

3         Q.    And this document is titled, on page three

4    of it, Notice of Motion to Discontinue Action,

5    Vacate Judgment and Cancel Lis Pendens."  Do you see

6    that?

7         A.    What page?

8         Q.    Page three of the document.  That's what

9    this document is; correct?

10        A.    Yeah, but I didn't see this.

11        Q.    Turn to the next page, which is titled,

12   "Affirmation in Support." and if you go down to

13   paragraph three.

14        A.    Okay.

15        Q.    Paragraph three affirms to the court that

16   the plaintiff is discontinuing the action and

17   canceling the notice of pendency with respect to the

18   property located at 126 177th Street, which was the

19   property that was the subject of the foreclosure and

20   again the property which you presently reside;

21   correct?

22        A.    Mm-hmm.

23        Q.    Is that a yes?

24        A.    Yes.

25        Q.    You did not oppose this motion; correct?

1                    E. STEPHENS

2         A.    No, I didn't go in front of the judge.   I

3    did not.   Mr. Rouse went inside.

4         Q.    You didn't oppose it; right?

5         A.    I did not see that.

6         Q.    I know you didn't see it.   Mr. Rouse to

7    your knowledge did not oppose this motion on your

8    behalf; right?

9         A.    No.

10        Q.    This is a document that says the

11   foreclosure is over; right?

12        A.    Yes, but I didn't go in with the judge.

13   He alone went in there and came out and he said the

14   judge will call us back.

15        Q.    But you didn't submit any opposition to

16   this; right?

17        A.    No, I cannot recall that.

18        Q.    Well, you didn't want your home taken;

19   correct?

20        A.    No, that's why Mr. Rouse went.

21        Q.    Exactly.   In fact, you were in support and

22   in favor of this because this ended the foreclosure;

23   right?

24        A.    That's what I said.

25        Q.    I don't mean to badger you, I just wanted

Page 283

1              E. STEPHENS

2    to get the answer clear.  I apologize if I was

3    badgering you there.  Ms. Stephens, showing you

4    Exhibit W, please, take a second and review it.  Let

5    me know when you're done.

6              (Three-Page Document was introduced as

7              Exhibit W.)

8         Q.    This is a three-page exhibit, which is an

9    order entered on the public docket in your

10   foreclosure case by Judge Greco on June 6, 2019,

11   followed by an order that was entered on June 11,

12   2019; do you see that?

13        A.    Yeah, I'm seeing it.  Hold on a second.  I

14   didn't see that.

15        Q.    Okay.  On the first page of Exhibit W, if

16   you look at the second paragraph.

17        A.    Motion.

18        Q.    Yes.  The last sentence it states,

19   "Plaintiff's counsel affirmed that the action should

20   be discontinued due to a shortfall payoff."  Do you

21   see that?

22        A.    I see that.

23        Q.    So your foreclosure case was dismissed by

24   the Court because of the short payoff, that you

25   sought in Exhibit R, and was provided to you in

1              E. STEPHENS

2    Exhibit T; correct?

3         A.    Yeah, but again as I said I did not see

4    these papers.

5         Q.    I'm not asking if you saw it.  It's a

6    public document.  I'm just asking you to confirm

7    that the foreclosure case that was filed against

8    you, related to your property, was dismissed as a

9    result of the short sale that you acquired under

10   Exhibit R; is that right?

11        A.    That's what I'm seeing here now but --

12        Q.    I know your testimony is you didn't see

13   that document.  This is probably the first time you

14   saw that; is that right?  Okay.

15             MR. MULVANEY:  I don't think I have

16   anything else.  Thank you.  I have nothing further

17   for you today.

18   EXAMINATION BY MR. SMITH:

19        Q.    Ms. Stephens, my name is Jordan Smith, I

20   represent in this case Wilmington Savings Fund

21   Society FSB, not in it's individual capacity but

22   solely as owner trustee for Verus Securitization

23   Trust 2020-NPLI, and I will just note in the caption

24   of this case this entity was sued as Wilmington

25   Saving Fund Society FSB WSF and Verus Securitization

1              E. STEPHENS

2  Trust 2020-NPLI, as two separate entities but is

3  really one entity.  I represent those parties, the

4  parties just referenced.  Have you ever heard of

5  them?

6       A.   What parties?

7       Q.   The people I said I represent, have you

8  ever heard of them?

9       A.   No.

10      Q.   Have you ever heard of Wilmington Savings

11  Society --

12      A.   I can't recall that.

13      Q.   -- or Verus Securitization Trust, have you

14  ever heard of that?

15      A.   Not really.

16      Q.   Are you aware you're suing them in this

17  action?

18      A.   Yeah, I'm suing them.  I have to go

19  through it, different mails that came.

20      Q.   Do you have an understanding of what

21  Wilmington Savings Fund Society or Verus

22  Securitization Trust is?

23      A.   It's a bank.

24      Q.   What does that connection to you in

25  particular?

1              E. STEPHENS

2        A.    What do you mean "connected" to me?  I'm

3   suing them because they want money from me, or

4   something or the other.

5        Q.    What money do they want from you, Ms.

6   Stephens?

7        A.    For $55,000 or something, I don't know.

8   They're suing me for the property that I'm living

9   in.

10       Q.    Someone is suing you for the property?

11       A.    Yes, that I'm living in.

12       Q.    Who is suing you for the property?

13       A.    One of the banks.

14       Q.    Do you have any paperwork related to the

15   suit against you for the property?  You just took

16   out some paperwork.  What paperwork did you bring

17   with you today?

18            MS. JOSEPH:  I don't see the

19   relevance of that question.

20            MR. SMITH:  She just took out a bunch

21   of paperwork.

22       A.    The paperwork I bring just from years ago.

23       Q.    Did you bring any documents related to the

24   property that you live in with you today?

25       A.    No.

1          E. STEPHENS

2      Q.   To your knowledge does your counsel have

3  documents related to the property with her today?

4               MS. JOSEPH:  What's the relevance?

5      Q.   Did you review any documents in

6  preparation for this deposition today?

7      A.   Yeah, paperwork at home, I went through

8  it, but I can't recall everything that's in there.

9  I can't recall it.

10              MR. SMITH:  I'm going to call for

11  production of the documents in her house related to

12  the property, particularly anything she reviewed in

13  preparation for the deposition.

14              MS. JOSEPH:  I think that's too

15  broad.  Any documents in her house related to the

16  property or any documents that she used in

17  preparation for the deposition?

18              MR. SMITH:  At a minimum anything

19  that she used for the deposition and other things

20  that may be responsive to our document requests from

21  earlier.

22      Q.   Ms. Stephens, we got together in early

23  June when we did the first part of this deposition;

24  do you remember that?

25      A.   Yes.

1           E. STEPHENS

2      Q.    Since that time have you reviewed any

3   documents related to this lawsuit?

4      A.    I didn't review anything.  I just drop

5   everything down and I never really go through

6   anything.

7      Q.    What does "drop everything down" mean?

8      A.    I just drop my paperwork in my bag because

9   I got to go to work and that's it.  I'm so busy,

10  trust me.  Sometimes I don't have time for myself.

11     Q.    Did you discuss the fact that you were

12  coming here for this deposition with anyone other

13  than your attorney -- you got to let me finish.

14           MS. JOSEPH:  Listen to his question.

15     Q.    Did you discuss that you were coming here

16  for this deposition with anyone other than one of

17  your attorneys?

18     A.    Yes.

19     Q.    Who did you speak to about this deposition

20  since we got together last time?

21     A.    What's the paperwork that --

22           MS. JOSEPH:  He asked who did you

23  speak to --

24     A.    I didn't speak.

25           MS. JOSEPH:  -- about this

1            E. STEPHENS

2   deposition.

3        A.   I text Mr. Caram (phonetic).  Yes, I did.

4             MS. JOSEPH:  Besides your attorney.

5        A.   Nobody else, I speak to.

6        Q.   I want to switch gears for a second and go

7   back to 2019 with the closing of the short sale, and

8   you testified extensively last time about how you

9   went there and signed documents, etc; do you

10  remember that?

11       A.   Yes.

12       Q.   When that closing was finished did you get

13  any documents?

14       A.   No, I did not get anything.

15       Q.   So when you walked out of that closing

16  room you had no documents?

17       A.   I had nothing.

18       Q.   Can you take a look at Exhibit T and

19  exhibit U.  Do you have those in front of you?

20       A.   125.

21       Q.   So Exhibit T is Stephens 125 on the first

22  page; right?

23       A.   Mm-hmm.

24       Q.   And Exhibit U says Stephens 128 on the

25  first page?

1                    E. STEPHENS

2        A.   Yes.

3        Q.   And that means we got those documents from

4    your counsel; do you understand that?

5        A.   Right.  I did not get this.  Maybe -- I

6    don't know how he get it.

7        Q.   Is it your testimony that you don't know

8    how your lawyer got a copy of Exhibit T?

9        A.   I didn't give him this.

10       Q.   And do you have any knowledge of how your

11   lawyer got it --

12       A.   Maybe he print it out.

13       Q.   Let me ask the question.  Is it your

14   testimony you don't know how your lawyer got Exhibit

15   U either?

16       A.   No.

17       Q.   You don't know?

18       A.   This one?

19       Q.   Yeah.

20       A.   Transfer wire request?

21       Q.   My only question is do you know how your

22   lawyer got that document to give it to us?

23       A.   I don't know.

24       Q.   You don't know?

25       A.   No, I have no idea.

1                  E. STEPHENS

2        Q.   Going to Exhibit T, if you look at the

3   third page, it says Stephens 127 at the bottom.

4        A.   This one?

5        Q.   Exhibit T.  And go to the page that says

6   127 at the bottom.

7                  MS. JOSEPH:  She's on T.

8        Q.   Do you see your signature?

9                  MS. JOSEPH:  On the last page.

10       Q.   On page 127.

11       A.   Yup.

12       Q.   Okay.  And right above that can you read

13  what it says in that sentence right above it?

14       A.   I cannot read this because this is just

15  black.

16       Q.   You can't read that?

17       A.   No, it's black.

18       Q.   Well, let me ask --

19       A.   Read it for me, please.

20       Q.   I read it to say, the undersigned

21  acknowledges receipt of this disclosure statement

22  and agree to the correctness thereof.  Can you see

23  that?

24       A.   Yeah, I see it.

25       Q.   So do you understand that means you're

1          E. STEPHENS

2    acknowledging you received this document?

3          A.   No, I did not.

4          Q.   So you signed it without getting it?

5          A.   That is right.

6          Q.   Is there anything that's not correct on

7    this document?

8          A.   Where does this document come from?  I

9    never see them.

10         Q.   I'm asking about Exhibit T, ma'am.  Is

11   there anything on that document that you maintain is

12   not correct?

13         A.   The amount of the property is 3-something.

14         Q.   You can't ask your Laura a question.

15         A.   I asked her how much the amount is here.

16              MS. JOSEPH:  The print is illegible.

17         A.   And I did not get these things.  I didn't

18   see them.

19         Q.   Okay.  But somehow your lawyer got it but

20   you don't know how.

21         A.   Yeah.

22         Q.   You're talking about Mr. Dahiya; correct?

23         A.   Yes.

24         Q.   Was he present at the closing in 2019?

25         A.   No.

1          E. STEPHENS

2       Q.   Now, Ms. Stephens, you had the loan you

3  took out in 2006 which was serviced by Ocwen?

4       A.   Yes.

5       Q.   And you used to receive monthly statements

6  from Ocwen?

7       A.   Yes.

8       Q.   At some point did those monthly statements

9  stop coming?

10      A.   No, they keep coming.

11      Q.   Did you get one last month?

12      A.   You mean after the house was sold over?  I

13 never seen any last month.

14      Q.   Okay.  I think you just testified they

15 never stopped sending you statements.

16      A.   Listen to me carefully, when the house was

17 transferred -- you guys know whats' going on.  Ocwen

18 never sent anything to me again.

19      Q.   When did you stop received statements from

20 Ocwen?

21      A.   Could be about 2019, just after they

22 finished with transferring the things.

23      Q.   Do you have an understanding of why you

24 stopped receiving statements from Ocwen?

25      A.   Of course, because they took it.

1               E. STEPHENS

2      Q.   "Who" is they and what is "it"?

3      A.   The holding company, which is Tony and

4  Maxine.

5      Q.   Meaning what?

6      A.   They stop coming because they took over

7  everything from me so I wouldn't get anything again.

8      Q.   Was it your understanding at that point

9  that your relationship with Ocwen was over because

10  the loan had been paid?

11      A.   Of course.

12      Q.   Do you know where the money came from to

13  pay Ocwen?

14      A.   The holding company.

15      Q.   The holding company being the current

16  owner of the property that you sold it to?

17      A.   Yes.

18      Q.   Do you know where they got the money to

19  pay Ocwen?

20      A.   I have no idea.

21      Q.   But it's your understanding that they paid

22  Ocwen?

23      A.   To my understanding.

24      Q.   And that's why Ocwen left you alone at

25  that point; right?

Page 295

E. STEPHENS

1

2     A.    I guess so.

3     Q.    You guess so?

4     A.    I think so.   It's true.

5     Q.    You testified at the beginning of your

6 testimony someone else was asking you for money,

7 $55,000?

8     A.    I saw it in a paper that they were suing

9 me for $55,000.

10    Q.    Who is they?

11    A.    The holding company.

12    Q.    Does that have anything to do with my

13 client, Wilmington or Verus?

14    A.    I have no idea.

15    Q.    What paper are you referring to?

16    A.    A paper I saw when I was reading, maybe

17 the mail.   A lot of mail came to my house.

18    Q.    Do you still have that paper?

19    A.    Not concerning me, concerning them.

20    Q.    Do you still have the paper you're

21 referring to about someone suing you for $55,000?

22    A.    No.

23    Q.    Do you have it at home?

24    A.    I think that so.

25                MR. SMITH:   I think that should be

1              E. STEPHENS

2   produced.

3       A.   I don't know.  I have no idea.

4             MS. JOSEPH:  If such a paper exists.

5             MR. SMITH:  Well, she just testified

6   it exists.

7       Q.   When is the last time you had any contact

8   with Mr. Rouse?

9       A.   Some years now.  I haven't seen him or

10  talked to him.

11      Q.   Have you ever sent a text message to

12  anybody related to what happened with your property

13  and Ms. Bonaparte and our clients?

14      A.   Text message?

15      Q.   Yeah.

16      A.   No.

17      Q.   You never sent a text message about this

18  ever?

19      A.   The only one I spoke to was my attorney.

20      Q.   Is there anybody else that you're aware of

21  that has information about this situation that we

22  haven't talked about in this deposition?

23      A.   My family, my husband, children.

24      Q.   What information do they have about this?

25      A.   That what went on -- what's going on with

1              E. STEPHENS

2    Maxine and what they did to me.

3         Q.   Can you just take a look at Exhibit X and

4    let me know when you're ready to proceed.  Have you

5    had a change to look at this?

