UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>EVIS NEVERLANE STEPHENS,<br><br>Debtor. | 21-42857-jmm<br><br>Chapter 13 |
| EVIS NEVERLANE STEPHENS,<br><br>Plaintiff,<br>v.<br><br>MAXINE BONAPARTE,<br>LEZANTONIO WOODBURN,<br>12706 HOLDINGS, INC.,<br>CHARLES L. MESTER, ESQ.<br>PLANET MANAGEMENT GROUP, LLC,<br>PLANET HOME LENDING, LLC d/b/a PLANET HOME SERVICING,<br>WILMINGTON SAVINGS FUND SOCIETY, FSB (WSF),<br>VERUS SECURITIZATION TRUST 2020-NPL1<br><br>Appellees. | Adversary Proceeding No. 22-01037(jmm) |

**DECLARATION IN SUPPORT OF MOTION BY DEFENDANTS, COUNTERCLAIMANTS AND CROSSCLAIMANTS PLANET MANAGEMENT GROUP, LLC AND PLANET HOME LENDING, LLC d/b/a PLANET HOME SERVICING FOR SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMS AND ON CERTAIN OF THE COUNTERCLAIMS ASSERTED AGAINST PLAINTIFF PURSUANT TO FED.R.CIV.P. 56, FED.R.BANKR.P. 7056 AND LOCAL RULE OF BANKRUPTCY PROCEDURE 7056-1**

I, Janina Woods, of full age, hereby certify and declare under penalty of perjury pursuant to section 1746 of Title 28 of the United States Code:

1

1.  I am employed as Senior Vice President of Defendant, Counterclaimant, and Crossclaimant, Planet Management Group, LLC ("PMG"). I am authorized to execute this Declaration on behalf PMG, which was the originator and lender of the commercial mortgage loan at issue in this case. PMG is a fully integrated business line platform of Planet Financial Group. As such, I am authorized to submit this Declaration on behalf of PMG. I am fully aware of the underlying action, as well as the papers and proceedings heretofore had herein.

2.  I make this Declaration in support of the motion by PMG and Defendant, Counterclaimant, and Crossclaimant, Planet Home Lending d/b/a Planet Home Servicing ("PHL") (PMG and PHL collectively referred to as "Planet Defendants") for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, which is made applicable to this Adversary Proceeding pursuant to Rule 7056 of the Federal Rules of Bankruptcy Procedure, on the remaining claims asserted by Plaintiff, Evis Neverlane Stephens ("Plaintiff"), against the Planet Defendants and on Counterclaims asserted against Plaintiff by the Planet Defendants. I make this Declaration based upon my personal knowledge and based upon the information taken from business records that include physical and electronic records of loan activity, events and transactions (the "Loan Records") about the commercial mortgage loan originated and delivered by and in favor of PMG, as lender, to Defendant, 12706 Holdings Inc. ("12706 Holdings"), as borrower ("Commercial Mortgage Loan").

3.  As part of my job responsibilities, I have personal knowledge of PMG's practices for creating and maintaining the Loan Records. The Loan Records are: (a) made at or near the time of the occurrence of the matters recorded; (b) made by, or from information transmitted by, persons with personal knowledge of the matters recorded; (c) kept during the course of regularly

conducted business activities. It is the regular practice of such businesses activities to make and maintain the Loan Records associated with the Commercial Mortgage Loan.

4. I am familiar with and have access to the Loan Records for the Commercial Mortgage Loan, which I have reviewed to verify the accuracy of this Declaration. The documents referenced in and attached as exhibits to this Declaration are copies of the Loan Records from the Commercial Mortgage Loan.

I. General Background

5. PMG is a commercial business purpose lending institution.

6. The Loan Records reflect that the loan came to PMG through a broker, identified as VIS Capital Venture ("VIS").

7. As set forth in more detail below, by way of the Commercial Mortgage Loan, PMG loaned $535,000.00 to 12706 Holdings.

II. The Commercial Mortgage Loan

A. The Loan Agreement

8. On March 27, 2019, PMG, as lender, entered into a loan agreement with 12706 Holdings, as borrower, pursuant to which PMG agreed to make a commercial loan to 12706 Holdings in the principal amount of $535,000.00 (the "Loan Agreement").

