# EXHIBIT A

**LOAN AGREEMENT**

**Dated as of MARCH 27, 2019**

by and between

**PLANET MANAGEMENT GROUP, LLC,**
as Lender,

and

**12706 HOLDINGS INC,**
as Borrower

PLANET- 00857

# TABLE OF CONTENTS

                                                                                                                    **Page**

**ARTICLE 1 DEFINITIONS; PRINCIPLES OF CONSTRUCTION**...................................34
  1.1             Definitions...............................................................................34
  1.2             Principles of Construction...................................................35
  1.3             Other Terms...........................................................................36

**ARTICLE 2 LOAN TERMS AND ADVANCES** ...........................................................36
  2.1             The Loan ................................................................................36
  2.2             Maturity Date .........................................................................36
  2.3             Payments, Prepayments.........................................................37
  2.4             Initial Advance ......................................................................38
  2.5             Future Advance.......................................................................38
  2.6             Participations.........................................................................40
  2.7             Origination Fee......................................................................41

**ARTICLE 3 REPRESENTATIONS AND WARRANTIES** .........................................41
  3.1             Organization and Power.........................................................41
  3.2             Validity of Loan Documents..................................................41
  3.3             Litigation...............................................................................41
  3.4             Bankruptcy ............................................................................41
  3.5             Agreements ............................................................................41
  3.6             Compliance ............................................................................42
  3.7             Financial Information.............................................................42
  3.8             Condemnation ........................................................................42
  3.9             Federal Reserve Regulation ...................................................42
  3.10           Utilities and Public Access.....................................................42
  3.11           Separate Lots..........................................................................42
  3.12           Assessments ...........................................................................42
  3.13           Insurance ................................................................................43
  3.14           Licenses.................................................................................43
  3.15           Flood Zone ............................................................................43
  3.16           Physical Condition .................................................................43
  3.17           Ownership; Leases .................................................................43
  3.18           No Prior Work........................................................................43
  3.19           Tax Matters ............................................................................43
  3.20           Illegal Activity ......................................................................44
  3.21           No Change in Facts or Circumstances; Disclosure ...............44
  3.22           Investment Company Act........................................................44
  3.23           Business Purposes ..................................................................44
  3.24           Survival of Representations and Warranties ..........................44

**ARTICLE 4 COVENANTS**.....................................................................................44
  4.1             No Encumbrances ..................................................................44
  4.2             No Transfers...........................................................................44
  4.3             Title to Property .....................................................................45
  4.4             Existence, Compliance with Law............................................45
  4.5             Taxes .....................................................................................45
  4.6             Access to Property..................................................................45

PLANET- 00858

4.7    Planned Improvements; Alterations.................................................45
4.8    Notice of Certain Events ...............................................................45
4.9    Accuracy of Representations and Warranties ...............................45
4.10   No Occupany.................................................................................45
4.11   Costs and Expenses.......................................................................45
4.12   Further Assurances........................................................................46
4.13   Indemnification .............................................................................46
4.14   Insurance .......................................................................................46
4.15   Estoppel Statement........................................................................48
4.16   No Debt..........................................................................................48
4.17   Environmental Matters...................................................................49

ARTICLE 5 EVENTS OF DEFAULT .................................................................50
5.1    Payments .......................................................................................50
5.2    Sale, Encumbrance ........................................................................50
5.3    Covenants.......................................................................................50
5.4    Representations and Warranties ....................................................50
5.5    Involuntary Bankruptcy or Other Proceeding ...............................50
5.6    Voluntary Bankruptcy ...................................................................50
5.7    Other Obligations ..........................................................................50

ARTICLE 6 REMEDIES .......................................................................................50
6.1    Remedies - Insolvency Events .......................................................50
6.2    Remedies - Other Events...............................................................51
6.3    Lender's Right to Perform the Obligations ...................................51
6.4    Reimbursement of Expenses ..........................................................51
6.5    Inspections .....................................................................................51
6.6    Rights and Remedies Cumulative ..................................................51

ARTICLE 7 CONDEMNATION/CASUALTY .....................................................52
7.1    Casualty..........................................................................................52
7.2    Condemnation.................................................................................52
7.3    Restoration .....................................................................................53

ARTICLE 8 MISCELLANEOUS...........................................................................55
8.1    Notices ...........................................................................................55
8.2    Appointment of Agent....................................................................55
8.3    Amendments and Waivers .............................................................56
8.4    Limitation on Interest.....................................................................56
8.5    Invalid Provisions...........................................................................56
8.6    Lender Not in Control; No Partnership..........................................56
8.7    Time of the Essence .......................................................................57
8.8    Successors and Assigns...................................................................57
8.9    Waivers ...........................................................................................57
8.10   Cumulative Rights..........................................................................57
8.11   Titles of Articles, Sections and Subsections .................................57
8.12   Forum .............................................................................................57
8.13   Survival ..........................................................................................57
8.14   Waiver of Jury Trial .......................................................................58
8.15   Governing Law................................................................................58
8.16   Entire Agreement ...........................................................................58

PLANET- 00859

8.17    Use of Name..................................................................................................58
8.18    Counterparts.................................................................................................58

**SCHEDULES**

3.1  Borrower's Ownership Structure

**EXHIBITS**

A.  Planned Improvements

PLANET- 00860

## LOAN AGREEMENT

**THIS LOAN AGREEMENT** (this "Agreement") is entered into as of MARCH 27, 2019 (the "Closing Date") between (i) **PLANET MANAGEMENT GROUP, LLC**, a **DELAWARE** Limited Liability Company having an address at **105 MAXESS ROAD, SUITE N107, MELVILLE, NY 11747** ("Lender"), and (ii) **12706 HOLDINGS INC**, a **NEW YORK Corporation** having its principal place of business at **130-21 140th STREET, JAMAICA, NY 11436** ("Borrower").

## RECITALS

A. Subject to the terms and conditions set forth herein, Lender has agreed to make a loan to Borrower in the maximum principal amount of up to **FIVE HUNDRED THIRTY-FIVE THOUSAND DOLLARS and 00/100 Dollars (USD $535,000.00)** (the "Note Amount") or so much thereof as may be advanced hereunder (the "Loan"). Concurrently with this Agreement, Borrower is executing a Promissory Note in the Note Amount, payable to the order of Lender (the "Note"). As more particularly described in Section 2.4 below, the Initial Advance under the Note shall be in the amount of **FIVE HUNDRED THIRTY-FIVE THOUSAND DOLLARS and 00/100 Dollars (USD $535,000.00)**. As more particularly described in Section 2.5 below, the Future Advance under the Note shall be in a maximum amount of up to **ZERO and 00/100 Dollars (USD 0.00)**.

B. Borrower owns or is simultaneously herewith acquiring certain real property known by the street address of **127-06 177TH STREET, JAMAICA, NY 11434** (the "Property"), which is described on Exhibit A of the Mortgage dated as of the date hereof (the "Security Instrument").

C. Concurrently with this Agreement, ("Guarantor") is executing and delivering a Guaranty for the benefit of Lender (the "Guaranty").

D. This Agreement, and all other documents evidencing and/or securing the Loan, including the Note, the Security Instrument, and the Guaranty, are hereinafter collectively referred to as the "Loan Documents".

**NOW, THEREFORE,** in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt of which is hereby acknowledged, Lender and Borrower hereby agree as follows:

## ARTICLE 2
## DEFINITIONS; PRINCIPLES OF CONSTRUCTION

2.1    Definitions. Capitalized terms not otherwise defined in the body of this Agreement shall have the meanings set forth below.

"After Repair Value" means, as of any date of determination an amount equal to the lesser of (a) $765,000.00 and (b) the Appraised Value determined by an Appraisal made after completion of all Planned Improvements pursuant to Section 2.5(a)(v) below.

"Appraisal" means an appraisal, interior broker's price opinion or other determination of value of the Property given by an appraisal firm, licensed real estate agent or broker retained by Lender, which Appraisal is subject to Lender's approval.

"Appraised Value" means the value set forth in the Appraisal approved by Lender.

34

PLANET- 00861

"Business Day" shall mean any day other than a Saturday, Sunday or any other day on which national banks in New York, New York are not open for business.

"Debt" means the outstanding principal amount set forth in, and evidenced by, this Agreement and the Note together with all interest accrued and unpaid thereon and all other sums due to Lender in respect of the Loan under the Note, this Agreement, the Security Instrument or any other Loan Document.

"Default" means an event that, in and of itself or, with notice, lapse of time or both, could constitute an Event of Default.

"Default Rate" means a rate per annum equal to the lesser of (a) three percent (2%) above the Interest Rate and (b) the maximum non-usurious rate, if any, that may be charged or received.

"Governmental Authority" means any (a) federal, state, municipal, foreign or other governmental entity, board, bureau, agency or instrumentality, (b) administrative or regulatory authority (including any central bank or similar authority) or (c) court or judicial authority.

"Initial Value" means $535,000.00

"Inspection Agent" means any party retained by Lender for the purpose of reviewing the renovation and repair work completed at the Property.

"Interest Rate" means TWELVE percent, 12.000%, per annum.

"Law" means any laws (including the common law), ordinances, constitutions, regulations, decrees, directives, statutes, treaties, rules, codes, licenses, requirements, orders or injunctions, including those related to the environment, adopted, enacted, implemented, promulgated, issued or entered by or under the authority of any Governmental Authority, each as amended or modified, and as in effect from time to time.

"Planned Improvements" means the repair, renovation work and improvements to the Property described on Exhibit A hereto.

