# EXHIBIT ANNEX

to the Affirmation of Karamvir Dahiya in Support of
Plaintiff's Renewed Motion for Default Judgment

Stephens v. Bonaparte et al., Adv. Pro. No. 22-01037-jmm (Bankr. E.D.N.Y.)
In re Evis Neverlane Stephens, Case No. 21-42857-jmm

"The Revised Second Amended Complaint (Adv. ECF No. 93) and the exhibits incorporated therein by reference (Compl. ¶ 46 & n.1), as filed in redacted form at Adv. ECF No. 34 pursuant to the Court's order at Adv. ECF No. 32."

# OPERATIVE COMPLAINT

Adv. ECF No. 93 (filed February 22, 2024)

Revised Second Amended Complaint

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
**-------------------------------------------------------X 21-42857-206**
**In re:**

**Evis Neverlane Stephens,**

**Debtor.**

**Chapter 13**

**-------------------------------------------------------X**

**Evis Neverlane Stephens,**

**Plaintiff,** **Adversary Proceeding No. 22-01037**

**v.**

**Maxine Bonaparte,**
**Lezantonio Woodburn,**
**12706 Holdings Inc.,**
**Charles L Mester, Esq.,**
**Planet Management Group, LLC,**
**Planet Home Lending LLC dba Planet Home Servicing,**
**Wilmington Savings Fund Society, FSB (WSF),**
**Verus Securitization Trust 2020-NPL1,**

**Defendants.**

**-------------------------------------------------------X**

## REVISED SECOND AMENDED COMPLAINT[1]

### Brief Introduction

Ms. Evis Neverlane Stephens is a tragic victim of a foreclosure rescue scam, engineered by the defendants. Often, these homeowners facing foreclosure are desperate enough to try any

[1] This Second Amended Complaint has been amended with the names removed of those defendants from particular counts and claims that the Court had dismissed against such defendants. The Second Amended Complaint is not asserting claims which are dismissed by the Hon. Judge in her orders entered in this adversary proceeding. The complaint is amended pursuant to the judicial allowance granted to the plaintiff by the Court in its orders. The amendment is confined to the claims as permitted by the Court. For the sake of clarity and brevity, no new facts have been added other than some amplification in the causes of action, especially Fifteenth Cause of Action split into three independent claims—A, B, and C. Sixteenth and Seventeenth causes have been similarly amplified factually, twentieth cause of action is reproduction of last cause of action in the former complaint, now labelled as "Twentieth Cause of Action." The paragraph numbering is also unchanged to the extent possible. The exhibits mentioned and numbered here are the same as in the former complaints. The former complaint is incorporated herein to the extent it does not conflict with the Second Amended Complaint.

offer that looks like it may save their home, even if it costs thousands of dollars or puts the homeowner's equity at risk. Foreclosure rescue scammers take advantage of homeowners' desperation through a variety of schemes. When homeowners have significant equity in their homes or when property values are appreciating, foreclosure rescue scams often focus on obtaining title to the home and robbing homeowners of their equity. When homeowners have little equity, scams center on squeezing upfront fees—often thousands of dollars—from borrowers. There are many different types of foreclosure rescue scam. Most foreclosure rescue scams fall into one of three categories: phantom help, obtaining title by fraud or deception, and obtaining title through a fake bailout. The homeowners believe they are obtaining refinancing or a new loan and do not realize they are surrendering ownership of the house. The homeowners may truly sign the papers transferring the home, but the transaction is confusing and the homeowners are misled about the nature of the papers they are signing. Or it could be a "bailout" in which the homeowner typically understands that they are signing a deed to transfer ownership of the home, but they are doing so in the belief that they will be able to regain ownership at a later time. Meanwhile, the homeowner becomes a tenant in their own home on terms that are often oppressive and unaffordable, ending with eviction. The rescuer may even renege on promises to pay off the mortgage, leaving the homeowner liable for loans on a house they no longer own. Sometimes the rescuer goes even further—selling the house to a third party or mortgaging it and pocketing the proceeds. Law enforcement authorities are aware of these horrible predatory practices.[2]

[2] https://ag.ny.gov/press-release/2020/attorney-general-james-launches-protect-our-homes-initiative-combat-deed-theft; https://www.nysenate.gov/newsroom/press-releases/velmanette-montgomery/governor-cuomo-signs-montgomery-weinstein-deed-theft

The Defendants here used a hybrid approach convinced Ms. Stephens that she has to transfer the title to their company and charged her $10,000 for rescuing her home with the promise that once the loan is modified with the help of their company they would revert the home back to Stephens. Ms. Stephens's expectation was that the transaction will help them retain possession and ownership of the home. During the transaction homeowners surrender title to their home with the expectation that they will be able to remain in the home as a renter until they are able to repurchase the property. However not everyone is lucky[3] to come out unscathed out of this heinous quagmire of scheme predators like the Defendants. Immediately after the transfer of the title the Defendants commenced eviction proceedings[4] against Ms. Stephens and her family members. The whole family has been put to severe torture, criminal threats and as well as eviction proceeding. Now upon further discovery, it has been found that defendants obtained a commercial loan with the active assistance of the complained defendants to pay off the earlier residential mortgage. This commercial loan has an interest rate that exceeds consumer loans usual interest rates, with a default rate of 24%. Now the said loan is also in default rapidly devouring any and all equity in the house.

[3] *In re Wells*, 2016 WL 5819798, at *1 n.2 (Bankr. S.D. Fla. Oct. 5, 2016) (after stating that consumer debtor was contacted by foreclosure rescue company, entered into sale-leaseback to save home from foreclosure and successfully exercised option to repurchase, court noted "The Court is very familiar with these foreclosure rescue schemes and is amazed that, at least in this instance, the homeowner was able to successfully recover ownership of the home.").

[4] *See, e.g.*, *In re* Lima, 2012 WL 3070569 (Bankr. D.R.I. July 30, 2012); *In re* Davis, 169 B.R. 285 (E.D.N.Y. 1994).

> In *In re Davis* the lease agreement required monthly rent payments that were clearly unaffordable and required an entire year's rent upon default. Within one month after the sale-leaseback transaction closed and two weeks after the first rental payment was due, the purchaser had perfected a judgment against the former homeowners for a full year's rent and cost and obtained a warrant of eviction for nonpayment of rent.

Defendants acted, colluded as a team to achieve this unlawful deprivation of Debtor's home and defendants unlawful monetary gains.

## SUBJECT REAL PROPERTY

1. The real property (Home) which is the subject of this action is a single two family house located at 127-06 177th Street, Jamaica NY 11434, more particularly described as:

> LOT 0093; BLOCK 12527 AS PER MAP RECORDED IN BOOK OF/IN THE OFFICE OF THE COUNTY RECORDER OF QUEENS COUNTY,

hereinafter refer to as "subject premises", or "plaintiff's home" or "Real Property" or "Home."

## JURISDICTION

2. This Court has jurisdiction over the claims for relief under 18 U.S.C. §§ 1964(a) (Equity) and 1964(c) (Right to Sue and Treble Damages); 28 U.S.C. §§ 1334 (bankruptcy); 28 U.S.C. §§ 1331(federal question) and 28 U.S.C. § 1367 (supplemental jurisdiction over state claims).

## PERSONAL JURISDICTION AND VENUE

3. Personal jurisdiction and venue are predicated upon 18 U.S.C. § 1965(a) and (b) and 28 U.S.C. § 1391(b) and (d) since the Defendants are residents of, have an agent or agents, or transact their affairs in the Eastern district of New York and the acts and occurrences in furtherance of the claims alleged herein arose in the Eastern District of New York, and because the ends of justice require that other parties residing in other districts be brought before the court.

## PARTIES

4. Plaintiff Evis Neverlane Stephens ("Ms. Stephens"") is a resident of the County of Queens, city and state of New York. She resides in the subject premises, with her family, which she purchased in or around 2006.

5. Plaintiff is informed and believes and thereupon alleges that defendant and participant Maxine Bonaparte ("Maxine") is a resident of the city and state of New York. Plaintiff is informed

and believes that Maxine uses several aliases and she has some court records. **Ex. A.** She is also an agent and or an officer of the defendant 12706 Holdings Inc. along with the Lezantonio Woodburn.

6. Plaintiff is informed and believes and thereupon alleges that defendant and participant Lezantonio Woodburn ("Woodburn") is a resident of the city and state of New York. Plaintiff is informed and believes that Woodburn also an agent and or an officer of the 12706 Holdings Inc. along with Maxine.

7. Plaintiff is informed and believes and thereupon alleges that defendant 12706 Holdings Inc. (Holdings) was and is a corporation organized under the laws of the State of New York. Holdings' principal place of business is in New York

8. Plaintiff is informed and believes and thereupon alleges that defendant and participant Charles L Mester (Mester) is a resident of the city and state of New York. Mester is an attorney engaged in the legal professional with an office located at 26 Court Street, Suite 1200, Brooklyn, New York.

9. Defendant Planet Management Group, LLC (Planet Management) is a New York based company operating from 105 Maxes Road, Suite N 205, Melville, New York 11747, which funded and facilitated the transfer of the real property to the Holdings.

10. Planet Home Lending LLC dba Planet Home Servicing (Planet Servicing) is a servicer of the loan funded by Planet Management.

11. Wilmington Savings Fund Society, FSB (WSF) is a Delaware company operating from 500 Delaware Avenue, Wilmington, DE 19801, and upon information and belief is the trustee of the trustee Verus Securitization Trust 2020-NPL1 currently holding the loan note.

12. Verus Securitization Trust 2020-NPL1 (Verus Trust) upon and belief is a Trust presently holding the Note and Mortgage regarding the home of the Debtor 127-06 177th Street, Jamaica NY 11434 (the "Real Property").

13. Planet Management, WSF, Planet Servicing and Verus trustee have been collectively addressed as "Planet Enterprise" for pleading purposes, a reference to one includes reference to the other member of the "Planet Enterprise."

14. Plaintiff is informed and believes and thereupon alleges that at all times herein mentioned:

(a) Holdings formed and used and continues to be used as a mere instrumentality and conduit through which Maxine and Woodburn for convenience, has conducted and continues to conduct their own business;
(b) Maxine and Woodburn governed and influenced and continues to govern and influence Holdings;
(c) There is such a unity of interest and ownership between Maxine, Woodburn and Holdings that the individuality and separateness of Holdings and Maxine and Woodburn did not and does not exist, and Holdings was and is the alter ego of Woodburn and Maxine and merely a conduit through which Woodburn and Maxine performed the acts herein alleged; and
(d) Adherence to the fiction of the separate existence of Holdings would sanction fraud and promote injustice.

**THE PATTERN OF UNLAWFUL RACKETEERING ACTIVITY**

15. During the relevant times, the Defendants and Participants conspired with one another to defraud Ms. Stephens and her family members. As part of the scheme to defraud, the Defendants used another participant an attorney Mester to foster an impression of an undertaking to save her house, however all these actors had setup the entire mechanism to defraud Ms. Stephens and her family to divert unlawfully the title of her Home to the benefit of themselves and others who had no lawful right to the title of Real Property. The multifarious racketeering activities through which these broad objectives of the Defendants and Participants were carried out consisted of a complex pattern of individual transactions and groups of transactions. It was a part of the scheme to defraud that Participant Defendants would and did agree and conspire together with the others to devise and participate in a plan of deceit and deception, whereby they would and did abuse their positions

of trust and fiduciary relationships with Ms. Stephens; they would and did abuse the discretion granted to them and breach their obligations of loyalty and fidelity and their duty to act honestly and faithfully in the best interests of Ms. Stephens  and not for their own self interests; and they would and did use false and fraudulent pretenses, representations and promises calculated to deceive persons of ordinary prudence and due care and make material nondisclosures and concealment of fact and information important to Ms. Stephens in deciding whether to act in the conduct of Ms. Stephens loan modification, all so as to unlawfully, intentionally and willfully, and with intent to defraud, that is, knowingly and with specific intent to deceive in order to cause financial gain to themselves, procure secretly and divert the title of the Home and profits to themselves to the use and benefit of themselves and others and to the detriment of Ms. Stephens and her family members. Once the transfer of the title to the property was accomplished, the Defendants moved from a subversive to an open notorious conduct including criminally threatening the family members of the plaintiff to leave the house.

16. That scheme to defraud evolved over time as a pattern of racketeering activities that inflicted discrete harms on Ms. Stephens and other family members These discrete transactions and harms are listed herein. Ms. Stepehens and her family, the victims of the unlawful patterns of racketeering activity suffered loss of their only Home.

17. In carrying out the scheme to defraud Ms. Stephens of the title to her home, Defendants and Participants including Planet Enterprise engaged, *inter alia*, in conduct in violation of Federal laws, to wit: mail fraud in violation of 18 U.S.C. § 1341; wire fraud in violation of 18 U.S.C. § 1343; violations of the Currency and Foreign Transactions Reporting Act, 31 U.S.C. § 5313; interstate transportation of persons and of property obtained by fraud in violation of 18 U.S.C. § 2314; and Hobbs act extortion in violation of 18 U.S.C. §1951.

18. In carrying out the scheme to defraud Ms. Stephens, Defendants and Participant also engaged, *inter alia*, in conduct in violation of the laws of the State of New York including to wit: Deed theft in violation of NY RPP § 265-a. Home equity theft prevention.

**Factual Background**

19. In and around 2006, Ms. Stephens was a home health aide doing live-in-jobs but working part time in different homes from 9am in the morning to 9 pm. She worked very hard, at times she would work all night and get off 9 am next day to go to another house. Sometimes she worked 24 hours living in cooking, washing, cleaning, doing laundry shopping, taking elderly people to their doctor's. Her salary was $1,000 a week. She got paid weekly. She saved around $10,000 and wanted to a buy a house.

**Mortgage broker Osmond Decoteau**

20. While attending a church service, Ms. Stephens asked another parishioner if he knew any he knew any broker or a real estate agent. Ms. Stephens wanted to buy a home. After looking for some weeks she finally saw a home she liked. She went with the broker Osmond Decoteau (Osmond) to check it out. It was a two-family house priced at $650,000. The broker told her not to worry about the monthly payments as that would be affordable and he would help her get the house with zero percent down payment. Ms. Stephens attended the closing of the house, however her nightmare started when she started getting mortgage statements from banks regarding other properties that she never bought. Osmond used her credit and bought other properties in her name without her knowledge or understanding. Also, her mortgage payment on her home was not $2500 as she was told rather sum exceeding $5000 a month. Alarmed, Ms Stephens called Osmond several times, however he kept assuring her that he would call her back. Which he never did. Ms Stephens was stuck with the properties bought in her name and also with a high mortgage payment

on her house. Ms. Stephens was contacted by the FBI special agents regarding Osmond. Osmond was shortly thereafter indicted, however he used insanity as a plea to his wrong doings and was not convicted. The said three properties are located at 127-06 177 Street Jamaica, NY 11434 (Jamaica House) since 2006; 1487 East 53 Street, Brooklyn, New York (1487 Property); and 844 East 34th Street, Brooklyn, New York (844 Property). The Jamaica House is the prime residence of Ms. Stephens. And she is in possession of the same, but ownership has been stolen from her by the aforesaid Defendants.

21. The obligation of the mortgages on three properties burdened Ms. Stephens and her health started failing. She lost her good credit owing to damage caused by the broker Osmond

22. She struggled to pay mortgages on the subject property her home. In order to make mortgage payments, Ms. Stephens rented out the top floor for a sum of $2000 a month. However, the tenants fell behind in their payments. Ms. Stephens got into a loan modification with the bank with the payments now reducing to $2500. Owing to financial strain and failed health, Ms. Stephens once again fell behind in her payments and once again there was the foreclosure proceeding against her house.

**John Clark, Herkimer Realty One and Maxine Bonaparte**

23. Meanwhile Ms. Stephens other two properties payments were already in default and she sought help. Around in 2010, Ms. Stephens was referred to one John Clark (Clark)running an office under his company Herkimer Realty One (Herkimer). Clark claimed expertise in loan modifications. Clark introduced Ms. Stephens to Maxine Bonaparte (Maxine) in 2017/18. Maxine spoke to Ms. Stephens and told her that she would help her out from the mortgage issues and she offered to get the loan transactions transferred to Ms. Stephens's husband name if he had a good

credit history. She took $1500 from Stephens to check Ms. Stephens husband, Calivin Stephens' credit history.

24. Maxine came by Ms. Stephens home to talk at length about saving her house. She told Ms. Stephens that she has some bad news that her house is on the "steps," to be sold and that she could save it. She further suggested that the only way she could save it is to follow her in every manner. She suggested that the title of the Jamaica House has to be transferred to her friend's name or a company and that she would have it retransferred back to her once the property is saved from foreclosure. She also suggested that she could also do something for her houses in Brooklyn and get $150,000 out of them and she could use that money to save her home. Ms. Stephens agreed to do anything to save her home, the Jamaica House. Meanwhile owing to the stress, in 2018 Ms. Stephens suffered a head stroke. Ms. Stephens also developed high blood pressure, as she was breaking down under the pressure of the mortgage payments.

25. Maxine demanded $10,000 to save the Jamaica House. She was paid that amount by Ms. Stephens. **Ex. B.** Ms. Stephens had to borrow the same amount and same was sent to her from her son in law. Maxine told her that $10,000 would be given back to her once everything is under control. However, Maxine instructed Ms. Stephens to leave the beneficiary's name blank and she suggested that she would fill it up. Ms. Stephens wrote two blank checks $5000. Copies of the Checks retrieved from the bank shows that Maxine had made the checks payable to KE2Contract LLC and 160 21 Avenue Corp. Maxine also suggested that she has a special lawyer Mr. Charles Mester, who is an expert in complex deals and that he is going to help Ms. Stephens in saving the house.

**Charles Mester, Attorney at Law**

26. Around September 21, 2018, Maxine came to Ms. Stephen's house to pick her up and drove to attorney Mester. In his office, Maxine spoke about the legal issues to which Mester said that he is going to help. Mester also offered to help Ms. Stephens regarding her Brooklyn properties. Attorney Mester had a retainer dated September 21, 2018 (the "Retainer") executed between Ms. Stephens and his office. The Retainer in its very first paragraph states the following:

> Thank you for meeting with me in relation to retaining CHARLES L. MESTER, ESQ. ("Attorney") to provide legal services to you in connection with your prosecution of civil litigation involving the real properties located at 1487 East 53rd Street, Brooklyn New York, and 844 East 34th Street, Brooklyn, New York and ***sale of leaseback of the real property located at 12706 177th Street, Jamaica, New York.*** This letter, when fully executed, confirms that the Attorney will represent you in the above referenced matters. This engagement does not include any appeals work, which would only be handled after a separate agreement and retainer is agreed upon at the appropriate time. . . .

**Ex. C. Retainer** (emphasis added). In this meeting, once Ms. Stephens had talked about circumstances and the mortgages on the properties, Mester told her to step out of the office and leave Maxine and him alone in office. Ms. Stephens went out of the office and waited for Maxine to come out. However, after half an hour wait, Ms. Stephens was called back and made to sign some papers as the Retainer. Mester promised that he is going to be saving Jamaica House and as well as other properties. Ms. Stephens expressed deep concerns about the ongoing foreclosure of Home. Mr. Mester assured her that he will have her Home.

27. Mester met Ms. Stephens only twice. Once at the signing of the Retainer and second and last time at the time of Deed transfer of Ms. Stephens Jamaica House. Till date there is no litigation undertaken by Meseter regarding properties that he promised to do.

28. In and around March 2019, Maxine along with Lezantonio Woodburn (Woodburn), once again came to Ms. Stephens to pick her up and take her to the closing to save her house. Ms.

Stephens found herself in an office with a long conference table. Ms. Stephens met Mester and another attorney claiming to be an attorney for Woodburn. There were some other people, whom Ms. Stephens could not recognize. Upon information and belief the Planet Enterprise was present throughs its agents. Mester on the conference table slides the paperwork to Ms. Stephens and pointed out the exact places where she had to sign. She signed those papers. Mester did not explain the contents of the papers, nor was she told the reasons for such signing, other than that this was to save her house. Ms. Stephens spent approximately two hours in the conference room. When the people at the table started leaving, Ms. Stephens asked for copies of paperwork. Neither Mester nor Maxine provided any paperwork. She did pick a paper which purports to be a loan term sheet. The Planet Enterprise did not provide her with any paperwork, nor did they disclose to her that they are facilitating the funding of the transfer of the property. While Maxine was driving Ms. Stephens back to her house, Ms. Stephens asked Maxine about the paperwork. Maxine assured her that she would soon get her copies of what was signed. Woodburn who was also in the car, told Ms. Stephens, "Don't worry, I do not need your property. I will give it back to you." This only confused Ms. Stephens. She could not understand what Woodburn meant because she had not given her property to anyone. Till date, Maxine has not been provided the paperwork signed by Ms. Stephens.

29. Upon information and belief, Mester is Maxine and Woodburn's attorney for their businesses and other ventures. The Retainer also has Maxine signature as Mester's client. There was no money paid by Ms. Stephens, as she was told that Mester had an understanding with Maxine. Upon information and belief, even though Mester had a retainer agreement signed with Ms. Stephens, he unethically represented both the 12706 Holdings Inc. and Ms. Stephens.

30. Upon information and belief Mester prepared (or caused to be prepared) both any paperwork related to Purchase and Sale Agreement and Transfer Ownership Agreement. Mester misrepresented the terms of both documents to the Ms. Stephens and urged her to sign them while never advising her to have them reviewed by independent counsel, knowing that she was under duress as she did not want to lose her Home. At no time did Mester, Maxine or Woodburn inform Ms. Stephens that, on information and belief, they had a beneficial interest in 12706 Holdings Inc. Ms. Stephens did not fully read or understand either agreement, a fact of which defendants were aware or should have been aware. In addition, defendant Mester unduly pressured Ms. Stephens by, among other things, have her signature under the threat of loss of her home. However, trusting and believing that defendant, as her attorney, was acting in her best interests, plaintiff signed the documents in reliance on Attorney's statements and assurances.

31. Within a day or two of the said closing, Maxine instructed that Ms. Stephens to make a payment of $2500 per month as a mortgage payment while the property is in third party's name. No paperwork was given to Ms. Stephens explaining her situation and or the paperwork. After the closing, Ms. Stephens kept her promised started making regular payment of $2500 every month until December 2019. As around this time, Maxine stated coming to the subject property and started screaming at Ms. Stephens: I *want you to start paying rent, you have to start giving me your rent money. You cannot afford to buy this house you cannot afford this house*." Ms. Stephens contacted attorney Charles who just advised her," "if you cannot afford to buy the house continue paying your rent." At the time Ms. Stephens called Charles, she heard Maxine in the background. Not a single week passed by, after the signing of housing saving documents, that Maxine would not come by the House screaming and threatening the family members of the Ms. Stephens's household to leave.

32. A few days there, Woodburn turned up at Ms. Stephens' home. He also accused Ms. Stephens of not paying the mortgage on the house. When he was told by Ms Stephens that she is regular with the mortgage, he told her that it was not sufficient to meet the entire mortgage amount. He also instructed them to leave the house as he had to renovate it. Ms. Stephens advised Woodburn that she has been carrying out the regular renovation and that she had spent $1500 fixing the sewer. Meanwhile the boiler at the house broke down. Ms. Stephens had to pay for the same.

33. Before the Covid-19 closure, one day around 9 PM Woodburn accompanied with a Notary came to meet Ms Stephens with a copy of an agreement titled as **Contract-Use and Occupancy Agreement for 127 06 177th Street Jamaica New York 11434** (Occupancy Contract). **Ex. D.** He told her that the monies being paid is not enough and said that if they want to stay in the house, they will haves to sign the Occupancy Contract. Fearing that they would lose the house, Ms. Stephens and her husband under duress signed the Occupancy Contract. The Occupancy Contract makes the following declaration:

> This agreement dated January 1, 2020 is between the **owner 12706 Holdings Inc and** the **occupants, Calvin Stephens, Evis Stephens, John Doe(s) and Jane Doe(s). The owner 12706 Holdings Inc has agreed to:**
>
> **Sell** the property known as **12706 177th Street .Jamaica NY 11434 Block: 12527 Lot: 0093.** To Calvin Stephens, Evis Stephens, John Doe(s) and Jane Doe(s) in Two Years and Three Months.
> This agreement is for Two Years and Three Months.
>
> **NATURE OF OCCUPANCY:**
> Calvin Stephens, Evis Stephens, John Doe(s) and Jane Doe(s) will occupy the property as licensee only and **not as Tenant.** The seller confirms and the occupants agrees that they do not have the rights as tenants as in Landlord and Tenant law.
>
> **TERMS:**

.
From 1/1/2020 to 4/1/2022, Calvin Stephens, Evis Stephens, John Doe (s) and Jane Doe(s) will Occupy the property at unit 1 for a fee of $1500.00 each month. The fee is due on the 1st of Every month. Occupants will pay the Gas and Electric bill for Unit 1, $150.00 every three months for Water Bill in Unit 1. Washer and Dryer area must be kept clean and clutter free in the basement.

Basement will only have a Sofa, TV, pantry and closet. Basement will not be a storage space for boxes, barrels or any other items except items listed above. Any disregards for the rule will result in a fee in the amount of $1000.00. No storage in the boiler room. No allowing children to
write on the walls, doors, closets or the walls, hook basketball hoops to any walls in the house.
Areas must be kept clean in the house.

Empty rooms cannot be storage space. A bed, dresser or TV in rooms only.

Kitchen must be kept extremely clean. No grease on the walls or floors.

Living Room must be clutter free, Sofa, TV and dining furniture.

**NOTICE:**

The occupants will be responsible for all and any damages to the property that occurs during their stay.

The damages include the backyard. The shad will not be overstocked with items not used. No storage of unused items in the shad. No storage on the property, (backyard) The seller will provide back yard furniture for the summer months. Shad must be able to store the lawn
furniture.

The occupants must keep the front area of the property sweep clean, garbage in provided cans.
Garbage put on curbside on destinated days, including recyclable.

If the property 127 06 177th Street Jamaica NY 11434 is damage at any time the occupants will pay to repair or be prepared to move out. The occupants must call the owner for any repairs.

If the occupants cannot purchase the property at the end of the contract agreement, the Occupants agree to move out of property, 12706 177th Street Jamaica NY 11434 without argument in 30 (Thirty days) from the expiration of the agreement.

**The property 127 06177th Street Jamaica NY 11434 has, new roof with new leaders' new**
**kitchen, bathrooms. Hallway walls have been repaired and painted. Bathrooms has new vanities, toilets and painted. Walls have been repaired and painted. Bedrooms has been painted. New back yard fence and landscape cemented back yard. Front of house**
**landscaped and painted. New three security Doors. New Shad 10 x 12.**

**Owner shall expect unit one to remain in the rehab condition during the agreement period including back yard. Property must be appraisable after two years and three months, if not the occupants must cure any damages to pass the appraisal or move out. The Stephens, John Doe(s) and Jane Doe(s) can move out at any time prior to the next month payment.**

****** The damage sewage line has been repaired; lead water line has been replaced****.**
****** Please take note the rules must be followed. If not, the owner can demand you to move out of the property asap.******

The signatures are acknowledgment of this agreement:

**/s/ Lez Antonio Woodburn**
**/s/ Evis Stephens**
**/s/ Calvin Stephens**

Notary Notary acknowledges the signatures of, Lez Antonio W oodbum, Evis Stephens, and Calvin Stephens on this.

**Ex. D. Occupancy Contract.** However, lot of the alleged improvements are a false statement in the Occupancy Contract, which Ms. Stephens signed out of fear. She and her husband did not want to lose their home. They had no choice; they were expecting that their house would be reverted back to them.

34. Maxine thereafter immediately moved to take possession of the house. She changed the locks the house. She also told Ms. Stephens' relatives that she and Woodburn were the new owners and that they will have to pay her $1000 a month in rent and also demanded Ms. Stephens to pay at least $3000 in rent. Maxine also brought several people into the house with one pretext or the other. Once she came removed all the curtains of the house and removed towels from the bathroom. Woodburn accompanied her in few of these visits. Maxine and Woodburn also took possession of the one of the rooms of the house and rented it to a third party. On or about August 20, 2019 and continuing even now, Maxine and Woodburn placed notices at the house of Ms. Stephens claiming that the house driveway does not belong Ms. Stephens and that should she park her car, it would be towed away. On September 25, 2020, Woodburn left a notice at the house: "You were told to not park in the driveway, Today is your Final Warning—You will not get another. The cars will be towed." **Ex**. **E**. The house utilities were changed. Woodburn and Maxine created new accounts. Con Edison refused to accept payments from Stephens and Defendants did not make payments for the utilities, as a result of which there were final disconnection notices that kept coming to the house.

35. On or about April 10, 2020 Woodburn through his company 12706 Holdings Inc. issued a "Cancellation of contract—Use and Occupancy Agreement." **Ex. F**. The Notice stated the following:

> The agreement dated January 1, 2020 between the owner, 1206 Holdings Inc. and occupancy, Calvdin Stephens, Evis Stephens, John Does and Jane Does is terminated as of April 10, 2020.
>
> The owner 12706 Holdings Inc. has decided to cancel the Contract—sue and occupancy agreement to purchase, 12706 177th Street, Jamaica, NY 11434, Block: 12527 Lot: 0093 and reside at the property.
>
> The Short Sale liquidation is an Arm's length transaction. It does not allow the homeowner, and all occupant that resides at the property to continue residing for more than 90 days, however 12706 Holdings has given the

> homeowner a and the occupant more than a year. The homeowner signed the Affidavit of Arm's length Transaction at closing.
>
> 12706 Holdings Inc. has given the occupants and homeowner more than one year to relocated, which can be common a nd customary in New York, however the homeowner and occupants must vacate the property. Use and Occupancy fees, all utilities services charges continue until the occupants move.
> /s/_____________
> Owner, 12706 Holdings Inc.
> Lez Antonio Woodburn.

**Holdings Notice of Cancellation. Ex. F.**

36. On or about May 5, 2020, Woodburn issued an eviction letter to Ms. Stepehens and her husband, wherein, he made the following statement:

> Please take notice the use and occupancy agreement is cancelled as of April 10, 2020. The agreement can not be validated, due to the Arm's length Transaction.
> The occupant must be out of the above property by June 1, 2020. All owed Use and occupancy fees, Water bill, and utilities will be deducted from the refunded $10,000.

Letter May 5, 2020 (Eviction Letter). Woodburn also on September 1, 2020 and November 2, 2020 signing letter as owner also issued a 10 Day notice to quit. **Ex. G.**

37. Finally, Maxine commenced an eviction proceeding against Ms Stephens and her family with the Queens Housing Court (LT-058417-20/QU). Also on or about October 2, 2020, Holdings and Woodburn as plaintiffs commenced a breach of contract and negligence action against Ms. Stepehens and her family claiming money damages of $45,000. In the complaint with the Supreme Court, Woodburn and Holdings claimed the following:

> The Complaint of the plaintiff, Lezantonio Woodburn, respectfully shows and alleges as follows:
>
> The defendants Evis Stephens, Calvin Stephens, John Does, Jane Does principal address is 12706, Jamaica NY 11434.
>
> The property was sold on March 27, 2019 to 12706 Holdings Inc. & Lezantonio Woodburn as a short sale for $350,000. The premises had extensive repairs to the sum of $250,000.

Ms. Evis Stephens signed an affidavit of Arm's length transaction which allows the mortgage holder (seller) to remain in the premises as a tenant for a short term, nor more than 90 days after the sale. The defendant tenancy expired June 27, 2019.

Ms. Evis Stephens, Calvin Stpehens, John Does and Jane Does continue to live in the premises 12706 177th Street, Jamaica NY 11434 from July 2019 to current date in 2020(October) without paying use & occupancy, Con Edison, National grid $ Dep Water bill.
The defendants made several promises to move out of the premises. Each time myself or partner tried to get a move out date, Ms. Evis Stephens would use her health as a reason she could not find new location to move. January 1, 2020, an agreement was crated signed by all parties. The defendants made 1 payment which wqs later. The agreement was cancelled three months later.

Ms. Evis Stephens stated she was not going to pay any bills & I would have to take her & her family to court.

As the Plaintiffs I am requesting the court to grant me use & occupancy from August to December 2019 : 1500 x 5: $72, 5000 & January to current (October) 2020 10 x 2500=25,000; national grid: $1500 con Edison & 1600 Dep Water bill $ 1000.

All frees to continue to be paid until defendants move out or evicted Secondly to order the defendants to pay all bills owed.

Evict The defendants based upon breach of Contract with the bank's arm length transaction.

As the Plaintiff, I have lost buyers, income and late mortgage payments. I am forced to spend my personal money to maintain the bills.

The defendants Calvin Stephens works at Marlene Union 301 Nicklane, Malevene NY 11566. He is currently employed.

Ms. Evis Stephens works off the books at a home in Long Island, NY.
Jane Does John Does doesn't work. She is at premise all days. The Stephens had no hardship in he pandemic, neither parties did not stop working in the pandemic.

The defendants do not want to move. The defendants do not want to pay any bills for the premises which they lived for one year and 7 months.
The defendants dont qualify to purchase the property 12706 Jamaica NY 11434.

The defendants are causing plaintiff extreme hardship, credit & income has been affected.

> Currently I have a buyer, which took me 5 months to vacate the buyer. The lack of cooperation from the defendants is making the sale difficult. I cannot maintain the house with my personal funds.
>
> *Verification*
>
> *Lezantonio Woodburn*, being duly sworn, deposes and says: I am the plaintiff in the above entitled action. I have thread the foreign complaint nad know the contents thereof. The same are t4rue to my knowled.ge, exception as to matter there in stated to be alleged information and beliefs and as to those matters I believe them to be true.

Supreme Court, Queens County Complaint. **Ex. H.**

38. On or about November 2, 2020, Woodburn issued another 10 days' notice to quit upon the plaintiff and her husband. The Notice stated the following:

> PLEASE TAKE NOTICE, that you are and all other persons occupying the subject premises are required to quit and vacate the premises on or before November 16, 2020.
> You are in possession of the premises after the short sale. Ms. Stephens and her family were permitted to stay on the premises after the short sale for a shorter term to facilitate new location but longer than (90) ninety days. The shorter term to stay on the premises expired on June 30, 2019. Evis Stephens signed the affidavit of arm's length transaction.
> Your rights to occupy the subject premise has been revoked by 12706 Holdings Inc.
> PLEASE TAKE NOTICE, that if you a and all other persons fail to quit, vacate or surrender the subject premises by November 16, 2020, the undersigned will commence summary proceeding against you.
> Daed: November 2, 2020
>
> 12706 Holdings Inc.
> s/_______________ Landlord

39. On November 9, 2020, Ms. Stephens and her daughter filed an order to show cause for a finding of harassment and for a restraining order with the Housing Court. The Court found conduct of the defendants as harassing and restrained the defendants Maxine and Woodburn from acting in an improper manner. **Ex. I**.