6              (Occupancy Agreement was introduced as

7              Exhibit X.)

8         A.   Yes, I have seen this paper.

9         Q.   Have you seen this document before?

10        A.   Yes, I did.

11        Q.   What is it?

12        A.   Hu?

13        Q.   What is this document?

14        A.   Occupancy agreement.

15        Q.   Did you sign it on the second page?

16        A.   Yes, I did.

17        Q.   And Calvin Stephens, is that your husband?

18        A.   Yes.

19        Q.   Did he sign it as well?

20        A.   Occupancy, yes, he did.

21        Q.   How did this agreement come to be made?

22        A.   This agreement when the house was

23   transferred to the holding company, right, we

24   supposed to pay 2,500 every month, and they say they

25   give us back the house and we continue paying the

Page 298

E. STEPHENS

1
2    mortgage for 2,500.  The occupancy, now they find

3    we're not paying enough money for the property and

4    they get a notary person to come and say that this

5    will be occupancy because we cannot afford it.  9:00

6    in the night he came with the notary person to sign

7    it.  My husband really didn't want to sign it but I

8    said let's sign it because I'm tired of the

9    harassment and she left the documents of what we

10   supposed to have, what we not supposed to do, and

11   all this kind of drama.  I said we did not have that

12   agreement.  The agreement is to stay there for two

13   years until we can continue to pay the 2,500 and we

14   could afford it.

15        Q.   On the very first page at the top this

16   agreement it indicates it's between the owner,

17   127-06 Holdings Inc, and between you and Calvin

18   Stephens and John Does; do you see that?

19        A.   The owner holding, yes, inc and occupancy

20   Calvin Stephens and Evis Stephens, that's my

21   husband.

22        Q.   Is that accurate that 127-06 Holdings was

23   the owner at that time?

24        A.   Yes.

25        Q.   And you and Mr. Stephens were occupants at

Page 299

1                     E. STEPHENS
2     that time?
3          A.   Yes.
4          Q.   You testified it's your understanding you
5     would get the property back?
6          A.   Yes.
7          Q.   What was your understanding of how that
8     would happen?
9          A.   It would happen like give them the
10    authority to get the property from me because I
11    could have given it to any person but he promised,
12    Ms. Maxine promised that you get back everything,
13    transfer it, you get back everything, everything
14    will be fine but while paying the money 2,500 we
15    come to the conclusion that we cannot afford it.  So
16    we going to allow you to have an occupancy
17    agreement, and we should have never signed it
18    because that was 9:00 at night, but I didn't have
19    nobody to talk to, I didn't have an attorney.
20         Q.   Let me bring you back to the question
21    here, just to be clear, what is your understanding
22    of how you would get the property back in two years
23    were they just going to give it to you?
24         A.   Transfer it back to me.
25         Q.   Would you have to pay anything more in two

1              E. STEPHENS

2    years?

3         A.   Like what?

4         Q.   You testified you were going to pay them

5    $2,500 a month.

6         A.   In the beginning they got $10,000 to do

7    all the transactions for me.  10,000 I give them.

8         Q.   But after that two years were you going to

9    pay for those two years?

10        A.   I was paying but the two years isn't up

11   yet, it wasn't even a year yet.

12        Q.   What was your understanding, after two

13   years what was supposed to happen?

14        A.   They transfer everything back to me.

15        Q.   Did you have to pay anything more in the

16   two years?

17        A.   No.

18        Q.   They were just going to give it back to

19   you after two years?

20        A.   Yes.

21        Q.   Did my client, Wilmington, have anything

22   to do with this agreement you have with Ms.

23   Bonaparte or anyone else?

24        A.   Who's Wilmington?

25        Q.   My client Wilmington or Verus did they

1          E. STEPHENS

2    have anything to do with what you just described?

3          A.    I know nothing about it.   I was having

4    conversations with Maxine and Tony, nobody else,

5    Maxine and Tony.

6          Q.    So to your understanding Wilmington and

7    Verus had nothing to do with any of that?

8          A.    That is right.   I didn't know it was

9    Wilmington.   I don't know who they are.

10          Q.    You brought this lawsuit, Ms. Stephens,

11    what is that you want to happen in this lawsuit?

12          A.    I want back my property because it was

13    promised, give us $10,000.   They took us in the

14    basement and everything they told us, she,

15    especially Ms. Maxine, and you're going to get a

16    bank that will give you a good everything,

17    everything, everything she told me I would get.   I

18    didn't have the $10,000.

19          Q.    So let me go back to my question.   So what

20    is it that you believe should happen as a result of

21    this lawsuit?   You should get the property back?

22          A.    I want back my property.

23          Q.    And do you have to pay anyone for that?

24          A.    I'm not paying anyone for it.

25          Q.    So you just get the property back?

1               E. STEPHENS

2       A.    Yeah, I continue to pay the mortgage.

3  That's what the agreement was.

4       Q.    Pay the mortgage to who?

5       A.    Whoever the bank is that they transfer it

6  to.

7       Q.    Do you know how much -- withdrawn.  Do you

8  know whether there's a mortgage on this property?

9       A.    I don't know.

10      Q.    You don't know?

11      A.    No, nobody never told me anything.

12              MR. SMITH:  I don't think I have

13  anymore questions.

14  EXAMINATION BY MR. MESTER:

15      Q.    Good morning, Ms. Stephens.

16      A.    Good morning.

17      Q.    As you know I'm Charles Mester, I was your

18  attorney at the closing during the short sale when

19  the property was sold to Maxine and Lezantonio.

20      A.    Right.

21      Q.    We were just provided with documentation

22  from Mr. Wertman, who's on the video screen today

23  who's the attorney for Maxine Bonaparte and

24  Lezantonio and the holding company that he owns,

25  that's also a defendant in this case, and I want to

1                    E. STEPHENS

2    mark one of those documents that we received as

3    Exhibit Y.

4                    MS. JOSEPH:  Was it received as part

5    of the Discovery Demand?

6                    MR. MESTER:  It was in response to

7    the Discovery that was just recently made when

8    Mr. Wertman --

9                    MR. SMITH:  It was produced

10   yesterday.

11                   (Five-Page Document was introduced as

12                   Exhibit Y.)

13        Q.   Ms. Stephens, do you have a copy of the

14   document?

15        A.   Yes.

16        Q.   Do you see the date on the first page, on

17   the top on the left-hand side?

18        A.   Yeah, that was.

19        Q.   That was before the closing of 177th

20   Street before the property was sold; correct?

21        A.   I guess so.

22        Q.   Do you remember when the closing took

23   place?  Do you remember the date?

24        A.   I can't recall.

25        Q.   Well, I'm going to refer you to exhibit T,

Page 304

1              E. STEPHENS
2   the closing statement that you looked at earlier
3   today.
4        A.    This?
5        Q.    Yes.  It has a date on it.  It's hard to
6   make out.  On the right-hand side it says,
7   "Settlement Date."  Do you see that?  Does 2019
8   sound familiar to you, when we met for the closing?
9        A.    Yes.
10       Q.    The second time we met.
11       A.    Yes.
12       Q.    The first time was in my office with
13   Maxine?
14       A.    Yes.
15       Q.    And the second time was at the real estate
16   closing.
17       A.    Right.
18       Q.    And there was a lot of people, it was in
19   the conference room and we signed a lot of documents
20   that day.
21       A.    Yes.
22       Q.    Okay.  This document that I just showed
23   you for the first time today, 2018, that was before
24   the closing took place; right?  You were negotiating
25   with Ocwen to do the reduced amount of the mortgage

1              E. STEPHENS

2  so it could be sold, right, a short sale?

3       A.   Could I ask a question?  Who was

4  negotiating?  I?  You?

5       Q.   You asked somebody to negotiate for you,

6  didn't you?

7       A.   I didn't understand what was going on in

8  the first place.

9       Q.   When you first met Maxine what did she

10  tell you she was going to do for you?

11       A.   She would take the property and put it

12  under her friend's name, transfer it over to him and

13  transfer it back to me.

14       Q.   As part of that process did you understand

15  that she had negotiated with your mortgage company

16  in order to reduce the amount of the mortgage?

17       A.   With Ocwen?

18       Q.   With Ocwen; yes.

19       A.   Yes, because I asked Ms. Maxine and she

20  said I have it already, I will get it down.

21       Q.   So she and you had conversations about

22  calling Ocwen --

23       A.   Yes.

24       Q.   -- to negotiate with Ocwen; correct?

25       A.   Yeah, but she didn't allow me to do it,

1                    E. STEPHENS

2    she went and did.

3        Q.    You signed papers to allow her to do that

4    for you?

5        A.    No, I didn't sign papers or have to do

6    anything.  I can't recall that.

7        Q.    I'm going to ask you to turn to, the

8    middle of the documents that are stapled here, to

9    page 26.  The handwriting on the document that is an

10   Ocwen document that says, "Mortgage Assistance

11   Application."

12                    MS. JOSEPH:  This?

13                    MR. MESTER:  Yes.

14       Q.    Are you on that page?

15       A.    Yes.

16       Q.    Okay.  What is your understanding of this

17   mortgage assistance application?  What was it for?

18       A.    Mortgage assistance?  I don't understand

19   this.

20       Q.    You don't understand what this document is

21   at this point?

22       A.    No.

23       Q.    Well, let's go over what the document on

24   its face is.  It's a document from Ocwen Loan

25   Services; correct?

1                     E. STEPHENS

2       A.   Right.

3       Q.   And Ocwen was the company that was

4  servicing your mortgage on the property?

5       A.   Okay.

6       Q.   Is that correct?

7       A.   Yes.

8       Q.   So there's an account number on that front

9  page, in the mortgage assistance application; do you

10 see that?

11      A.   Yes.

12      Q.   Does that number look familiar to you?

13      A.   No.  This is Ocwen or something?  I don't

14 know.

15      Q.   It on the Ocwen document; correct?

16      A.   I see my social.

17      Q.   You do see your social?  Where do you see

18 that?

19      A.   Account holder name.

20      Q.   7829 is the last four digits of your

21 social?

22      A.   Yes.

23      Q.   And the email address, do you see that?

24      A.   Yeah.

25      Q.   Do you know whose email address

1          E. STEPHENS

2   orangeblue456@aol.com (phonetic) is?

3          A.    I don't know.

4          Q.    And the phone number?

5          A.    No, I don't know.  That's not my number.

6          Q.    And I would like you to turn to the second

7   page of that document, the second page of the

8   mortgage assistant application.  Let's establish at

9   this point, if you look at the first page of that

10  application it says page one of five, if you look at

11  the bottom.  So we'll establish it's a five-page

12  document and do you have all five pages in front of

13  you?

14         A.    Right.

15         Q.    You have all five pages?

16         A.    Yes.

17         Q.    Let's turn to page two of five.

18         A.    Page two?

19         Q.    Yes.

20         A.    Okay.

21         Q.    There's a section on page two that says,

22  "Property Information."  Do you see that?

23         A.    Yes.

24         Q.    That's the property that you owned and had

25  the mortgage on; correct?

1              E. STEPHENS

2       A.    Right.

3       Q.    And that's the property in which we did

4  the short sale; correct?

5       A.    Okay.

6       Q.    Yes?

7       A.    Yes.

8       Q.    There are items that are checked in this

9  section of property information, do you see a check

10  mark?

11      A.    Yeah.

12      Q.    The property is currently a primary

13  residence and that's checked, right, primary

14  residence?

15      A.    Yes.

16      Q.    That's your primary residence; correct?

17      A.    Yes.

18      Q.    The property is owner occupied, and that's

19  checked; right?

20      A.    Uh-huh.

21      Q.    That's occupied by you, you were the owner

22  at the time; correct?

23      A.    Yes.

24      Q.    I want to sell the property is checked.

25      A.    Yeah.

```
 1                    E. STEPHENS
 2        Q.   Do you see a check mark there?
 3        A.   Yes, I see it.
 4        Q.   And that was your intention when you
 5   were -- with your mortgage company you were
 6   indicating that you wanted to sell the property; is
 7   that accurate?
 8        A.   Yes.  I wasn't selling the property in the
 9   frist place.  I didn't do that.
10        Q.   It is checked; correct?
11        A.   Yes.
12        Q.   And the next section says, "Is the
13   property listed for sale?" and it says "Yes."
14   Right?
15        A.   Yes.
16        Q.   And it lists names underneath that and a
17   phone number; do you see that?
18        A.   Uh-huh.
19        Q.   Whose name is listed there?
20        A.   Maxine Bonaparte.
21        Q.   And who else?
22        A.   I don't know.  Who is that?  Charles?
23        Q.   I'm asking if you can read that name.
24        A.   I cannot read that.
25             MS. JOSEPH:  No, I can't.
```

1              E. STEPHENS

2      Q.   I think it says Sharmaine (phonetic).

3      A.   I don't know who that is.

4      Q.   Do you know Sharmaine Bishop?

5      A.   No.

6      Q.   But you do know Maxine Bonaparte?

7      A.   Yes.

8      Q.   You had already spoken to Maxine

9  Bonaparte, right, in order to handle the issues with

10  your property; right?

11     A.   Yes, she was handling everything.

12     Q.   Is that phone number, that's the same

13  phone number from page one?

14     A.   I cannot recall.  Whose number is that?

15  Can I ask?

16     Q.   Is that the same phone number on page one

17  of the document?  Yes, it is; right?  Can you

18  confirm that?

19     A.   718-578-5773, I can't recall the number.

20     Q.   Do you have a cell phone with you today?

21     A.   Yes.

22     Q.   Would you be able to see if that phone

23  number is saved in your phone?

24     A.   I don't know.

25     Q.   Can you check, please.

1                    E. STEPHENS

2        A.    I don't know that number.

3        Q.    Let's see if it's saved in your contacts.

4              MS. JOSEPH:  What are you asking her

5    to do?

6        A.    I'm calling the number.  Yeah, it's her

7    number.

8              (Phone ringing.)

9        Q.    That number is Maxine Bonaparte's number?

10       A.    Yes.

11       Q.    Did you participate with Maxine in filling

12   out this application for mortgage assistance?

13       A.    No, I did not fill that out.  This paper?

14       Q.    Yes.

15       A.    No, I did not fill this paper out.

16       Q.    You did not fill it out?

17       A.    No.

18       Q.    Have you seen this before?

19       A.    No.  Maxine never bring this paper to me

20   never with Ocwen, never did.

21       Q.    Let's turn to page five of five, the last

22   page of this document.  It's a five-page document.

23   Ms. Stephens, do you see page five of five?

24       A.    Yes.

25       Q.    Do you see an account number written on

1              E. STEPHENS

2    the top of that document?

3         A.   7195; yes.

4         Q.   Is that the same account number that has

5    been listed on page one of five, page two of five,

6    page three of five and page four of five --

7    actually, it's not on every page, I apologize.  Is

8    that the same number on page one of five?

9         A.   Hold on.

10             MS. JOSEPH:  What page?

11        Q.   Let's go back to page one.  I just want to

12   make sure were all on the same page.  That's page

13   one.  We looked at that page already.  You

14   identified your social security number on that page;

15   right?

16        A.   Yes.

17        Q.   And you identified the phone number, which

18   you just called, is Maxine's number?

19             MS. JOSEPH:  Correction, the social

20   security number is not on there.  The account number

21   you mean.

22        Q.   We identified her social security number.

23        A.   That's my last four.

24        Q.   And the account number is on the top of

25   the page; right?  Do you see that?

Page 314

1          E. STEPHENS

2      A.   Yes.

3      Q.   And in the account holder information, do

4  you see that, 71955702?  It's on the top of the page

5  in the account holder information section; correct?

6      A.   Right.

7      Q.   Now, I want you to turn to page five of

8  five and look at the top.  Do you see the account

9  number?

10     A.   Right.

11     Q.   Is it the same account number as on the

12 other page?

13     A.   Yes.

14     Q.   And do you see this document has been

15 signed?

16     A.   Yeah, I see it signed.

17     Q.   Do you recognize that signature?

18     A.   Yes, it's my signature.

19     Q.   And do you see what date?

20     A.   12/21/2015 or '15 or '16.  These numbers,

21 I cannot understand what they're writing.

22     Q.   For the record, it's 2018.  Does that make

23 sense to you that you signed the document with

24 Maxine at the end of 2018?

25     A.   No, I cannot recall it either.

1                    E. STEPHENS

2        Q.    Did you sign any documents at all that

3   Maxine provided to you?

4        A.    No, I never signed.   The only thing I

5   signed was the occupancy.   I can't recall that.