9. Attached hereto as Exhibit "A" is a true and accurate copy of the Loan Agreement.

10. The Loan Agreement was executed by Defendant, Lezantonio Woodburn ("Woodburn"), in his official capacity as President of 12706 Holdings.

11. Section 2.1 of the Loan Agreement provided an After Repair Value of the Subject Property in the amount of the lesser of $765,000.00 and the Appraised Value determined by an

Appraisal made after completion of all Planned Improvements pursuant to Section 2.5(a)-(v) in the Loan Agreement.

12. The After Repair Value was based on an appraisal that was previously prepared by Greater NY Appraisal Services, Inc. ("Greater NY Appraisal") for a borrower identified in the appraisal as 7842 79th Pl., Inc. The appraisal was effective December 17, 2018, before PMG's involvement and before 12706 Holdings applied to PMG for a loan.

13. Attached hereto as Exhibit "B" is a true and accurate copy of the appraisal, which was made part of the Loan Records.

14. For purposes of the loan-to-value ratio, the principal loan amount of $535,000.00 reflected seventy percent of the $765,000.00 After Repair Value of the Subject Property.

15. Greater NY Appraisal noted in the appraisal that it considered "[s]everal 'flips'" in its comparables analysis because "they were considered to best represent the condition of the [S]ubject [Property] based on the hypothetical conditions employed in the report." Those hypothetical conditions were, as detailed in the Loan Agreement, the After Repair Value assuming repairs were made to the Subject Property. In other words, in December 2018, Greater NY Appraisal forecasted the appraised value of the Subject Property based on what the planned improvements contemplated in the Loan Agreement might result but before those planned improvements were completed. Section 2.1 makes clear that the Loan Agreement contemplated another appraisal after the planned improvements had been completed. The After Repair Value would ultimately be the lesser of either the After Repair Value set forth in the appraisal effective December 17, 2018, or the value set forth in an appraisal after the planned improvements were completed. For example, if the Subject Property appraised for $685,000.00 after the planned

improvements were completed, then the After Repair Value would no longer be the $765,000.00 as forecasted in December 2018, but would be set at $685,000.00.

16. The certification set forth in the appraisal noted that the appraisal expired on December 21, 2019.

17. The appraisal was not ordered by PMG, nor was PMG involved at the time the appraisal was conducted and at the time the appraisal was prepared.

18. When 12706 Holdings subsequently applied to PMG in March 2019, the prior appraisal was subsequently certified to PMG by Greater NY Appraisal, which is why PMG is noted as the lender for an appraisal that was effective on December 17, 2018, before its involvement. Still, however, the appraisal referenced the borrower as 7842 79th Pl., Inc. As reflected in the appraisal, PMG relied on an as-renovated value of the Subject Property.

19. PMG validated the After Repair Value set forth in the appraisal by way of a Property Review.

20. Attached hereto as Exhibit "C" is a true and accurate copy of the Property Review validation.

21. Pursuant to Section 3.2 of the Loan Agreement, the maturity date of the Commercial Mortgage Loan was April 1, 2020. Pursuant to Article 3.3(a) of the Loan Agreement, 12706 Holdings was required to make its first payment of interest on May 1, 2019, and continue on the first day of each month thereafter until the maturity date. Interest, including default interest, and late fees on the unpaid principal balance are due and owing pursuant to Articles 3.3(b) through (e) of the Loan Agreement.

22. Pursuant to Section 4.2 of the Loan Agreement, 12706 Holdings represented and warranted that the execution, delivery and performance by 12706 Holdings, as borrower, and

Woodburn, as guarantor, of the Loan Documents to which they are parties will not violate any law or result in the imposition of any lien, charge or encumbrance upon all or any portion of the Subject Property, except for any liens in favor of PMG, as lender, as contemplated by the Loan Documents. The Loan Documents as referenced in the Loan Agreement include the Loan Agreement, the Commercial Mortgage, the Note, and the Guaranty Agreement, which are all further identified below.

23. Pursuant to Section 4.17 of the Loan Agreement, 12706 Holdings represented and warranted that it was the sole owner of the property located at 127-06 177th Street, Jamaica, New York 11434 ("Subject Property"); the Subject Property is not subject to any leases; other than 12706 Holdings, no person has any possessory interest in the Subject Property or right to occupy the same; the Subject Property is not occupied and neither 12706 Holdings, as borrower, nor Woodburn, as guarantor, has any intent to occupy the Subject Property, or to permit any other person to occupy the Subject Property during the term of the Commercial Mortgage Loan.