"Projected Value" means the projected value of the Property based upon completion of all Planned Improvements as underwritten by Lender.

"Servicer" means the Lender's designated servicer or other firm that Lender may approve from time to time. The initial Servicer selected by Lender is PLANET MANAGEMENT GROUP, LLC.

## 2.2 Principles of Construction.

(a) Words used in this Agreement and the other Loan Documents in the singular, where the context so permits, shall be deemed to include the plural and *vice versa*. The definitions of words in the singular in this Agreement and the other Loan Documents shall apply to such words when used in the plural where the context so permits and *vice versa*.

(b) The words "hereof," "hereunder" and similar terms when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and article, section, subsection, schedule and exhibit references herein are references

35

PLANET- 00862

to articles, sections, subsections, schedules and exhibits to this Agreement unless otherwise specified.

(c) When used in this Agreement and the other Loan Documents, the phrase "including" shall mean "including, but not limited to," the phrase "satisfactory to Lender" and words to that effect, shall mean "in form and substance satisfactory to Lender in all respects," the phrase "with Lender's consent" or "with Lender's approval" or words to that effect, shall mean such consent or approval at Lender's discretion, and the phrase "acceptable to Lender" shall mean "acceptable to Lender at Lender's sole discretion." Without limitation, unless the Loan Document expressly states another standard, Lender may make all decisions, including approvals, consents, determinations and waivers, in its sole and absolute discretion.

(d) Reference to any agreement (including this Agreement), document or instrument means such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof and, if applicable, the terms hereof.

2.3 <u>Other Terms</u>. All accounting terms not specifically defined herein shall be construed in accordance with generally accepted accounting principles. The terms "including" or "includes" mean "including without limitation" or "includes without limitation," as applicable. Reference to any person include that person's successors and, to the extent permitted by this agreement, assigns and references to a person in a particular capacity excludes such person in any other capacity or individually.

## ARTICLE 3
## LOAN TERMS AND ADVANCES

3.1 <u>The Loan</u>. Lender agrees to make the Loan to Borrower subject to the terms and conditions of this Agreement.

3.2 <u>Maturity Date</u>. The Maturity Date shall mean (a) **APRIL 1, 2020** (the "<u>Original Maturity Date</u>"), (b) the Extended Maturity Date, if Lender consents to the extension(s) set forth below, or (c) such earlier date on which all principal and interest under the Note (or this Agreement) is due and payable as therein or herein provided by declaration of acceleration, or otherwise. Borrower may request that Lender extend the term of the Loan to the date occurring six (6) months after the Original Maturity Date and, if the Original Maturity Date is so extended then Borrower may extend the Maturity Date for an additional period of six (6) months (i.e., to the first anniversary of the Original Maturity Date (each such extended date being the "<u>Extended Maturity Date</u>"). If Borrower desires to extend the term of the Loan, Borrower shall deliver to Lender a request therefor no later than sixty (60) days prior to the then applicable Maturity Date. Lender shall have the sole option as to whether to extend the term. If Lender agrees to an extension, the Maturity Date shall be extended only upon satisfaction of the following terms and conditions:

(a) No Default or Event of Default shall have occurred and be continuing at any time from the date the applicable extension is requested through and including the date on which the applicable extension commences;

(b) In connection with each extension, Borrower shall have delivered to Lender together with its notice pursuant to this <u>Section 2.2</u> and as of the commencement of the applicable extension, an Officer's Certificate in form reasonably acceptable to Lender certifying that each of

36

the representations and warranties of Borrower contained in the Loan Documents is true, complete and correct as of the date of such Officer's Certificate; and

(c) in connection with each extension, Borrower shall pay to Lender, by wire transfer of immediately available funds, an extension fee equal to TWO-percent (2%) multiplied by the outstanding principal balance of the Loan.

All references in this Agreement and in the other Loan Documents to the Maturity Date shall mean the applicable Extended Maturity Date in the event the applicable extension is effectuated, or such earlier date upon declaration of acceleration by Lender, prepayment by Borrower, or otherwise.

### 3.3 Payments, Prepayments.

(a) Installment Payments. Borrower shall pay all accrued interest on this Loan monthly (each an "Interest Only Payment"), with the first payment due on **MAY 1, 2019** and continuing on the first day of each month thereafter through **APRIL 1, 2020**. If not sooner paid, by declaration of acceleration or otherwise, the entire unpaid principal balance of the Loan and all interest thereon shall be paid on the Maturity Date.

(b) Prepayments. The Loan may be prepaid in full, but not in part, at any time upon not less than fifteen (15) days prior notice to Lender.

(c) Interest Calculation. Interest on the unpaid principal balance of the Loan will accrue at the Interest Rate from the date of advance until final payment thereof. Interest on the outstanding principal balance of the Loan shall be calculated by multiplying (a) the actual number of days elapsed in the period for which the calculation is being made by (b) a daily rate equal to the Interest Rate divided by three hundred sixty (360) by (c) the outstanding principal balance of the Loan.

(d) Payments after Default. Upon the occurrence and during the continuance of an Event of Default, interest on the outstanding principal balance of the Loan and, to the extent permitted by applicable Law, overdue interest and other amounts due in respect of the Loan, shall accrue at the Default Rate, calculated from the date of the underlying Default without regard to any grace or cure periods contained herein, and shall be payable immediately on demand from Lender. Interest at the Default Rate shall be computed from the occurrence of the Default until the actual receipt and collection of the Loan (or that portion thereof that is then due). To the extent permitted by applicable Law, interest at the Default Rate shall be added to the Loan, shall itself accrue interest at the same rate as the Loan, and shall be secured by the Security Instrument. This paragraph shall not be construed as an agreement or privilege to extend the date of the payment of the Loan, nor as a waiver of any other right or remedy accruing to Lender by reason of the occurrence of any Event of Default and Lender retains its rights under the Note to accelerate and to continue to demand payment of the Debt upon the happening of any Event of Default.

(e) Late Fee. If any monthly payment is not received by the fifth day of the month when such payment is due, Lender may assess a late charge equal to 5.0% of the amount of the payment to defray the expenses incident to such delay. Payment of the late charge shall be a condition to curing any Event of Default. This provision for a late charge is not permission to make a late payment. If Lender has not received full payment of all amounts due under the Loan

37

PLANET- 00864

Documents by the Maturity Date, the 5.00% fee described herein will not be assessed on the principal sum then due, although all Lender's remedies under the Loan Documents for an Event of Default will apply (including collection of interest at the Default Rate).

(f)    Application of Payments.  Except when there exists a Default or Event of Default or as provided in Article 7 with respect to Insurance and Condemnation Proceeds and Net Deficiency Proceeds, all payments received by Lender under the Loan Documents shall be applied: first, to any fees and expenses due to Lender under the Loan Documents; second, to any interest at the Default Rate; third, to accrued and unpaid interest; and fourth, to the principal sum due under the Loan.  During the existence of a Default or Event of Default, Lender may apply all payments, including any Insurance and Condemnation Proceeds and Net Proceeds Deficiency, in such order and manner as Lender determines.  All payments hereunder shall be paid in U.S. dollars in immediately available funds (1) by wire transfer or electronic funds transfer via an automated clearing house to Servicer, or (2) by such other means and/or to such other place or person as Lender designates from time to time.  Until further notice payments shall be made to Servicer in accordance with the instructions set forth in Schedule 2.3(f).

3.4    Initial Advance.  On the Closing Date, Lender shall make an initial advance to Borrower in the amount of USD $535,000.00 (the "Initial Advance").  The Initial Advance shall be subject to the following conditions, in addition to such other conditions as Lender may require:

(a)    Lender shall have received a loan policy of title insurance on such form as Lender requires in the Note Amount insuring that the lien of the Security Instrument is a valid first priority lien on the Property, subject only to the lien of current real property taxes and assessments not yet due and payable and such non-monetary encumbrances as are acceptable to Lender and including such endorsements as Lender may require (the "Title Policy").

(b)    Borrower shall have executed and delivered the Note and the Security Instrument, and the Security Instrument shall have been recorded in the local land records, at the expense of Borrower.

(c)    Lender shall have received an Appraisal satisfactory to Lender setting forth both the as-is Appraised Value and the Projected Value.

(d)    Borrower shall have caused Guarantor to execute and deliver to Lender the Guaranty.

3.5    Future Advance.

(a)    Upon satisfaction of the following terms and conditions as determined by Lender, Lender shall make a single additional principal advance to Borrower (the "Future Advance") in an amount not to exceed USD $0.00.

(i)    No Default or Event of Default shall have occurred at any time from the Closing Date through and including the funding date of the Future Advance (the "Future Advance Funding Date").

PLANET- 00865

(ii)     The Future Advance shall be limited to such amount so that the maximum principal amount advanced under the Loan (after adding the amount of the Initial Advance to the amount of the Future Advance) shall be equal to the lesser of (x) 80% of the Property's Initial Value, or (y) 65% of the Property's After Repair Value, as determined by the Lender in its sole discretion.

(iii)     Borrower shall have delivered to Lender on or prior to the date which is not less than ten (10) days prior to the Future Advance Funding Date (but not more than thirty (30) days prior to the Future Advance Funding Date), a funding request for the Future Advance substantially in the form attached hereto as Schedule I (each, a "Future Advance Funding Notice"), which Future Advance Funding Notice shall have been executed by an authorized officer of Borrower and shall have been delivered together with (A) a certificate (i) stating there has been no Default or Event of Default from the Closing Date, (ii) stating that all of the Planned Improvements have been completed in a good and workmanlike manner, (iii) identifying each person that supplied materials or labor in connection with the Planned Improvements, and (iv) stating that each such person has been paid in full, (B) unconditional final lien waivers from all such persons and such other evidence of payment satisfactory to Lender and (C) all other information and documentation in respect of the Future Advance required to be submitted to Lender by Borrower pursuant to this Section 2.5.