40. On April 7, 2022, around 12:30 PM, the Debtor and her family saw Ms. Bonaparte parked a dark blue Honda in front of the house. Ms. Bonaparte did not come out of the car. The Debtor's family called 911 explaining that she had parked her car. Almost an hour later the police came and

talked to the Debtor and Ms. Bonaparte. Ms. Bonaparte told the police that the Debtor and her family should not be parking their car in house driveway. The police officers demanded proofs of the Debtors' residence which was duly provided. At the same a toll truck came by. One of the police officer went to the toll truck to tell them that Debtor's has properly utilized her driveway and that the toll truck absolutely could not remove the Debtors car. And the police left having instructed the Debtor that in case Ms. Bonaparte calls any towing truck on them, they should call the police.

41. On or about April 19, 2022, the family of the Debtor realizing that there was no heat in the house went to the basement to check the boilers, they found out that the two boilers have been turned off. It was found when Debtor's family wasn't there, Ms. Bonaparte came to the House and turned off the boilers to forcibly evict the family from the house.

42. Perforce under the foregoing circumstances, Ms. Stephens not wanting to lose her house had to seek bankruptcy protection in November 2021.

43. Upon learning of the existence of the subject grant deed, plaintiff thereupon executed a notice of rescission pursuant to NY RPL 265-a on November 18, 2021, of the subject grant deed and attempted to have the same recorded with the county. Till date, the defendants have not responded to the said notice.

44. On date of the transfer of the subject property to defendants, the approximate value of the subject property exceeded $850,000. It is a two-family house.

45. Pursuant to Defendants own admission, the Defendants took title to the property by a payment of a sum not exceeding $350,000 to Ocwen bank, thus fraudulently depriving the plaintiff of her Home.

46. All exhibits attached hereto are incorporated by reference.

**Unraveling of the Fraud, Mail and Wire Scheme**

47. Maxine and Woodburn were the foreclosure rescue experts as is unraveled by the paperwork filed in the state court and with this Court regarding lifting stay. Maxine charged a sum of $10,000 for help Ms. Stephens to negotiate her loan. The checks dated December 7, 2018 were taken in blank by Maxine**. Ex. B**. Maxine along with Woodburn and attorney Mester provided a platform to foster an impression upon Ms. Stephens that a genuine effort is being made to protect her house and negotiate a loan deal. However, it was a scheme to take over Home of Stephens. A House exceeding $850,000 was transferred to wholly owned corporation of defendants Maxine and Woodburn, called Holdings at a purchase price of $350,000. It was a termed short sale.

48. Maxine and Woodburn had already started working on this conspiracy to take over the house, way before June 2018, when they incorporated 12706 Holdings Inc. on June 20, 2018.

49. Maxine took Stephens signatures on papers which prepared by the defendants are presently in exclusively custody of Defendants, which clearly upon information and belief must have shown the value of property at a depressed level.

50. Ms. Maxine and Woodburn mailed several documents to Ocwen to facilitate the short sale as a means of taking over the house of Ms. Stephens. The date of mailing and all correspondences is strictly within the custody and control of the defendants.

51. Maxine to show that she is financing the deal to help the family, took out a loan application to be signed by Mr. Calvin Stephens, husband of Ms. Stephens. In the residential loan application form, she had it filled gave it to Mr. Stephens to sign the same which was signed by him. It is unclear if the same application has been used by the Defendants. **Ex. J**. However, the Defendants here in the loan application showed the value of the Real Property at least $725,000 and the same Defendants negotiated a settlement of Real Property at $350,000.

52. At a closing which was supposed to be a loan modification for Ms. Stephens, she was made to sign deed transfer papers. On or about July 19, 2019, one Nathaly Chilliest, Esq. and United American Title Agency on behalf of the defendants, caused to be mailed and registered via electronic means a deed registration with the Queens County records as a part of their taking over of the house of Ms. Stephens. The Planet Enterprise assisted, aided and abetted the alleged loan modification or funding the transfer of the Home from the Debtor to the Holding.

53. On or about October 2, 2020, Woodburn caused to have summons issued from the Queens County State Supreme Court along with a complaint claiming breach of contract and negligence claiming money damages of $45,000 and mailed them to Ms. Stephen with full knowledge that there was neither a breach of a contract or negligence and that Ms. Stephens was the actual owner of the house.

54. On or about September 28, 2021, the Defendants Holdings and Woodburn and Maxine caused to be issued by the Civil Court notice of Court date for ejectment proceedings of the Plaintiff from the subject property. The video conferences initially set by the civil court was not attended by the complaining defendants. Once the civil court heard the matter, it was brought to their attention that the Ms. Stephens has filed for bankruptcy, that the court after a couple of hearing decided to stop the proceeding.

55. Both the Defendants, Maxine and Woodburn used threats of immediate ejectment from their home unless they had signed the agreement to buy back and also, to acknowledge false claims of improvement on the real property. On January 2, 2020, Woodburn made Ms. Stephens and her husband sign Contract-Use and Occupancy Agreement making Ms. Stephens and her husband acknowledge that Woodburn has carried out stated repairs on the property, when in fact no such repairs etc. were carried out. Also, by virtue of the signing of the said agreement, the Defendants

made them a vendee of the real property and that they had to buy the real property in two years and three months from January 1, 2020. **Ex. D.** However, around March 30, 2020 (as disclosed by Holdings Motion in the Court), Woodburn makes an Amendment to Use and Occupancy agreement. **Ex. K**. He authors the following amendment:

> The previous agreement dated January 1, 2020 between the owner , 12706 Holdings Inc and occupancy, Calvin Stephens, Evis Stephens, John Does and Jane Does is hereby amended to:
>
> Unit 1(Floor 1) no basement usage, please remove your washer and dryer. The backyard is not usable. The shad is just for the 12706 Holdings Inc. Items.
>
> The occupants can continue to put the garbage in the can. The recycles go in the recyclable garbage can, as of, April 10, 2020 is the start date, please put recyclable items in the can.
>
> 12706 Holdings Inc. is adjusting the two years and three-month purchase agreement to:
>
> One year (January 01, 2021) due to the Stephens inability to get financing as of 10/10/19, 2019 to purchase 12706 177th Street Jamaica NY 11434 and the Arm's length agreement expired on June 27, 2019.
>
> If the Stephens cannot ger the finance to purchase 12706 177th Street Jamaica NY 11434 by the end of this contract, they agreed to vacate 12706 177th Street Jamaica NY with their family members on floor 2 within 30 days.
>
> The signature are acknowledgment of the amendment of the agreement.
>
> /s/ Lez Antonio Woodburn
> /s/evis stepehens
> /s/ Calvin Stephens

56. The Defendants enticing the plaintiff to transfer the ownership of the property with the excise to get a loan modification, started tightening the hold over the property, gradually chipping away any right to recover the property, which entailed reducing the buyback time [not disclosing the buyback purchase price], implanting other tenants in the house, removing Ms. Stephens from complete dominion and enjoyment of her house.

57. Woodburn and Maxine used fear of loss of home for the plaintiff, Ms. Stephens to sign an acknowledgment of the alleged investment in the property and as well as the accepting status as a licensee. Both Woodburn and Maxine used wrongful means to achieve ownership of the house on which they had no lawful claim. The Defendants have no lawful claim over the house of the plaintiff, however under the pretext of loan modification, made Ms. Stephens transfer her ownership and then used fear of eviction from her house to sign Use and Occupancy Agreement. However shortly thereafter within and by April 10, 2020, Woodburn through Holdings terminated the contract as of April 10, 2020. **Ex. L**

58. In furtherance of the scheme to exact and extract monies for work not done and for work allegedly done to the property when the ownership had already been takeover by the Defendants, the Defendants caused a Proof of Claim filed with the bankruptcy court on April 14, 2022 claiming $55,000.

59. On or about April 15, 2022, the Defendant Holdings moved this Court for lifting the stay, which revealed a new set of paperwork. With motion is attached a copy of the contract of sale, which was undertaken to save the plaintiff's house from foreclosure. The Contract is very telling. The Contract dated January 4, 2019 is a residential contract of sale from Evis Stephens to 12706 Holdings Inc. for sale of house for $400,000 (as a short sale) when in fact that the value of the house was not less than $850,000. The Contact is signed by both Ms. Stephens and Woodburn on behalf of Holdings. The Contract clearly an attorney marked contract does not hear the name of the attorney for either parties. The Motion of 12706 also has a copy of the approval of the sale at a discounted price of $337,5000 (payoff amount). The motion also bears a deed transfer from Ms. Stephens to the Holdings and also attached is the HUD- 1 statement. HUD statement reflects no

payment to the plaintiff. The HUD statement has figures that makes sense only to the Defendants, especially:

Garrison Construction: $15,000
Khermit Enterprises: $25,000.
Addittional settlement charges for Kermit Enterprise: $7,425.00
Donaldson & Chilliant LLP: $5000
Madison Construction and Development: $22,5000.

**Ex. M. HUD statement**. Upon information and belief Khermit enterprise is a company owned and operated by Maxine.

60. Also listed with the motion is an Affidavit of Arm's Length Transactions, which were signed by the parties including Stepehns and Maxine Bonaparte on the date of the closing, the form which was pre-marked "sign here." Also in this affidavit, Maxine Bonaparte signs both as a the Seller agents and as well as the Buyer's agent. Also the Notary notarized the affidavit on March 28, 2019, when in fact the Affidavit shows March 27, 2019 as the date of closing and signing of affidavit. **Ex. N.**

61. Immediately after the transfer of the ownership, the demands of the Defendants increased, from regular payments for an alleged "New Mortgage," for new alleged renovation of the property. Maxine came to the house every week and threatened the family members to leave, changed the locks, dislodged the family from couple of rooms and even turning off the boilers.

62. On or about April 13, 2022, pursuant to the eviction proceedings commenced by the Defendants with the civil court of the City of New York, the Civil Court mailed a letter to Ms. Stephens, scheduling a hearing on May 2, 2022 with a warning: "This is your opportunity to answer the petitioners' motion to proceed with a warrant of eviction against you."

63. The Defendants in a vicious manner took over the property of the Plaintiff by misleading her that they are going to help her negotiate a loan modification and under those excuses, the Defendants manipulated Ms. Stephens to transfer ownership of the house.

**FIRST CAUSE OF ACTION**
**Cancellation of Deed**
**Based upon Forgery or Fraud in Factum**
**(Against all Defendants)**

64. Plaintiff incorporates the allegations contained in paragraphs 1 through 57, inclusive, as though fully set forth at this place.

65. Plaintiff did not sign the subject grant deed nor did she authorize anyone to sign same.

66. Plaintiff never knowingly signed or intended to sign the subject grant deed. Plaintiff signed documents presented to her by Maxine, Woodburn, Mester, Planet Enterprise which they led her to believe were preliminary to an agreement of the parties, and did not intend to transfer title to her home at the time these documents were signed.

67. Because of the forgery of plaintiff's name to the grant deed or the fraud in the factum in obtaining plaintiff's signature, the subject grant deed is null and void *ab initio*.

68. Plaintiff intends service of the summons and complaint in this action to serve as a notice of cancellation of the subject grant deed.

69. Plaintiff is under a reasonable apprehension that the subject grant deed will cause serious injury if left outstanding. Plaintiff now seeks to cancel the subject grant deed.

WHEREFORE, plaintiffs pray for judgment as follows:

a. That this Court declare that the subject grant deed is null and void *ab initio* and of no effect;
b. For costs of suit;
c. For such other and further relief as this court deems just and proper.

**SECOND CAUSE OF ACTION**
**Rescission of Equity Purchase Contract and Grant**
**Deed, Declaratory Relief and Damages**
**(Against all Defendants)**

70. Plaintiff incorporates the allegations contained in paragraphs 1 through 69 inclusive, as though fully set forth at this place.

71. All statutory references in this cause of action are to the NY Real Property Laws unless otherwise indicated.

72. At all times herein mentioned plaintiff was an "equity seller" within the meaning of Section 265-a (2)(f).

73. At all times herein mentioned Holdings was an "equity purchaser" within the meaning of Section 265-a (2)(e).

74. At all times mentioned herein Woodburn, Maxine, Holdings, and Planet Enterprise are an "equity purchaser" within the meaning of Section 265-a, or the "representative" of an equity purchaser, namely Holdings, within the meaning of Section 265-a

75. At all times herein mentioned the subject premises was a "residence in foreclosure" within the meaning of Section 265-a.

76. Because Woodburn, Maxine, Mester are and were Holdings representative and the transaction related to the Real Property facilitated by Planet Enterprise's itself and through their agents, Woodburn, Maxine, Mester, Planet Enterprise are liable for all damages resulting from any action or omission of Woodburn, Maxine, Mester, Planet Enterprise regarding Holdings' acquisition of the subject premises pursuant to section 265-a.

77. In the transaction involving the transfer of plaintiff's the subject premises in foreclosure, all Defendants took unconscionable advantage of plaintiff, in violation of section 265-a.

78. Plaintiff is informed and believes and thereupon alleges that she was never presented with and never signed any equity purchase contract in the transaction involving plaintiff's home in foreclosure.

79. If in fact plaintiff signed an equity purchase contract in the transaction involving plaintiff's home in foreclosure, which plaintiff denies, said equity purchase contract violates Section 265-a in the following ways that are listed by way of example and not limitation:

a. Plaintiff is informed and believes and thereupon alleges that said contract is not and was not fully completed and signed and dated by the equity seller and equity purchaser, in violation of Section 265-a.

b. Plaintiff is informed and believes and thereupon alleges that said contract did not and does not contain: the name, business address, and telephone number of the equity purchaser; the address of the residence in foreclosure; the total consideration to be given by the equity purchaser; a complete description of the terms of payment or other consideration; the time at which possession would be transferred; the terms of any rental agreement, and the required notice that until plaintiff's right to cancel had ended that she could not have been asked to sign any deed or other document, all in violation of Section 265-a.

c. Plaintiff is informed and believes and thereupon alleges that said contract did not and does not contain a notice of cancellation, in violation of Section 265-a.

d. Defendants did not provide plaintiff with a copy of the equity purchase contract nor the notice of cancellation, in violation of Section 265-a

80. The transaction involving the transfer of plaintiff's home in foreclosure violated section 265-a in the following ways which are listed by way of example and not limitation:

a. Prior to the expiration of the time plaintiff had to cancel the transaction, the Defendants: accepted from plaintiff and induced her to sign the subject grant deed, in violation of Section265-a, recorded the subject grant deed, in violation of section 265-a and encumbered the premises, in violation of Section 265-a.

81. Defendants, violated Section 265-a in the following ways which are listed by way of example and not limitation by not taking the steps including that :

a. "The equity purchaser verifies by appropriate documentation that the equity seller has or is likely to have a reasonable ability to pay for the subsequent conveyance of an interest back to the equity seller. In the case of a lease with an option to purchase, payment ability also includes the reasonable ability to purchase the property within the term of the option to purchase."

b. by entering into an agreement which violates 265-a: "An equity purchaser shall not enter into repurchase or lease terms as part of the reconveyance arrangement that are unfair or commercially unreasonable, and is prohibited from engaging in any other unfair or unconscionable conduct."

82. Because of Defendants failure to comply with Section 265-a as described above, plaintiff elects to have the purported equity purchase contract, if one exists, declared void *ab initio*.

83. As the result of the actions or inaction of Defendants described above, plaintiff was damaged in that a $550,000 in that she is lost that equity of the House.

84. The conduct of Defendants as described herein was and continues to be willful, malicious, oppressive and constitutes an intentional scheme to defraud plaintiff with the intention of depriving her of her home and legal rights. Defendants' actions constitute despicable conduct in conscious disregard of plaintiff's rights so as to justify an award of punitive damages from Defendants an amount to be determined at trial.

WHEREFORE, plaintiff prays for judgment as follows:

(a) That this court declare that the equity purchase contract if any is null and void *ab initio*;

(b) That this court declare that the subject grant deed is null and void and that defendants required to deliver same to the clerk of the court for cancellation;

(c) For actual damages in the amount of $550,000 of loss equity and $25,000 penalty for each violation of section 265-a.

(d) For exemplary damages against Defendants in an amount to be determined,

(e) For reasonable attorneys fees and costs of suit;

(f) For such other and further relief as this court deems just and proper.

**THIRD CAUSE OF ACTION**
**Quiet Title**
**(Against Defendants, Maxine Bonaparte, Lezantonio Woodburn, 12706 Holdings Inc., Wilmington Savings Fund Society, FSB (WSF), Verus Securitization Trust 2020-NPL1, and Does 1 through 200, inclusive)**

85. Plaintiff incorporates the allegations contained in paragraphs 1 through 84, inclusive, as though fully set forth at this place.

86. Defendant Holdings and Woodburn claims that they owns the subject premises in fee simple absolute pursuant to the subject grant deed.

87. The Defendants claims that they have invested monies on the property in terms of repairs etc.

88. Plaintiff owns the premises in fee simple absolute, and free and clear of any purported encumbrance created by the Defendants.

89. The claims of Defendants are without any right whatsoever and such defendants have no right, title, estate, lien or interest whatsoever in the subject premises, and never had any right, title, estate, lien or interest whatsoever in the subject premises, due to the fact that the subject grant deed is a forgery and is void *ab initio* or is voidable under Sections 265-a, and the Defendants were not and are not bona fide encumbrancers.

90. Plaintiff seeks to quiet title as of March 27, 2019, the date the subject grant deed was purportedly signed by plaintiff.

WHEREFORE, plaintiff prays for judgment as follows:

(a) That this Court declare that Defendants have no right, title, interest, estate, title or lien in the subject premises, and never had any right, title, interest, estate, lien or title in the subject premises, and that the subject grant deed conveyed no interest, estate, lien or title to the subject premises to Holdings and that the subject deed created no lien or encumbrance on the subject premises, and that as of March 27, 2019, and from that day forward, plaintiff was and is the owner in fee simple absolute of the subject premises which was and is not encumbered by the subject deed of trust;

(b) For such other and further relief as this Court deems just and proper.

**FOURTH CAUSE OF ACTION**
**Negligent and Intentional Infliction**
**of Emotional Distress**
**(Against Maxine Bonaparte, Lezantonio Woodburn, 12706 Holdings Inc.,)**

91. Plaintiff incorporates the allegations contained in paragraphs 1 through 90 inclusive, as though fully set forth at this place.

92. The conduct of Defendants described above was intentional and malicious and done for the purpose of causing plaintiffs to suffer humiliation, mental anguish, and emotional distress.

93. Defendants knew or should have known that their conduct, as described above, would cause plaintiffs to suffer severe emotional distress.

94. As a direct and proximate result of defendants' conduct as herein alleged, plaintiff has suffered extreme emotional distress.

95. The conduct of defendants as described herein was willful, malicious, oppressive and constitutes an intentional scheme to defraud plaintiff with the intention of depriving her of her home and legal rights. Defendants' actions constitute despicable conduct in conscious disregard of plaintiff's rights so as to justify an award of punitive damages from each defendant in an amount to be determined at trial.

WHEREFORE, plaintiff prays for judgment as follows:

a. For general damages in the sum of Five Hundred Thousand Dollars ($500,000);
b. For punitive damages according to proof;
c. For costs of suit;
d. For such other and further relief as this court deems just and proper.

**FIFTH CAUSE OF ACTION**
**For Violation of New York GBL § 349**
**(Against Defendants Maxine Bonaparte, Lezantonio Woodburn,**
**12706 Holdings Inc., Charles L Mester, Esq.,)**

96. Plaintiff incorporates the allegations contained in paragraphs 1 through 60, inclusive, as though fully set forth at this place.

97. Plaintiff is suing both in her individual capacity and on behalf of the general public.

98. Plaintiff is informed and believes and thereupon alleges that beginning at an exact date which is unknown to plaintiff, but from 2000, defendants have committed unfair and fraudulent business practices as defined by New York GBL § 349, by engaging in the following unlawful business practices:

a. In the transaction involving the subject premises in foreclosure defendants violated section 265-a of NY RPL, and engaged in practices which operated as a fraud and deceit upon plaintiff, as set forth above;
b. Defendants have tricked elderly, disabled and unsophisticated homeowners in foreclosure into unconscionable and fraudulent

transactions involving their homes in foreclosure, and has thereby gained substantial monies, fees and profits for himself and/or their companies;

c. On information and belief, Maxine and Woodburn have routinely worked together to mislead the homeowners the banks to take over their properties.

d. Planet Enterprise unconscionably taking a lien over a residential home, converting a residential home related loan to a commercial setting up with a default interest of 24%.

e. Upon information and belief, Planet Enterprise routinely have advanced loans and obtained lien interests in the properties with full knowledge that the debtors would not able to service the debt.

f. Upon information and belief, Plane Enterprise routinely have advanced loans to the consumers in violation of state and federal consumer protections, by packaging the loans as commercial ones, despite knowledge that the loans are not for commercial purposes.

99. The acts and practices described above were and are likely to mislead the public and therefore constitute unfair or fraudulent business practices within the meaning of New York GBL § 349.

100. Plaintiff is informed and believes that defendants unlawful, unfair and fraudulent business practices described above present a continuing threat to members of the public and that defendants continue to engage in the unfair and unlawful acts described above.

101. Plaintiff seeks injunctive relief enjoining defendants from engaging in the unfair business practices described above.. Defendants have engaged in deceptive acts and practices by conduct including but not limited to: i) misrepresenting regarding their services; ii) misrepresenting that they resolve the foreclosures issues of the homeowner; iii) failing to disclose takeover of the houses; iv) misrepresenting that the agreements are enforceable when in fact they are void under New York law; v) misrepresenting their ability to help homeowners; vi) advancing loans and obtaining lien on the houses of people who do not have the capacity to pay such debts.

102. Injunctive relief is proper as plaintiff has no adequate remedy at law. Monetary damages will not compel defendants to cease to engage in the unfair business practices described in this

action. Plaintiff alleges that the benefit to the public good, as well as to the plaintiff, far outweighs the inconvenience to the defendants of ceasing to engage in the unfair business practices.

WHEREFORE, plaintiff prays for judgment as follows:

a. That this Court enter a preliminary and permanent injunction restraining and enjoining all defendants, and their agents, servants, employees, representatives, and anyone acting on their behalf or at their direction from engaging in, committing, permitting, or performing, directly or indirectly, any of the unfair business practices described above;
b. For restitutionary damages in an amount equal $550,000, which is the amount of loss of equity;
b. For reasonable attorneys' fees;
c. For costs of suit;
d. For such other relief as this Court deems proper and just.

**SIXTH CAUSE OF ACTION[5]**
**(Violations of New York Judiciary Law§ 487 against defendant Charles Mester has been dismissed pursuant to the Court's order)**

103. The Debtor realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

104. New York Judiciary Law§ 487 provides, in pertinent part, as follows: "An attorney or counselor who ... [i]s guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party ... [i]s guilty of a misdemeanor, and in addition to the punishment prescribed therefore by the penal law, he forfeits to the party injured treble damages, to be recovered in a civil action."

105. As set forth above, Mester engaged in an intentional pattern of collusion, wrongdoing, and deceit with the intent to deceive Ms. Stephens. Ms. Stephens thought that she is a meeting a lawyer and he would be assisting her in saving her property. However, he was the cementing factor of the fraud, he gave the impression that he was helping Ms. Stephens save her property, rather he was

[5] This Sixth Cause of Action was dismissed against Charles Mester , however the same has been retained here for formatting and as well as for appellate review .

helping the other defendants in unlawful takeover of her property. Mester assured Ms. Stephens that he will save her home from pending foreclosure. Ms. Stephens shared with him foreclosure actions papers which was pending in the Supreme Court, Queens County.

106. As a result of the deceitful and fraudulent conduct of these Defendants as described in the foregoing paragraphs, Ms. Stephens have been looted of her home and thus has been injured in an amount to be established at trial.

107. Because of the foregoing, Ms. Stephens is entitled to monetary damages against the attorney defendants and the law firm, treble damages, and reasonable attorneys' fees pursuant to judiciary Law § 487.

**SEVENTH CAUSE OF ACTION**

**(Fraud against Maxine Bonaparte, Lezantonio Woodburn, 12706 Holdings Inc., Charles L Mester, Esq.,)**

108. The allegations of paragraphs 1 – 107 are incorporated herein as if fully set forth.

109. Defendants procured title to plaintiff’s home by fraud. The fraudulent conduct included: having the plaintiff sign paperwork transferring ownership with the pretext of saving it from foreclosure; misrepresenting the terms of the Purchase and Sale Agreement and that signing same was in plaintiff’s best interests and was the only means of saving her home; misrepresenting the terms of the Transfer Ownership Agreement and that signing same was in plaintiff’s best interests and the only means of saving her home; demanding that plaintiff pay $10,000 for their services for professional help; failing to inform plaintiff of the content and significance of the documents they had her sign; failing to advise plaintiff that she should have real estate documents reviewed by independent counsel; and upon ownership change, immediately suing her and her family to claim possession of the real property.

110. Plaintiff relied on defendant's above-described fraudulent misrepresentations, and said reliance was reasonable under the circumstances.

111. As direct and proximate results of defendant's fraud, plaintiff suffered monetary loss and severe emotional distress and mental anguish.

WHEREFORE, plaintiff prays that judgment be entered awarding her compensatory damages, interest, and costs of suit.

**EIGTH CAUSE OF ACTION**
**(Breach of Fiduciary Duty by Mester and Maxine)**

112. The allegations of paragraphs 1 – 111 are incorporated herein as if fully set forth.,

113. As plaintiff's attorney Mester and foreclosure expert Maxine owed plaintiff the highest standard of care commensurate with their position as a fiduciary. Ms. Stephens trusted them and also gave $10,000 to Maxine for her professional expertise.

114. Defendants breached said duty negligently and/or willfully by engaging in the conduct set forth herein and placing their own interests before those of plaintiff, then their client.

115. As direct and proximate results of defendant's breach, plaintiff suffered financial loss and severe emotional distress and mental anguish.

WHEREFORE, plaintiff prays that judgment be entered awarding her compensatory damages, interest, and costs of suit.

**NINTH CAUSE OF ACTION**
**Unconscionability**
**(Against Maxine Bonaparte, Lezantonio Woodburn,** 12706 **Holdings Inc.)**

116. Plaintiffs repeat and reallege paragraphs 1 through 115 as though fully set forth herein.

117. Throughout the course of the March 2019 mortgage/deed transaction, an enormous disparity in bargaining power existed between plaintiff and defendants. Plaintiff is an ailing

minority woman, whereas defendants are seasoned players of the market. The defendants are experienced entities and individuals that sought to profit from the disparity in bargaining power and did so by deliberately targeting plaintiff with misinformation.

118. The terms of the March 2019 mortgage/deed transaction are so one-sided as to be abusive and unconscionable. Defendants exploited the disparity in bargaining power to induce plaintiffs to transfer title to her home and enter a highly disadvantageous equitable loan when plaintiff believed that they were applying for a new mortgage and helping her settle her bank debt and making mortgage more manageable. The defendants Planet Enterprise saddled the Real Property with an exorbitant interest loan with a default interest of 24%. The Defendant Planet Enterprise in collusion with the other defendants obtained inequitable lien on the Debtor's Home. Said procedural and substantive unconscionability renders void and unenforceable the March 2019 equitable mortgage/deed transfer.

**TENTH CAUSE OF ACTION**
**New York Real Property Actions and Proceedings Law, Article 15**
**(Against Maxine Bonaparte, Lezantonio Woodburn, 12706 Holdings Inc.,**
**Wilmington Savings Fund Society, FSB (WSF), Verus Securitization Trust 2020-NPL1)**

119. Plaintiffs repeat and reallege paragraphs 1 through 118 as though fully set forth herein.

120. Plaintiffs bring this claim pursuant to Article 15 of the New York State Real Property Actions and Proceeding Law to compel the determination of any claims adverse to those of plaintiffs in the subject premise, the Home. Through this action, plaintiffs seek to quiet title to the subject property by having declared as void the fraudulent deed transfer from plaintiffs to Holding.

121. Plaintiffs was the sole owner of the Real Property. She had bought the subject property in 2006. Public records now suggest that defendant Holdings and Planet Enterprise claim an interest in the property. Their purported interest, and the documents upon which it rests, are void because they were obtained through a conspiratorial and fraudulent scheme that tricked plaintiff into conveying ownership of their home without her knowledge. Alternatively, the deed transfer constituted an equitable mortgage and not a deed transfer.

122. Upon information and belief, no party who is or should be a defendant is or might be an infant, mentally retarded, mentally ill or an alcohol abuser.

123. Upon information and belief, the judgment to be entered in this action will not affect a person or persons not in being or ascertained at the commencement of this action, who by any contingency contained in a devise or grant or otherwise, could afterward become entitled to a beneficial estate or interest in the property; moreover, every person in being who would have been entitled to such interest in the property if such contingency happened immediately prior to the commencement of this action are parties hereto.

124. Accordingly, plaintiffs request that this Court issue:

a. a declaration that plaintiff is the lawful sole owner of the subject property and are entitled to lawful, peaceable, and uninterrupted possession thereof as against all defendants herein, and as against anyone claiming under them;
b. an injunction prohibiting all defendants, and every person claiming under them, from claiming an estate or interest in, or lien or encumbrance on, the property;
c. a judgment declaring as void the fraudulent deed dated March 27, 2019 purporting to transfer plaintiffs' interest in the property to 12706 Holdings;
d. a judgment declaring as void any interest or lien of the Defendants against the property;
e. damages stemming from plaintiffs' lost rents and other damage in connection with the loss of their exclusive right to use the property in the manner of her choosing; and
f. any other relief that this Court deems just and proper.

**ELEVENTH CAUSE OF ACTION**
**(Violation of RICO, 18 U.S.C. 1962(c))**
**(Predicate of Mail Wire fraud and Hobbs Act against Maxine Bonaparte, Lezantonio Woodburn, 12706 Holdings Inc., Charles L Mester, Esq.,)**

125. Plaintiffs repeat and reallege paragraphs 1 through 124 as though fully set forth herein.

126. To carry out its unlawful scheme, the Defendants have conducted a criminal enterprise through a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and (d). Specifically, between 2018 and the present, the Defendants have knowingly and intentionally submitted false and materially misleading declarations under oath with Ocwen Bank, New York State Supreme Court, Queens County and civil court of the same county and as well as this bankruptcy proceeding. While professing to be safeguarding interest of the plaintiff, the Defendants preyed upon the vulnerabilities of the plaintiff and her family and by fraud had her transfer her deed to their own company 12706 Holdings Inc. and then had her signed paperwork under threat. Holdings and the other Defendants also offered her to sell back the house but without the benefit of the sum particular and also taking away the same option when they had fully entrenched with the property ownership. The defendants also violated Hobbs act by physically threatening the family members

to leave the house and forcibly turning off heat and changing locks and also making Ms. Stephens sign paperwork reducing them to licensee. In sum in executing its criminal enterprise, the Defendants crime have included: Mail fraud in violation of 18 U.S.C. § 1341; Wire fraud in violation of 18 U.S.C. § 1343; Hobbs Act in violation of 18 USC. 1951; Unlawful monetary transactions in violation of 18 U.S.C. §§ 1956 and 1957(a); and Bankruptcy fraud in violation of 18 U.S.C. §§ 152(2) and 152(3). The Planet Enterprises aided and abetted the rest of the Defendants in achieving their unlawful results as complained herein.

127. Ms. Stephens is direct victim and target of Defendants unlawful scheme. Defendants' criminal enterprise has caused Ms. Stephens to lose her house with a profit/equity of a sum exceeding $500,000.

128. Ms. Stephens hired to two professionals, Maxine and Mester for dire situation with the home loan. However they saw this as an opportunity to make money and they used unlawful means to achive the same result. Instead of conforming to these requirements fiduciary, Defendants affirmatively misrepresented its disinterestedness and unlawfully concealed its disqualifying connections to parties with clear financial interests in the outcome of the work they had undertaken on behalf of the plaintiff. Mester appeared for both Ms. Stepehns and Maxine Bonaparte. Maxine appeared as the agent for both Ms. Stepehes and her company 12606 Holdings along with Woodburn. Also, Maxine and Woodburn regularly visited the house of Ms. Stephens and threatened her and her family members to leave on every visit to the House.

129. The Defendants engaged in a scheme to defraud Ms. Stephens and other family members through falsity, concealment, and obfuscation of disqualifying conflicts of interest, which thereby deprived Ms. Stephens of a reduced mortgage and her ownership of the house. To achieve complete ownership of the house, with no possibility of reversion of the house back to Ms.

Stephens, the defendants made buy agreement without the benefit of the sale price and as well as reducing the buy back period utilitarianly. The Defendants also forcibly managed to took over physical ownership of the part of the house by putting in their own friend in one of the rooms of the house. The Defendants also threatened Ms. Stephens with eviction if she did not sign the agreements which kept changing and were one sided. Ms. Stephens through deception engineered by the defendants lost her house to the Defendants.

130. In furtherance of the scheme, besides threats of violence and eviction, and as described herein, the Defendants prior to the ownership of the house, transmitted, or caused to be transmitted, by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures, and sounds, in violation of 18 U.S.C. § 1343, and also caused matters and things to be placed in a post office or authorized depository or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier, in violation of 18 U.S.C. § 1341. The Defendants' specific mailings and interstate wirings in furtherance of the scheme to defraud included, but are not limited to, the aforementioned, rather there are other numerous mailing undertaken by Maxine and Mester which are solely within the custody and control of the defendants. The mailing was initially undertaken for the purposes of loan modification [or rather short sale] in the name of the plaintiff, but solely for their own ulterior design to takeover the house. The Planet Enterprise assisted rest of the Defendant to achieve their unlawful results including its own lien on the Home of the Debtor.

131. Upon information and belief, the Defendants also used the interstate wires, United States mail, or private interstate commercial carrier to effectuate ownership change of the house of Stephens Evidence of such transactions is peculiarly within the Defendants' knowledge and control and will be proven at trial following discovery.

132. The Defendants also used the interstate wires, United States mail, or private interstate commercial carrier to transfer illegally obtained funds within the United States for the purpose of furthering the objectives of the Defendants. These transfers include the movement of funds in connection with fees of the loan modification, taking money with the sham excuse of making mortgage payments.

133. Each of the Defendants, through their direct or indirect control of the various functionaries, participated in, numerous acts of mail and wire fraud. In particular, each of the Defendants, through their control of and/or participation. Each of the said defendants sent or caused to be sent numerous mail or wire communications, or acted with knowledge that mail or wire communications would follow in the ordinary operation of loan modifications with Ocwen or could reasonably have foreseen that the mails or wires would be used in the ordinary course of business as a result of the Defendants' acts in furtherance of the transactions discussed above, including the uses of the mails and interstate wires Also, Maxine and Woodburn threatened evictions to elicit agreements signatures on the Agreements regarding Use and Occupancy and also acknowledgement of expenses which were never undertaken, solely done to make it impossible for Ms. Stephens to buy back her home. And said fraud was completely sealed by the Planet Enterprise obtaining lien on the house of the Debtor with default interest rate of 24% and or exceeding the usurious cap.

**The RICO Enterprise**

134. From October 2018 (said date being approximate and inclusive) and continuing to the present, all Defendants collectively have constituted an enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) or, alternatively, an *association-in fact enterprise* within the meaning of those provisions (the "**Enterprise**").