6        Q.    Before the closing, Ms. Stephens, did

7   Maxine come to see you many times?

8        A.    Yes.

9        Q.    Did she bring papers to you to sign.

10       A.    No.

11       Q.    Never brought any papers?

12       A.    If I see any I can't recall it.

13       Q.    Do you remember her bringing any papers to

14   you for signature?

15       A.    No.

16       Q.    How many times did she come to see you?

17       A.    She was always there.

18       Q.    What was the purpose of her coming to see

19   you?

20       A.    Always having something to discuss about

21   concerning the house, money, how to get money, did

22   you get the money yet.   So she always coming.

23       Q.    In none of those visits did she bring

24   paperwork for you to sign?

25       A.    I can't remember signing this one, maybe.

1                          E. STEPHENS

2    I can't remember.

3         Q.   So it's possible that you signed it?

4         A.   It could be.

5         Q.   It does look like your signature; correct?

6         A.   Yes.  Yes.

7         Q.   I would like you to turn to the next page

8    after five of five, the next page.  Do you see that?

9         A.   Yes.

10        Q.   And the date on the top is December 24,

11   2018?

12        A.   Mm-hmm.

13        Q.   Below that it has printed your address;

14   correct?

15        A.   Yeah.

16        Q.   And it has a title on it.  It says,

17   "Letter of Financial Status."  Correct?

18        A.   Mm-hmm, yes.

19        Q.   This piece of paper also has a signature

20   on it; correct?

21        A.   Yes.

22        Q.   It says Evis Stephens below the signature.

23   Does that appear to be your signature?

24        A.   Apparently.  I don't know.  It looks like

25   mine.

Page 317

1                    E. STEPHENS

2        Q.   It looks like your signature; correct?

3        A.   Yes.  Yes.

4        Q.   And what does this document say?  Please,

5   read it for the record.

6        A.   Evis Stephens have been unemployed.  I

7   don't see this paper at all.

8        Q.   Read it exactly how it is.

9        A.   Unemployment stated in 2005.  I have

10  struggled with seeking unemployment due to age and

11  health.  I suffered from stress.  That's not true

12  and I cannot remember signing that.  I have

13  liquidated house debtor short sale.  That's not

14  true.

15       Q.   What's not true?

16       A.   It's not true.  I did not sign that

17  because I was never unemployed.  I was always

18  employed.  I always take care of myself, I pay my

19  taxes and everything.  I don't know what is this?  I

20  don't know.  I can't remember.

21       Q.   You did testify on the first day that you

22  have extreme stress.

23       A.   Not around this time.

24       Q.   Around this time you --

25       A.   2018.  I get stress because of Maxine.

1              E. STEPHENS
2    That started the stress.
3        Q.   Okay.  At this point in time you were
4    working with Maxine; correct?  Look at the date,
5    December 2018; correct?
6        A.   Right.
7        Q.   Did that stress you out working with
8    Maxine?
9        A.   Of course it stressed me out.
10       Q.   Is it accurate to say that you're
11   suffering from extreme stress?
12       A.   With my house in in foreclosure I would
13   get stressed.  Somebody taking over my property.
14   All that is stress.
15       Q.   That's a very, you know, honest answer.  I
16   appreciate that because that's significant.  Okay.
17   So the section that says, "I opted to liquidate the
18   house debt with a short sale." that's an accurate
19   statement; correct?  You were going to do a short
20   sale; correct?
21       A.   You call it a short sale.  I did not think
22   about a short sale.  I think about transferring the
23   house to them.  So I wasn't thinking of short sale
24   and especially if I'm under stress.  You think I'm
25   thinking properly?

Page 319

1                          E. STEPHENS

2          Q.    Ms. Stephens, in your mind you were

3     thinking of transferring the house to them to help

4     you; right?

5          A.    Yes.

6          Q.    To transfer the house you needed to get

7     rid of the mortgage; right?  One thing can't be done

8     without the other.

9          A.    Transfer the house and it come back to me,

10    that's part of the mortgage.

11         Q.    Well, the mortgage is money that's owed on

12    the house and the house has an owner as well;

13    correct?  You were the owner at the time.

14         A.    We all know that.

15         Q.    You owned the house.

16         A.    Yes.

17         Q.    You also had a mortgage that you owed

18    money on and was in foreclosure and you knew that if

19    that mortgage was not taken care of they would

20    auction the house and you would lose it; right?

21         A.    I could have appealed the case.

22         Q.    You could have appealed the case.

23         A.    That is right.

24         Q.    But the mortgage company had the right to

25    foreclose and auction the house if you didn't pay

1                    E. STEPHENS

2     that mortgage; right?

3          A.    As I said; right.

4          Q.    Do you understand that's the process when

5     you don't pay a mortgage?

6          A.    Yes.

7          Q.    Yes.  Right?

8          A.    Right.

9          Q.    So Maxine came to you with the idea of

10    helping you, she presented a strategy to you; right?

11         A.    Yes, but can I ask a question?

12         Q.    No, you can only answer my questions.  She

13    presented a strategy to you, right, and that

14    required you to sell the house; correct?

15         A.    Not sell the house, transfer the house.  I

16    didn't sell it.

17         Q.    So you think there's a difference between

18    transferring the house and selling the house?

19         A.    Ocwen --

20              MS. JOSEPH:  Answer the question.

21         A.    Yes.

22         Q.    What's the difference between those two?

23         A.    We getting rid of the mortgage or

24    something.

25         Q.    So you were going to transfer the house

1          E. STEPHENS

2  and the mortgage was just going to disappear?  What

3  do you understand how the mortgage was going to be

4  removed?

5          A.   Pay the difference or something in order

6  to get a lower price or something.  I don't know.  I

7  have no idea.

8          Q.   The lower mortgage; right?

9          A.   Right.

10          Q.   Is that your understanding of what Maxine

11  was assisting you with to try to get the mortgage

12  lower?

13          A.   Yes.

14          Q.   And then at the time of the transfer you

15  understood that the mortgage, whatever amount that

16  the mortgage company agreed to take, was going to be

17  paid; right?

18          A.   Yes.

19          Q.   And that money was going to come from

20  Maxine and/or Lezantonio; correct?

21          A.   I guess so.

22          Q.   You had met Lezantonio prior to the

23  closing; right?

24          A.   Yes.

25          Q.   He introduced himself as the person that

1                    E. STEPHENS

2    was going to be taking over the house; correct?

3        A.   Yes.

4        Q.   You knew that before the closing; correct?

5        A.   Yes.

6                    MR. MESTER:  That's it.  I have

7    nothing else.

8                    MR. WERTMAN:  Before we adjourn can I

9    have about five minutes to speak to my clients.

10                   MR. MESTER:  Not a problem.

11                   (A break was taken.)

12       Q.   Ms. Stephens, how are you?

13       A.   I'm okay.

14       Q.   I'm Charles Wertman.  As you probably know

15   I represent the other defendants that are in this

16   matter.  I want to ask you a few questions.

17   Hopefully they were not asked previously, if they

18   were, please, just have your lawyer point it out and

19   well move on to the next question.  I will try to

20   make this go as quickly as possible.  Did there ever

21   come a time that you submitted a list of properties

22   that you own other than the property that's the

23   subject of this lawsuit?

24                   MS. JOSEPH:  Objection to that

25   question.  It's vague.  A list of properties to

1             E. STEPHENS

2    whom?

3        Q.    Did you ever submit a list of properties

4    that you own other than the property that's the

5    subject of this lawsuit?

6                 MS. JOSEPH:   To whom?  To anyone?

7                 MR. WERTMAN:  Yeah.

8                 MS. JOSEPH:   Objection to that

9    question.

10       Q.    Did you ever prepare a list of properties

11   that you own, other than -- do you own any other

12   properties besides this property that's the subject

13   of this lawsuit?

14                MS. JOSEPH:   Speak up.

15       A.    Other properties in my name that I said

16   the last time and I don't know if they're there

17   still.

18       Q.    Now, when you say there in your name, does

19   that mean you own them?

20       A.    I will take the owner of it.  It's in my

21   name so -- I give you a list.

22       Q.    What properties do you own other than this

23   subject property?

24       A.    I can't recall those numbers now, those

25   addresses, but it's in Brooklyn.  I can't recall

1            E. STEPHENS

2   them.

3       Q.   As you sit here now do you know any of the

4   properties that you might own other than this

5   property?

6       A.   One has been forgiven.

7       Q.   What property is that?

8       A.   I think eight-something.  I can't recall

9   the address, and the other one I think is still

10  there, 840-something.  I can't recall it.

11      Q.   840.  Do you know the street that it's on?

12      A.   No, dear, I don't know.  I can't recall it

13  but it's forgiven by the government.

14      Q.   When you say it's "forgiven by the

15  government," what do you mean by that?

16      A.   They give the house back to me.

17      Q.   Why did they give the house back to you?

18      A.   I cannot explain that either.

19      Q.   What is your understanding when you said

20  they give the house back to you?

21      A.   It belongs to me and it's in Brooklyn and

22  I don't have it also, somebody else took it away.

23      Q.   Who took it away?

24      A.   I think it belongs to Mr. John Clark.

25      Q.   Who is Mr. John Clark?

1              E. STEPHENS

2       A.   He was one of my paralegals.

3       Q.   When you say he was a paralegal, what do

4  you mean by that?

5       A.   Like an attorney.

6       Q.   Was is it an attorney?

7       A.   A paralegal, he's just a para legal.

8       Q.   Does he work for anybody?

9       A.   I have no clue.

10      Q.   What did you engage him to do?

11      A.   I hand him the property.  I just give him

12  the property.

13      Q.   And what do you mean?

14      A.   I sign it over to him.

15      Q.   Why would you sign over the property to

16  Mr. John Clark?

17      A.   Because he was doing some work for me.

18      Q.   What type of work did he do for you?

19      A.   Modification for my property.

20      Q.   What property is it that he modified or

21  tried to modify?

22      A.   He tried to modify where I live in Queens.

23      Q.   What's the address of that?

24      A.   127-06, that's where I'm living.

25      Q.   Now, did he try to modify any of the other

1                    E. STEPHENS

2    properties that you own?

3         A.    I don't think so.  I don't know.  I have

4    no clue.

5         Q.    Did you have any documents that you gave

6    to Mr. Clark that would show properties that you own

7    or the modifications that he was working on?

8         A.    I have nothing like that.  Those things

9    happened years ago.

10         Q.    When is the last time you spoke with

11   Mr. Clark?

12         A.    I have no clue.  I don't speak to

13   Mr. Clark for about a year or more now.

14         Q.    Do you know if he's employed by any law

15   firm or independently employed?

16         A.    No, I don't know.

17         Q.    Would you have given Mr. Clark a list of

18   properties that you own?

19         A.    I can't recall.  I just talked about the

20   two, that's what you told me about, and I just

21   telling you about the two, nothing more.

22         Q.    When you say about the two, what

23   properties are you referring to?

24         A.    1487 East 53rd and I think it's

25   eight-something.  I can't recall the number, the

1                    E. STEPHENS

2   address.

3         Q.   Do you currently own 1487 East 53rd?

4         A.   I do not own anything, the bank has it and

5   I don't own it.   I think -- I don't know what's

6   going on with it.   All I was interested in is the

7   house I'm living in.

8         Q.   Now, when you say the bank has it, you're

9   referring to the other two properties; correct?

10         A.   1487 and eight-something.   Mr. Clark got

11   that house because that house was forgiven.

12         Q.   Was it the subject of a foreclosure

13   proceeding?

14         A.   I don't I think so.

15         Q.   Were you named as a defendant?

16         A.   I can't recall.

17         Q.   Was your husband named as a defendant?

18         A.   No, he was not.

19         Q.   Did you own it in an LLC or your own

20   personal name?

21         A.   I can't recall.   Also, those are things

22   that happened some years ago.

23         Q.   How did you meet Mr. Clark?

24         A.   A friend of mine introduced me to

25   Mr. Clark.

1            E. STEPHENS

2       Q.   Who is that friend?

3       A.   What was his name?  I think it's an Indian

4   guy but I can't recall where he is now.

5       Q.   When was that?

6       A.   Maybe 2006, 2007, around 2010.  I can't

7   recall these numbers.

8       Q.   Did you ever give Mr. Clark any money?

9       A.   No, I did not give him any money.  He

10  never took money from me.

11      Q.   Where any checks given to Mr. Clark on

12  your behalf?

13      A.   No, I did not give Mr. Clark anything.  He

14  never asked me for any money.

15      Q.   Was there ever an understanding for you to

16  pay any part of the mortgage after Maxine agreed to

17  help you with the short sale?

18      A.   Repeat that.

19      Q.   After Maxine agreed to help you with the

20  short sale did you agree to pay any part of the

21  mortgage?

22      A.   The $2,500 I was giving her.

23      Q.   And did anybody else agree to pay anything

24  else?

25      A.   Nobody else.  You're talking about the

1              E. STEPHENS
2    house I'm living in now?
3         Q.   Yes.  Yes.
4         A.   I keep paying money.  The tenants upstairs
5    was giving her money.
6         Q.   Who are the tenants upstairs?
7         A.   My nieces and my brother are living
8    upstairs.
9         Q.   Do they still live there?
10        A.   Yeah, they still there.
11        Q.   And what was your understanding that they
12   were going to pay rent, the amount?
13        A.   I don't know.  They were just paying their
14   money for the water and utilities.  Maxine came over
15   and told them they have to start paying rent because
16   she's the owner of the property and I don't know
17   what she took from them, you have to ask them that.
18        Q.   You say that you had agreed to pay $2,500,
19   what did that $2,5100 represent?
20        A.   That 2,500 was to go towards the mortgage
21   that Maxine and me have.
22        Q.   Did you ever make those payments?
23        A.   I did.
24        Q.   How many?
25        A.   I can't recall how many I made.  I think

1                    E. STEPHENS

2    it was, like, five mortgage I think I paid the 2,500

3    and then she come and say that money is not enough

4    and she wants me to pay for rent.  She wants to rent

5    it, occupancy.  I have to pay for rent now because

6    you cannot afford it.  She just come there and say

7    that.

8         Q.   Did you continue to make those $2,500

9    payments?

10        A.   She stopped me from paying the 2,500.  She

11   said you have to pay rent.  I want you to rent now.

12        Q.   What happened afterward, did you pay rent?

13        A.   Yes, I was paying $1,500, plus giving her

14   money for the utilities.

15        Q.   What happened to the $2,500 payments?

16        A.   Ask her.  I don't know.

17        Q.   Were you making the $1,500 payments in

18   addition to the $2,500 payment?

19        A.   Yes.  She bring a notary at 9:00 in the

20   night, she brought that person, and she said that I

21   cannot afford it, just like that.  She just said I

22   cannot afford.

23        Q.   How did you make those $2,500 payments?

24   Did you pay in cash?

25        A.   Check.

1          E. STEPHENS

2     Q.   Do you have copies of those check?

3     A.   I don't have here but I have copies.

4     Q.   Can you produce those?

5     A.   If I have those at home.

6     Q.   We ask you to produce those checks.

7     A.   Okay.  I will do that.

8     Q.   Thank you.  Did you sign any -- did there

9  ever come a time that you signed a short sale

10  agreement with the bank?

11     A.   With Ocwen?

12     Q.   Yeah.

13     A.   I can't recall because Maxine is the one

14  handing all those things.  She didn't allow me to do

15  anything.  She went and get Ocwen and did what she

16  had to do with Ocwen, and I asked her.  Apparently

17  she had contact with Ocwen.