24. Pursuant to Section 4.2 of the Loan Agreement, 12706 Holdings represented and warranted that neither 12706 Holdings, as borrower, nor Woodburn, as guarantor, had failed to disclose any fact that could cause any information described in any representation or warranty to be misleading or adversely affect the value of the Subject Property. 12706 Holdings, as borrower, and Woodburn, as guarantor, further represented and warranted that no statement of fact made by them in any of the Loan Documents contained any untrue statement of a material fact or omitted to state any material fact necessary to make statements contained in the Loan Documents not misleading. 12706 Holdings, as borrower, and Woodburn, as guarantor, further represented and warranted that there was no fact then-known to them that has not been disclosed to PMG, as lender,

which adversely affects, nor as they could foresee, might adversely affect the business, operation or condition of 12706 Holdings, Woodburn or the Subject Property.

25. In consideration for and to induce PMG to enter into the Loan Agreement and the related loan documents such as the promissory note, mortgage, and guaranty, the Loan Agreement contained an indemnification provision. Pursuant to Section 5.13 of the Loan Agreement, 12706 Holdings, as borrower and as indemnitor, agreed, among other things, to:

> indemnify, defend and hold harmless Lender and its affiliates and their respective owners, members, managers, officers, directors, managers, agents, employees, trustees, partners, successors and permitted assigns from and against any and all losses, liabilities, claims, damages, expenses, obligations, penalties, actions, judgments, suits, costs or disbursements of any kind or nature whatsoever, including the reasonable fees and actual expenses of Lender's counsel, arising from or in connection with (i) the Loan; (ii) any failure to complete the Planned Improvements in accordance with applicable Law; (iii) any inaccuracy in or breach of any representation or warranty made by Borrower in this Agreement or any other Loan Documents; (iv) any failure of Borrower to perform any of its agreements, duties or obligations in accordance with the terms of this Agreement or any other Loan Document; (v) any investigative, administrative, mediation, arbitration, or judicial proceeding, whether or not Lender is designated a party thereto, commenced or threatened at any time (including after the repayment of the Loan) in any way related to the execution, delivery or performance of any Loan Document; (vi) any acts by Lender pursuant to Section 4.7 and Section 6.3, including all sums paid by Lender or otherwise expended thereunder; and (vii) any brokerage commissions or finder's fees claimed by any broker or other party in connection with the Loan or any of the transactions contemplated in the Loan Documents.

26. Events of default under the Loan Agreement include, among other things as set forth in Section 6, 12706 Holdings' failure to pay any principal, interest or other amount due under the Loan Documents when due, 12706 Holdings' violations of its obligations under Sections 3.3(a) and/or 6.3 of the Loan Agreement, and the untruth in any material respect when made or deemed made any representation or warranty made in any Loan Document.

B. <u>The Promissory Note</u>

27. On March 27, 2019, 12706 Holdings executed a Promissory Note in connection with the Commercial Mortgage Loan (the "Note").

28. Attached hereto as Exhibit "D" is a true and accurate copy of the Note.

29. Pursuant to the Note, 12706 Holdings, as borrower, promised to repay $535,000.00 plus interest to PMG.

30. The Note was executed by Woodburn in his official capacity as President of 12706 Holdings.

C. <u>The Mortgage, Security Agreement, And Fixture Filing</u>

31. To secure repayment of the Note, 12706 Holdings executed a Mortgage, Security Agreement, And Fixture Filing on March 27, 2019 (the " Commercial Mortgage") in favor of PMG, encumbering and granting to PMG a security interest in the Subject Property.

32. Attached hereto as Exhibit "E" is a true and accurate copy of the Commercial Mortgage.

33. The Commercial Mortgage was recorded on July 19, 2019, in the Office of the City of Register of the City of New York under CRFN: 2019000227660 and bears Document ID 2019041000506001.

34. The Commercial Mortgage was executed by Woodburn in his official capacity as President of 12706 Holdings.

35. It is my understanding that certain of the funds from the Commercial Mortgage Loan satisfied obligations under a mortgage executed and delivered on August 29, 2006, by Plaintiff, Evis Neverlane Stephens ("Plaintiff"), to Mortgage Electronic Registration Systems,

Inc., as nominee for Novastar Mortgage, Inc., its successors and assigns, encumbering the Subject Property as security for a loan and debt in the principal sum of $630,000.00 (the "2006 Mortgage").