(iv)     Borrower shall have delivered unconditional releases and other evidence satisfactory to Lender that there exist no notices of sums due or to become due, notices of a potential claim of lien, notices of pendency, stop orders, mechanic's or materialman's liens or notices of intention to file same, or any other liens or encumbrances of any nature whatsoever on or against the Property other than liens for current real property taxes and assessments not yet due and payable and other non-monetary encumbrances specified in the Title Policy.

(v)     Lender shall have received an updated Appraisal issued after the completion of the Planned Improvements. Inspection Agent shall have inspected the Property and confirmed to Lender that the Planned Improvements have been completed in a good and workmanlike manner in compliance with Law and Exhibit A and such other matters as Lender may require.

(vi)     All costs and expenses required to have been paid by Borrower pursuant to this Agreement and the other Loan Documents as of the Future Advance Funding Date shall have been paid, and Borrower shall have paid all of Lender's out-of-pocket third party expenses incurred in connection with the Future Advance (including, without limitation, reasonable attorneys' fees, disbursements, title costs, inspection fees and appraisal fees).

(vii)     The representations and warranties made by Borrower in the Loan Documents or otherwise made by or on behalf of Borrower in connection therewith after the date hereof shall be true and correct on and as of the date made and on and as of the Future Advance Funding Date.

(viii)     Borrower shall have delivered to Lender a title bring down or endorsement to the Title Policy that (v) confirms the coverage is equal to the maximum amount of the Loan, (w) confirms that the Security Instrument is a first lien, (x) reflects no other liens or

39

encumbrances other than real estate taxes not yet due and payable and the non-monetary encumbrances set forth in the Title Policy and (y) contains such endorsements as Lender may require.

(ix)     The Property, as constructed, shall comply with all applicable Laws. All certifications, permits, licenses and approvals, including building permits, certificates of completion and occupancy permits required for the use and occupancy of the Property as a personal residence (collectively, the "Licenses"), shall have been obtained and in full force and effect and not subject to revocation, suspension or forfeiture; provided, that, to the extent any License is not required at such time in order to complete the Planned Improvements as scheduled and in accordance with good construction practices and Laws, same shall be delivered as and when obtained. At Lender's request, made from time to time, Borrower shall deliver to Lender true and correct copies of all Licenses.

(x)     No Law shall have been adopted and no order, judgment or decree of any Governmental Authority shall have been issued, which in the good faith judgment of Lender, would enjoin, prohibit or restrain, or impose or result in the imposition of any material adverse condition upon, the making or repayment of any Future Advance or the consummation of the transactions contemplated hereby.

(xi)     Borrower shall have delivered to Lender any other documents and information as Lender may request to evidence Borrower's continued compliance with the terms of the Loan Documents.

(xii)     Borrower shall have delivered to Lender an estoppel certificate stating the increased outstanding principal balance of the Note and such other matters contemplated by Section 4.15.

(b)     Lender shall make the Future Advance to Borrower by wire transfer to Borrower pursuant to instructions given by Borrower in the Future Advance Funding Notice. If any advance is scheduled for a day that is not a Business Day, then same shall be made on the next succeeding Business Day.

(c)     Borrower's sole remedy at law or in equity in connection with any claim that Lender has failed to make a Future Advance shall be to seek specific performance. In no event shall Lender be liable for any direct, indirect, special, punitive or consequential damages. The obligations of Borrower under this Agreement, the Note and the other Loan Documents shall not be reduced, discharged or released because or by reason of any existing or future offset, claim or defense of Borrower, or any other party, against Lender by reason of Lender's failure to perform its obligations under Section 2.5.

3.6     Participations. Borrower acknowledges that Lender has the right, as Lender determines in its sole discretion, to split the Note or grant one or more participations in the Note in order to include the Future Advance in a separate promissory note or separate junior participation and in separate sales, participations or securitizations undertaken by Lender. In the event that Lender includes the Future Advance in a separate note or separate junior participation as aforesaid (the "Future Advance Note"), Borrower (a) acknowledges that only the holder of the Future Advance Note shall be obligated to make Future Advances and no other holder of any other part of the Note shall have any liability or obligation with

40

respect to any Future Advances and (b) agrees, as a condition to the making of the Future Advance, to execute and deliver an amendment to the Security Instrument in form and substance satisfactory to Lender in order to ensure that the Future Advance Note is secured by the Security Instrument and that the holder of the Future Advance Note is, in a manner satisfactory to Lender, entitled to the rights, remedies and protections of a beneficiary of the Security Instrument.

3.7     Origination Fee. In consideration of Lender making the Loan hereunder to Borrower, Borrower shall pay a fee in the amount of $16,050.00 (3% of the mortgage amount) (the "Origination Fee") to Lender, which shall be deducted from the gross proceeds of the Loan distributed on the Closing Date, if any. **In addition, Borrower has previously paid the appraiser an Appraisal Fee of $550.00 and the Borrower hereby agrees to pay at closing the sum of $0.00, Servicing Fee of $775.00, Budget Review Fee of $395.00, and an Attorney Settlement Fee of $2,000.00. The Borrower has also agreed to pay a Repair Reserve of $0.00 and an Interest Reserve of $0.00.** Other than the Origination Fee and the other fees, Borrower has not paid any fees or similar compensation to or at the direction of Lender or any of its agents in connection with the Loan, it being understood that such fees and compensation shall not be deemed to include third party diligence and closing costs such as appraisal fees and title insurance costs.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants to Lender that:

4.1     Organization and Power. Borrower is a **Corporation** duly organized and validly existing and in good standing in the State of **NEW YORK**, with requisite power and authority to own the Property and to transact the businesses in which it is now engaged. Borrower is duly qualified to do business and is in good standing in each jurisdiction where it is required to be so qualified in connection with the Property, its businesses and operations. Borrower's principal place of business as of the date hereof is the address set forth in the introductory paragraph of this Agreement. Borrower is organized under the laws of the State of **NEW YORK** and its organizational identification number is **83-2200008**. The Borrower's ownership structure is set forth on Schedule 3.1 hereto.

4.2     Validity of Loan Documents. The execution, delivery and performance by each of Borrower and Guarantor of the Loan Documents to which they are parties: (i) are duly authorized and do not require the consent or approval of any other party or governmental authority which has not been obtained; and (ii) will not violate any Law or result in the imposition of any lien, charge or encumbrance upon all or any portion of the Property, except for any liens in favor of Lender as contemplated by the Loan Documents. The Loan Documents to which they are parties constitute the legal, valid and binding obligations of Borrower and Guarantor, as applicable, enforceable in accordance with their respective terms. The Loan Documents are not subject to any right of rescission, set-off, counterclaim or defense by Borrower or Guarantor, including the defense of usury, and neither Borrower nor Guarantor has asserted any right of rescission, set-off, counterclaim or defense with respect thereto.

4.3     Litigation. There is no litigation, administrative proceeding, investigation or other legal action (including any proceeding under any state or federal bankruptcy or insolvency Law) pending or, to the knowledge of Borrower or Guarantor, threatened, against Borrower, Guarantor or the Property.

4.4     Bankruptcy. Neither Borrower nor Guarantor is the subject of any petition under state or federal bankruptcy or insolvency Laws or for the liquidation of all or a major portion of its assets or property, and neither Borrower nor Guarantor has knowledge of any person contemplating the filing of any such petition against it. No petition under the bankruptcy code or similar state bankruptcy or insolvency

41

Law has been filed against Borrower or any Guarantor in the last two (2) years, and neither Borrower nor Guarantor in the last two (2) years has ever made an assignment for the benefit of creditors or taken advantage of any insolvency act for the benefit of debtors. Neither Borrower nor Guarantor is contemplating either the filing of a petition by it under the bankruptcy code or similar state bankruptcy or insolvency Law or the liquidation of all or a major portion of Borrower's or Guarantor's assets or property, and neither Borrower nor Guarantor has knowledge of any person contemplating the filing of any such petition against it.

4.5 <u>Agreements</u>. Neither Borrower nor Guarantor is a party to any agreement or instrument or subject to any restriction which would materially and adversely affect Borrower, Guarantor or the Property, or Borrower's or Guarantor's business, properties or assets, operations or condition, financial or otherwise. Neither Borrower nor Guarantor is in default in any material respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any material agreement or instrument to which it is a party or by which Borrower, Guarantor or the Property is bound.

4.6 <u>Compliance</u>. The Property and the use thereof complies in all respects with all applicable Laws and, when the Planned Improvements are constructed, will continue to comply. The Property is currently zoned to be used as a one-to-four family residence. No legal proceedings are pending or, to the knowledge of Borrower and Guarantor, threatened with respect to the zoning of the Property. Neither the zoning nor any other right to construct, use or operate the Property is in any way legally dependent upon any property other than the Property. Neither Borrower nor Guarantor is in default or violation of any order, writ, injunction, decree or demand of any Governmental Authority.