135. At all relevant times, each of the Defendants was, and is, a person that exists separate and distinct from the Enterprise.

136. From the time of the inception of the Enterprise, enterprise participated in the proceedings and activities as complaint of above. Accordingly, at all relevant times, the Enterprise was engaged in, and its activities affected, interstate and foreign commerce.

137. Between 2018 and the present, each of the Defendants engaged in a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1961(5), consisting of the predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1)(B) and 18 U.S.C. § 1961(1)(D) described in the aforesaid paragraphs and other predicate acts to be identified after further investigation and discovery herein.

138. Each of the Defendants engaged in two or more predicate acts of racketeering, and each committed at least one such act of racketeering after the effective date of RICO.

139. The predicate acts of racketeering activity were related in that they were committed for the purpose of (1) concealing or obfuscating real nature of the takeover/transfer of the house from Ms. Stephens to their entities; (II) taking over unlawfully the ownership of the house of the plaintiff; (III) taking away the inbuilt equity of the house from Ms. Stephens to themselves with fraudulent means; (IV) eliminating any chances for the recovery of the house from the Defendants; (V) saddling the property with a commercial lien and commercial mortgage with a high interest rate, despite the fact that it is a residence. These acts, and others to be identified after further investigation and discovery herein, shared a common or related purpose, goal, result, participants, victim, and method of commission.

140. Through such patterns of racketeering activity, each of the Defendants conducted or participated, directly or indirectly, in the conduct of the affairs of the Enterprise in violation of 18 U.S.C. § 1962(c).

141. As a direct and proximate result of RICO violations of 18 U.S.C. § 1962(c) by the Defendants, Ms. Stephens has been injured in her property interest suffering damages in an amount to be determined at trial. The damages to Ms. Stephens include, but are not limited to, loss of homeownership, fees from the sham closing of the house, the equity Ms. Stephens would have earned in the absence of the Defendants' unlawful conduct; other lost opportunities; and attorneys' fees and costs, including attorneys' fees and costs associated with exposing and pursuing redress for Defendants' criminal activities.

142. Pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), Ms. Stephens is thereby entitled to recover treble damages, together with the costs of this suit and reasonable attorneys' fees.

**TWELTH CAUSE OF ACTION**
**(CONSPIRACY TO VIOLATE RICO, 18 U.S.C. § 1962(d))**
**Against Defendants Maxine Bonaparte, Lezantonio Woodburn, 12706 Holdings Inc., Charles L Mester, Esq.)**

143. The Plaintiff repeats and realleges paragraphs 1 through 142 as if fully set forth herein.

144. Defendants have unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

145. By and through each of the Defendants' close business and employment relationships with one another, and their close coordination with one another in the affairs of Enterprise described above, each Defendant knew the nature of these enterprises and each Defendant knew that these enterprises extended beyond each Defendant's individual role. Moreover, through the same

connections and coordination, each Defendant knew that the other Defendants were engaged in a conspiracy to commit predicate acts, including those set forth above, and that the predicate acts were part of a pattern of racketeering activity, and each agreed to pursue the same criminal objective.

146. Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the affairs of the Association in fact Enterprise, and/or the Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d).

147. In particular, each Defendant was a knowing, willing, and active participant in one or more such Enterprises and their affairs, and each of the Defendants shared a common purpose, namely, the orchestration, planning, perpetuation, and execution of the scheme to victimize Ms. Stephens and take over her Home as a title holder or a lien holder.

148. The Defendants played the following roles besides other as mentioned in racketeering conspiracy:

a. Maxine Bonaparte professed to be an expert in loan resolutions, and she made Ms. Stephens to hire her;

b. Maxine Bonaparte took Ms. Stephens to Charles Mester to represent Ms. Stephens and provide a veneer of professionalism.

c. Maxine Bonaparte acted as the agent for Ms. Stephens and 12706 Holdings, the buyer of the short-sale home.

d. Mester actually represented the 12706 Holdings in the sale, though retainer with Stephens was that he will represent her.

e. Lez Antonio Woodburn made himself as the front face of 12706 Holdings.

f. Both Maxine and Woodburn threatened Ms. Stephens to leave her house and they made Ms. Stephens and her husband sign Use and Occupancy agreement.

g. Maxine Bonaparte, Lez Woodburn, Charles Mester collectively led the enterprise to take over Ms. Stephens house to have loot monies distributed among each other.

h. The Planet Enterprise assisted the other defendants in achieving the stated unlawful results as well entrenching itself as the lien holder over the property of the Debtor.

149. Further evidence of an agreement among the Defendants is particularly within the knowledge and control of the Defendants.

150. The participation and agreement of each of the Defendants was necessary to allow the commission of this pattern of racketeering activity.

151. Ms. Stephens has been and will continue to be injured in her property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at trial. The injuries to Ms. Stephens directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to loss of equity in her house; other lost business opportunities; and attorneys' fees and costs, including attorneys' fees and costs associated with exposing and pursuing redress for Defendants' criminal activities.

152. Pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), Ms. Stephens is thereby entitled to recover treble damages, together with the costs of this suit and reasonable attorneys' fees.

**THIRTEENTH CAUSE OF ACTION**
**(Unjust Enrichment)**
**(Against Maxine Bonaparte, Lezantonio Woodburn, 12706 Holdings Inc.,)**

153. Plaintiffs repeat and reallege paragraphs 1 through 152 as though fully set forth herein.

154. As a result of the events described above, each of the Defendants has unjustly retained a benefit to Ms. Stephens detriment.

155. Specifically, each of the Defendants were on notice of Ms. Stephen's continuing ownership interest at a time when they took title to the Property, or took a lien hold interest in the Property, or cashed out a portion of Ms. Stephens equity.

WHEREFORE, Ms. Stephens ask this court to void the transfer of title to 12706 Holdings to require that each Defendant pay Plaintiffs the value of the equity in the Property unjustly received by that Defendants.

**FOURTEENTH CAUSE OF ACTION**
**(Constructive Trust)**
**(Against Maxine Bonaparte, Lezantonio Woodburn, 12706 Holdings Inc.,)**

156. Plaintiffs repeat and reallege all preceding paragraphs as if fully set forth herein.

157. Undoubtedly Defendants took custody of Plaintiffs' property under a circumstance that would render it equitable for it to return such property to its rightful owner upon due demand.

158. Ms. Stephens approached Maxine and through Maxine, attorney Mester to help her save her house. Such relationship created a fiduciary relationship.

159. Ms. Stephens trusted Maxine and Mester with her property and thinking that it was a part of loan modification and that the property is being kept in trust for her, she signed all the papers whatever was given to her to sign by Maxine and Mester

160. Ms. Stephens had a confidential fiduciary relationship with the Defendants.

161. It is just and equitable that the court impress a constructive trust to attach to the res of Plaintiffs' property from the time it entered Defendants' possession.

162. Each transferee took possession under circumstances in which such transferee knew Plaintiffs had been despoiled, making it just and fair for the court to apply an equitable lien under the principles of equity.

163. Applying the doctrine of equitable servitudes to ownership of the house wrongfully obtained by transferees is fair and just under the circumstances.

164. Defendants would be unjustly enriched if permitted to retain the house or any of the benefits including any lien or equity accruing therefrom.

165. Plaintiffs have no adequate remedy at law.

166. Permitting the Defendants to retain property belonging to the Plaintiff is unfair and unjust and in light of the totality of the circumstance's warrants imposing a constructive trust under equitable principles of New York law.

167. Plaintiff pray for an order impressing a constructive trust upon all holders and purchasers of Plaintiffs' property and their agents, past and present and ordering that all ownership be returned to Plaintiff and that any income, commissions or other benefits be disgorged and paid to Plaintiff.

**FIFTEENTH CAUSE OF ACTION--A**
**(Fraudulent conveyance, Section 273 of NYCD law, 11 U.S.C. §544)**
**(Against Maxine Bonaparte, Lezantonio Woodburn, 12706 Holdings Inc., Planet Management Group, LLC, Planet Home Lending LLC dba Planet Home Servicing, Wilmington Savings Fund Society, FSB (WSF), Verus Securitization Trust 2020-NPL1)**

168. Plaintiff incorporates the allegations contained in paragraphs 1 through 167, inclusive, as though fully set forth at this place.

169. The debtor-plaintiff sought bankruptcy protection on November 11, 2021.

170. Section 544 of Title 11 states that "the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title." New York Debtor and Creditor Law section

273 states: Every conveyance made, and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

171. The debtor has unsecured claims at the time of the filing of the case and at the time of transfer of the deed to the Defendants, especially

i. Debtor had unsecured debts related to creditors so-called 'golden' or 'triggering' creditors such creditors included LVNV Funding, LLC, Jefferson Capital Systems LLC, Ashley Funding Services, LLC, National Grid (Triggering Creditors) at time of filing of petition and as well as on the date of the transfer of the Debtor’s house to Holdings. The Triggering Creditors had a right to be paid from Debtor.

ii. Triggering Creditors holds an allowable unsecured claim under section 502, and had different amount of claim as of the date of the transfer of the deed from the Debtor.

iii. Triggering Creditors could avoid the transfers at issue under applicable New York State law.

172. Debtor owned Home and it exceeded $850,0000 in value in 2019.

173. On March 27, 2019, the Debtor was fraudulently induced to part with her house with the excuse that the same was necessary for loan modification.

174. The fraudulent parting of the house was designed by the defendant as a short sale for a sum of $350,000, but the value of the house exceeded $850,000.

175. Thus, the debtor was deprived of equity worth more than $500,000. This conveyance was made without fair consideration, rather there was no consideration and Debtor was made to pay monies for this transfer of her own property what she was thought was a loan modification. This transfer diminished the size of the debtor's estate and occurred at a time when the debtor was in a financial condition that made it impossible or unlikely that the debtor could satisfy the claims of all its creditors in full. For the said complained transaction, the transferees of the Real Property

did not provide fair equivalent value and did not act in good faith towards the Debtor. And the Debtor was generally not paying its debts as they came due.

176. As a result of this transfer, the Debtor was rendered insolvent and could not pay her bills.

177. The impugned transfer of the deed violated section 273 of New York Debtor & Creditor Law entitling the plaintiff as a debtor relief pursuant to 11 U.S.C. 544 and further (a) disregarding the conveyance of the Real Property and allowing and (b) awarding the value of the property, including interest or appreciation, to the maximum extent allowed by law and (c) awarding reasonable attorney's fees incurred in this action.

Wherefore, the Debtor now in bankruptcy, the March 27, 2019, transfer should be set aside.

**FIFTEENTH CAUSE OF ACTION--B**
**(Fraudulent conveyance, Section 275 of NYCD law, 11 U.S.C. §544)**
**(Against Maxine Bonaparte, Lezantonio Woodburn, 12706 Holdings Inc., Planet Management Group, LLC, Planet Home Lending LLC dba Planet Home Servicing, Wilmington Savings Fund Society, FSB (WSF), Verus Securitization Trust 2020-NPL1)**

178. Plaintiff incorporates the allegations contained in paragraphs 1 through 177, inclusive, as though fully set forth at this place.

179. The debtor-plaintiff sought bankruptcy protection on November 11, 2021.

180. Section 544 of Title 11 states that "the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title."

181. New York Debtor and Creditor Law section 275 states: Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors. This transfer diminished the size of

the debtor's estate and occurred at a time when the debtor was in a financial condition that made it impossible or unlikely that the debtor could satisfy the claims of all its creditors in full. For the said complained transaction, the transferees of the Real Property did not provide fair equivalent value and did not act in good faith towards the Debtor. And the Debtor was generally not paying its debts as they came due.

182. The debtor has unsecured claims at the time of the filing of the case and at the time of transfer of the deed to the Defendants.

i. Debtor had unsecured debts related to creditors so-called 'golden' or 'triggering' creditors such creditors included LVNV Funding, LLC, Jefferson Capital Systems LLC, Ashley Funding Services, LLC , National Grid (Triggering Creditors) at time of filing of petition and as well as on the date of the transfer of the Debtor’s house to Holdings.

ii. Triggering Creditors holds an allowable unsecured claim under section 502, and had different amount of claim as of the date of the transfer of the deed from the Debtor and

iii. Triggering Creditors could avoid the transfers at issue under applicable New York State law.

183. Debtor owned Home and it exceeded $850,0000 in value in 2019.

184. On March 27, 2019, the Debtor was fraudulently induced to part with her house with the excuse that the same was necessary for loan modification.

185. The fraudulent parting of the house was designed by the defendant as a short sale for a sum of $350,000, but the value of the house exceeded $850,000.

186. Thus, the debtor was deprived of equity worth more than $500,000. This conveyance was made without fair consideration.

187. As a result of this transfer, the Debtor was rendered insolvent and now she could not pay her debts in a regular course. When the transfer took place, the Debtor intended to incur, or believed or reasonably should have believed that that she has only one house and that is the house she lived in and that she would incur debts beyond her ability to pay as they mature.

188. The impugned transfer of the deed violated section 275 of New York Debtor & Creditor Law, entitling the plaintiff as a debtor (a) disregarding the conveyance and allowing and (b) awarding the value of the property, including interest or appreciation, to the maximum extent allowed by law, and (c) awarding reasonable attorney's fees incurred in this action.

Wherefore March 27, 2019, transfer should be set aside.

**FIFTEENTH CAUSE OF ACTION--C**
**(Homestead Exemption in the Fraudulently conveyed Section 273 and 275 of NYCD law, 11 U.S.C. §544)**
**(Against Maxine Bonaparte, Lezantonio Woodburn, 12706 Holdings Inc., Planet Management Group, LLC, Planet Home Lending LLC dba Planet Home Servicing, Wilmington Savings Fund Society, FSB (WSF), Verus Securitization Trust 2020-NPL1)**

189. The Plaintiff repeats and re-alleges the allegations set forth in paragraphs "1" through "188" as if set forth fully herein.

190. The debtor-plaintiff sought bankruptcy protection on November 11, 2021.

191. Section 544 of Title 11 states that “the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.” New York Debtor and Creditor Law section 273 states: Every conveyance made, and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

192. In addition and as an alternative to section 544 of the Bankruptcy Code, section 522(h) state that the, “debtor may avoid a transfer of property of the debtor … to the extent that the debtor could have exempted such property under subsection (g)(1) of this section if the trustee had avoided such transfer . . . if-(1) such transfer is avoidable by the trustee under

section 544, 545, 547, 548, 549, or 724(a) of this title or recoverable by the trustee under section 553 of this title; and(2) the trustee does not attempt to avoid such transfer."

193. Ms. Christa Preuss is the Chapter 13 Trustee appointed in this case, 11 U.S.C. § 1302. The Trustee could but has not attempted to avoid the transfer as alleged here.

194. The Debtor's transfer of Real Property was involuntary, as she never wanted to sell the Real Property.

195. The Debtor was made to sign the papers by misleading her that she was signing papers for her loan modification.

196. The Debtor continued to reflect her interest in the Real Property as her home in her bankruptcy filing.

197. The Debtor continues to in possession of the Real Property as her home.

198. If the title of the Real Property was in her name, as it was before the alleged fraudulent transfer to the defendants, the Debtor would he entitled to homestead exemption as guaranteed by New York state, NY CPLR 5206.

199. Now the Debtor seeks to exercise an avoidance power among others under 11 U.S.C. § § 522(h), 544.

200. The Real Property which was transferred to the defendants, could have been exempted if the trustee had avoided the transfer under the provisions of 11 U.S.C. §522(g). But the Trustee did not avoid the transfer.

201. The Real Property is the home of the Debtor entitling her state guaranteed homestead exemption.

202. The debtor has unsecured claims at the time of the filing of the case and at the time of transfer of the deed to the Defendants.

i. Debtor had unsecured debts related to creditors so-called 'golden' or 'triggering' creditors such creditors included LVNV Funding, LLC, Jefferson Capital Systems LLC, Ashley Funding Services, LLC , National Grid (Triggering Creditors) at time of filing of petition and as well as on the date of the transfer of the Debtor's house to Holdings. The Triggering Creditors had a right to be paid from Debtor.

ii. Triggering Creditors holds an allowable unsecured claim under section 502, and had different amount of claim as of the date of the transfer of the deed from the Debtor and

iii. Triggering Creditors could avoid the transfers at issue under applicable New York State law and could have avoided the instant transfer of the Real Property.

203. Debtor owned Home and it exceeded $850,0000 in value in 2019.

204. On March 27, 2019, the Debtor was fraudulently induced to part with her house with the excuse that the same was necessary for loan modification.

205. The fraudulent parting of the house was designed by the defendant as a short sale for a sum of $350,000, but the value of the house exceeded $850,000.

206. Thus, the debtor was deprived of equity worth more than $500,000. This conveyance was made without fair consideration, rather there was no consideration and Debtor was made to pay monies for this transfer of her own property what she was thought was a loan modification. This transfer diminished the size of the debtor's estate and occurred at a time when the debtor was in a financial condition that made it impossible or unlikely that the debtor could satisfy the claims of all its creditors in full. For the said complained transaction, the transferees of the Real Property did not provide fair equivalent value and did not act in good faith towards the Debtor. And the Debtor was generally not paying its debts as they came due. This involuntary transfer of the Real property also was fraudulent to the present and future creditors.

207. As a result of this transfer, the Debtor was rendered insolvent and could not pay her bills.

208. The impugned transfer of the deed violated section 273 and 275 of New York Debtor & Creditor Law entitling the plaintiff as a debtor relief pursuant to 11 U.S.C. §522(h), 544 and further

(a) disregarding the conveyance of the Real Property and its return to the Debtor and or (b) awarding the value of her property, including interest or appreciation, to the maximum extent allowed by law and (c) awarding reasonable attorney's fees incurred in this action.

Wherefore, the Debtor now in bankruptcy, the March 27, 2019, transfer should be set aside.

**SIXTEENTH CAUSE OF ACTION**
**(Avoidance Recovery of Fraudulent Transfer under 11 U.S.C. § 550 from 12706 Holdings)**
**(Against Maxine Bonaparte, Lezantonio Woodburn, 12706 Holdings Inc, Planet Management Group, LLC, Planet Home Lending LLC dba Planet Home Servicing, Wilmington Savings Fund Society, FSB (WSF), Verus Securitization Trust 2020-NPL1)**

209. The Plaintiff repeats and re-alleges the allegations set forth in paragraphs "1" through "207" as if set forth fully herein.

210. Section 550(a) of the Bankruptcy Code provides in relevant part: [T]o the extent that a transfer is avoided under section 544, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from ... the initial transferee of such transfer or the entity for whose benefit such transfer was made; or ... any immediate or mediate transferee of such initial transferee. 11 U.S.C. § 550(a).

211. Under section 550(a) of the Bankruptcy Code, the Plaintiff may recover the Transfer or the value thereof from the initial transferee 12706 Holdings Inc., which had by virtue of title ownership to the Real Property full dominion and control over the Real Property.

212. By reason of the foregoing, the Plaintiff is entitled to an order recovering the Transfer, or the value thereof, pursuant to section 550 of the Bankruptcy Code and a judgment against the Defendant, the initial transferee, 12706 Holdings Inc., in an amount as yet undetermined, but in no event believed to be less than $1million, plus interest thereon, attorneys' costs, or such other amount as may be determined by the Court.

**SEVENTEENTH CAUSE OF ACTION**
**Avoidance and Recovery of Fraudulent Transfers from the Planet Management Group, LLC, Planet Home Lending LLC and Wilmington Savings Fund Society, FSB, Verus Securitization Trust 2020-NPL1**
**(11 U.S.C. §§ 544 and 550)**

213. The Plaintiff re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

214. The defendants, Ms. Bonaparte and Mr. Woodburn unlawfully misleading the Debtor with the complained of transaction, transferred the Deed and incurred obligations thereby granting the immediate transferees, the Planet Management Group, LLC, Planet Home Lending LLC, and then the mediate transferees Wilmington Savings Fund Society, FSB, Verus Securitization Trust 2020-NPL1, security interest and made the same for no consideration to the Debtor. The initial transferee, immediate transferee and mediate transferee acted in combination or coordination and or in mutual interest to cement their dominion and control over the Real Property of the Debtor.

215. The Debtor received no value in exchange for incurring, granting and/or making the engineered transfer [by Ms. Bonaparte and Mr. Woodburn] of her Home and or having a lien of Planet Enterprise and or the Wilmington Savings Fund Society, Verus Securitization Trust 2020-NPL1 with a default interest rate exceeding 24%.

216. The Debtor was insolvent, became insolvent, or intended or believed she would incur debts beyond its ability to pay as such debts matured at the time the Planet Enterprise or Wilmington Savings Fund Society, FSB, Verus Securitization Trust 2020-NPL1, the lien or interest in the Real Property were incurred, granted and/or made.

216. The Planet Enterprise Defendants are the initial transferees of the impugned transfer for the encumbrance put on the Real Property, followed by Wilmington Savings Fund Society, FSB,

Verus Securitization Trust 2020-NPL1, the entity or person for whose benefit the said transfer were made, or the immediate or mediate transferees of the initial transferee receiving the transfers. The said encumbrances on the Real Property were not borne of good faith, as Planet Defendants. had full knowledge of the underlying transactions and details—i.e. continued occupation of the house by the Debtor, and value of the Real Property itself [property value exceeding $850,000 being transferred for a sum of $350,000 (as sum reduced as a projected short sale)] was notice enough to put any lender to an inquiry. The Planet defendants knew and thus had reasonable basis to know of the debtor's insolvency or of the fraudulent intent of the other defendants underlying the transfer.

217. Wilmington Savings Fund Society, FSB, Verus Securitization Trust 2020-NPL1 at the time of transfer of the Note or the Mortgage etc. to the trust knew about the nature of the transaction, had knowledge of the voidability of the transfer, as the Debtor continued to occupy the Real Property as her residence and her pending bankruptcy [a public document listing claims against the defendants]. The Debtor had filed in her petition a notice of rescission of the deed to defendants, which Wilmington Savings Fund Society and Verus Securitation Trust 2020-NPLI knew.

218. Based on the foregoing, the Plaintiff is entitled to recover the value of the transfers and or return of her Home pursuant to sections 522, 544 and 550 of the Bankruptcy Code.

WHEREFORE, the Plaintiff respectfully requests the entry of a judgment against Planet Management Group, LLC, Planet Home Lending LLC and Wilmington Savings Fund Society, FSB, Verus Securitization Trust 2020-NPL1 avoiding their lien interest in the property and awarding the Plaintiff costs, pre- and post-judgment interest and such other relief the Court deems equitable and just.

**EIGHTEENTH CAUSE OF ACTION**
**(Disallowance of Claims)**
**(Against Maxine Bonaparte, Lezantonio Woodburn, 12706 Holdings Inc., )**

219**.** The Plaintiff repeats and re-alleges the allegations set forth in paragraphs "1" through "218" as if set forth fully herein.

220. To the extent the Defendants are found liable for any of the transfers subject to avoidance and recovery as alleged herein, any claims the Defendants may assert against the estate pursuant to section 502(h) of the Bankruptcy Code or otherwise must be disallowed unless and until the Defendants pay the estate or the Debtor the amount of such liability and make the Debtor whole.

**NINETEENTH CASUE OF ACTION**
**(Legal Malpractice Against Mester)**

221. The Plaintiff repeats and re-alleges the allegations set forth in paragraphs "1" through "220" as if set forth fully herein.

222. Ms. Stephens had her Home in foreclosure proceeding. She wanted to save her home. She was referred to Mr. Mester. Ms. Stephens approached him for saving her home. By signing a retainer agreement and reposing her trust, Ms. Stephens established a client attorney relationship with Mester.

223. Mr. Mester owed a duty of care to Ms. Stephens. He had assured her that he will save her house.

224. Mr. Mester failed to exercise required care, rather he abused Ms. Stephens trust by colluding with others depriving Ms. Stephens of her home with a substantial equity as said in the foregoing part of the Amended Complaint.

225. Mr. Mester was expected to proceed in a manner reasonably calculated to advance a client's lawful objectives, as defined by the client after consultation. He was expected to act with reasonable competence and diligence. He was expected to comply with obligations concerning the

client's confidences and property, avoid impermissible conflicting interests, deal honestly with the client, and not employ advantages arising from the client-lawyer relationship in a manner adverse to the client; and fulfill valid contractual obligations to the client. Mr. Mester breached said duties and obligation. This failure to exercise due care and abuse of trust caused the complained of injury to Ms. Stephens.

226. Ms. Stephens lost her home because of active collusion and deception of Mr. Mester.

227. Ms. Stephens damages and deprivation of her home and humiliation has been caused by Mr. Mester breach of obligation with active collusion with other defendants.

Wherefore Ms. Stephens is entitled to be compensated for the damages owing to Mr. Mester's conduct.

**TWENTIETH CAUSE OF ACTION**
**Preliminary and Permanent Injunction**
**(Against the Defendants Maxine Bonaparte, Lezantonio Woodburn, 12706 Holdings Inc.,)**

228. Plaintiff incorporates the allegations contained in paragraphs 1 through 204 inclusive, as though fully set forth at this place.

229. The Defendants are now seeking to sell the subject premise. Said conduct is wrongful because the subject grant deed to them is void.

230. The Defendants having record title, may seek at any time to evict plaintiff, or to transfer or encumber the premise and they are already doing the same.

231. The Defendants' wrongful conduct unless and until enjoined and restrained by order of this Court will cause great irreparable injury to plaintiff in that plaintiff will suffer loss of her home which will cause personal suffering, including potential homelessness for plaintiff and her grandchildren, which cannot be compensated for by monetary damages.

232. Plaintiff has no adequate remedy at law for the threatened conduct by defendants.

WHEREFORE, plaintiff prays for judgment against defendant, as follows:

a. For a preliminary and permanent injunction restraining and enjoining the Defendants and their agents, servants, employees, representatives, and anyone acting on their behalf or at their direction from committing, permitting, or performing, directly or indirectly, any of the following acts regarding the premises:

(1) Contracting for, purchasing, leasing, exchanging, granting, conveying, mortgaging, transferring in trust, encumbering or hypothecating the subject premises;

(2) Attempting to contract for, purchase, lease, exchange, grant, convey, mortgage, transfer in trust, encumber or hypothecate the subject premises;

(3) Serving any notices terminating tenancy or filing any unlawful detainer actions or prosecuting any unlawful detainer actions against plaintiff;

(4) Seeking in any fashion to dispossess plaintiff from the premises.

**PRAYER FOR RELIEF**
**(Debtor demands trial by jury on all causes of action)**

**WHEREFORE**, Plaintiff prays for relief and judgment as follows:

(a) Judgment in favor of plaintiff on all counts;
(b) General and compensatory damages according to proof at trial;
(c) Treble damages pursuant to 18 U.S.C. § 1964(c); NY RPL 265-a; NY Judiciary law § 487;
(d) Disgorgement of all moneys received by Defendants as a result of their unlawful activities;
(e) An award of Plaintiffs reasonable attorneys' fees and costs and expenses, pursuant to 18 U.S.C. § 1964(c);
(f) Punitive damages;
(g) Prejudgment interest;
(h) Voidance of Lien or any interest obtained by the Defendants on the Debtor's home;
(i.) Reconveyance of the Real Property title to the Debtor plaintiff and
(h) Such other and further relief as the Court deems just and proper.

Dated: February 22, 2024
New York New York

*/s/Karamvirdahiya*

Karamvir Dahiya
Dahiya Law Offices, LLC
75 Maiden Lane Suite 606
New York New York 10038
Tel: 212 766 8000

# COMPLAINT AS DOCKETED WITH EXHIBITS

Adv. ECF No. 34 (filed December 28, 2022)

Amended Complaint, Redacted

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
**-------------------------------------------------------X 21-42857-206**
**In re:**

**Evis Neverlane Stephens,**

**Debtor.**
**Chapter 13**
**-------------------------------------------------------X**

**Evis Neverlane Stephens,**

**Plaintiff, Adversary Proceeding No. 22-01037**
**v.**

**Maxine Bonaparte,**
**Lezantonio Woodburn,**
**12706 Holdings Inc.,**
**Charles L Mester, Esq.,**
**Planet Management Group, LLC,**
**Planet Home Lending LLC dba Planet Home Servicing,**
**Wilmington Savings Fund Society, FSB (WSF),**
**Verus Securitization Trust 2020-NPL1,**

**Defendants.**
**-------------------------------------------------------X AMENDED COMPLAINT**

**Brief Introduction**

Ms. Evis Neverlane Stephens is a tragic victim of a foreclosure rescue scam, engineered by the defendants. Often, these homeowners facing foreclosure are desperate enough to try any offer that looks like it may save their home, even if it costs thousands of dollars or puts the homeowner's equity at risk. Foreclosure rescue scammers take advantage of homeowners' desperation through a variety of schemes. When homeowners have significant equity in their homes or when property values are appreciating, foreclosure rescue scams often focus on obtaining title to the home and robbing homeowners of their equity. When homeowners have little equity, scams center on squeezing upfront fees—often thousands of dollars—from borrowers. There are

many different types of foreclosure rescue scam. Most foreclosure rescue scams fall into one of three categories: phantom help, obtaining title by fraud or deception, and obtaining title through a fake bailout. The homeowners believe they are obtaining refinancing or a new loan and do not realize they are surrendering ownership of the house. The homeowners may truly sign the papers transferring the home, but the transaction is confusing and the homeowners are misled about the nature of the papers they are signing. Or it could be a "bailout" in which the homeowner typically understands that they are signing a deed to transfer ownership of the home, but they are doing so in the belief that they will be able to regain ownership at a later time. Meanwhile, the homeowner becomes a tenant in their own home on terms that are often oppressive and unaffordable, ending with eviction. The rescuer may even renege on promises to pay off the mortgage, leaving the homeowner liable for loans on a house they no longer own. Sometimes the rescuer goes even further—selling the house to a third party or mortgaging it and pocketing the proceeds. Law enforcement authorities are aware of these horrible predatory practices.[1]

The Defendants here used a hybrid approach convinced Ms. Stephens that she has to transfer the title to their company and charged her $10,000 for rescuing her home with the promise that once the loan is modified with the help of their company they would revert the home back to Stephens. Ms. Stephens's expectation was that the transaction will help them retain possession and ownership of the home. During the transaction homeowners surrender title to their home with the expectation that they will be able to remain in the home as a renter until they are able to repurchase the property. However not everyone is lucky[2] to come out unscathed out of this heinous

[1] https://ag.ny.gov/press-release/2020/attorney-general-james-launches-protect-our-homes-initiative-combat-deed-theft; https://www.nysenate.gov/newsroom/press-releases/velmanette-montgomery/governor-cuomo-signs-montgomery-weinstein-deed-theft

[2] *In re Wells*, 2016 WL 5819798, at *1 n.2 (Bankr. S.D. Fla. Oct. 5, 2016) (after stating that consumer debtor was contacted by foreclosure rescue company, entered into sale-leaseback to save home from

quagmire of scheme predators like the Defendants. Immediately after the transfer of the title the Defendants commenced eviction proceedings[3] against Ms. Stephens and her family members. The whole family has been put to severe torture, criminal threats and as well as eviction proceeding. Now upon further discovery, it has been found that defendants obtained a commercial loan with the active assistance of the complained defendants to pay off the earlier residential mortgage. This commercial loan has an interest rate that exceeds consumer loans usual interest rates, with a default rate of 24%. Now the said loan is also in default rapidly devouring any and all equity in the house. Defendants acted, colluded as a team to achieve this unlawful deprivation of Debtor's home and defendants unlawful monetary gains.

## SUBJECT REAL PROPERTY

1. The real property (Home) which is the subject of this action is a single two family house located at 127-06 177th Street, Jamaica NY 11434, more particularly described as:

> LOT 0093; BLOCK 12527 AS PER MAP RECORDED IN BOOK OF/IN THE OFFICE OF THE COUNTY RECORDER OF QUEENS COUNTY,

hereinafter refer to as "subject premises", or "plaintiff's home" or "Real Property" or "Home."

## JURISDICTION

---

foreclosure and successfully exercised option to repurchase, court noted "The Court is very familiar with these foreclosure rescue schemes and is amazed that, at least in this instance, the homeowner was able to successfully recover ownership of the home.").

[3] See, e.g., *In re* Lima, 2012 WL 3070569 (Bankr. D.R.I. July 30, 2012); *In re* Davis, 169 B.R. 285 (E.D.N.Y. 1994).

> In In re Davis the lease agreement required monthly rent payments that were clearly unaffordable and required an entire year's rent upon default. Within one month after the sale-leaseback transaction closed and two weeks after the first rental payment was due, the purchaser had perfected a judgment against the former homeowners for a full year's rent and cost and obtained a warrant of eviction for nonpayment of rent.

2. This Court has jurisdiction over the claims for relief under 18 U.S.C. §§ 1964(a) (Equity) and 1964(c) (Right to Sue and Treble Damages); 28 U.S.C. §§ 1334 (bankruptcy); 28 U.S.C. §§ 1331(federal question) and 28 U.S.C. § 1367 (supplemental jurisdiction over state claims).

**PERSONAL JURISDICTION AND VENUE**

3. Personal jurisdiction and venue are predicated upon 18 U.S.C. § 1965(a) and (b) and 28 U.S.C. § 1391(b) and (d) since the Defendants are residents of, have an agent or agents, or transact their affairs in the Eastern district of New York and the acts and occurrences in furtherance of the claims alleged herein arose in the Eastern District of New York, and because the ends of justice require that other parties residing in other districts be brought before the court.

**PARTIES**

4. Plaintiff Evis Neverlane Stephens ("Ms. Stephens"") is a resident of the County of Queens, city and state of New York. She resides in the subject premises, with her family, which she purchased in or around 2006.

5. Plaintiff is informed and believes and thereupon alleges that defendant and participant Maxine Bonaparte ("Maxine") is a resident of the city and state of New York. Plaintiff is informed and believes that Maxine uses several aliases and she has some court records. **Ex. A.** She is also an agent and or an officer of the defendant 12706 Holdings Inc. along with the Lezantonio Woodburn.

6. Plaintiff is informed and believes and thereupon alleges that defendant and participant Lezantonio Woodburn ("Woodburn") is a resident of the city and state of New York. Plaintiff is informed and believes that Woodburn also an agent and or an officer of the 12706 Holdings Inc. along with Maxine.

7. Plaintiff is informed and believes and thereupon alleges that defendant 12706 Holdings Inc. (Holdings) was and is a corporation organized under the laws of the State of New York. Holdings' principal place of business is in New York

8. Plaintiff is informed and believes and thereupon alleges that defendant and participant Charles L Mester (Mester) is a resident of the city and state of New York. Mester is an attorney engaged in the legal professional with an office located at 26 Court Street, Suite 1200, Brooklyn, New York.

9. Defendant Planet Management Group, LLC (Planet Management) is a New York based company operating from 105 Maxes Road, Suite N 205, Melville, New York 11747, which funded and facilitated the transfer of the real property to the Holdings.

10. Planet Home Lending LLC dba Planet Home Servicing (Planet Servicing) is a servicer of the loan funded by Planet Management.