18     Q.   What was your understanding that Maxine

19  was going to do?

20     A.   She was going to ask Ocwen to see if she

21  can get the house under her name.

22     Q.   Whose name?

23     A.   Lezantonio, her friend.

24     Q.   And how were they going to get it in their

25  name?

1                    E. STEPHENS

2        A.    Ask Ocwen and Maxine.

3        Q.    What were you going to get?

4        A.    I will get nothing.  I will just have to

5   stay until they get it in their name and after a

6   while she said I will get back the property.

7        Q.    How would you get back the property?

8        A.    They transfer it back to me.

9        Q.    Would you have to pay her?

10       A.    I don't think so.  I just keep paying the

11  mortgage.

12       Q.    So it your testimony they would pay the

13  bank to have the property transferred over to --

14       A.    No.  No.  No.  I was paying the property.

15  As I said, she stopped me.  Why did you stop me?

16  She stopped me from paying.  She said I have to move

17  out from the house and go.

18       Q.    Well, actually a moment ago you said that

19  she was going to work something out with the bank

20  and have the property transferred in their name; is

21  that correct?

22       A.    Yes.

23       Q.    Now, what did you understand that to mean

24  when you say they transferred it to her name?

25       A.    I don't know how Maxine going to do it.

1                    E. STEPHENS

2    She told me and I just believed what she's going to

3    do and I don't know how she's going to get it done.

4         Q.    I'm not asking you that.  I'm asking what

5    did you understand that transfer was going to be?

6         A.    I'm going to get back the house by paying

7    $2,500, and that's what I understand.

8         Q.    Why would they need to have the house

9    transferred into their name?

10        A.    I don't know.  She said she's going to

11   help me out.  She came by my house.  I didn't look

12   for Maxine, Maxine came to my house.

13        Q.    But you understood that the house was

14   going to be transferred to their name?

15        A.    Yes.  To her friend Lezantonio.

16        Q.    Did she pay you any money for that?

17        A.    No, she did not.  I pay her money.  I paid

18   her $10,000.

19        Q.    What kind of agreement did you understand

20   you were going to have with the bank?

21        A.    Let me get this straight, Maxine came to

22   me and she told me, Ms. Stephens, I want you to give

23   me $10,000.

24        Q.    I'm asking what you understood the

25   agreement was with the bank.

Page 334

E. STEPHENS

1

2      A.    Well, she go to the bank and maybe that

3   she will know how to get the bank to give me back

4   the property when she transfer it back to me, to

5   Antonio.   I don't know how it was going to be done.

6   She said she will give me back the property.   That's

7   all she said to me.   I was happy about it and I did

8   everything she ask me.

9      Q.    At the time that you spoke to Maxine was

10  the mortgage in default?

11     A.    Of course the mortgage was in default.

12     Q.    And at the time that you spoke to Maxine

13  was there a pending foreclosure action?

14     A.    Yes.   I went to court.

15     Q.    And what did you understand was going to

16  happen with the money that was in arrears?

17     A.    The house was in foreclosure, that's what

18  I understand.

19     Q.    Well, how was the foreclosure going to be

20  resolved, in your understanding?

21     A.    Can I explain something to everybody here?

22     Q.    No, I'm asking you a question.   What was

23  your understanding as to --

24     A.    That I would get back the property.

25     Q.    What was your understanding as to what was

1              E. STEPHENS

2  going to happen with the foreclosure proceeding?

3       A.   I will get back the property.  She

4  promised all that to me.  That's my understanding.

5       Q.   I understand that but how were you going

6  to --

7       A.   By paying the $2,500 every month.

8       Q.   And who was going to pay the arrears?

9              MS. JOSEPH:  I think she answered the

10  question.

11             MR. WERTMAN:  She did not answer the

12  question.

13             MS. JOSEPH:  That's her answer to the

14  question.

15       Q.   How much was the mortgage payment at the

16  time?

17       A.   Where ever Maxine went, whatever bank she

18  went in, she said, Ms. Stephens, how much you going

19  to pay, and I said 2,500.

20       Q.   If you were paying 2,500 wouldn't you have

21  to also pay for the arrears?

22       A.   Ask Ms. Maxine that.

23       Q.   I'm asking you that.

24       A.   I don't know.  Why would I know.  She's

25  coming to me.

1          E. STEPHENS

2     Q.   Well, what would you think would happen

3  with the arrears?

4     A.   When I keep paying 2,500.  She give me two

5  years to pay 2,500, and I willfully pay it, and I

6  understood that the house would come back to me.  I

7  don't know how she do it.  I never ask her how she

8  going to get it done but she say she's going to get

9  it done.

10    Q.   I understand that.  You keep answering

11 that.

12          MS. JOSEPH:  That's her answer.

13    Q.   Do you know how much was in arrears at the

14 time that you spoke to Maxine?

15    A.   Ask Maxine.

16    Q.   I'm asking you.

17    A.   She went and look up everything.  She went

18 and look for everything.  She knows.  I'm going to

19 get everything done, that's why she came to me.

20    Q.   Do you know how much money was in arrears?

21    A.   She had everything.  She had everything

22 made.

23    Q.   Can you estimate how much money was in

24 arrears?

25    A.   I didn't ask her.

1          E. STEPHENS

2      Q.   When did you stop paying the mortgage?

3      A.   I can't recall.  I stop paying it.  I

4  couldn't afford it and it came back to me where I

5  went to court.  Maxine came to my home and give me

6  her promise.

7      Q.   Do you know approximately how many years

8  you hadn't paid the mortgage at that time?

9      A.   I can't remember.

10     Q.   Can you give us an approximation?

11     A.   I can't recall.

12     Q.   Was it more than five years?

13     A.   No, less than that, and I can't recall.

14     Q.   Was it more than three years?

15     A.   I can't recall.

16     Q.   But there was an amount in arrears that

17 was due to the bank; is that correct?

18     A.   I guess so.

19     Q.   So how were those arrears going to be

20 collected?  How was the bank going to get their

21 arrears?

22     A.   My understanding is to pay the money, pay

23 the $10,000 and you will continue to pay the 2,500

24 and if I continue you never know we going to

25 refinance it back from Tony, from Maxine and the

1                    E. STEPHENS

2    company, and it come back to me.  That what my

3    understanding was.

4         Q.    Did you make a mortgage application for

5    the new refinancing?

6         A.    With who?

7         Q.    You said that Tony was to -- you said you

8    were going to do a refinance and pay back Tony.

9         A.    It didn't reach yet.

10        Q.    Did you pay any money to Tony towards the

11   mortgage payoff?

12        A.    $2,500.

13        Q.    You said that Tony was going to get

14   reimbursed for his money, who gave him the money?

15        A.    Listen to me very carefully, the 2,500

16   Maxine and Tony was in the story and that was the

17   money that I give to Tony and Maxine, the 2,500.

18        Q.    Just walk me through this deal, if I may,

19   and then we can conclude.  At some point in time you

20   stopped paying the mortgage; is that correct?

21        A.    Right.

22        Q.    And at some point in time a foreclosure

23   proceeding was commenced; correct?

24        A.    Right.

25        Q.    And at some point in time you were named

1              E. STEPHENS

2    as a defendant in that foreclosure proceeding; is

3    that correct?

4         A.   Right.

5         Q.   And did you have an attorney that

6    represented you in that foreclosure proceeding?

7         A.   No, I didn't have anybody.  Ocwen was

8    talking.  Ocwen and I was talking back and forth.

9         Q.   When you spoke with Ocwen what did the

10   conversation consist of?

11        A.   Ocwen promised that if I continue with

12   arrears I would be all right.  My attorney was

13   Mr. Rouse.

14        Q.   Spell that, please.

15        A.   No.

16        Q.   Do you know his first name?

17             MS. JOSEPH:  It's in the documents

18   that were submitted earlier into evidence.

19             MR. WERTMAN:  I'm asking her if she

20   knows his name.

21        A.   Of course, Mr. Rouse was the attorney for

22   me.  He's the one that took me to the court on

23   Sutphin Boulevard for my house.

24        Q.   What eventually happened in that

25   foreclosure proceeding?

1                    E. STEPHENS
2          A.    I didn't go in the room and the judge told
3    him to come in the room and have a discussion.
4          Q.    What did he tell you?
5          A.    That we can do a modification.
6          Q.    Did you try to do a modification?
7          A.    By that time to do a modification Ms.
8    Maxine came around.
9          Q.    Now, when Mrs. Maxine came around the
10   foreclosure was still pending; is that correct?
11         A.    I guess so.
12         Q.    And what did you understand was going to
13   happen now?  Now that we walked through the
14   transaction, you know there's arrears, you know
15   there's a foreclosure, and what did you understand
16   was going to happen with the arrears and the
17   foreclosure?
18         A.    First we were going to appeal the case, as
19   I said, we were going to appeal the case to the
20   court because the court gives you time to do a lot
21   of stuff and at that time Maxine came to me.
22         Q.    I don't understand.  Who was going to
23   handle the appeal?
24         A.    Mr. Rouse.
25         Q.    Was there ever an appeal filed?

1                    E. STEPHENS

2       A.   No, we cannot file because Ms. Maxine

3   came.

4       Q.   And instead of doing the appeal you went

5   forward with the short sale; correct?

6       A.   Yes, the Maxine deal.

7       Q.   And, now, what was that deal going -- what

8   was that deal going to do?  Let's go back again, how

9   was that deal going to resolve the foreclosure

10  proceeding?

11      A.   I don't know.  I didn't get no foreclosure

12  document.

13      Q.   You said you were in the court.  You said

14  you were in court for the foreclosure; correct?  You

15  knew there was a foreclosure; is that correct?

16      A.   I didn't get any documents for

17  foreclosure.

18      Q.   You were aware that there was a

19  foreclosure; is that correct?

20      A.   Yes.

21      Q.   When you were going to do a deal with

22  Maxine what did you understand was going to happen

23  in the foreclosure?

24      A.   You can always appeal the case with the

25  foreclosure; right?

1          E. STEPHENS

2      Q.   You said that Maxine did not appeal the

3   case and there never was an appeal, so what did you

4   understand was going to happen, they were going to

5   pay the house on your behalf?  Was that going to

6   happen?  They were going to pay the bank?

7      A.   That's what Maxine promised me.

8      Q.   Why would she want to pay the bank on your

9   behalf?  What would be in it for her?

10     A.   Why did she take my $10,000?

11     Q.   I'm not asking you that.  You're saying

12  for $10,000.  How much money did she have to pay the

13  bank?

14     A.   She took my $10,000 to go to the bank and

15  negotiate with the bank and put Tony on the contract

16  to get the house back to me.  That's what the

17  promise was and that's it, amen.

18     Q.   What was Tony going to get for that?

19     A.   Ask Tony.

20     Q.   I'm asking you.

21     A.   I don't know.  I didn't ask him.  He said

22  he's going to give me back the property, I don't

23  want the property, I'm going to give it back to you.

24     Q.   When he would give you back the property?

25  Were you going to pay him back the money he paid the

1                    E. STEPHENS

2    bank?

3          A.    Well, maybe he might have a deal about

4    that after when we reach that time but they didn't

5    negotiate with anything, so maybe that time after

6    when the property go back to me there might by

7    something that he would get out of it.  I have no

8    idea.

9          Q.    Earlier you were shown a mortgage

10   satisfaction, do you remember seeing that?

11         A.    You tell me.  I don't know.

12         Q.    I'm asking you, when you saw the mortgage

13   satisfaction, do you understand what a mortgage

14   satisfaction is?

15         A.    No.

16         Q.    So did you ever hear or did you ever feel

17   that the mortgage was paid off at any time?

18         A.    When we went to the closing I guess it was

19   paid off.

20         Q.    Now, what did you understand the closing

21   to be?

22         A.    When it was transferred to their name and

23   they pay a lower amount of money for the house.

24         Q.    How much did they pay?

25         A.    I have no idea.

```
1                    E. STEPHENS
2        Q.    Well, do you know approximately how much
3   they paid?
4        A.    I think 300,000-something.
5        Q.    Now, they were paying $300,000, what were
6   they getting in return for the $300,000 payment?
7        A.    Maybe they negotiate something with me
8   then maybe they get something.
9        Q.    What happens if they didn't negotiate with
10  you?  What was going happen with the $300,000?
11       A.    I would fight back for everything.
12       Q.    So why would they lay out $300,000 for
13  you?
14       A.    I don't know.
15       Q.    Did you ever have an understanding that
16  you were going to pay them back that 300,000?
17       A.    I don't know.  We have to come to that
18  conclusion.
19       Q.    Did you think you were getting a $300,000
20  gift?
21       A.    Maybe.  Maybe that's my godmother.
22       Q.    Why would they give you a $300,000 gift?
23  Are you related to Maxine?
24       A.    Well, I don't know.  She came to my
25  property.
```

1              E. STEPHENS

2      Q.    Are you related to Tony?

3      A.    No.  They came to me.

4      Q.    Who did they give the $300,000 to?

5      A.    I don't know.

6      Q.    Well, how do you know that it was around

7  $300,000?

8      A.    It's in the record.

9      Q.    When you were at the closing -- you

10  attended the closing; correct?

11     A.    Yes.

12     Q.    What did you understand that closing to

13  be?

14     A.    A closing.  Just Mr. Mester was

15  representing me and Tony on the other side signing

16  and telling me where to sign.  They told me what to

17  do.

18     Q.    What was your role at the closing?  Were

19  you the seller?

20     A.    Signing over my name to them.

21     Q.    When you were signing were you signing as

22  a seller of the property?

23     A.    Maybe.

24     Q.    So you sold the property for $300,000,

25  that they were going to pay the bank; is that

Page 346

1                    E. STEPHENS
2     correct?
3          A.   I don't know how much it was.  I don't
4     know.  I saw it in the record after.  I didn't know
5     it was that amount of money.
6          Q.   So you sold the property for a certain
7     amount of money and in return they were going to get
8     title to the property; is that correct?
9          A.   I don't know, maybe.
10         Q.   Well, what other arrangement did you have
11    with them?
12         A.   After the closing?
13         Q.   No, at the closing.  At the closing what
14    was your arrangement?
15         A.   Just to sign.  Sign here, sign there.
16         Q.   What were you signing?
17         A.   Signing documents to sign it over to Tony.
18         Q.   Did you sign a deed?
19         A.   I don't know what it was.  It was a deed I
20    think.
21         Q.   So what did you understand that deed to
22    be?
23         A.   Tony taking possession of the property.
24         Q.   When you say "possession," do you mean
25    ownership of the property?

1          E. STEPHENS

2     A.    That's what it is.   That's what we agreed

3   about.

4     Q.    Okay.  So you agreed to have him have

5   ownership; is that correct?

6     A.    Right.

7     Q.    Okay.  Do you still live at 127-06 177th

8   Street?

9     A.    Yes, I am.

10    Q.    Okay are you paying rent to anyone?

11    A.    Should I answer that?  Who am I going to

12  pay the rent to?

13    Q.    I'm asking.  Do you pay for the electric?

14    A.    Yes, I did.  My utilities was cut off by

15  Maxine and Tony and I went to the court and they

16  didn't want me to get it back and National Grid

17  said, no, I was always paying my utilities.

18  National Grid and Con Ed give me back my lights in

19  my name.