36. The 2006 Mortgage was recorded in the Office of the City Register of the City of New York on August 14, 2007, under CRFN 2007000419551.

37. The 2006 Mortgage encumbered the Subject Property as set forth in the 2006 Mortgage and was security for the corresponding note.

38. As is standard in the mortgage lending industry, a title report ("Title Report") was obtained and a policy of title insurance was issued to PMG by issued by WFG National Title Insurance Company ("WFG National") assuring PMG that the Commercial Mortgage Loan to 12706 Holdings would be in first lien position ("Title Policy").

39. Attached hereto as Exhibits "F" and "G" are a true and accurate copies of the Title Report and the Title Policy.

40. Because WFG National issued the Title Policy, PMG understood that to mean that the 2006 Mortgage was paid to the foreclosing mortgagee's satisfaction.

41. The Title Report showed that the pending foreclosure against Plaintiff was dated nine days before (March 18, 2019) the closing of the Commercial Mortgage Loan (March 27, 2019). As a result, PMG understood that a portion of the funds it was providing pursuant to the Commercial Mortgage Loan were used or were to be used to satisfy the 2006 Mortgage, end the pending foreclosure, and clear title to the Subject Property.

42. The HUD-1 attached to Plaintiff's Amended Complaint when Plaintiff first named the Planet Defendants reflects payment of the 2006 Mortgage and the Commercial Mortgage Loan disbursement documents similarly reflect the transmission of funds to eight recipients, including to the law firm that represented 12706 Holdings in the amount of $496,884.97.

43. Attached hereto as Exhibits "H" and "I" are true and accurate copies of the HUD-1 Settlement Statement and the Mortgage Proceeds Disbursement documents.

44. Consistent with a Master Mortgage Loan Sale and Servicing Agreement ("Master Servicing Agreement") between PMG and IRP Fund II Trust 1A, an affiliate of Verus Residential Loanco, LLC ("Verus"), IRP Fund II Trust 1A purchased the Commercial Mortgage Loan from PMG on April 30, 2019. As a result of that transaction, PMG is no longer the holder of the Commercial Mortgage.

45. Attached as Exhibit "J" is a true and accurate copy of the Master Servicing Agreement.

46. Pursuant to an Assignment of Mortgage ("Assignment") that was recorded on May 12, 2022, the Commercial Mortgage was assigned to PHL, as servicer for Wilmington Savings Fund Society, FSB, not in its individual capacity but solely as owner trustee for Verus Securitization Trust 2020-NPL1, which is the owner trustee of Verus Securitization Trust 2020-NPL1, the trust that now owns the Commercial Mortgage Loan and holds the Commercial Mortgage.

47. Attached hereto as Exhibit "K" is a true and accurate copy of the Assignment.

48. Pursuant to the Commercial Mortgage, upon the occurrence and continuance of an event of default, interest on the outstanding principal balance of the Commercial Mortgage Loan and, to the extent permitted by applicable law, overdue interest and other amounts due shall accrue at the default rate calculated from the date of default.

D. <u>Guaranty Agreement</u>

49. To induce PMG, as lender, to extend and deliver the Commercial Mortgage in connection with the Commercial Mortgage Loan to 12706 Holdings, as borrower, Woodburn, in

his personal and individual capacity, entered into a Guaranty Agreement effective as of March 27, 2019.