4.7 <u>Financial Information</u>. All financial data that has been delivered to Lender in respect of Borrower and Guarantor (i) is true, complete and correct in all material respects, (ii) accurately represents in all material respects the financial condition of Borrower and Guarantor, as applicable, as of the date of such reports, and (iii) has been prepared in accordance with generally accepted accounting principles throughout the periods covered, except as disclosed therein. Since the date of such financial statements, there has been no materially adverse change in the financial condition, operations or business of Borrower or Guarantor, as applicable.

4.8 <u>Condemnation</u>. No Condemnation or other similar proceeding has been commenced or, to the best of Borrower's and Guarantor's knowledge, is threatened or contemplated with respect to all or any portion of the Property or for the relocation of roadways providing access to the Property.

4.9 <u>Federal Reserve Regulation</u>. No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose which would be inconsistent with such Regulation U or any other Regulations of such Board of Governors, or for any purposes prohibited by applicable Law or by the terms and conditions of this Agreement or the other Loan Documents.

4.10 <u>Utilities and Public Access</u>. The Property has rights of access to public ways and is served by public water, sewer, sanitary sewer and storm drain facilities adequate to service the Property for its intended use. All public utilities necessary or convenient to the use and enjoyment of the Property are located either in the public right-of-way abutting the Property (which are connected so as to serve the Property without passing over other property) or in recorded easements serving the Property and such easements are set forth in and insured by the Title Insurance Policy.

4.11 <u>Separate Lots</u>. The Property is comprised of a separate tax lot and does not constitute a portion of any other tax lot.

42

PLANET- 00869

4.12    Assessments. There are no pending or proposed special or other assessments for public improvements or otherwise affecting the Property, nor are there any contemplated improvements to the Property that may result in such special or other assessments.

4.13    Insurance. Borrower has obtained and has delivered to Lender certified copies of all insurance policies reflecting the insurance coverages, amounts and other requirements set forth in this Agreement. No person, including Borrower and Guarantor, has done, by act or omission, anything which would impair in any material respect the coverage of any such policy.

4.14    Licenses. All Licenses have been obtained and are in full force and effect and are not subject to revocation, suspension or forfeiture, provided the Licenses required for the Planned Improvements shall be obtained prior to the commencement of such Improvements; provided, that, to the extent any License is not required at such time in order to complete the Planned Improvements as scheduled and in accordance with good construction practices and Laws, same shall be obtained at such times as necessary to ensure such completion. Borrower shall keep and maintain all Licenses necessary for the operation of the Property.

4.15    Flood Zone. None of the improvements on the Property are located in an area as identified by the Federal Emergency Management Agency as an area having special flood hazards or, if so located, the flood insurance required pursuant to Section 4.13 is in full force and effect.

4.16    Physical Condition. Upon completion of the Planned Improvements, the Property will be in good condition, order and repair in all material respects; there will not exist any structural or other material defects or damage in or to the Property, whether latent or otherwise. The Property is, and upon completion of the Planned Improvements will be, free from damage covered by fire or other casualty. All liquid and solid waste disposal, septic and sewer systems located on the Property will be in a good and safe condition and repair and in compliance with all applicable Laws.

4.17    Ownership; Leases. Borrower is the sole owner of the Property. The Property is not subject to any Leases. Other than Borrower, no person has any possessory interest in the Property or right to occupy the same. The Property is not occupied and neither Borrower nor Guarantor has any intent to occupy the Property, or to permit any other person to occupy the Property during the term of the Loan.

4.18    No Prior Work. No renovation or other work has been performed with respect to the Property by or on behalf of Borrower prior to Borrower taking sole fee ownership thereof.

4.19    Tax Matters. All transfer taxes, grantee or so-called "Mansion Tax", deed stamps, intangible taxes or other amounts in the nature of transfer taxes required to be paid by any person under applicable Law in connection with the transfer of the Property to Borrower have.been paid. All mortgage, mortgage recording, stamp, intangible or other similar tax required to be paid by any person under applicable Law in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents have been paid. Each of Borrower and Guarantor has filed all federal, state, county, municipal, and city income and other tax returns required to have been filed by it and has paid all taxes and related liabilities which have become due pursuant to such returns or pursuant to any assessments received by it. Neither Borrower nor Guarantor knows of any basis for any additional assessment in respect of any such taxes and related liabilities for prior years. No tax audit is pending or, to Borrower's and Guarantor's knowledge, threatened against Borrower or Guarantor.

43

PLANET- 00870

4.20    Illegal Activity.  No portion of the Property has been or will be purchased with proceeds of any illegal activity and to Borrower's and Guarantor's knowledge, there are no illegal activities or activities relating to any controlled substances at the Property.

4.21    No Change in Facts or Circumstances; Disclosure.  Neither Borrower nor Guarantor has failed to disclose any fact that could cause any information described in any representation or warranty made herein to be misleading or adversely affect the value of the Property or the completion of the Planned Improvements.  No statement of fact made by or on behalf of Borrower or Guarantor in this Agreement or in any of the other Loan Documents contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained herein or therein not misleading.  There is no fact presently known to Borrower or Guarantor which has not been disclosed to Lender which adversely affects, nor as far as Borrower and Guarantor can foresee, might adversely affect, the business, operations or condition (financial or otherwise) of Borrower, Guarantor or the Property.

4.22    Investment Company Act.  Neither Borrower nor Guarantor is (a) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; (b) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 1935, as amended; or (c) subject to any other Law which purports to restrict or regulate its ability to borrow money.

4.23    Business Purposes.  The Loan is solely for the business purpose of Borrower, and is not for personal, family, household, or agricultural purposes.  The Loan originated under the Loan Documents is not a consumer loan, and Borrower and Guarantor understand, acknowledge and agree that the Real Estate Settlement Procedures Act and its implementing Regulation, Regulation X, and the Truth in Lending Act and its implementing Regulation, Regulation Z, do not apply to the Loan.  Without limitation, during the term of the Loan the Property shall not be used or occupied for residential purposes.  Borrower shall not reside in the Property at any time during the term of the Loan.

4.24    Survival of Representations and Warranties.  Borrower and Guarantor agree that all of the representations and warranties of Borrower and Guarantor, set forth in Article 3 and elsewhere in this Agreement and in the other Loan Documents shall survive indefinitely.  All representations, warranties, covenants and agreements made in this Agreement or in the other Loan Documents by Borrower or Guarantor shall be deemed to have been relied upon by Lender notwithstanding any investigation heretofore or hereafter made by Lender or on its behalf.

### ARTICLE 5
### COVENANTS

Borrower covenants and agrees with Lender as follows:

5.1    No Encumbrances.  Borrower shall not create, incur, assume, grant or permit to exist any lien or other encumbrance on all or any portion of the Property, other than the liens in favor of Lender contemplated by this Agreement or other Loan Documents and the lien of real estate taxes not yet due and payable. Borrower may request Lender's consent to place a subordinate lien to secure Subordinated Debt, which consent may be withheld in Lender's discretion.

5.2    No Transfers.  Neither Borrower nor Guarantor shall directly or indirectly sell or transfer all or any portion of the Property or any of its right, title and interest therein, including any direct or indirect beneficial interest.

44

5.3     Title to Property.  Borrower shall warrant and defend the title to the Property and every part thereof and the validity and priority of the liens created by the Security Instrument against the claims of all persons whatsoever.

5.4     Existence, Compliance with Law.  Borrower shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect all Licenses and comply with all Laws applicable to it, the Property and the completion of the Planned Improvements.  Borrower shall not engage in any dissolution, liquidation or consolidation or merger with or into any other business entity, modify, amend, waive or terminate its organizational documents or its qualification and good standing in any jurisdiction.  Borrower shall not change its name, identity (including its trade name or names), or principal place of business, without, in each case, first giving Lender thirty (30) days prior notice.  Borrower shall not change its corporate, partnership or other structure, or the place of its organization, without, in each case, the consent of Lender.

5.5     Taxes.  Borrower shall pay all taxes now or hereafter levied or assessed or imposed against the Property or any part thereof as the same become due and payable.  Borrower shall furnish to Lender receipts, or other evidence for the payment of the taxes prior to the date the same shall become delinquent.

5.6     Access to Property.  Borrower shall permit Lender and its agents, representatives and employees to inspect the Property at any time and from time to time.

5.7     Planned Improvements; Alterations.

(a)     Borrower shall promptly following the date hereof commence the Planned Improvements.  Once commenced Borrower shall diligently pursue and complete the Planned Improvements in a good and workmanlike manner in compliance with all applicable Laws.  Borrower shall obtain Lender's prior consent to any material alterations to the Planned Improvements.

(b)     Notwithstanding anything to the contrary herein, nothing in this Section 4.7 shall (i) make Lender responsible for making or completing the Planned Improvements or any other improvements to the Property or (ii) require Lender to expend any funds to make or complete the Planned Improvements (other than funding Future Advances in accordance with this Agreement).

5.8     Notice of Certain Events.  Borrower shall promptly and in any event within three (3) days give notice to Lender of any (a) any threatened or pending legal, judicial or regulatory proceedings affecting Borrower and/or the Property, including any dispute between Borrower and any Governmental Authority, and (b) written or oral notice received from any Governmental Authority with respect to any failure to comply with any applicable Law by which Borrower or the Property is bound.

5.9     Accuracy of Representations and Warranties.  Borrower shall ensure that all representations and warranties remain true, accurate and complete at all times.