11. Wilmington Savings Fund Society, FSB (WSF) is a Delaware company operating from 500 Delaware Avenue, Wilmington, DE 19801, and upon information and belief is the trustee of the trustee Verus Securitization Trust 2020-NPL1 currently holding the loan note.

12. Verus Securitization Trust 2020-NPL1 (Verus Trust) upon and belief is a Trust presently holding the Note and Mortgage regarding the home of the Debtor 127-06 177th Street, Jamaica NY 11434 (the "Real Property").

13. Planet Management, WSF, Planet Servicing and Verus trustee have been collectively addressed as "Planet Enterprise" for pleading purposes, a reference to one includes reference to the other member of the "Planet Enterprise."

14. Plaintiff is informed and believes and thereupon alleges that at all times herein mentioned:

(a) Holdings formed and used and continues to be used as a mere instrumentality and conduit through which Maxine and Woodburn for convenience, has conducted and continues to conduct their own business;

(b) Maxine and Woodburn governed and influenced and continues to govern and influence Holdings;

(c) There is such a unity of interest and ownership between Maxine, Woodburn and Holdings that the individuality and separateness of Holdings and Maxine and Woodburn did not and does not exist, and Holdings was and is the alter ego of Woodburn and Maxine and merely a conduit through which Woodburn and Maxine performed the acts herein alleged; and

(d) Adherence to the fiction of the separate existence of Holdings would sanction fraud and promote injustice.

## THE PATTERN OF UNLAWFUL RACKETEERING ACTIVITY

15. During the relevant times, the Defendants and Participants conspired with one another to defraud Ms. Stephens and her family members. As part of the scheme to defraud, the Defendants used another participant an attorney Mester to foster an impression of an undertaking to save her house, however all these actors had setup the entire mechanism to defraud Ms. Stephens and her family to divert unlawfully the title of her Home to the benefit of themselves and others who had no lawful right to the title of Real Property. The multifarious racketeering activities through which these broad objectives of the Defendants and Participants were carried out consisted of a complex pattern of individual transactions and groups of transactions. It was a part of the scheme to defraud that Participant Defendants would and did agree and conspire together with the others to devise and participate in a plan of deceit and deception, whereby they would and did abuse their positions of trust and fiduciary relationships with Ms. Stephens; they would and did abuse the discretion granted to them and breach their obligations of loyalty and fidelity and their duty to act honestly and faithfully in the best interests of Ms. Stephens and not for their own self interests; and they would and did use false and fraudulent pretenses, representations and promises calculated to deceive persons of ordinary prudence and due care and make material nondisclosures and concealment of fact and information important to Ms. Stephens in deciding whether to act in the conduct of Ms. Stephens loan modification, all so as to unlawfully, intentionally and willfully, and

with intent to defraud, that is, knowingly and with specific intent to deceive in order to cause financial gain to themselves, procure secretly and divert the title of the Home and profits to themselves to the use and benefit of themselves and others and to the detriment of Ms. Stephens and her family members. Once the transfer of the title to the property was accomplished, the Defendants moved from a subversive to an open notorious conduct including criminally threatening the family members of the plaintiff to leave the house.

16. That scheme to defraud evolved over time as a pattern of racketeering activities that inflicted discrete harms on Ms. Stephens and other family members These discrete transactions and harms are listed herein. Ms. Stepehens and her family, the victims of the unlawful patterns of racketeering activity suffered loss of their only Home.

17. In carrying out the scheme to defraud Ms. Stephens of the title to her home, Defendants and Participants including Planet Enterprise engaged, *inter alia*, in conduct in violation of Federal laws, to wit: mail fraud in violation of 18 U.S.C. § 1341; wire fraud in violation of 18 U.S.C. § 1343; violations of the Currency and Foreign Transactions Reporting Act, 31 U.S.C. § 5313; interstate transportation of persons and of property obtained by fraud in violation of 18 U.S.C. § 2314; and Hobbs act extortion in violation of 18 U.S.C. §1951.

18. In carrying out the scheme to defraud Ms. Stephens, Defendants and Participant also engaged, *inter alia*, in conduct in violation of the laws of the State of New York including to wit: Deed theft in violation of NY RPP § 265-a. Home equity theft prevention.

**Factual Background**

19. In and around 2006, Ms. Stephens was a home health aide doing live-in-jobs but working part time in different homes from 9am in the morning to 9 pm. She worked very hard, at times she

would work all night and get off 9 am next day to go to another house. Sometimes she worked 24 hours living in cooking, washing, cleaning, doing laundry shopping, taking elderly people to their doctor's. Her salary was $1,000 a week. She got paid weekly. She saved around $10,000 and wanted to a buy a house.

**Mortgage broker Osmond Decoteau**

20. While attending a church service, Ms. Stephens asked another parishioner if he knew any he knew any broker or a real estate agent. Ms. Stephens wanted to buy a home. After looking for some weeks she finally saw a home she liked. She went with the broker Osmond Decoteau (Osmond) to check it out. It was a two-family house priced at $650,000. The broker told her not to worry about the monthly payments as that would be affordable and he would help her get the house with zero percent down payment. Ms. Stephens attended the closing of the house, however her nightmare started when she started getting mortgage statements from banks regarding other properties that she never bought. Osmond used her credit and bought other properties in her name without her knowledge or understanding. Also, her mortgage payment on her home was not $2500 as she was told rather sum exceeding $5000 a month. Alarmed, Ms Stephens called Osmond several times, however he kept assuring her that he would call her back. Which he never did. Ms Stephens was stuck with the properties bought in her name and also with a high mortgage payment on her house. Ms. Stephens was contacted by the FBI special agents regarding Osmond. Osmond was shortly thereafter indicted, however he used insanity as a plea to his wrong doings and was not convicted. The said three properties are located at 127-06 177 Street Jamaica, NY 11434 (Jamaica House) since 2006; 1487 East 53 Street, Brooklyn, New York (1487 Property); and 844 East 34th Street, Brooklyn, New York (844 Property). The Jamaica House is the prime residence

of Ms. Stephens. And she is in possession of the same, but ownership has been stolen from her by the aforesaid Defendants.

21. The obligation of the mortgages on three properties burdened Ms. Stephens and her health started failing. She lost her good credit owing to damage caused by the broker Osmond

22. She struggled to pay mortgages on the subject property her home. In order to make mortgage payments, Ms. Stephens rented out the top floor for a sum of $2000 a month. However, the tenants fell behind in their payments. Ms. Stephens got into a loan modification with the bank with the payments now reducing to $2500. Owing to financial strain and failed health, Ms. Stephens once again fell behind in her payments and once again there was the foreclosure proceeding against her house.

**John Clark, Herkimer Realty One and Maxine Bonaparte**

23. Meanwhile Ms. Stephens other two properties payments were already in default and she sought help. Around in 2010, Ms. Stephens was referred to one John Clark (Clark)running an office under his company Herkimer Realty One (Herkimer). Clark claimed expertise in loan modifications. Clark introduced Ms. Stephens to Maxine Bonaparte (Maxine) in 2017/18. Maxine spoke to Ms. Stephens and told her that she would help her out from the mortgage issues and she offered to get the loan transactions transferred to Ms. Stephens's husband name if he had a good credit history. She took $1500 from Stephens to check Ms. Stephens husband, Calivin Stephens' credit history.

24. Maxine came by Ms. Stephens home to talk at length about saving her house. She told Ms. Stephens that she has some bad news that her house is on the "steps," to be sold and that she could save it. She further suggested that the only way she could save it is to follow her in every manner.

She suggested that the title of the Jamaica House has to be transferred to her friend's name or a company and that she would have it retransferred back to her once the property is saved from foreclosure. She also suggested that she could also do something for her houses in Brooklyn and get $150,000 out of them and she could use that money to save her home. Ms. Stephens agreed to do anything to save her home, the Jamaica House. Meanwhile owing to the stress, in 2018 Ms. Stephens suffered a head stroke. Ms. Stephens also developed high blood pressure, as she was breaking down under the pressure of the mortgage payments.

25. Maxine demanded $10,000 to save the Jamaica House. She was paid that amount by Ms. Stephens. **Ex. B.** Ms. Stephens had to borrow the same amount and same was sent to her from her son in law. Maxine told her that $10,000 would be given back to her once everything is under control. However, Maxine instructed Ms. Stephens to leave the beneficiary's name blank and she suggested that she would fill it up. Ms. Stephens wrote two blank checks $5000. Copies of the Checks retrieved from the bank shows that Maxine had made the checks payable to KE2Contract LLC and 160 21 Avenue Corp. Maxine also suggested that she has a special lawyer Mr. Charles Mester, who is an expert in complex deals and that he is going to help Ms. Stephens in saving the house.

**Charles Mester, Attorney at Law**

26. Around September 21, 2018, Maxine came to Ms. Stephen's house to pick her up and drove to attorney Mester. In his office, Maxine spoke about the legal issues to which Mester said that he is going to help. Mester also offered to help Ms. Stephens regarding her Brooklyn properties. Attorney Mester had a retainer dated September 21, 2018 (the "Retainer") executed between Ms. Stephens and his office. The Retainer in its very first paragraph states the following:

> Thank you for meeting with me in relation to retaining CHARLES L. MESTER, ESQ. ("Attorney") to provide legal services to you in connection with your prosecution of civil litigation involving the real properties located at 1487 East 53rd Street, Brooklyn New York, and 844 East 34th Street, Brooklyn, New York and ***sale of leaseback of the real property located at 12706 177th Street, Jamaica, New York.*** This letter, when fully executed, confirms that the Attorney will represent you in the above referenced matters. This engagement does not include any appeals work, which would only be handled after a separate agreement and retainer is agreed upon at the appropriate time. . . .

**Ex. C. Retainer** (emphasis added). In this meeting, once Ms. Stephens had talked about circumstances and the mortgages on the properties, Mester told her to step out of the office and leave Maxine and him alone in office. Ms. Stephens went out of the office and waited for Maxine to come out. However, after half an hour wait, Ms. Stephens was called back and made to sign some papers as the Retainer. Mester promised that he is going to be saving Jamaica House and as well as other properties. Ms. Stephens expressed deep concerns about the ongoing foreclosure of Home. Mr. Mester assured her that he will have her Home.

27. Mester met Ms. Stephens only twice. Once at the signing of the Retainer and second and last time at the time of Deed transfer of Ms. Stephens Jamaica House. Till date there is no litigation undertaken by Meseter regarding properties that he promised to do.

28. In and around March 2019, Maxine along with Lezantonio Woodburn (Woodburn), once again came to Ms. Stephens to pick her up and take her to the closing to save her house. Ms. Stephens found herself in an office with a long conference table. Ms. Stephens met Mester and another attorney claiming to be an attorney for Woodburn. There were some other people, whom Ms. Stephens could not recognize. Upon information and belief the Planet Enterprise was present throughs its agents. Mester on the conference table slides the paperwork to Ms. Stephens and pointed out the exact places where she had to sign. She signed those papers. Mester did not explain

the contents of the papers, nor was she told the reasons for such signing, other than that this was to save her house. Ms. Stephens spent approximately two hours in the conference room. When the people at the table started leaving, Ms. Stephens asked for copies of paperwork. Neither Mester nor Maxine provided any paperwork. She did pick a paper which purports to be a loan term sheet. The Planet Enterprise did not provide her with any paperwork, nor did they disclose to her that they are facilitating the funding of the transfer of the property. While Maxine was driving Ms. Stephens back to her house, Ms. Stephens asked Maxine about the paperwork. Maxine assured her that she would soon get her copies of what was signed. Woodburn who was also in the car, told Ms. Stephens, "Don't worry, I do not need your property. I will give it back to you." This only confused Ms. Stephens. She could not understand what Woodburn meant because she had not given her property to anyone. Till date, Maxine has not been provided the paperwork signed by Ms. Stephens.

29. Upon information and belief, Mester is Maxine and Woodburn's attorney for their businesses and other ventures. The Retainer also has Maxine signature as Mester's client. There was no money paid by Ms. Stephens, as she was told that Mester had an understanding with Maxine. Upon information and belief, even though Mester had a retainer agreement signed with Ms. Stephens, he unethically represented both the 12706 Holdings Inc. and Ms. Stephens.

30. Upon information and belief Mester prepared (or caused to be prepared) both any paperwork related to Purchase and Sale Agreement and Transfer Ownership Agreement. Mester misrepresented the terms of both documents to the Ms. Stephens and urged her to sign them while never advising her to have them reviewed by independent counsel, knowing that she was under duress as she did not want to lose her Home. At no time did Mester, Maxine or Woodburn inform Ms. Stephens that, on information and belief, they had a beneficial interest in 12706 Holdings Inc.

Ms. Stephens did not fully read or understand either agreement, a fact of which defendants were aware or should have been aware. In addition, defendant Mester unduly pressured Ms. Stephens by, among other things, have her signature under the threat of loss of her home. However, trusting and believing that defendant, as her attorney, was acting in her best interests, plaintiff signed the documents in reliance on Attorney's statements and assurances.

31. Within a day or two of the said closing, Maxine instructed that Ms. Stephens to make a payment of $2500 per month as a mortgage payment while the property is in third party's name. No paperwork was given to Ms. Stephens explaining her situation and or the paperwork. After the closing, Ms. Stephens kept her promised started making regular payment of $2500 every month until December 2019. As around this time, Maxine stated coming to the subject property and started screaming at Ms. Stephens: I *want you to start paying rent, you have to start giving me your rent money. You cannot afford to buy this house you cannot afford this house*." Ms. Stephens contacted attorney Charles who just advised her," "if you cannot afford to buy the house continue paying your rent." At the time Ms. Stephens called Charles, she heard Maxine in the background. Not a single week passed by, after the signing of housing saving documents, that Maxine would not come by the House screaming and threatening the family members of the Ms. Stephens's household to leave.

32. A few days there, Woodburn turned up at Ms. Stephens' home. He also accused Ms. Stephens of not paying the mortgage on the house. When he was told by Ms Stephens that she is regular with the mortgage, he told her that it was not sufficient to meet the entire mortgage amount. He also instructed them to leave the house as he had to renovate it. Ms. Stephens advised Woodburn that she has been carrying out the regular renovation and that she had spent $1500

fixing the sewer. Meanwhile the boiler at the house broke down. Ms. Stephens had to pay for the same.

33. Before the Covid-19 closure, one day around 9 PM Woodburn accompanied with a Notary came to meet Ms Stephens with a copy of an agreement titled as **Contract-Use and Occupancy Agreement for 127 06 177th Street Jamaica New York 11434** (Occupancy Contract). **Ex. D.** He told her that the monies being paid is not enough and said that if they want to stay in the house, they will haves to sign the Occupancy Contract. Fearing that they would lose the house, Ms. Stephens and her husband under duress signed the Occupancy Contract. The Occupancy Contract makes the following declaration:

> This agreement dated January 1, 2020 is between the **owner 12706 Holdings Inc and** the **occupants, Calvin Stephens, Evis Stephens, John Doe(s) and Jane Doe(s). The owner 12706 Holdings Inc has agreed to:**
>
> **Sell** the property known as **12706 177th Street .Jamaica NY 11434 Block: 12527 Lot: 0093.** To Calvin Stephens, Evis Stephens, John Doe(s) and Jane Doe(s) in Two Years and Three Months.
> This agreement is for Two Years and Three Months.
>
> **NATURE OF OCCUPANCY:**
> Calvin Stephens, Evis Stephens, John Doe(s) and Jane Doe(s) will occupy the property as licensee only and **not as Tenant.** The seller confirms and the occupants agrees that they do not have the rights as tenants as in Landlord and Tenant law.
>
> **TERMS:**
> .
> From 1/1/2020 to 4/1/2022, Calvin Stephens, Evis Stephens, John Doe (s) and Jane Doe(s) will Occupy the property at unit 1 for a fee of $1500.00 each month. The fee is due on the 1st of Every month. Occupants will pay the Gas and Electric bill for Unit 1, $150.00 every three months for Water Bill in Unit 1. Washer and Dryer area must be kept clean and clutter free in the basement.
>
> Basement will only have a Sofa, TV, pantry and closet. Basement will not be a storage space for boxes, barrels or any other items

except items listed above. Any disregards for the rule will result in a fee in the amount of $1000.00. No storage in the boiler room. No allowing children to
write on the walls, doors, closets or the walls, hook basketball hoops to any walls in the house.
Areas must be kept clean in the house.

Empty rooms cannot be storage space. A bed, dresser or TV in rooms only.

Kitchen must be kept extremely clean. No grease on the walls or floors.

Living Room must be clutter free, Sofa, TV and dining furniture.

**NOTICE:**

The occupants will be responsible for all and any damages to the property that occurs during their stay.

The damages include the backyard. The shad will not be overstocked with items not used. No storage of unused items in the shad. No storage on the property, (backyard) The seller will provide back yard furniture for the summer months. Shad must be able to store the lawn
furniture.

The occupants must keep the front area of the property sweep clean, garbage in provided cans.
Garbage put on curbside on destinated days, including recyclable.

If the property 127 06 177th Street Jamaica NY 11434 is damage at any time the occupants will pay to repair or be prepared to move out. The occupants must call the owner for any repairs.

If the occupants cannot purchase the property at the end of the contract agreement, the Occupants agree to move out of property, 12706 177th Street Jamaica NY 11434 without argument in 30 (Thirty days) from the expiration of the agreement.

**The property 127 06177th Street Jamaica NY 11434 has, new roof with new leaders' new**
**kitchen, bathrooms. Hallway walls have been repaired and painted. Bathrooms has new vanities, toilets and painted. Walls have been repaired and painted. Bedrooms has been painted.**

**New back yard fence and landscape cemented back yard.**
**Front of house**
**landscaped and painted. New three security Doors. New Shad 10 x 12.**

**Owner shall expect unit one to remain in the rehab condition during the agreement period including back yard. Property must be appraisable after two years and three months, if not the occupants must cure any damages to pass the appraisal or move out. The Stephens, John Doe(s) and Jane Doe(s) can move out at any time prior to the next month payment.**

****** The damage sewage line has been repaired; lead water line has been replaced****.**
****** Please take note the rules must be followed. If not, the owner can demand you to move out of the property asap.******

The signatures are acknowledgment of this agreement:

**/s/ Lez Antonio Woodburn**
**/s/ Evis Stephens**
**/s/ Calvin Stephens**

Notary Notary acknowledges the signatures of, Lez Antonio W oodbum, Evis Stephens, and Calvin Stephens on this.

**Ex. D. Occupancy Contract.** However, lot of the alleged improvements are a false statement in the Occupancy Contract, which Ms. Stephens signed out of fear. She and her husband did not want to lose their home. They had no choice; they were expecting that their house would be reverted back to them.

34. Maxine thereafter immediately moved to take possession of the house. She changed the locks the house. She also told Ms. Stephens' relatives that she and Woodburn were the new owners and that they will have to pay her $1000 a month in rent and also demanded Ms. Stephens to pay at least $3000 in rent. Maxine also brought several people into the house with one pretext or the other. Once she came removed all the curtains of the house and removed towels from the bathroom. Woodburn accompanied her in few of these visits. Maxine and Woodburn also took possession of

the one of the rooms of the house and rented it to a third party. On or about August 20, 2019 and continuing even now, Maxine and Woodburn placed notices at the house of Ms. Stephens claiming that the house driveway does not belong Ms. Stephens and that should she park her car, it would be towed away. On September 25, 2020, Woodburn left a notice at the house: "You were told to not park in the driveway, Today is your Final Warning—You will not get another. The cars will be towed." **Ex**. **E**. The house utilities were changed. Woodburn and Maxine created new accounts. Con Edison refused to accept payments from Stephens and Defendants did not make payments for the utilities, as a result of which there were final disconnection notices that kept coming to the house.

35. On or about April 10, 2020 Woodburn through his company 12706 Holdings Inc. issued a "Cancellation of contract—Use and Occupancy Agreement." **Ex. F**. The Notice stated the following:

> The agreement dated January 1, 2020 between the owner, 1206 Holdings Inc. and occupancy, Calvdin Stephens, Evis Stephens, John Does and Jane Does is terminated as of April 10, 2020.
>
> The owner 12706 Holdings Inc. has decided to cancel the Contract—sue and occupancy agreement to purchase, 12706 177th Street, Jamaica, NY 11434, Block: 12527 Lot: 0093 and reside at the property.
>
> The Short Sale liquidation is an Arm's length transaction. It does not allow the homeowner, and all occupant that resides at the property to continue residing for more than 90 days, however 12706 Holdings has given the homeowner a and the occupant more than a year. The homeowner signed the Affidavit of Arm's length Transaction at closing.
>
> 12706 Holdings Inc. has given the occupants and homeowner more than one year to relocated, which can be common a nd customary in New York, however the homeowner and occupants must vacate the property. Use and Occupancy fees, all utilities services charges continue until the occupants move.
> /s/_____________
> Owner, 12706 Holdings Inc.
> Lez Antonio Woodburn.

**Holdings Notice of Cancellation. Ex. F.**

36. On or about May 5, 2020, Woodburn issued an eviction letter to Ms. Stepehens and her husband, wherein, he made the following statement:

> Please take notice the use and occupancy agreement is cancelled as of April 10, 2020. The agreement can not be validated, due to the Arm's length Transaction.
> The occupant must be out of the above property by June 1, 2020. All owed Use and occupancy fees, Water bill, and utilities will be deducted from the refunded $10,000.

Letter May 5, 2020 (Eviction Letter). Woodburn also on September 1, 2020 and November 2, 2020 signing letter as owner also issued a 10 Day notice to quit. **Ex. G.**

37. Finally, Maxine commenced an eviction proceeding against Ms Stephens and her family with the Queens Housing Court (LT-058417-20/QU). Also on or about October 2, 2020, Holdings and Woodburn as plaintiffs commenced a breach of contract and negligence action against Ms. Stepehens and her family claiming money damages of $45,000. In the complaint with the Supreme Court, Woodburn and Holdings claimed the following:

> The Complaint of the plaintiff, Lezantonio Woodburn, respectfully shows and alleges as follows:
>
> The defendants Evis Stephens, Calvin Stephens, John Does, Jane Does principal address is 12706, Jamaica NY 11434.
>
> The property was sold on March 27, 2019 to 12706 Holdings Inc. & Lezantonio Woodburn as a short sale for $350,000. The premises had extensive repairs to the sum of $250,000.
>
> Ms. Evis Stephens signed an affidavit of Arm's length transaction which allows the mortgage holder (seller) to remain in the premises as a tenant for a short term, nor more than 90 days after the sale. The defendant tenancy expired June 27, 2019.
>
> Ms. Evis Stephens, Calvin Stpehens, John Does and Jane Does continue to live in the premises 12706 177th Street, Jamaica NY 11434 from July 2019 to current date in 2020(October) without paying use & occupancy, Con Edison, National grid $ Dep Water bill.
> The defendants made several promises to move out of the premises. Each time myself or partner tried to get a move out date, Ms. Evis Stephens would use her health as a reason she could not find new location to move.

January 1, 2020, an agreement was crated signed by all parties. The defendants made 1 payment which wqs later. The agreement was cancelled three months later.

Ms. Evis Stephens stated she was not going to pay any bills & I would have to take her & her family to court.

As the Plaintiffs I am requesting the court to grant me use & occupancy from August to December 2019 : 1500 x 5: $72, 5000 & January to current (October) 2020 10 x 2500=25,000; national grid: $1500 con Edison & 1600 Dep Water bill $ 1000.

All frees to continue to be paid until defendants move out or evicted Secondly to order the defendants to pay all bills owed.

Evict The defendants based upon breach of Contract with the bank's arm length transaction.

As the Plaintiff, I have lost buyers, income and late mortgage payments. I am forced to spend my personal money to maintain the bills.

The defendants Calvin Stephens works at Marlene Union 301 Nicklane, Malevene NY 11566. He is currently employed.

Ms. Evis Stephens works off the books at a home in Long Island, NY.
Jane Does John Does doesn't work. She is at premise all days. The Stephens had no hardship in he pandemic, neither parties did not stop working in the pandemic.

The defendants do not want to move. The defendants do not want to pay any bills for the premises which they lived for one year and 7 months.
The defendants dont qualify to purchase the property 12706 Jamaica NY 11434.

The defendants are causing plaintiff extreme hardship, credit & income has been affected.

Currently I have a buyer, which took me 5 months to vacate the buyer. The lack of cooperation from the defendants is making the sale difficult. I cannot maintain the house with my personal funds.

*Verification*

*Lezantonio Woodburn*, being duly sworn, deposes and says: I am the plaintiff in the above entitled action. I have thread the foreign complaint nad know the contents thereof. The same are t4rue to my knowled.ge, exception as to matter there in stated to be alleged information and beliefs and as to those matters I believe them to be true.

Supreme Court, Queens County Complaint. **Ex. H.**

38. On or about November 2, 2020, Woodburn issued another 10 days' notice to quit upon the plaintiff and her husband. The Notice stated the following:

> PLEASE TAKE NOTICE, that you are and all other persons occupying the subject premises are required to quit and vacate the premises on or before November 16, 2020.
> You are in possession of the premises after the short sale. Ms. Stephens and her family were permitted to stay on the premises after the short sale for a shorter term to facilitate new location but longer than (90) ninety days. The shorter term to stay on the premises expired on June 30, 2019. Evis Stephens signed the affidavit of arm's length transaction.
> Your rights to occupy the subject premise has been revoked by 12706 Holdings Inc.
> PLEASE TAKE NOTICE, that if you a and all other persons fail to quit, vacate or surrender the subject premises by November 16, 2020, the undersigned will commence summary proceeding against you.
> Daed: November 2, 2020
> 12706 Holdings Inc.
> s/________________ Landlord

39. On November 9, 2020, Ms. Stephens and her daughter filed an order to show cause for a finding of harassment and for a restraining order with the Housing Court. The Court found conduct of the defendants as harassing and restrained the defendants Maxine and Woodburn from acting in an improper manner. **Ex. I**.

40. On April 7, 2022, around 12:30 PM, the Debtor and her family saw Ms. Bonaparte parked a dark blue Honda in front of the house. Ms. Bonaparte did not come out of the car. The Debtor's family called 911 explaining that she had parked her car. Almost an hour later the police came and talked to the Debtor and Ms. Bonaparte. Ms. Bonaparte told the police that the Debtor and her family should not be parking their car in house driveway. The police officers demanded proofs of the Debtors' residence which was duly provided. At the same a toll truck came by. One of the police officer went to the toll truck to tell them that Debtor's has properly utilized her driveway and that the toll truck absolutely could not remove the Debtors car. And the police left having

instructed the Debtor that in case Ms. Bonaparte calls any towing truck on them, they should call the police.

41. On or about April 19, 2022, the family of the Debtor realizing that there was no heat in the house went to the basement to check the boilers, they found out that the two boilers have been turned off. It was found when Debtor's family wasn't there, Ms. Bonaparte came to the House and turned off the boilers to forcibly evict the family from the house.

42. Perforce under the foregoing circumstances, Ms. Stephens not wanting to lose her house had to seek bankruptcy protection in November 2021.

43. Upon learning of the existence of the subject grant deed, plaintiff thereupon executed a notice of rescission pursuant to NY RPL 265-a on November 18, 2021, of the subject grant deed and attempted to have the same recorded with the county. Till date, the defendants have not responded to the said notice.

44. On date of the transfer of the subject property to defendants, the approximate value of the subject property exceeded $850,000. It is a two-family house.

45. Pursuant to Defendants own admission, the Defendants took title to the property by a payment of a sum not exceeding $350,000 to Ocwen bank, thus fraudulently depriving the plaintiff of her Home.

46. All exhibits attached hereto are incorporated by reference.

**Unraveling of the Fraud, Mail and Wire Scheme**

47. Maxine and Woodburn were the foreclosure rescue experts as is unraveled by the paperwork filed in the state court and with this Court regarding lifting stay. Maxine charged a sum of $10,000 for help Ms. Stephens to negotiate her loan. The checks dated December 7, 2018 were taken in blank by Maxine**. Ex. B**. Maxine along with Woodburn and attorney Mester provided a

platform to foster an impression upon Ms. Stephens that a genuine effort is being made to protect her house and negotiate a loan deal. However, it was a scheme to take over Home of Stephens. A House exceeding $850,000 was transferred to wholly owned corporation of defendants Maxine and Woodburn, called Holdings at a purchase price of $350,000. It was a termed short sale.

48. Maxine and Woodburn had already started working on this conspiracy to take over the house, way before June 2018, when they incorporated 12706 Holdings Inc. on June 20, 2018.

49. Maxine took Stephens signatures on papers which prepared by the defendants are presently in exclusively custody of Defendants, which clearly upon information and belief must have shown the value of property at a depressed level.

50. Ms. Maxine and Woodburn mailed several documents to Ocwen to facilitate the short sale as a means of taking over the house of Ms. Stephens. The date of mailing and all correspondences is strictly within the custody and control of the defendants.

51. Maxine to show that she is financing the deal to help the family, took out a loan application to be signed by Mr. Calvin Stephens, husband of Ms. Stephens. In the residential loan application form, she had it filled gave it to Mr. Stephens to sign the same which was signed by him. It is unclear if the same application has been used by the Defendants. **Ex. J**. However, the Defendants here in the loan application showed the value of the Real Property at least $725,000 and the same Defendants negotiated a settlement of Real Property at $350,000.

52. At a closing which was supposed to be a loan modification for Ms. Stephens, she was made to sign deed transfer papers. On or about July 19, 2019, one Nathaly Chilliest, Esq. and United American Title Agency on behalf of the defendants, caused to be mailed and registered via electronic means a deed registration with the Queens County records as a part of their taking over

of the house of Ms. Stephens. The Planet Enterprise assisted, aided and abetted the alleged loan modification or funding the transfer of the Home from the Debtor to the Holding.

53. On or about October 2, 2020, Woodburn caused to have summons issued from the Queens County State Supreme Court along with a complaint claiming breach of contract and negligence claiming money damages of $45,000 and mailed them to Ms. Stephen with full knowledge that there was neither a breach of a contract or negligence and that Ms. Stephens was the actual owner of the house.

54. On or about September 28, 2021, the Defendants Holdings and Woodburn and Maxine caused to be issued by the Civil Court notice of Court date for ejectment proceedings of the Plaintiff from the subject property. The video conferences initially set by the civil court was not attended by the complaining defendants. Once the civil court heard the matter, it was brought to their attention that the Ms. Stephens has filed for bankruptcy, that the court after a couple of hearing decided to stop the proceeding.

55. Both the Defendants, Maxine and Woodburn used threats of immediate ejectment from their home unless they had signed the agreement to buy back and also, to acknowledge false claims of improvement on the real property. On January 2, 2020, Woodburn made Ms. Stephens and her husband sign Contract-Use and Occupancy Agreement making Ms. Stephens and her husband acknowledge that Woodburn has carried out stated repairs on the property, when in fact no such repairs etc. were carried out. Also, by virtue of the signing of the said agreement, the Defendants made them a vendee of the real property and that they had to buy the real property in two years and three months from January 1, 2020. **Ex. D.** However, around March 30, 2020 (as disclosed by Holdings Motion in the Court), Woodburn makes an Amendment to Use and Occupancy agreement. **Ex. K**. He authors the following amendment:

> The previous agreement dated January 1, 2020 between the owner , 12706 Holdings Inc and occupancy, Calvin Stephens, Evis Stephens, John Does and Jane Does is hereby amended to:
>
> Unit 1(Floor 1) no basement usage, please remove your washer and dryer. The backyard is not usable. The shad is just for the 12706 Holdings Inc. Items.
>
> The occupants can continue to put the garbage in the can. The recycles go in the recyclable garbage can, as of, April 10, 2020 is the start date, please put recyclable items in the can.
>
> 12706 Holdings Inc. is adjusting the two years and three-month purchase agreement to:
>
> One year (January 01, 2021) due to the Stephens inability to get financing as of 10/10/19, 2019 to purchase 12706 177th Street Jamaica NY 11434 and the Arm's length agreement expired on June 27, 2019.
>
> If the Stephens cannot ger the finance to purchase 12706 177th Street Jamaica NY 11434 by the end of this contract, they agreed to vacate 12706 177th Street Jamaica NY with their family members on floor 2 within 30 days.
>
> The signature are acknowledgment of the amendment of the agreement.
>
> /s/ Lez Antonio Woodburn
> /s/evis stepehens
> /s/ Calvin Stephens

56. The Defendants enticing the plaintiff to transfer the ownership of the property with the excise to get a loan modification, started tightening the hold over the property, gradually chipping away any right to recover the property, which entailed reducing the buyback time [not disclosing the buyback purchase price], implanting other tenants in the house, removing Ms. Stephens from complete dominion and enjoyment of her house.

57. Woodburn and Maxine used fear of loss of home for the plaintiff, Ms. Stephens to sign an acknowledgment of the alleged investment in the property and as well as the accepting status as a licensee. Both Woodburn and Maxine used wrongful means to achieve ownership of the house on which they had no lawful claim. The Defendants have no lawful claim over the house of the

plaintiff, however under the pretext of loan modification, made Ms. Stephens transfer her ownership and then used fear of eviction from her house to sign Use and Occupancy Agreement. However shortly thereafter within and by April 10, 2020, Woodburn through Holdings terminated the contract as of April 10, 2020. **Ex. L**

58. In furtherance of the scheme to exact and extract monies for work not done and for work allegedly done to the property when the ownership had already been takeover by the Defendants, the Defendants caused a Proof of Claim filed with the bankruptcy court on April 14, 2022 claiming $55,000.

59. On or about April 15, 2022, the Defendant Holdings moved this Court for lifting the stay, which revealed a new set of paperwork. With motion is attached a copy of the contract of sale, which was undertaken to save the plaintiff's house from foreclosure. The Contract is very telling. The Contract dated January 4, 2019 is a residential contract of sale from Evis Stephens to 12706 Holdings Inc. for sale of house for $400,000 (as a short sale) when in fact that the value of the house was not less than $850,000. The Contact is signed by both Ms. Stephens and Woodburn on behalf of Holdings. The Contract clearly an attorney marked contract does not hear the name of the attorney for either parties. The Motion of 12706 also has a copy of the approval of the sale at a discounted price of $337,5000 (payoff amount). The motion also bears a deed transfer from Ms. Stephens to the Holdings and also attached is the HUD- 1 statement. HUD statement reflects no payment to the plaintiff. The HUD statement has figures that makes sense only to the Defendants, especially:

Garrison Construction: $15,000
Khermit Enterprises: $25,000.
Addittional settlement charges for Kermit Enterprise: $7,425.00
Donaldson & Chilliant LLP: $5000
Madison Construction and Development: $22,5000.

**Ex. M. HUD statement**. Upon information and belief Khermit enterprise is a company owned and operated by Maxine.

60. Also listed with the motion is an Affidavit of Arm's Length Transactions, which were signed by the parties including Stepehns and Maxine Bonaparte on the date of the closing, the form which was pre-marked "sign here." Also in this affidavit, Maxine Bonaparte signs both as a the Seller agents and as well as the Buyer's agent. Also the Notary notarized the affidavit on March 28, 2019, when in fact the Affidavit shows March 27, 2019 as the date of closing and signing of affidavit. **Ex. N.**

61. Immediately after the transfer of the ownership, the demands of the Defendants increased, from regular payments for an alleged "New Mortgage," for new alleged renovation of the property. Maxine came to the house every week and threatened the family members to leave, changed the locks, dislodged the family from couple of rooms and even turning off the boilers.