20    Q.    Are you paying utilities now?

21    A.    I'm always paying utilities, ever since.

22    Q.    Are you paying National Grid now?

23    A.    Definitely.

24    Q.    Who pays the taxes on the house?

25    A.    Nobody pays the taxes on that property

```
1                    E. STEPHENS
2    right now, nobody.
3         Q.    Who pays the water bill?
4         A.    Nobody.  Who am I going to pay it to?  I
5    call to pay the water bill and I couldn't pay it.  I
6    was going to pay.  I couldn't pay because it's under
7    their name.
8                    MR. WERTMAN:  All right.  I have no
9    further questions.
10                   COURT REPORTER:  Is anyone ordering a
11   copy?
12                   MR. SMITH:  Yes, we will order a
13   copy.
14              (TIME NOTED:  12:20 p.m.)
15
16
17
18
                   _____
19                      EVIS NEVERLANE STEPHENS
20
21   Subscribed and sworn to before me
22   this _____ day of _____, 20___.
23
24   _____
25        NOTARY PUBLIC
```

Page 349

```
 1                    E. STEPHENS
 2                  I N D E X
 3   EXAMINATION BY                        PAGE
 4   Mr. Ryan                             270
     Mr. Smith                            284
 5   Mr. Mester                           302
 6
 7                E X H I B I T S
 8   EXHIBIT        DESCRIPTION            PAGE
     Exhibit S      Release of Mortgage    272
 9   Exhibit T      Stephens125-Stephens127  275
     Exhibit U      Stephens128-Stephens131  277
10   Exhibit V      Notice to Discontinue  279
     Exhibit W      Three-Page Document    283
11   Exhibit X      Occupancy Agreement    297
     Exhibit Y      Five-Page Document     303
12        Exhibits retained by counsel.
13
14
15                R E Q U E S T S
16   DESCRIPTION              PAGE        LINE
17   Documents               287          11
     Paper confirming being sued
18   for $50,000             295          25
     Checks                  331           6
19
20
21
22
23
24
25
```

1          E. STEPHENS
2          C E R T I F I C A T E
3

4     I, ANNMARIE OAKLEY, a Shorthand Reporter and
5  Notary Public within and for the State of New York,
6  do hereby certify:
7     THAT EVIS NEVERLANE STEPHENS, the witness whose
8  deposition is herein before set forth, was duly
9  sworn by me, and that such deposition is a true
10  record of the testimony given by such witness.
11     I further certify that I am not related to any
12  of the parties to this action by blood or by
13  marriage and that I am in no way interested in the
14  outcome of this matter.
15     IN WITNESS THEREOF, I have hereunto set my hand
16  this 30th day of July, 2025.
17
18                *Ann McOakley*
19                ANNMARIE OAKLEY
20
21
22
23
24
25

Page 351

ERRATA SHEET
VERITEXT/NEW YORK REPORTING, LLC

CASE NAME: Evis  Neverlane Stephens v. Maxine Bonaparte, Et Al
DATE OF DEPOSITION: 7/30/2025
WITNESSES' NAME: Evis Neverlane Stephens

| PAGE | LINE (S) | CHANGE | REASON |
|------|----------|--------|--------|
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |

_____
Evis Neverlane Stephens

SUBSCRIBED AND SWORN TO BEFORE ME
THIS _____ DAY OF _____, 20__.


_____          _____
(NOTARY PUBLIC)                        MY COMMISSION EXPIRES:

[& - 5702]                                                                    Page 1

| **&** |
| --- |
| **&**   269:11 |

| **0** |
| --- |
| **07407**   269:13 |

| **1** |
| --- |
| **1,500**   330:13,17 |

**10,000**   300:6,7
  301:13,18
  333:18,23
  337:23 342:10
  342:12,14
**100**   269:22
**10007**   269:5
**1001**   269:4
**10020**   268:19
  269:18
**10122**   269:9
**11**   283:11
  349:17
**11434**   270:11
  274:11
**11570**   269:23
**12/21/2015**
  314:20
**12258**   350:18
**125**   275:15,22
  289:20,21
**1251**   268:19
  269:18
**126**   281:18
**127**   275:15,17
  291:3,6,10

**127-06**   270:10
  271:11 273:9
  273:18,23
  274:10 276:7
  276:19 279:9
  280:5 298:17
  298:22 325:24
  347:7
**12706**   268:14
**128**   278:7
  289:24
**12:20**   348:14
**13**   268:7
**131**   278:7
**1487**   326:24
  327:3,10
**15**   314:20
**16**   314:20
**177th**   270:10
  271:11 273:9
  273:18,23
  276:7 279:9
  280:5 281:18
  303:19 347:7

| **2** |
| --- |
| **2,500**   297:24 |

  298:2,13
  299:14 300:5
  328:22 329:18
  329:20 330:2,8
  330:10,15,18
  330:23 333:7
  335:7,19,20

  336:4,5 337:23
  338:12,15,17
**2,5100**   329:19
**20**   348:22
  351:22
**2005**   317:9
**2006**   293:3
  328:6
**2007**   328:6
**201**   269:13
**2010**   328:6
**2018**   304:23
  314:22,24
  316:11 317:25
  318:5
**2019**   283:10,12
  289:7 292:24
  293:21 304:7
**2020**   268:16
  269:17 284:23
  285:2
**2025**   268:20
  350:16
**21-42857**   268:6
**22-01037**
  268:17
**225**   269:8
**24**   316:10
**25**   349:18
**26**   306:9
**270**   349:4
**272**   349:8
**275**   349:9

**277**   349:9
**279**   349:10
**283**   349:10
**284**   349:4
**287**   349:17
**295**   349:18
**297**   349:11

| **3** |
| --- |
| **3**   292:13 |

**30**   268:20
**300,000**   344:4,5
  344:6,10,12,16
  344:19,22
  345:4,7,24
**302**   349:5
**303**   349:11
**304w**   269:22
**305**   269:4
**30th**   350:16
**331**   349:18
**337,500**   277:14
  278:10
**34th**   269:8
**37th**   269:18

| **5** |
| --- |
| **50,000**   349:18 |

**53rd**   326:24
  327:3
**55,000**   286:7
  295:7,9,21
**5702**   273:4
  276:24 278:16
  279:6

| 6 | acknowledging | afterward | annmarie |
|---|---|---|---|
| **6** 283:10 | 292:2 | 330:12 | 268:24 350:4 |
| 349:18 | **acquired** 284:9 | **age** 317:10 | 350:19 |
| **669** 269:13 | **action** 281:4,16 | **ago** 280:9 | **answer** 271:8 |

| 7 |
|---|

**7/30/2025** 351:3
**718-578-5773** 311:19
**7195** 313:3
**71955702** 314:4
**7829** 307:20

| 8 |
|---|
| **840** 324:10,11 |

| 9 |
|---|
| **9th** 269:8 |

| a |
|---|

**a.m.** 268:20
**able** 311:22
**above** 268:23
276:15 291:12
291:13
**account** 307:8
307:19 312:25
313:4,20,24
314:3,5,8,11
**accurate**
298:22 310:7
318:10,18
**acknowledges**
291:21

**action** 281:4,16
283:19 285:17
334:13 350:12
**actually** 313:7
332:18
**addition**
330:18
**address** 270:8
273:18,20,21
273:23,25
274:11,13,15
275:23 276:16
278:17 307:23
307:25 316:13
324:9 325:23
327:2
**addresses**
323:25
**adjourn** 322:8
**adversary**
268:15
**affirmation**
281:12
**affirmed** 270:3
283:19
**affirms** 281:15
**afford** 298:5,14
299:15 330:6
330:21,22
337:4

**age** 317:10
**ago** 280:9
286:22 326:9
327:22 332:18
**agree** 291:22
328:20,23
**agreed** 270:21
321:16 328:16
328:19 329:18
347:2,4
**agreement**
297:6,14,21,22
298:12,12,16
299:17 300:22
302:3 331:10
333:19,25
349:11
**akerman**
269:16
**al** 351:2
**allow** 299:16
305:25 306:3
331:14
**amen** 342:17
**americas**
268:19 269:18
**amount** 277:14
278:9 292:13
292:15 304:25
305:16 321:15
329:12 337:16
343:23 346:5,7

**answer** 271:8
274:8 280:14
283:2 318:15
320:12,20
335:11,13
336:12 347:11
**answered**
335:9
**answering**
336:10
**antonio** 334:5
**anybody**
296:12,20
325:8 328:23
339:7
**anymore**
302:13
**aol.com** 308:2
**apologize** 283:2
313:7
**apparently**
316:24 331:16
**appeal** 340:18
340:19,23,25
341:4,24 342:2
342:3
**appealed**
319:21,22
**appear** 316:23
**appearing**
268:23

**application**
306:11,17
307:9 308:8,10
312:12 338:4
**appreciate**
318:16
**approximately**
272:14 337:7
344:2
**approximation**
337:10
**arrangement**
346:10,14
**arrears**  334:16
335:8,21 336:3
336:13,20,24
337:16,19,21
339:12 340:14
340:16
**asked**  288:22
292:15 305:5
305:19 322:17
328:14 331:16
**asking**  284:5,6
292:10 295:6
310:23 312:4
333:4,4,24
334:22 335:23
336:16 339:19
342:11,20
343:12 347:13
**assistance**
306:10,17,18
307:9 312:12

**assistant**  308:8
assisting
321:11
**attended**
345:10
**attorney**
280:17,20,22
288:13 289:4
296:19 299:19
302:18,23
325:5,6 339:5
339:12,21
**attorneys**  269:4
269:8,11,16,21
288:17
**auction**  319:20
319:25
**authority**
299:10
**avenue**  268:19
269:18
**aware**  279:12
279:14,14
285:16 296:20
341:18

| b |
| --- |

**b**  349:7
**back**  282:14
289:7 297:25
299:5,12,13,20
299:22,24
300:14,18
301:12,19,21

301:22,25
305:13 313:11
319:9 324:16
324:17,20
332:6,7,8
333:6 334:3,4
334:6,24 335:3
336:6 337:4,25
338:2,8 339:8
341:8 342:16
342:22,23,24
342:25 343:6
344:11,16
347:16,18
**badger**  282:25
**badgering**
283:3
**bag**  288:8
**bank**  273:15
285:23 301:16
302:5 327:4,8
331:10 332:13
332:19 333:20
333:25 334:2,3
335:17 337:17
337:20 342:6,8
342:13,14,15
343:2 345:25
**bankruptcy**
268:2
**banks**  286:13
**basement**
301:14

**bates**  278:6
beginning
295:5 300:6
**behalf**  282:8
328:12 342:5,9
**believe**  273:13
273:15 301:20
**believed**  333:2
**belongs**  324:21
324:24
**bill**  348:3,5
**bishop**  311:4
**black**  275:11
291:15,17
**blood**  350:12
**bonaparte**
268:13 269:21
269:25 296:13
300:23 302:23
310:20 311:6,9
351:2
**bonaparte's**
312:9
**borrower**
276:16,19
**bottom**  275:17
278:6 291:3,6
308:11
**boulevard**
339:23
**break**  322:11
**bring**  286:16
286:22,23
299:20 312:19

315:9,23
330:19
**bringing**
315:13
**broad** 287:15
**broadway**
269:4
**brooklyn**
323:25 324:21
**brother** 329:7
**brought** 301:10
315:11 330:20
**bunch** 286:20
**busy** 288:9
**buy** 272:3

**c**

**c** 269:2 350:2,2
**call** 282:14
287:10 318:21
348:5
**called** 313:18
**calling** 305:22
312:6
**calvin** 297:17
298:17,20
**cancel** 281:5
**canceling**
281:17
**capacity**
284:21
**caption** 284:23
**caram** 289:3

**care** 317:18
319:19
**carefully**
293:16 338:15
**case** 270:18
274:2,21
275:14 278:8
279:12,18
280:10,17,19
280:21 283:10
283:23 284:7
284:20,24
302:25 319:21
319:22 340:18
340:19 341:24
342:3 351:2
**cash** 330:24
**cell** 311:20
**centre** 269:23
**certain** 272:13
346:6
**certify** 350:6,11
**chance** 272:12
**change** 297:5
351:5
**chapter** 268:7
**charles** 268:14
269:7,8,9,21,23
302:17 310:22
322:14
**check** 309:9
310:2 311:25
330:25 331:2

**checked** 309:8
309:13,19,24
310:10
**checks** 328:11
331:6 349:18
**children**
296:23
**chronology**
280:4
**city** 272:16,18
**clark** 324:24,25
325:16 326:6
326:11,13,17
327:10,23,25
328:8,11,13
**clear** 283:2
299:21
**client** 295:13
300:21,25
**clients** 296:13
322:9
**closing** 280:6
289:7,12,15
292:24 302:18
303:19,22
304:2,8,16,24
315:6 321:23
322:4 343:18
343:20 345:9
345:10,12,14
345:18 346:12
346:13,13
**clue** 325:9
326:4,12

**collect** 278:9
collected
337:20
**color** 275:12
**column** 277:10
**come** 292:8
297:21 298:4
299:15 315:7
315:16 319:9
321:19 322:21
330:3,6 331:9
336:6 338:2
340:3 344:17
**coming** 288:12
288:15 293:9
293:10 294:6
315:18,22
335:25
**commenced**
338:23
**commission**
351:25
**company**
270:25 271:2
294:3,14,15
295:11 297:23
302:24 305:15
307:3 310:5
319:24 321:16
338:2
**completed**
277:24
**con** 347:18

**concerning**
271:7,11
295:19,19
315:21
**concerns**  279:4
**conclude**
338:19
**concluded**
271:3
**conclusion**
299:15 344:18
**conference**
304:19
**confirm**  279:5
284:6 311:18
**confirming**
349:17
**connected**
286:2
**connection**
285:24
**consist**  339:10
**contact**  296:7
331:17
**contacts**  312:3
**continue**
297:25 298:13
302:2 330:8
337:23,24
339:11
**continued**
268:22
**contract**
342:15

**conversation**
339:10
**conversations**
301:4 305:21
**copies**  331:2,3
**copy**  275:12
290:8 303:13
348:11,13
**correct**  272:24
273:10,22
274:16,18,21
275:2 276:4,10
276:11,13
277:4,15
278:18,25
279:6 280:17
281:9,21,25
282:19 284:2
292:6,12,22
303:20 305:24
306:25 307:6
307:15 308:25
309:4,16,22
310:10 314:5
316:5,14,17,20
317:2 318:4,5
318:19,20
319:13 320:14
321:20 322:2,4
327:9 332:21
337:17 338:20
338:23 339:3
340:10 341:5
341:14,15,19

345:10 346:2,8
347:5
**correction**
313:19
**correctness**
291:22
**counsel**  283:19
287:2 290:4
349:12
**county**  274:22
**course**  293:25
294:11 318:9
334:11 339:21
**court**  268:2
281:15 283:24
334:14 337:5
339:22 340:20
340:20 341:13
341:14 347:15
348:10
**current**  294:15
**currently**
273:21 274:3
276:12 309:12
327:3
**cut**  347:14

**d**

**d**  349:2
**dahiya**  292:22
**date**  303:16,23
304:5,7 314:19
316:10 318:4
351:3

**day**  304:20
317:21 348:22
350:16 351:22
**dba**  269:12
**deal**  338:18
341:6,7,8,9,21
343:3
**dear**  324:12
**debt**  318:18
**debtor**  268:8
317:13
**december**
316:10 318:5
**deed**  346:18,19
346:21
**default**  334:10
334:11
**defendant**
269:8,16
302:25 327:15
327:17 339:2
**defendants**
268:18 269:11
270:17,22
322:15
**definitely**
347:23
**demand**  303:5
**department**
272:17
**deposition**
268:22 270:21
271:4 287:6,13
287:17,19,23