50. Attached hereto as Exhibit "L" is a true and accurate copy of the Guaranty Agreement.

51. Pursuant to the Guaranty Agreement, Woodburn, as guarantor, irrevocably and unconditionally guaranteed to PMG the full and prompt payment and performance of the Guaranteed Obligations of 12706 Holdings. The Guaranteed Obligations include (1) the prompt and complete payment of the Debt (defined by the Loan Agreement as the outstanding principal amount set forth in, and evidenced by, the Loan Agreement and the Note together with all interest accrued and unpaid thereon and all other sums due to PMG in respect of the Loan under the Note, the Loan Agreement, the Security Instrument or any other Loan Document) in full when due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under § 362(a) of the Bankruptcy Code) (collectively defined as the "Performance Sums"); (2) the prompt payment of interest at the Default Rate (as defined in the Note) which accrues on the Performance Sums from the date of demand for payment under the Guaranty Agreement from PMG, as lender, to Woodburn, as guarantor, until the Performance Sums are paid in full; (3) the prompt performance when due of all other obligations of 12706 Holdings under the Loan Documents; (4) the prompt payment upon demand of all costs and expenses of any collection or other realization under the Guaranty Agreement including reasonable compensation to PMG, as lender, and its agents and counsel, and all expenses, liabilities and advances made or incurred by PMG, as lender, in connection therewith.

52. Pursuant to its terms, the Guaranty Agreement is an absolute, present and continuing, irrevocable, and unconditional guaranty of payment and performance.

II. Circumstances Surrounding The Commercial Mortgage Loan

53. PMG was not in possession of any of the short-sale documents between Plaintiff and Ocwen Loan Servicing, LLC ("Ocwen") before the Commercial Mortgage Loan closed and funded. Those documents were first provided to PMG when it was named in this action as a defendant because they were attached as exhibits to the First Amended Complaint, which was added to the Loan Records. PMG did not participate in, was not a party to, was not involved in, and had no knowledge of any negotiations that led to Plaintiff's short sale agreement with Ocwen. As previously mentioned, PMG did not become involved in the Commercial Mortgage Loan until March 2019.

54. In connection with the origination of and due diligence related to the Commercial Mortgage Loan, PMG received documents from 12706 Holdings. Those documents are: documents related to 12706 Holdings' corporate status and registration; the Title Report; the Title Policy; the Loan Agreement; the Commercial Mortgage; the Note; the Guaranty; the appraisal of the Subject Property; the Deed and Transfer Documents; a Lexis/Nexis Report concerning Woodburn; Declaration of Non-Owner Occupancy executed by 12706 Holdings; a Guarantor Credit Report providing a credit history of Woodburn, as guarantor; copy of photo IDs of Woodburn; evidence of property insurance; credit authorization for 12706 Holdings; loan application from 12706 Holdings; repair budget concerning work contemplated to be done on the Subject Property before selling it; Certificate of Business Purpose of Loan signed by 12706 Holdings; Investor Experience Questionnaire signed by Woodburn; and FEMA Standard Flood Hazard Determination Form.

55. Attached hereto as Exhibit "M" are the documents received from 12706 Holdings that have not already been attached hereto as an independent exhibit.

56. None of the documents that PMG received during the due diligence process before it entered into the Commercial Mortgage Loan provided any indication or information about the negotiations that led to 12706 Holdings' acquisition of the Subject Property that Plaintiff formerly owned. Other than providing ordinary lending services, namely providing the proceeds of the Commercial Mortgage Loan to 12706 Holdings, PMG did not participate in, was not a party to, was not involved in, and had no knowledge of any negotiations that led to 12706 Holdings' acquisition of the Subject Property from Plaintiff, did not attend any closing of the short sale between Plaintiff and Ocwen, and did not attend the closing of the Commercial Mortgage Loan. In addition, none of the documents makes any reference to Plaintiff other than the Title Report and copies of the deed transfer documents. The documents simply provided information about either the Subject Property or 12706 Holdings and its president and guarantor of 12706 Holdings' obligations under the Commercial Mortgage Loan, namely Woodburn.

57. The documents that PMG received during the due diligence process showed that the Commercial Mortgage Loan was taken out for the purpose of repairing and selling the Subject Property, which is why the Commercial Mortgage Loan's maturity date was April 1, 2020, a little more than one year after the Commercial Mortgage Loan originated. That the prior owner – Plaintiff – had been the subject of and a defendant to a residential mortgage foreclosure action as reflected in the Title Report did not raise any concerns about the validity of the Commercial Mortgage Loan. Moreover, as is common for some of the types of loans originated by PMG, some of the properties – like the Subject Property – require at least some rehabilitation. Ultimately, the Commercial Mortgage Loan was unremarkable.

I hereby certify and declare under penalty and perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge. I am aware that if any of the statements made by me are willfully false, I am subject to punishment.

Dated: December 10, 2025

By: *Janina Woods, SVP*
Janina Woods, Senior Vice President
Planet Management Group, LLC