5.10     No Occupancy.  Neither Borrower nor Guarantor shall, or shall permit any other person to, occupy the Property.

5.11     Costs and Expenses.  Borrower shall reimburse Lender within ten (10) days after demand for all out-of-pocket fees, costs and expenses paid or incurred by Lender in connection with the negotiation, preparation and execution of this Agreement and the other Loan Documents (and any amendments,

45

approvals, consents, waivers and releases requested, required, proposed or done from time to time), or in connection with the disbursement, administration or collection of the Loan including (a) all fees and expenses of counsel; (b) fees and charges of each construction consultant, inspector and engineer; (c) appraisal, including any Appraisal, re-appraisal and survey costs; (d) title insurance charges and premiums; (e) title search or examination costs, including abstracts, abstractors' certificates and Uniform Commercial Code searches; (f) judgment and tax lien searches for Borrower and each Guarantor; (g) escrow fees; (h) fees and costs of environmental investigations, site assessments and remediations; (i) recordation taxes, documentary taxes, transfer taxes and mortgage taxes; and (j) filing and recording fees. At Lender's option, Borrower shall be obligated to advance fees, costs and expenses to be incurred by Lender and/or Lender may net any incurred or to-be-incurred fees, costs and expenses against any Advance.

5.12    **Further Assurances.** Borrower shall promptly, (i) cure any defects in the execution and delivery of the Loan Documents, (ii) deliver an estoppel certificate to Lender, in form and substance and at such times, as Lender requests and (iii) execute and deliver, or cause to be executed and delivered, all such other documents, agreements and instruments as Lender may reasonably request to further evidence and more fully describe the collateral for the Loan, to correct any omissions in the Loan Documents, to perfect, protect or preserve any liens created under any of the Loan Documents, or to make any recordings, file any notices, or obtain any consents, as may be necessary or appropriate in connection therewith.

5.13    **Indemnification.** Borrower shall indemnify, defend and hold harmless Lender and its affiliates and their respective owners, members, managers, officers, directors, managers, agents, employees, trustees, partners, successors and permitted assigns from and against any and all losses, liabilities, claims, damages, expenses, obligations, penalties, actions, judgments, suits, costs or disbursements of any kind or nature whatsoever, including the reasonable fees and actual expenses of Lender's counsel, arising from or in connection with (i) the Loan; (ii) any failure to complete the Planned Improvements in accordance with applicable Law; (iii) any inaccuracy in or breach of any representation or warranty made by Borrower in this Agreement or any other Loan Documents; (iv) any failure of Borrower to perform any of its agreements, duties or obligations in accordance with the terms of this Agreement or any other Loan Document; (v) any investigative, administrative, mediation, arbitration, or judicial proceeding, whether or not Lender is designated a party thereto, commenced or threatened at any time (including after the repayment of the Loan) in any way related to the execution, delivery or performance of any Loan Document; (vi) any acts by Lender pursuant to Section 4.7 and Section 6.3, including all sums paid by Lender or otherwise expended thereunder; and (vii) any brokerage commissions or finder's fees claimed by any broker or other party in connection with the Loan or any of the transactions contemplated in the Loan Documents.

5.14    Insurance.

    (a)    Borrower shall at all times keep (and/or, as noted below, shall cause its general contractor, if any, to keep), in full force and effect the following policies of insurance with respect to the Property:

        (i)    All risk insurance in an amount equal to the greater of (X) 100% of the full replacement cost of the improvements and (Y) the Initial Advance plus the Future Advance (when applicable), including," an "increased cost of construction endorsement" and an "agreed amount endorsement," covering the perils of fire, flood (if in a flood hazard zone), earthquakes (if in an earthquake zone and the PML exceeds 20%), and such other perils as Lender may require, without deduction for physical depreciation;

        (ii)    Commercial general liability insurance with coverage at least as broad as ISO Form CG 00 01 10 93, insuring against claims for bodily injury (including death),

46

PLANET- 00873

property damage, personal injury, negligent supervision liability, and advertising liability occurring upon the Property or operations incidental or necessary thereto located in or on the Property, such insurance to afford protection in an amount not less than $1,000,000.00 per occurrence and in the aggregate; provided that such liability insurance shall also be carried by Borrower's general contractor, if any;

(iii)    At all times during which construction, repairs or alterations are being made (A) commercial general liability and excess and/or umbrella liability insurance covering claims related to the construction, repairs or alterations being made which are not covered by or under the terms or provisions of the insurance provided for in Section 4.14(a)(ii); and (B) the insurance provided for in Section 4.14(a)(i) shall be written in a so-called builder's risk completed value form, including coverage for 100% of the total cost of construction (1) on a non-reporting basis, (2) against all perils required to be insured against pursuant to this Section 4.14(a), (3) shall include permission to occupy the Property, and (4) shall contain an agreed amount endorsement waiving co-insurance provisions; provided that, such builder's risk insurance may be carried by Borrower's general contractor, if any, in lieu of Borrower;

(iv)    Workers' compensation, subject to the statutory limits of the State in which the Property is located, and employer's liability insurance with a limit of at least $1,000,000.00 per accident and per disease per employee, and $1,000,000.00 for disease aggregate in respect of any work or operations on or about the Property, or in connection with the Property or its operation (if applicable); provided that such workers' compensation insurance may be carried by Borrower's general contractor, if any, in lieu of Borrower;

(v)    Automobile liability coverage for all owned and non-owned vehicles, including rented and leased vehicles containing minimum limits per occurrence of $1,000,000.00 (if applicable); provided that such automobile coverage shall also be carried by Borrower's general contractor, if any and if applicable; and

(vi)    Such other insurance and in such amounts or as Lender from time to time may reasonably request against such other insurable hazards which at the time are commonly insured against for property similar to the Property located in or around the region in which the Property is located.

(b)    All policies shall:

(vii)    be issued by a company or companies satisfying either of the following: (x) if rated by the Best Company, Inc. either (1) a B or better Financial Strength Rating in Best's Insurance Reports or (2) an A or better Financial Strength Rating and a Financial Size Category of VIII or greater in Best's Insurance Reports non-U.S. Edition or (y) if rated by Standard and Poor's, a BBB or better Financial Strength Rating in Standard and Poor's Ratings Direct Insurance Service;

(viii)    not contain a co-insurance clause or other clause limiting the amount of coverage under any conditions;

(ix)    name Lender an additional insured as to liability coverage;

47

PLANET- 00874

(x)     contain a Non-Contributory Standard Mortgagee Clause and the Lender's Loss Payable Endorsement (Form 438 BFU NS), or equivalent, in favor of Lender;

(xi)     provide a minimum of 30 days' written notice to Lender prior to any modification, termination, cancellation or non-renewal (and a 10-day notification for cancellation because of non-payment of premium);

(xii)     provide for deductibles acceptable to Lender; and

(xiii)     be satisfactory to Lender in all other respects.

(c)     Certified copies of the policies of insurance required herein, and original Acord 27 (Acord 28, if available) and Acord 25 (as to liability and excess liability only) certificates evidencing the insurance required herein shall be provided to Lender. In the event Borrower shall fail to maintain the insurance required by this section and such failure continues for a period of ten (10) days after notice thereof from Lender (or Lender's designated servicer), Lender may, but shall not be so obligated, procure such insurance as Lender shall deem necessary, and any amount so expended by Lender shall be secured by the Security Instrument and be repayable by Borrower upon demand, with interest at the Default Rate.

(d)     In the event of any damage or destruction to the Property, Borrower shall promptly make proof of loss to the insurers and Lender. Borrower shall not adjust or compromise any claim under such insurance without the prior approval of Lender. All proceeds of such insurance shall be paid directly to Lender, and each insurer is hereby authorized and directed to make such payment directly to Lender. Any proceeds shall be applied first to the payment of all costs and expenses incurred by Lender in obtaining such proceeds. The balance of the proceeds, if any, shall be applied in accordance with the provisions of Article VII (Casualty and Condemnation).

5.15     Estoppel Statement. After request by Lender, Borrower shall within ten (10) days furnish Lender with a statement, duly acknowledged and certified, setting forth (i) the amount of the original principal amount of the Note, (ii) the unpaid principal amount of the Note, (iii) the Interest Rate, (iv) the date installments of interest and/or principal were last paid, (v) any offsets or defenses to the payment of the Debt, (vi) that the Note, this Agreement, the Security Instrument and the other Loan Documents are valid, legal and binding obligations and have not been modified or if modified, giving particulars of such modification and (vii) such other matters as Lender may request.

5.16     No Debt.

(a)     Borrower shall not incur any indebtedness other than Subordinated Debt. "Subordinated Debt" means debt that is subordinate and junior in right of payment to the prior payment in full of all Debt. From and after the occurrence of an Event of Default, if any sums shall be paid by Borrower to any person or entity on account of Subordinated Debt, such sums shall be deemed held in trust for the benefit of Lender and shall forthwith be paid to Lender For purposes of this Section 4.16, the term "indebtedness" means all debt, liabilities, and obligations of Borrower, whether such debt, liabilities, and obligations now exist or are hereafter incurred or arise, or whether the obligations of Borrower thereon are direct, indirect, contingent, primary,

48

PLANET- 00875

secondary, several, joint and several, or otherwise, and irrespective of whether such debt, liabilities, or obligations are evidenced by a note, contract, open account, or otherwise.

(b)    Any and all liens, security interests, judgment liens, charges, or other encumbrances upon Borrower's assets securing payment of any Subordinated Debt shall be and remain inferior and subordinate to any and all liens, security interests, judgment liens, charges, or other encumbrances upon Borrower's assets securing payment of the Debt or any part thereof, regardless of whether such encumbrances in favor of the holder of the Subordinated Debt or Lender presently exist or are hereafter created or attached. Borrower shall inform the obligee of any potential Debt of the provisions of this Section 4.16 prior to effectuating such Debt.