62. On or about April 13, 2022, pursuant to the eviction proceedings commenced by the Defendants with the civil court of the City of New York, the Civil Court mailed a letter to Ms. Stephens, scheduling a hearing on May 2, 2022 with a warning: "This is your opportunity to answer the petitioners' motion to proceed with a warrant of eviction against you."

63. The Defendants in a vicious manner took over the property of the Plaintiff by misleading her that they are going to help her negotiate a loan modification and under those excuses, the Defendants manipulated Ms. Stephens to transfer ownership of the house.

**FIRST CAUSE OF ACTION**
**Cancellation of Deed**
**Based upon Forgery or Fraud in Factum**
**(Against all Defendants)**

64. Plaintiff incorporates the allegations contained in paragraphs 1 through 57, inclusive, as though fully set forth at this place.

65. Plaintiff did not sign the subject grant deed nor did she authorize anyone to sign same.

66. Plaintiff never knowingly signed or intended to sign the subject grant deed. Plaintiff signed documents presented to her by Maxine, Woodburn, Mester, Planet Enterprise which they led her to believe were preliminary to an agreement of the parties, and did not intend to transfer title to her home at the time these documents were signed.

67. Because of the forgery of plaintiff's name to the grant deed or the fraud in the factum in obtaining plaintiff's signature, the subject grant deed is null and void *ab initio*.

68. Plaintiff intends service of the summons and complaint in this action to serve as a notice of cancellation of the subject grant deed.

69. Plaintiff is under a reasonable apprehension that the subject grant deed will cause serious injury if left outstanding. Plaintiff now seeks to cancel the subject grant deed.

WHEREFORE, plaintiffs pray for judgment as follows:

a. That this Court declare that the subject grant deed is null and void *ab initio* and of no effect;
b. For costs of suit;
c. For such other and further relief as this court deems just and proper.

**SECOND CAUSE OF ACTION**
**Rescission of Equity Purchase Contract and Grant Deed, Declaratory Relief and Damages**
**(Against all Defendants)**

70. Plaintiff incorporates the allegations contained in paragraphs 1 through 69 inclusive, as though fully set forth at this place.

71. All statutory references in this cause of action are to the NY Real Property Laws unless otherwise indicated.

72. At all times herein mentioned plaintiff was an "equity seller" within the meaning of Section 265-a (2)(f).

73. At all times herein mentioned Holdings was an "equity purchaser" within the meaning of Section 265-a (2)(e).

74. At all times mentioned herein Woodburn, Maxine, Holdings, and Planet Enterprise are an "equity purchaser" within the meaning of Section 265-a, or the "representative" of an equity purchaser, namely Holdings, within the meaning of Section 265-a

75. At all times herein mentioned the subject premises was a "residence in foreclosure" within the meaning of Section 265-a.

76. Because Woodburn, Maxine, Mester are and were Holdings representative and the transaction related to the Real Property facilitated by Planet Enterprise's itself and through their agents, Woodburn, Maxine, Mester, Planet Enterprise are liable for all damages resulting from any action or omission of Woodburn, Maxine, Mester, Planet Enterprise regarding Holdings' acquisition of the subject premises pursuant to section 265-a.

77. In the transaction involving the transfer of plaintiff's the subject premises in foreclosure, all Defendants took unconscionable advantage of plaintiff, in violation of section 265-a.

78. Plaintiff is informed and believes and thereupon alleges that she was never presented with and never signed any equity purchase contract in the transaction involving plaintiff's home in foreclosure.

79. If in fact plaintiff signed an equity purchase contract in the transaction involving plaintiff's home in foreclosure, which plaintiff denies, said equity purchase contract violates Section 265-a in the following ways that are listed by way of example and not limitation:

a. Plaintiff is informed and believes and thereupon alleges that said contract is not and was not fully completed and signed and dated by the equity seller and equity purchaser, in violation of Section 265-a.

b. Plaintiff is informed and believes and thereupon alleges that said contract did not and does not contain: the name, business address, and telephone number of the equity purchaser; the address of the residence in foreclosure; the total consideration to be given by the equity purchaser; a complete description of the terms of payment or other

consideration; the time at which possession would be transferred; the terms of any rental agreement, and the required notice that until plaintiff's right to cancel had ended that she could not have been asked to sign any deed or other document, all in violation of Section 265-a.

c. Plaintiff is informed and believes and thereupon alleges that said contract did not and does not contain a notice of cancellation, in violation of Section 265-a.

d. Defendants did not provide plaintiff with a copy of the equity purchase contract nor the notice of cancellation, in violation of Section 265-a

80. The transaction involving the transfer of plaintiff's home in foreclosure violated section 265-a in the following ways which are listed by way of example and not limitation:

a. Prior to the expiration of the time plaintiff had to cancel the transaction, the Defendants: accepted from plaintiff and induced her to sign the subject grant deed, in violation of Section265-a, recorded the subject grant deed, in violation of section 265-a and encumbered the premises, in violation of Section 265-a.

81. Defendants, violated Section 265-a in the following ways which are listed by way of example and not limitation by not taking the steps including that :

a. "The equity purchaser verifies by appropriate documentation that the equity seller has or is likely to have a reasonable ability to pay for the subsequent conveyance of an interest back to the equity seller. In the case of a lease with an option to purchase, payment ability also includes the reasonable ability to purchase the property within the term of the option to purchase."

b. by entering into an agreement which violates 265-a: "An equity purchaser shall not enter into repurchase or lease terms as part of the reconveyance arrangement that are unfair or commercially unreasonable, and is prohibited from engaging in any other unfair or unconscionable conduct."

82. Because of Defendants failure to comply with Section 265-a as described above, plaintiff elects to have the purported equity purchase contract, if one exists, declared void *ab initio*.

83. As the result of the actions or inaction of Defendants described above, plaintiff was damaged in that a $550,000 in that she is lost that equity of the House.

84. The conduct of Defendants as described herein was and continues to be willful, malicious, oppressive and constitutes an intentional scheme to defraud plaintiff with the intention of depriving her of her home and legal rights. Defendants' actions constitute despicable conduct in conscious

disregard of plaintiff's rights so as to justify an award of punitive damages from Defendants an amount to be determined at trial.

WHEREFORE, plaintiff prays for judgment as follows:

(a) That this court declare that the equity purchase contract if any is null and void *ab initio*;
(b) That this court declare that the subject grant deed is null and void and that defendants required to deliver same to the clerk of the court for cancellation;
(c) For actual damages in the amount of $550,000 of loss equity and $25,000 penalty for each violation of section 265-a.
(d) For exemplary damages against Defendants in an amount to be determined,
(e) For reasonable attorneys fees and costs of suit;
(f) For such other and further relief as this court deems just and proper.

**THIRD CAUSE OF ACTION**
**Quiet Title**
**(Against all Defendants,**
**and Does 1 through 200, inclusive)**

85. Plaintiff incorporates the allegations contained in paragraphs 1 through 84, inclusive, as though fully set forth at this place.

86. Defendant Holdings and Woodburn claims that they owns the subject premises in fee simple absolute pursuant to the subject grant deed.

87. The Defendants claims that they have invested monies on the property in terms of repairs etc.

88. Plaintiff owns the premises in fee simple absolute, and free and clear of any purported encumbrance created by the Defendants.

89. The claims of Defendants are without any right whatsoever and such defendants have no right, title, estate, lien or interest whatsoever in the subject premises, and never had any right, title, estate, lien or interest whatsoever in the subject premises, due to the fact that the subject grant deed is a forgery and is void *ab initio* or is voidable under Sections 265-a, and the Defendants were not and are not bona fide encumbrancers.

90. Plaintiff seeks to quiet title as of March 27, 2019, the date the subject grant deed was purportedly signed by plaintiff.

WHEREFORE, plaintiff prays for judgment as follows:

(a) That this Court declare that Defendants have no right, title, interest, estate, title or lien in the subject premises, and never had any right, title, interest, estate, lien or title in the subject premises, and that the subject grant deed conveyed no interest, estate, lien or title to the subject premises to Holdings and that the subject deed created no lien or encumbrance on the subject premises, and that as of March 27, 2019, and from that day forward, plaintiff was and is the owner in fee simple absolute of the subject premises which was and is not encumbered by the subject deed of trust;

(b) For such other and further relief as this Court deems just and proper.

**FOURTH CAUSE OF ACTION**
**Negligent and Intentional Infliction of Emotional Distress**
**(Against all Defendants)**

91. Plaintiff incorporates the allegations contained in paragraphs 1 through 90 inclusive, as though fully set forth at this place.

92. The conduct of Defendants described above was intentional and malicious and done for the purpose of causing plaintiffs to suffer humiliation, mental anguish, and emotional distress.

93. Defendants knew or should have known that their conduct, as described above, would cause plaintiffs to suffer severe emotional distress.

94. As a direct and proximate result of defendants' conduct as herein alleged, plaintiff has suffered extreme emotional distress.

95. The conduct of defendants as described herein was willful, malicious, oppressive and constitutes an intentional scheme to defraud plaintiff with the intention of depriving her of her home and legal rights. Defendants' actions constitute despicable conduct in conscious disregard

of plaintiff's rights so as to justify an award of punitive damages from each defendant in an amount to be determined at trial.

WHEREFORE, plaintiff prays for judgment as follows:

a. For general damages in the sum of Five Hundred Thousand Dollars ($500,000);
b. For punitive damages according to proof;
c. For costs of suit;
d. For such other and further relief as this court deems just and proper.

**FIFTH CAUSE OF ACTION**
**For Violation of New York GBL § 349**
**(Against all Defendants)**

96. Plaintiff incorporates the allegations contained in paragraphs 1 through 60, inclusive, as though fully set forth at this place.

97. Plaintiff is suing both in her individual capacity and on behalf of the general public.

98. Plaintiff is informed and believes and thereupon alleges that beginning at an exact date which is unknown to plaintiff, but from 2000, defendants have committed unfair and fraudulent business practices as defined by New York GBL § 349, by engaging in the following unlawful business practices:

a. In the transaction involving the subject premises in foreclosure defendants violated section 265-a of NY RPL, and engaged in practices which operated as a fraud and deceit upon plaintiff, as set forth above;
b. Defendants have tricked elderly, disabled and unsophisticated homeowners in foreclosure into unconscionable and fraudulent transactions involving their homes in foreclosure, and has thereby gained substantial monies, fees and profits for himself and/or their companies;
c. On information and belief, Maxine and Woodburn have routinely worked together to mislead the homeowners the banks to take over their properties.
d. Planet Enterprise unconscionably taking a lien over a residential home, converting a residential home related loan to a commercial setting up with a default interest of 24%.

e. Upon information and belief, Planet Enterprise routinely have advanced loans and obtained lien interests in the properties with full knowledge that the debtors would not able to service the debt.

f. Upon information and belief, Plane Enterprise routinely have advanced loans to the consumers in violation of state and federal consumer protections, by packaging the loans as commercial ones, despite knowledge that the loans are not for commercial purposes.

99. The acts and practices described above were and are likely to mislead the public and therefore constitute unfair or fraudulent business practices within the meaning of New York GBL § 349.

100. Plaintiff is informed and believes that defendants unlawful, unfair and fraudulent business practices described above present a continuing threat to members of the public and that defendants continue to engage in the unfair and unlawful acts described above.

101. Plaintiff seeks injunctive relief enjoining defendants from engaging in the unfair business practices described above.. Defendants have engaged in deceptive acts and practices by conduct including but not limited to: i) misrepresenting regarding their services; ii) misrepresenting that they resolve the foreclosures issues of the homeowner; iii) failing to disclose takeover of the houses; iv) misrepresenting that the agreements are enforceable when in fact they are void under New York law; v) misrepresenting their ability to help homeowners; vi) advancing loans and obtaining lien on the houses of people who do not have the capacity to pay such debts.

102. Injunctive relief is proper as plaintiff has no adequate remedy at law. Monetary damages will not compel defendants to cease to engage in the unfair business practices described in this action. Plaintiff alleges that the benefit to the public good, as well as to the plaintiff, far outweighs the inconvenience to the defendants of ceasing to engage in the unfair business practices.

WHEREFORE, plaintiff prays for judgment as follows:

a. That this Court enter a preliminary and permanent injunction restraining and enjoining all defendants, and their agents, servants, employees, representatives,

and anyone acting on their behalf or at their direction from engaging in, committing, permitting, or performing, directly or indirectly, any of the unfair business practices described above;

b. For restitutionary damages in an amount equal $550,000, which is the amount of loss of equity;

b. For reasonable attorneys' fees;

c. For costs of suit;

d. For such other relief as this Court deems proper and just.

**SIXTH CAUSE OF ACTION**
**(Violations of New York Judiciary Law§ 487)**
**(Against Charles S. Mester, Esq.)**

103. The Debtor realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

104. New York Judiciary Law§ 487 provides, in pertinent part, as follows: "An attorney or counselor who ... [i]s guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party ... [i]s guilty of a misdemeanor, and in addition to the punishment prescribed therefore by the penal law, he forfeits to the party injured treble damages, to be recovered in a civil action."

105. As set forth above, Mester engaged in an intentional pattern of collusion, wrongdoing, and deceit with the intent to deceive Ms. Stephens. Ms. Stephens thought that she is a meeting a lawyer and he would be assisting her in saving her property. However, he was the cementing factor of the fraud, he gave the impression that he was helping Ms. Stephens save her property, rather he was helping the other defendants in unlawful takeover of her property. Mester assured Ms. Stephens that he will save her home from pending foreclosure. Ms. Stephens shared with him foreclosure actions papers which was pending in the Supreme Court, Queens County.

106. As a result of the deceitful and fraudulent conduct of these Defendants as described in the foregoing paragraphs, Ms. Stephens have been looted of her home and thus has been injured in an amount to be established at trial.

107. Because of the foregoing, Ms. Stephens is entitled to monetary damages against the attorney defendants and the law firm, treble damages, and reasonable attorneys' fees pursuant to judiciary Law § 487.

**SEVENTH CAUSE OF ACTION**
**(Fraud against all defendants)**

108. The allegations of paragraphs 1 – 107 are incorporated herein as if fully set forth.

109. Defendants procured title to plaintiff's home by fraud. The fraudulent conduct included: having the plaintiff sign paperwork transferring ownership with the pretext of saving it from foreclosure; misrepresenting the terms of the Purchase and Sale Agreement and that signing same was in plaintiff's best interests and was the only means of saving her home; misrepresenting the terms of the Transfer Ownership Agreement and that signing same was in plaintiff's best interests and the only means of saving her home; demanding that plaintiff pay $10,000 for their services for professional help; failing to inform plaintiff of the content and significance of the documents they had her sign; failing to advise plaintiff that she should have real estate documents reviewed by independent counsel; and upon ownership change, immediately suing her and her family to claim possession of the real property.

110. Plaintiff relied on defendant's above-described fraudulent misrepresentations, and said reliance was reasonable under the circumstances.

111. As direct and proximate results of defendant's fraud, plaintiff suffered monetary loss and severe emotional distress and mental anguish.

WHEREFORE, plaintiff prays that judgment be entered awarding her compensatory damages, interest, and costs of suit.

**EIGTH CAUSE OF ACTION**
**(Breach of Fiduciary Duty by Mester and Maxine)**

112. The allegations of paragraphs 1 – 111 are incorporated herein as if fully set forth.,

113. As plaintiff's attorney Mester and foreclosure expert Maxine owed plaintiff the highest standard of care commensurate with their position as a fiduciary. Ms. Stephens trusted them and also gave $10,000 to Maxine for her professional expertise.

114. Defendants breached said duty negligently and/or willfully by engaging in the conduct set forth herein and placing their own interests before those of plaintiff, then their client.

115. As direct and proximate results of defendant's breach, plaintiff suffered financial loss and severe emotional distress and mental anguish.

WHEREFORE, plaintiff prays that judgment be entered awarding her compensatory damages, interest, and costs of suit.

**NINTH CAUSE OF ACTION**
**(Against all Defendants)**
**Unconscionability**

116. Plaintiffs repeat and reallege paragraphs 1 through 115 as though fully set forth herein.

117. Throughout the course of the March 2019 mortgage/deed transaction, an enormous disparity in bargaining power existed between plaintiff and defendants. Plaintiff is an ailing minority woman, whereas defendants are seasoned players of the market. The defendants are experienced entities and individuals that sought to profit from the disparity in bargaining power and did so by deliberately targeting plaintiff with misinformation.

118. The terms of the March 2019 mortgage/deed transaction are so one-sided as to be abusive and unconscionable. Defendants exploited the disparity in bargaining power to induce plaintiffs to transfer title to her home and enter a highly disadvantageous equitable loan when plaintiff believed that they were applying for a new mortgage and helping her settle her bank debt and making mortgage more manageable. The defendants Planet Enterprise saddled the Real Property with an exorbitant interest loan with a default interest of 24%. The Defendant Planet Enterprise in collusion with the other defendants obtained inequitable lien on the Debtor's Home. Said

procedural and substantive unconscionability renders void and unenforceable the March 2019 equitable mortgage/deed transfer.

**TENTH CAUSE OF ACTION**
**New York Real Property Actions and Proceedings Law, Article 15**

119. Plaintiffs repeat and reallege paragraphs 1 through 118 as though fully set forth herein.

120. Plaintiffs bring this claim pursuant to Article 15 of the New York State Real Property Actions and Proceeding Law to compel the determination of any claims adverse to those of plaintiffs in the subject premise, the Home. Through this action, plaintiffs seek to quiet title to the subject property by having declared as void the fraudulent deed transfer from plaintiffs to Holding.

121. Plaintiffs was the sole owner of the Real Property. She had bought the subject property in 2006. Public records now suggest that defendant Holdings and Planet Enterprise claim an interest in the property. Their purported interest, and the documents upon which it rests, are void because they were obtained through a conspiratorial and fraudulent scheme that tricked plaintiff into conveying ownership of their home without her knowledge. Alternatively, the deed transfer constituted an equitable mortgage and not a deed transfer.

122. Upon information and belief, no party who is or should be a defendant is or might be an infant, mentally retarded, mentally ill or an alcohol abuser.

123. Upon information and belief, the judgment to be entered in this action will not affect a person or persons not in being or ascertained at the commencement of this action, who by any contingency contained in a devise or grant or otherwise, could afterward become entitled to a beneficial estate or interest in the property; moreover, every person in being who would have been

entitled to such interest in the property if such contingency happened immediately prior to the commencement of this action are parties hereto.

124. Accordingly, plaintiffs request that this Court issue:

a. a declaration that plaintiff is the lawful sole owner of the subject property and are entitled to lawful, peaceable, and uninterrupted possession thereof as against all defendants herein, and as against anyone claiming under them;
b. an injunction prohibiting all defendants, and every person claiming under them, from claiming an estate or interest in, or lien or encumbrance on, the property;
c. a judgment declaring as void the fraudulent deed dated March 27, 2019 purporting to transfer plaintiffs' interest in the property to 12706 Holdings;
d. a judgment declaring as void any interest or lien of the Defendants against the property;
e. damages stemming from plaintiffs' lost rents and other damage in connection with the loss of their exclusive right to use the property in the manner of her choosing; and
f. any other relief that this Court deems just and proper.

**ELEVENTH CAUSE OF ACTION**
**(Violation of RICO, 18 U.S.C. 1962(c))**
**(Predicate of Mail Wire fraud and Hobbs Act against all Defendants)**

125. Plaintiffs repeat and reallege paragraphs 1 through 124 as though fully set forth herein.

126. To carry out its unlawful scheme, the Defendants have conducted a criminal enterprise through a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and (d). Specifically, between 2018 and the present, the Defendants have knowingly and intentionally submitted false and materially misleading declarations under oath with Ocwen Bank, New York State Supreme Court, Queens County and civil court of the same county and as well as this bankruptcy proceeding. While professing to be safeguarding interest of the plaintiff, the Defendants preyed upon the vulnerabilities of the plaintiff and her family and by fraud had her transfer her deed to their own company 12706 Holdings Inc. and then had her signed paperwork under threat. Holdings and the

other Defendants also offered her to sell back the house but without the benefit of the sum particular and also taking away the same option when they had fully entrenched with the property ownership. The defendants also violated Hobbs act by physically threatening the family members to leave the house and forcibly turning off heat and changing locks and also making Ms. Stephens sign paperwork reducing them to licensee. In sum in executing its criminal enterprise, the Defendants crime have included: Mail fraud in violation of 18 U.S.C. § 1341; Wire fraud in violation of 18 U.S.C. § 1343; Hobbs Act in violation of 18 USC. 1951; Unlawful monetary transactions in violation of 18 U.S.C. §§ 1956 and 1957(a); and Bankruptcy fraud in violation of 18 U.S.C. §§ 152(2) and 152(3). The Planet Enterprises aided and abetted the rest of the Defendants in achieving their unlawful results as complained herein.

127. Ms. Stephens is direct victim and target of Defendants unlawful scheme. Defendants' criminal enterprise has caused Ms. Stephens to lose her house with a profit/equity of a sum exceeding $500,000.

128. Ms. Stephens hired to two professionals, Maxine and Mester for dire situation with the home loan. However they saw this as an opportunity to make money and they used unlawful means to achive the same result. Instead of conforming to these requirements fiduciary, Defendants affirmatively misrepresented its disinterestedness and unlawfully concealed its disqualifying connections to parties with clear financial interests in the outcome of the work they had undertaken on behalf of the plaintiff. Mester appeared for both Ms. Stepehns and Maxine Bonaparte. Maxine appeared as the agent for both Ms. Stepehes and her company 12606 Holdings along with Woodburn. Also, Maxine and Woodburn regularly visited the house of Ms. Stephens and threatened her and her family members to leave on every visit to the House.

129. The Defendants engaged in a scheme to defraud Ms. Stephens and other family members through falsity, concealment, and obfuscation of disqualifying conflicts of interest, which thereby deprived Ms. Stephens of a reduced mortgage and her ownership of the house. To achieve complete ownership of the house, with no possibility of reversion of the house back to Ms. Stephens, the defendants made buy agreement without the benefit of the sale price and as well as reducing the buy back period utilitarianly. The Defendants also forcibly managed to took over physical ownership of the part of the house by putting in their own friend in one of the rooms of the house. The Defendants also threatened Ms. Stephens with eviction if she did not sign the agreements which kept changing and were one sided. Ms. Stephens through deception engineered by the defendants lost her house to the Defendants.

130. In furtherance of the scheme, besides threats of violence and eviction, and as described herein, the Defendants prior to the ownership of the house, transmitted, or caused to be transmitted, by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures, and sounds, in violation of 18 U.S.C. § 1343, and also caused matters and things to be placed in a post office or authorized depository or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier, in violation of 18 U.S.C. § 1341. The Defendants' specific mailings and interstate wirings in furtherance of the scheme to defraud included, but are not limited to, the aforementioned, rather there are other numerous mailing undertaken by Maxine and Mester which are solely within the custody and control of the defendants. The mailing was initially undertaken for the purposes of loan modification [or rather short sale] in the name of the plaintiff, but solely for their own ulterior design to takeover the house. The Planet Enterprise assisted rest of the Defendant to achieve their unlawful results including its own lien on the Home of the Debtor.

131. Upon information and belief, the Defendants also used the interstate wires, United States mail, or private interstate commercial carrier to effectuate ownership change of the house of Stephens Evidence of such transactions is peculiarly within the Defendants' knowledge and control and will be proven at trial following discovery.

132. The Defendants also used the interstate wires, United States mail, or private interstate commercial carrier to transfer illegally obtained funds within the United States for the purpose of furthering the objectives of the Defendants. These transfers include the movement of funds in connection with fees of the loan modification, taking money with the sham excuse of making mortgage payments.

133. Each of the Defendants, through their direct or indirect control of the various functionaries, participated in, numerous acts of mail and wire fraud. In particular, each of the Defendants, through their control of and/or participation. Each of the said defendants sent or caused to be sent numerous mail or wire communications, or acted with knowledge that mail or wire communications would follow in the ordinary operation of loan modifications with Ocwen or could reasonably have foreseen that the mails or wires would be used in the ordinary course of business as a result of the Defendants' acts in furtherance of the transactions discussed above, including the uses of the mails and interstate wires Also, Maxine and Woodburn threatened evictions to elicit agreements signatures on the Agreements regarding Use and Occupancy and also acknowledgement of expenses which were never undertaken, solely done to make it impossible for Ms. Stephens to buy back her home. And said fraud was completely sealed by the Planet Enterprise obtaining lien on the house of the Debtor with default interest rate of 24% and or exceeding the usurious cap.

**The RICO Enterprise**

134. From October 2018 (said date being approximate and inclusive) and continuing to the present, all Defendants collectively have constituted an enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) or, alternatively, an *association-in fact enterprise* within the meaning of those provisions (the "**Enterprise**").

135. At all relevant times, each of the Defendants was, and is, a person that exists separate and distinct from the Enterprise.

136. From the time of the inception of the Enterprise, enterprise participated in the proceedings and activities as complaint of above. Accordingly, at all relevant times, the Enterprise was engaged in, and its activities affected, interstate and foreign commerce.

137. Between 2018 and the present, each of the Defendants engaged in a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1961(5), consisting of the predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1)(B) and 18 U.S.C. § 1961(1)(D) described in the aforesaid paragraphs and other predicate acts to be identified after further investigation and discovery herein.

138. Each of the Defendants engaged in two or more predicate acts of racketeering, and each committed at least one such act of racketeering after the effective date of RICO.

139. The predicate acts of racketeering activity were related in that they were committed for the purpose of (1) concealing or obfuscating real nature of the takeover/transfer of the house from Ms. Stephens to their entities; (II) taking over unlawfully the ownership of the house of the plaintiff; (III) taking away the inbuilt equity of the house from Ms. Stephens to themselves with fraudulent means; (IV) eliminating any chances for the recovery of the house from the Defendants; (V) saddling the property with a commercial lien and commercial mortgage with a high interest rate, despite the fact that it is a residence. These acts, and others to be identified after further

investigation and discovery herein, shared a common or related purpose, goal, result, participants, victim, and method of commission.

140. Through such patterns of racketeering activity, each of the Defendants conducted or participated, directly or indirectly, in the conduct of the affairs of the Enterprise in violation of 18 U.S.C. § 1962(c).

141. As a direct and proximate result of RICO violations of 18 U.S.C. § 1962(c) by the Defendants, Ms. Stephens has been injured in her property interest suffering damages in an amount to be determined at trial. The damages to Ms. Stephens include, but are not limited to, loss of homeownership, fees from the sham closing of the house, the equity Ms. Stephens would have earned in the absence of the Defendants' unlawful conduct; other lost opportunities; and attorneys' fees and costs, including attorneys' fees and costs associated with exposing and pursuing redress for Defendants' criminal activities.

142. Pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), Ms. Stephens is thereby entitled to recover treble damages, together with the costs of this suit and reasonable attorneys' fees.

**TWELTH CAUSE OF ACTION**
**(CONSPIRACY TO VIOLATE RICO, 18 U.S.C. § 1962(d))**
**Against All Defendants**

143. The Plaintiff repeats and realleges paragraphs 1 through 142 as if fully set forth herein.

144. Defendants have unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

145. By and through each of the Defendants' close business and employment relationships with one another, and their close coordination with one another in the affairs of Enterprise described

above, each Defendant knew the nature of these enterprises and each Defendant knew that these enterprises extended beyond each Defendant's individual role. Moreover, through the same connections and coordination, each Defendant knew that the other Defendants were engaged in a conspiracy to commit predicate acts, including those set forth above, and that the predicate acts were part of a pattern of racketeering activity, and each agreed to pursue the same criminal objective.

146. Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the affairs of the Association in fact Enterprise, and/or the Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d).

147. In particular, each Defendant was a knowing, willing, and active participant in one or more such Enterprises and their affairs, and each of the Defendants shared a common purpose, namely, the orchestration, planning, perpetuation, and execution of the scheme to victimize Ms. Stephens and take over her Home as a title holder or a lien holder.

148. The Defendants played the following roles besides other as mentioned in racketeering conspiracy:

a. Maxine Bonaparte professed to be an expert in loan resolutions, and she made Ms. Stephens to hire her;

b. Maxine Bonaparte took Ms. Stephens to Charles Mester to represent Ms. Stephens and provide a veneer of professionalism.

c. Maxine Bonaparte acted as the agent for Ms. Stephens and 12706 Holdings, the buyer of the short-sale home.

d. Mester actually represented the 12706 Holdings in the sale, though retainer with Stephens was that he will represent her.

e. Lez Antonio Woodburn made himself as the front face of 12706 Holdings.

f. Both Maxine and Woodburn threatened Ms. Stephens to leave her house and they made Ms. Stephens and her husband sign Use and Occupancy agreement.

g. Maxine Bonaparte, Lez Woodburn, Charles Mester collectively led the enterprise to take over Ms. Stephens house to have loot monies distributed among each other.

h. The Planet Enterprise assisted the other defendants in achieving the stated unlawful results as well entrenching itself as the lien holder over the property of the Debtor.

149. Further evidence of an agreement among the Defendants is particularly within the knowledge and control of the Defendants.

150. The participation and agreement of each of the Defendants was necessary to allow the commission of this pattern of racketeering activity.

151. Ms. Stephens has been and will continue to be injured in her property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at trial. The injuries to Ms. Stephens directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to loss of equity in her house; other lost business opportunities; and attorneys' fees and costs, including attorneys' fees and costs associated with exposing and pursuing redress for Defendants' criminal activities.

152. Pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), Ms. Stephens is thereby entitled to recover treble damages, together with the costs of this suit and reasonable attorneys' fees.

**THIRTEENTH CAUSE OF ACTION**
**(Unjust Enrichment)**

153. Plaintiffs repeat and reallege paragraphs 1 through 152 as though fully set forth herein.

154. As a result of the events described above, each of the Defendants has unjustly retained a benefit to Ms. Stephens detriment.

155. Specifically, each of the Defendants were on notice of Ms. Stephen's continuing ownership interest at a time when they took title to the Property, or took a lien hold interest in the Property, or cashed out a portion of Ms. Stephens equity.

WHEREFORE, Ms. Stephens ask this court to void the transfer of title to 12706 Holdings to require that each Defendant pay Plaintiffs the value of the equity in the Property unjustly received by that Defendants.

**FOURTEENTH CAUSE OF ACTION**
**(Constructive Trust)**
**(Against All Defendants)**

156. Plaintiffs repeat and reallege all preceding paragraphs as if fully set forth herein.

157. Undoubtedly Defendants took custody of Plaintiffs' property under a circumstance that would render it equitable for it to return such property to its rightful owner upon due demand.

158. Ms. Stephens approached Maxine and through Maxine, attorney Mester to help her save her house. Such relationship created a fiduciary relationship.

159. Ms. Stephens trusted Maxine and Mester with her property and thinking that it was a part of loan modification and that the property is being kept in trust for her, she signed all the papers whatever was given to her to sign by Maxine and Mester

160. Ms. Stephens had a confidential fiduciary relationship with the Defendants.

161. It is just and equitable that the court impress a constructive trust to attach to the res of Plaintiffs' property from the time it entered Defendants' possession.

162. Each transferee took possession under circumstances in which such transferee knew Plaintiffs had been despoiled, making it just and fair for the court to apply an equitable lien under the principles of equity.

163. Applying the doctrine of equitable servitudes to ownership of the house wrongfully obtained by transferees is fair and just under the circumstances.

164. Defendants would be unjustly enriched if permitted to retain the house or any of the benefits including any lien or equity accruing therefrom.

165. Plaintiffs have no adequate remedy at law.

166. Permitting the Defendants to retain property belonging to the Plaintiff is unfair and unjust and in light of the totality of the circumstance's warrants imposing a constructive trust under equitable principles of New York law.

167. Plaintiff pray for an order impressing a constructive trust upon all holders and purchasers of Plaintiffs' property and their agents, past and present and ordering that all ownership be returned to Plaintiff and that any income, commissions or other benefits be disgorged and paid to Plaintiff.

**FIFTEENTH CAUSE OF ACTION**
**(Fraudulent conveyance, Section 273 of NYCD law)**

168. Plaintiff incorporates the allegations contained in paragraphs 1 through 167, inclusive, as though fully set forth at this place.

169. The debtor-plaintiff sought bankruptcy protection on November 11, 2021.

170. Section 544 of Title 11 states that "the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title." New York Debtor and Creditor Law section 273 states: Every conveyance made, and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

171. The debtor has unsecured claims at the time of the filing of the case and at the time of transfer of the deed to the Defendants.

172. Debtor owned Home and it exceeded $850,0000 in value in 2019.

173. On March 27, 2019, the Debtor was fraudulently induced to part with her house with the excuse that the same was necessary for loan modification.

174. The fraudulent parting of the house was designed by the defendant as a short sale for a sum of $350,000, but the value of the house exceeded $850,000.

175. Thus, the debtor was deprived of equity worth more than $500,000.

176. As a result of this transfer, the Debtor was rendered insolvent.

177. The impugned transfer of the deed violated section 273 of New York Debtor & Creditor Law.

Wherefore, the Debtor now in bankruptcy, the March 27, 2019, transfer should be set aside.

**FIFTEENTH CAUSE OF ACTION**
**(Fraudulent conveyance, Section 275 of NYCD law)**

178. Plaintiff incorporates the allegations contained in paragraphs 1 through 177, inclusive, as though fully set forth at this place.

179. The debtor-plaintiff sought bankruptcy protection on November 11, 2021.

180. Section 544 of Title 11 states that "the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title."

181. New York Debtor and Creditor Law section 275 states: Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering

into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors.

182. The debtor has unsecured claims at the time of the filing of the case and at the time of transfer of the deed to the Defendants.

183. Debtor owned Home and it exceeded $850,0000 in value in 2019.

184. On March 27, 2019, the Debtor was fraudulently induced to part with her house with the excuse that the same was necessary for loan modification.

185. The fraudulent parting of the house was designed by the defendant as a short sale for a sum of $350,000, but the value of the house exceeded $850,000.

186. Thus, the debtor was deprived of equity worth more than $500,000.

187. As a result of this transfer, the Debtor was rendered insolvent and now she cannot pay her debts in a regular course.

188. The impugned transfer of the deed violated section 275 of New York Debtor & Creditor Law.

Wherefore March 27, 2019 transfer should be set aside.

**SIXTEENTH CAUSE OF ACTION**
**(Recovery of Fraudulent Transfer under 11 U.S.C. § 550)**

189. The Plaintiff repeats and re-alleges the allegations set forth in paragraphs "1" through "188" as if set forth fully herein.

190. Section 550(a) of the Bankruptcy Code provides in relevant part: [T]o the extent that a transfer is avoided under section 544, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from ... the initial transferee of such transfer or the entity for whose benefit such

transfer was made; or ... any immediate or mediate transferee of such initial transferee. **11** U.S.C. § 550(a).