288:12,16,19
289:2 296:22
350:8,9 351:3
**described**
301:2
**description**
349:8,16
**difference**
320:17,22
321:5
**different**
285:19
**digits** 307:20
**disappear**
321:2
**disclosure**
291:21
**discontinue**
279:21 281:4
349:10
**discontinued**
283:20
**discontinuing**
281:16
**discovery**
278:5 303:5,7
**discuss** 288:11
288:15 315:20
**discussion**
340:3
**dismissed**
283:23 284:8
**dismissing**
280:10

**district** 268:3
docket 279:18
283:9
**document**
272:6,12,14,19
272:23 275:4
275:14 278:5,7
279:15,17,25
280:2 281:3,8
281:9 282:10
283:6 284:6,13
287:20 290:22
292:2,7,8,11
297:9,13
303:11,14
304:22 306:9
306:10,20,23
306:24 307:15
308:7,12
311:17 312:22
312:22 313:2
314:14,23
317:4 341:12
349:10,11
**documentation**
302:21
**documents**
271:14 279:11
279:13 286:23
287:3,5,11,15
287:16 288:3
289:9,13,16
290:3 298:9
303:2 304:19

306:8 315:2
326:5 339:17
341:16 346:17
349:17
**doing** 270:16
325:17 341:4
**drama** 298:11
**drive** 269:13
**drop** 288:4,7,8
**due** 283:20
317:10 337:17
**duly** 270:2
350:8

## e

**e** 269:1,2,2
270:2,2,2
271:1 272:1
273:1 274:1
275:1 276:1
277:1 278:1
279:1 280:1
281:1 282:1
283:1 284:1
285:1 286:1
287:1 288:1
289:1 290:1
291:1 292:1
293:1 294:1
295:1 296:1
297:1 298:1
299:1 300:1
301:1 302:1
303:1 304:1

305:1 306:1
307:1 308:1
309:1 310:1
311:1 312:1
313:1 314:1
315:1 316:1
317:1 318:1
319:1 320:1
321:1 322:1
323:1 324:1
325:1 326:1
327:1 328:1
329:1 330:1
331:1 332:1
333:1 334:1
335:1 336:1
337:1 338:1
339:1 340:1
341:1 342:1
343:1 344:1
345:1 346:1
347:1 348:1
349:1,2,7,15,15
350:1,2,2
**earlier** 278:22
278:24 287:21
304:2 339:18
343:9
**early** 287:22
**east** 326:24
327:3
**eastern** 268:3
**ed** 347:18

**efforts** 271:15
**eight** 324:8
  326:25 327:10
**either** 290:15
  314:25 324:18
**electric** 347:13
**elmwood**
  269:13
**email** 307:23
  307:25
**employed**
  317:18 326:14
  326:15
**ended** 282:22
**ends** 273:3
**engage** 325:10
**entered** 280:4
  283:9,11
**entities** 270:23
  285:2
**entity** 284:24
  285:3
**errata** 351:1
**especially**
  301:15 318:24
**esq** 268:14
  269:5,5,9,14,19
  269:23
**establish** 308:8
  308:11
**estate** 304:15
**estimate**
  336:23

**et** 351:2
**eventually**
  339:24
**everybody**
  334:21
**evidence**
  339:18
**evis** 268:6,10
  268:22 270:7
  298:20 316:22
  317:6 348:19
  350:7 351:2,3
  351:21
**exactly** 282:21
  317:8
**examination**
  270:12 284:18
  302:14 349:3
**examined**
  270:4
**exhibit** 272:6
  272:10 275:5,9
  277:3,18,21
  278:21,24
  279:6,16,22
  280:6,7,8
  283:4,7,8,15,25
  284:2,10
  289:18,19,21
  289:24 290:8
  290:14 291:2,5
  292:10 297:3,7
  303:3,12,25
  349:8,8,9,9,10

  349:10,11,11
**exhibits** 349:12
**exists** 296:4,6
**expires** 351:25
**explain** 275:10
  278:2 324:18
  334:21
**extensively**
  289:8
**extreme** 317:22
  318:11

      **f**

**f** 350:2
**face** 306:24
**fact** 282:21
  288:11
**familiar** 304:8
  307:12
**family** 296:23
**favor** 282:22
**feel** 343:16
**fight** 344:11
**file** 341:2
**filed** 274:2
  279:11,13
  284:7 340:25
**fill** 312:13,15
  312:16
**filling** 312:11
**finance** 272:17
**financial**
  316:17

**find** 298:2
**fine** 299:14
**finish** 288:13
**finished** 289:12
  293:22
**firm** 326:15
**first** 270:2
  275:21 277:11
  278:4 283:15
  284:13 287:23
  289:21,25
  298:15 303:16
  304:12,23
  305:8,9 308:9
  317:21 339:16
  340:18
**five** 303:11
  308:10,11,12
  308:15,17
  312:21,21,22
  312:23,23
  313:5,5,6,6,8
  314:7,8 316:8
  316:8 322:9
  330:2 337:12
  349:11
**floor** 269:8,18
**followed**
  283:11
**follows** 270:4
**foreclose**
  319:25
**foreclosure**
  273:20 274:2

274:21 276:10
278:18 279:11
279:13,18,18
280:10,10,17
280:19,21
281:19 282:11
282:22 283:10
283:23 284:7
318:12 319:18
327:12 334:13
334:17,19
335:2 338:22
339:2,6,25
340:10,15,17
341:9,11,14,15
341:17,19,23
341:25
**forgiven**  324:6
  324:13,14
  327:11
**forth**  339:8
  350:8
**forward**  341:5
**found**  272:21
**four**  307:20
  313:6,23
**franklin**  280:23
**friend**  327:24
  328:2 331:23
  333:15
**friend's**  305:12
**frist**  310:9
**front**  282:2
  289:19 307:8

308:12
fsb  268:16
  269:17 284:21
  284:25
**fund**  268:15
  269:16 284:20
  284:25 285:21
**further**  273:17
  278:15 284:16
  348:9 350:11

---

**g**

**g**  276:6
**gardens**  273:19
  274:6,9
**gears**  289:6
**getting**  292:4
  320:23 344:6
  344:19
**gift**  344:20,22
**give**  290:9,22
  297:25 299:9
  299:23 300:7
  300:18 301:13
  301:16 323:21
  324:16,17,20
  325:11 328:8,9
  328:13 333:22
  334:3,6 336:4
  337:5,10
  338:17 342:22
  342:23,24
  344:22 345:4
  347:18

**given**  299:11
  326:17 328:11
  350:10
**gives**  340:20
**giving**  328:22
  329:5 330:13
**go**  275:21
  281:12 282:2
  282:12 285:18
  288:5,9 289:6
  291:5 301:19
  306:23 313:11
  322:20 329:20
  332:17 334:2
  340:2 341:8
  342:14 343:6
**godmother**
  344:21
**going**  272:5
  275:10 287:10
  291:2 293:17
  296:25 299:16
  299:23 300:4,8
  300:18 301:15
  303:25 305:7
  305:10 306:7
  318:19 320:25
  321:2,3,16,19
  322:2 327:6
  329:12 331:19
  331:20,24
  332:3,19,25
  333:2,3,5,6,10
  333:14,20

334:5,15,19
335:2,5,8,18
336:8,8,18
337:19,20,24
338:8,13
340:12,16,18
340:19,22
341:7,8,9,21,22
342:4,4,5,6,18
342:22,23,25
344:10,16
345:25 346:7
347:11 348:4,6
**good**  270:13,16
  270:16 301:16
  302:15,16
**government**
  324:13,15
**greco**  283:10
**grid**  347:16,18
  347:22
**group**  268:15
  269:11 270:19
**guess**  270:25
  295:2,3 303:21
  321:21 337:18
  340:11 343:18
**guy**  328:4
**guys**  293:17

---

**h**

**h**  270:2 349:7
**hand**  277:9
  303:17 304:6

| | | | |
|---|---|---|---|
| 325:11 350:15 | hereunto | 320:18,18,25 | illegible 292:16 |
| handing 331:14 | 350:15 | 322:2 324:16 | independently |
| handle 311:9 | hmm 271:24 | 324:17,20 | 326:15 |
| 340:23 | 277:5 280:12 | 327:7,11,11 | indian 328:3 |
| handling | 281:22 289:23 | 329:2 331:21 | indicates |
| 311:11 | 316:12,18 | 332:17 333:6,8 | 298:16 |
| handwriting | hold 283:13 | 333:11,12,13 | indicating |
| 306:9 | 313:9 | 334:17 336:6 | 310:6 |
| happen 299:8,9 | holder 307:19 | 339:23 342:5 | individual |
| 300:13 301:11 | 314:3,5 | 342:16 343:23 | 284:21 |
| 301:20 334:16 | holding 294:3 | 347:24 | information |
| 335:2 336:2 | 294:14,15 | hu 297:12 | 296:21,24 |
| 340:13,16 | 295:11 297:23 | huh 309:20 | 308:22 309:9 |
| 341:22 342:4,6 | 298:19 302:24 | 310:18 | 314:3,5 |
| 344:10 | holdings | husband | inside 282:3 |
| happened | 268:14 276:20 | 296:23 297:17 | intention 310:4 |
| 296:12 326:9 | 298:17,22 | 298:7,21 | interested |
| 327:22 330:12 | home 268:15 | 327:17 | 327:6 350:13 |
| 330:15 339:24 | 269:12,12 | **i** | introduced |
| happens 344:9 | 270:18 282:18 | idea 290:25 | 272:9 275:8 |
| happy 334:7 | 287:7 295:23 | 294:20 295:14 | 277:20 279:21 |
| harassment | 331:5 337:5 | 296:3 320:9 | 283:6 297:6 |
| 298:9 | honest 318:15 | 321:7 343:8,25 | 303:11 321:25 |
| hard 304:5 | hopefully | identified | 327:24 |
| health 317:11 | 322:17 | 275:15,16 | issues 311:9 |
| hear 270:16 | house 287:11 | 276:19 277:3 | item 277:12 |
| 343:16 | 287:15 293:12 | 278:6 279:9 | items 309:8 |
| heard 285:4,8 | 293:16 295:17 | 313:14,17,22 | **j** |
| 285:10,14 | 297:22,25 | identifies | jamaica 270:10 |
| help 319:3 | 315:21 317:13 | 273:18 276:16 | 274:6,10 276:7 |
| 328:17,19 | 318:12,18,23 | 276:23 278:15 | jmm 268:6,17 |
| 333:11 | 319:3,6,9,12,12 | 278:16,17 | john 298:18 |
| helping 320:10 | 319:15,20,25 | | 324:24,25 |
| | 320:14,15,15 | | |

325:16
**jordan** 269:19
284:19
**joseph** 269:3,5
271:8 286:18
287:4,14
288:14,22,25
289:4 291:7,9
292:16 296:4
303:4 306:12
310:25 312:4
313:10,19
320:20 322:24
323:6,8,14
335:9,13
336:12 339:17
**judge** 282:2,12
282:14 283:10
340:2
**judgment**
281:5
**july** 268:20
350:16
**june** 283:10,11
287:23

**k**

**keep** 293:10
329:4 332:10
336:4,10
**kind** 298:11
333:19
**knew** 319:18
322:4 341:15

**know** 272:7,19
275:6 277:19
277:24 279:20
282:6 283:5
284:12 286:7
290:6,7,14,17
290:21,23,24
292:20 293:17
294:12,18
296:3 297:4
301:3,8,9
302:7,8,9,10,17
307:14,25
308:3,5 310:22
311:3,4,6,24
312:2 316:24
317:19,20
318:15 319:14
321:6 322:14
323:16 324:3
324:11,12
326:3,14,16
327:5 329:13
329:16 330:16
332:25 333:3
333:10 334:3,5
335:24,24
336:7,13,20
337:7,24
339:16 340:14
340:14 341:11
342:21 343:11
344:2,14,17,24
345:5,6 346:3

346:4,4,9,19
**knowledge**
282:7 287:2
290:10
**knows** 336:18
339:20

**l**

**l** 268:14 269:7
269:8,9,25
**laura** 292:14
**law** 269:3,7,21
326:14
**lawsuit** 288:3
301:10,11,21
322:23 323:5
323:13
**lawyer** 290:8
290:11,14,22
292:19 322:18
**lay** 344:12
**lease** 276:20
**lee** 269:11
**left** 275:17
294:24 298:9
303:17
**legal** 325:7
**lending** 269:12
**letter** 316:17
**lezantonio**
268:13 269:21
302:19,24
321:20,22
331:23 333:15

**lights** 347:18
**line** 277:12
349:16 351:5
**liquidate**
318:17
**liquidated**
317:13
**lis** 281:5
**list** 322:21,25
323:3,10,21
326:17
**listed** 310:13
310:19 313:5
**listen** 288:14
293:16 338:15
**lists** 310:16
**live** 286:24
325:22 329:9
347:7
**living** 274:12
286:8,11
325:24 327:7
329:2,7
**llc** 268:15
269:12,12
273:3 327:19
351:1
**llp** 269:16
**loan** 273:2,8
276:23,23
277:2,6,11
278:13,15,20
279:5 293:2
294:10 306:24

| | | | |
|---|---|---|---|
| **located** 281:18 | **mails** 285:19 | 328:19 329:14 | 280:18 302:14 |
| location 276:6 | maintain | 329:21 331:13 | 302:17 303:6 |
| 276:15 | 292:11 | 331:18 332:2 | 306:13 322:6 |
| **longer** 271:18 | **make** 304:6 | 332:25 333:12 | 322:10 345:14 |
| 274:24 | 313:12 314:22 | 333:12,21 | 349:5 |
| **look** 272:7,22 | 322:20 329:22 | 334:9,12 | **met** 304:8,10 |
| 277:9,18,22 | 330:8,23 338:4 | 335:17,22 | 305:9 321:22 |
| 283:16 289:18 | **making** 330:17 | 336:14,15 | **middle** 275:22 |
| 291:2 297:3,5 | **management** | 337:5,25 | 306:8 |
| 307:12 308:9 | 268:15 269:11 | 338:16,17 | **midway** 277:10 |
| 308:10 314:8 | 270:19 | 340:8,9,21 | 278:8 |
| 316:5 318:4 | **manner** 270:24 | 341:2,6,22 | **mind** 273:16 |
| 333:11 336:17 | **mark** 303:2 | 342:2,7 344:23 | 319:2 |
| 336:18 | 309:10 310:2 | 347:15 351:2 | **mine** 316:25 |
| **looked** 304:2 | **marked** 272:6 | **maxine's** | 327:24 |
| 313:13 | 275:5,21 | 313:18 | **minimum** |
| **looks** 316:24 | 277:18 279:16 | **mean** 270:22 | 287:18 |
| 317:2 | **marriage** | 272:2 282:25 | **minutes** 322:9 |
| **lose** 319:20 | 350:13 | 286:2 288:7 | **mm** 271:24 |
| **lot** 295:17 | **matter** 322:16 | 293:12 313:21 | 277:5 280:12 |
| 304:18,19 | 350:14 | 323:19 324:15 | 281:22 289:23 |
| 340:20 | **maxine** 268:13 | 325:4,13 | 316:12,18 |
| **lower** 321:6,8 | 269:21 294:4 | 332:23 346:24 | **modification** |
| 321:12 343:23 | 297:2 299:12 | **meaning** 294:5 | 325:19 340:5,6 |
| | 301:4,5,15 | **means** 290:3 | 340:7 |
| **m** | 302:19,23 | 291:25 | **modifications** |
| | 304:13 305:9 | **meet** 327:23 | 326:7 |
| **m** 269:25 | 305:19 310:20 | **mentioned** | **modified** |
| **ma'am** 292:10 | 311:6,8 312:9 | 268:23 | 325:20 |
| **made** 297:21 | 312:11,19 | **merrick** 269:22 | **modify** 325:21 |
| 303:7 329:25 | 314:24 315:3,7 | **message** 296:11 | 325:22,25 |
| 336:22 | 317:25 318:4,8 | 296:14,17 | **moment** 332:18 |
| **mail** 295:17,17 | 320:9 321:10 | **mester** 268:14 | **moments** 280:9 |
| **mailing** 274:13 | 321:20 328:16 | 269:7,8,9 | |