5.17    Environmental Matters.

(a)    "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants or wastes by Environmental Law and the following substances, if not otherwise included: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; "Environmental Law" is Law that relates to health, safety or environmental protection; "Environmental Cleanup" includes any response action, remedial action or removal action as defined in Environmental Law; and an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

(b)    Borrower represents and warrants to Lender that there is no pending action or proceeding involving the Property in which compliance with any Environmental Law is an issue. To the Borrower's and Guarantor's knowledge, there is no past or present non-compliance with Environmental Law or presence on the Property or in the immediate vicinity of the Property of any Hazardous Substances.

(c)    Borrower shall not cause or permit the presence, use, disposal, storage or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (i) that is in violation of any Environmental Law, (ii) which creates an Environmental Condition or (iii) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property.

(d)    Borrower shall promptly give Lender notice of (i) any investigation, claim, demand, lawsuit or other action by any Governmental Authority or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has knowledge, (ii) any Environmental Condition, including any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (iii) any condition caused by the presence, use or release of a Hazardous Substance which affects the Property. If Borrower learns or is notified by any Governmental Authority or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

PLANET- 00876

(e)     The obligations of Borrower in this Section 4.17 are supplemental to any obligations relating to Hazardous Substances and Environmental Law set forth elsewhere in this Agreement or in any other Loan Agreement.

## ARTICLE 6
## EVENTS OF DEFAULT

Each of the following shall constitute an Event of Default under the Loan:

6.1     <u>Payments</u>.  Borrower's failure to pay any principal, interest or other amount due under the Loan Documents when due.

6.2     <u>Sale, Encumbrance</u>.  Borrower's violation of its obligations under <u>Sections 4.1</u> and/or <u>4.2</u> of this Agreement.

6.3     <u>Covenants</u>.  Borrower's failure to perform or observe any of the agreements and covenants contained in this Agreement not otherwise covered by an Event of Default in this <u>Article 5</u> or in any of the other Loan Documents and the continuance of such failure for ten (10) Business Days after notice by Lender to Borrower.

6.4     <u>Representations and Warranties</u>.  Any representation or warranty made in any Loan Document proves to be untrue in any material respect when made or deemed made.

6.5     <u>Involuntary Bankruptcy or Other Proceeding</u>.  Commencement of an involuntary case or other proceeding against Borrower or Guarantor which seeks liquidation, reorganization or other relief with respect to it or its debt or other liabilities under any bankruptcy, insolvency or other similar Law now or hereafter in effect or seeks the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any of its property, and such involuntary case or other proceeding shall remain undismissed or unstayed for a period of sixty (60) days; or an order for relief against Borrower or Guarantor shall be entered in any such case under the Federal bankruptcy code.

6.6     <u>Voluntary Bankruptcy</u>.  Commencement by Borrower or Guarantor of a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts or other liabilities under any bankruptcy, insolvency or other similar Law or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official for it or any of its property, or consent by Borrower or Guarantor to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it, or the making by Borrower or Guarantor of a general assignment for the benefit of creditors, or the failure by Borrower or Guarantor, or the admission by Borrower or Guarantor in writing of its inability, to pay its debts generally as they become due, or any action by Borrower or Guarantor to authorize or effect any of the foregoing.

6.7     <u>Other Obligations</u>.  Default beyond any applicable notice and/or cure period by Borrower or Guarantor or any of their Affiliates under any financing or other arrangement with Lender or any of its Affiliates.

## ARTICLE 7
## REMEDIES

7.1     <u>Remedies - Insolvency Events</u>.  Upon the occurrence of any Event of Default described in <u>Section 5.5</u> or <u>Section 5.6</u> of this Agreement, the obligations of Lender to advance amounts

50

PLANET- 00877

hereunder shall immediately terminate, and all amounts due under the Loan Documents immediately shall become due and payable, all without presentment, demand, protest, notice of protest or dishonor, notice of intent to accelerate the maturity thereof, notice of acceleration of the maturity thereof, or any other notice of default of any kind, all of which are hereby expressly waived by Borrower.

7.2 <u>Remedies - Other Events</u>. While any Event of Default exists, Lender may take any or all of the following actions: (i) declare the entire Loan to be immediately due and payable without presentment, demand, protest, notice of protest or dishonor, notice of intent to accelerate the maturity thereof, notice of acceleration of the maturity thereof, or other notice of default of any kind, all of which are hereby expressly waived by Borrower; (ii) terminate the obligation, if any, of Lender to advance amounts hereunder; (iii) exercise all rights and remedies therefor under the Loan Documents, at Law or in equity, including under the UCC or other applicable Uniform Commercial Code, including foreclosure on and/or the power of sale of the Property; (iv) institute any proceeding or bring any action to enforce all or any part of the Debt and Lender's rights with respect to any or all of the collateral; or (v) foreclose the liens granted under this Agreement by any available judicial procedure.

7.3 <u>Lender's Right to Perform the Obligations</u>. If Borrower shall fail, refuse or neglect to make any payment or perform any act required by the Loan Documents, without notice to or demand upon Borrower and without waiving or releasing any other right, remedy or recourse Lender may have because of such Default, Lender may (but shall not be obligated to) make such payment or perform such act for the account of and at the expense of Borrower and to take all such action as it may deem necessary or appropriate. If Lender shall elect to pay any sum due, Lender may do so in reliance on any bill, statement or assessment procured from the appropriate Governmental Authority or other issuer thereof without inquiring into the accuracy or validity thereof. Similarly, in making any payments to protect the security intended to be created by the Loan Documents, Lender shall not be bound to inquire into the validity of any apparent or threatened adverse title, lien, encumbrance, claim or charge before making an advance for the purpose of preventing or removing the same. In furtherance and not in limitation of the foregoing, Borrower hereby constitutes and appoints Lender its true and lawful attorney-in-fact with full power and authority to execute such instruments and to do and perform all and every act and thing necessary and proper to carry into effect the purposes of this <u>Section 6.3</u> and protect Lender's interest in the Property.

7.4 <u>Reimbursement of Expenses</u>. Borrower shall upon request reimburse Lender for all amounts expended, advanced or incurred by Lender to collect the Note, or to enforce the rights of Lender under this Agreement or any other Loan Document, including as contemplated by <u>Section 6.3</u>, or to defend or assert the rights and claims of Lender under the Loan Documents (by litigation or other proceedings), which amounts will include all court costs, reasonable attorneys' fees (whether incurred at the trial or appellate level, in an arbitration proceeding, in bankruptcy (including, without limitation, any adversary proceeding, contested matter or motion) or otherwise) and expenses, fees of auditors and accountants, and investigation expenses as may be incurred by Lender in connection with any such matters (whether or not litigation is instituted), together with interest at the Default Rate on each such amount from the date of disbursement until the date of reimbursement to Lender, all of which shall constitute part of the Loan and shall be evidenced and secured by the Loan Documents. Borrower shall be responsible for all taxes, costs and expenses associated with recording the Security Instrument and filing any financing statement, and the premium and costs of the Title Policy (including all endorsements thereto); provided that Lender hereby agrees to pay the same on Borrower's behalf and all such amounts paid by Lender shall be reimbursed by Borrower.

7.5 <u>Inspections</u>. Lender shall have the right at any time, upon reasonable prior notice to Borrower, to enter upon the Property for the purpose of inspecting the same or to exercise any of its rights and remedies under the Loan Documents.

51

PLANET- 00878

7.6    Rights and Remedies Cumulative. All rights, powers and remedies of Lender set forth in this Agreement and in the other Loan Documents are cumulative, and in addition to every other right, power and remedy, express or implied, now or hereafter existing at Law, in equity, by contract or otherwise; and each and every right, power and remedy set forth in the Loan Documents or otherwise now or hereafter existing may be enforced and/or exercised singly, alternatively, successively or together and from time to time and as often and in any order (and against any one or more Person(s) and/or any of the collateral) as Lender may elect in its sole discretion, it being the intent hereof that none of Lender's rights, powers or remedies shall be to the exclusion of any other. Lender may, in its sole discretion, exercise any of its rights and/or remedies without resorting to and without regard to any collateral security or sources of liability with respect to the Debt. The failure or delay of Lender or any discontinuance by Lender, for any period of time or on more than one occasion, to exercise any right or remedy (including its right to accelerate the Loan), or any single or partial exercise by Lender of any right or remedy, shall not constitute a waiver or release of, or in any way preclude or limit, the right to exercise the same or any different or other right or remedy at any time, and from time to time, during the continued existence of any Event of Default or any subsequent Event of Default, nor shall any such failure, delay or discontinuance by Lender be construed to be a waiver of any Event of Default. No performance by Lender of Borrower's obligations under any of the Loan Documents shall release Borrower of any such obligation or be deemed to have cured any Event of Default.

## ARTICLE 8
## CONDEMNATION/CASUALTY

8.1    Casualty. If the Property shall be damaged or destroyed, in whole or in part, by fire or other casualty (a "Casualty"), Borrower shall give prompt notice of such damage to Lender and shall promptly commence and diligently prosecute the "Restoration", i.e., the repair and restoration of the Property as nearly as possible to the condition the Property was in immediately prior to the applicable Casualty or Condemnation, together with the Planned Improvements, whether or not previously constructed, with such alterations as may be approved by Lender and otherwise in accordance with Section 7.3. Borrower shall pay all costs of such Restoration whether or not such costs are covered by insurance. Lender may, but shall not be obligated to, make proof of loss if not made promptly by Borrower.