188. Under section 550(a) of the Bankruptcy Code, the Plaintiff may recover the Transfer or the value thereof.

189. By reason of the foregoing, the Plaintiff is entitled to an order recovering the Transfer, or the value thereof, pursuant to section 550 of the Bankruptcy Code and a judgment against the Defendant in an amount as yet undetermined, but in no event believed to be less than $550,000.00, plus interest thereon, attorneys' costs, or such other amount as may be determined by the Court.

**SEVENTEENTH CAUSE OF ACTION**
**Avoidance and Recovery of Fraudulent Transfers from the Planet Enterprise**
**(11 U.S.C. §§ 544 and 550)**

190. The Plaintiff re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

191. The Debtor through the complained of transaction, transfer of the Deed incurred obligations, granted the Planet Enterprise security interest and made the same for no or insufficient consideration.

192. The Debtor received no, or less than reasonably equivalent, value in exchange for incurring, granting and/or making the transfer of her Home and or having a lien of Planet Enterprise with a default interest rate exceeding 24%.

193. The Debtor was insolvent, became insolvent, or intended or believed it would incur debts beyond its ability to pay as such debts matured at the time the Planet Enterprise lien or interest in the Real Property were incurred, granted and/or made.

194. The Planet Enterprise Defendants are the initial transferees of the impugned transfer, the entity or person for whose benefit the said transfer were made, or the immediate or mediate transferees of the initial transferee receiving the transfers.

195. Based on the foregoing, the Plaintiff is entitled to recover the value of the transfers and or return of her Home pursuant to section 550 of the Bankruptcy Code.

**WHEREFORE**, the Plaintiff respectfully requests the entry of a judgment against the Planet Enterprise Defendants avoiding their lien interest in the property and awarding the Plaintiff costs, pre- and post-judgment interest and such other relief the Court deems equitable and just.

**EIGHTEENTH CAUSE OF ACTION**
**(Disallowance of Claims)**

196**.** The Plaintiff repeats and re-alleges the allegations set forth in paragraphs "1" through "195" as if set forth fully herein.

197. To the extent the Defendants are found liable for any of the transfers subject to avoidance and recovery as alleged herein, any claims the Defendants may assert against the estate pursuant to section 502(h) of the Bankruptcy Code or otherwise must be disallowed unless and until the Defendants pay the estate or the Debtor the amount of such liability and make the Debtor whole.

**NINETEENTH CASUE OF ACTION**
**(Legal Malpractice Against Mester)**

198. The Plaintiff repeats and re-alleges the allegations set forth in paragraphs "1" through "197" as if set forth fully herein.

199. Ms. Stephens had her Home in foreclosure proceeding. She wanted to save her home. She was referred to Mr. Mester. Ms. Stephens approached him for saving her home. By signing a retainer agreement and reposing her trust, Ms. Stephens established a client attorney relationship with Mester.

200. Mr. Mester owed a duty of care to Ms. Stephens. He had assured her that he will save her house.

201. Mr. Mester failed to exercise required care, rather he abused Ms. Stephens trust by colluding with others depriving Ms. Stephens of her home with a substantial equity as said in the foregoing part of the Amended Complaint.

202. Mr. Mester was expected to proceed in a manner reasonably calculated to advance a client's lawful objectives, as defined by the client after consultation. He was expected to act with reasonable competence and diligence. He was expected to comply with obligations concerning the client's confidences and property, avoid impermissible conflicting interests, deal honestly with the client, and not employ advantages arising from the client-lawyer relationship in a manner adverse to the client; and fulfill valid contractual obligations to the client. Mr. Mester breached said duties and obligation. This failure to exercise due care and abuse of trust caused the complained of injury to Ms. Stephens.

203. Ms. Stephens lost her home because of active collusion and deception of Mr. Mester.

204. Ms. Stephens damages and deprivation of her home and humiliation has been caused by Mr. Mester breach of obligation with active collusion with other defendants.

Wherefore Ms. Stephens is entitled to be compensated for the damages owing to Mr. Mester's conduct.

**SEVENTEENTH CAUSE OF ACTION**
**Preliminary and Permanent Injunction**
**(Against the Defendants)**

205. Plaintiff incorporates the allegations contained in paragraphs 1 through 204 inclusive, as though fully set forth at this place.

206. The Defendants are now seeking to sell the subject premise. Said conduct is wrongful because the subject grant deed to them is void.

207. The Defendants having record title, may seek at any time to evict plaintiff, or to transfer or encumber the premise and they are already doing the same.

208. The Defendants' wrongful conduct unless and until enjoined and restrained by order of this Court will cause great irreparable injury to plaintiff in that plaintiff will suffer loss of her home which will cause personal suffering, including potential homelessness for plaintiff and her grandchildren, which cannot be compensated for by monetary damages.

209. Plaintiff has no adequate remedy at law for the threatened conduct by defendants.

WHEREFORE, plaintiff prays for judgment against defendant, as follows:

a. For a preliminary and permanent injunction restraining and enjoining the Defendants and their agents, servants, employees, representatives, and anyone acting on their behalf or at their direction from committing, permitting, or performing, directly or indirectly, any of the following acts regarding the premises:

(1) Contracting for, purchasing, leasing, exchanging, granting, conveying, mortgaging, transferring in trust, encumbering or hypothecating the subject premises;

(2) Attempting to contract for, purchase, lease, exchange, grant, convey, mortgage, transfer in trust, encumber or hypothecate the subject premises;

(3) Serving any notices terminating tenancy or filing any unlawful detainer actions or prosecuting any unlawful detainer actions against plaintiff;

(4) Seeking in any fashion to dispossess plaintiff from the premises.

## PRAYER FOR RELIEF
## (Debtor demands trial by jury on all causes of action)

**WHEREFORE**, Plaintiff prays for relief and judgment as follows:

(a) Judgment in favor of plaintiff on all counts;
(b) General and compensatory damages according to proof at trial;
(c) Treble damages pursuant to 18 U.S.C. § 1964(c); NY RPL 265-a; NY Judiciary law § 487;
(d) Disgorgement of all moneys received by Defendants as a result of their unlawful activities;
(e) An award of Plaintiffs reasonable attorneys' fees and costs and expenses, pursuant to 18 U.S.C. § 1964(c);
(f) Punitive damages;
(g) Prejudgment interest;
(h) Voidance of Lien or any interest obtained by the Defendants on the Debtor's home; and

(h) Such other and further relief as the Court deems just and proper.

Dated: December 18, 2022
New York New York

*/s/Karamvirdahiya*
Karamvir Dahiya
Dahiya Law Offices, LLC
75 Maiden Lane Suite 606
New York New York 10038
Tel: 212 766 8000

# EXHIBIT A

Adv. ECF No. 34-1

Bonaparte criminal records and Fellows v. Bonaparte action (Compl. ¶ 5)

# New York State Unified Court System

## WebCriminal

## Case Details - Appearances

**CASE INFORMATION**

Court: **Kings Supreme Court - Criminal Term**
Case #: **02539-2011**
Defendant: **Bonaparte, Maxine**

| Date/ Time | Judge/ Part | Calendar Section | Arraignment/ Hearing Type | Court Reporter | Outcome/ Release Status |
|---|---|---|---|---|---|
| 03/24/2020 | Goldberg, J 22 | VIOLATION OF PROBATION | Violation of Probation | | |
| 01/07/2020 | Shillingford, R 22 | VIOLATION OF PROBATION | Violation of Probation | Marin, M | Adjourned Released on Recognizance |
| 11/12/2019 | Goldberg, J 22 | VIOLATION OF PROBATION | Violation of Probation | Isaacs, S | Adjourned Released on Recognizance |
| 10/15/2019 | Goldberg, J 22 | VIOLATION OF PROBATION | Violation of Probation | Manning, D | Adjourned Released on Recognizance |
| 08/20/2019 | Goldberg, J 22 | VIOLATION OF PROBATION | Violation of Probation | Cardillo, | Adjourned Released on Recognizance |
| 07/23/2019 | Goldberg, J 22 | VIOLATION OF PROBATION | Violation of Probation | Neri, E | Adjourned Released on Recognizance |
| 06/11/2019 | Goldberg, J 22 | VIOLATION OF PROBATION | Violation of Probation | Monaco, V | Adjourned Released on Recognizance |
| 04/09/2019 | Goldberg, J 22 | VIOLATION OF PROBATION | Violation of Probation | Monaco, V | Adjourned Released on Recognizance |
| 03/26/2019 | Goldberg, J 22 | VIOLATION OF PROBATION | Violation of Probation | Lynch, S | Adjourned Released on Recognizance |
| 01/15/2019 | Goldberg, J 22 | VIOLATION OF PROBATION | Violation of Probation | Buccheri, J | Adjourned Released on Recognizance |
| 12/11/2018 | Goldberg, J 22 | VIOLATION OF PROBATION | Violation of Probation | Russo, D | Adjourned Released on Recognizance |
| 11/13/2018 | Goldberg, J 22 | VIOLATION OF PROBATION | Violation of Probation | Russo, M | Adjourned Released on Recognizance |
| 10/16/2018 | Goldberg, J 22 | VIOLATION OF PROBATION | Violation of Probation | Lee, N | Adjourned Released on Recognizance |
| 08/28/2018 | Goldberg, J 22 | VIOLATION OF PROBATION | Violation of Probation | Cassidy, M | Adjourned Released on Recognizance |
| 07/24/2018 | Goldberg, J 22 | VIOLATION OF PROBATION | No Type | Santilli, T | Adjourned Released on Recognizance |
| 04/24/2018 | Goldberg, J 22 | VIOLATION OF PROBATION | No Type | Buccheri, J | Adjourned Released on Recognizance |

# New York State Unified Court System

## WebCriminal

## Case Details - Charges

**CASE INFORMATION**

Court: **Kings Supreme Court - Criminal Term**
Case #: **02539-2011**
Defendant: **Bonaparte, Maxine**

| Charge | Detail | Disposition/Sentence |
|---|---|---|
| PL 155.40 01<br>**TOP CHARGE** | **C Felony, 2 counts, Arrest charge, Not an arraignment charge**<br>Description: *Gr Lar 2nd:property Val>$50000*<br>Indictment Count: *5* | Pled Guilty, Probation For 5 Years, Restitution |
| PL 155.40 01 | **C Felony, 2 counts, Arrest charge, Not an arraignment charge**<br>Description: *Gr Lar 2nd:property Val>$50000*<br>Indictment Count: *6* | Pled Guilty, Probation For 5 Years |

# New York State Unified Court System

## WebCriminal

## Case Details - Summary

**CASE INFORMATION**

Court: **Kings Supreme Court - Criminal Term**
Case #: **02539-2011**
Defendant: **Bonaparte, Maxine**

**Defendant**

Name: **Bonaparte, Maxine**
Birth Year: **1960**

**Incident and Arrest**

**Incident**
Date: **October 28, 2009**
CJTN: **65028339Q**

**Arrest**
Date & Time: **September 8, 2011 10:30**
Arrest #: **K11686999**

**Officer**
No Officer Information on File

**Attorney Information**

**Defense Attorney**
Name: **Salaway, M**
Type: **18B (Assigned)**
Court Date: **October 30, 2014**
Court Part: **32**
Phone: **000 - 000 - 0000**

**Assistant District Attorney**
Name: **Farrell,**
Assigned: **May 2, 2013**

**Next Appearance**

Date: **March 24, 2020**
Court: **Kings Supreme Court - Criminal Term**
Judge: **Goldberg, J**
Part: **22**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

Index No.:
Date Purchased:

-----------------------------------------------------X

Jason Fellows as administrator of the ESTATE OF TINA FELLOWS,

Plaintiff,

-against-

MAXINE BONAPARTE,

Defendants.

-----------------------------------------------------X

SUMMONS

Plaintiff designates Nassau County as place of venue

Plaintiff resides in Nassau, New York

To the above-named Defendants:

YOU ARE HEREBY SUMMONED and required to serve upon plaintiff's attorneys a verified answer to the verified complaint in this action within twenty (20) days after the service of this summons, exclusive of the day of service, or within thirty (30) days after service is complete if this summons is not personally delivered to you within the State of New York. Incase of your failure to answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated: Farmingdale, New York
June 18, 2022

LAW OFFICES OF CLARKE & FELLOWS P.C.

Jonathan C. Clarke, Esq.
*Attorneys for Plaintiff*
140 Gazza Boulevard
Farmingdale, New York 11735
Tel: 631-532-0221
Facsimile: 631-777-7312

TO: Maxine Bonaparte

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
-----------------------------------------------------------X
Jason Fellows as administrator of the ESTATE OF
TINA FELLOWS,

Plaintiff, **VERIFIED COMPLAINT**

-against-

MAXINE BONAPARTE,

Defendant,
-----------------------------------------------------------X

Plaintiff, by their attorneys, Law Offices of Clarke & Fellows P.C., complaining of the Defendant respectfully alleges, upon information and belief:

1. At all times hereinafter mentioned, Plaintiff was a resident of the County of Nassau, State of New York.

2. At all times hereinafter mentioned, Plaintiff was a resident of the County of Yonkers, State of New York.

3. This action concerns the deliberate efforts of Defendant to cheat a sickly Plaintiff of the benefit of her bargain in the sale of the subject property with addresses at 442 Park Hill Ave, Yonkers, New York.

4. On 1/14/2021 Plaintiff and Defendant entered into a written agreement. The agreement was entered into because decedent was too sickly to prepare the property for sale. Pursuant thereto, the terms of the contract were to begin on 1/20/2021 with the completion within six (6) months.

5. As part of the terms of the contract, the Defendant was obligated to keep current with property taxes and sell the subject property by 6/19/2016. The Defendant was allowed to keep any of the sale proceeds over $440,000.

6. After entering into the contract, Plaintiff became gravely ill and Defendant sought to deprive Plaintiff of the benefit of her bargain and caused severe damage to the subject property by not adhering to the obligations in the contract.

7. On 11/18/2016 the decedent was terminally ill and not able to manage the property on her own. The Plaintiff Jason Fellows, son of decedent and decedents brother Hal Skopicki assisted in the management in the property during that period.

8. The Plaintiff Jason Fellows contacted Defendant on 11/18/2016 who refused to comply with requests for updated property status relating to tax compliance, sale of property, and transfer of ownership (Defendant had locks on property that did not allow the Plaintiff to access said property). Defendant had no ownership rights in the property and illegally locked out the rightful owner.

9. On 02/03/2017, the contract Plaintiff passed away.

10. On 04/28/2017 Plaintiff had arranged to meet the Defendant at the subject property with (2) real estate advisors Nicholas Tuccillo and Michael Tuccillo, to review property conditions and status of sale. Upon arrival of the property, trash and overgrown weeds encompassed the exterior of the property. Upon entry to the property, it was noted that the interior of the property was completely gutted down to the studs. All interior framing, drywall, doors, kitchen tile, kitchen cabinet, kitchen sink, bathroom tub and accessories, toilets, hot water heater, most plumbing piping, were completely removed from the property. The property as seen was completely uninhabitable. The Defendant stated that everything was removed from the property to allow for renovation of the property although at this point the Plaintiff was in breach of the agreement by nearly ten (10) months.

11. Upon further investigation, the neighbors of subject property stated that they saw the

Defendant arrive at the property with another individual on multiple occasions in a U-Haul box truck removing various items from the subject property.

12. On 05/03/2017, due to property conditions Plaintiff had the property appraised at a value of $282,000.00, which is significantly less than what it has been appraised at in years prior where the property was assessed over $450,000.

13. The Defendant also failed to comply with keeping property taxes in good standing as agreed upon costing the Plaintiff over $8,000.00 in interest damages as well as over $32,000.00 in past due property taxes.

FIRST CLAIM FOR RELIEF
(Breach of Contract)

14. Plaintiff repeats and realleges all proceeding paragraphs as if full set forth herein.

15. The Contract was a valid and blinding agreement between the decedent and the Defendant.

16. Plaintiff performed by allowing the Defendant access to the property so the Defendant could prepare the property for sale.

17. As alleged hereinabove, the Defendant did not abide by the term of the contract through material breaches.

18. Due to the material breaches, the Plaintiff incurred significant costs and losses.

19. As a result of the material breaches, Plaintiff was damaged in a sum that exceeds the jurisdictional limits of all lower courts.

SECOND CLAIM FOR RELIEF
(Unjust Enrichment)

20. Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

21. The Defendant was enriched at the expense of the Plaintiff.

22. That the Defendant was enriched and it would be against equity and good conscience to permit them to retain what is sought to be recovered.

23. As a result of being unjustly enriched, Plaintiff was damaged in a sum that exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction.

THIRD CLAIM FOR RELIEF
(Fraud)

24. Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

25. Defendant materially misrepresented that she would prepare the property for sale and pay taxes.

26. The Defendant had no intention of selling the property but intended to steal the fixtures and other attachments to the property to enrich herself:

27. The Defendant had the intent to defraud Plaintiff of property rights and the the fixtures and attachment to the property.

28. The Plaintiff relied on the Defendant selling the property and paying the property taxes but Defendant took the opportunity to access the property to commit theft of the fixtures and other attachments to the property.

29. As a result of the aforementioned, the property sold for significantly less and the property taxes accrued.

30. By reason of the facts and circumstances stated above, Plaintiff has been damaged in the sum of $300,000.

Dated: Farmingdale, New York
June 18, 2022

LAW OFFICES OF CLARKE & FELLOWS P.C.

Jonathan C. Clarke, Esq.
*Attorneys for Plaintiff*
140 Gazza Boulevard
Farmingdale, New York 11735
Tel: 631-532-0221
Facsimile: 631-777-7312

# VERIFICATION

STATE OF NEW YORK )
)ss.:
COUNTY OF NASSAU )

I, the undersigned being duly sworn deposes and says:

I am the Plaintiff in the within action. I have read the foregoing Summons and Complaint and agree with the contents thereof. The content is true to my own knowledge as to those matters I believe them to be true.

Jason Fellows

Sworn to before me this
18th day of June 2022

Notary Public

ANNETTE PENNELL
Notary Public - State of New York
No. 01PE6140263
Qualified in Suffolk County
My Commission Expires May 15, 20 26

# EXHIBIT B

Adv. ECF No. 34-2

Checks: two $5,000 Stephens checks (Dec. 7, 2018) and $5,000 cashier's check to Mester (Mar. 28, 2019) (Compl. ¶¶ 25, 47)

**Subject:** Checks
**From:** Jillen Stephens <jillenstephens@ymail.com>
**Date:** 4/5/2022, 6:34 PM
**To:** karam@legalpundit.com

—image0.jpeg




—image2.jpeg

image3.jpeg



EVIS STEPHENS
876
Date 2-7-18
Pay to the order of KEZ Construction LLC $5,000
Five thousand Dollars
CHASE
Memo
Evis Stephens
[redacted] [redacted] 0876

[redacted] 130415 [redacted] 612798
TRN_DEBIT NUMBER
Great Neck 0963 94004 5963 2 0053

1


EVIS STEPHENS
878
12-7-18
$ 5,000
Five Thousand
CHASE
Evis Stephens
[redacted] P LLC [redacted] 878

PAY TO THE ORDER OF
REPUBLIC BANK
ROUTING # 071001180
FOR DEPOSIT ONLY
BLAKE CORP
ACCT. # 9572001333

---

Sent from my iPad

—Attachments:—

| | |
|---|---|
| image0.jpeg | 1.3 MB |
| image2.jpeg | 1.3 MB |
| image3.jpeg | 1.3 MB |

# EXHIBIT C

Adv. ECF No. 34-3

Mester legal engagement/retainer, Sept. 21, 2018, signed by Stephens and Bonaparte (Compl. ¶¶ 26, 29)

917
608-
6462

5


# CHARLES L. MESTER
## ATTORNEY AT LAW

26 COURT STREET
SUITE 1200
BROOKLYN, NEW YORK 11242

33 WOOD AVENUE SOUTH
SUITE 600
ISELIN, NEW JERSEY 08830

Charles L. Mester (NY & NJ)

NY Tel: 718-797-5700
NY Fax: 718-522-0356

NJ Tel: 732-777-9580
NJ Fax: 732-777-9589

Email: CMester@LTAttorneys.com


September 21, 2018

Evis Stephens
12706 177th Street
Jamaica, New York 11434

Maxine Bonaparte
Bronx, New York

**Re: Legal Engagement Agreement**

Dear Ms. Stephens and Ms. Bonaparte:

Thank you for meeting with me in relation to retaining CHARLES L. MESTER, ESQ. ("Attorney") to provide legal services to you in connection with your prosecution of civil litigation involving the real properties located at 1487 EAST 53rd STREET, BROOKLYN, NEW YORK and 1844 EAST 34th STREET, BROOKLYN, NEW YORK and sale and leaseback of the real property located at 12706 177th STREET, JAMAICA, NEW YORK. This letter, when fully executed, confirms that Attorney will represent you in the above-referenced matters. This engagement letter does not include any appeals work, which would only be handled after a separate agreement and retainer is agreed upon at the appropriate time.

Legal Fees

Fees for legal services will be determined on an hourly basis for the litigation work and a flat fee basis for the transactional work. In addition, if we are successful on the litigation and any of the properties involved in the litigation are ultimately sold by you, I will be entitled to a percentage of the sale price.

Litigation: Attorney's present hourly rate is $450. Attorney will provide you with litigation services on an hourly basis in an effort to have the two properties put into your name and/or remove all liens from the properties, and obtain clear title to same. The retainers shall be $10,000 for each litigation. In the event the litigation is ultimately successful, any hourly charges accrued above the retainer not already paid shall be paid at the time of the closing.

Transactions: In addition, if the litigation is successful, Attorney will provide you with transactional services involving the sale of each of the Premises to Ms. Bonaparte or her designated entity and any sale by Ms. Bonaparte or her designated entity either as a wholesale or rehab transaction. In such case, Attorney will obtain a separate and additional legal fee of 20% of the purchase price being paid by the third-party prospective buyer. In addition, any litigation fees not yet paid shall be paid at the time of the final closing.

As for the short sale transaction, Attorney will provide you with transactional services involving the short sale and leaseback of the Property to you. Attorney shall receive the legal fee approved by the lender and shall be entitled to a separate and additional legal fee of 20% upon the refinancing of the property subsequent to the short sale.

Expenses

Attorney is authorized to incur and collect from you the out-of-pocket costs arising in connection with our engagement. These costs typically include photocopying charges, messenger, courier and express delivery charges, court filing fees, court reporter transcription fees, computerized legal research and fees of outside experts and consultants. Every reasonable effort will be made to give you advance notice of any non-ministerial expenses.

It is understood and agreed that under no circumstance shall Attorney have any responsibility or obligation to advance any fees or disbursement on your behalf. As such, all known fees shall be collected prior to being disbursed by Attorney.

Billing

Attorney will provide statements for fees and expenses posted during the preceding time period and you agree to make prompt payment on all invoices rendered by Attorney, as and when received. It is our policy to describe the services performed in detail, so that you may fully understand the work we have done and the charges for such work. Statements are due upon presentation. If not paid within sixty (60) days, Attorney will have the right to cease performing further work and to withdraw from our representation of you, in accordance with our ethical obligations.

Upon conclusion of the litigation and transactions, Attorney shall have a lien on the sale proceeds from the sale of the Properties for any unpaid fees and expenses due under this Engagement Letter. At his option, Attorney may file a memorandum of contract against the Premises in order to securitize the balance of the fees owed herein.

Retainer Deposit

Attorney requires that you pay an initial retainer in the sum of $10,000.00 (the "**Retainer**") on account of each of the legal services for each litigation to be rendered in connection herewith. Attorney is authorized to credit you on an hourly basis for all legal fees for litigation services rendered during the course of representing you as noted herein.

There will be no appearance made on the court's record until the full Retainer has been paid, nor will there be a refund of any part of this Retainer once services have commenced.

Termination of Representation

Attorney shall have the right to withdraw from the action as your attorney if you do not make payment as required under this Engagement Letter, if you have misrepresented or failed to disclose material facts to Attorney, if you fail to follow Attorney's advice or cooperate with Attorney, if you fail to provide Attorney with complete information and documents related to your case, if you fail to pay for Attorney to continue with the litigations beyond the initial retainers, or if you engage in any conduct which would make it inappropriate to continue Attorney's representation of you. If any of these events occur, you agree to execute the necessary documents upon our request to withdraw as your counsel. In the event we withdraw from this action as provided for herein, Attorney shall be entitled to a fee based upon the extent of the services rendered by the firm, on a *quantum meruit* basis (i.e. "as much as is deserved", based upon the reasonable value of such services), as may be agreed upon by Attorney and you. The provisions of this Engagement Letter may be disclosed to a mediator, arbitrator, or judge in connection with any application by Attorney for fees for services and/or expenses that may be rendered on your behalf.

General

We understand that we are to rely upon instructions that we receive from you. In order to enable us to effectively render legal services on your behalf, we ask that you advice us immediately of any problems or developments that you become aware of relating to this matter or our representation, and that you be available to consult with us as developments occur. We will provide you, upon request or as needed, with copies of the documents, letters and other materials that we generate or receive during the course of our representation.

Our responsibilities under this retainer agreement are to provide legal counsel and assistance to you in accordance with this letter, and to provide statements to you that indicate the basis for our fees and charges. During the course of this engagement, we may express opinions or beliefs to you about the effectiveness of various courses of action or about the results that might be anticipated. Such statements are expressions of opinion only and should not be construed as promises or guaranties. We hope you will be clear

and complete in your communications with us and will extend your reasonable assistance and cooperation to us.

YOU AGREE THAT ATTORNEY MAY COMMUNICATE WITH ONE OR BOTH OF YOU ON ALL MATTERS RELATED TO YOUR REPRESENTATION AND SUCH COMMUNICATIONS SHALL NOT BE A VIOLATION OF PRIVILEGE AND BE ACCORDED FULL ATTORNEY-CLIENT PRIVILEGE AND REMAIN CONFIDENTIAL AS FULLY AS THE LAW ALLOWS.

Please note that in accordance with the rules of the Appellate Divisions of the Supreme Court of the State of New York, effective January 1, 1998, we are required to post a Statement of Client's Rights in our office. I enclose for your review a copy of a notice outlining a non-exclusive list of your rights as a client under New York State Law.

Please confirm your acceptance and agreement to the foregoing by countersigning and returning a copy of this letter together with the Retainer. Toward that end, it is agreed that facsimile or other electronically transmitted signatures hereupon shall be deemed the equivalent of original signatures in all respects.

Attorney is delighted to have the opportunity to represent you and looks forward to working with you. Please call if there are any questions.

Very truly yours,

Charles L. Mester

**ACKNOWLEDGED AND AGREED:**

By: Evis Stephens

By: Maxine Bonaparte

# EXHIBIT D

Adv. ECF No. 34-4

Contract-Use and Occupancy Agreement, Jan. 1, 2020, with payment receipts signed by Bonaparte (Compl. ¶¶ 33, 55)

# Contract -Use and Occupancy Agreement
# For 127 06 177th Street Jamaica NY 11434

This agreement dated January 1, 2020 is between the **owner 12706 Holdings Inc and** the **occupants, Calvin Stephens, Evis Stephens, John Doe(s) and Jane Doe(s). The owner 12706 Holdings Inc has agreed to:**

**Sell** the property known as **12706 177th Street Jamaica NY 11434 Block: 12527 Lot: 0093**. to Calvin Stephens, Evis Stephens, John Doe(s) and Jane Doe(s) in Two Years and Three Months. This agreement is for Two Years and Three Months.

**NATURE OF OCCUPANCY**:

Calvin Stephens, Evis Stephens, John Doe(s) and Jane Doe(s) will occupy the property as licensee only and **not as Tenant**. The seller confirms and the occupants agrees that they do not have the rights as tenants as in Landlord and Tenant law.

**TERMS:**

From 1/1/2020 to 4/1/2022, Calvin Stephens, Evis Stephens, John Doe (s) and Jane Doe(s) will Occupy the property at unit 1 for a fee of $1500.00 each month. The fee is due on the 1st of Every month. Occupants will pay the Gas and Electric bill for Unit 1, $150.00 every three months for Water Bill in Unit 1. Washer and Dryer area must be kept clean and clutter free in the basement.

Basement will only have a Sofa, TV, pantry and closet. Basement will not be a storage space for boxes, barrels or any other items except items listed above. Any disregards for the rule will result in a fee in the amount of $1000.00. No storage in the boiler room. No allowing children to write on the walls, doors, closets or the walls, hook basketball hoops to any walls in the house. Areas must be kept clean in the house.

Empty rooms cannot be storage space. A bed, dresser or TV in rooms only.

Kitchen must be kept extremely clean. No grease on the walls or floors.

Living Room must be clutter free, Sofa, TV and dining furniture.

**NOTICE:**

The occupants will be responsible for all and any damages to the property that occurs during their stay.

The damages include the backyard. The shad will not be overstocked with items not used. No storage of unused items in the shad. No storage on the property, (backyard) The seller will

provide back yard furniture for the summer months. Shad must be able to store the lawn furniture.

The occupants must keep the front area of the property sweep clean, garbage in provided cans.

Garbage put on curbside on destinated days, including recyclable.

If the property 127 06 177th Street Jamaica NY 11434 is damage at any time the occupants will pay to repair or be prepared to move out. The occupants must call the owner for any repairs.

If the occupants cannot purchase the property at the end of the contract agreement, the Occupants agree to move out of property, 12706 177th Street Jamaica NY 11434 without argument in 30 (Thirty days) from the expiration of the agreement.

**The property 127 06 177th Street Jamaica NY 11434 has, new roof with new leaders' new kitchen, bathrooms. Hallway walls have been repaired and painted. Bathrooms has new vanities, toilets and painted. Walls have been repaired and painted. Bedrooms has been painted. New back yard fence and landscape cemented back yard. Front of house landscaped and painted. New three security Doors. New Shad 10 x 12.**

**Owner shall expect unit one to remain in the rehab condition during the agreement period. Including back yard. Property must be appraisable after two years and three months, if not the occupants must cure any damages to pass the appraisal or move out. The Stephens, John Doe(s) and Jane Doe(s) can move out at any time prior to the next month payment.**

****** The damage sewage line has been repaired; lead water line has been replaced****.**

****** Please take note the rules must be followed. If not, the owner can demand you to move out of the property asap. ******

The signatures are acknowledgment of this agreement:

Lez Antonio Woodburn

Evis Stephens Evis Stephens

Calvin Stephens

Calvin Stephens

Notary acknowledges the signatures of, Lez Antonio Woodburn, Evis Stephens, and Calvin Stephens on this

**JONATHAN P. BROWN**
**Notary Public, State of New York**
**No. 01BR6369891**
**Qualified in Queens County**
**Commission Expires Nov 2022**

**RECEIPT** DATE 3/13/20 No. 571558

RECEIVED FROM CALVIN STEPHENS $ 195.00

One hundred and ninety five —— DOLLARS

○ FOR RENT ✓ FOR CON Edison Deposit for service

| | | |
|---|---|---|
| ACCOUNT | / | |
| PAYMENT | 195 | — |
| BAL. DUE | 0 | |

○ CASH ○ CHECK ○ MONEY ORDER ○ CREDIT CARD

FROM CON EDISON TO

BY [signature]

A-2701 T-46800

**RECEIPT** DATE 4/10/2020 No. 571561

RECEIVED FROM ELVIS Stephens $ 300.00

Three hundred —— DOLLARS

✓ ~~FOR RENT~~ ✓ FOR WATER BILL

| | | |
|---|---|---|
| ACCOUNT | 758 | 50 |
| PAYMENT | 300 | — |
| BAL. DUE | 458 | 50 |

✓ CASH ○ CHECK ○ MONEY ORDER ○ CREDIT CARD

FROM WATER BILL TO

BY [signature]

A-2701 T-46800

**RECEIPT** DATE 2/4/2020 No. 571551

RECEIVED FROM Ellis Stephens $ 1,500.00

one thousand and five hundred DOLLARS

○ FOR RENT
✓ FOR Use & occupancy for 12706 177th St. Jamaica NY 11434

| | | |
|---|---|---|
| ACCOUNT | — | — |
| PAYMENT | 1500 | 00 |
| BAL. DUE | — | |

✓ CASH
○ CHECK
○ MONEY ORDER
○ CREDIT CARD

February, 2020

FROM Feb 1 TO Feb 29, 2020

BY Maxine Bonaparte

A-2701
T-46800

**RECEIPT** DATE 3/10/20 No. 571557

RECEIVED FROM Ellis Stephens $ 500.00

five hundred DOLLARS

○ FOR RENT
✓ FOR Use & occupancy for January 2020

| | | |
|---|---|---|
| ACCOUNT | — | |
| PAYMENT | 500 | 00 |
| BAL. DUE | ∅ | |

○ CASH
○ CHECK
○ MONEY ORDER
○ CREDIT CARD

FROM TO

BY Maxine Bonaparte

A-2701
T-46800

# EXHIBIT E

Adv. ECF No. 34-5

Driveway/tow notices from "Tony & Maxine" (Aug. 20, 2019; Sept. 25, 2020 "Final Warning") (Compl. ¶ 34)

9/25/2020 Time: 4:4 [redacted]

To: Calvin Stephen
Stephens, Elvis Stephens

From: Tony

You were told to not park in the Driveway, Today is your Final Warning you will not get another. The cars will be towed.

9/25/2020 Time: 4:4

TO: Calvin Stephen
Stephens, Ellis Stephens

From: Tony

You were told to not park in the Driveway, Today is your Final Warning you will not get another. The cars will be towed.

8/20/19

FROM: TONY & MAXINE



To: STEVENS

DO NOT PARK IN DRIVEWAY AT ALL.

I will Get the CARS TOWED

8/20/19 [redacted] FROM: TONY
To: STEVENS & MAXINE

DO NOT PARK IN DRIVEWAY
AT ALL.
I will Get the CARS Towed

# EXHIBIT F

Adv. ECF No. 34-6

Cancellation of Use and Occupancy Agreement as of Apr. 10, 2020,
signed Lez Antonio Woodburn (Compl. ¶ 35)

## Cancellation of contract -Use and Occupancy Agreement
## For 12706 177th Street Jamaica NY 11434

The agreement dated January 1, 2020 between the owner ,12706 Holdings Inc and occupants, Calvin Stephens, Evis Stephens, John Doe(S) and Jane Doe(S) is terminated as of April 10, 2020.

The owner 12706 Holdings Inc has decided to cancel the Contract – use and occupancy agreement to purchase, 12706 177th Street Jamaica NY 11434, Block: 12527 Lot: 0093 and reside at the property.

The Short Sale liquidation is an Arm's length transaction. It does not allow the homeowner, and all occupants that reside at the property to continue residing for more than 90 days, however 12706 Holdings has given the homeowner and the occupants more than a year. The homeowner signed the Affidavit of Arm's length Transaction at closing.

12706 Holdings Inc has given the occupants and homeowner more than one year to relocate, which can be common and customary in New York, however the homeowner and occupants must vacate the property. Use and Occupancy fees, all utilities services charges continue until the occupants move.