| | | | |
|---|---|---|---|
| **money** 286:3,5 | 305:15,16 | 327:20 328:3 | **neverlane** |
| 294:12,18 | 306:10,17,18 | 331:21,22,25 | 268:6,10,22 |
| 295:6 298:3 | 307:4,9 308:8 | 332:5,20,24 | 348:19 350:7 |
| 299:14 315:21 | 308:25 310:5 | 333:9,14 | 351:2,3,21 |
| 315:21,22 | 312:12 319:7 | 339:16,20 | **new** 268:3,19 |
| 319:11,18 | 319:10,11,17 | 343:22 345:20 | 268:19,25 |
| 321:19 328:8,9 | 319:19,24 | 347:19 348:7 | 269:5,9,18 |
| 328:10,14 | 320:2,5,23 | 351:2,3 | 270:4,10 |
| 329:4,5,14 | 321:2,3,8,11,15 | **named** 327:15 | 272:16 273:19 |
| 330:3,14 | 321:16 328:16 | 327:17 338:25 | 274:7,10 276:7 |
| 333:16,17 | 328:21 329:20 | **names** 310:16 | 338:5 350:5 |
| 334:16 336:20 | 330:2 332:11 | **narissa** 269:3,5 | 351:1 |
| 336:23 337:22 | 334:10,11 | **national** 347:16 | **nieces** 329:7 |
| 338:10,14,14 | 335:15 337:2,8 | 347:18,22 | **night** 298:6 |
| 338:17 342:12 | 338:4,11,20 | **need** 333:8 | 299:18 330:20 |
| 342:25 343:23 | 343:9,12,13,17 | **needed** 319:6 | **nj** 269:13 |
| 346:5,7 | 349:8 | **negotiate** 305:5 | **normally** |
| **month** 293:11 | **motion** 281:4 | 305:24 342:15 | 274:10 |
| 293:13 297:24 | 281:25 282:7 | 343:5 344:7,9 | **notary** 268:24 |
| 300:5 335:7 | 283:17 | **negotiated** | 270:3 298:4,6 |
| **monthly** 293:5 | **move** 322:19 | 305:15 | 330:19 348:25 |
| 293:8 | 332:16 | **negotiating** | 350:5 351:25 |
| **morning** | **mulvaney** | 304:24 305:4 | **note** 284:23 |
| 270:13 302:15 | 269:14 284:15 | **never** 273:16 | **noted** 348:14 |
| 302:16 | | 288:5 292:9 | **notice** 279:21 |
| **mortgage** | **n** | 293:13,15,18 | 281:4,17 |
| 271:19,21,22 | **n** 269:2 270:2 | 296:17 299:17 | 349:10 |
| 272:2,9,24 | 349:2 | 302:11 312:19 | **npli** 268:16 |
| 273:9,14 | **name** 270:5 | 312:20,20 | 269:17 284:23 |
| 274:24 275:2 | 275:22 276:16 | 315:4,11 | 285:2 |
| 277:3,7,11 | 278:17 284:19 | 317:17 328:10 | **number** 273:3 |
| 278:22 280:8 | 305:12 307:19 | 328:14 336:7 | 273:8 276:23 |
| 298:2 302:2,4 | 310:19,23 | 337:24 342:3 | 276:23 277:2,6 |
| 302:8 304:25 | 323:15,18,21 | | 278:6,16,20 |

279:5 307:8,12
308:4,5 310:17
311:12,13,14
311:16,19,23
312:2,6,7,9,9
312:25 313:4,8
313:14,17,18
313:20,20,22
313:24 314:9
314:11 326:25
**numbers**
314:20 323:24
328:7
**ny** 269:5,9,18
269:23

**o**

**oakley** 268:24
350:4,19
**objection**
322:24 323:8
**obtain** 271:15
**occupancy**
297:6,14,20
298:2,5,19
299:16 315:5
330:5 349:11
**occupants**
298:25
**occupied**
309:18,21
**ocwen** 271:5,6
271:7,19,22
273:2,10

274:24 278:13
279:2 293:3,6
293:17,20,24
294:9,13,19,22
294:24 304:25
305:17,18,22
305:24 306:10
306:24 307:3
307:13,15
312:20 320:19
331:11,15,16
331:17,20
332:2 339:7,8
339:9,11
**office** 269:3,7
269:21 272:17
304:12
**oh** 274:17
**okay** 270:15,20
272:11,22
273:5 275:24
276:3 280:3
281:14 283:15
284:14 291:12
292:19 293:14
304:22 306:16
307:5 308:20
309:5 318:3,16
322:13 331:7
347:4,7,10
**oppose** 281:25
282:4,7
**opposition**
282:15

**opted** 318:17
orangeblue456
308:2
**order** 283:9,11
305:16 311:9
321:5 348:12
**ordering**
348:10
**outcome**
350:14
**owed** 319:11,17
**own** 322:22
323:4,11,11,19
323:22 324:4
326:2,6,18
327:3,4,5,19,19
**owned** 308:24
319:15
**owner** 284:22
294:16 298:16
298:19,23
309:18,21
319:12,13
323:20 329:16
**ownership**
346:25 347:5
**owns** 302:24

**p**

**p** 269:2,2,14
270:2
**p.m.** 348:14
**page** 272:18
273:17 275:16

275:21,22
276:22 277:10
278:9 281:3,7
281:8,11 283:6
283:8,15
289:22,25
291:3,5,9,10
297:15 298:15
303:11,16
306:9,14 307:9
308:7,7,9,10,11
308:17,18,21
311:13,16
312:21,22,22
312:23 313:5,5
313:6,6,7,8,10
313:11,12,12
313:13,14,25
314:4,7,12
316:7,8 349:3
349:8,10,11,16
351:5
**pages** 272:15
308:12,15
**paid** 274:24
294:10,21
321:17 330:2
333:17 337:8
342:25 343:17
343:19 344:3
**paper** 295:8,15
295:16,18,20
296:4 297:8
312:13,15,19

316:19 317:7
349:17
**papers** 284:4
306:3,5 315:9
315:11,13
**paperwork**
286:14,16,16
286:21,22
287:7 288:8,21
315:24
**para** 325:7
**paragraph**
281:13,15
283:16
**paralegal** 325:3
325:7
**paralegals**
325:2
**park** 269:13
**part** 287:23
303:4 305:14
319:10 328:16
328:20
**participate**
312:11
**particular**
285:25
**particularly**
287:12
**parties** 285:3,4
285:6 350:12
**pay** 271:18
275:2 277:14
294:13,19

297:24 298:13
299:25 300:4,9
300:15 301:23
302:2,4 317:18
319:25 320:5
321:5 328:16
328:20,23
329:12,18
330:4,5,11,12
330:24 332:9
332:12 333:16
333:17 335:8
335:19,21
336:5,5 337:22
337:22,23
338:8,10 342:5
342:6,8,12,25
343:23,24
344:16 345:25
347:12,13
348:4,5,5,6,6
**paying** 297:25
298:3 299:14
300:10 301:24
329:4,13,15
330:10,13
332:10,14,16
333:6 335:7,20
336:4 337:2,3
338:20 344:5
347:10,17,20
347:21,22
**payment**
278:13 330:18

335:15 344:6
payments
329:22 330:9
330:15,17,23
**payoff** 271:21
277:11 283:20
283:24 338:11
**pays** 347:24,25
348:3
**pendency**
281:17
**pendens** 281:5
**pending** 334:13
340:10
**people** 285:7
304:18
**person** 298:4,6
299:11 321:25
330:20
**personal**
327:20
**phone** 308:4
310:17 311:12
311:13,16,20
311:22,23
312:8 313:17
**phonetic**
280:24 289:3
308:2 311:2
**phrase** 270:22
**piece** 316:19
**place** 268:24
303:23 304:24
305:8 310:9

**plaintiff** 268:12
269:4 280:9
281:16
**plaintiff's**
283:19
**planet** 268:14
268:15 269:11
269:12,12
270:18,19,22
270:23,25
**please** 270:6,9
274:8 277:19
279:19 283:4
291:19 311:25
317:4 322:18
339:14
**plus** 330:13
**point** 293:8
294:8,25
306:21 308:9
318:3 322:18
338:19,22,25
**possession**
346:23,24
**possible** 316:3
322:20
**preparation**
287:6,13,17
**prepare** 323:10
**present** 269:25
292:24
**presented**
320:10,13

**presently**
  274:16 281:20
**previously**
  322:17
**price**  321:6
**primary**
  309:12,13,16
**print**  290:12
  292:16
**printed**  316:13
**prior**  321:22
**probably**
  284:13 322:14
**problem**
  322:10
**proceed**  270:23
  297:4
**proceeding**
  268:16 327:13
  335:2 338:23
  339:2,6,25
  341:10
**process**  305:14
  320:4
**produce**  331:4
  331:6
**produced**
  275:14 278:5,8
  296:2 303:9
**production**
  287:11
**promise**  337:6
  342:17

**promised**
  299:11,12
  301:13 335:4
  339:11 342:7
**properly**
  318:25
**properties**
  322:21,25
  323:3,10,12,15
  323:22 324:4
  326:2,6,18,23
  327:9
**property**
  271:11 272:3
  273:18,23,25
  274:3,20 276:6
  276:9,12,15
  278:17 279:8
  281:18,19,20
  284:8 286:8,10
  286:12,15,24
  287:3,12,16
  292:13 294:16
  296:12 298:3
  299:5,10,22
  301:12,21,22
  301:25 302:8
  302:19 303:20
  305:11 307:4
  308:22,24
  309:3,9,12,18
  309:24 310:6,8
  310:13 311:10
  318:13 322:22

  323:4,12,23
  324:5,7 325:11
  325:12,15,19
  325:20 329:16
  332:6,7,13,14
  332:20 334:4,6
  334:24 335:3
  342:22,23,24
  343:6 344:25
  345:22,24
  346:6,8,23,25
  347:25
**provided**
  283:25 302:21
  315:3
**provides**  273:3
**public**  268:24
  270:3 272:16
  279:17 283:9
  284:6 348:25
  350:5 351:25
**pulled**  272:15
  279:17
**purpose**  315:18
**put**  273:16
  274:5 305:11
  342:15

**q**

**quarter**  276:22
**queens**  274:22
  325:22
**question**  271:9
  274:8 286:19

  288:14 290:13
  290:21 292:14
  299:20 301:19
  305:3 320:11
  320:20 322:19
  322:25 323:9
  334:22 335:10
  335:12,14
**questions**
  302:13 320:12
  322:16 348:9
**quickly**  322:20

**r**

**r**  269:2 280:6
  283:25 284:10
  349:15 350:2
**reach**  338:9
  343:4
**read**  291:12,14
  291:16,19,20
  310:23,24
  317:5,8
**reading**  295:16
**ready**  297:4
**real**  304:15
**really**  273:16
  277:25 285:3
  285:15 288:5
  298:7
**reason**  273:13
  351:5
**recall**  273:11
  280:2 282:17

**[recall - right]**                                                                   Page 16

| | | | |
|---|---|---|---|
| 285:12 287:8,9 | **referenced** | 317:12,20 | **resolve** 341:9 |
| 303:24 306:6 | 278:21 285:4 | 337:9 343:10 | resolved |
| 311:14,19 | **referring** | **removed** 321:4 | 334:20 |
| 314:25 315:5 | 295:15,21 | **rent** 329:12,15 | **respect** 280:5 |
| 315:12 323:24 | 326:23 327:9 | 330:4,4,5,11,11 | 281:17 |
| 323:25 324:8 | **refinance** | 330:12 347:10 | **response** 303:6 |
| 324:10,12 | 337:25 338:8 | 347:12 | **responsive** |
| 326:19,25 | **refinancing** | **repeat** 328:18 | 287:20 |
| 327:16,21 | 338:5 | **reporter** | **result** 271:21 |
| 328:4,7 329:25 | **register** 272:18 | 348:10 350:4 | 284:9 301:20 |
| 331:13 337:3 | **reimbursed** | **reporting** | **retained** |
| 337:11,13,15 | 338:14 | 351:1 | 349:12 |
| **receipt** 291:21 | **related** 271:15 | **represent** | **return** 344:6 |
| **receive** 293:5 | 284:8 286:14 | 270:17 272:15 | 346:7 |
| **received** 292:2 | 286:23 287:3 | 273:14 275:13 | **review** 272:12 |
| 293:19 303:2,4 | 287:11,15 | 279:16 284:20 | 275:6 277:23 |
| **receiving** | 288:3 296:12 | 285:3,7 322:15 | 277:24 279:19 |
| 293:24 | 344:23 345:2 | 329:19 | 283:4 287:5 |
| **recently** 303:7 | 350:11 | **represented** | 288:4 |
| **recipient** | **relationship** | 280:16,23 | **reviewed** |
| 278:12 | 294:9 | 339:6 | 287:12 288:2 |
| **recognize** | **release** 271:22 | **representing** | **rid** 319:7 |
| 275:19 314:17 | 271:25 272:9 | 345:15 | 320:23 |
| **record** 270:5,9 | 272:23 274:23 | **request** 290:20 | **right** 270:17,25 |
| 275:13 314:22 | 277:3,7 278:21 | **requests** | 271:17 274:4 |
| 317:5 345:8 | 280:7 349:8 | 287:20 | 274:14,24 |
| 346:4 350:10 | **relevance** | **required** | 275:3 276:15 |
| **recorded** | 286:19 287:4 | 320:14 | 277:7,9,10 |
| 271:22 280:8 | **remember** | **reside** 273:21 | 278:13,19,22 |
| **records** 272:16 | 270:17 271:5 | 274:3,16 | 278:23 279:3,7 |
| **reduce** 305:16 | 271:19 287:24 | 276:13 281:20 | 282:4,8,11,16 |
| **reduced** 304:25 | 289:10 303:22 | **residence** | 282:23 284:10 |
| **refer** 303:25 | 303:23 315:13 | 274:16 309:13 | 284:14 289:22 |
| | 315:25 316:2 | 309:14,16 | 290:5 291:12 |

| | **s** | 282:10 289:24 | 286:18 291:8 |
|---|---|---|---|
| 291:13 292:5 | | 291:3,5,13 | 291:22,24 |
| 294:25 297:23 | s   269:2 270:2,2 | 304:6 306:10 | 292:9,18 |
| 301:8 302:20 | 270:2 272:6,10 | 308:10,21 | 298:18 303:16 |
| 304:6,17,24 | 277:3 278:21 | 310:12,13 | 304:7 307:10 |
| 305:2 307:2 | 280:8 349:7,8 | 311:2 316:16 | 307:16,17,17 |
| 308:14 309:2 | 349:15,15 | 316:22 318:17 | 307:23 308:22 |
| 309:13,19 | 351:5 | **screen**  302:22 | 309:9 310:2,3 |
| 310:14 311:9 | **sale**  271:4,6,16 | **scroll**  273:17 | 310:17 311:22 |
| 311:10,17 | 279:8 280:4,7 | **second**  275:6 | 312:3,23,25 |
| 313:15,25 | 284:9 289:7 | 277:23 279:19 | 313:25 314:4,8 |
| 314:6,10 318:6 | 302:18 305:2 | 283:4,13,16 | 314:14,16,19 |
| 319:4,7,20,23 | 309:4 310:13 | 289:6 297:15 | 315:7,12,16,18 |
| 319:24 320:2,3 | 317:13 318:18 | 304:10,15 | 316:8 317:7 |
| 320:7,8,10,13 | 318:20,21,22 | 308:6,7 | 331:20 |
| 321:8,9,17,23 | 318:23 328:17 | **section**  276:6 | **seeing**  280:2 |
| 338:21,24 | 328:20 331:9 | 308:21 309:9 | 283:13 284:11 |
| 339:4,12 | 341:5 | 310:12 314:5 | 343:10 |
| 341:25 347:6 | **satisfaction** | 318:17 | **seeking**  317:10 |
| 348:2,8 | 343:10,13,14 | **securitization** | **seen**  279:25 |
| **ringing**  312:8 | **saved**  311:23 | 268:16 269:17 | 293:13 296:9 |
| **river**  269:13 | 312:3 | 284:22,25 | 297:8,9 312:18 |
| **road**  269:22 | **saving**  284:25 | 285:13,22 | **sell**  309:24 |
| **rockville** | **savings**  268:15 | **security**  313:14 | 310:6 320:14 |
| 269:23 | 269:16 284:20 | 313:20,22 | 320:15,16 |
| **role**  345:18 | 285:10,21 | **see**  273:4,6 | **seller**  275:23 |
| **room**  289:16 | **saw**  278:22,24 | 275:17,23,25 | 276:4 345:19 |
| 304:19 340:2,3 | 280:5,7,8 | 276:17,20,24 | 345:22 |
| **rouse**  280:23 | 284:5,14 295:8 | 277:11,13 | **selling**  310:8 |
| 280:25 282:3,6 | 295:16 343:12 | 278:10,11,19 | 320:18 |
| 282:20 296:8 | 346:4 | 281:5,10 282:5 | **sending**  293:15 |
| 339:13,21 | **saying**  342:11 | 282:6 283:12 | **sense**  314:23 |
| 340:24 | **says**  272:23 | 283:14,21,22 | **sent**  293:18 |
| **ryan**  269:14 | 275:22 277:11 | 284:3,12 | 296:11,17 |
| 270:12 349:4 | | | |