8.2    Condemnation.

(a)    Borrower shall promptly give Lender notice of the actual or threatened commencement of any proceeding for the Condemnation of all or any part of the Property and deliver to Lender copies of any and all papers served in connection with such proceedings. Lender may participate in any such proceedings, and Borrower shall from time to time deliver to Lender all instruments requested by it to permit such participation. Borrower shall, at its expense, diligently prosecute any such proceedings, and shall consult with Lender, its attorneys and experts, and cooperate with them in the carrying on or defense of any such proceedings. Notwithstanding any taking by any public or quasi-public authority through Condemnation or otherwise (including any transfer made in lieu of or in anticipation of the exercise of such taking), Borrower shall continue to pay the Debt at the time and in the manner provided for in the Note and in this Agreement and the Debt shall not be reduced until any Condemnation award shall have been actually received and applied by Lender, after the deduction of expenses of collection, to the reduction or discharge of the Debt. Lender shall not be limited to the interest paid on the award by the condemning authority but shall be entitled to receive out of the award interest at the rate or

52

rates provided herein or in the Note. If the Property or any portion thereof is taken by a condemning authority, Borrower shall promptly commence and diligently prosecute the Restoration of the Property and otherwise comply with the provisions of <u>Section 7.3</u>. If the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of the award, Lender shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive the award, or a portion thereof sufficient to pay the Debt.

(b) Notwithstanding the foregoing provisions of this <u>Section 7.2</u> and <u>Section 7.3</u>, if, immediately following a release of any portion of the lien of the Security Instrument following a Condemnation (but taking into account any proposed Restoration on the remaining Property), the ratio of the unpaid principal balance of the Loan to the value of the remaining Property is greater than 65% (such value to be determined in Lender's sole discretion), the principal balance of the Loan must be prepaid by an amount necessary so that such ratio is no greater than 65%.

8.3 <u>Restoration</u>. The following provisions shall apply in connection with the Restoration of the Property:

(a) Borrower's right, title and interest in and to all Net Proceeds are hereby assigned by Borrower to Lender and all Net Proceeds shall be paid to Lender. Lender shall make the Net Proceeds available for the Restoration, or apply the Net Proceeds to the Debt, in accordance with the provisions of this <u>Section 7.3</u>. The term "<u>Net Proceeds</u>" means: (i) the net amount of all insurance proceeds received by Lender pursuant to <u>Section 4.14</u> as a result of such damage or destruction, after deduction of its reasonable costs and expenses (including reasonable counsel fees), if any, in collecting same ("<u>Insurance Proceeds</u>"), or (ii) the net amount of the award, after deduction of its reasonable costs and expenses (including reasonable counsel fees), if any, in collecting same ("<u>Condemnation Proceeds</u>"), whichever the case may be.

(xiv) The Net Proceeds shall be made available to Borrower for Restoration provided that each of the following conditions are met, as determined by Lender:

A. no Default or Event of Default shall have occurred and be continuing;

B. (1) in the event of a Casualty, less than forty percent (40%) of the total floor area of the improvements on the Property has been damaged, destroyed or rendered unusable as a result of such Casualty, (2) in the event of a Condemnation, less than ten percent (10%) of the land constituting the Property is taken, such land is located along the perimeter or periphery of the Property, and no portion of the improvements or the Property access, including any driveway, is located on such land, or (3) in the event of a Casualty or Condemnation, the costs of Restoration are less than Ten percent (10%) of the then face amount of the Note];

C. Borrower shall commence the Restoration as soon as reasonably practicable (but in no event later than thirty (30) days after such Casualty or Condemnation occurs) and shall diligently pursue the same to satisfactory completion in compliance with all applicable Laws;

D. Lender shall be satisfied that the Restoration will be completed on or before the earliest to occur of (1) thirty (30) days prior to the Maturity Date, (2) six (6) months after the occurrence of such Casualty or Condemnation, or (3) such time as may be required under Applicable Law

53

PLANET- 00880

in order to repair and restore the Property to the condition it was in immediately prior to such Casualty or Condemnation;

        E.      the Property and the use thereof after the Restoration will be in compliance with all applicable Laws;

        F.      Borrower shall deliver to Lender a detailed budget setting forth in detail the entire cost of completing the Restoration, which budget shall be acceptable to Lender;

        G.      the Net Proceeds, together with any available Future Advance and any cash deposited by Borrower with Lender, are sufficient to cover the cost of the Restoration; and

        H.      all other conditions required for Borrower to obtain a Future Advance (other than the items set forth in Section 2.5(a)(ii) and (v), shall have been satisfied as if the disbursement of Net Proceeds were a Future Advance.

        (xv)    The Net Proceeds shall be held by Lender and, until disbursed in accordance with the provisions of this Section 7.3, shall constitute additional security for the Debt and other obligations under the Loan Documents. The Net Proceeds shall be disbursed by Lender to, or as directed by, Borrower from time to time during the course of the Restoration, but not more often than once a month upon receipt of evidence satisfactory to Lender that (A) all materials installed and work and labor performed (except to the extent that they are to be paid for out of the requested disbursement) in connection with the Restoration have been paid for in full, and (B) there exist no notices of pendency, stop orders, mechanic's or materialman's liens or notices of intention to file same, or any other liens or encumbrances of any nature whatsoever on the Property which have not fully bonded to the satisfaction of Lender and discharged of record.

        (xvi)    All plans and specifications required in connection with the Restoration shall be subject to prior review and approval in all respects by Lender and the Inspection Agent. Lender shall have the use of the plans and specifications and all Licenses required or obtained in connection with the Restoration. All costs and expenses incurred by Lender in connection with making the Net Proceeds available for the Restoration, including reasonable counsel fees and disbursements, and the Inspection Agent's fees, shall be paid by Borrower.

        (xvii)  In no event shall Lender be obligated to make disbursements of the Net Proceeds in excess of an amount equal to the costs actually incurred from time to time for work in place as part of the Restoration, as certified by the Inspection Agent, minus an amount equal to ten percent (10%) of the costs actually incurred (such amount, "the Casualty Retainage"). The Casualty Retainage shall in no event be less than the amount actually held back by Borrower from contractors, subcontractors and materialmen engaged in the Restoration. Without limiting the other conditions for the release of Net Proceeds, the Casualty Retainage shall not be released until the Inspection Agent certifies to Lender that the Restoration has been completed in accordance with the provisions of this Section 7.3 and that all approvals necessary for the occupancy and use of the Property as a personal residence, including any certificate of occupancy, have been obtained from all appropriate Governmental Authorities, and Lender receives evidence satisfactory to Lender that the costs of the Restoration have been paid in full or will be paid in full out of the Casualty Retainage;

54

PLANET- 00881

(xviii) Lender shall not be obligated to make disbursements of the Net Proceeds more frequently than once every calendar month.

(xix)    If at any time the Net Proceeds or the undisbursed balance thereof, together with any available Future Advance, shall not, in the opinion of Lender, be sufficient to pay in full the balance of the costs which are estimated by Lender or, at Lender's direction, the Inspection Agent to be incurred in connection with the completion of the Restoration, Borrower shall deposit the deficiency (the "Net Proceeds Deficiency") with Lender before any further disbursement of the Net Proceeds or any Future Advance shall be made.  The Net Proceeds Deficiency deposited with Lender shall be held by Lender and shall be disbursed for costs actually incurred in connection with the Restoration on the same conditions applicable to the disbursement of the Net Proceeds, and until so disbursed pursuant to this Section 7.3 shall constitute additional security for the Debt and other obligations under the Loan Documents.

(xx)    The excess, if any, of the Net Proceeds and the remaining balance, if any, of the Net Proceeds Deficiency deposited with Lender after the Inspection Agent certifies to Lender that the Restoration has been completed in accordance with the provisions of this Section 7.3, and the receipt by Lender of evidence satisfactory to Lender that all costs incurred in connection with the Restoration have been paid in full, shall be remitted by Lender to Borrower, provided no Default or Event of Default shall have occurred and be continuing.

(b)    All Net Proceeds not required (i) to be made available for the Restoration or (ii) to be returned to Borrower as excess Net Proceeds pursuant to Section 7.3(a)(vii) may be retained and applied by Lender toward payment of the Debt whether or not then due and payable in such order, priority and proportions as Lender in its sole discretion shall deem proper.  If Lender shall receive and retain Net Proceeds, the lien of the Security Instrument shall be reduced only by the amount thereof received and retained by Lender and actually applied by Lender in reduction of the Debt.

## ARTICLE 9
## MISCELLANEOUS

9.1    Notices.  Any notice, request, statement, consent, waiver or demand required or permitted to be given under this Agreement shall be in writing and either shall be sent by overnight air courier service, registered mail (postage prepaid, return receipt requested) or personally delivered to a representative of the receiving party, or sent by telecopy (provided an identical notice is also sent simultaneously by mail, overnight courier, or personal delivery as otherwise provided in this Section 8.1).  All such communications shall be mailed, sent or delivered, addressed to the party for whom it is intended at its address set forth below.