Owner, 12706 Holdings Inc

Lez Antonio Woodburn

Notary acknowledges the signature of Lez Antonio Woodburn on this April 10th, 2020

Notary:

JONATHAN P. BROWN
Notary Public, State of New York
No. 01BR6369891
Qualified in Queens County
Commission Expires Nov 2022

# EXHIBIT G

Adv. ECF No. 34-7

May 5, 2020 eviction letter; termination notices; 10-day notices to quit (Sept. 1 and Nov. 2, 2020) (Compl. ¶¶ 36, 38)

May 5, 2020

Eviction Letter

To: Ms. Evis Stephens & Calvin Stephens ,Jane Doe ,John Doe

Re: Arm's Length Transaction 12706 177th Street Queens NY 11434

Please take notice the use and occupancy agreement is canceled as of April 10th, 2020. The agreement can not be validated , due to the Arm's length Transaction.

The occupants must be out of the above property by June 1, 2020. All owed Use and occupancy fees, Water bill, and utilities will be deducted from the refunded $10,000.00.

Ms. Stephens, the longer you remain in the property all monies owed will be deducted from the $10,000.00 .

Owner:

12706 Holdings Inc

Lez Antonio Woodburn

[signature]

©2019 by BlumbergExcelsior, Inc., Publisher, NYC 1 1241
www.blumberg.com

Re: Premises: 12706 177th St Jamaica N.Y 11434
All rooms Unit 2 side Apt. No.
at 12706 177th St. Jamaica N.Y 11434
used for [x] Dwelling [ ] Business purposes.

TO: Urilla
John Doe(s) Jane Doe(s) Tenant and, John Doe(s) Jane Doe(s) Undertenant*

First name of Tenant and/or Undertenant being fictitious and unknown to petitioner, person intended being in possession of the premises herein described

or assigns, and every person in possession of the premises.

You are hereby notified that the Landlord elects to terminate your tenancy of the above described premises now held by you under monthly hiring. Unless you remove from the said premises on October 30, 2020 the day on which your term expires, the Landlord will commence summary proceedings under the Statute to remove you from said premises for the holding over after the expiration of your term within the time frame and for the reasons checked below and will demand the value of your use and occupancy of the premises during such holding over.

Pursuant to the Housing Stability and Tenant Protection Act of 2019,

- [ ] 30 Day Notice — required if a tenant has a lease of less than one (1) year
- [x] 60 Day Notice — required if a tenant has a lease of at least one (1) year but less than two (2) years, or has lived in an apartment for more than one (1) year but less than two (2) years
- [ ] 90 Day Notice — required if a tenant has a lease of at least two (2) years, or has lived in apartment for more than two (2) years.

Dated: August 28, 2020

[signature] Landlord

________________ Agent

________________ Address

* Use window envelope if mailed to tenant.
Use ordinary envelope if mailed to undertenant.

Blumberg's LawProducts ®

309—Omnibus Notice of Termination of Tenancy of Non-Regulated Residences, 7-19
(in N.Y.C serve in same manner as a Notice of Petition)

©2019 by BlumbergExcelsior, Inc., Publisher, NYC 1 1241
www.blumberg.com

Re: Premises: 12706 177th St Jamaica N.Y 11434
All rooms Unit 2 side Apt. No.
at 12706 177th St. Jamaica NY 11434
used for ☑ Dwelling ☐ Business purposes.

TO: Bel Fon,
John Doe(s) Jane Doe(s) Tenant and, John Doe(s) Jane Doe(s) Undertenant*

First name of Tenant and/or Undertenant being fictitious and unknown to petitioner, person intended being in possession of the premises herein described

or assigns, and every person in possession of the premises.

You are hereby notified that the Landlord elects to terminate your tenancy of the above described premises now held by you under monthly hiring. Unless you remove from the said premises on October 30, 2020 the day on which your term expires, the Landlord will commence summary proceedings under the Statute to remove you from said premises for the holding over after the expiration of your term within the time frame and for the reasons checked below and will demand the value of your use and occupancy of the premises during such holding over.

Pursuant to the Housing Stability and Tenant Protection Act of 2019.

☐ 30 Day Notice — required if a tenant has a lease of less than one (1) year

☑ 60 Day Notice — required if a tenant has a lease of at least one (1) year but less than two (2) years, or has lived in an apartment for more than one (1) year but less than two (2) years

☐ 90 Day Notice — required if a tenant has a lease of at least two (2) years, or has lived in apartment for more than two (2) years.

Dated: August 28, 2020

[signature] Landlord

________________ Agent

________________ Address

* Use window envelope if mailed to tenant.
Use ordinary envelope if mailed to undertenant.

## TEN (10) DAY NOTICE TO QUIT

**Date: September 1, 2020**

**RE: 12706 177th Street Jamaica NY 11434**

**Rooms : All    Apt No    Floor : Unit 1**

**At: 12706 177th Street Jamaica NY 11434**

**To: Evis Stephens and Calvin Stephens**

**12706 177th Street Jamaica NY 11434**

**and John (s) and Jane(s) Name of the occupants being fictious and unknown to the person entitled to possession of the premises herein described.**

**PLEASE TAKE NOTICE,** that you and all other persons occupying the subject premises are required to quit and vacate the premises on or before **September 18, 2020.**

You are in possession of the premises after the short sale arm length transaction, which expired on **June 30, 2019.**

Your rights to occupy the subject premises has been **revoked** by 12706 Holdings Inc/Lezantonio Woodburn.

**PLEASE TAKE NOTICE** , that if you and all other persons fail to quit, vacate, surrender the subject premises by **September 1[illegible] 2020** , the undersigned will commence summary proceedings against you.
18

Date: 9/1/2020

Signature , Owner Lezantonio Woodburn

# 10 DAY NOTICE TO QUIT

**Re: Premises : 12706 177th Street Jamaica NY 11434**

**All Rooms / Floor : 1st/ Floor Apartment 1 used for Dwelling Purpose**

**Apartment 1**

**To: Evis Stephens**
**Calvin Stephens** **and ,** **Jane Doe(s) ,John Doe(s)**

Name of the occupants being fictious and unknown to the person entitled to possession of the premises herein described.

**PLEASE TAKE NOTTICE** , that you and all other persons occupying the subject premises are required to quit and vacate the premises on or before **November 16, 2020.**

You are in possession of the premises after the short sale. Ms. Stephens and her family were permitted to stay on the premises after the short sale for a short term to facilitate new relocation **but no longer than (90) ninety days** .The short term to stay on the premises expired on **June 30, 2019** . Evis Stephens signed the affidavit of Arm's length transaction.

Your rights to occupy the subject premise has been revoked by **12706 Holdings Inc** .

**PLEASE TAKE NOTICE** , that if you and all other persons fail to quit, vacate or surrender the subject premises by **November 16, 2020** , the undersigned will commence summary proceeding against you.

**Dated : November 2, 2020**

**12706 Holdings Inc**

______________________ **landlord**

______________________ **Address**

# EXHIBIT H

Adv. ECF No. 34-8

Queens Supreme Court summons and verified complaint, 12706 Holdings/Woodburn v. Stephens, Index No. 717483/2020 (Compl. ¶¶ 37, 45, 53)

Reset Form

**[Print in <u>black</u> ink to fill in the spaces next to the instructions. *Both* pages *must* be completed. This summons <u>cannot</u> be used for divorce actions.]**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS
-----------------------------------------------------------------------------X

12706 Holdings Inc/LezAntonio Woodburn,
**[Your name(s)]** Plaintiff(s)

-against-

Evis Stephens,Calvin Stephens Jane &John Doe(s),
**[Name(s) of party being sued]** Defendant(s)
-----------------------------------------------------------------------------X

**SUMMONS ~~WITH NOTICE~~**

Index No. 717483 / 2020

10/2 ,20 20
Date Index No. purchase

To the Person(s) Named as Defendant(s) above:

PLEASE TAKE NOTICE THAT YOU ARE HEREBY SUMMONED to appear in this action by serving a notice of appearance on the plaintiff(s) at the address set forth below, and to do so within 20 days after the service of this Summons (not counting the day of service itself), or within 30 days after service is complete if the summons is not delivered personally to you within the State of New York.

YOU ARE HEREBY NOTIFIED THAT should you fail to answer or appear, a judgment will be entered against you by default for the relief demanded below.

Dated: 10/2 , 20 20
**[Date of summons]**

Lezantonio Woodburn
**[Your name(s)]**

130 21 140th Street
South Ozone Park NY 11436
917 882 7978
**[Your address(es)and telephone no.(s)]**

Queens County Clerk's Office
Pay# 287495 10/02/2020 12:42p
Cashier SRAPHAEL Register # 2

Tr.3532236 $210.00
Documents Pay At Court E-file
12706 holdings vs stephens smw

Total: $210.00

Cash $220.00
Change: $10.00

Defendant(s) 12706 177 St. Jamaica N.Y 11436
**[Address(es) of party being sued]**

Notice: The nature of this action is **[briefly describe the nature of your case against the defendant(s), such as, breach of contract, negligence]:**
Breach of Contract, negligence

The relief sought is **[briefly describe the kind of relief you are asking for, such as, money damages of $25,000]** Money damages of $45,000

Should defendant(s) fail to appear herein, judgment will be entered by default for the sum of $45,000 **[amount of money demanded]**, with interest form the date of July 27, 2019 **[date from which interest on the amount demanded is claimed]** and the costs of this action.

Venue: 88-11 Sutphin Blvd, Jamaica NY 11435

Plaintiff(s) designate Queens County as the place of trial. The basis of this designation is **[check box that applies]:**

☑ Plaintiff(s) residence in Queens County

☑ Defendant(s) residence in Queens County

☐ Other [See CPLR Article 5]: ____

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS

---------------------------------------------------------------x

12706 Holdings Inc
Lezantonio Woodbuen

Plaintiff, Index No.________/20__

- against -

**COMPLAINT**

Evis Stephens, Calvin Stephens
John-Doe(s)-Jane Doe(s)

Defendant.

---------------------------------------------------------------x

TO THE SUPREME COURT OF THE STATE OF NEW YORK

The complaint of the plaintiff, Lezantonio Woodbuen, respectfully shows and alleges as follows:

The defendant(s) Evis stephens, Calvin Stephens, John Doe(s) Jane Doe(s) principal address is 12706 177th St. Jamaica NY 11434

The property Was Sold on March 27, 2019 to 12706 Holdings Inc + Lezantonio Woodbuen as [redacted] a Short Sale for $350,000. The premises had extensive repairs to the sum of $250,000.

Ms Evis Stephens Signed an affidavit of Arm's length Transaction which allows the Mortgage holder (seller) to remain in the premises as a tenant for a short term, no more than 90 days [redacted] after the sale. The defendants tenancy expired June 27, 2019.

Ms. Evis Stephens, Calvin Stephens, John Doe(s) and Jane Doe(s) Continue to live in the premises 12706 177th St Jamaica N.Y 11434 from July, 2019 to current date in 2020 (October) without paying use & occupancy, Con Edison, national grid & Dep Water bill.

The defendants Made Several promises to Move out of the premises. Each time myself or partner tried to get a Move out date, Ms. Evis Stephens would use her health as a reason she could not find new location to move.

January 1, 2020 an agreement was created signed by all parties. The defendants made 1 payment, which was late. The agreement was cancelled three month later.

Ms. Evis Stephens stated she was not going to pay any bills & I would have to take her & her family to court.

As the Plantiff Im requesting the court to grant me use & occupany fee from August to December 2019: 2500 x 5 = $12,500 & January to current (October) 2020 10 x 2500 = 25,000 ; natural grid: $1500 Con Edison $1600 Dep water bill $1000. All fees to continue to be paid until defendants move out or evicted. Secondly to order the defendants to pay all bills owed.

Evict the defendants based upon breach of contract with the bank & Arm's length transaction.

As the Plantiff I have lost buyers, Income and late Mortgage payments. I'm force to spend my personal money to maintain the bills.
The defendant, [redacted] Calvin Stephens works at Malverne Union 301 Nicklane, Malverne, NY 11566. He is currently employed.
Ms. Evis Stephens works off the books at a home in Long Island, NY.
Jane Doe(s) John Doe(s) doesn't work she is at premises all day. The Stephens had no hardship in the pandemic. Neither parties did not stop working in the pandemic.

The defendants do not want to move. The defendants do not want to pay any bills for the premises which they lived for one year and 7 months.

The defendants do not qualify to Purchase the property 12706 177th St Jamaica NY 11434.

The defendants are Causing the Plantiff extreme hardship. Credit, & income has been affected.

Currently I have a buyer, which took me 5 months to locate the buyer. The lack of cooperation from the defendants is making the sale difficult. I can not maintain the house with my personal Funds.

Dated: 10/2/2020

Lez Antonio Woodburn
Plaintiff

VERIFICATION

Lezantonio Woodburn, being duly sworn, deposes and says:

I am the plaintiff in the above-entitled action. I have read the foregoing complaint and know the contents thereof. The same are true to my knowledge, except as to matters therein stated to be alleged on information and belief and as to those matters I believe them to be true.

Signature

Lezantonio Woodburn
Print Name

Sworn to before me this
2nd day of October 2020

Notary Public

ALISHA ESAU
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01ES6399741
Qualified in QUEENS County
Commission Expires 10/28/2023

Reset Form

## VERIFICATION

lezantonio Woodburn **(YOUR NAME)**, being duly sworn, deposes and says:

I am the plaintiff in the above-entitled action. I have read the foregoing complaint and know the contents thereof. The same are true to my knowledge, except as to matters therein stated to be alleged on information and belief and as to those matters I believe them to be true.

**[Signature]**

Lezantonio Woodburn **[Printed]**
Plaintiff

Sworn to before me this
2nd day of October, 2020

Notary Public

ALISHA ESAU
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01ES6399741
Qualified in QUEENS County
Commission Expires 10/28/2023

# EXHIBIT I

Adv. ECF No. 34-9

Housing Court harassment OSC, verified petition, and Interim Order
(Sanchez, J., Nov. 25, 2020, HP Index No. 763/20) (Compl. ¶ 39)

NYS ? D Landlord copy

CIVIL COURT OF THE CITY OF NEW YORK
County of QUEENS
Housing Part

Index No.: HP

Eris and Calvin Stevens and Jilleshea Stevens
Tenant(s)/Petitioner(s)

-against-

Lezaniorio Woodburn/Marise Bonapaute
139-21 ... Jamaica Owner(s)/Respondent(s) and
The Dept. of Housing Preservation and Development (DHPD)
11435

**ORDER TO SHOW CAUSE FOR A FINDING OF HARASSMENT and FOR A RESTRAINING ORDER**
(H.P. Action)

Premises:
127-06 177St Fl 1
(Street Address & Apt./Room No.)
Jamaica NY 11434
(Borough & Zip Code)
phone 347-... 6758

Upon the Verified Petition of the above named Petitioner(s), sworn to on 11/09/2020:

Let the Respondent(s) or Respondent's attorney(s) show cause (tell the judge) at the:

**Civil Court of the City of New York,** Housing Part: Q Room 407 Part Q
Located at: 89-17 Sutphin Boulevard Jamaica, New York 11435
On: Nov 30, 2020 at 9:30 AM at 9:30 A.M.,
or as soon as everyone can be heard, why an Order should not be made:

a) finding that the Respondent(s) has/have harassed Petitioner(s) pursuant to Section 27-2005[d] of the Administrative Code of the City of New York;
b) determining that a class c violation existed at the time the harassment occurred;
c) restraining the Respondent(s) from violating Section 27-2005[d] and directing the Respondent(s) to ensure that no further violation occurs;
d) imposing civil penalties upon the Respondent(s) in an amount not less than one thousand dollars and not more that five thousand dollars for each dwelling unit in which the Petitioner(s) have been the subject of a violation of 27-2005[d]; and
e) awarding such other and further relief as this court deems just and proper.

Service of a copy of this Order, together with the annexed Verified Petition, on the Respondent(s) (by Certified Mail, Return Receipt Requested/personally) and the Department of Housing Preservation and Development by Certified Mail, Return Receipt Requested, on or before 11/... , as permitted by Section 27-2115 (j) of the Administrative Code, will be considered good and sufficient. Proof of the service can be filed in the Clerk's Office of the Housing Part before the return date of this Order to Show Cause, or on the date of trial with the Clerk in the Part indicated above.

If the Respondent(s) is/are registered with the Department of Housing Preservation and Development, personal service or mailing may be made to the Respondent(s) at the address indicated in such registration.

Mailing to the DHPD must be made to this address:
Department of Housing Preservation and Development
Housing Litigation Bureau
100 Gold Street
New York, NY 10038

11/09/2020
Date

[signature]
Judge, Housing/Civil Court

## Civil Court of the City of New York

County of QUEENS                                    Index Number ________

Housing Part

Evis and Calvin Stephens and [illegible] Stephens & Jillen Stephens Tenant(s)/Petitioner(s),

-against-

Lezontonio Woodbury/Maxine Bonaparte
130 21 140 st
Jamaica NY 11436 Owner(s)/Respondent(s), and
*The Dept. of Housing Preservation and Development (DHPD)*

**VERIFIED PETITION IN SUPPORT OF AN ORDER TO SHOW CAUSE**

Requesting an Order Finding Harassment and Restraining Respondent(s) From Harassing Tenant(s)/Petitioner(s) (Section 27-2115 Administrative Code of the City of New York)

127-06 177st Jamaica NY 11434
(Address of Tenant/Petitioner)
1 floor Apt. /Rm. # 1

**PETITION**

1. I, Evis & Calvin Stephens, & [illegible] Stephens Jillen Stephens, the Petitioner, am the tenant/person lawfully entitled to possession of the above apartment/room.
2. The Respondent (s) is/are the owner(s) or agent(s) of the owner of the apartment/room. The address of the Respondent(s) is: 130 21 140 st Jamaica NY 11436.
3. ***Check One***
   - ☐ I do not live in a one or two family house.
   - ☐ The apartment/room is in a one or two family house but there are more than two families living in the house or building.
4. I am not a shareholder or condominium owner living in the apartment. I am not a person lawfully entitled to live with such shareholder or condominium owner.
5. In accordance with the Administrative Code of the City of New York section 27-2005[d] I make the following statements: The Respondent has or a person/persons on his/her behalf has/have:
   a) Violated the Administrative Code of the City of New York Section 27-2005[d] by causing or intending to cause the tenant/petitioner to move out of the above mentioned apartment/room or to give up or waive any rights to such apartment/room, and
   b) The Respondent has or a person/persons on his/her behalf has/have:

   ***Check any boxes that are correct***

   - ☑ used force or said they would use force or implied the use of force.
   - ☑ repeatedly interrupted or stopped giving essential services and a violation of record was issued.
   - ☐ failed to timely comply with NYC Admin. Code §27-2140[c] by failing to correct the conditions which made the apartment(s)/room(s) unlivable or unfit for habitation, which are described in the Vacate Order issued by DHPD pursuant to NYC Admin. Code §27–2139[b], and a violation of record has been issued for at least one of those conditions.
   - ☑ repeatedly brought court cases for no good reasons.
   - ☐ removed my possessions from the apartment.
   - ☑ repeatedly caused or permitted acts or omissions that substantially interfered with or disturbed the comfort, peace or quiet of the tenant/petitioner. If the acts or omissions involve physical conditions in the apartment/room/public areas, a violation of record was issued.
   - ☐ removed the door to the apartment or made the lock to the apartment not work, or changed the lock on the apartment door without giving a key to the new lock to the tenant/petitioner.

*Please provide dates and details as to the items you checked in 5 (b) above:*

THe landlord and His Management [Maxine Bonaparte] Constantly keeps threaten us to leave and that they will have our car towed if park in the drive way. We also got a turn off notice from Conedison if not paid. also the went to our cable and internet provider and have them disconnect our Service at 11-9-2020 even though there some remote learning going on. they Constantly keep sending strangers to our house sticking notices on the doors. Keep coming to the basement making noise and singing we not allowed to use the basement even though we have a lease with the basement ... until court because someone has an underlining condition.

6. In accordance with the Administrative Code of the City of New York, I make the following request:
   a. find that owner(s)/respondent(s) has/have harassed me pursuant to 27–2005[d];
   b. decide that a class c violation existed at the time the harassment occurred;
   c. order the owner(s)/respondent(s) to stop harassing me under 27–2005[d] and 27–2121;
   d. order the owner(s)/respondent(s) to pay to the Department of Housing Preservation and Development civil penalties for no less than $1,000 and not more than $5,000 for each dwelling unit in which violations are found following 27–2115(m); and
   e. award such other and further relief as this court deems just and proper.

7. CHECK ONE ☐ I have not brought a case in Housing court for Harassment

☐ I have brought a case or cases in Housing Court for Harassment

***Give index numbers and/or dates*** ______________________

8. Check if requested ☐ The petitioner requests that permission be granted to serve these papers him/herself.

11/09/2020
Date

[signature]
Signature of Tenant/Petitioner

**VERIFICATION**

State of New York, County of Queens, ss.:

Evis + Calvin Stephens & Jillian Stephens, being duly sworn, deposes and says:

I am the petitioner named above, I have read the petition and know the truth of the statements except as to those matters alleged to be on information and belief, and as to those matters I believe them to be true.

Sworn to before me this 9 day of Nov, 20 20

[signature]
Signature and Title of Court Employee, or Notary Public

[signature]
Signature of Tenant/Petitioner

CIVIL COURT OF THE CITY OF NEW YORK
COUNTY OF QUEENS: HOUSING PART C

EVIS STEPEHNS, CALVIN STEPHENS,
JILLEN STEPHENS, Petitioner,

HP Index No. 763/20

against

LEZANTONIO WOODBURN,
MAXINE BONAPARTE,
and
NEW YORK CITY DEPARTMENT OF HOUSING PRESERVATION AND DEVELOPMENT (DHPD),
Respondents,

**Interim Order**

HON. ENEDINA PILAR SANCHEZ,

Petitioner filed this HP case seeking a finding of harassment. Petitioner resides at 127-06 177th Street, 1st Floor, Jamaica, NY 11434. Respondent Woodburn appeared in court. Respondent Bonaparte did not appear. Petitioners and counsel for respondent Department of Housing Preservation and Development (DHPD) appeared via Microsoft Teams video conference pursuant to the Administrative Order in place due to the COVID-19 pandemic. Petitioner provided proof of service. Service was proper. DHPD does not take a position on this harassment case.

Petitioners allege that they are threatened with eviction and the towing of the family vehicle. The internet service was disconnected by respondent Bonaparte.

The Court notes that during this COVID-19 pandemic internet services have become essential. It is necessary for students to participate in school lessons and for a virtual visit with a doctor. As such, interfering with internet service may be construed as harassment under the law.

The matter is adjourned to **December 12, 2020 at 9:30 AM** at respondent's request to seek counsel and for resolution. The parties may appear via Microsoft Team video conference.

This constitutes the Interim Order of the Court.

Dated: November 25, 2020
Queens, New York

So ordered,

APPROVED
epsanchez 11/28/2020 4:18:07 PM

ENEDINA PILAR SANCHEZ
Judge, Housing Court

# EXHIBIT J

Adv. ECF No. 34-10

Uniform Residential Loan Application ($725,000) (Compl. ¶ 51)

# Uniform Residential Loan Application

This application is designed to be completed by the applicant(s) with the Lender's assistance. Applicants should complete this form as "Borrower" or "Co-Borrower", as applicable. Co-Borrower information must also be provided (and the appropriate box checked) when ☐ the income or assets of a person other than the "Borrower" (including the Borrower's spouse) will be used as a basis for loan qualification or ☐ the income or assets of the Borrower's spouse or other person who has community property rights pursuant to state law will not be used as a basis for loan qualification, but his or her liabilities must be considered because the spouse or other person has community property rights pursuant to applicable law and Borrower resides in a community property state, the security property is located in a community property state, or the Borrower is relying on other property located in a community property state as a basis for repayment of the loan.

If this is an application for joint credit, Borrower and Co-Borrower each agree that we intend to apply for joint credit (sign below):

Borrower ______________ Co-Borrower ______________

## I. TYPE OF MORTGAGE AND TERMS OF LOAN

| Mortgage Applied for: | ☐ VA<br>☒ FHA | ☐ Conventional<br>☐ USDA/Rural Housing Service | ☐ Other (explain): | Agency Case Number | Lender Case Number |
|---|---|---|---|---|---|

| Amount | Interest Rate | No. of Months | Amortization Type: | | |
|---|---|---|---|---|---|
| $ 725,000 | % | 360 | | ☒ Fixed Rate<br>☐ GPM | ☐ Other (explain):<br>☐ ARM (type): |

## II. PROPERTY INFORMATION AND PURPOSE OF LOAN

Subject Property Address (street, city, state, & ZIP): 127-06 177TH STREET ST ALBANS NY 11434

No. of Units: 2

Legal Description of Subject Property (attach description if necessary): 2 FAMILY WITH FINISHED BASEMENT AND DRIVEWAY

Year Built: 1930

Purpose of Loan: ☒ Purchase ☐ Refinance ☐ Construction ☐ Construction-Permanent ☐ Other (explain):

Property will be: ☒ Primary Residence ☐ Secondary Residence ☐ Investment

*Complete this line if construction or construction-permanent loan.*

| Year Lot Acquired | Original Cost | Amount Existing Liens | (a) Present Value of Lot | (b) Cost of Improvements | Total (a+b) |
|---|---|---|---|---|---|
| | $ | $ | $ | $ | $ |

*Complete this line if this is a refinance loan.*

| Year Acquired | Original Cost | Amount Existing Liens | Purpose of Refinance | Describe Improvements ☐ made ☐ to be made |
|---|---|---|---|---|
| | $ | $ | | Cost: $ |

Title will be held in what Name(s): TAHA MF MARTIN & CALVIN O STEPHENS

Manner in which Title will be held:

Estate will be held in: ☒ Fee Simple ☐ Leasehold (show expiration date)

Source of Down Payment, Settlement Charges and/or Subordinate Financing (explain):

## III. BORROWER INFORMATION

| Borrower | Co-Borrower |
|---|---|
| Borrower's Name (include Jr. or Sr. if applicable): TAHA MF MARTIN | Co-Borrower's Name (include Jr. or Sr. if applicable): CALVIN O STEPHENS |
| Social Security Number: [redacted]95 | Social Security Number: [redacted]3988 |
| Home Phone (incl. area code): [redacted]43 | Home Phone (incl. area code): [redacted]8 |
| DOB (mm/dd/yyyy): [redacted] | DOB (mm/dd/yyyy): [redacted] |
| Yrs. School: 17 | Yrs. School: 12 |
| ☒ Married (includes registered domestic partners)<br>☐ Unmarried (includes single, divorced, widowed)<br>☐ Separated | ☒ Married (includes registered domestic partners)<br>☐ Unmarried (includes single, divorced, widowed)<br>☐ Separated |
| Dependents (not listed by Co-Borrower) No. Ages | Dependents (not listed by Borrower) No. Ages |
| Present Address (street, city, state, ZIP/ country) ☐ Own ☒ Rent 5 No. Yrs.<br>5 TENAFLY ROAD<br>ENGLEWOOD NJ 07631 | Present Address (street, city, state, ZIP/ country) ☐ Own ☒ Rent 1 No. Yrs.<br>96 WHITEWOOD ROAD<br>WATERBURY CT 06708 |
| Mailing Address, if different from Present Address | Mailing Address, if different from Present Address |

*If residing at present address for less than two years, complete the following:*

| Borrower | Co-Borrower |
|---|---|
| Former Address (street, city, state, ZIP) ☐ Own ☐ Rent ___ No. Yrs. | Former Address (street, city, state, ZIP) ☐ Own ☐ Rent ___ No. Yrs. |
| Former Address (street, city, state, ZIP) ☐ Own ☐ Rent ___ No. Yrs. | Former Address (street, city, state, ZIP) ☐ Own ☐ Rent ___ No. Yrs. |

Borrower ______
Co-Borrower ______

# LOAN APPLICATION

## 1) GUARANTOR/BORROWER INFORMATION

Name: CALVIN O STEPHENS

Social Security Number: [redacted]986

Home Phone Number: (718) 570-7318

Home Address:
96 Whitewood Road
Waterbury CT 06708

Own ☐ Rent ☑

Cell Phone Number:

Date of Birth: [redacted]1953

Fax Number:

Number of Years at Above Address: 2

Single ☐ Married ☑

E-mail Address:

## 2) EMPLOYMENT INFORMATION

Name and Address of Employer:
Malverne UFSD
301 WicksLane
Malverne NY 11565

Check if Self-employed ☐

Years on Job: 10

Position Held:

Business Phone Number:

Business Fax Number:

## 3) FINANCIAL INFORMATION

| Gross Monthly Income | Amount | Gross Monthly Expenses | Amount |
|---|---|---|---|
| Gross Salary/Commissions | | Federal & State Taxes | |
| Rental Income | | Mortgage/Rent* | |
| Interest Income | | Auto Payments and Insurance | |
| Investment Income | | Credit Card Payments | |
| Other Income | | Student Loans/Other Loans | |
| | | Other Expenses | |
| | | | |
| **TOTAL INCOME** | | **TOTAL EXPENSES** | |

** If property taxes and insurance are not included in mortgage payment please include those in other expenses*

# EXHIBIT K

Adv. ECF No. 34-11

Amendment to Use and Occupancy agreement, Mar. 30, 2020 (buyback shortened to one year) (Compl. ¶ 55)

Monday, March 30, 2020

**Amendment to Use and Occupancy agreement for 12706 177th Street, Jamaica NY 11434**

**The previous agreement dated January 1, 2020 between the owner, 12706 Holdings Inc and the occupants, Calvin Stephens, Evis Stephens, John Doe(s) and Jane Doe(s) is hereby amended to:**

**Unit 1(Floor 1) no basement usage , please remove your washer and dryer.**

**The backyard is not usable. The shed is just for the 12706 Holdings Inc items.**

**The occupants can continue to put the garbage in the can. The recyclables go in the recyclable garbage can, as of, April 10, 2020 is the start date, please put recyclable items in the can.**

12706 Holdings Inc is adjusting the two years and three-month purchase agreement to: [initials] 10/04/19

**One year (January 01, 2021)** due to the Stephens inability to get financing as of 2019 to purchase 12706 177th Street Jamaica NY 11434 **and The Arm's length agreement expired on June 27, 2019.**

**If the Stephens cannot get the finance to purchase 12706 177th street Jamaica NY 11434 by the end of this contract, they agreed to vacate 12706 177th Street Jamaica NY with their family members on floor 2 within 30 days.**

**The signatures are acknowledgement of the amendment to the agreement**

Lez Antonio Woodburn

[signature]

Evis Stephens

[signature]

Calvin Stephens

[signature]

Notary acknowledges the signature of Lez Antonio Woodburn, Evis Stephens, and Calvin Stephens on this 30th day of March 2020

Notary Signature

**JONATHAN P. BROWN**
**Notary Public, State of New York**
**No. [illegible]**
**Qualified in Queens County**
**Commission Expires July 20 22**

[signature]

# EXHIBIT L

Adv. ECF No. 34-12

Termination of contract (Apr. 10, 2020) with 10-day notice to quit and statement (Compl., unnumbered ¶ following ¶ 57)

**Cancellation of contract -Use and Occupancy Agreement**
**For 12706 177th Street Jamaica NY 11434**

The agreement dated January 1, 2020 between the owner ,12706 Holdings Inc and occupants, Calvin Stephens, Evis Stephens, John Doe(S) and Jane Doe(S) is terminated as of April 10, 2020.

The owner 12706 Holdings Inc has decided to cancel the Contract – use and occupancy agreement to purchase, 12706 177th Street Jamaica NY 11434, Block: 12527 Lot: 0093 and reside at the property.

The Short Sale liquidation is an Arm's length transaction. It does not allow the homeowner, and all occupants that reside at the property to continue residing for more than 90 days, however 12706 Holdings has given the homeowner and the occupants more than a year. The homeowner signed the Affidavit of Arm's length Transaction at closing.

12706 Holdings Inc has given the occupants and homeowner more than one year to relocate, which can be common and customary in New York, however the homeowner and occupants must vacate the property. Use and Occupancy fees, all utilities services charges continue until the occupants move.

Owner, 12706 Holdings Inc

Lez Antonio Woodburn

Notary acknowledges the signature of Lez Antonio Woodburn on this April 10th, 2020

Notary:

JONATHAN P. BROWN
Notary Public, State of New York
No. 01BR6369891
Qualified in Queens County
Commission Expires Nov 2022

# 10 DAY NOTICE TO QUIT

**Re: Premises : 12706 177th Street Jamaica NY 11434**

**All Rooms / Floor : 1st/ Floor Apartment 1 used for Dwelling Purpose**

**Apartment 1**

**To: Evis Stephens**
**Calvin Stephens** **and ,** **Jane Doe(s) ,John Doe(s)**

Name of the occupants being fictious and unknown to the person entitled to possession of the premises herein described.

**PLEASE TAKE NOTTICE** , that you and all other persons occupying the subject premises are required to quit and vacate the premises on or before **November 16, 2020.**

You are in possession of the premises after the short sale. Ms. Stephens and her family were permitted to stay on the premises after the short sale for a short term to facilitate new relocation **but no longer than (90) ninety days** .The short term to stay on the premises expired on **June 30, 2019** . Evis Stephens signed the affidavit of Arm's length transaction.

Your rights to occupy the subject premise has been revoked by **12706 Holdings Inc** .

**PLEASE TAKE NOTICE** , that if you and all other persons fail to quit, vacate or surrender the subject premises by **November 16, 2020** , the undersigned will commence summary proceeding against you.

**Dated : November 2, 2020**

**12706 Holdings Inc**

____________________ **landlord**

____________________ **Address**

## Statement from 10 day Notice to Quit

Ms. Maxine Bonaparte constantly keeps harassing us to leave and that they will have our vehicles towed if parked in the driveway. We also got a turned off notice from Con-Edison if not paid.

They went to our cable and internet provider and have them disconnect our services on November 8, 2020 even though there was remote learning taking place.

They constantly keep sending strangers to our home and sticking notices on the doors. We were so uncomfortable when they keep going in the basement and making noise.

We kindly spoke to them and ask to stop and wait for the court but Ms. Maxine Bonaparte keep showing up and harassing us and we kept stating to her that Jane Doe has an underlying condition.