**sentence**
283:18 291:13
**separate** 285:2
**serviced** 293:3
**services** 306:25
**servicing**
268:15 269:12
270:18 273:3
278:13 307:4
**set** 350:8,15
**settlement**
304:7
**sharmaine**
311:2,4
**sheet** 351:1
**short** 271:4,6
271:15 279:8
280:4,6 283:24
284:9 289:7
302:18 305:2
309:4 317:13
318:18,19,21
318:22,23
328:17,20
331:9 341:5
**shortfall**
283:20
**shorthand**
350:4
**show** 272:5
326:6
**showed** 271:14
304:22

**showing** 275:4
277:17 283:3
**shown** 343:9
**shows** 276:3
**side** 277:9
303:17 304:6
345:15
**sign** 297:15,19
298:6,7,8
306:5 315:2,9
315:24 317:16
325:14,15
331:8 345:16
346:15,15,15
346:17,18
**signature**
275:17,19
291:8 314:17
314:18 315:14
316:5,19,22,23
317:2 350:18
**signed** 271:15
289:9 292:4
299:17 304:19
306:3 314:15
314:16,23
315:4,5 316:3
331:9
**significant**
318:16
**signing** 315:25
317:12 345:15
345:20,21,21
346:16,17

**sit** 324:3
**situation**
296:21
**six** 272:14
**smith** 269:19
280:13 284:18
284:19 286:20
287:10,18
295:25 296:5
302:12 303:9
348:12 349:4
**social** 307:16
307:17,21
313:14,19,22
**society** 268:16
269:17 284:21
284:25 285:11
285:21
**sold** 293:12
294:16 302:19
303:20 305:2
345:24 346:6
**solely** 284:22
**somebody**
272:3 305:5
318:13 324:22
**sort** 272:13
**sought** 283:25
**sound** 304:8
**spans** 272:14
**speak** 288:19
288:23,24
289:5 322:9
323:14 326:12

**specifically**
272:17
**spell** 339:14
**spoke** 296:19
326:10 334:9
334:12 336:14
339:9
**spoken** 311:8
**springfield**
273:19 274:6,9
**stapled** 306:8
**start** 329:15
**started** 318:2
**state** 268:25
270:3,5,8
350:5
**stated** 317:9
**statement**
291:21 304:2
318:19
**statements**
293:5,8,15,19
293:24
**states** 268:2
273:2 278:9
283:18
**status** 316:17
**stay** 298:12
332:5
**stephens** 268:6
268:10,23
269:1 270:7,13
271:1 272:1,5
272:22 273:1,6

| | | | |
|---|---|---|---|
| 274:1 275:1,4 | 330:1 331:1 | 273:9,19,24 | 295:8,21 |
| 275:15,16,22 | 332:1 333:1,22 | 276:7 279:9 | suit 286:15 |
| 275:25 276:1 | 334:1 335:1,18 | 280:5 281:18 | **suite** 269:4,13 |
| 277:1,17 278:1 | 336:1 337:1 | 303:20 324:11 | 269:22 |
| 278:7,7 279:1 | 338:1 339:1 | 347:8 | **support** 281:12 |
| 279:15,23 | 340:1 341:1 | **stress** 317:11 | 282:21 |
| 280:1,3 281:1 | 342:1 343:1 | 317:22,25 | **supposed** 274:6 |
| 282:1 283:1,3 | 344:1 345:1 | 318:2,7,11,14 | 297:24 298:10 |
| 284:1,19 285:1 | 346:1 347:1 | 318:24 | 298:10 300:13 |
| 286:1,6 287:1 | 348:1,19 349:1 | **stressed** 318:9 | **sure** 313:12 |
| 287:22 288:1 | 350:1,7 351:2 | 318:13 | **sutphin** 339:23 |
| 289:1,21,24 | 351:3,21 | **struggled** | **switch** 289:6 |
| 290:1 291:1,3 | **stephens125** | 317:10 | **sworn** 270:3 |
| 292:1 293:1,2 | 275:8 349:9 | **stuff** 340:21 | 348:21 350:9 |
| 294:1 295:1 | **stephens127** | **subject** 273:20 | 351:22 |
| 296:1 297:1,17 | 275:8 349:9 | 274:2,21 | |
| 298:1,18,20,20 | **stephens128** | 276:10 278:18 | **t** |
| 298:25 299:1 | 277:20 349:9 | 281:19 322:23 | **t** 270:2 275:5,9 |
| 300:1 301:1,10 | **stephens131** | 323:5,12,23 | 278:24 279:6 |
| 302:1,15 303:1 | 277:20 349:9 | 327:12 | 280:7 284:2 |
| 303:13 304:1 | **steven** 269:11 | **submit** 282:15 | 289:18,21 |
| 305:1 306:1 | **stop** 293:9,19 | 323:3 | 290:8 291:2,5 |
| 307:1 308:1 | 294:6 332:15 | **submitted** | 291:7 292:10 |
| 309:1 310:1 | 337:2,3 | 322:21 339:18 | 303:25 349:7,9 |
| 311:1 312:1,23 | **stopped** 293:15 | **subscribed** | 349:15 350:2,2 |
| 313:1 314:1 | 293:24 330:10 | 348:21 351:22 | **take** 272:7 |
| 315:1,6 316:1 | 332:15,16 | **sued** 284:24 | 275:6 277:18 |
| 316:22 317:1,6 | 338:20 | 349:17 | 277:23 279:19 |
| 318:1 319:1,2 | **story** 338:16 | **suffered** 317:11 | 283:4 289:18 |
| 320:1 321:1 | **straight** 333:21 | **suffering** | 297:3 305:11 |
| 322:1,12 323:1 | **strategy** 320:10 | 318:11 | 317:18 321:16 |
| 324:1 325:1 | 320:13 | **suing** 285:16 | 323:20 342:10 |
| 326:1 327:1 | **street** 269:8 | 285:18 286:3,8 | **taken** 282:18 |
| 328:1 329:1 | 270:10 271:12 | 286:10,12 | 319:19 322:11 |

| | | | |
|---|---|---|---|
| **talk** 299:19 | 326:8 327:21 | 323:16 326:10 | **took** 286:15,20 |
| talked 296:10 | 331:14 | 331:9 334:9,12 | 293:3,25 294:6 |
| 296:22 326:19 | **think** 271:6 | 335:16 336:14 | 301:13 303:22 |
| **talking** 271:4 | 273:11 284:15 | 337:8 338:19 | 304:24 324:22 |
| 292:22 328:25 | 287:14 293:14 | 338:22,25 | 324:23 328:10 |
| 339:8,8 | 295:4,24,25 | 340:7,20,21 | 329:17 339:22 |
| **taxes** 317:19 | 302:12 311:2 | 343:4,5,17 | 342:14 |
| 347:24,25 | 318:21,22,24 | 348:14 | **top** 276:22 |
| **tell** 305:10 | 320:17 324:8,9 | **times** 315:7,16 | 298:15 303:17 |
| 340:4 343:11 | 324:24 326:3 | **tired** 298:8 | 313:2,24 314:4 |
| **telling** 326:21 | 326:24 327:5 | **title** 272:23 | 314:8 316:10 |
| 345:16 | 327:14 328:3 | 316:16 346:8 | **towards** 329:20 |
| **tenants** 329:4,6 | 329:25 330:2 | **titled** 281:3,11 | 338:10 |
| **testified** 270:4 | 332:10 335:9 | **today** 270:14 | **transaction** |
| 289:8 293:14 | 336:2 344:4,19 | 270:24 284:17 | 340:14 |
| 295:5 296:5 | 346:20 | 286:17,24 | **transactions** |
| 299:4 300:4 | **thinking** | 287:3,6 302:22 | 300:7 |
| **testify** 317:21 | 318:23,25 | 304:3,23 | **transfer** 278:3 |
| **testimony** | 319:3 | 311:20 | 279:2 290:20 |
| 284:12 290:7 | **third** 291:3 | **together** | 299:13,24 |
| 290:14 295:6 | **three** 272:19 | 287:22 288:20 | 300:14 302:5 |
| 332:12 350:10 | 281:3,8,13,15 | **told** 301:14,17 | 305:12,13 |
| **text** 289:3 | 283:6,8 313:6 | 302:11 326:20 | 319:6,9 320:15 |
| 296:11,14,17 | 337:14 349:10 | 329:15 333:2 | 320:25 321:14 |
| **thank** 284:16 | **time** 268:23 | 333:22 340:2 | 332:8 333:5 |
| 331:8 | 284:13 288:2 | 345:16 | 334:4 |
| **thereof** 291:22 | 288:10,20 | **tony** 294:3 | **transferred** |
| 350:15 | 289:8 296:7 | 301:4,5 337:25 | 293:17 297:23 |
| **thing** 277:22,25 | 298:23 299:2 | 338:7,8,10,13 | 332:13,20,24 |
| 278:4 315:4 | 304:10,12,15 | 338:16,17 | 333:9,14 |
| 319:7 | 304:23 309:22 | 342:15,18,19 | 343:22 |
| **things** 272:13 | 317:23,24 | 345:2,15 | **transferring** |
| 273:16 287:19 | 318:3 319:13 | 346:17,23 | 293:22 318:22 |
| 292:17 293:22 | 321:14 322:21 | 347:15 | 319:3 320:18 |

**tried** 325:21,22
true 295:4
  317:11,14,15
  317:16 350:9
**trust** 268:16
  269:17 284:23
  285:2,13,22
  288:10
**trustee** 284:22
**try** 321:11
  322:19 325:25
  340:6
**turn** 272:18
  275:16 281:11
  306:7 308:6,17
  312:21 314:7
  316:7
**two** 285:2
  298:12 299:22
  299:25 300:8,9
  300:10,12,16
  300:19 308:17
  308:18,21
  313:5 320:22
  326:20,21,22
  327:9 336:4
**type** 325:18

### u

**u** 277:18,21
  289:19,24
  290:15 349:9
  349:15

**uh** 309:20
  310:18
**under** 270:15
  272:22 273:2
  276:6 278:12
  284:9 305:12
  318:24 331:21
  348:6
**underneath**
  310:16
**undersigned**
  291:20
**understand**
  271:23,25
  272:13 274:5
  278:2 280:3,11
  290:4 291:25
  305:7,14
  306:18,20
  314:21 320:4
  321:3 332:23
  333:5,7,19
  334:15,18
  335:5 336:10
  340:12,15,22
  341:22 342:4
  343:13,20
  345:12 346:21
**understanding**
  285:20 293:23
  294:8,21,23
  299:4,7,21
  300:12 301:6
  306:16 321:10

  324:19 328:15
  329:11 331:18
  334:20,23,25
  335:4 337:22
  338:3 344:15
**understood**
  321:15 333:13
  333:24 336:6
**underwent**
  271:5
**unemployed**
  317:6,17
**unemployment**
  317:9,10
**united** 268:2
**upstairs** 329:4
  329:6,8
**used** 274:10,11
  287:16,19
  293:5
**utilities** 329:14
  330:14 347:14
  347:17,20,21

### v

**v** 270:2 279:16
  279:22 349:10
  351:2
**vacate** 281:5
**vague** 322:25
**veritext** 351:1
**verus** 268:16
  269:17 284:22
  284:25 285:13

  285:21 295:13
  300:25 301:7
**video** 302:22
**virtue** 274:23
**visits** 315:23

### w

**w** 283:4,7,15
  349:10
**walk** 338:18
**walked** 289:15
  340:13
**want** 272:18
  279:4 282:18
  286:3,5 289:6
  298:7 301:11
  301:12,22
  302:25 309:24
  313:11 314:7
  322:16 330:11
  333:22 342:8
  342:23 347:16
**wanted** 282:25
  310:6
**wants** 330:4,4
**water** 329:14
  348:3,5
**way** 350:13
**weather** 270:15
**went** 280:6
  282:3,13,20
  287:7 289:9
  296:25 306:2
  331:15 334:14

335:17,18
336:17,17
337:5 341:4
343:18 347:15
**wertman**
269:21,23
302:22 303:8
322:8,14 323:7
335:11 339:19
348:8
**west** 269:8
**willfully** 336:5
**wilmington**
268:15 269:16
284:20,24
285:10,21
295:13 300:21
300:24,25
301:6,9
**wire** 278:2
279:2 290:20
**withdrawn**
302:7
**witness** 280:13
350:7,10,15
**witnesses'**
351:3
**woodburn**
268:14 269:22
269:25
**words** 280:14
**work** 288:9
325:8,17,18
332:19

**working** 318:4
318:7 326:7
**writing** 314:21
**written** 312:25
**wsf** 268:16
269:17 284:25

---

**x**

**x** 268:4,9,18
297:3,7 349:2
349:7,11

---

**y**

**y** 303:3,12
349:11
**yeah** 272:25
277:13,25
278:11 279:24
281:10 283:13
284:3 285:18
287:7 290:19
291:24 292:21
296:15 302:2
303:18 305:25
307:24 309:11
309:25 312:6
314:16 316:15
323:7 329:10
331:12
**year** 300:11
326:13
**years** 286:22
296:9 298:13
299:22 300:2,8
300:9,10,13,16

300:19 326:9
327:22 336:5
337:7,12,14
**yesterday**
303:10
**york** 268:3,19
268:19,25
269:5,9,18
270:4,10
272:16 273:19
274:7,10 276:7
350:5 351:1
**yup** 291:11

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.