If to Borrower:      **130-21 140TH STREET JAMAICA, NY 11436**

If to Lender:      **105 MAXESS ROAD, SUITE N107, MELVILLE, NY 11747**

Any communication so addressed and mailed shall be deemed to be given on the earliest of (i) when actually delivered, (ii) on the second business day after deposit with an overnight air courier service, or (iii) in the case of registered mail on the third day following the day on which it was mailed and any communication so delivered in person shall be deemed to be given when receipted for by, or actually

55

received by Lender or Borrower, as the case may be. If given by facsimile, a notice shall be deemed given and received when the facsimile is transmitted to the party's facsimile number specified above, and confirmation of complete receipt is received by the transmitting party during normal business hours or on the next business day if not confirmed during normal business hours, and an identical notice is also sent simultaneously by mail, overnight courier, registered mail or personal delivery as otherwise provided in this Section 8.1. Either party may designate a change of address by written notice to the other by giving at least ten (10) days prior written notice of such change of address.

9.2    Appointment of Agent. Lender hereby appoints and authorizes the Servicer to act as its agent hereunder and, as applicable, under the other Loan Documents, such authorization to include the sending of and receipt of notices to and from Borrower, the receipt of payments hereunder (unless another person is designated by Lender pursuant to Section 2.3(f)) and for such other purposes as Lender may designate from time to time.

9.3    Amendments and Waivers. No amendment or waiver of any provision of the Loan Documents shall be effective unless in writing and signed by the party against whom enforcement is sought.

9.4    Limitation on Interest. It is the intention of the parties hereto to conform strictly to applicable usury Laws. Accordingly, all agreements between Borrower and Lender with respect to the Loan are hereby expressly limited so that in no event, whether by reason of acceleration of maturity or otherwise, shall the amount paid or agreed to be paid to Lender or charged by Lender for the use, forbearance or detention of the money to be lent hereunder or otherwise, exceed the maximum amount allowed by Law. If the Loan would be usurious under applicable Law, including the Laws of the state where the Property is located, then, notwithstanding anything to the contrary in the Loan Documents: (i) the aggregate of all consideration which constitutes interest under applicable Law that is contracted for, taken, reserved, charged or received under the Loan Documents shall under no circumstances exceed the maximum amount of interest allowed by applicable Law, and any excess shall be credited on the Note by the holder thereof (or, if the Note has been paid in full, refunded to Borrower); and (ii) if maturity is accelerated by reason of an election by Lender, or in the event of any prepayment, then any consideration which constitutes interest may never include more than the maximum amount allowed by applicable Law. In such case, excess interest, if any, provided for in the Loan Documents or otherwise, to the extent permitted by applicable Law, shall be amortized, prorated, allocated and spread from the date of advance until payment in full so that the actual rate of interest is uniform through the term hereof. If such amortization, proration, allocation and spreading is not permitted under applicable Law, then such excess interest shall be cancelled automatically so that of the date of such acceleration or prepayment and, if theretofore paid, shall be credited on the Note (or, if the Note has been paid in full, refunded to Borrower). The terms and provisions of this Section shall control and supersede every other provision of the Loan Documents. The Loan Documents are contracts made under and shall be construed in accordance with and governed by the laws of the State of New York, except that if at any time the laws of the United States of America permit Lender to contract for, take, reserve, charge or receive a higher rate of interest than is allowed by the laws of the State of New York (whether such federal laws directly so provide or refer to the law of any state), then such federal laws shall to such extent govern as to the rate of interest which Lender may contract for, take, reserve, charge or receive under the Loan Documents.

9.5    Invalid Provisions. If any provision of any Loan Document is held to be illegal, invalid or unenforceable, such provision shall be fully severable; the Loan Documents shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part thereof; the remaining provisions thereof shall remain in full effect and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance therefrom; and in lieu of such illegal, invalid or unenforceable provision there shall be added automatically as a part of such Loan Document a provision as similar in

56

terms to such illegal, invalid or unenforceable provision as may be possible to be legal, valid and enforceable.

9.6     Lender Not in Control; No Partnership.  None of the covenants or other provisions contained in this Agreement shall, or shall be deemed to, give Lender the right or power to exercise control over the affairs or management of Borrower, the power of Lender being limited to the rights to exercise the remedies referred to in the Loan Documents.  The relationship between Borrower and Lender is, and at all times shall remain, solely that of debtor and creditor.  No covenant or provision of the Loan Documents is intended, nor shall it be deemed or construed, to create a partnership, joint venture, agency or common interest in profits or income between Lender and Borrower.  Lender neither undertakes nor assumes any responsibility or duty to Borrower or any other Person with respect to the Loan, except as expressly provided in the Loan Documents.

9.7     Time of the Essence.  Time is of the essence with respect to Borrower's obligations under the Loan Documents.

9.8     Successors and Assigns.  This Agreement shall be binding upon Lender and Borrower and the respective successors and assigns of Lender and Borrower and shall inure to the benefit of Lender and its successors and assigns and Borrower and its permitted successors and assigns.  Borrower shall not, without Lender's prior consent, assign or transfer this Agreement or any of the Loan Documents. Nothing in this Agreement shall limit Lender's (including its successors and assigns) right to sell or transfer the Loan or any interest in the Loan one or more times without notice to Borrower.

9.9     Waivers.  No course of dealing on the part of Lender, its officers, employees, consultants or agents, nor any failure or delay by Lender with respect to exercising any right, power or privilege of Lender under any of the Loan Documents, shall operate as a waiver thereof.

9.10    Cumulative Rights.  The rights and remedies of Lender under the Loan Documents shall be cumulative, and the exercise or partial exercise of any such right or remedy shall not preclude the exercise of any other right or remedy.

9.11    Titles of Articles, Sections and Subsections.  All titles or headings to articles, sections, subsections or other divisions of this Agreement and the other Loan Documents or the exhibits hereto and thereto are only for the convenience of the parties and shall not be construed to have any effect or meaning with respect to the other content of such articles, sections, subsections or other divisions, such other content being controlling as to the agreement between the parties hereto.

9.12    Forum.  Borrower hereby irrevocably submits generally and unconditionally for itself and in respect of its property to the jurisdiction of any state/local court, or any United States federal court, sitting in the State of New York, or any other forum selected by Lender, over any suit, action or proceeding arising out of or relating to this Agreement.  Borrower hereby irrevocably waives, to the fullest extent permitted by Law, any objection that Borrower may now or hereafter have to the laying of venue in any such court and any claim that any such court is an inconvenient forum.  Borrower hereby agrees and consents that, in addition to any methods of service of process provided for under applicable Law, all service of process in any such suit, action or proceeding in any state court, or any United States federal court, sitting in the State of New York, or such other state as Lender may select, may be made by certified or registered mail, return receipt requested, directed to Borrower at Borrower's address for notice set forth in Section 8.1 of this Agreement, and service so made shall be complete five (5) days after the same shall have been so mailed.  Nothing herein shall affect the right of Lender to serve process in any

57

PLANET- 00884

manner permitted by Law or limit the right of Lender to bring proceedings against Borrower in any other court or jurisdiction.

9.13  Survival.  All of the representations, warranties, covenants and indemnities hereunder, and under the indemnification provisions of the other Loan Documents, shall survive the repayment in full of the Loan and the release of the liens evidencing or securing the Loan.

9.14  Waiver of Jury Trial.  TO THE MAXIMUM EXTENT PERMITTED BY LAW, BORROWER AND LENDER, HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENT (WHETHER VERBAL OR WRITTEN) OR ACTION OF EITHER PARTY OR ANY EXERCISE BY ANY PARTY OF THEIR RESPECTIVE RIGHTS UNDER THE LOAN DOCUMENTS OR IN ANY WAY RELATING TO THE LOAN (INCLUDING, WITHOUT LIMITATION, ANY ACTION TO RESCIND OR CANCEL THIS AGREEMENT, AND ANY CLAIM OR DEFENSE ASSERTING THAT THIS AGREEMENT WAS FRAUDULENTLY INDUCED OR IS OTHERWISE VOID OR VOIDABLE). THIS WAIVER IS A MATERIAL INDUCEMENT FOR LENDER TO ENTER THIS AGREEMENT.

9.15  Governing Law.  The Loan Documents are being delivered, and are intended to be performed, in the State of New York and the laws of the State of New York and of the United States of America shall govern the rights and duties of the parties hereto and the validity, construction, enforcement and interpretation of the Loan Documents, provided, however, that with respect to the creation, perfection, priority and enforcement of the liens and security interests created by this Agreement, the Security Instrument and the other Loan Documents, and the determination of deficiency judgments, the Laws of the State where the Property is located shall apply.

9.16  Entire Agreement.  This Agreement and the other Loan Documents embody the entire agreement and understanding between Lender and Borrower and supersede all prior agreements and understandings between such parties relating to the subject matter hereof and thereof. Accordingly, the Loan Documents may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the parties. There are no unwritten oral agreements between the parties.

9.17  Use of Name.  Borrower shall not, nor shall it permit or authorize any of its affiliates, agents or representatives to, use Lender's name or any variation thereof in connection with its or Guarantor's business.

9.18  Counterparts.  This Agreement may be executed in multiple counterparts, each of which shall constitute an original, but all of which shall constitute one document.

[signature page follows]

58

PLANET- 00885

This Loan Agreement is executed as of the date first written above.

**Borrower:**

**12706 HOLDINGS INC**

By: _____ ,

Name:  **LEZANTONIO WOODBURN**

Title:  **PRESIDENT**

**Lender:**

**PLANET MANAGEMENT GROUP, LLC**

By: _____ ,

Name: Jeffrey Phelan

Title: SVP, Rehab Lending

Schedule 3.1

Borrower's Ownership Structure

**LEZANTONIO WOODBURN** is the **PRESIDENT** of the Corporation owning **TWO HUNDRED Shares of the company.**

Exhibit A

Planned Improvements

PLANET- 00888