# EXHIBIT M

Adv. ECF No. 34-13

HUD-1 Settlement Statement ($375,000 price; line 603 cash to seller $0.00) and Chase wire of $337,500 to Ocwen Loan Servicing (Compl. ¶ 59)

OMB Approval No. [illegible]

# A. Settlement Statement (HUD-1)

DISTRIBUTED BY Judicial Title

**B. Type of Loan**

| | | | |
|---|---|---|---|
| 1. ☐ FHA 2. ☐ RHS 3. ☐ Conv. Unins. 4. ☐ VA 5. ☐ Conv. Ins. | 6. File Number: | 7. Loan Number: | 8. Mortgage Insurance Case Number: |

C. Note: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

| | | |
|---|---|---|
| D. Name & Address of Borrower:<br>[illegible] HOLDINGS INC<br>[illegible] WEST 11[illegible] STREET SUITE [illegible]<br>NEW YORK NY [illegible] | E. Name & Address of Seller:<br>[illegible]<br>[illegible] 177[illegible] ST<br>Jamaica, NY 11[illegible] | F. Name & Address of Lender:<br>CASH |
| G. Property Location:<br>[illegible] 177[illegible] STREET<br>Jamaica NY 11[illegible] | H. Settlement Agent:<br>Charles [illegible]<br>[illegible] Court Street<br>Brooklyn NY 11[illegible]<br>Place of Settlement:<br>[illegible] Abstract | I. Settlement Date:<br>[illegible]<br>LOAN #: [redacted] |

**J. Summary of Borrower's Transaction**

| 100. Gross Amount Due from Borrower | |
|---|---|
| 101. Contract Sale Price | $[illegible] |
| 102. Personal Property | |
| 103. Settlement charges to borrower (line 1400) | $0.00 |
| 104. | |
| 105. Charles [illegible] | $[illegible] |
| Adjustments for items paid by seller in advance | |
| 106. City/town taxes to | |
| 107. County taxes to | |
| 108. Assessments to | |
| 109. [illegible] | $[illegible] |
| 110. [illegible] | $[illegible] |
| 111. [illegible] & [illegible] LLP | $[illegible] |
| 112. Home Owner [illegible] | $[illegible] |
| 120. Gross Amount Due from Borrower | $[illegible] |
| 200. Amount Paid by or in Behalf of Borrower | |
| 201. Deposit or earnest money | |
| 202. Principal amount of new loan(s) | |
| 203. Existing loan(s) taken subject to | |
| 204. | |
| 205. | |
| 206. | |
| 207. | |
| 208. | |
| 209. | |
| Adjustments for items unpaid by seller | |
| 210. City/town taxes to | |
| 211. County taxes to | |
| 212. Assessments to | |
| 213. | |
| 214. | |
| 215. | |
| 216. | |
| 217. | |
| 218. | |
| 219. | |
| 220. Total Paid by/for Borrower | $0.00 |
| 300. Cash at Settlement from/to Borrower | |
| 301. Gross amount due from borrower (line 120) | $[illegible] |
| 302. Less amounts paid by/for borrower (line 220) | $0.00 |
| 303. Cash ☐ From ☐ To Borrower | $[illegible] |

**K. Summary of Seller's Transaction**

| 400. Gross Amount Due to Seller | |
|---|---|
| 401. Contract Sale price | $[illegible] |
| 402. Personal Property | |
| 403. | |
| 404. | |
| 405. | |
| Adjustments for items paid by seller in advance | |
| 406. City/town taxes to | |
| 407. County taxes to | |
| 408. Assessments to | |
| 409. | |
| 410. | |
| 411. | |
| 412. | |
| 420. Gross Amount Due to Seller | $[illegible] |
| 500. Reductions in Amount Due to Seller | |
| 501. Excess deposit (see instructions) | |
| 502. Settlement charges to seller (line 1400) | $[illegible] |
| 503. Existing loan(s) taken subject to | |
| 504. Payoff of first mortgage loan | $[illegible] |
| 505. Payoff of second mortgage loan | |
| 506. | |
| 507. | |
| 508. | |
| 509. | |
| Adjustments for items unpaid by seller | |
| 510. City/town taxes to | |
| 511. County taxes to | |
| 512. Assessments to | |
| 513. | |
| 514. | |
| 515. | |
| 516. | |
| 517. | |
| 518. | |
| 519. | |
| 520. Total Reduction Amount Due Seller | $[illegible] |
| 600. Cash at Settlement to/from Seller | |
| 601. Gross amount due to seller (line 420) | $[illegible] |
| 602. Less reductions in amounts due seller (line 520) | $[illegible] |
| 603. Cash ☐ To ☐ From Seller | $0.00 |

The Public Reporting Burden for this collection of information is estimated at 35 minutes per response for collecting, reviewing, and reporting the data. This agency may not collect this information, and you are not required to complete this form, unless it displays a currently valid OMB control number. No confidentiality is assured; this disclosure is mandatory. This is designed to provide the parties to a RESPA covered transaction with information during the settlement process.

L. Settlement Charges

| | | Paid From Borrower's Funds at Settlement | Paid From Seller's Funds at Settlement |
|---|---|---|---|
| 700. Total Real Estate Broker Fees | | | |
| Division of commission (line 700) as follows: | | | |
| 701. $ to | | | |
| 702. $ to | | | |
| 703. Commission paid at settlement | | | |
| 704. Medical Construction and Development | | | [illegible] |
| **800. Items Payable in Connection with Loan** | | | |
| 801. Our origination charge $ | (from GFE #1) | | |
| 802. Your credit or charge (points) for the specific interest rate chosen $ | (from GFE #2) | | |
| 803. Your adjusted origination charges | (from GFE #A) | | |
| 804. Appraisal fee to | (from GFE #3) | | |
| 805. Credit report to | (from GFE #3) | | |
| 806. Tax service to | (from GFE #3) | | |
| 807. Flood certification to | (from GFE #3) | | |
| 808. | | | |
| 809. | | | |
| 810. | | | |
| 811. | | | |
| **900. Items Required by Lender to be Paid in Advance** | | | |
| 901. Daily interest charges from to @ $ /day | (from GFE #10) | | |
| 902. Mortgage insurance premium for months to | (from GFE #3) | | |
| 903. Homeowner's insurance for years to | (from GFE #11) | | |
| 904. | | | |
| **1000. Reserves Deposited with Lender** | | | |
| 1001. Initial deposit for your escrow account | (from GFE #9) | | |
| 1002. Homeowner's insurance months @ $ per month $ | | | |
| 1003. Mortgage insurance months @ $ per month $ | | | |
| 1004. Property Taxes months @ $ per month $ | | | |
| 1005. months @ $ per month $ | | | |
| 1006. months @ $ per month $ | | | |
| 1007. Aggregate Adjustment -$ | | | |
| **1100. Title Charges** | | | |
| 1101. Title services and lender's title insurance | (from GFE #4) | | |
| 1102. Settlement or closing fee $ | | | |
| 1103. Owner's title insurance | (from GFE #5) | | |
| 1104. Lender's title insurance $ | | | |
| 1105. Lender's title policy limit $ | | | |
| 1106. Owner's title policy limit $ | | | |
| 1107. Agent's portion of the total title insurance premium to $ | | | |
| 1108. Underwriter's portion of the total title insurance premium to $ | | | |
| 1109. | | | |
| 1110. | | | |
| 1111. | | | |
| **1200. Government Recording and Transfer Charges** | | | |
| 1201. Government recording charges | (from GFE #7) | | |
| 1202. Deed $ Mortgage $ Release $ | | | |
| 1203. Transfer taxes | (from GFE #8) | | |
| 1204. City/County tax/stamps Deed $ Mortgage $ | | | [illegible] |
| 1205. State tax/stamps Deed $ Mortgage $ | | | [illegible] |
| 1206. | | | |
| **1300. Additional Settlement Charges** | | | |
| 1301. Required services that you can shop for | (from GFE #6) | | |
| 1302. Attorney $ | | | [illegible] |
| 1303. Department of Water and Sewage $ | | | [illegible] |
| 1304. Grand Extinction | | | [illegible] |
| 1305. | | | [illegible] |
| 1400. Total Settlement Charges (enter on lines 103, Section J and 502, Section K) | | $0.00 | [illegible] |

| Charges That Cannot Increase | HUD-1 Line Number | | |
|---|---|---|---|
| Our origination charge | # 801 | | |
| Your credit or charge (points) for the specific interest rate chosen | # 802 | | $0.00 |
| Your adjusted origination charges | # 803 | | $0.00 |
| Transfer taxes | # 1203 | | $0.00 |
| | | | $0.00 |

| | | | |
|---|---|---|---|
| Government recording charges | # 1201 | | $0.00 |
| | # | | |
| | # | | |
| | # | | |
| | # | | |
| | # | | |
| | # | | |
| | # | | |
| | | $0.00 | $0.00 |
| | | $0.00 or | % |

| | | | |
|---|---|---|---|
| Initial deposit for your escrow account | # 1001 | | $0.00 |
| Daily interest charges $ /day | # 901 | | $0.00 |
| Homeowner's insurance | # 903 | | $0.00 |
| | # | | |
| | # | | |

Loan Terms

| | |
|---|---|
| Your initial loan amount is | $ |
| Your loan term is | years |
| Your initial interest rate is | % |
| Your initial monthly amount owed for principal, interest, and any mortgage insurance is | $ includes<br>☐ Principal<br>☐ Interest<br>☐ Mortgage Insurance |
| Can your interest rate rise? | ☐ No ☐ Yes, it can rise to a maximum of % . The first change will be on and can change again every after . Every change date, your interest rate can increase or decrease by %. Over the life of the loan, your interest rate is guaranteed to never be lower than % or higher than %. |
| Even if you make payments on time, can your loan balance rise? | ☐ No ☐ Yes, it can rise to a maximum of $ |
| Even if you make payments on time, can your monthly amount owed for principal, interest, and mortgage insurance rise? | ☐ No ☐ Yes, the first increase can be on and the monthly amount owed can rise to $ . The maximum it can ever rise to is $ |
| Does your loan have a prepayment penalty? | ☐ No ☐ Yes, your maximum prepayment penalty is $ |
| Does your loan have a balloon payment? | ☐ No ☐ Yes, you have a balloon payment of $ due in years on . |
| Total monthly amount owed including escrow account payments | ☐ You do not have a monthly escrow payment for items, such as property taxes and homeowner's insurance. You must pay these items directly yourself.<br>☐ You have an additional monthly escrow payment of $ that results in a total initial monthly amount owed of $ . This includes principal, interest, any mortgage insurance and any items checked below:<br>☐ Property taxes ☐ Homeowner's insurance<br>☐ Flood insurance ☐<br>☐ ☐ |

Note: If you have any questions about the Settlement Charges and Loan Terms listed in this form, please contact your lender.

**The Undersigned Acknowledges Receipt of this Disclosure Statement and Agrees to the Conditions Thereof.**

[illegible] ______________________ [illegible] ______________________

______________________ ______________________

## Wire Transfer Outgoing Request

CHASE

### Wire Transfer Sender Information

Sender Name:
ANTHONY S CHILLEST

| | | | | | |
|---|---|---|---|---|---|
| Account Name: IOLA-DONALDSON & CHILLEST, LLP | | Street Address: 1825 PARK AVE RM 1102 | | | |
| City: NEW YORK | State: NY | Zip: [redacted]-1841 | Country: USA | | Daytime Phone: [redacted] |
| Primary ID Type: Driver's License | ID Issuer: NY | ID Number: [redacted]4 | ID Issue Date: 07/26/2017 | | ID Exp: [redacted]2021 |
| Secondary ID Type: Chase or Bank Issued ATM Card | ID Issuer: chase | ID Number: XXXXXXXXXXXX2259 | ID Issue Date: | | ID Exp: [redacted]020 |

Comments:

### Wire Transfer Information

| | | | |
|---|---|---|---|
| Request Date: 03/29/2019 | Request time: 05:38:45PM Eastern time | Effective date: 04/01/2019 | Wire Type: Domestic |
| Debit Account #: [redacted]66 | Debit Account Type: IOLTA ACCOUNT | Available Balance: $552,787.70 | Wire Amount (US dollars): $337,500.00 |
| Qualifying Account #: | Qualifying Account Type: | Source of funds: Checking | Wire Fee: $0 |
| Currency type to be sent: US Dollars | Exchange rate: N/A | Foreign currency account: N/A | Amount to Collect (USD): $337,500.00 |

FX Contract Number:

A

### Recipient Account Information

Account Name:
OCWEN LOAN SERVICING, LLC

| | | | | |
|---|---|---|---|---|
| Street Address: | Account Number: [redacted]52 | | | |
| | City: | State: | Zip: | Country: |

Text to Recipient:
loan number [redacted] Eva Stephens 12706 179th st jamaica, ny 11434-3307

### Receiving Bank Information

Bank Name:
Wells Fargo Bank, National Association

| | | | | |
|---|---|---|---|---|
| Street Address: 1000 LOUISIANA ST | Bank ABA/SWIFT Code: [redacted]8 | | | |
| | City: HOUSTON | State: TX | Zip: [redacted]008 | Country: USA |

Intermediary Bank Name:

| | | | | |
|---|---|---|---|---|
| Street Address: | Intermediary Bank ABA: | | | |
| | City: | State: | Zip: | Country: |

Text to Receiving Bank:

# Wire Transfer Agreement

**1. Service.**

The terms and provisions in this Wire Transfer Agreement ("Agreement") describe our wire transfer service, including what you can expect from us (JPMorgan Chase Bank, N.A.) and the security procedures we will take when you send a wire transfer. If there is a conflict between any section of your Deposit Account Agreement and this Agreement, the provisions of this Agreement will apply.

The following types of wire transfers, when completed by a branch banker or by a Chase Private Client banker, are governed by this Agreement:

- **Domestic Wire Transfer:** A wire transfer sent to a bank within the U.S., including its territories.
- **International Wire Transfer:** A wire transfer sent in either U.S. or foreign currencies, including using our Chase Global Transfer service, to a bank outside the U.S. **Consumer International Wire Transfers** are wires that are sent from an account used primarily for personal, family, or household purposes.

By providing your signature as authorization, as part of our security procedures, you agree to these terms and conditions and authorize us to provide you Domestic Wire Transfers or International Wire Transfers. Wire transfers, when completed using our Online Services or Mobile Services, are governed by a separate agreement.

**2. Security Procedures.**

These security procedures are only to help prevent unauthorized access to your account. All wire transfer requests go through an internal review, and we may need to contact you to verify information about your wire transfer. We may impose stricter security procedures for any particular wire transfer you make, but we have no obligation to do so. If we choose to impose stricter security procedures, we will not be liable to you for any delays or losses, and we will not be obligated to impose such security procedures in the future.

**(a) For Chase Branch Wire Transfers Only:**

When you request a wire transfer in a branch you will be required to provide your signature as authorization for each wire transfer and show valid identification. You acknowledge these security procedures used for wire requests you make in a branch are a commercially reasonable method of verifying your branch wire transfer. You are responsible for any wire transfer issued in your name using these security procedures, whether or not you actually authorized the transfer.

**(b) For Chase Private Client Customers Only:**

Only Chase Private Client Telephone Banking can complete your wire transfer request using this service. To request wire transfers, you must provide your signature as authorization and maintain an active Chase Private Client Checking or Savings account. On the authorization form you can place a dollar limit on the wire transfers you request.

- You may request a wire transfer by telephone, and you agree that we will confirm your request by using any of the following security procedures, at our discretion:
  - Confirming certain personal information about you.
  - Contacting you, another account holder or someone else you have listed on the authorization form.
- You may request a wire transfer by email, and you agree that we will confirm your request by contacting you or another account holder.
- We may call you at any phone number we have for you in our records or to the phone numbers provided on the authorization form.
- You acknowledge that we offer wire transfer services in person at our branches, or online which provide a higher level of security for your accounts, and you can use these options instead. You acknowledge the respective security procedures above for wire transfers are a commercially reasonable method of verifying your wire transfer. You are responsible for any wire transfer issued in your name using these security procedures, whether or not you actually authorized the transfer.
- If you do not specify the account from which to subtract the funds, we can subtract the amount of the wire transfer from any account you designated on the authorization form.

**3. Processing, Canceling, Delays and Notifications of Wire Transfers.**

**(a) Processing:** We'll start processing your wire transfer the same business day if we receive it before the cutoff times we establish from time to time or provide you at the time you request your transfer. If we receive your request after that time, we'll process it the following business day. After we start processing your wire transfer, you must have available funds in the deposit account you designated in your instructions.

**(b) Canceling:** You have the right to cancel Consumer International Wire Transfers at no cost to you within 30 minutes after you have authorized us to send it. For all other wire transfers, once you have submitted a wire transfer for the current business day, you cannot cancel it after we've begun processing, but you may request us to attempt to return the funds to you. If the recipient's bank agrees, your funds may be returned to you, but likely not the full amount that was originally sent. We will not automatically cancel your wire transfer due to the transfer being delayed by more than five business days; if we do cancel your wire transfer we'll notify you.

**(c) Modifying:** Once a wire transfer has begun processing, we will not be able to change any type of wire transfer requests unless the recipient's bank agrees. If the recipient's bank declines to change the wire transfer request, you will be responsible for the transfer you initially requested.

**(d) Internal Review:** During our internal review, we may subtract funds from your account or place a hold on your account and it may result in processing delays. Once we have released the wire transfer, the recipient's bank may delay credit to the recipient due to their own internal review processes.

**(e) Notifications:** We will send you an email notification on the status of your wire transfer, it will be sent to an email address you have provided. We may also notify you verbally of the status of your wire transfer, but we are not required to do so. If you do not have an email address on file, if the email is returned undeliverable, or we are unable to send an email due to system failures or outages beyond our reasonable control, it is your responsibility to monitor your account for the status of your wire transfer. You may contact us for the status of your wire transfer. These notification methods are deemed to be commercially reasonable. Any other information we may provide upon successfully scheduling a wire transfer is only an indication that we've received your request and not an indication that we've accepted your wire transfer.

**4. Identifying Number.**

We or any other bank involved in the wire transfer will complete your wire transfer request using the account number or bank identification number you provide, even if the numbers do not match the recipient's or bank's name. ***If you provided us an incorrect account number for the recipient or an incorrect routing or identification number for the recipient's bank, you could lose the amount of the transfer.***

**5. Future Dated Wire Transfers.**
You may request a future dated (one-time) domestic wire transfer, up to 10 business days from the current business days cutoff of 5 p.m. Eastern Time (2 p.m. Pacific Time). You cannot cancel a future dated wire transfer once it has been requested.

**6. Foreign Exchange Transfer.**
It is our discretion in which foreign currencies we will send wire transfers, and these can change at any time. If you send a wire transfer in a foreign currency, you authorize us to deduct the amount from your account at the exchange rate we offered at the time you requested it. The foreign exchange rates we use are determined by us in our sole discretion.

The exchange rate we use will include a spread and may include commissions or other costs that we, our affiliates, or our vendors may charge in providing foreign currency exchange to you. The exchange rate may vary among customers depending on your relationship, products with us or the type of transaction being conducted, the dollar amount, type of currency, and the date and the time of the exchange. You should expect that these rates will be less favorable than rates quoted online or in publications.

If the funds are returned or payment cannot be made for any reason, we will not be liable for more than the amount of the wire transfer at our exchange rate at the time we return the funds to you, less charges taken by any other bank involved in the wire transfer. If you cancel a funds transfer request, other than a cancellation of a Consumer International Funds Transfer within 30 minutes after you authorized us to send it, and it causes a loss or cost to us, we may subtract funds from your account to cover these losses. If your initial request is returned, cancelled or changed, your new wire transfer request will be subject to a new exchange rate.

If the wire transfer is not in the currency of the recipient's account, the recipient's bank or another processing bank may reject the wire transfer or convert it. If converted, you agree the wire transfer may be converted to a different currency at their exchange rate and may subtract additional fees.

**7. Fees and Payment Route.**
We may charge a fee when you use this service. Please refer to your account agreement or product information for fees that may apply. We may use any funds transfer system we believe reasonable to complete your request, regardless of any instructions you might give us. If we also are the recipient's bank, we may complete your request using an internal transfer. You are responsible for all fees and taxes, including our fees and any fees charged by other funds transfer systems or banks involved in the transfer.

**8. Wire Transfer System Rules and Laws.**
The use of this service is subject to all applicable U.S. federal and state laws, regulations, rules and wire transfer arrangements, including the respective state's Uniform Commercial Code Article 4A, as may be applicable. If you make a Consumer International Wire Transfer, it is also subject to additional federal laws and regulations which, in the event of a conflict with this Agreement, will govern. All of your wire transfers must comply with U.S. laws, including the regulations and economic sanctions administered by the U.S. Treasury Department's Office of Foreign Asset Control and other applicable laws.

**9. Indemnification.**
You will indemnify us for all claims, expenses, liabilities, and losses (including reasonable legal fees) if you or a third party makes a claim against us for any of our actions or services in this Agreement, unless they prove gross negligence or willful misconduct. You understand this section will survive even if you close your account or this Agreement is terminated.

**10. Failure to Perform; Limitation of Liability.**
We are only responsible for performing the services specified in this Agreement. We will not be liable for the failure or delay of any wire transfer or for failing to meet other obligations in the Agreement because of circumstances or causes beyond our control, including governmental, legal or regulatory restrictions or prohibitions, third party actions, natural disasters, equipment or system failures, labor disputes, wars or riots. We are not liable for any indirect, special or consequential damages.
Any provision of this Agreement that limits the bank's liability does not negate the bank's duty (if any) under applicable law to act in good faith and with reasonable care.

**11. Changes to the Agreement**
We may change the terms of this Agreement, including fees and features of this service, at any time. If any change would adversely affect you, we will notify you in advance, unless the change is necessary to comply with a legal requirement.

We may direct you to a branch or to your Chase Private Client banker for the content of any changes or the revised Agreement unless the law requires a different method. Your use of this service after we have made such changes available will be considered your agreement to the change.

**By providing your signature as authorization, you agree to these terms and conditions, that the wire transfer information in this document is accurate and you authorize us to process this wire transfer.**

**Recipient Bank's Identifier (ABA/SWIFT):** [redacted]8 **Recipient's Account Number:** [redacted]952

**Sender's Signature:** ______________________ **Date:** ____________

**Email Address:** achilliest@aol.com

**Transaction Number (Contact ID):** [redacted]T0009

**The Email Address and Transaction Number provided will be used for communication purposes.**

**Branch / Department Information**

Initiated by: [redacted]LARDO ______ Initiating Branch: West Harlem - 24686 Phone: [redacted]-1049 ______ Request Time: [redacted]5PM

Wire Transfer: ☐ Approved ☐ Declined Approved/Declined by (Print): ______

Approved/Declined by Signature: ______ Date: ______

Decline Reason: ______ Comments: ______

Approving Manager (wire amount over limit) ______

Method of Approval (attach required supporting documentation) ☐ Phone call ☐ Email ☐ Other (explain) ______

**Wire Tracking Information**

FX Contract Number (if applicable) ______

# EXHIBIT N

Adv. ECF No. 34-14

Ocwen Affidavit of Arm's Length Transaction package (Bonaparte signing as agent for both seller and buyer; notarized Mar. 28, 2019; closing Mar. 27, 2019) (Compl. ¶ 60)

Ocwen Loan Servicing, LLC
www.ocwen.com
*Helping Homeowners is What We Do!®*

1661 Worthington Road, Suite 100
West Palm Beach, FL 33409
Toll Free: 800.746.2936

## AFFIDAVIT OF 'ARM'S LENGTH TRANSACTION'

**Account Number:** [redacted]

**Property Address:**
12706 177th St
Jamaica, NY 11434-3307

All Parties to the contract to purchase aforementioned property dated: 01 / 04 / 2019

This affidavit is to be executed before or at the time of closing of the sale of the Mortgaged Premises by all Borrower(s), purchaser(s), real estate brokers representing any of the parties, the escrow/closing agent performing the closing of the sale, and the transaction facilitator facilitating the sale (if any) certifying under penalty of perjury that to the best of each signatory's knowledge and belief:

(a) The sale of the Mortgaged Premises is an 'arm's length' transaction, between parties who are unrelated and unaffiliated by family, marriage or commercial enterprise;

(b) There are no agreements, understandings or contracts between the parties that the Borrower will remain in the Mortgaged Premises as a tenant or later obtain title or ownership of the Mortgaged Premises, except to the extent that the Borrower is permitted to remain as a tenant on the Mortgaged Premises for a short term, as is common and customary in the market, but no longer than ninety (90) days, in order to facilitate relocation;

(c) Neither the Borrower(s) nor the purchaser(s) will receive any funds or commissions from the sale of the Mortgaged Premises. The Borrower may receive a payment if it is offered by the Servicer, approved by the Investor and reflected on the Settlement/ Closing Disclosure Statement;

(d) There are no agreements, understandings or contracts relating to the current sale or subsequent sale of the Mortgaged Premises that have not been disclosed to the Servicer;

(e) All amounts to be paid to any party, including holders of other liens on the Mortgaged Premises, in connection with the short payoff transaction have been disclosed to and approved by the Servicer and will be reflected on the Settlement/ Closing Disclosure Statement;

(f) Each signatory understands, agrees and intends that the Servicer and the Investor are relying upon the statements made in the affidavit as consideration for the reduction of the payoff amount of the Mortgage and agreement to the sale of the Mortgaged Premises;

(g) A signatory who makes a negligent or intentional misrepresentation agrees to indemnify the Servicer and the Investor for any and all loss resulting from the misrepresentation including, but not limited to, repayment of the amount of the reduced payoff of the Mortgage;

(h) The certification will survive the closing of the transaction; and

(i) Each signatory understands that a misrepresentation may subject the party making the misrepresentation to civil and/or criminal liability.



*This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is provided purely for informational purposes only with regard to our secured lien on the above referenced property. It is not intended as an attempt to collect a debt from you personally.*

**TAX CONSEQUENCES.** Please be advised that completing a short sale may have consequences with respect to your federal, state, or local tax liability, as well as eligibility for any public assistance benefits you may receive. Ocwen cannot advise you on tax liability or any effect on public assistance benefits, you may wish to consult with a qualified individual or organization about any possible tax or other consequences resulting from the short sale and/or deficiency waiver.

**CREDIT REPORTING.** We will follow standard industry practice and report to the major credit reporting agencies that your mortgage was settled for less than the full payment. We have no control over or responsibility for the impact of this report on your credit score. You may access the following website to learn more about the potential impact of a short sale on your credit: http://www.ftc.gov/bcp/edu/pubs/consumer/credit/cre24.shtm.

**NOTICE REGARDING CREDIT DISCRIMINATION:** The Federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The federal agency that administers compliance with this law concerning this creditor is Federal Trade Commission, Equal Credit Opportunity, Washington, D.C. 20580.

Ocwen reserves the right to terminate this offer at any time prior to your timely acceptance of the terms set forth above. All terms within this agreement must be strictly complied with, and any failure to complete or comply with any term constitutes failure to accept this discounted payoff offer rendering the offer is null and void. If this discounted payoff is not accepted, is terminated prior to acceptance, or otherwise is not completed as instructed in the manner and time frame set forth in this letter, then nothing in this letter shall be construed to prejudice, waive, modify or alter any of Ocwen or Investor's rights or remedies in law or in equity in collecting the entire amounts due and to come due on the Loan or be construed to waive any defense of Ocwen or Investor.



*This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is provided purely for informational purposes only with regard to our secured lien on the above referenced property. It is not intended as an attempt to collect a debt from you personally.*

Ocwen Loan Servicing, LLC
www.ocwen.com
*Helping Homeowners is What We Do!®*

1661 Worthington Road, Suite 100
West Palm Beach, FL 33409
Toll Free: 800.746.2936

ACKNOWLEDGED AND ACCEPTED by:

SIGN HERE

Evis Stephens (signature)
Evis Stephens

3/27/19
Date (MM/DD/YY)

NMLS # 1852

DISC_PLS_VAM

*This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is provided purely for informational purposes only with regard to our secured lien on the above referenced property. It is not intended as an attempt to collect a debt from you personally.*

OCWEN

Ocwen Loan Servicing, LLC
www.ocwen.com
*Helping Homeowners is What We Do!®*

1661 Worthington Road, Suite 100
West Palm Beach, FL 33409
Toll Free: 800.746.2936

# AFFIDAVIT OF "ARM'S LENGTH TRANSACTION"

Loan Number [redacted]2

**Property Address:**
12706 177th St
Jamaica, NY 11434-3307

All Parties to the contract to purchase aforementioned property dated: 02/25/2019

This affidavit is to be executed before or at the time of closing of the sale of the Mortgaged Premises by all Borrower(s), purchaser(s), real estate brokers representing any of the parties, the escrow/closing agent performing the closing of the sale, and the transaction facilitator facilitating the sale (if any) certifying under penalty of perjury that to the best of each signatory's knowledge and belief:

(a) The sale of the Mortgaged Premises is an "arm's length" transaction, between parties who are unrelated and unaffiliated by family, marriage, or commercial enterprise;

(b) There are no agreements, understandings or contracts between the parties that the Borrower will remain in the Mortgaged Premises as a tenant or later obtain title or ownership of the Mortgaged Premises, except to the extent that the Borrower is permitted to remain as a tenant on the Mortgaged Premises for a short term, as is common and customary in the market but no longer than ninety (90) days, in order to facilitate relocation;

(c) Neither the Borrower(s) nor the purchaser(s) will receive any funds or commissions from the sale of the Mortgaged Premises. The Borrower may receive a payment if it is offered by the Servicer, approved by the Investor and reflected in the SETTLEMENT/CLOSING DISCLOSURE STATEMENT;

(d) There are no agreements, understandings or contracts relating to the current sale or subsequent sale of the Mortgaged Premises that have not been disclosed to the Servicer;

(e) All amounts to be paid to any party, including holders of other liens on the Mortgaged Premises, in connection with the short payoff transaction have been disclosed to and approved by the Servicer and will be reflected in the SETTLEMENT/CLOSING DISCLOSURE STATEMENT;

(f) Each signatory understands, agrees and intends that the Servicer and the Investor are relying upon the statements made in the affidavit as consideration for the reduction of the payoff amount of the Mortgage and agreement to the sale of the Mortgaged Premises;

(g) A signatory who makes a negligent or intentional misrepresentation agrees to indemnify the Servicer and the Investor for any and all loss resulting from the misrepresentation including, but not limited to, repayment of the amount of the reduced payoff of the Mortgage;

(h) The certification will survive the closing of the transaction; and

(i) Each signatory understands that a misrepresentation may subject the party making the misrepresentation to civil and/or criminal liability.



*This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is provided purely for informational purposes only with regard to our secured lien on the above referenced property. It is not intended as an attempt to collect a debt from you personally.*

Ocwen Loan Servicing, LLC
www.ocwen.com
*Helping Homeowners is What We Do!®*

1661 Worthington Road, Suite 100
West Palm Beach, FL 33409
Toll Free: 800.746.2936

## AFFIDAVIT OF "ARM'S LENGTH TRANSACTION" (PAGE 2)

Loan Number: [redacted]02

**Property Address:**
12706 177th St
Jamaica, NY 11434-3307

One cannot list the property with or sell the property to anyone to whom they are related or with whom they have a close personal or business relationship. In legal language, it must be an "arm's length transaction." If one has a real estate license, they cannot earn a commission by listing the owned property. There may not be any agreements to receive a portion of the commission or the sale price after closing. The purchaser of a property subject to a short sale must agree not to resell the property within 30 calendar days of closing and is further prohibited from any resale of the property for 31 to 90 calendar days after closing for a gross sales price greater than 120 percent of the gross sales price of the short sale transaction. Any knowing violation of the arm's length transaction prohibition may be a violation of federal law.

SIGN HERE

Evis Stephens 3-27-19
Seller & Co-Seller(s) Signature & Date (MM/DD/YY)

Buyer & Co-Buyer(s) Signature & Date (MM/DD/YY)

Evis Stephens
Seller's Printed Name

12706 Holdings INC
Buyer's Printed Name

SIGN HERE

Moore Bonaparte 3/27/19
Seller's Agent Signature & Date (MM/DD/YY)

Moore Bonaparte 3/27/19
Buyer's Agent Signature & Date (MM/DD/YY)

Moore Bonaparte
Seller's Agent Name

Moore Bonaparte
Buyer's Agent Name



*This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is provided purely for informational purposes only with regard to our secured lien on the above referenced property. It is not intended as an attempt to collect a debt from you personally.*

Ocwen Loan Servicing, LLC
www.ocwen.com
*Helping Homeowners is What We Do!*℠

1661 Worthington Road, Suite 100
West Palm Beach, FL 33409
Toll Free: 800.746.2936

Andkye Blissett
Escrow / Closing Agent Name

United American Title
Escrow /Closing Agent Company Name

SIGN HERE

3/27/19
Escrow Closing Agent Signature & Date (MM/DD/YY)

SIGN HERE

Transaction Facilitator Signature (If Applicable) & Date (MM/DD/YY)



*This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is provided purely for informational purposes only with regard to our secured lien on the above referenced property. It is not intended as an attempt to collect a debt from you personally.*

A Blissett Anokye Blissiett

Escrow / Closing Agent Name

~~[illegible]~~ United American Title

Escrow /Closing Agent Company Name

3/27/19

SIGN HERE

3/27/19

Escrow Closing Agent Signature & Date (MM/DD/YY)

SIGN HERE

Transaction Facilitator Signature (If Applicable) & Date (MM/DD/YY)



*This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is provided purely for informational purposes only with regard to our secured lien on the above referenced property. It is not intended as an attempt to collect a debt from you personally.*

OCWEN

Ocwen Loan Servicing, LLC
www.ocwen.com
*Helping Homeowners is What We Do!®*

1661 Worthington Road, Suite 100
West Palm Beach, FL 33409
Toll Free: 800.746.2936

03/08/2019

## APPLICATION OF SUSPENSE FUNDS AFFIDAVIT

Loan Number: [redacted]2

**Property Address:**
12706 177th St
Jamaica, NY 11434-3307

AVAILABLE SUSPENSE FUNDS: $41.37

**This affidavit is to confirm the following:**

1) The property shown above is owned by me;

2) I have received a payoff quote, which is valid until the Expiration Date (as that term is defined in the Discounted Payoff Agreement and Release of Claims). I understand this affidavit must be executed and returned to Ocwen on or before the Expiration Date;

3) I am choosing to authorize Ocwen Loan Servicing, LLC to apply the Available Suspense Funds in the amount of $41.37 as part of a payoff for the loan number(s) referenced above.

4) I understand that striking any portion of this document will render the entire document void.

SIGN HERE

______________________ 3-27-19
Evis Stephens Signature — Date (MM|DD|YY)

NMLS # 1852 — DISC_PLS_VAM

*This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is provided purely for informational purposes only with regard to our secured lien on the above referenced property. It is not intended as an attempt to collect a debt from you personally.*

Ocwen Loan Servicing, LLC
www.ocwen.com
*Helping Homeowners is What We Do!®*

1661 Worthington Road, Suite 100
West Palm Beach, FL 33409
Toll Free: 800.746.2936

ACKNOWLEDGEMENT

The State of NY County/Parish: Queens

Before me, the undersigned authority, in and for said county on this day personally appeared.
Known to me to be the person(s), name subscribed to the forgoing instrument, and knowledge to me that he/she executed the same for the purpose and consideration therein expressed.

Given under my hand and seal of office, this 28 day of Mar 2019

Notary Public, County/Parish

ANOKYE S. BLISSETT
NOTARY PUBLIC-STATE OF NEW YORK
No. 01BL6168374
Qualified in Queens County
My Commission Expires June 11, 2019

My Commission Expires

ANOKYE S. BLISSETT
NOTARY PUBLIC-STATE OF NEW YORK
County
My Commission Expires June 11, 2019

NMLS # 1852

DISC_PLS_VAM

*This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is provided purely for informational purposes only with regard to our secured lien on the above referenced property. It is not intended as an attempt to collect a debt from you personally.*